E6GAASERC                        Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        13 CR 58 (KBF)

5   ANTHONY SERRANO,

6                  Defendant.

7   ------------------------------x

8                                        New York, N.Y.
                                         June 16, 2014
9                                        9:00 a.m.

10
    Before:
11
                    HON. KATHERINE B. FORREST,
12
                                         District Judge
13

14                      APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    RACHEL MAIMIN
17  RAHUL MUKHI
         Assistant United States Attorneys
18
    CESAR DE CASTRO
19       Attorney for Defendant Serrano

20  VALERIE GOTLIB
         Attorney for Defendant Serrano
21
    ALSO PRESENT:  Danielle Craig, Paralegal
22  Todd Riley, Special Agent, DEA

23

24

25

E6GAASERC                    Conference

1          THE COURT:  Good morning, everyone.  Please, be

2    seated.

3          (Case called)

4          MR. MUKHI:  Rahul Mukhi and Rachel Maimin, for the

5    United States.  And with us are Special Agent Todd Riley of the

6    DEA and our paralegal specialist Danielle Craig.  And during

7    the trial Special Agent Natalie Bara of the FBI will also be

8    sitting at the table.  She's in the audience right now.

9          THE COURT:  All right.  Good morning, all.

10          MR. DE CASTRO:  For Mr. Serrano, Cesar de Castro and

11    Valerie Gotlib.  Mr. Serrano is seated to our left.

12          THE COURT:  Good morning and good morning,

13    Mr. Serrano.

14          All right.  We've got several matters to go through

15    this morning before we get our jury.  We are one of two

16    criminal trials picking juries today.  There's another criminal

17    trial tomorrow starting so we ought to get our jury, we hope,

18    sooner rather than later.  But as you folks know, they watch a

19    video and do their intake process, do some paperwork and so I

20    would be very surprised if we got one before ten in any event,

21    but we'll see.  We'll get reports at different times and it's

22    possible we'll get one sooner than that.

23          As an initial matter I want to make sure that you all

24    understand the jury selection process and to answer any

25    questions that you may have I described it during the final

1    pretrial conference and just want to give you folks another

2    opportunity if there were any questions raised by that to

3    address those questions now.

4              MR. MUKHI:  We don't have any questions, your Honor.

5              MR. DE CASTRO:  None from the defense.

6              THE COURT:  All right.  Thank you.  Now, I have been

7    through the remaining motion in limine which was brought

8    forward by way of letter motion dated June 11 and it was

9    responded to.  It was brought forth by the government on

10   June 11 and responded to on June 13.  And I've reached some

11   preliminary conclusions about this but I want to be sure I

12   understand and that my reading of the letter is clear in terms

13   of how the testimony is likely to come in.

14             Let me just describe for you the two potential

15   viewpoints.  There is the background of the July 4 burglary

16   which is set forth in the government's letter on page two

17   largely.  Then there's separately the discussion portion of the

18   government's letter which enumerates in sub-bullets one through

19   three what I understand to be the nature of the testimony.

20   Therefore, it appears that, for instance, one and two if I am

21   correct about the government's proffer as to how things are

22   going to proceed don't even involve statements though they

23   implicate statements, if you will.

24             MS. MAIMIN:  That's correct, your Honor.  We were

25   careful to carve out the actual statements themselves.

E6GAASERC                    Conference

1          THE COURT:  All right.  So, three then which is the

2    statement where the CW contacts Serrano, he is going to say he

3    is going to recite the Serrano statement?

4          MS. MAIMIN:  He is, your Honor.

5          THE COURT:  All right.  So that one would be the sole

6    statement.  Now, in light of that, it is my view that one and

7    two -- and then we'll deal with three -- one and two aren't

8    even out-of-court statements offered for the truth.  They're

9    not in fact statements at all.  In any event, the background

10   information which may implicate statements if you want to take

11   it that far is not offered for the truth.  It's to, for

12   instance, demonstrate the effect on the CW, the listener and to

13   explain the circumstances under which certain subsequent

14   actions were taken and that fits well within the certified

15   environmental case which was decided on May 28 by the Second

16   Circuit in an opinion written by Judge Rakoff.  So, I don't

17   even find that one and two are hearsay even potentially.

18         As to three, I also do not find that it's hearsay.

19   While it is a statement and therefore differs from the prior

20   two categories, it is not a statement which is offered for the

21   truth.  In other words, the statement just to be absolutely

22   clear that we're talking about is the following:

23         "I don't care he's looking for me.  I will look for

24   him.  I don't give a fuck."

25         That is the statement, right?

E6GAASERC                    Conference

1      MR. MUKHI:  Yes, your Honor.

2      MS. MAIMIN:  Yes, your Honor.

3      MR. MUKHI:  Sorry to interrupt.  Your Honor recited

4   the fact that we submitted our motion on June 11.  We also put

5   in a reply this Saturday.  I don't know if your Honor received

6   it as of yet.

7      THE COURT:  No.

8      MR. MUKHI:  The only point I wanted to raise is we

9   have it narrowed a little bit even further what we're going to

10   elicit on the second bullet point.

11      And third we pointed out is also not hearsay because

12   it is an admission of the defendant under 701 and --

13      THE COURT:  Not under 701.

14      MR. MUKHI:  Sorry.

15      THE COURT:  701 is lay opinion testimony.

16      MR. MUKHI:  It is an admission.  I don't have the rule

17   on the tip of my tongue.  801, perhaps, as an exception to

18   hearsay because the defendant said it and it doesn't have to be

19   an inculpatory opinion.  We cited a case to that effect.  As

20   long as the defendant said it, it's an admission and so it's

21   admissible as non hearsay under an exception to hearsay on

22   that.

23      THE COURT:  All right.  I will look at that.  I'll

24   have my deputy print that reply out and I apologize for not

25   having it.  For some reason it didn't show up on the ECF report

1    that came out over the weekend but that could be because of the

2    timing.  It may have come out this morning's ECF report which I

3    haven't look at yet.

4          But, the third statement which I've recited now is not

5    offered for the truth because it doesn't matter if he in fact

6    cares or doesn't care to take the first portion of the

7    statement.  So the "I don't care" that's not a statement that

8    is offered for the truth.  The statement "he's looking for me"

9    is a question that's not offered for the truth and "I will look

10   for him" is just a statement really not, certainly, not offered

11   for truth.  It doesn't matter if he is going to look for him.

12   There's no issue in this case as to whether or not he will look

13   for him or is being looked for.  And "I don't give a fuck" is

14   simply a statement of state of mind.  So, I don't believe that

15   any of those individual statements -- Thank you.  I have been

16   handed a reply -- any of those individual statements are

17   hearsay.

18         Now, to the extent that they implicate hearsay is that

19   by extension they must be a statement of participation, I don't

20   even -- if that's what you are suggesting, Mr. Mukhi, at least

21   as a back-up argument.  I don't see the "I don't care if he's

22   looking for me, I will look for him.  I don't give you a fuck",

23   I don't see that as indicating that Mr. Serrano even concedes

24   that he was involved.  It's more of a statement at least on its

25   face as this fellow's looking for me?  Fine, let him look for

1    me, for whatever reason.

2                MR. MUKHI:  No dispute with that, your Honor.  Our

3    only point was that in order to be admitted as an admission and

4    we cited this in the last paragraph of our letter, it doesn't

5    need to be an admission in the colloquial sense that he's

6    implicating himself in the crime.  An admission is admissible

7    under the, of a opposing party under the rules of evidence just

8    by virtue of the fact that the defendant said it.  It doesn't

9    matter --

10               THE COURT:  Oh, I see what you are saying.

11               MR. MUKHI:  He said it.  So, it doesn't matter

12   whether -- I am sure defense is going to argue it wasn't

13   inculpatory statement.  That's fine.  They can argue that but

14   it doesn't matter for admissibility purposes.

15               THE COURT:  I was going on the basis of admission.  I

16   think Mr. de Castro had referenced it in his letter.

17               MR. MUKHI:  Correct.  They can argue that but that

18   doesn't go to admissibility.

19               THE COURT:  All right.  In any event --

20               Mr. de Castro.

21               MR. DE CASTRO:  Just so I can make a record here,

22   judge, on this issue, number one, just to address the last

23   point first I guess, with respect to the admission, the

24   government's admission in their reply is, yes, and that they've

25   made it today is that basically any statement by a defendant is

E6GAASERC                    Conference

 1  an admission.  I don't think that's the case.  They cited

 2  Seventh Circuit case for that.  From my perspective in which we

 3  are going to look outside the circuit, fine.  There's an

 4  Eastern District case that says admission is a voluntary

 5  acknowledgment made by the party of the existence of the truth

 6  of certain facts which are inconsistent with his or her claims

 7  in an action.  That's the point of an admission here.

 8          And in the case they cite the actual statement they

 9  were talking about was a, I guess it was a plaintiff's or the

10  plaintiff I think died in this case.  She said I guess after a

11  car accident that they didn't have anything do with it.  It

12  wasn't their fault, an admission, something that is at issue.

13          Here, two things I want to make a record of, number

14  one is I don't think these are relevant at all.  The only

15  reason the government is putting it in is to show that he was,

16  Mr. Serrano was responsible for this burglary.  That is the

17  only reason to put that statement in because they want the two

18  prior references which is references to both Mr. Whites and

19  Mr. Moral's beliefs.  Number one, Mr. Moral is going to testify

20  about what Whites tells him his belief is who is responsible

21  for an actual count here that we're talking about

22          THE COURT:  As I understood it that is not the way

23  it's going to come in.

24          Ms. Maimin, as I understood the proffer from the

25  government that is the background to the statement.  But on

E6GAASERC                    Conference

1   page three of the government's letter of June 11 it appears to

2   indicate with the sub-bullets that it would come in -- I'm

3   sorry.  Page two -- hold on.  I am looking at June 14.  It is

4   page three of the sub-bullets that it's after the conversation

5   with Whites and it's not going to reference the texts messages

6   or the actual conversation in terms of content, just that a

7   conversation had occurred.

8           Ms. Maimin, am I misunderstanding?

9           MS. MAIMIN:  No, that's exactly right.  We are not

10  going to elicit any statements of Whites.  We are simply going

11  to elicit that after a conversation with Whites Mr. Moral

12  understood that Whites believed that the defendant was

13  responsible for the burglary.

14          THE COURT:  So, hold on.  Let's just parse that out.

15  Is Mr. Moral, the cooperating witness, going to testify, I

16  believed that Whites believed that, he is going to say that?

17          MS. MAIMIN:  Yes.

18          MR. DE CASTRO:  That's where, judge, I think that's

19  the ultimate issue in this case.  He can't testify to that.

20  Not to mention his belief is formed by what Whites is telling

21  him where Whites was looking at something else.  It's double

22  the triple.

23          THE COURT:  All right.  Now, the way it's appropriate

24  to have it come in I think is the version that I had suggested

25  which is that I had a conversation with Whites.  Whites had

E6GAASERC                    Conference

1    been the victim of the robbery and after that conversation I

2    understood Whites was going to be pursuing Serrano.  I called

3    Serrano up and said, hey, this guy is going come looking for

4    you and Serrano said to me, hey, I don't care.

5         MS. MAIMIN:  Yes, your Honor, we can limit it to those

6    very narrowed tailored statements.

7         THE COURT:  That way it is not stating that he

8    believes that Whites believed Serrano that had, in fact, been

9    behind the burglary.  Now, it may be that in any event it's

10   state of mind and so if we go to the double hearsay analysis it

11   would not be hearsay in any event.  However, if we can avoid

12   that conundrum it would be better.

13        MS. MAIMIN:  We will, your Honor.  He'll just testify

14   that he had a conversation with Whites about the burglary and

15   then he called the defendant and told him that Whites was

16   looking for him.

17        THE COURT:  Now I do understand that that is

18   nonetheless inculpatory because it is the case that if you

19   discuss with the victim of the burglary the fact that he's gone

20   off and assaulted Locksmith I think it the name of the fellow

21   and then in addition to that determines that he's going to go

22   after Serrano, there is an implication that Serrano is

23   involved.  However -- and this is a separate point -- that is

24   not a hearsay issue.  That's a Rule 403 issue.  And the Court

25   has performed the balancing test necessary under Rule 403 and

E6GAASERC                    Conference

1   it is my view that the probative value of the series of pieces

2   of evidence that we were talking about here is not

3   substantially outweighed by any prejudicial effect.  Certainly,

4   there is a prejudicial effect as with all relevant evidence

5   that goes toward proving an element of a cause of action or a

6   crime but here it does complete the story.  It really, as I

7   understand it, lays out why and how the CW and Serrano got

8   together to perform additional robberies in addition to the

9   so-called cargo theft.

10          MS. MAIMIN:  Yes, your Honor.  And we're also not even

11   going to elicit that the locksmith as beaten-up by Whites.  So,

12   that's another piece that we are not even introducing.

13          THE COURT:  All right.  So, let me also make sure that

14   I have one other thing which is under the 403 analysis I also

15   think that this statement is probative of the relationship of

16   trust.  I think I described it as describing the circumstances

17   under which they came together but it could further the

18   relationship of trust.  And while it's got a prejudicial effect

19   it's not substantially -- that prejudicial effect is not, does

20   not substantially outweigh the probative value.  So, that if

21   the information comes in that way in the way in which the

22   government has suggested then it will be allowed.

23          All right.  Now, what I may do is depending upon how

24   it comes in offer a curative instruction.  Now I may not.  It

25   depends on how it comes in.  I don't want to draw undue

E6GAASERC                    Conference

1    attention to it.  I don't want to suggest that it's

2    inculpatory.  It doesn't sound inculpatory.  We'll just wait an

3    hear.

4            Mr. de Castro, if when it comes in you believe -- and

5    I have not sua sponte suggested a curative instruction -- if

6    you believe that one is necessary that would be something to

7    take up at the sidebar at the next break.

8            MR. DE CASTRO:  OK.  I will.

9            THE COURT:  All right.  Thank you.  So, that is the

10   remaining motion in limine.  Now, let me just also say that in

11   reviewing the Certified Environmental Services case it does

12   raise a couple of things that have typically come up in the way

13   in which criminal trials are conducted these days which is the

14   use of the cooperation agreements.  And I have not read the

15   Certified Environmental case before the motion in limine was

16   presented to me.  Having read it now, I hope that you folks are

17   all familiar with it and that the government intends to proceed

18   accordingly.

19           So, in other words you, shouldn't reference Moral's

20   obligation to tell the truth in your opening because he won't

21   have attacked yet.  And unless Mr. de Castro raises Mr. Moral's

22   credibility in his opening you would be precluded from raising

23   the truth telling aspects of cooperation agreement unless and

24   until Mr. de Castro or Ms. Gotlib goes after Mr. Moral's

25   credibility which based upon the proffers is likely but it will

E6GAASERC                    Conference

1    be a redirect then as opposed to direct.  I just say that

2    because of the way in which I think this changes the manner of

3    proceeding.

4              MR. MUKHI:  Your Honor, we've read it closely and

5    we're not going to veer from anything that was held in that

6    case.  Obviously, we're not referencing the truth telling

7    provisions.  In the opening we'll listen carefully to Mr. de

8    Castro's opening to see what attacks, if any, he makes on

9    Moral's credibility at that point and we'll proceed

10   accordingly.

11             THE COURT:  Fine.  I just wanted to make sure we're

12   all on the same page.  It sounds like we are.  The other issues

13   are relatively unique to that case.

14             All right.  In terms of the witnesses, has there been

15   any luck in reaching any stipulations which you folks have

16   thought there were to be at least one as to the custodial

17   witnesses which are listed as numbers I think 16 through 22?

18             MR. MUKHI:  Yes, your Honor.  We actually have reached

19   a number of stipulations except for the phone custodians.  So,

20   there's one stipulation with respect to expert and expert areas

21   related to interstate effect of narcotics trafficking,

22   particularly, heroin and cocaine.  So that eliminates number

23   14, Special Agent Eric Baldus of the DEA.  We've reached a

24   stipulation with respect to the Department of Motor Vehicles

25   witness.  So that will eliminates 16.  Seventeen, 18, 19, 20

E6GAASERC                    Conference

1    are still going to be witnesses.  We have the name of the

2    Sprint witness and we've provided that to the defense.  There's

3    also no stipulation to audio recordings still.  So Frank Piazza

4    will be testifying with respect then the enhancement of audio,

5    primarily.  And we have reach stipulation with regards to the

6    video recordings and that eliminates the need as to Sergeant

7    Decandido who collected a video that we'll be introducing.

8             THE COURT:  All right.  So with my notes.

9             MR. DE CASTRO:  The one thing I wanted to bring up

10   with the government which I just forgot this morning was that I

11   think the only issue, the only person, the only custodian

12   person I think that and I don't know how it affects their

13   witnesses that we would not stipulate to would be the cell site

14   person.

15            THE COURT:  And the cell site is the Verizon person?

16            MR. DE CASTRO:  One moment.

17            (Pause)

18            MR. DE CASTRO:  Judge, if I could just confer with my

19   client, please?

20            THE COURT:  Yes.

21            (Pause)

22            MR. DE CASTRO:  We're going to have a stipulation on

23   that, judge.

24            THE COURT:  So, that will be for the three.

25            MR. DE CASTRO:  The phone custodian.

E6GAASERC                    Conference

1        THE COURT:  The four phone custodians.  So, the

2   remaining custodial witness will be 21 which is the audio

3   enhancement.

4        MR. DE CASTRO:  Correct.

5        THE COURT:  All right.  Thank you.  All right.  So let

6   me just make sure that we're all on the same page about that.

7   Based upon the government witness list and I am working off the

8   one from June 6, is titled June 6.  It came in as part of your

9   final pretrial order, that would be number 14 is off which is

10  Special Agent Eric Baldus; 16, which is the DMV; 17, Verizon;

11  18, Sprint; 19, T-Mobile; 20, AT&T and 22, Sergeant Michael

12  Decandido NYPD.  Those would be no longer necessary.  Do I have

13  the correct list?

14        MR. MUKHI:  Yes, your Honor.

15        THE COURT:  Mr. de Castro?

16        MR. DE CASTRO:  I think that's correct, judge.

17        THE COURT:  All right.  Thank you.

18        OK.  So with those eliminations does the government

19  have a revised view as to how long it expects its case in chief

20  to last?

21        MR. MUKHI:  Your Honor, one more that come off the

22  list is 13.  We got a stipulation as to direct at the testing.

23  And 13 was a drug chemist, Caitlin Farrel.

24        THE COURT:  Mr. de Castro, is that correct?

25        MR. DE CASTRO:  That's correct.

1          THE COURT:  All right.  Thank you.

2          Mr. Mukhi, with those eliminations are we still

3    talking about the same length of time or shorter?

4          MR. MUKHI:  I think we should be done with testimony

5    on Thursday.

6          THE COURT:  All right.  So, we'll then see.  At this

7    point in time, Mr. de Castro, do you have a view as to whether

8    or not your client is intending to testify?  And I am not

9    requiring that there be, that he commit one way or the other

10   until he sees how the government's case comes in but if he

11   knows for sure now that he is or is not, then it will be

12   helpful to know.

13         MR. DE CASTRO:  I will let the Court know as soon as I

14   know.  I don't know yet.

15         THE COURT:  All right.  Fine.  Then I will tell the

16   jury that the case is likely to take the entire week and

17   possibly Monday and Tuesday and that that's our best estimate.

18   It could go a little fast or a little slower but, basically,

19   that is the timeframe.

20         All right.  We'd spoken at the final pretrial about

21   any objections that there might be to evidence and I had not

22   received any objections in advance as to the government's list

23   of evidence.

24         Mr. de Castro, did you have an opportunity to review

25   that?

E6GAASERC                    Conference

1            MR. DE CASTRO:  Yes, judge.  We have no objection.

2            THE COURT:  All right.  Nonetheless, we'll still go

3    through the same process of laying foundations and if things

4    come in differently, Mr. de Castro, than you expect and you

5    have an objection you did not previously believe you had, of

6    course, you should raise it and you are not eliminating your

7    ability to do so but it does help me if I understand it to make

8    some preliminary rulings which is why I ask.

9            The jury charge you'll be getting probably tomorrow

10   morning and you'll get it in Word form as well as a hard copy

11   so you folks can go through.  We'll try to give you a black

12   line as well.

13           Anything else that we should go over right now?

14           MR. MUKHI:  Yes, your Honor.  There's one substantive

15   issue and then a few housekeeping issues.  I'll start with the

16   substantive.

17           One of our witness who's scheduled to testify today

18   Sergeant Kolakowski could you say sky of the Hudson County

19   prosecutor's office.  In sum and substance he is going to

20   testifying about two days where he conducted surveillance

21   during a controlled buy of heroin where heroin was bought

22   through an informant from an individual who had interactions

23   with the defendant on those days.  So that what he's going to

24   be testifying about.  We have disclosed that Sergeant

25   Kolakowski was a defendant in a lawsuit in a completely

E6GAASERC                    Conference

1    unrelated case in an unrelated investigation where there was a

2    wrongful arrest lawsuit against him and other officers.

3            Our understanding is in sum and substance the officers

4    misidentified the defendant through a series of, I believe what

5    they -- and Ms. Gotlib has some deposition testimony that

6    indicates this -- they had gone off of phone records and car

7    records, arrested the individual who is on those records and

8    then subsequently determined that someone else had stolen this

9    person's identity or was using the identity of another person

10   who was the actual person committing the crime. So, there was

11   a civil lawsuit generated out of that. And the ultimate

12   finding of the lawsuit was that there was probable cause to

13   make the arrest and the civil lawsuit didn't proceed.

14           So, the defense has raised with us that they intend to

15   cross-examine Sergeant Kolakowski about that case and that

16   lawsuit and our view is that it's not proper topic for

17   cross-examination. It's completely unrelated to this case.

18   The fact that there was a wrongful arrest in some other case is

19   not relevant.

20           THE COURT: Well, let me just ask you I want to make

21   sure I understand Kolakowski's proffer and what you expect his

22   testimony to be at this point in time. His testimony is not

23   going to relate, for instance, to identifying this defendant

24   through analysis of phone records; is that right?

25           MR. MUKHI: That's correct, through his observations.

E6GAASERC                    Conference

1    There may have been surveillance in that other case as well.

2    That's what Sergeant Kolakowski told us.  Originally, it was

3    that it was a misidentification made by another officer during

4    surveillance.  Ms. Gotlib has some deposition testimony that

5    seems to indicate that the identification was also based on

6    analysis of phone records and car records and records but there

7    may have been some surveillance.  At least that's what Sergeant

8    Kolakowski told us in that other investigation.

9           THE COURT:  All right.  So let me just sort of make

10   sure I understand the fact scenario.  So Kolakowski and another

11   officer are involved in an investigation.  Another officer

12   conducts surveillance of some sort.  And based upon that there

13   is the identification of a defendant.  A fellow is arrested.

14   There's subsequently a lawsuit relating to wrongful arrest on

15   probable cause grounds, is found to have been not a wrongful

16   arrest though is there a concession that there's

17   misidentification?

18          MR. MUKHI:  Yes, there is.  The case is dismissed

19   against the person who ultimately files the lawsuit.  So

20   there's a concession it was the wrong guy.

21          THE COURT:  All right.  And the expectation is that

22   that lawsuit would be used for cross-examination of

23   Mr. Kolakowski.

24          MR. MUKHI:  Correct.

25          THE COURT:  All right.  So what is the purpose is

E6GAASERC                    Conference

1   that -- first of all, is that right, Mr. de Castro, Ms. Gotlib?

2           And then secondly, if it is correct that there is an

3   expectation of using that, what impeachment purpose would it

4   serve as opposed to having Kolakowski, essentially, become an

5   expert in the fact that there can be misidentifications which

6   would not be a proper purpose?  The jury knows that some

7   identifications are right and some are wrong.  So, explain to

8   me what the purpose is.

9           MS. GOTLIB:  Sure.  The overall purpose is really

10  things aren't always as they seem.  But more importantly as to

11  the impeachment and the credibility of Detective Kolakowsk was

12  that he --

13          THE COURT:  Stop for one second.  Address the "things

14  aren't always as they seem".  That would not be a proper

15  purpose for cross-examination because that would just be a

16  trying to use a particular event to suggest that there have

17  been instances when things were not as they seemed in another

18  unrelated case.  That's not probative as to whether or not in

19  this particular case things are not as they seem.  I understand

20  the point.  I understand the defense but that would not be a

21  proper purpose.

22          So, let's go to the second which is the impeachment.

23          MS. GOTLIB:  We believe that that bears on his

24  credibility.  It shows in this actually particular case that

25  arrest was made in November of 2009 and it wasn't dismissed

1    until January of 2011.  Had the officer listened to the phone

2    calls that they've based the, that they had a wiretap on he

3    would have heard that the individual who they did arrest had a

4    meeting for probation.  The individual who they ultimately

5    arrested was not on probation.  Once defense counsel uncovered

6    this and brought it to them they then dismissed it.  Had he

7    done his due diligence and carefully listened and gone through

8    all of the evidence, he probably would have discovered that and

9    might not have brought charges.  And we think that that's

10   relevant of his since it wasn't his surveillance, since he

11   didn't do surveillance in this case.  We think that's relevant

12   as to his credibility.

13           THE COURT:  Credibility would go to his propensity to

14   be truthful or untruthful and so that would be evidence which

15   you could elicit if the officer at his deposition or in some

16   other manner suggested he hadn't done his due diligence for

17   instance the he had listened to the phone calls when he had not

18   and therefore then crossing him on the "and you didn't, did

19   you" and you then testified that in fact you hadn't when you

20   previously said you had, that would be a lie or an untruth and

21   that would be a proper way of impeaching and going towards

22   credibility.

23           If the point is shoddy work, that he has a propensity

24   for shoddy work in some manner that is not directly relevant to

25   the facts in this case.  In an unrelated case, so tell me in

E6GAASERC                    Conference

1    terms of testimony, do you have him conceding I told you I'd

2    done it or anything close to that.  I am not suggesting how it

3    has to come in where he's caught in an untruth or a lie or a

4    obfuscation of the truth in some manner that could lead to the

5    jury questioning his voracity.

6           MS. GOTLIB:  No.  I just recently was able to locate

7    the transcript and I've viewed it briefly.  If I could ask the

8    Court for --

9           THE COURT:  Yes.

10          (Pause)

11          MS. GOTLIB:  Well, an arrest was made based on his

12   assertions that this was the individual and that at the end of

13   the day was not correct.

14          THE COURT:  And at the time of the arrest had there

15   been any suggestion that that tape excessed and that he should

16   have listened to the tape at the time of the arrest.

17          MS. GOTLIB:  Yes.  He was aware that that's how they

18   found the individual because there were wire tapes and there

19   was somebody listening to the tapes and monitoring them.

20          THE COURT:  What I am trying to do is trying to catch

21   him in a lie.  I am trying to catch a moment of where you could

22   impugn his voracity or his credibility.  Is there anything that

23   suggests that he said or indicated that he had done something

24   that he hadn't done, not that as a matter of negligence it

25   would have been better practice one might argue.  I have no

1    idea that he should have listened to the tape but did anybody

2    suggest that he had or he hadn't?

3           And if you want to give me the testimony to review, I

4    can review it.  If that's where you are getting the information

5    or if there are a couple of pieces of paper that puts together

6    the story, I am happy to look at this.  Clearly, we've got to

7    select a jury and go through openings.  We've got a little bit

8    of time.

9           MS. GOTLIB:  Yes, if your Honor would be OK.  I have

10   the deposition testimony as well as the statement of undisputed

11   material facts from the summary judgment that ultimately did

12   prevail in the case.

13          THE COURT:  All right.  So let me take a look at

14   those.  Let me see whether or not they change my initial view.

15          Do you have a view or are you making an argument that

16   it would be proper impeachment of a witness on

17   cross-examination to try to go after something other than

18   credibility, truthfulness I mean as opposed to, essentially,

19   calling him as your own witness?

20          MS. GOTLIB:  It would be in the scope of direct

21   because the direct is about what he did in this investigation

22   and his work.  And while this was in another one I do think

23   that it has some bearing on his overall investigation skills

24   and his diligence again in everything.

25          THE COURT:  I see what you are saying.  So, just so

1    it's clear, so when you say "in this investigation" you are

2    referring to the Serrano investigation that that investigation

3    refers to the one relating to this other third party?

4              MS. GOTLIB:  Yes.

5              THE COURT:  Let me take a look at the stuff, the

6    material that you have.

7              Mr. Mukhi.

8              MR. MUKHI:  I don't think this is right, defense

9    saying that the prior investigation is related to the Serrano

10   investigation.

11             THE COURT:  No, she's not saying that.  That is what I

12   was trying to clarify that.  As I understand it, these are

13   completely unrelated investigations that Mr. Kolakowski was

14   implicated in a wrongful arrest in a second investigation that

15   somehow implicated a tape which had it been listened to and

16   when it was listened to resulted in a determination that the

17   defendant there in that unrelated investigation was not the

18   correct defendant.  And the implication is that the

19   thoroughness of Mr. Kolakowski's work there may have some

20   bearing on the thoroughness of his work here.

21             MR. MUKHI:  I would just add and we haven't seen the

22   deposition transcript or the other papers but we accept the

23   defendant's proffers thus far about them, but this would really

24   just be a trial within a trial.  We would then establish on

25   redirect, OK, he didn't listen to that recording what else did

 1    he do in this investigation of -- I don't even know the

 2    defendant's name -- as far as other evidence that he had

 3    gathered that established probable cause as the civil court

 4    held.  And so then we would get into, well, he didn't listen to

 5    the recording but he did pull these records.  He did listen to

 6    these other recordings to this one recording that I guess the

 7    allegation was that the agents missed.  So under a 403 analysis

 8    we'd go very far afield.

 9              THE COURT:  Well, it depends on how long it would

10    take.  The risk of confusion increases as the duration of the

11    testimony increases.  The testimony for Ms. Gotlib if her cross

12    on this is going to be relatively limited and your cross would

13    be, say hers is ten minutes and say yours is ten minutes that

14    is different than spending half a day on this detour and

15    frolic.

16              MR. MUKHI:  We understand.  That's correct.  But I

17    guess the point is this is completely unrelated.  We are going

18    to be talking about some individual I don't even recall his

19    name because he's unrelated to this case and about the

20    investigatory steps that were taken into I don't even know what

21    type of case it was in 2009.

22              And the other point that Ms. Gotlib made about the

23    length it took to dismiss the case, the agents don't decide

24    when the case is dismissed.

25              THE COURT:  Let's put the length of how long it took

E6GAASERC                    Conference

1    to the side because I think the point as I understand

2    Ms. Gotlib's proffer that they would like to show is that this

3    fellow was being presented as having done a particular kind of

4    investigation and the jury is supposed to rely upon the quality

5    of that investigation and that he's had another situation in

6    his career whether it turned out that his investigation had not

7    been of high quality and that therefore this particular

8    individual, the jury should understand has had a -- I am just

9    making out the argument as best I can see it -- has had a very

10   success rate in terms of maintaining quality standards.

11            Do I have your argument, generally speaking?

12            MS. GOTLIB:  Yes, you do.  And I would limit the

13   cross.  It would be very short, as you said, about ten minutes.

14            MR. MUKHI:  OK.  But a ten-minute cross, one question

15   about you didn't listen to this one recording leaves an unfair

16   impression that the one recording was the key to the case that

17   he didn't listen to, so we would have to -- the other thing is

18   this agent --

19            THE COURT:  How long would that take, do you think?

20            MR. MUKHI:  I haven't seen the deposition testimony.

21            THE COURT:  Why don't you take a look at it and let's

22   talk about it during a break and see whether or not it can be

23   kept within a relatively narrow parameter.  I also have to look

24   at this and see what I think.

25            MR. DE CASTRO:  She didn't mean ten minutes on this

E6GAASERC                    Conference

1    topic alone.  She means ten minutes total for that witness.

2            THE COURT:  All right.

3            MR. MUKHI:  The other point is that Sergeant

4    Kolakowski was not the lead investigator in this case.  I

5    believe he was in the lawsuit.  Now, here's just going to be

6    testifying about conducting surveillance on two days and what

7    he saw on those two days.  And I don't believe there's going to

8    be any suggestion that he made a misidentification visually on

9    those days.  And so it's a --

10           THE COURT:  Is that right?  Is there going to be --

11           MR. MUKHI:  -- totally different situation.

12           THE COURT:  Let me make sure that's correct.  Is the

13   defendant going to argue that Mr. Kolakowski misidentified the

14   defendant on those two days or misidentified what he saw on

15   those two days?

16           MS. GOTLIB:  No, we are not arguing that.  But it's

17   our view that those have to be the exact same situation.

18           THE COURT:  All right.  Let me take a look at these

19   materials.  I think I understand the issue and we'll come back

20   to it.  It is not immediately clear to me that this should come

21   in but I am not also making a determination yet that it should

22   not.  I want to look at this and think about it for a little

23   bit.  Because there's no suggestion of misidentification or

24   that the surveillance here somehow did not indicate what had

25   been seen accurately.  It is further afield and I am concerned

1    that the jury would be confused and take from this an

2    implication that more generally misidentifications occur with

3    frequency again turning him into sort of by implication an

4    expert on or by implication a speaker on the extent to which

5    there are -- So let me think about it.

6            I have been handed the following materials in

7    connection with this point, a statement of undisputed material

8    facts and CIV116744 of District of New Jersey along with the

9    plaintiff's response to that.  One is a document 40-2.  The

10   other is 45-1 and then Exhibit A which is 40-4 to this same

11   proceeding and I will review that.

12           MS. GOTLIB:  I would just like to put on the record

13   that I just obtained them through the District of New Jersey

14   ECF, the docket for that case publicly available.

15           THE COURT:  Thank you.  So we'll come back to that.

16   What else was there?  We are going to get the jury by the way

17   at 10:30.

18           MR. MUKHI:  Just for the Court's information Sergeant

19   Kolakowski is our second witness who is going to testify today.

20           THE COURT:  All right.  Well, I don't anticipate

21   having to contemplate this issue for a terribly long period of

22   time.  I think I'll have an answer after I've looked at these

23   materials.

24           MR. MUKHI:  And depending on timing we may try to put

25   in a brief letter because there are cases that address when

E6GAASERC                    Conference

1    unrelated lawsuits should come in and shouldn't come in and so

2    if we have time we may put something in.

3                 (Continued on next page)

1          THE COURT:  Well, let's put it this way, rather than

2     having a letter, I would like a cite or two.  If you think

3     there are cases directly on point which demonstrate this should

4     not come in and just give me a cite or two, we can print it out

5     right here, and that would be quite helpful to my threading my

6     way through it.  All right?

7          MR. MUKHI:  We can do that between now and 10:30.  And

8     then just a couple of housekeeping matters.  None of these are

9     substantive, and I think all of them were conferred to defense

10    already, and there is no dispute.

11         One, as I mentioned at the beginning, we are going to

12    have two agents who are going to be sitting at the table

13    throughout the trial.  They are both case agents.  One is

14    Special Agent Todd Riley from the DEA, he is the DEA case

15    agent, he will also be testifying.  And then Special Agent

16    Natalie Bara who is from the F.B.I. Newark, who will also be

17    testifying, and she is also a case agent, and we told the

18    defense that both of them will be here throughout the trial,

19    and there was no objection to that.

20         Then with respect to the introduction of physical

21    evidence, we talked to the defense about doing it the same way

22    that we did in the Borrero trial, which is introducing it all

23    at once, and there was no objection to that.

24         Same with the name plates for the face plate and name

25    plate board, there is no dispute as to various people's names,

E6F7SER2                        Voir dire

```
 1   and aliases, so for the most part, maybe some exceptions, we
 2   are just going to put them up on the board without showing them
 3   to the witness, and we will introduce them all at once.
 4            THE COURT:  Let me say in terms of aliases, you remind
 5   me that in the voir dire one alias I'm not intending to ask
 6   separately about is Jay, because a lot of people could know the
 7   name Jay.  It's Javion Camacho.  I will mention his name, and I
 8   will also mention known as King Kong but not just randomly Jay.
 9   Is there an objection?
10            MR. MUKHI:  That's fine with us.
11            THE COURT:  And Mr.Serrano's alias is uncontested,
12   Challini?
13            MR. DECASTRO:  Correct.
14            THE COURT:  Am I pronouncing it correctly?
15            MR. DECASTRO:  Yes.
16            MR. MUKHI:  And this might be mooted, but we were
17   planning to introduce some phone records and charts through our
18   first witness, Detective Kealy, subject to connection, since
19   they are based on Verizon records, and we were expecting to
20   have the custodian testify tomorrow.  But if we can work out a
21   stipulation before he testifies, then they will just be
22   offered, not subject to --
23            THE COURT:  All right.  Thank you.  Anything from
24   defense counsel?
25            MR. DECASTRO:  No, your Honor.
```

E6F7SER2                        Voir dire

1              THE COURT:  All right.  Are openings still in the

2      vicinity of 15 to 20 minutes approximately?

3              MS. MAIMIN:  Yes, your Honor.

4              MR. DECASTRO:  Yes.

5              THE COURT:  All right.  So let's do this.  Let's take

6      a break.  We will then come back when we get the jury, go

7      directly into jury selection, and proceed in that way.  Are

8      there demonstratives people are using in the openings and, if

9      so, have you shared them with each other?

10             MS. MAIMIN:  We're not.

11             MR. DE CASTRO:  No.

12             THE COURT:  Great.  Let's take a break until the jury

13     gets here.

14             (Recess)

15             (Jury panel present)

16             THE COURT:  All right, ladies and gentlemen.  We're

17     here to pick a jury for a criminal trial.  We are going to pick

18     a jury of 12 jurors and two alternates, and I am Judge Forrest

19     and I am going to preside over this case and preside over the

20     jury selection process.  So, let me tell you a little bit about

21     how the jury selection process works in my courtroom.

22             What I do is we have 12 of you called randomly, and

23     you are seated in the box in the positions of jurors 1 through

24     12.  At that point you are a prospective juror.  Right now you

25     are all prospective jurors.  Two alternates will also be seated

1   in the box.  Then I ask a series of questions.

2         The folks who are sitting in the box, if they have a

3   yes answer, or otherwise need to address the question, will

4   raise their hand.  But all of you should listen, and all of you

5   should keep in mind whether or not you also have a yes answer

6   to any of the questions, because it could well be the case that

7   you find yourself sitting in the box, and then what I do is I

8   say you prospective juror 2, you heard me ask a series of

9   questions, were there any that you would have had a yes answer

10  to?  And you might say yes, as a matter of fact, my husband is

11  a police officer, or, yes, as a matter of fact, I have served

12  on a jury before.  That doesn't mean you are off the jury; it

13  means we will proceed to ask you some additional questions.

14  All right?  But that's why it's important that everybody listen

15  to what I'm saying.

16        If at any point in time you can't understand me, you

17  can't hear me, or I'm speaking too quickly, you raise your

18  hand, we will make sure that I speak in a way that everybody

19  can hear and understand.

20        Now, when you are sitting in the box, and if you

21  answer a question, it's important that you not convey

22  information to the rest of the jury that might cause them to

23  think thoughts in a particular way that might change the way

24  they view the case or influence them in some way.  So, if your

25  answer to a question is yes or no, keep it at yes or no.  We

 1    will take it step by step.  But if you've got a long

 2    explanation for something, we will probably take you over here

 3    at side bar.  That's what we call it when we move over to side

 4    bar, so that things aren't said in a way that's public, that

 5    everybody can hear that might unduly influence the rest of the

 6    panel.

 7             Now, you should understand that these questions are

 8    not meant to embarrass you in any way.  We ask questions

 9    because we are trying to get a fair and impartial jury, and we

10    have to ask a series of questions.  But, please, don't think

11    that these questions are directed at you in any personal way in

12    terms of trying to embarrass you in any way.

13             Now, my questions in this case, and any prospective

14    juror's answers to those questions are not evidence, they are

15    just questions designed to ensure that we get a fair and

16    impartial jury in this case.

17             Now your oath that you took downstairs -- the oath

18    that you took -- did you not take an oath downstairs and up

19    here?  Two?  One oath, just up here.  Got it.

20             Your oath which you have taken obligates you to give

21    truthful answers to the questions that I ask.  Now, our system

22    of law depends upon citizens performing their jury service.  I

23    have absolutely no doubt that everybody in this room would be

24    doing something else if you weren't called to come serve on a

25    jury.  There is very little to no likelihood that you would

randomly show up in my courtroom and be sitting here.  So I
want to, number one, thank you; two, acknowledge that you have
a life and that you are taking time out of your life to be here
to perform your jury service, and to say that is something that
we as citizens need to do.

        Judges are not immune from it.  We go over to state
court and sit on juries if they pick us.  It will be
fascinating to sit on a jury.  Everybody has to do it.  The old
exemptions are gone.  All right?  So doctors sit, lawyers sit,
judges sit, famous people sit, important people sit,
unimportant people, everybody sits.  This is what we do as
citizens.

        Now, as I said earlier, this is a criminal case, which
means that the defendant is punishable under the laws of the
United States if the jury finds him guilty beyond a reasonable
doubt of the crimes with which he has been charged.  Now, in a
criminal case every defendant is presumed innocent unless and
until the government is able to prove guilt beyond a reasonable
doubt.  That presumption of innocence stays with a defendant
throughout the trial, and he starts then with a clean slate.
It's very important that everybody understand that.

        Now, as the jury, the jury decides the issues of fact
in a criminal case.  I as the judge, I have certain other jobs,
but I don't decide guilt or innocence.  That's for the jury.
What I decide are issues of evidence, is certain evidence going

1    to be admitted.  I keep an orderly courtroom, and I instruct

2    the jury on the law.  But the jury is the finder of the facts

3    in a criminal case.

4         Now, the charges against a defendant in a criminal

5    case are contained in a document that's called an indictment.

6    All right?  An indictment is not evidence; it is evidence of

7    nothing.  It is simply a statement about the charges brought

8    against the defendant.  You cannot draw any inference that the

9    defendant is guilty from the fact that he has been indicted and

10   is here before you on trial.

11        We're on trial now because the defendant has pled not

12   guilty to the charges against him in the indictment and,

13   therefore, the indictment is simply a series of accusations,

14   and it is up to the government to prove the defendant is guilty

15   beyond a reasonable doubt before he can be found guilty of

16   those accusations.  And the only evidence that the jury can

17   consider in that regard is evidence from witnesses who testify

18   here in the courtroom, documents and other evidence offered by

19   the government and accepted by the court.

20        Now I am going to describe to you a little bit about

21   the case, and then we are going to call our first set of 12

22   plus two into the box.  All right?

23        Now, the defendant in this criminal case is a fellow

24   named Anthony Serrano.  He also is known as Chillini, and he

25   has been formally charged, as I said a moment ago, in an

E6F7SER2                         Voir dire

 1   indictment.  In that indictment he has been charged with two

 2   counts of conspiracy and one firearm count.  And I am going to

 3   describe those to you in a little bit high level detail.

 4          Count One charges the defendant with participating in

 5   a conspiracy to distribute or possess with intent to distribute

 6   a controlled substance, here heroin and cocaine.  That

 7   conspiracy is alleged to have existed from in or about 2012 up

 8   through and including July 31, 2013.

 9          Count Two charges the defendant with participating in

10   a conspiracy to commit a robbery of individuals believed to be

11   engaged in narcotics trafficking.  That conspiracy is alleged

12   to have occurred during the same time period as Count One.

13          Now, Count Three charges the defendant with using,

14   carrying or possessing a firearm or gun that was brandished, or

15   aiding and abetting another in doing that in further of either

16   the narcotics conspiracy in Count One or the robbery conspiracy

17   in Count Two.

18          So, that's what this case is about.  Now, the case is

19   going to last this week and maybe possibly Monday and Tuesday

20   of next week.  It's not a long case.  All right?  And as I

21   said, I know you folks would be someplace else if you weren't

22   here, so I thank you in advance for the fact that you are here

23   doing your jury service.

24          We are now going to call the first 12 randomly and put

25   you in the box.  And the two alternates will also be put in the

E6F7SER2                         Voir dire

 1    box.

 2              Now, Joe is going to get the cards out.  After I am

 3    done asking a series of preliminary questions, and we have the

 4    12 and the two, and we will replace people as we go, after that

 5    people will be asked to stand up and just give a short

 6    statement about here are the TV shows I watch, here is the kind

 7    of job that I'm in, the people in my household have the

 8    following kinds of jobs.  It's just very short, 30 seconds, to

 9    give counsel an idea of who you are, a little bit of very basic

10    information about who you are.  But I will lead you through

11    this, and we will do it step by step.

12              All right, Joe.

13              This is also used for bingo on Sunday nights.

14              DEPUTY COURT CLERK:  Prospective Juror 1, Sarah J.

15    Shweisky, s-h-w-e-i-s-k-y.  Please take the first seat in the

16    first row closest to me.

17              Prospective Juror 2, Yolanda Rivera, R-i-v-e-r-a.

18    Ms. Rivera, please take the second seat in the first row

19    closest to me.

20              Prospective Juror 3, Thomas G. Bukkley, B-u-k-k-l-e-y.

21              Mr. Buckley, please take the third seat in the first

22    row.

23              Prospective Juror 4, Sarah W. Soong, S-o-o-n-g.  Am I

24    pronouncing that correctly?  Please take the fourth seat in the

25    first row.

E6F7SER2                          Voir dire

1            Prospective Juror 5, Isabel A. Tirado, T-i-r-a-d-o.

2    Ms. Tirado, please take the fifth seat in the first row.

3            Prospective Juror 6, Sarah L. Baumann, B-a-u-m-a-n-n.

4    Ms. Baumann, please take the sixth seat in the first row.

5            Prospective Juror 7, Miriam Green, G-r-e-e-n.

6    Ms. Green, please take the last seat in the first row.

7            Prospective Juror 8, Peter E. Nowicki, N-o-w-i-c-k-i.

8    Mr. Nowicki, please take the first seat in the second row

9    closest to me.

10           Prospective Juror 9, Kachung Lai, K-a-c-h-u-n-g L-a-i.

11   Mr. Lai, please take the second seat in the first row.

12           Prospective Juror 10, Anthony R. Inoa, I-n-o-a.

13   Mr. Inoa, is that pronounced correctly?

14           JUROR:  Yes.

15           DEPUTY COURT CLERK:  Prospective Juror 11, Isabel

16   Figueroa, F-i-g-u-e-r-o-a.  Please take the fourth seat in the

17   second row.

18           Prospective Juror 12, Andy Camejo, C-a-m-e-j-o.

19   Mr. Camejo, please take the fifth seat in the second row.

20           Prospective Alternate Juror 1, Shaymali Chanda,

21   S-h-a-y-m-a-l-i C-h-a-n-d-a.  Ms. Chanda, please take the

22   second to last seat in the last row.

23           And Prospective Alternate Juror 2, Diane C. McNulty,

24   M-c-N-u-l-t-y.  Ms. McNulty, would you please take the last

25   seat in the last row.

1          THE COURT:  Thank you.  All right.  I want to remind

2     everybody whose name was not initially called to listen to all

3     of the questions, because it is always the case that multiple

4     people who are sitting out in the audience now will find their

5     way into the box for one reason or another as we proceed, so

6     it's very important that you not think that the process is now

7     irrelevant to you.  It is relevant to everybody here.

8          All right.  Now, I'm going to ask some questions, and

9     the folks who are out in the audience you don't have to raise

10    your hands right now.  Just the folks in the box need to raise

11    their hand, both the 12 and the 2.  All right?

12         So everybody sitting in the box, if you've got a yes

13    answer, or otherwise need to address one of the questions that

14    I ask, then you will raise your hand and we will decide which

15    of these matters we take here and which of them we need to take

16    over here.

17         Now, you folks heard me describe just a little bit

18    about this case a few minutes ago.  Does any prospective juror

19    have any personal knowledge or knowledge from other sources of

20    the charges in the indictment against this defendant?

21         Does any prospective juror feel that he or she could

22    not view fairly and impartially a case involving such charges?

23         Does any juror, prospective jury, feel that the

24    actions involved in such charges should not be a crime?

25         Has any juror -- when I say juror, I am talking about

E6F7SER2                          Voir dire

prospective jurors obviously, and prospective alternate

jurors -- been involved in an offense involving heroin, cocaine

or any other controlled substance?

          Has any juror's relative or close friend been involved

in an offense involving heroin, cocaine or other controlled

substance?

          Does any prospective juror have any biases for or

against the U.S. government, the United States attorney's

office, or any federal or state law enforcement agency, or

people who work in law enforcement?

          Now, I mentioned a few moments ago this case is going

to last this week.  Friday we will actually have off unless you

are deliberating.  If the jury is in the process of

deliberating as of Thursday, we will have you come back on

Friday to continue.  But if you are not deliberating and

testimony is still going on, then we will take Friday off and

come back Monday.  But it's going to be a relatively short case

in that we expect around a week or possibly even less.  Now,

that's an estimate; it could go a couple days one way or the

other.  Does any prospective juror have any reason why you

could not serve on a jury of that duration?  Does it present

any particular and unusual hardship?

          Now, does any prospective juror have any problem with

hearing or vision, or any other problem that you can either

that would prevent you from giving your full attention to the

E6F7SER2                        Voir dire

1    evidence in this case?

2            Is there any prospective juror taking any medication

3    that would make it difficult for you to give your full

4    attention to the evidence in this trial?

5            Does any prospective juror have any difficulty

6    understanding or reading English such that you do not believe

7    you could listen to and understand the evidence in this trial?

8            Does any prospective juror have any religious,

9    philosophical or other beliefs that would make you unable to

10   render a guilty verdict in a criminal case?

11           Let me go back for a moment.  Does any prospective

12   juror have any difficulty understanding or reading the English

13   language?  All right.  Alternate number one, do you believe

14   you've got difficulty understanding or reading the English

15   language?

16           JUROR:  Yes.

17           THE COURT:  Which one?  Reading or speaking?

18           JUROR:  Speaking.

19           THE COURT:  And did you go to school in the United

20   States?

21           JUROR:  Yes.

22           THE COURT:  Did you go to school in the English

23   language?

24           JUROR:  Yes.

25           THE COURT:  What was the highest level of school that

1   you went to?

2           JUROR:  High school.

3           THE COURT:  Which high school?

4           JUROR:  Hampton High School.

5           THE COURT:  And how many years did you go to that high

6   school?  Was it four, or did you start someplace else and

7   finish there?

8           JUROR:  Three years.

9           THE COURT:  Three and a half years?

10          JUROR:  Yes.

11          THE COURT:  All right.  And can you read English?

12          JUROR:  A little bit, not too much.

13          THE COURT:  Did you take the Regents exam when you

14  graduated from high school?

15          JUROR:  Yes.

16          THE COURT:  And did you pass the Regents exam?

17          JUROR:  Yes.

18          THE COURT:  All right.  So we will hold off just for a

19  moment, and we will continue.

20          All right.  Has any prospective juror had any legal or

21  paralegal training?  Prospective Juror 7?  8?

22          JUROR:  I'm acting as an expert witness in some

23  litigation that's going on.

24          THE COURT:  What's your profession, sir?

25          JUROR:  I'm a banker by trade.

E6F7SER2                          Voir dire

1          THE COURT:  And is there anything -- is that a

2     criminal case or a civil case?

3          JUROR:  It's a civil case.

4          THE COURT:  Is there anything about your role as an

5     expert witness or potential expert that makes you believe you

6     could not be fair and impartial in this case?

7          JUROR:  No.

8          THE COURT:  All right, thank you.  Anybody else?

9          All right.  Now, in a moment I'm going to ask counsel

10     to introduce themselves and the other folks sitting at their

11     table, and I am going to be asking you folks whether or not you

12     know any of these individuals.  So, Mr. Mukhi, why don't you

13     introduce folks.

14          MR. MUKHI:  Yes.  Good morning.  My name is Rahul

15     Mukhi, assistant United States attorney in the Southern

16     District of New York, and with me is assistant United States

17     attorney Rachel Maimin; Special Agent Todd Riley with the Drug

18     Enforcement Administration or the DEA; a paralegal specialist

19     named Danielle Craig, who also works at the U.S. Attorney's

20     office; and finally Special Agent Natalie Bara, who works at

21     the Federal Bureau of Investigation or the F.B.I.

22          THE COURT:  All right.  Does any prospective juror

23     know any individuals sitting at the government's table?

24          Let's have Mr. De Castro introduce himself and his

25     table.

E6F7SER2                    Voir dire

1           MR. DE CASTRO:  My name is Cesar De Castro, and I

2    represent Anthony Serrano, and Valerie Gotlib, and we represent

3    Mr. Serrano.

4           THE COURT:  And that's Mr. Serrano there, ladies and

5    gentlemen.  Does anybody know either defense counsel or the

6    defendant Mr. Serrano?  All right.  Thank you.  You may be

7    seated.

8           Now, during the trial you are going to hear from and

9    about certain people, and I am going to ask you now if you know

10   any of them, so I'm going to list a bunch of names.  If you

11   know any people by the name that I say, raise your hand.  It

12   may be that there is somebody else who has the same name.  That

13   happens with some frequency, so we take it step by step.

14          All right.  Does anybody know anybody named Linda

15   Serrano?  Javion Camacho, also known as King Kong?  Julio

16   Camacho, also known as King Honesty?  Alex Cespedes?  Victor

17   Moral?  Louis Borrero?  Ali Husein?  Joshua Roman, also known

18   as Swag?  Benjamin Jimenez?  Domingo Vasquez?  Gary Sanchez?

19   Manuel Pimenteo?  Oliver Flores?  Oscar Noriega?  Rafael

20   Huerta?  Ramon Jiminez?  Victor Gomez?  Jauncey Valle or Valle?

21   Carlota Camacho?  Margaret Camacho?  Benny Lisojo?  Somebody

22   who is known as Nene, N-e-n-e?  Wilfredo Martinez?  Benny

23   Blanco?  Wilfredo Suarez, also known as Black?  Ricardo Pena,

24   also known as White or Whites?  Erickson Gilbert?  Yscarly

25   Infante?  Efrain Ortiz?  Crystal Lonneberg?  Joseph Sierra?

E6F7SER2                       Voir dire

Mario Rodriguez?  Nicholas Hall?  Michael Gamba?  Lou Faccone?
Philip Fanara?  Detective Justin Kealy of the Hudson County
prosecutor's office?  Special Agent Todd Riley of the DEA?
Investigator Reginald Donaldson of the United States attorney's
office, Southern District of New York?  Police officer
Christina Briones of the NYPD?  Special Agent Eric Perry of the
F.B.I?  Sergeant Anthony Musante of the Hudson County
prosecutor's office?  Sergeant John Kolakowski of the Hudson
County prosecutor's office?  Special agent Natalie Bara,
B-a-r-a, of the F.B.I?  Sergeant Michael Decandido of the NYPD?
Anybody know any of those folks?

 All right.  Now you are also going to hear -- let me
just ask you another question.  Does anybody know if their
family or close friends know any of those folks?

 During the trial you are also going to hear about
certain places, and I want to know now if you have particular
familiarity with these places, not just that you happen to pass
it when you are walking one day, but do you have particular
familiarity.  And if you do, we will take it one by one.

 The Post Road between Lakeview and 253rd Street in the
Bronx.  West 251st Street and Broadway in the Bronx.  The
McDonald's located at 427 Tenth Avenue, which is the corner of
34th and Tenth.  348 8th Street in Jersey City, New Jersey.
Northwest corner of St. Nicholas Avenue and West 171st Street
in Manhattan.  120 Audubon Avenue in Manhattan.  Webster Avenue

E6F7SER2                          Voir dire

1    in the Bronx.  Burnside Avenue in the Bronx.

2              Which one?  Burnside?

3              JUROR:  Burnside.

4              THE COURT:  Which part of Burnside?

5              JUROR:  By Morris.

6              THE COURT:  By Morris?

7              JUROR:  Yeah.

8              THE COURT:  And what does your familiarity stem from?

9              JUROR:  I live across -- I live around there.  I live.

10             THE COURT:  Right there?

11             JUROR:  Yeah.

12             THE COURT:  OK.  What number do you live at?  Well,

13   don't tell us.  Hold on.  Tell me, Mr. Mukhi, is that the area

14   that is going to be referenced?

15             MR. MUKHI:  One moment, your Honor.

16             THE COURT:  We are looking at Morris and Burnside.

17             MR. MUKHI:  Your Honor, the spot at issue at trial is

18   Anthony Avenue and Grand Concourse.  It looks like it's about

19   four blocks away.

20             THE COURT:  Are you familiar with that area as well?

21             JUROR:  Yeah.

22             THE COURT:  All right.  Now, based upon the fact that

23   you live in that area, do you think that you would have an

24   issue being fair and impartial evaluating events that may or

25   may not have occurred but that are alleged to have occurred in

E6F7SER2                          Voir dire

1    that area?

2                 JUROR:  No.

3                 THE COURT:  All right.  Amsterdam Avenue, between

4    163rd Street and 164th Street in Manhattan.  The Barge Inn in

5    Jersey City.

6                 All right.  Now, I am going to ask another series of

7    questions, and I want you to be thinking not only about

8    yourself for these questions but also about whether or not a

9    family member or very close friend or relative but close, not

10   your 12th cousin twice removed, would answer these questions in

11   a particular way as well.

12                Has any juror had any dealings with or been employed

13   by the F.B.I., DEA, Drug Enforcement Agency, the U.S.

14   attorney's office, or with any other federal, state or local

15   law enforcement agency?  And that includes, for instance, the

16   NYPD, or if you've got a relative who is a corrections officer.

17                All right.  So we have Prospective Juror 3 and 9.

18   Number 3, sir, who do you know, not in terms of the name but

19   who knows whom and what position?

20                JUROR:  Sister-in-law.

21                THE COURT:  What is she?

22                JUROR:  She was a police officer.

23                THE COURT:  Was she NYPD?

24                JUROR:  No, upstate Albany area.

25                THE COURT:  Is she retired?

1           JUROR:  She is no longer working.

2           THE COURT:  Is there anything about your

3   sister-in-law's prior employment as in law enforcement that

4   would make you be unable to be fair and impartial in this case?

5           JUROR:  No.

6           THE COURT:  All right.  Prospective Juror 9, who do

7   you know?

8           JUROR:  My cousin.

9           THE COURT:  All right.  And is that a first cousin or

10   second cousin?

11           JUROR:  Distant cousin.

12           THE COURT:  Do you spend a lot of time with this

13   distant cousin?

14           JUROR:  No.

15           THE COURT:  All right.  And what position does that

16   distant cousin have?

17           JUROR:  NYPD.

18           THE COURT:  All right.  And is that cousin currently

19   employed by the NYPD?

20           JUROR:  Yeah.

21           THE COURT:  Do you know if he or she is employed in

22   any particular area, division, task force?

23           JUROR:  No.

24           THE COURT:  You just don't know one way or the other?

25           JUROR:  Yeah.

E6F7SER2                    Voir dire

1              THE COURT:  Is there anything about your cousin's

2     employment by the NYPD that makes you feel that you could not

3     be fair and impartial in this case?

4              JUROR:  No.

5              THE COURT:  All right, thank you.

6              Anybody else?  Yes, 10?

7              JUROR:  Uncle, officer.

8              THE COURT:  Is that in the NYPD?

9              JUROR:  Yes.

10             THE COURT:  All right.  And do you spend a fair amount

11    of time with your uncle?

12             JUROR:  No.

13             THE COURT:  Do you know if your uncle was on any kind

14    of task force or part of any particular division?

15             JUROR:  No.

16             THE COURT:  You just don't know one way or the other.

17    I saw you nodding your head no.  Is that right?

18             JUROR:  Right.

19             THE COURT:  The court reporter takes down every word I

20    say and every word that everybody else says, so he can't take

21    head motions, especially when I'm behind him.

22             All right.  Is there anything about your uncle's

23    employment by the NYPD that makes you feel that you couldn't be

24    fair and impartial in there case?

25             JUROR:  No.

1              THE COURT:  Anybody else?  All right.

2              Now, does anyone have any close family member,

3     including a domestic partner, who works in law enforcement, in

4     the criminal justice system, in jail or in a prison?  That

5     includes what I was saying before, but it's a little bit

6     broader.

7              Now, are any of you employed by the court system as a

8     judge, law clerk, court attendant, clerk or any other part of

9     the court's personnel?

10             Has any juror, prospective juror, served as a juror in

11    a criminal or civil case before?  And if you have, I will walk

12    you through it one by one and we will find out how many.  I

13    don't ever want to know what the verdict was, and so I warn you

14    about that in advance.

15             Who served before as a juror?  All right.  Prospective

16    Jurors 4, 5.  Who else?  11 and alternate 1.

17             Prospective Juror 4, how many times have you served on

18    a jury before?

19             JUROR:  Just once.

20             THE COURT:  And was that in a criminal or a civil

21    case?

22             JUROR:  Civil case.

23             THE COURT:  All right.  And without telling me the

24    result in the civil case, did you go all the way to a verdict?

25             JUROR:  Yes.

1          THE COURT:  All right.  And is there anything about

2     your prior jury service that makes you feel you couldn't be

3     fair and impartial in this case?

4          JUROR:  No.

5          THE COURT:  Prospective Juror 5, how many times have

6     you served?

7          JUROR:  Twice.

8          THE COURT:  Civil or criminal?

9          JUROR:  Civil and criminal.

10          THE COURT:  One of each?

11          JUROR:  One of each.

12          THE COURT:  And without telling me the verdicts, did

13     the civil case go to verdict?

14          JUROR:  No.

15          THE COURT:  Did it settle?

16          JUROR:  Yes.

17          THE COURT:  All right.  And the criminal case, did

18     that go all the way to verdict?

19          JUROR:  Yes.

20          THE COURT:  Is there anything about your prior jury

21     service that makes you feel that you couldn't be fair and

22     impartial in this case?

23          JUROR:  No.

24          THE COURT:  All right.  Prospective Juror 11, how many

25     times did you serve?

E6F7SER2                         Voir dire

 1              JUROR:  One.

 2              THE COURT:  Criminal or civil?

 3              JUROR:  Civil.

 4              THE COURT:  And without telling me the verdict, did

 5      you reach a verdict?

 6              JUROR:  Settled.

 7              THE COURT:  It settled.  All right.  Is there anything

 8      about your prior service as a juror that makes you feel you

 9      could not be fair and impartial in this case?

10              JUROR:  No.

11              THE COURT:  All right.  And Alternate Juror 1 --

12      actually you're technically number 2 -- but how many times have

13      you served before?

14              JUROR:  Twice.

15              THE COURT:  Was it criminal or civil?

16              JUROR:  One of each.

17              THE COURT:  And on the civil case, did it go all the

18      way to verdict?

19              JUROR:  No, it settled.

20              THE COURT:  And on the criminal case, did it go to

21      verdict?

22              JUROR:  Yes.

23              THE COURT:  And is there anything about your prior

24      service as a juror that makes you feel that you could not be

25      fair and impartial in there case?

E6F7SER2                          Voir dire

1              JUROR:  No.

2              THE COURT:  Anybody else who served as a juror before?

3              JUROR:  I did.

4              THE COURT:  Sorry.  Prospective Juror 1, how many

5      times?

6              JUROR:  Just once.

7              THE COURT:  Civil or criminal?

8              JUROR:  Civil.

9              THE COURT:  And did it go all the way to a verdict?

10             JUROR:  Um-hum.

11             THE COURT:  Is that yes?

12             JUROR:  Yes.

13             THE COURT:  OK.  All right.  And is there anything

14     about your prior jury service that makes you feel you couldn't

15     be fair and impartial in this case?

16             JUROR:  No.

17             THE COURT:  Thanks.  Anybody else?  All right.  Now,

18     has anybody -- and again this includes a close family member,

19     including a domestic partner -- has anybody been charged with a

20     crime or been the subject of any investigation or accusation by

21     a governmental body?  All right.  So, number 3, we will take

22     these over here at side bar, so you can come on down.

23             Let me ask, does anybody -- and again this includes

24     not just yourself but domestic partners and other close family

25     members -- is anybody under a subpoena or about to be that they

1    know of in a criminal case or in an investigation?  All right.

2    Juror 3, come on down.

3              (At the side bar)

4              THE COURT:  Was it you or somebody close to you?

5              JUROR:  My sister-in-law is in a county correctional

6    facility right now.

7              THE COURT:  Is she accused or gone all the way to

8    verdict in the case?

9              JUROR:  She is going to have a hearing, I believe, in

10   a couple weeks.

11             THE COURT:  What has she been accused of?

12             JUROR:  It's a family court matter.

13             THE COURT:  Do you know if there were any narcotics

14   involved in it?

15             JUROR:  Alcohol, I think.

16             THE COURT:  And do you know if there are any firearms

17   involved?

18             JUROR:  No.

19             THE COURT:  OK.  Is there anything about that, the

20   fact that you have a sister-in-law who is currently under

21   investigation and is in a correctional facility, that makes you

22   feel you could not be fair and impartial in this criminal case?

23             JUROR:  I don't know why she is actually there, but I

24   think I could be impartial actually.

25             THE COURT:  OK.  So it's important that -- I always

1    ask again if people say they think they can be.  It's very

2    important that the defendant have impartial jurors.  Do you

3    think you could be?

4          JUROR:  Yeah.

5          THE COURT:  Counsel.  Do you have any other questions

6    you would like me to ask?  All right.  Thank you.

7          (Juror not present)

8          THE COURT:  Before we all go, let me just ask one more

9    question.  You can go ahead back.  I am just going to ask from

10    here who has been a victim of a crime.  All right?  Because

11    then we will get people to come down.  OK?  Just hold on.

12          (In open court)

13          THE COURT:  I am going to ask the next question from

14    here because sometimes we get people who need to come down, so

15    rather than going back and forth, we will have you all come

16    down.

17          Have any of you or a close family member -- again

18    including a domestic partner -- been victims of a crime?

19          All right, Prospective Juror 8, why don't you come on

20    down.  Anybody else?  OK.  Prospective Juror 11.  Anybody else?

21    All right, we will take you one by one over here.

22          (At the side bar)

23          JUROR:  I was robbed in Brooklyn.

24          THE COURT:  What year?

25          JUROR:  In high school.  This is Brooklyn Tech.

E6F7SER2                          Voir dire

1          THE COURT:  So this is Prospective Juror 8?

2          JUROR:  And the police staged -- attended the subway I

3    was in, and they caught the guys, and I went to Brooklyn court,

4    and I was the victim in a trial.

5          THE COURT:  So let me ask you, without embarrassing

6    you, how long ago was this?

7          JUROR:  I was 16, so it was 40 years ago.

8          THE COURT:  All right.  Now, and you said -- did you

9    testify in fact in that trial?

10          JUROR:  Yes.

11          THE COURT:  And did that go to verdict?

12          JUROR:  Yes.

13          THE COURT:  And was the verdict guilty or not guilty?

14          JUROR:  Guilty.

15          THE COURT:  OK.  Now, is there anything about that

16    situation that you were a victim of and the fact that you also

17    were at a trial that makes you feel you couldn't be fair and

18    impartial here?

19          JUROR:  I can be fair and impartial.

20          THE COURT:  All right.  Thank you.

21          Counsel, anything further?  All right.

22          Prospective Juror 11, please.  Was it you or somebody

23    close to you?

24          JUROR:  My son in Virginia.

25          THE COURT:  And how long ago did it occur?

E6F7SER2                          Voir dire

1          JUROR:  Like seven years ago.

2          THE COURT:  Seven years ago?  And he was a victim?

3          JUROR:  No, they accusing him of drinking and driving.

4          THE COURT:  I see.  And did he go to trial on that?

5          JUROR:  No.

6          THE COURT:  Reach some other resolution?

7          JUROR:  They suspended his license.

8          THE COURT:  Is there anything about that situation

9   with your son that makes you feel you could not be fair and

10  impartial in this criminal case?

11         JUROR:  Not really.

12         THE COURT:  Have you or anybody you know of or who is

13  close to you been the victim of a crime?

14         JUROR:  No.

15         THE COURT:  OK, thank you.  You can go ahead and go

16  back.

17         All right, ladies and gentlemen, anything further with

18  those two?

19         MS. MAIMIN:  No.

20         MR. DE CASTRO:  No.

21         THE COURT:  Let me just also say, since I have you up

22  here, that I am disinclined to dismiss Alternate 1 for cause

23  because my assessment was that her English language skills were

24  better than she suggested they were based upon her experience

25  in New York City schools taking tests and things, etc.  If we

E6F7SER2                          Voir dire

1    determine at some point that her language skills are less than

2    adequate, we will deal with that, of course.  Any objection?

3              MS. MAIMIN:  No.

4              MR. DE CASTRO:  No.

5              (In open court)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E6GAASER3                         Jury Voir Dire

1                  (In open court)

2                  THE COURT:  All right.  Ladies and gentlemen, we're

3       going to go on to some additional questions now.  The witnesses

4       in this case may include law enforcement personnel.  Indeed,

5       the witnesses will include law enforcement.

6                  Do any of you believe you would be biased either for

7       or against a witness just because he or she is a member of law

8       enforcement?

9                  You may hear testimony in this case from someone

10      working with law enforcement personnel, for instance, somebody

11      working in an undercover capacity.  That is, you may hear

12      testimony from an agent or officer or someone working with an

13      agent or officer who pretended to be someone other than himself

14      or herself for the purposes of furthering the investigation.

15      These people who work with law enforcement are sometimes called

16      confidential informants.  I advise you that the use of

17      undercover agents and confidential informants is legal.

18                 Does any of you have any general feeling about the

19      government's use of undercover agents or confidential

20      informants that would make it difficult for you to render a

21      wholly fair and impartial verdict in this case?

22                 Now, you may also hear testimony in this case from one

23      or more cooperating witnesses, that is, people who have

24      themselves committed crimes and who have pled guilty to their

25      criminal conduct pursuant to a cooperation agreement with the

E6GAASER3                        Jury Voir Dire

1   government.  I advise you that he use of cooperating witnesses

2   is legal.

3          Do any of you have any feelings about the government's

4   use of cooperating witnesses that would make it difficult for

5   you to render a wholly fair and impartial verdict in case?

6          Now, under our system of law every defendant as I've

7   said, is presumed to be innocent and cannot be found guilty

8   unless a jury having heard all of the evidence in a case

9   unanimously decides that the evidence proves the defendant's

10  guilt beyond a reasonable doubt.

11         Is there anyone who has difficulty accepting that

12  proposition of law?

13         Now, it's not pleasant duty to find another individual

14  guilty of committing a crime.  Is there any juror who feels

15  that even if the evidence established the defendant's guilt

16  beyond a reasonable doubt he or she might not be able to render

17  a guilty verdict for reasons unrelated to the law and the

18  evidence?

19         Now, will each juror accept the proposition of law

20  that the question of punishment is for the Court alone to

21  decide and that possible punishment should not enter and must

22  not entered into the deliberation of the jurors in terms of

23  guilt or innocence?  And when I say "Court" I mean "judge".

24  Anybody have a problem accepting that proposition of law?

25         A defendant is not required to call any witnesses or

1    to produce any evidence in a case or to take the witness stand.

2    If the defendant elects not to take the witness stand you may

3    not draw any inference unfavorable to the defendant based on

4    the fact that he chose not to testify.  That may not enter into

5    your decision.

6          Is there any prospective juror who has a difficulty

7    following that instruction?

8          Now, I've tried to bring your attention to various

9    matters that would expose and potentially reveal any biases or

10   partiality that you might have but you yourselves search your

11   own mind and your own consciences and ask yourselves is there

12   any reason that you know of that you could not be fair and

13   impartial in this case?  Because if you cannot be fair and

14   impartial in this case it is your duty not to serve as a juror

15   in this case.

16         THE JUROR:  Yeah, I think so.

17         THE COURT:  All right.  Prospective Juror No. 1, you

18   are excused.

19         We're going to call someone else up from the panel.

20   We're going to randomly dig into the bingo box here and pull

21   out a name.

22         COURTROOM DEPUTY:  Prospective Juror No. 1, Rosemary

23   Delia, D-E-L-I-A.  Will you, please, take the first seat in the

24   first row.

25         THE COURT:  Prospective Juror No. 1, you heard me ask

E6GAASER3                         Jury Voir Dire

1    a number of questions.  Were there any to which you would have

2    a "yes" answer?

3               THE JUROR:  Yes.

4               THE COURT:  Okay.  Which ones?

5               THE JUROR:  Several.  I was a victim of a crime.

6               THE COURT:  OK.

7               THE JUROR:  Several police officers in my family.

8               THE COURT:  OK.

9               THE JUROR:  Trying to remember.  There were a couple

10   more.  I was a juror, did reach a verdict.

11              THE COURT:  OK.  All right.  Any others that you can

12   think of?

13              THE JUROR:  That's it.

14              THE COURT:  All right.  We'll do the victim of a crime

15   separately but let me ask you first about your relatives who

16   are police officers.  Are they currently police officers?

17              THE JUROR:  Yes.

18              THE COURT:  Are they NYPD?

19              THE JUROR:  Yes.

20              THE COURT:  OK.  And are any of them associated with

21   any particular task forces?

22              THE JUROR:  Undercover.

23              THE COURT:  All right.  And are any of them

24   involved -- well, I'll stop bright there.  So how close are

25   these relatives?

E6GAASER3                          Jury Voir Dire

1                 THE JUROR:  Nephew, two first cousins.

2                 THE COURT:  Do you see these folks with any

3      regularity?

4                 THE JUROR:  Yes.

5                 THE COURT:  Do you think that you would be biased in

6      favor or against the NYPD or any other law enforcement as a

7      result?

8                 THE JUROR:  In favor.

9                 THE COURT:  You think you would be biased in favor?

10                THE JUROR:  Yes.

11                THE COURT:  You don't think you could put that to the

12     side and listen impartially?

13                THE JUROR:  No, not with them of them in the family.

14                THE COURT:  All right.  You are excused.

15                COURTROOM DEPUTY:  Prospective Juror No. 1, William A

16     Friedman, F-R-I-E-D-M-A-N.

17                Mr. Friedman, please, take the first seat in the first

18     row.

19                THE COURT:  Mr. Mukhi, while we're doing that, and I

20     just apologize, but have you introduced the special agent?

21                MR. MUKHI:  Natalie Bara, yes, we did.

22                THE COURT:  All right.  Terrific.

23                All right.  Prospective Juror No. 1, you heard me ask

24     a number of questions.  Were there any to which you would have

25     had a "yes" answer?

E6GAASER3                         Jury Voir Dire

 1              THE JUROR:  No.

 2              THE COURT:  All right.  Now, ladies and gentlemen,

 3     we're going to go on to the next phase.  The next phase is

 4     you're all going to stand up and just tell us a little bit

 5     about yourself.  My deputy is going to hand out a questionnaire

 6     and it asks for things like your age.  If you don't want to

 7     give a precise age you are allowed to give a range.  After I

 8     hit 50 that became my moniker, you know.  So we'll take each of

 9     you.  This is not to be like your autobiography of complete

10     sort of statement of everything you've ever done.  It's just a

11     30 seconds or so, whatever will help us just to get to know a

12     little bit about you.

13              So, we'll start with Prospective juror No. 1.  You

14     don't have to say "question number one".  You can just say,

15     following it down, here is what I do, here is where I am.  I am

16     going to have you stand up because we can get a better

17     projection of your voice that way.

18              THE JUROR:  25 years old, live on the upper east side

19     of Manhattan, work at a speakers bureau, so I represent various

20     celebrities for speaking engagements.  Don't have any children,

21     not married, watch TV, big sports fan.  That's what I do spare

22     time.

23              THE COURT:  All right.  Do you read any magazines or

24     things online in particular?

25              THE JUROR:  Mostly sports things but I follow the news

E6GAASER3                         Jury Voir Dire

1    as well.

2              THE COURT:  All right.  Thank you, sir.  Do you live

3    in New York?  In your household do you live with other folks?

4              THE JUROR:  Two roommates, friends from college.

5              THE COURT:  What are their professions?

6              THE JUROR:  One is in construction management.  One is

7    in kind of marketing, advertising.

8              THE COURT:  Thank you.

9              Prospective of Juror No. 2, tell us about yourself.

10             THE JUROR:  I am 36 years old.  I live in the Bronx.

11   I live with my two kids.  I am a chef.  I have been a chef for

12   six years.  I've never been married.  I do read books but I

13   read like fiction books.

14             THE COURT:  What kind of TV shows do you watch?

15             THE JUROR:  Gossip Girl and all that stuff with my

16   kids.

17             THE COURT:  All right.  Thank you.  Prospective Juror

18   No. 3.

19             THE JUROR:  51, married, two kids.  I live on the

20   midtown east.  I have been running a staff and family staffing

21   company for 25 years, follow the stock market, sports.

22             THE COURT:  Do you read any particular magazines or

23   newspapers everyday or regularly?

24             THE JUROR:  Pretty much the Internet.  I follow CNN,

25   those type of things.

E6GAASER3                    Jury Voir Dire

1          THE COURT:  Do you watch any TV shows on a regular

2    basis?

3          THE JUROR:  No.

4          THE COURT:  All right.  Thank you.  Prospective Juror

5    No. 4.

6          THE JUROR:  That's me.  Hi.  I have been in this

7    country most of my life ever since I was a year old.  Grew up

8    in Arizona and I have been a teacher for many years and I am

9    now a substitute teacher in the town where I live.  OK.  I have

10   one child and I read The New York Times and let's see.

11   Probably online magazine.  I watch like 20/20 and sometimes

12   CSI, OK.  All right.

13         THE COURT:  And your child employed or still --

14         THE JUROR:  Yeah, she's 27.  She works for Google in

15   California.

16         THE COURT:  I see.  OK.  All right.  Prospective Juror

17   No. 5.

18         THE JUROR:  I am 66.  And I've lived here most of my

19   life since from Puerto Rico.  I live in Washington Heights and

20   I live alone.  My occupation is I am a professor of history and

21   I work William Patterson office in Wayne, New Jersey.  So, I

22   was married to a finance banker.  And I do have an adult

23   daughter who has her own business.  And I have a PhD and I read

24   and I dance and I do exercise and I do read The New York Times

25   everyday plus a lot of other things as part of my work and I do

E6GAASER3                         Jury Voir Dire

1    watch the News Hour and Law and Order.

2                THE COURT:  All right.  Thank you.  Prospective Juror

3    No. 6.

4                THE JUROR:  I am 40 years old.  I live in Harlem with

5    my husband who is a public school teacher.  I am a financial

6    analyst in Jersey City, New Jersey.  No children.  I've

7    graduated college and I am working on my masters degree.  I

8    like to spend time outside and exercise, camping.

9                THE COURT:  What kind of TV shows do you watch?

10               THE JUROR:  I -- well, don't watch a lot of TV.

11               THE COURT:  All right.  Thank you.  Prospective Juror

12   No. 7.

13               THE JUROR:  I am 69.  I lived in this country all my

14   life and I am a resident of Chelsea.  My occupation was a Head

15   Start teacher for 40 years.  I am retired.  I am a widow.  I do

16   not have a domestic partner for the moment.  My children are

17   grown.  They're married and they're out of the household.

18               THE COURT:  What do your kids do?

19               THE JUROR:  One is a school teacher retired also,

20   cause they're my stepchildren and one lives in Baltimore and

21   she works with a youth program.  I haven't worked for the past

22   12 years.  I have been retired.  And I love reading and

23   attending church and senior center and I read the Daily News

24   and the Times and I just like to see oh, I love Scandal and

25   Criminal Minds.

E6GAASER3                          Jury Voir Dire

1              THE COURT:  Thank you.  Prospective Juror No. 8.

2              THE JUROR:  56 year old married father of two

3    teen-agers who lives on the middle east side I guess, as well.

4    I have been in this country or 46 years.  I've spent 30 plus

5    years on Wall Street running parts of banks.  I am currently

6    unemployed because of the credit crisis and I am doing some

7    consulting work for an economic consulting litigation

8    consulting company and I love TV.  I am a ski instructor

9    part-time.  I work with a lot of kids.

10             THE COURT:  What do you watch on TV?

11             THE JUROR:  Mostly Net Flicks, crime dramas.

12             THE COURT:  Did you spend, you said you spent 46 of

13   those 56 years in this country.

14             THE JUROR:  I was born in Eastern Europe, Poland to be

15   specific.

16             THE COURT:  All right.  Thank you.  Prospective Juror

17   No. 9.

18             THE JUROR:  I am 44 years old.  I lived in this

19   country for 34 years and I have been living in Rockland for --

20   my occupation is auto mechanic.  I work for New York City

21   Transit for over 20 years.  And I am married, have two kids and

22   they're both in school.  My wife is a mechanical engineer and I

23   finished high school and two years of vocational school.  In

24   spare time I work on the house and car and watch car magazines

25   and Popular Mechanics and on the Internets.

1          THE COURT:  Any TV shows in particular that you watch

2    regularly?

3          THE JUROR:  History channels and speed channel.

4          THE COURT:  All right.  Thank you.  Where were you

5    born?

6          THE JUROR:  Kantong, China.

7          THE COURT:  All right.  Thank you, sir.

8          Prospective Juror No. 10.

9          THE JUROR:  32, born and raised here, manhattan, lived

10   down in the Bronx, occupation bus driver, school bus driver,

11   not married.  I have a girlfriend.  Education, GED, spare time

12   outside riding bikes or programs probably like -- rescue or

13   something like that.

14         THE COURT:  All right.  Thank you.

15         All right prospective Juror No. 11.

16         THE JUROR:  I am 65 years old.  I lived in the Bronx

17   for 46 years.  I live with my husband I am the first vice

18   president for Local 20 D.C. 37 AFSME.  I work for them for 27

19   years.  I am married or 25 years.  My husband is a taxi driver.

20   I have two years of college.  I also have one year of college

21   in labor.  I like to read.  I like to read union books and also

22   labor law.  My television program is Undercover Boss.

23         THE COURT:  All right.  And where were you born?

24         THE JUROR:  Puerto Rico.

25         THE COURT:  Thank you.  All right Prospective Juror

1    No. 12.

2              THE JUROR:  I am 30 years old.  Live in the Bronx for

3    the past 16 years, married two kids.  My wife is a travel

4    agent.  The kids are in school.  I work as a doorman.  Watch TV

5    shows, sports.  I read the papers everyday.

6              THE COURT:  What kind of papers?

7              THE JUROR:  Daily News, Post, New York Times.

8              THE COURT:  All right.  Thank you.

9              All right.  Alternate Number One, tell us a little bit

10   about yourself.

11             THE JUROR:  I am 30 years old.  I live in the Bronx

12   for seven years and I got divorced and I live with my family.

13             THE COURT:  All right.  Do you have a job.

14             THE JUROR:  Yes.

15             THE COURT:  What type of occupation?

16             THE JUROR:  Retail shop.

17             THE COURT:  I see.  And your family members, what

18   kinds of outside occupations, if any, do they have that you

19   live with?

20             THE JUROR:  They also work in the retail store like

21   Sears and Macy's.

22             THE COURT:  Do you watch any TV shows regularly?

23             THE JUROR:  When I have a chance.

24             THE COURT:  What kind?

25             THE JUROR:  Anything with my family members.

E6GAASER3                    Jury Voir Dire

 1           THE COURT:  All right.  And do you read any newspapers
 2   on a regular basis or magazines?
 3           THE JUROR:  Sometimes.
 4           THE COURT:  Which kind, which magazines or newspapers?
 5           THE JUROR:  Time.
 6           THE COURT:  All right.  Anything else?
 7           THE JUROR:  No.
 8           THE COURT:  All right.  Thank you.  Alternate number
 9   2.
10           THE JUROR:  I am 60.  I was born and raised in
11   Manhattan as well.  I work for a newspaper.  And I have for the
12   past 25 years and my husband is an editor and I have a son
13   who's a student.
14           THE COURT:  And what is your position with the
15   newspaper?
16           THE JUROR:  I am the program director for conferences.
17           THE COURT:  OK.  You watch any TV shows regularly?
18           THE JUROR:  Net Flicks and news and public affairs.
19           THE COURT:  And do you read the newspaper that you
20   work for?
21           THE DEFENDANT:  Yes.
22           THE COURT:  Regularly?
23           THE JUROR:  Yes.
24           THE COURT:  Do you read any other newspapers
25   regularly?

E6GAASER3                    Jury Voir Dire

1           THE JUROR:  Yes, all the competition and the New

2    Yorker.

3           THE COURT:  All right.  So you read sort of a variety

4    of newspapers everyday?

5           THE JUROR:  Oh, yeah.

6           THE COURT:  All right.  Thank you.

7           All right, counsel, now, ladies and gentlemen, we're

8    on to our next phase.  Let me describe to you how this works.

9    There is a process now that we call preemptory challenges which

10   is the opportunity for the lawyers to strike jurors for any

11   reason that is lawful that they want, so we don't inquire into

12   why and you should not think about or speculate as to why, all

13   right.  If you are struck somebody will be pulled from back

14   there and we'll go through a process with whoever the

15   replacements are and there are six rounds of this, all right.

16   And so we're going to go through it boom, boom, boom.  And then

17   after that is when we're done all right.  So, again, do not

18   think twice if you are struck about why.  Just take your card

19   and you'll return to the jury room.

20          OK.  Counsel, we're going to start with our first

21   round.  And I should say that the alternates are actually a

22   separate round.  It's the peremptories right now are against

23   the first 12.

24          So the two of you, Alternates One and Two, you won't

25   hear your names called in this first round.  After we go

E6GAASER3                    Jury Voir Dire

1    through the peremptories there's one separate round for the

2    alternates, all right.

3              Ladies and gentlemen, whoever ends up on the jury

4    you'll hear me talk about how you are all allowed to have

5    coffee on the jury box or water or soda.  I have what's called

6    what's good for the goose is good for the gander.  Fair is

7    fair.  I am not going to sit up here and drink it unless I let

8    everybody do the same thing.

9              Let's turn over the first Post-it.

10             (Pause)

11             COURTROOM DEPUTY:  Juror No. 3, Thomas Buckley; Juror

12   No. 5 Isabel Tirado and Juror No. 11 Isabel Figuroa.

13             (Pause)

14             THE COURT:  All right.  So we're going to call three

15   names from the back.

16             COURTROOM DEPUTY:  Prospective Juror No. 3, Matthew

17   Jones, J-O-N-E-S.  Mr. Jones, please, take the third seat in

18   the first row.

19             Prospective Juror No. 5, Charles Stevenson,

20   S-T-E-V-E-N-S-O-N.

21             Mr. Stevenson, please, take the fifth seat in the

22   first row.

23             Prospective Juror No. 11 Eric T. Saletin,

24   S-A-L-E-T-I-N.  Sir, please, take the fourth seat in the second

25   row.

E6GAASER3                       Jury Voir Dire

1              (Pause)

2              THE COURT:  All right.  Prospective Juror No. 3, you

3      heard me ask a number of questions earlier.  Were there any to

4      which you would have had a "yes" answer?

5              THE JUROR:  A couple of them yes.

6              THE COURT:  Which ones?

7              THE JUROR:  Relatives in law enforcement and victims

8      of crime.

9              THE COURT:  OK.  Who do you know who is in law

10     enforcement?

11             THE JUROR:  Two of my siblings.

12             THE COURT:  All right.  And which law enforcement

13     agency are they employed by?

14             THE JUROR:  Ones an officer in a Westchester County

15     town and ones a dispatcher in another state.

16             THE COURT:  OK.  Is there anything about your

17     siblings' employment in law enforcement that make you believe

18     you could not be fair and impartial in this case?

19             THE JUROR:  No.

20             THE COURT:  And we'll take the crime issue in a moment

21     down hear.  Now, Prospective Juror No. 5, were there any

22     questions to which you would have had a "yes" answer?

23             THE JUROR:  No.

24             THE COURT:  All right.  And then Prospective Juror No.

25     11, yeah, you, were there any questions to which you would have

E6GAASER3                          Jury Voir Dire

1    had a "yes" answer?

2              THE JUROR:  Yes.

3              THE COURT:  All right.  Which ones?

4              THE JUROR:  The one regarding knowing one who was

5    convicted and put away for something very similar to this.

6    Actually, it my uncle's best friend had gone away for seven

7    years.  So we were very close, sent away for selling drugs.

8              THE COURT:  Was your uncle's friend, did you spend

9    time with that individual?

10             THE JUROR:  Yeah, the whole family.

11             THE COURT:  And we'll take that down here in just a

12   moment.

13             Anything else?

14             THE JUROR:  No.

15             THE COURT:  All right.  So why don't we have

16   prospective Juror No. 3, why don't you come on down.  We'll ask

17   you know another question.

18             (Continued on next page)

19

20

21

22

23

24

25

E6GAASER3                         Jury Voir Dire

 1              (Sidebar)

 2              THE COURT:  All right.  Prospective Juror No. 3, was

 3     it you or someone close to you that was a victim of a crime?

 4              THE JUROR:  Me, yeah, my family.

 5              THE COURT:  OK.  And how long ago was it?

 6              THE JUROR:  About three years ago.

 7              THE COURT:  And what was the nature of the crime?

 8              THE JUROR:  Our house was robbed.

 9              THE COURT:  Were you home when it was robbed?

10              THE JUROR:  No.

11              THE COURT:  OK.  And do you know if the robber was

12     ever found?

13              THE JUROR:  No, I don't believe so.

14              THE COURT:  Is there anything about your experience as

15     being the victim of a robbery that makes you feel that you

16     couldn't be fair and impartial in this case?

17              THE JUROR:  No.

18              THE COURT:  You know that this case involves

19     allegations that the defendant was involved with robberies?

20              THE JUROR:  Yes.

21              THE COURT:  OK.  You believe you can be fair and

22     impartial?

23              THE JUROR:  Yeah.

24              THE COURT:  OK.  All right.  You can go back.

25              THE JUROR:  Thank you.

E6GAASER3                          Jury Voir Dire

1                    (Juror not present)

2                    THE COURT:  Counsel, anything else about the

3      individual or anybody else?

4                    MS. MAIMIN:  No.

5                    MR. DE CASTRO:  No.

6                    THE COURT:  All right.  Number 11, come on over, sir.

7                    (Juror present)

8                    THE COURT:  All right.  Sir, so I just wanted to

9      inquire a little bit more about that situation with your

10     uncle's friend.

11                   THE JUROR:  Sure.  So --

12                   THE COURT:  There are lots of people who were

13     convicted of crimes and the question for you ultimately is if

14     you think you can be fair and impartial in this case even

15     though there was a situation?

16                   THE JUROR:  It's so similar I think I would be

17     impartial because I saw how it affected our whole family.

18                   THE COURT:  You mean you would be partial?

19                   THE JUROR:  Yes, I think so.

20                   THE COURT:  You mean you think you would be biased?

21                   THE JUROR:  He was put away for seven years and there

22     was a lot of things I thought were wrong with that idea, so I

23     thought --

24                   THE COURT:  You understand that the period of time if

25     there was a conflict if there was, the penalty is determined by

E6GAASER3                    Jury Voir Dire

1    the Court.  Do you understand that is not determined about the

2    jury?

3              THE JUROR:  I still think I would be not so good on

4    this, yeah.

5              THE COURT:  OK.  All right.  So you are excused.

6              (Juror not present)

7              THE COURT:  All right. Counsel, anything on that?

8              MS. MAIMIN:  No objection.

9              MR. DE CASTRO:  No objection.

10             THE COURT:  Thank you.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E6GAASER3                    Jury Voir Dire

 1              (In Open Court)

 2              COURTROOM DEPUTY:  Prospective Juror No. 11 Jean Marie

 3     Cannon, C-A-N-N-O-N.

 4              Ms. Cannon, please, take the fourth seat in the second

 5     row.

 6              THE COURT:  All right. Prospective Juror No. 11, were

 7     there any questions to which you would have had a "yes" answer?

 8              THE JUROR:  Yes.  I have a first cousin in the NYPD

 9     and we're not very close.  I did serve on a criminal trial.  We

10     did deliberate and reach a verdict.

11              THE COURT:  Any other question with a "yes" answer to?

12              THE JUROR:  No.

13              THE COURT:  Is there anything about your cousin's

14     employment by NYPD that makes you feel like you couldn't be

15     fair and impartial here?

16              THE JUROR:  No.

17              THE COURT:  In terms of your service on a criminal

18     case as a juror, is there anything about that prior jury

19     experience that makes you feel you couldn't be fair and

20     impartial as a juror here?

21              THE JUROR:  No.

22              THE COURT:  OK.  So, now what we are going to do is

23     hear about the biographical information from three, five and

24     11.

25              Three, why don't you tell us a little bit about

E6GAASER3                    Jury Voir Dire

1    yourself.

2              THE JUROR:  I am 49 years old, born and raised in

3    Westchester County, married, I have two children.  I have been

4    a Postal worker for about 20 years until the end of the month.

5    I like to watch comedy on TV.  I don't have spare time and

6    that's about it, I guess.  Oh, I have a master degree in

7    accounting.

8              THE COURT:  OK.  All right.  Thank you.  Prospective

9    Juror No. 5.

10             THE JUROR:  Good morning.  I am 59.  Recently

11   divorced.  I have two sons, pretty much adults.  I make TV

12   shows.  I make reality crime -- for CBS.  So that might have

13   some relevance and I read a lot of newspapers.  I read the Post

14   and the Daily News and the New York Times and I don't watch

15   much TV.

16             THE COURT:  Do you watch reality TV at all?

17             THE JUROR:  No.

18             THE COURT:  Do you watch crime shows at all?

19             THE JUROR:  Occasionally.

20             THE COURT:  Is there anything about your job as

21   related to crime shows that are reality based that makes you

22   feel you could not be fair and impartial in this criminal case?

23             THE JUROR:  No.

24             THE COURT:  Prospective Juror No. 11.

25             THE JUROR:  I am 49 years old.  I've lived in this

E6GAASER3                     Jury Voir Dire

1   area my whole life.  I live on the upper east side.  I am a

2   registered nurse.  I've worked at New York Presbyterian for 25

3   years, pediatric critical care and infection control.  I am

4   single.  Never been married.  I don't have children.  Spare

5   time, I read a lot.  I read a lot of online journals and blogs

6   and things like that.  TV, anything BBC pretty much.

7           THE COURT:  When you say you read a lot, is there a

8   particular area?

9           THE JUROR:  Politics, history, things like that.

10          THE COURT:  Do you watch anything regularly apart from

11  the news?

12          THE JUROR:  Games of Thrones this week.

13          THE COURT:  All right.  Thank you.  We are going on to

14  round two.  I always have that temptation to have that Jeopardy

15  song play.

16          (Pause)

17          THE COURT:  All right.  Then we'll do the same process

18  again.  Whoever is struck, take your card, don't think about

19  it, then Joe will call some people randomly to fill-in.

20          COURTROOM DEPUTY:  Juror No. 3 Matthew Jones; Juror

21  No. 5, Charles Stevenson; Juror No. 11, Jean Marie Cannon.

22          (Pause)

23          COURTROOM DEPUTY:  Prospective Juror No. 3, Peter

24  Landsman, L-A-N-D-S-M-A-N.  Mr. Landsman, please, take the

25  third seat in the fist row.

 1          Prospective Juror No. 5, John F. Duarte, D-U-A-R-T-E.

 2          Mr. Duarte, please, take the fifth seat in the first

 3   row.

 4          And Prospective Juror No. 11, Paulianda J. Jones.

 5   Ms. Jones, please, take the fourth seat in the second row.

 6          All right.  Prospective Juror No. 3, you heard me ask

 7   a number of questions.  Were there any to which you would have

 8   had a "yes" answer?

 9          THE JUROR:  I served in a jury on a civil court that

10   didn't go to trial, that didn't finish and it won't prejudice

11   me, nothing that would prejudice me.  You asked if I am biased

12   about a member of the Justice Department.  Well, yes.  He's in

13   contempt of Congress, Attorney General Holder.  I am biased

14   against him for what I perceive as misbehavior.

15          THE COURT:  All right.  If you hold that view why

16   don't you go ahead and step down because the prosecution is

17   brought in the name of the United States of America and

18   Attorney General Holder is ultimately --

19          THE JUROR:  Represents everybody.

20          THE COURT:  Well, the government, not the defendant.

21   So, in light of that personal view we'll just have you step

22   down and we'll fill-in in just a moment.

23          (Pause)

24          THE COURT:  Let me ask Prospective Juror No. 5, were

25   there any questions which I asked earlier to which you would

1    have had a "yes" answer?

2              THE JUROR:  Yes.

3              THE COURT:  Which ones?

4              THE JUROR:  One that I've known many guys who have

5    been in the business of drug dealing.  And the second is I may

6    be biased toward NYPD officers at one point.

7              THE COURT:  You mean biased in their favor or against

8    them?

9              THE JUROR:  Against them.

10             THE COURT:  Do you think you might be biased at some

11   point, biased now or do you think that's a point that could be

12   reached?

13             THE JUROR:  I just don't really know.

14             THE COURT:  All right.  You said you knew a number of

15   individuals involved in the drug trade?

16             THE JUROR:  Yes.

17             THE COURT:  Were any of those individuals prosecuted?

18             THE JUROR:  When I was growing up a few of them were

19   prosecuted.  But as a matter of fact one of the guys whom I

20   grew up with was actually put in jail, served time and then

21   deported to the Dominican Republic.

22             THE COURT:  All right.  Let me just ask, let me go

23   with Juror No. 11 for a moment.  Were there any questions to

24   which you would have had a "yes" answer?

25             THE JUROR:  Yes.  The relative that may have been

E6GAASER3                          Jury Voir Dire

 1  prosecuted for drugs or trafficking.  So that was the "yes"

 2  answer.

 3           THE COURT:  All right.  Any others?

 4           THE JUROR:  No.

 5           THE COURT:  All right.  And why don't we, Juror No. 5,

 6  why don't you go on ahead.  You can get your card from Joe and

 7  we're going to fill-in spots three and five and then we're

 8  going to come back to you, Juror No. 11, in a moment.

 9           (Pause)

10           COURTROOM DEPUTY:  Prospective Juror No. 3, Katherine

11  M. Brant, B-R-A-N-T.

12           Ms. Brant, please, take the third seat in the first

13  row.

14           Prospective Juror No. 5, Wilmore C. Wright,

15  W-R-I-G-H-T, W-I-L-M-O-R-E.

16           Mr. Wright, please, take the fifth seat in the first

17  row.

18           THE COURT:  All right.  Prospective Juror No. 3, were

19  there any questions to which you would have had a "yes" answer?

20           THE JUROR:  No.

21           THE COURT:  Prospective Juror No. 5, were there any

22  questions that I'd asked to which you would have had a "yes"

23  answer?

24           THE JUROR:  No.

25           THE COURT:  All right.  I am going to have 11 come

E6GAASER3                        Jury Voir Dire

1    down just for a moment and then we'll going to do a little bit

2    of a biographical statement from you folks.

3                    (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (Sidebar)

2            THE COURT:  All right.  Prospective Juror No. 11,

3    whose relationship was that individual who was prosecuted for a

4    drug crime?

5            THE JUROR:  A first cousin.

6            THE COURT:  How long was it?

7            THE JUROR:  Maybe seven years ago.

8            THE COURT:  Was in the New York City area or some

9    place else?

10           THE JUROR:  Yes.

11           THE COURT:  Were you close or are you close to that

12   cousin?

13           THE JUROR:  Relative, yeah, family gatherings.

14           THE COURT:  And was that individual incarcerated as a

15   result?

16           THE JUROR:  I think he was deported.

17           THE COURT:  OK.  And was he convicted or did he plead

18   guilty to that crime?

19           THE JUROR:  That, I am not sure about.

20           THE COURT:  OK.  Is there anything about that

21   experience of having a relative be convicted for a drug crime

22   and deported that makes you feel you could not be fair and

23   impartial in this case which involves as you know a drug

24   allegation of drug conspiracy in part?

25           THE JUROR:  Yeah, I think -- yes, I feel like I would

E6GAASER3                         Jury Voir Dire

1   be slightly biased.

2            THE COURT:  OK.  All right.  And would that bias be

3   against the government or in favor of the government?

4            THE JUROR:  Probably against.

5            THE COURT:  OK.  So, you would be looking more towards

6   the defendant?

7            THE JUROR:  Right.

8            THE COURT:  All right.  You can go ahead and get your

9   card from Joe and head on back.  Thank you.

10           (Juror not present)

11

12           THE COURT:  All right.  Counsel, anything else or

13  anything any of questions on what I've done so far?  I always

14  check in.

15           MR. DE CASTRO:  The only thing was Ms. Baumann, I

16  think she's number six, I think you didn't get the news.  I

17  don't think you asked about the news.  I don't have any note on

18  that.

19           THE COURT:  Anything else?

20           (Continued on next page)

21

22

23

24

25

1              (In Open Court)

2              THE COURT:  Number six, where do you get your news

3    from?

4              THE JUROR:  I read A.M. New York.

5              THE COURT:  OK.  All right.

6              COURTROOM DEPUTY:  Prospective Juror No. 11, Ashley C.

7    Bleser, B-L-E-S-E-R, please, take the fourth seat in the second

8    row.

9              THE COURT:  All right.  Prospective Juror No. 11, were

10   there any questions to which you would have had a "yes" answer?

11             THE JUROR:  No.

12             THE COURT:  Prospective Juror No. 3, tell us a little

13   bit about yourself.

14             THE JUROR:  I am 29.  I grew up in manhattan.  I live

15   in the West Village with my boyfriend.  I am a teacher.  I have

16   my masters in early childhood general and special ed.  I enjoy

17   reading, books and New York Times.  I watch Law and Order and

18   National Geographic.  I enjoy exercising.

19             THE COURT:  All right.  Thank you.  What does your

20   boyfriend do?

21             THE JUROR:  He is in real estate management.

22             THE COURT:  All right.  Thank you.  Prospective Juror

23   No. 5, tell us a little bit about yourself.

24             THE JUROR:  I am 48 years old.  I live in the Bronx

25   for 27 years, married 35 years, three kids, all educated,

E6GAASER3                    Jury Voir Dire

1  graduated from college.  I work at Maimonides Hospital in

2  Brooklyn as a nursing attendant.  And I read anything, watch

3  TV, news, that's about it.

4          THE COURT:  All right.  And what kind, if any, TV

5  shows that you watch regularly apart from news?

6          THE JUROR:  Sports and -- channels, that's it about

7  it.

8          THE COURT:  What do your kids do?

9          THE JUROR:  One is a social worker, one is a computer

10 tech and the other does, she's a chemical tech in a sense.

11         THE COURT:  All right.  Thank you.

12         Prospective Juror No. 11, tell us a little bit about

13 yourself.

14         THE JUROR:  I am 31 years old.  I live on the Upper

15 West Side with my husband.  He's a New York City school

16 teacher.  I'm a dental student.  I don't read much many

17 magazines or anything.  And I watch some BBC shows like Downton

18 Abbey and -- Midwife.

19         THE COURT:  All right.  Thank you.

20         All right.  We are going to go on to the third round

21 and which are going to try to check our Post-Its just as soon

22 as we can.

23         (Pause)

24         COURTROOM DEPUTY:  Juror No. 8, Peter Nowicki; Juror

25 No. 11 Ashley Bleser.

E6GAASER3                        Jury Voir Dire

1            (Pause)

2            THE COURT:  All right.  So we're going to fill-in

3   eight and 11.

4            COURTROOM DEPUTY:  Prospective Juror No. 8, Bridget A.

5   Connolly, C-O-N-N-O-L-L-Y.

6            Ms. Connolly, please, take the first seat in the

7   second row.

8            And Prospective Juror No. 11, Gerard J. Magowan, Jr.

9   M-C-G-O-W-A-N.  Mr. McGowan, please, take the fourth seat in

10  the second row.

11           THE COURT:  Prospective Juror No. 8, were there any

12  questions to which you would have had a "yes" answer?

13           THE JUROR:  Yes.

14           THE COURT:  Which ones?

15           THE JUROR:  Victim of crime.

16           THE COURT:  Okay.  Any others?

17           THE JUROR:  I would be biased in favor of the NYPD.

18           THE COURT:  All right.  Do you know somebody who works

19  for the NYPD.

20           THE JUROR:  No.  They're at my job since 9/11.  They

21  protect where I work.

22           THE COURT:  I see.  And so you think you'd be biased

23  in favor of them?

24           THE JUROR:  Yes.

25           THE COURT:  All right.  Well, you can go ahead and

E6GAASER3                    Jury Voir Dire

1   step down.

2            Prospective Juror No. 11, were there any questions to

3   which you would have had a "yes" answer?

4            THE JUROR:  Yes.

5            THE COURT:  Which ones?

6            THE JUROR:  I am a patent attorney, so the law

7   question.  My grandfather was a police officer.  That was a

8   long time ago.  I was the victim of a crime a long time ago and

9   I have served on a jury.

10           THE COURT:  OK.  Let's go through those.  Is the fact

11  that you are a patent attorney do you think that that will make

12  you unable to review the evidence in this case in a fair and

13  impartial manner?

14           THE JUROR:  No.

15           THE COURT:  And the fact that your grandfather was a

16  member of law enforcement, do you think that that would make

17  you unable to be fair and impartial?

18           THE JUROR:  No.

19           THE COURT:  And your jury service, how many times did

20  you serve as a juror?

21           THE JUROR:  Once.

22           THE COURT:  Was it criminal or civil?

23           THE JUROR:  Civil.

24           THE COURT:  Without telling me what the result was,

25  did it reach a verdict or did it settle?

1        THE JUROR:  It did.

2        THE COURT:  Is there anything about your prior jury

3   service that makes you feel that you couldn't be fair and

4   impartial?

5        THE JUROR:  No.

6        THE COURT:  All right.  We are going to take the crime

7   in just a moment.  Let's fill-in number eight first.

8        COURTROOM DEPUTY:  Prospective Juror No. 8, Dwayne

9   Iverson, I-V-E-R-S-O-N.

10        Mr. Iverson, take the first seat in the second row.

11        THE COURT:  All right.  Prospective Juror No. 8, were

12   there any questions to which you would have had a "yes" answer?

13        THE JUROR:  Yes.

14        THE COURT:  Which ones?

15        THE JUROR:  I've been on jury duty.

16        THE COURT:  Anything else?

17        THE JUROR:  I have an uncle that retired from the

18   NYPD.

19        THE COURT:  All right.  Anything else?

20        THE JUROR:  I think that's about it.

21        THE COURT:  All right.  So how many times did you

22   serve as a juror before?

23        THE JUROR:  Four times.

24        THE COURT:  Criminal or civil?

25        THE JUROR:  Both.

1    THE COURT:  How many criminal?  How many civil?

2    THE JUROR:  Two and two.

3    THE COURT:  All right.  And for the criminal, did it

4    reach a verdict?

5    THE JUROR:  Yes.

6    THE COURT:  For the civil did it go all the way to

7    verdict?

8    THE JUROR:  One did and one settled.

9    THE COURT:  Is there anything about the fact that you

10   were or anything to do with the fact that you were on jury

11   service before and that you served as a juror that makes you

12   feel you can't be fair and impartial here?

13   THE JUROR:  No.  I was even on the grand jury too.

14   THE COURT:  Anything about that service that makes you

15   feel you can't be fair and impartial?

16   THE JUROR:  No.

17   THE COURT:  All right.  Now, you had a relative who

18   was NYPD?

19   THE JUROR:  Yeah.  He was borough chief.

20   THE COURT:  All right.  And that was your uncle?

21   THE JUROR:  Yeah.

22   THE COURT:  And is that individual, he is still

23   employed by the NYPD?

24   THE JUROR:  He retired more than 15 years there, so a

25   long time.

E6GAASER3                        Jury Voir Dire

1              THE COURT:  All right.  Is there anything about your

2     uncle's prior employment with the NYPD that makes you feel you

3     could be fair and impartial here?

4              THE JUROR:  No.

5              THE COURT:  All right.  Let's take number 11, why

6     don't you come on down.

7              (Continued on next page)

1          (Sidebar).

2          THE COURT:  All right.  Sir, victim of a crime?

3          THE JUROR:  I was.

4          THE COURT:  How long ago?

5          THE JUROR:  Long time ago.  It was like 1980 or.

6          THE COURT:  What was the nature of the crime?

7          THE JUROR:  I was mugged.  Someone held a gun to my

8   head and took my wallet.

9          THE COURT:  Did they ever find the perpetrator?

10          THE JUROR:  No.

11          THE COURT:  Is there anything about your experience as

12   a victim of that crime that makes you feel that you couldn't be

13   fair --

14          THE JUROR:  No, I don't think so.

15          THE COURT:  You know that there's gun charge in this

16   case.

17          THE JUROR:  I do.

18          THE COURT:  Will you be able a listen to that

19   evidence?

20          THE JUROR:  Sure.  We were also burglarized too and

21   they didn't catch them.

22          THE COURT:  When was that?

23          THE JUROR:  Mid 80s, early 80s.

24          THE COURT:  Is there anything about that experience --

25          THE JUROR:  No.

E6GAASER3                    Jury Voir Dire

1              THE COURT:  OK.  All right, counsel.  You can go on

2      back.

3              (Juror not present)

4              THE COURT:  Mr. de Castro, just want that make sure

5      anybody have anything to raise to raise it now.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In Open Court)

2              THE COURT:  All right.  I am going to have numbers

3    eight and 11.

4              Tell us a little bit about yourself, number 8.

5              THE JUROR:  Dwayne Iverson, born and raised in the

6    Bronx, not married, no kids 50 years old.  I am in the

7    technology field.  Now, I work at ABC, ESP and Disney as a

8    voice network engineer.  I read anything from technology

9    magazines to food and wine and GQ magazine.  It all depends.

10   My spare time, a little sports here and there and that's about

11   it.

12             THE COURT:  Who did you route for last night?

13             THE JUROR:  Spurs.

14             THE COURT:  All right.  Thank you, sir.

15             Prospective Juror No. 11, tell us a little about

16   yourself.

17             THE JUROR:  60 years old.  I was born here.  I live in

18   Westchester County.  I live alone.  I have been a patent

19   attorney for the last 28 years.  I work for June Lever in New

20   Jersey.  I've never been married.  My highest schooling is law

21   school.  I try to get a lot of exercise, a lot of jogging.  I

22   read James Patterson novels, that kind of thing.  I try to read

23   The Times or the Wall Street Journal every day or so from

24   Google News.  I don't watch too much television, Criminal

25   Minds.  I like Law and Order, that kind of thing.

E6GAASER3                    Jury Voir Dire

1           THE COURT:  All right.  Thank you.  All right.  So we

2    are going to pick up our Post-Its.  We are getting there, by

3    the way.  Hopefully, we'll get there before lunch.

4           (Pause)

5           COURTROOM DEPUTY:  Prospective Juror No. 7 Miriam

6    Green and number 11, Gerard McGowan.

7           (Pause)

8           COURTROOM DEPUTY:  Prospective Juror No. 7 Karene

9    Cole-Bailey.  Please, take the last seat in the first row.

10          And Prospective Juror No. 11, Karen M. Ross, R-O-S-S.

11   Ms. Ross, please, take the fourth seat in the second row.

12          THE COURT:  All right.  Prospective Juror No. 7, were

13   there any questions to which you would have had a "yes" answer?

14          THE JUROR:  No.

15          THE COURT:  All right.  Number 11, how about you?

16          THE JUROR:  Yes.  Legal training.  I am an attorney.

17   I work for the New York City Law Department.

18          THE COURT:  OK.  Anything else?

19          THE JUROR:  I was on a jury and that was like 30 years

20   ago, so I don't remember anything about it but I believe it was

21   civil.

22          THE COURT:  Anything else?

23          THE JUROR:  That's it.

24          THE COURT:  OK.  So you're a lawyer and you work for

25   the New York City Law Department?

E6GAASER3                    Jury Voir Dire

1            THE JUROR:  Correct.

2            THE COURT:  Do you have a particular area you work in?

3            THE JUROR:  Commercial litigation.

4            THE COURT:  OK.  Do you do any criminal law?

5            THE JUROR:  I don't.

6            THE COURT:  OK.  Do you do -- when you say "commercial

7    litigation" do you handle any 1983 cases or anything like that?

8            THE JUROR:  I don't.

9            THE COURT:  Is there anything about your legal

10   training or the fact that you are employed by the New York City

11   Law Department the makes you feel that you could be fair and

12   impartial in this case?

13           THE JUROR:  No.

14           THE COURT:  Would you be able to follow my

15   instructions on the law?

16           THE JUROR:  Yes.

17           THE COURT:  All right.  How about the fact that you

18   were a juror, is there anything about that prior jury service

19   that you feel would make you unable to be fair and impartial?

20           THE JUROR:  No.

21           THE COURT:  All right.  Thank you.

22           Juror No. 7, tell us a little bit about yourself.

23           THE JUROR:  Sure.  I am 44 years old.  I lived in this

24   country for maybe 18 years, originally from Jamaica West

25   Indies.  I worked for a venture capital company and I live in

E6GAASER3                    Jury Voir Dire

```
 1    Westchester with my 11 year old daughter.  In my spare time
 2    school is out I do watch television.  In fact I do watch 24 and
 3    Gang Related.
 4              THE COURT:  All right.  Thank you.  And do you read
 5    any newspapers on a regular basis?
 6              THE JUROR:  Yes.  New York Times, Wall Street Journal,
 7    BBC News I watch.
 8              THE COURT:  All right.  Thank you.  Prospective Juror
 9    No. 11, tell us a little bit about yourself.
10              THE JUROR:  56.  I was born here and I live in
11    Manhattan.  My husband is an attorney as well.
12              THE COURT:  What kind of attorney is he?
13              THE JUROR:  He does real estate transactions.
14              THE COURT:  Anything about his position as an attorney
15    that makes you feel you couldn't be fair and impartial?
16              THE JUROR:  No.
17              THE COURT:  All right.
18              THE JUROR:  Two daughters, neither of them are
19    employed, both are in school.  One of them just finished
20    school, college looking for work.  Anyone has any ideas.  I
21    read.  I spend time with my family.  I go to the gym.  I read
22    New York Times.  I read the New Yorker.  I don't watch a whole
23    lot of television but I watch sometimes I watch Rachel Maddow.
24    I watch The Daily Show.
25              THE COURT:  All right.  Thank you.  OK.  Round number
```

E6GAASER3                          Jury Voir Dire

1    five, let's get our Post-Its.

2              (Pause)

3              COURTROOM DEPUTY:  Juror No. 11 Karen Ross.

4              THE COURT:  All right.  We're going to fill-in that

5    spot and then we're going to go on to our last round for the

6    12th.  All right.

7              COURTROOM DEPUTY:  Prospective Juror No. 11, Patricia

8    G. Dong.  Ms. Dong, please, take the fourth seat in the second

9    row.

10             THE COURT:  All right.  Prospective Juror No. 11, you

11   are dressed appropriately even though it's 80 degrees outside.

12   I don't know how you thought ahead but you were right.  Were

13   there any questions that I asked to which you would have had a

14   "yes" answer?

15             THE JUROR:  I was on jury duty.  It was a civil case.

16   It went to decision.  There's nothing that would make me bias.

17             THE COURT:  Any other questions to which you would

18   have had a "yes" answer?

19             THE JUROR:  No.

20             THE COURT:  Tell us a bill little bit about yourself.

21             THE JUROR:  I am 52, born in this country.  I live in

22   northern Westchester County.  I live with my husband and two

23   kids.  I am an accountant.  I work for a public accounting firm

24   in Danbury, Connecticut.

25             THE COURT:  What does your husband do?

E6GAASER3                         Jury Voir Dire

1              THE JUROR:  He is in a doctoral program for physical

2     therapy.  Two quasi adult children, one's in college, one's out

3     of college.  They're both unemployed.  I have a master degree.

4     I read novels.  Garden, work around my house.  I don't read any

5     magazines or newspapers.  I get my news pretty much from radio

6     and television.  I watch British crime dramas.

7              THE COURT:  All right.  Thank you.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  OK.  We are into our last round, and we

2     have one round against the alternates.  So one round, our last

3     round 12, and then one round after that against the alternates.

4              No strikes?  All right.  OK.  We've got one round

5     against the alternates.  Let's hand over the Post-its against

6     the alternates.  We will fill them in if anyone is struck.

7              DEPUTY COURT CLERK:  Alternate Juror 1, Shaymali R.

8     Chanda.

9              Prospective Alternate Juror 1, Lorri S. Pagan,

10    P-a-g-a-n or Pagan.  Ms. Pagan, please take the seat that was

11    vacated, the second to last seat in the last row.

12             THE COURT:  All right, Alternate 1, were there any

13    questions to which you would have had a yes answer?

14             JUROR:  No.

15             THE COURT:  Tell us a little bit about yourself.

16             JUROR:  I'm 54 years old.  I live in Westchester

17    County.  I'm married, have a son 19 years old that goes to

18    college.  I work for a wholesale company here in Manhattan.

19             THE COURT:  And what's your job?  What area are you

20    in?

21             JUROR:  I'm in planning.

22             THE COURT:  OK.

23             JUROR:  I went to college at FIT, and in my spare time

24    I am an avid Yankees fan, and I read entertainment magazines

25    and trade publications.  And television shows, I like reality

1   TV.  And I get my news from the radio.

2          THE COURT:  OK, thank you.

3          Ladies and gentlemen, I am asking counsel, now, is

4   there anything that should be raised with me at side bar before

5   we proceed to our next step?

6          MR. MUKHI:  No, your Honor.MR. DE CASTRONo, your

7   Honor.

8          THE COURT:  Thank you.  Ladies and gentlemen, I am

9   pleased to say that we have completed jury selection in this

10  matter.  Those of you who have not been selected, I want to

11  thank you for coming here and being part of the pool and ask

12  you to take your card and return down to the jury room, and

13  they will tell you what to do next.  Joe will probably give the

14  cards to one person who can then hands them around.  Thank you

15  very much.

16         And I am going to give you a couple of instructions in

17  a moment, and then we are going to dismiss you for lunch, so we

18  can have lunch before we come back and do our next piece, just

19  so you have a sense of where you're going.  You are going to

20  get up and walk around in just a minute.  All right?

21         All right.  I am going to have Mr. Pecorino read out

22  the names of the jury, and then he will give you an oath,

23  another oath following that.

24         DEPUTY COURT CLERK:  Juror 1, William A. Friedman;

25  Juror 2, Yolanda Rivera; Juror 3, Katherine M. Brant; Juror 4,

E6F7SER4                    Voir dire

Sarah W. Soong; Juror 5, Wilmore C. Wright; Juror 6, Sarah L.

Baumann; Juror 7, Karene Cole-Bailey; Juror 8, Dwayne Iverson;

Juror 9, Kachung Lai; Juror 10, Anthony R. Inoa; Juror 11,

Patricia G. Dong; Juror 12, Andy Camejo; Alternate Juror 1,

Lorri S. Pagan; Alternate Juror 2, Diane C. McNulty.

          THE COURT:  Thank you.  Ladies and gentlemen, please

stand.

          (A Jury of 12 and 2 alternates was selected and sworn)

          THE COURT:  You may be seated.  Thank you.  I am just

going to give you some short instructions now, and then what we

are going to do is we're going to break for lunch and come back

at 2 o'clock for opening statements, and then we're going to go

opening statements, which won't be particularly long, and then

right into the evidence.  All right?  So I am going to give you

a few preliminary instructions first.

          You, ladies and gentlemen, members of the jury, are

the finders of fact in this criminal matter.  I am not the one

who determines guilt or innocence here; that is for you to

decide; you are the finders of fact.

          I, as I said, determine what evidence comes in, what

evidence stays out.  I keep the courtroom orderly, and I also

instruct you on the law.  But you are the finders of the facts.

          Nothing I say is evidence, and nothing that the

lawyers say is evidence.  Questions posed are never evidence.

Objections are not evidence.  Only the testimony of witnesses

E6F7SER4

1    who are here and are sworn and put under oath in your presence

2    is evidence in this case, along with whatever other evidence,

3    documents or physical evidence gets admitted into evidence.

4            In some instances there might be facts to which the

5    lawyers agree, and those are called stipulations, and I will

6    tell you specifically, OK, this is a stipulation of fact, and

7    you can also consider that as evidence.

8            Now, there are two kinds of evidence:  Direct

9    evidence, something that you feel or someone feels, sees,

10   senses with a sense, tastes, touches, that's direct evidence --

11   hears.

12           There is also circumstantial evidence.  Circumstantial

13   evidence is evidence where one fact is used to prove another

14   fact.  It's like putting two and two together, if you will.

15   And let me give you an example.  Let's assume for a moment that

16   you are on a desert island, and are you there and you are

17   alone, and you know you are alone, and you have been alone for

18   years, and one day you wake up and you see footprints of

19   someone of a human of a different size than your own

20   footprints.  Now, you haven't seen that person, but you deduct

21   or infer based upon the fact that you have seen these

22   footprints that you are no longer alone.  You have used the

23   circumstantial evidence of the footprint to infer the proof of

24   another fact or another fact.

25           Here is another example.  You come in today, let's

E6F7SER4

assume it's sunny outside, and over the course of the day you

see people coming in with umbrellas dripping wet, and you start

to realize I think it must be raining outside.  You haven't

seen the rain because the blinds are pulled, but you infer

based upon the fact that you are seeing the umbrella dripping

wet that another fact, that it's raining outside, is true.

You can consider both kinds of evidence.

Now, you are going to hear from witnesses at this

trial, and they are going to be sworn and put under oath, and

they will be testifying from this jury box, and you will be the

ones who determine whether you believe them or don't believe

them.  Right?

You determine the credibility of witnesses.  How do

you do that?  You watch them, you listen to them, and you

observe them.  Every single day you decide in your own life

whether you believe or don't believe people, and you bring that

same common sense with you here to this courtroom.  That's your

job as a juror; that's why we have juries which are juries of

our citizens.

So, you ask yourself do these people know what they

were talking about?  Were they candid, open, honest?  Did they

seem truthful to me?  Did they seem to testify falsely?  Did

they exaggerate?  And all of these things go into your

determination as to whether they're lying or telling the truth.

And they might be untruthful in some respect and truthful in

E6F7SER4

1   other respects.  It doesn't have to be an all or nothing

2   proposition.  It's for you to decide.

3           Now, the burden of proof here is very important for

4   you to understand.  The government bears the burden of proof

5   throughout this trial.  There is no burden of proof on the

6   defendant.  The government must prove that the defendant is

7   guilty beyond a reasonable doubt before the defendant can be

8   found guilty.  As I said before, the indictment in this matter,

9   which is the instrument which charges the defendant with the

10   crimes, that's not proof; that's just an accusation.  The

11   defendant, therefore, starts out with a clean slate.

12           So, let's talk about this burden of proof a little bit

13   more.  As I said before, the defendant could sit in silence

14   this whole trial.  It is not for the defendant to prove his

15   innocence; it's for the government to prove beyond a reasonable

16   doubt that he is guilty.  And it will be for you to determine

17   whether they have met that burden at the end of the case when

18   you have assessed all of the evidence.

19           Now it's very important for you to keep an open mind

20   throughout this case.  Don't form any judgments until all the

21   evidence is in.  Remember, the evidence comes in in pieces.

22   It's not like Law and Order where you see little bits and

23   pieces sort of where the camera is moving back and forth

24   between all of these moments all within a three minute

25   timeframe.  Instead, you hear what one witness has to say, then

1   you hear what another witness has to say, and then you might

2   hear another witness and another witness, and you put it all

3   together.  It's not told in some linear fashion where one

4   person talks about day one and another person talks about day

5   two; it comes in in pieces.  So, it's very important that you

6   keep an open mind and not rush to judgment.  There are sides,

7   as you know, to any story, so you want to keep an open mind as

8   things proceed.

9            Now, don't talk to anybody about this case until I

10  tell you that you can, which will only be at the end of the

11  case, after all the evidence is in, after the closing

12  statements, so that's several days from now, when I will tell

13  you that you can talk to each other.  But until you have

14  rendered a verdict, you cannot talk to anybody about this case,

15  nobody outside.  You can't talk to your husbands, your spouses

16  or friends.  You shouldn't update your Facebook profile with

17  "On a jury and here are my thoughts today."  You can't tweet

18  about it.  People really do these things, so we have to tell

19  you not to do these things.

20           So, this is very, very important that you only

21  consider the testimony and the evidence that comes in here in

22  this courtroom, and that you not listen to views of other

23  people who are friends of yours, and when you sort of talk, if

24  you talked about what happened during the day.  We don't want

25  any of that happening.

E6F7SER4

1         So, talk to no one about this case until the end of

2    the case when you will be able to talk to each other, and then

3    after a verdict is rendered I will release you from that oath.

4    You will hear my words "I now release you from your oath," and

5    then you can talk to whomever you want about the case.  OK?

6    But until then, please, do not talk about this case.  That

7    means you can't talk to each other, you can't walk into the

8    jury room and say, "hey, what did you think of so and so," or

9    "Gosh, I think such and such."  Don't talk to each other about

10   the case.  You can talk about the weather, you can talk about

11   Derek Jeter walking around on his farewell tour.  I hear

12   Mariano Rivera has a son now pitching.  Whatever you want to

13   talk about.

14        Now, lawyers, you are going to run into lawyers and

15   other folks associated with the case.  They are told not to

16   talk to you.  They are not being rude; they are not being

17   nasty.  It's not that they don't recognize you.  OK?  They are

18   told they cannot talk to you, either side, anybody at those

19   tables.  Why?  Because it's just easier that way.  Otherwise

20   somebody could think, oh, well, that so and so said hello to me

21   in a really friendly way, they want me to be bias for them.

22   It's just easier if I have an across-the-board rule no chit

23   chat with any of the folks at these two tables.  OK?  So they

24   are not allowed in an elevator to say hello; they are not

25   allowed in the bathroom to say hello, can't in the hallway say

E6F7SER4

1     hello.  If they run into you at the deli, they can't say hello.

2     That's the instruction.  It can be a little awkward.  Do not

3     hold it against them.  It's my rule.  It's just so that there

4     are no conversations about anything outside of this courtroom.

5     You folks should never be talking to counsel.

6             I use LiveNote.  LiveNote is a direct feed to the

7     court reporter, which means that everything that's said --

8     although right now my screen is dark; I have to get it going

9     again -- is transmitted directly in a transcript form into my

10    computer.  I'm not on Zappos, I'm not Googling or doing my

11    e-mail.  When you see me looking at my computer, it's because

12    I'm listening to what is going on, and sometimes with an

13    objection it's easier if I look at it and see exactly what was

14    said.

15            Beverages in the courtroom, you are allowed to have

16    them.  Bring in a bottle of water if you want, bring in soda if

17    you want.  Bear in mind that if you drink a lot of soda you

18    might be looking for a break a little sooner rather than later,

19    but whatever makes you feel comfortable, that's the point.

20            And also I say to people do not bring in Doritos, but

21    if you've got some little snack, some soft snack that helps you

22    wile away the afternoon, I could care less, if it makes you

23    comfortable.  Sometimes people really get uncomfortable if they

24    are too hungry.  So, I want you folks to be comfortable and be

25    able to concentrate on the evidence, so we want to do what we

E6F7SER4

1   need to do to have that occur.

2           Notes:  You are going to be given a pad and a pen.

3   You don't have to ever take off the top of the pen or write on

4   the pad, but if you want to take notes, you can take notes.

5   The notes are just for you.  It's however you learn best.  And

6   sometimes people learn best when they take notes, sometimes

7   people don't need to take notes.  There is never going to be a

8   moment when you are going to be allowed to or entitled to show

9   your notes to somebody else.  So, your notes can't become

10  proof:  Oh, I wrote it down, it must be so.  No, notes are for

11  you.  If it helps you, take notes.  But there is a transcript

12  of everything that's said, and so later on if you are wondering

13  if a yes or no was asked to a particular question by a witness,

14  that will be able to be read back to you if you have a question

15  in the jury room.  So, we have a whole record of what's going

16  on, but if you want to take notes, take notes.  You will leave

17  them behind each night.

18          After we have lunch, we are going to leave right now,

19  and you are not going to talk to anybody about this case,

20  including each other, although you can talk about the most

21  recent episode of Game of Thrones, etc., etc.  But when you

22  come back at two, we are going to have opening statements.

23  Opening statements are the lawyers' opportunity to give you a

24  road map, their view as to what the evidence is going to show.

25          Again, what lawyers say, either side, is never

E6F7SER4

1   evidence.  What is evidence is the testimony that actually

2   comes in and the other exhibits that are admitted.  And it will

3   be for you to determine how you weigh the evidence.  All right?

4           So, at 2 o'clock we will have opening statements.  I

5   am going to ask you to come in at five minutes to two and be

6   ready, because we will come out right at two.  I will try to be

7   very respectful of your time.  If you folks can be on time with

8   our clock as well.  Give yourself time -- you are not the only

9   jurors in the building -- to get through security downstairs.

10  Just bear that in mind, you can't walk from Foley Square at

11  five minutes to two and expect to get here by two.  And we will

12  start every morning at 9:30 promptly, and we will go only until

13  five.  You will be out of here at five.  OK?  I will see you at

14  2 o'clock.  Thanks.

15          (Jury not present)

16          THE COURT:  All right, ladies and gentlemen, let's all

17  be seated for one moment.  I know you also have been sitting

18  here for some time, so I don't want to keep you longer than is

19  necessary.

20          First, is there anything that anyone would like to

21  raise?

22          MR. MUKHI:  No, your Honor.

23          MR. DE CASTRO:  No, your Honor.

24          THE COURT:  All right.  So, the second thing that I

25  wanted to address was Mr. Kolakowski, and I am going to

E6F7SER4

```
 1   preclude the cross-examination of Mr. Kolakowski on the topic
 2   which we discussed for the following reason:  I have reviewed
 3   the materials that Ms. Gotlib had presented.  I do see that
 4   there are statements about apparently the audio of the tape and
 5   that the audio of the tape would have revealed that Craig Lane,
 6   I think was the individual's name, was in fact a speaker, and
 7   it wasn't Mr. Boyd who was then later arrested and then held
 8   for a period of time.  There is a number of issues.  One is
 9   that the misidentification is not an issue here in terms of the
10   point that Mr. Kolakowski will be testifying to.  As I
11   understand it, the nature of Mr. Kolakowski's testimony is
12   going to be on the surveillance and will not touch on those
13   issues which were raised in the Boyd case, and so the Boyd case
14   is not -- it's not on point, so it's not, I believe, relevant,
15   and also it doesn't go to credibility or veracity of Mr.
16   Kolakowski.
17          There are additional reasons that I could go into that
18   I think are unnecessary.  For instance, there is a real issue I
19   think in that case as to whether or not the investigative work
20   was even what I was calling earlier shoddy.  It appeared that
21   Mr. Kolakowski and others had read a transcript but had not
22   listened to the audio, so I wouldn't even want to go after or
23   suggest that there is anything that would be probative of the
24   thoroughness of investigative work, because I think that's an
25   open question indeed, and there of course was probable cause
```

E6F7SER4

1    found.  So for all of those reasons I don't deem that

2    particular line of questioning as relevant or proper in this

3    case, so that will be precluded.

4              Anything further we should do before we take our own

5    lunch?

6              MR. DE CASTRO:  Nothing from the defense.

7              MR. MUKHI:  No, your Honor.

8              THE COURT:  All right.  And tell us who the first

9    witness will be after the opening.

10             MR. MUKHI:  The first witness will be detective Justin

11   Kealy, followed by Sergeant Kolakowski, Musante, followed by

12   Victor Moral, if we get to Moral.  That will obviously take us

13   through the end of the day.

14             THE COURT:  Thank you.  We are adjourned until 2

15   o'clock.  If anybody has anything that they believe needs to be

16   raised in advance, and you are all here, then you can just let

17   Joe know, otherwise I will just come out at two.

18             (Luncheon recess)

19             (Continued on next page)

20

21

22

23

24

25

E6F7SER4

1                A F T E R N O O N   S E S S I O N

2                        2:00 p.m.

3           THE COURT:  I understand the jury is here.

4           MS. MAIMIN:  We wanted to advise the court that we

5      have placed jury binders under the seats of the jurors

6      containing transcripts of recordings, some of which are going

7      to be played today.

8           THE COURT:  Thank you.  And have you given a copy of

9      that binder to Mr. De Castro?

10          MS. MAIMIN:  We have.

11          THE COURT:  I will just instruct them not to touch

12     that until the appropriate time.  Thank you.

13          (Jury present)

14          THE COURT:  Ladies and gentlemen of the jury, before

15     we begin, I just want to tell you that placed under each of

16     your chairs is a binder, which do not touch now, because we

17     haven't gotten to it yet, but it's there because we will get

18     into it with some of the witnesses.  And I will give you some

19     particular instructions as to how to turn to different tabs,

20     when to turn to different tabs when we get there, but that's

21     what is under your chairs right now.

22          All right.  Would the government like to proceed.

23     Ms. Maimin?

24          MS. MAIMIN:  Thank you, your Honor.

25          On October 14, 2012 a couple was driving down 171st

1    Street in Washington Heights right here in Manhattan.  They

2    heard a police siren, looked in the rearview mirror and saw

3    that they were being stopped.  They pulled over and waited for

4    the police to approach their car.  The police were wearing

5    bulletproof vests, and they had a gun.

6           Another member of the police team was just up the

7    block in another car, preventing the couple from fleeing during

8    the stop.  But this was not the real police.  This was actually

9    a team of armed robbers pretending to be the police, and they

10   were robbing that couple because they believed that the couple

11   was transporting cocaine in their car.

12          Armed with a gun, the robbers ordered the couple out

13   of their car, and the couple obeyed the robbers commands, but

14   even if they hadn't, they wouldn't have been able to escape.

15   because that man, the defendant, Anthony Serrano, was waiting

16   in the dark in his car, preventing that couple from escaping.

17   He was a member of that team of armed robbers, and one of his

18   jobs that night was to make sure the victims couldn't get away

19   before the robbers could steal their drugs.

20          The robbers pushed the couple up against their car and

21   wouldn't let them turn around.  They asked for ID and had them

22   step away from the vehicle.  The robbers then suddenly stole

23   the couple's car and drove away, leaving the couple stranded in

24   the street because this was no ordinary police stop, this was a

25   roadside robbery.

E6F7SER4                          Opening - Ms. Maimin

1          The defendant and his team of robbers wanted a car so

2     they could take it and search it for cocaine that they could

3     resell, and the defendant played a critical role that night.

4     He was involved in planning that robbery, in assigning everyone

5     their roles.  He even supplied the gun.  And when it came time

6     to do the robbery, he was right there down the block, using his

7     car to block the couple from escaping.

8          You are going to learn that this was not the first

9     time the defendant and his team of robbers stole drugs from

10    drug dealers, because that is what the defendant and his crew

11    did:  They robbed drug dealers in order to resell the drugs on

12    the street, drugs they could sell for a hundred percent profit

13    because they stole them instead of buying them.  And make no

14    mistake about it, ladies and gentlemen, it is just as much of a

15    crime to rob a drug dealer as it is a bank or a jewelry store.

16         So, that is why we're here, ladies and gentlemen.  In

17    2012 and 2013 the defendant and his crew were on a crime spree.

18    They robbed drug dealers with force, and they broke into drug

19    dealers homes when they weren't there, all to get drugs that

20    they resold to their customers.  For committing these offenses

21    the defendant has been charged with three crimes:  A robbery

22    charge; a drug charge for the drugs that the crew stole and

23    resold; and a gun charge.  Over the next few days you are going

24    to hear the evidence that proves to you that the defendant is

25    guilty of every one of these charges.

1           So, what will the evidence at this trial show?  In

2   2012 the defendant joined a gang of robbers that operated in

3   New York City and New Jersey.  This special method of the

4   defendant's crew is they dressed up like police officers during

5   robberies.  They did this to catch their victims off guard and

6   make sure they didn't resist during the robbery.  But if the

7   victims did resist, the crew was ready to respond with force.

8           Now, everyone had a different role in the crew.  There

9   were the organizers, the look-outs, and there was the muscle,

10  people who were willing to face the victim and wave guns in

11  their faces.

12          What was the defendant's role?  Well, he was a

13  critical member of this crew.  He was one of the crew's

14  leaders.  He decided who would participate in certain robberies

15  and what their jobs would be.  But with one important

16  exception, which I will discuss in a moment, the defendant did

17  not usually go to the robberies himself.  He didn't want to be

18  seen at the crime scene by the victims or anybody else.  It's

19  just what you would expect from the boss of a robbery crew.  It

20  was the defendant's way of doing things, his MO, to send other

21  people to do his dirty work, and then reap the profits himself

22  by selling the drugs that his crew robbed and stole.

23          But there was one robbery that the defendant did go

24  to, the attempted robbery I just mentioned, the one in

25  Washington Heights with that couple who they believed were

E6F7SER4                          Opening – Ms. Maimin

1    transporting cocaine.  You are going to learn that the

2    defendant was involved in planning that crime, deciding that

3    the robbers would pretend to be police officers, conducting a

4    traffic stop on their victims.  He was also involved in

5    deciding that the crew was going to use a special car that they

6    had outfitted to look like a police car.  It had lights and

7    sirens, and it even had a special device when you pressed a

8    button a metal plate would go over the license plate so nobody

9    could see the license plate number, because they didn't want

10   anyone to write it down.

11          And you are going to learn that the defendant actually

12   went to that robbery himself, stalking the victims through the

13   streets of Manhattan with the other crew members, and used his

14   car to cut off the victims' escape while the other members of

15   the crew were holding them up.  Then he went with the others to

16   a deserted area in New Jersey to ransack the car to find the

17   cocaine.

18          So, after that robbery, what was the crew's next big

19   job?  Well, you will learn in December of 2012 the crew got a

20   tip from an inside source who worked with a heroin trafficking

21   organization.  This source was providing inside information to

22   another member of the defendant's crew, a robber named Javion

23   Camacho.  Camacho was the defendant's cousin, and he was also

24   one of the other robbers involved in that robbery of the couple

25   in Washington Heights.

1          The inside source told Camacho that there was an

2     upcoming massive shipment of heroin, more than 20 kilograms,

3     that the crew could rob.  Camacho explained to the source that

4     his team dressed up as police officers to rob drug dealers at

5     gunpoint.  He also explained that his fellow robbers, who he

6     even referred to as his family, had recently gotten its hands

7     on another large amount of heroin.  You are also going to learn

8     that just two months earlier the defendant had gotten a

9     kilogram of heroin himself that was stolen from another drug

10    dealer.

11         Now, while Camacho is meeting with the source in

12    December 2012 and January 2013, he was also in close contact

13    with the defendant by phone.  You are going to learn that right

14    around this very same time, just three days after Javion

15    Camacho stated that his team, his family, had just made a big

16    heroin score, the defendant sold heroin right out of his own

17    home to a confidential informant working with law enforcement

18    to get the defendant's heroin off the streets.  The defendant

19    did this four times in the coming weeks alone, selling the

20    heroin that his robbery team had gotten into the business of

21    dealing right out of the front door of his home.

22         In the meantime, the crew was preparing for that big

23    new heroin robbery.  On January 9, 2013 all of the pieces came

24    into place, and some of the crew members drove to the Bronx

25    that night to actually commit the robbery, more than 20 kilos

E6F7SER4                          Opening – Ms. Maimin

 1   of heroin.  16 of them showed up dressed as police officers and

 2   armed with six loaded guns.  But what you will learn is unlike

 3   that Washington Heights robbery of the couple, this robbery was

 4   prevented by the DEA, the Drug Enforcement Administration, as

 5   part of a sting operation.  The heroin dealer did not actually

 6   exist, so the inside source was actually a DEA informant.  The

 7   DEA had learned about the defendant's crew and had infiltrated

 8   it.

 9          You are going to learn that in the days leading up to

10   this attempted robbery, the defendant was in close phone

11   contact with other members of the crew, including his cousin

12   Javion Camacho.  28 phone communications with Javion Camacho in

13   the two days leading up to the robbery, 15 of which were on the

14   day of the robbery alone.

15          Now, the defendant did not actually go to that January

16   9th robbery of the heroin dealer, the one that turned out to be

17   a DEA sting, but he checked up on his cousin repeatedly during

18   the attempted robbery, repeatedly calling Camacho and another

19   crew member who was also arrested along with those 16 robbers.

20          You are going to learn that when those robbers were

21   arrested they were armed with loaded guns, handcuffs, zip ties,

22   a baseball bat and police gear, all the items that the

23   defendant and his crew used to rob drugs, just like they tried

24   to do on October 14, 2012 when the defendant and his fellow

25   crew members tried to rob that couple in Washington Heights.

E6F7SER4                              Opening - Ms. Maimin

1          That, ladies and gentlemen, is what the evidence at

2     this trial will show:  The defendant is an armed robber and a

3     drug dealer.  That is why we're here.

4          So, how will we prove this to you?  Well, a lot of the

5     evidence is going to come in through witnesses.  We will

6     discuss some of them now.  First you are going to hear from law

7     enforcement witnesses.  You will hear yourselves from the law

8     enforcement officers who saw the defendant selling heroin right

9     out of his own home, right after his cousin Javion Camacho, a

10     fellow robber, told the DEA informant that the crew had just

11     received a new supply of heroin.

12          You will also hear from the DEA agent that arranged

13     that sting operation, the one where the 16 people were

14     arrested.  He will tell you how he learned about the

15     defendant's crew and the steps he took to catch them.  He will

16     tell you how a DEA informant was recording his conversation

17     with Javion Camacho and others.  So, you will actually hear

18     these recordings for yourself.

19          You will hear Camacho describe exactly how the

20     defendant's family of robbers operated.  That agent will also

21     tell you about the night of that robbery sting when he arrested

22     the defendant's other crew members and found their loaded guns

23     and other robbery equipment.

24          And you will also hear from the police officer who

25     first responded to that robbery in Washington Heights after the

E6F7SER4                    Opening - Ms. Maimin

couple called 911.  She will tell you about how she went to the
scene of the robbery and found that couple stranded in the
street.

           So, what other types of witnesses are you going to
hear about?  Well, you are going to hear from some of the
defendant's victims, that couple who was robbed in Washington
Heights, they will testify before you.  You will learn that the
man actually was a drug dealer, although he didn't have any
drugs with him on the night of the robbery.  You will learn
that that couple saw that they were being followed by a car
with a covered license plate.  You will learn that they thought
they were being pulled over by police officers until the
robbers stole their car and left them stranded by the side of
the road.

           Now, I expect that these victims will not be able to
pick out the defendant and identify him here by face as one of
their attackers, because, as usual, he made sure to stay away
from them during the robbery, letting others take the risk of
getting caught.  He was up the block in the dark in his car
preventing the victims from escaping.  But these victims will
tell you what they did see and what they do remember from the
night of the robbery, and one of these victims will tell you
that she remembers being blocked by a car that matches the
description of the defendant's car.

           And at this trial you will also hear from one of the

E6F7SER4                    Opening - Ms. Maimin

1    robbery crew members himself.  His name is Victor Moral.  He

2    will tell you about how this crew operated from the inside, how

3    they targeted drug dealers and dressed up like the police, that

4    they carried guns and were prepared to use them.

5          Mr. Moral will tell you that in the fall of 2012 the

6    defendant sold a kilogram of heroin that Mr. Moral and others

7    had stolen from another drug dealer's house, and from then on

8    the defendant and Mr. Moral started planning robberies

9    together.

10          Mr. Moral will also tell you that he committed that

11   robbery of the couple in Washington Heights along with the

12   defendant, how he and the defendant shadowed that couple

13   through the streets of Manhattan, finally stopping their car,

14   pretending to be police officers.  And Mr. Moral will tell you

15   that the defendant supplied the gun for that robbery.  He will

16   also tell you that it was the defendant calling the shots that

17   night about who went where and who did what during the robbery,

18   that the defendant decided who would have to face the victim

19   and who would be permitted to sit in their car down the street

20   so that the victims could not identify them.  Mr. Moral will

21   also tell you that he was arrested on January 9 in that DEA

22   sting.

23          Now, this witness will take you right to the heart of

24   the defendant's crimes like no other witness can, because he

25   too was a member of that robbery crew.  Like the defendant,

1    Mr. Moral is a criminal.  The crimes he committed include

2    violent robberies and murder.  But this man has been caught and

3    prosecuted by the government.  He pled guilty and is in jail

4    waiting to be sentenced for his crime.

5           Now, to be clear, Mr. Moral is not testifying out of

6    the goodness of his own heart, nor do I expect he will claim to

7    be.  He will tell you that he is testifying because he is

8    hoping for a lower sentence.  So, listen carefully when

9    Mr. Moral testifies, see whether his testimony lines up with

10   the other evidence, because when you do, you will see that his

11   testimony is backed up by all of the other evidence in this

12   case.

13          So, what will that other evidence be?  Well, you are

14   going to see surveillance video in Washington Heights that

15   captured some of the events of that night live, of the couple's

16   robbery as they were happening.  You are going to see the

17   couple's car being followed by that fake cop car, and you are

18   going to see that right in front of the victim's car was the

19   defendant's car waiting to box the victims in.  You are even

20   going to see Javion Camacho on that video walking from the

21   defendant's car to the fake cop car at the direction of the

22   defendant.

23          What other evidence are you going to see?  Well, you

24   are going to see physical evidence.  You are going to see the

25   heroin that the defendant sold to the confidential informant on

E6F7SER4                         Opening - Ms. Maimin

1    four occasions while the police were washing.

2           You will also see the physical evidence that the DEA

3    seized off the defendant's crew after that sting operation.

4    You will see guns, bullets, the police shirts and vests, and

5    many other types of evidence that was seized on the night of

6    the robbery, everything that the defendant and his team used to

7    commit drug robberies.

8           You will also see that the DEA seized that fake police

9    car the night of the sting, that same police car that was used

10   to pull over the couple on the night of their robbery.  You

11   will see photos and a video of that fake police car, including

12   of a special license plate device that covered the license

13   plate at the push of a button.

14          Finally, during this trial we are going to walk you

15   through the phone records of the defendant and his crew.  You

16   will hear about something called cell phone location data for

17   the defendant's phone.  This is information that the

18   defendant's phone company keeps about the location of his

19   phone.  These records will confirm that on the night of the

20   robbery in Washington Heights the defendant drove from his home

21   in New Jersey to the scene of the robbery, was there at the

22   time the robbery was being committed, headed to a deserted area

23   in New Jersey, and then went home.

24          We will also show you the records that show the

25   defendant talking to Javion Camacho and another crew member

E6F7SER4                    Opening - Ms. Maimin

1   more than 70 times on the day and night of the Washington

2   Heights robbery.

3            By the end of this trial, all of this evidence will

4   prove to you that the defendant is guilty of all of the crimes

5   with which he is charged.

6            Until that time we ask you to do three things:  First,

7   please pay close attention to the evidence; second, follow

8   Judge Forrest's instructions on the law.  She will tell you how

9   to apply the law to this case.  Third, please use your common

10  sense.  You brought with you into this courtroom everything you

11  need to evaluate the evidence in this case.  It's simply the

12  same common sense that you use in your everyday lives.

13           If you do those three things, you will return the only

14  verdict that is consistent with the law and with the evidence:

15  The defendant is a robber, he is a drug dealer and he uses guns

16  to commit these crimes, and he is guilty.

17           THE COURT:  Thank you, Ms. Maimin.

18           Mr. De Castro.

19           MR. DE CASTRO:  May it please the court, government,

20  ladies and gentlemen of the jury, Anthony Serrano is not guilty

21  of these crimes.  He is not guilty of the drug conspiracy in

22  the indictment.  He is not a member of a robbery crew that

23  steals drugs and sells them.  There will be no direct evidence

24  of Mr. Serrano was selling any drugs that the robbery crew

25  stole.  The only evidence you are going to hear is from that

1    witness they mentioned, Victor Moral, a prolific criminal, a

2    government cooperator with quite a track record, a track record

3    of lying to the government, to courts and to a jury just like

4    you.

5        Mr. Serrano is not guilty of the robbery conspiracy

6    that alleges they robbed drug dealers.  He is also not guilty

7    of aiding and abetting the use of guns as part of that robbery

8    conspiracy.  As I said, he is not a member, we submit, of the

9    robbery crew, therefore he is not guilty of using guns in

10   furtherance of that.

11       As I said to you earlier, my name is Cesar De Castro,

12   and I along with Valerie Gotlib represent Mr. Serrano.  We do

13   not deny the existence of this so-called crew.  It's the Javion

14   Camacho crew; they robbed drug dealers.  They act as police

15   officers, they act as law enforcement, they even have that

16   police car.  It looks like an undercover police car, an

17   unmarked police car.  We don't deny that.  The question for

18   you, ladies and gentlemen, is who is a member of that robbery

19   conspiracy or that crew charged in the indictment, who

20   participated in those robberies.

21       You are going to hear that some jobs are bigger than

22   other jobs, you need more members for some jobs, you need less

23   members for others.  Let me give you an everyday example:  I'm

24   going to get my apartment painted in the near future, I don't

25   have a huge apartment, and I think my painter needs two people

1    maximum to do the job.  But if that painter, he has some

2    employees, were going to do a bigger apartment, maybe a house,

3    commercial space, for example, he would need a bigger crew no

4    doubt.  For a job big enough he may need all the painters that

5    he employed; he may need what I call an all-hands-on-deck job.

6    It's a big enough job, bring everybody.

7            In this case you are going to learn -- and I am going

8    to start by talking to you about January 9 -- that January 9

9    was an all-hands-on-deck job.  It was an all-hands-on-deck job

10   for the Javion Camacho crew.  You are going to hear a lot about

11   that robbery in the days to come.  You are also going to hear

12   about the days leading up to that robbery in the next few days.

13   But what you are going to learn is that that was a government

14   sting that ensnared the Camacho crew.  It's the biggest part of

15   the government's case.  They are going to introduce more than

16   200 pieces of evidence related to that planned robbery.  They

17   are going to introduce recordings, videos, text messages,

18   photos.  They are probably going to have a table here and put

19   out all the equipment that was brought that Ms. Maimin

20   mentioned.

21           Since this was such a huge job for the Camacho crew,

22   an all-hands-on-deck job, they brought all their members, and

23   they brought all their equipment.  In fact, as you heard

24   Ms. Maimin say, Javion Camacho and his crew, his family, who

25   did he bring to that robbery?  Julio Camacho.  This is the

1   biggest job that his crew ever attempted, and in my painting

2   example this would be like my painter doing an entire,

3   all-hands-on-deck, the whole crew would be working to get the

4   job done effectively and efficiently.  I suppose that's exactly

5   why the government in this sting operation proposed that it was

6   more than 20 kilos, so that they could ensnare the entire crew.

7   And their plan worked to perfection.  He brought the entire

8   crew.  It's going to be more than 20 kilos, there is enough to

9   go around.

10          So where was Anthony Serrano?  You will be asking

11  yourself this, why he wasn't there if he was supposed to be

12  such an important member of this crew.  There is no evidence

13  that he was there.  There is no evidence that he even knew what

14  was happening there.

15          The government will not be able to prove to you beyond

16  a reasonable doubt that Mr. Serrano was a member of that crew

17  or even rationally explain his absence on January 9.  Sure,

18  they are going to introduce evidence of calls and texts between

19  Mr. Serrano and Javion Camacho, calls and texts between

20  November and January, contact between him and his cousin.  It

21  doesn't prove anything.

22          What they can't show you is the substance of any of

23  those communications, but they want you to conclude that those

24  calls are related somehow simply based on the timing.  In

25  reality what you are going to see is that there are

1   communications in November to January, the holiday season.

2   What they're trying to suggest is his absence is all about his

3   MO, this is his modus operendi, but at the same time then he

4   wasn't operating the way he normally does on October 14, 2012,

5   that robbery that I will talk about in a minute and Ms. Maimin

6   led off with.

7           But I submit to you, ladies and gentlemen, that I have

8   a better explanation for Mr. Serrano's absence.  Simply he is

9   not a member of the crew.  If you want to know who was a member

10  of the Javion Camacho robbery crew, look no further than

11  January 9, 2013.  You are going to hear days of testimony

12  about, you are going to see tons of evidence about that day.

13  That's all you need to look at to figure out who is a member of

14  that crew.  The government did a great job.  I commend them for

15  setting up the sting operation.  They enticed the leader of

16  that crew to show up with his entire team, to gather all of his

17  troops and bring them.  And he did.  Anthony Serrano is

18  conspicuously absent.

19          Now, October 14, this is the robbery that the

20  government led off with.  You are going to hear a lot of

21  evidence, some evidence regarding this robbery.  That was a

22  robbery of a drug dealer in Washington Heights, and you are

23  going to hear, as the government said, from some witnesses that

24  will not be able to place Mr. Serrano there, because they will

25  not identify him.

1          But what will the government rely on?  They will rely

2     on that cell site location evidence, and more importantly they

3     are going to rely on Victor Moral, their star witness.

4          The cell site evidence will show that he was in the

5     area of the robbery, but I suspect the witness also will

6     testify that that cell site address cannot pinpoint the

7     location of a person's phone.  It can give you a sort of range,

8     but that cell site evidence cannot prove and it will not prove

9     that he was involved in a robbery in any way.

10          There are plenty of reasons why any one of us would be

11     in Washington Heights on a particular night.  There are plenty

12     of great restaurants in Washington Heights, great bars, clubs,

13     everything else.  But that's why they're going to call

14     Mr. Moral, because that evidence can't prove to you that he was

15     there committing any type of crime, so they're going to call

16     Victor Moral, and this case will come down to that one man, a

17     violent man who has lied his entire life.  He has lied under

18     oath in a courtroom about killing someone.

19          In February 2012 he became an informant for the state

20     police.  You are going to learn that while he was an informant

21     he didn't tell them he committed more than 20 robberies,

22     burglaries, car jackings, hijackings, cargo thefts.  He didn't

23     tell the state police, as he was required.

24          After his testimony it is going to be very, very clear

25     what his MO is:  If he stands to benefit, he will say whatever

1  he has to say.  He was involved in so many robberies,

2  burglaries, drug deals, car jackings, that he won't even be

3  able to keep them straight, and neither will you.  He knows how

4  to manipulate the system.  He knows how to manipulate the

5  government.  He is going to try to manipulate you, all because

6  he is facing potential life in prison.

7          Mr. Moral will take that stand, and he will testify,

8  and true to form he will lie to you.  He will try to manipulate

9  you into believing that Mr. Serrano was involved in these

10  crimes, and he will hope to get yet another pass for the

11  countless crimes for which he is facing the possibility of the

12  rest of his life in prison.

13          Now, the government is also going to put on evidence

14  of other robberies of the Camacho crew that it alleges

15  Mr. Serrano was somehow involved in.  And again going through

16  their argument regarding his modus operandi, they are going to

17  also acknowledge that he is not present, that he is somehow

18  this planner who doesn't get his hands dirty in all these

19  robberies.  And in this case, ladies and gentlemen, that's the

20  government's way of saying we don't have any direct evidence of

21  his involvement; the only direct evidence we may have is Victor

22  Moral, the man who is trying to avoid a life sentence by

23  implicating Mr. Serrano.

24          You are going to hear evidence, I suspect, of July 4,

25  2012, a robbery of an apartment in Jersey City, for which

1    Anthony Serrano was not present; a robbery of a DJ on the

2    Jersey Turnpike on November 22, 2012, for which Anthony Serrano

3    was not present; an October burglary of an apartment in the

4    Bronx, of which Anthony Serrano was not present; and of course

5    the January 9 robbery which you know he was not present.

6          Now, let me say a couple little things before I wrap

7    up about the narcotics conspiracy charged in this case.  I

8    submit to you that he is not a member of the robbery crew for

9    all the reasons I have said, he is not guilty of agreeing with

10   those people to sell drugs that they had robbed.  There will be

11   no direct evidence of him selling any drugs that the robbery

12   crew stole.  The only evidence will be again from Mr. Moral.

13         They will present evidence, as Ms. Maimin referred to,

14   of these drug deals in Jersey City by this older man named

15   Michael Gamba.  Gamba sold drugs to government informants.

16   Ms. Maimin said many times in her opening that agent, officers,

17   saw Anthony Serrano sell drugs.  Pay attention to that

18   testimony, ladies and gentlemen.  Pay attention to the

19   testimony regarding what officers saw.  What they're really

20   going to try to do is again show some type of circumstantial

21   evidence that Mr. Serrano made those drug deals and not

22   Mr. Gamba.  They are going to ask you to take an actual leap to

23   make a factual inference, and I will suggest to you you will

24   not be able to do that.

25         But even if you were, the government's theory is that

E6F7SER4                     Opening - Mr. De Castro

1    Mr. Serrano sells the drugs that the robbery crew steals.  The

2    drug sales you are going to hear about have nothing to do with

3    the conspiracy charged in the indictment.  Those are sales that

4    occurred in New Jersey with a person not even alleged to be

5    part of the robbery crew or anyone involved in the conspiracy

6    at all.

7            Now I'd like to thank you in advance for your service.

8    You play a vital role in the criminal justice system in judging

9    another human being.  And you have been chosen to be jurors for

10   pretty much two reasons:  One, common sense and your ability to

11   keep an open mind.  Mr. Serrano pled not guilty in this case,

12   as you know.  He is saying to you he is innocent of these

13   charges.  He enjoys a presumption of innocence.  What

14   Ms. Maimin said in her opening is not evidence.  What I say in

15   this opening is not evidence either.  The evidence comes

16   through the witnesses and any documents admitted and anything

17   else admitted into evidence.

18           Your job as jurors is to listen to all the evidence

19   not just from the government's questioning but also from

20   cross-examination.  People can say very different things on

21   cross-examination.  There are more than one side.  There is

22   more than one side to a story.  Keep an open mind until you

23   hear all of the evidence and the judge instructs you on the

24   law.  If you do that, I am confident that you will reach the

25   only just verdict and that is not guilty.  Thank you.

1            THE COURT:  Thank you, Mr. De Castro.

2            Would the government like to call its first witness,

3    please?

4            MR. MUKHI:  Yes, the government calls Detective Justin

5    Kealy.

6            THE COURT:  Let's get the detective to the stand and

7    let let's turn the podium back to facing the witness box.

8     JUSTIN KEALY,

9         called as a witness by the government,

10        having been duly sworn, testified as follows:

11           THE WITNESS:  Justin Kealy, K-e-a-l-y.

12           THE COURT:  Please be seated.  And you can adjust the

13   microphone.  It will be important for to you speak into it

14   clearly and loudly.  Thank you.

15           You may proceed, Mr. Mukhi.

16           MR. MUKHI:  Thank you.

17   DIRECT EXAMINATION

18   BY MR. MUKHI:

19   Q.  Mr. Kealy where do you work?

20   A.  I Hudson County prosecutor's office in New Jersey.

21   Q.  What is your title?

22   A.  Detective.

23   Q.  How long have you been a detective with the Hudson County

24   prosecutor's office?

25   A.  Eight years.

E6F7SER4                         Kealy - direct

1  Q.  And what did you do before that?

2  A.  I worked for a private equity firm in Manhattan and New

3  Jersey.

4  Q.  In your current job as detective, what types of cases and

5  investigations do you work on?

6  A.  Narcotic investigations.

7  Q.  Give the jury a general sense, what type of assignments do

8  you work on on a day-to-day basis?

9  A.  Surveillance, background investigations, debriefing

10  informants, debriefing prisoners, search warrants, arrest

11  warrants, buy and bust operations, buy and walk operations,

12  things of that nature.

13  Q.  You mentioned that you execute arrest warrants.  Do you see

14  anyone in the courtroom that you have arrested?

15  A.  Yes, I do.

16  Q.  Who do you see?

17  A.  Anthony Serrano ran flow.

18  Q.  And can you identify him by pointing at him and describing

19  a piece of clothing he is wearing?

20  A.  He is sitting at defense counsel with an orange shirt.

21        MR. MUKHI:  May the record reflect that the witness

22  has identified the defendant.

23        THE COURT:  So reflected.

24  Q.  Now, Detective Kealy, does the defendant go by any

25  nicknames that you know of?

E6F7SER4                          Kealy - direct

1   A.  Yes, Chillini.

2          MR. MUKHI:  Your Honor, may I approach?

3          THE COURT:  You may.

4          MR. MUKHI:  I am now handing the witness what has been

5   premarked for identification as Government Exhibit 4 and

6   Government Exhibit 4A and 4B.

7   Q.  Detective Kealy, what is Government Exhibit 4?

8   A.  It is a photograph of Anthony Serrano a/k/a Chillini.

9          MR. MUKHI:  The government offers Government Exhibit

10  4, which is the photograph, as well as 4A and 4B which are at

11  associated name plates.

12         THE COURT:  Any objection?

13         MR. DE CASTRO:  No objection.

14         THE COURT:  Received.

15         (Government's Exhibits 4, 4A and 4B received in

16  evidence)

17  Q.  Now, Detective Kealy, you mentioned that you arrested the

18  defendant Anthony Serrano.  When did you arrest him?

19  A.  August 1, 2013.

20  Q.  And where did you arrest him?

21  A.  In the vicinity of 348 Eighth Street in Jersey City, New

22  Jersey.

23  Q.  What is the significance of 348 Eighth Street in Jersey

24  City?

25  A.  That's where Serrano lives.

E6F7SER4                         Kealy - direct

1  Q.  And did you arrest him inside his home or outside his home?

2  A.  Outside.

3  Q.  And what was he doing at the time?

4  A.  Walking to his vehicle.

5  Q.  What type of vehicle does he have?

6  A.  A green Lexus ES.

7  Q.  Now, were you by yourself or with other law enforcement?

8  A.  I was with other law enforcement.

9  Q.  And who were some of the other agents who were there?

10  A.  Special Agent Todd Riley of the Drug Enforcement Agency,

11  DEA; special agent Natalie Bara of the Federal Bureau of

12  Investigation, F.B.I; and members of special agent Riley's

13  team.

14  Q.  Ms. Craig, can we now put on the screen just for the

15  witness Government's Exhibits 605A and 605B.

16          Detective Kealy, did you recognize the photos on your

17  screen?

18  A.  Yes, I do.

19  Q.  What are they?

20  A.  The photos are on the left-hand side is a photograph of 348

21  Eighth Street, Serrano's house, and on the right is a

22  photograph of the front door for 348 eighth Street.

23  Q.  Just for the record, the photograph on the left is 605A and

24  the photograph on the right is 605B?

25  A.  Correct.

E6GAASER5                        Kealy - Direct

1   BY MR. MUKHI:

2   Q.  Do they fairly and accurately depict the defendant's house?

3   A.  Yes, it does.

4           MR. MUKHI:  All right.  Your Honor, the government

5   offers Government Exhibit 605-A and 605-B?

6           MR. DE CASTRO:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibits 605-A and 605-B received in

9   evidence)

10          MR. MUKHI:  Ms. Craig, can we put up 605 briefly.

11          (Pause)

12  Q.  And Detective Kealy, what are we seeing here?

13  A.  This is a photograph of 348 Eighth Street.

14  Q.  And did there come a time that day when you entered this

15  residence?

16  A.  Yes.

17  Q.  Is it a single-family residence?

18  A.  It's a multifamily.

19          MR. MUKHI:  If we could go to 605-B.

20  Q.  What is this?

21  A.  That is the front door of the 348 Eighth Street.

22  Q.  Now, you mentioned you went inside the defendant's

23  residence that day.  Was that before or after you were

24  arrested?

25  A.  After.

1   Q.  Who, if anyone, else was at his home when you went to the

2   defendant's house?

3   A.  Linda Serrano and their young son.

4   Q.  Who is Linda Serrano?

5   A.  Linda Serrano is Anthony Serrano's wife.

6   Q.  How do you know that?

7   A.  We have a mutual friend.

8   Q.  You have a mutual friend with Linda Serrano or --

9   A.  Both.

10  Q.  Now, we'll get back to the defendant in a minute.  But

11  turning to another topic, you mentioned that one of the

12  assignments you do on a day-to-day basis, something that you

13  called a buy and walk operation.  What is that?

14  A.  It's called a controlled purchase or a controlled buy.

15  Q.  What is a controlled buy?

16  A.  It is when an informant gives us information about a drug

17  dealer.  It is our obligation to corroborate that information

18  or disprove it so we do an operation where we use the informant

19  to buy drugs from the dealer under our direction and control.

20  Q.  What happens to those drugs that are bought from the

21  dealer?

22  A.  It is given right to us and then placed into evidence.

23  Q.  Now, you mentioned "informant".  What is an informant?

24  A.  An informant is a person who is looking for help on charges

25  or it's he or she is looking for money.  We do our best to keep

E6GAASER5                          Kealy - Direct

1   the informant anonymous.

2   Q.  And what types of things do informants do for law

3   enforcement?

4   A.  They give information and they do operations like, just

5   like controlled buys, controlled purchases.

6   Q.  What are the different types of informants at the Hudson

7   County Prosecutors Office?

8   A.  Confidential informant is, again, someone who we try to

9   keep anonymous.  They have the understanding that we'll try our

10  best not to reveal them.  And a confidential source is

11  somebody, same thing, he's looking for help on the charges and

12  he or she is under the understanding that he or she won't be

13  revealed and will testify in court if needed.

14  Q.  Now, during a buy operation who, if anyone, is supervising

15  the source or the informant?

16  A.  It's usually myself and a supervisor.

17  Q.  And how many buy operations, controlled buy operations have

18  you been involved in during the course of your career?

19  A.  Seven, 800, something like that.

20  Q.  Now, do controlled buys usually follow the same procedures

21  each time?

22  A.  We do our best to try to follow the same procedure, yes.

23  Q.  So, what generally happens first in a controlled buy

24  operation?

25  A.  Based on, so we already talked to the informant.  We have

E6GAASER5                          Kealy - Direct

1    an understanding of who they're going to purchase drugs from.

2    We'll meet at a location and we'll have the informant place a

3    phone call to the target.  We overhear that usually through

4    speakerphone and just so we could verify that he is talking to

5    somebody that we believe is the target and we tell them to

6    set-up the deal.  We give them things to say when and where and

7    how much and we basically control the operation from there.

8    Q.  Now, you mentioned giving instruction about how much

9    narcotics to buy.  How do you determine what that instruction

10   is going to be to the informant?

11   A.  Before that operation we'll debrief a CI.  We'll find out

12   what's a comfortable level for them to buy.  We don't want to

13   ask them to do anything that they're not comfortable with or

14   that will put them at risk.

15   Q.  Now, you mentioned that usually the calls that the

16   informants place to the targets are overheard on speakerphone.

17   Are they ever recorded?

18   A.  Sometimes they're recorded, yes.

19   Q.  When are they recorded and when are they not recorded?

20   A.  When we are dealing with the confidential informant we

21   don't order the conversation, again, because we try to keep

22   them anonymous.  But when it's a cooperating source we will

23   record the telephone call.

24   Q.  When the calls are recorded who provides the recording

25   equipment?

1   A.   Law enforcement.

2   Q.   Now, if the target who's called by the informant who needs

3   to sell the informant or source drugs, what happens next?

4   A.   From the time he hangs up I will search the informant and

5   the informant's vehicle to make sure that the informant is not

6   holding any narcotics or weapons or extra money.  This is done

7   to prevent from an informant setting up a dealer and saying

8   that he purchased drugs from the dealer when he actually

9   provided it himself and holding more money when he gets to the

10   dealer.  Sometimes they will try to purchase more than what we

11   requested.

12   Q.   Now, what, if anything, do you give an informant or a

13   source before they go out to try to buy drugs from the target

14   or targets?

15   A.   We give them instructions on basically what to do and what

16   not to do.  We tell them, you know, just go straight from the

17   meet location to where ever the rally point is, then from there

18   to the target.  And don't deviate from that.  Don't go into a

19   another residence that we don't know about.  Don't go into a

20   store.  Usually, and we do our best to do this, we keep the

21   informant under surveillance so we see the informant at all

22   times.

23   Q.   And do you give the informant anything before --

24   A.   Yes, we give the informant money for the purchase of

25   narcotics.

1    Q.   And what happens after that?

2    A.   After the informant gets the narcotics from the target,

3    again, we meet and he'll hand the narcotics over to me and I'll

4    search the informant and the vehicle to make sure that there

5    is, that's all that there is.

6    Q.   And what is law enforcement doing while the informant is

7    trying or is actually buying drugs from the target or targets?

8    A.   We're on surveillance.  We're trying to see where the

9    target is moving and trying to get a big picture of the

10   operation.

11   Q.   And what type of clothes does law enforcement wear during

12   surveillance?

13   A.   We wear regular street clothes.  We try to blend in.

14   Q.   Does law enforcement conduct surveillance by foot or by

15   vehicles?

16   A.   Both.

17   Q.   And typically how many law enforcement officers are out

18   there conducting surveillance?

19   A.   Depending on the operation, anywhere between four to 12.

20   Q.   And are the officers in one location or multiple?

21   A.   Multiple locations.

22   Q.   How are those locations chosen?

23   A.   From information from the CI on regular meet spots and

24   intelligence that we've gathered we try to set up surveillance

25   on any and all locations that we know about.

E6GAASER5                          Kealy - Direct

1    Q.   Now, you mentioned that one of the goals is to always keep

2    track of the informant or the source?

3    A.   Yes.

4    Q.   Why is that important?

5    A.   To make sure that they don't get the drugs from somewhere

6    else and say that they got them from the target.

7    Q.   And who else are you trying to observe during surveillance

8    besides the informant or the source?

9    A.   Say again.

10   Q.   Who else are you trying to observe during surveillance, if

11   anyone, besides the source or informant?

12   A.   The person, the target of the investigation.

13   Q.   And what types of things are you looking for?

14   A.   We're looking to see where they meet to see if they go to

15   another location or we're looking to see if they're meeting

16   their connection or if there are stash spots that are missing,

17   things like that.

18   Q.   Now, are law enforcement officers in communication with

19   each other while they're conducting surveillance?

20   A.   Yes, we're communicating via handheld radios.

21   Q.   What are the officers conducting surveillance communicating

22   about, generally?

23   A.   Basically a play-by-play of everything that's going on from

24   start to end.

25   Q.   OK.  So you may have mentioned this but what happens after

1   the transaction take place between the informant and the

2   target?

3   A.  Afterwards we'll have the source meet us at a predetermined

4   meet location and we'll -- the source will give us the

5   narcotics.  We'll search the source again and the vehicle and

6   then we'll get a debriefing on what exactly happened.

7   Q.  Why is another search done after the narcotics is purchased

8   from the target?

9   A.  To make sure that the source didn't buy more than what was

10  requested and then holds it for themselves.

11  Q.  What happens to the narcotics that the informant turns over

12  to law enforcement after at the meet location?

13  A.  When we get back to the office we'll do afield test on it.

14  It's for the presumptive identification of narcotics and then

15  it's stored in our evidence folder in the lab.

16  Q.  All right.  I now want to direct your attention to

17  December 20, 2012.  Were you working that day?

18  A.  Yes, I was.

19  Q.  And what was your assignment?

20  A.  Narcotics Task Force.

21  Q.  And what were you doing that day?

22  A.  We were doing control of purchase from Michael Gamba and

23  Anthony Serrano.

24  Q.  And what was your role in the controlled buy transaction

25  that day?

E6GAASER5                         Kealy - Direct

1    A.  I was the lead investigator.

2    Q.  What does that mean?

3    A.  Basically, I controlled the -- I had the most information

4    about what's going on.  So I controlled the operation and put

5    people where they need to be.

6    Q.  And, approximately, how many other law enforcement officers

7    were you supervising or directing that day?

8    A.  I would say eight, around eight.

9    Q.  And what time of day was it?

10   A.  Afternoon.

11   Q.  Now, did this control buy transaction involve a source,

12   informant or both?

13   A.  Both.

14   Q.  Now, what were you trying to buy, by the way?

15   A.  Heroin.

16   Q.  And you mentioned that the two targets were Michael Gamba

17   and the defendant.  Did you see Michael Gamba that day?

18   A.  Yes, I did.

19   Q.  And do you see him on other occasions as well during the

20   course of the investigation?

21   A.  Yes, I did.  Yes, I have.

22              MR. MUKHI:  Your Honor, may I approach?

23              THE COURT:  You may.  May I approach the witness with

24   what's been remarked for identification as Government Exhibits

25   6 and 6A.

1   Q.  Do you recognize Government Exhibit 6?

2   A.  Yes, I do.

3   Q.  What is it?

4   A.  Photograph of Michael Gamba.

5          MR. MUKHI:  Your Honor, the government offers

6   Government Exhibit 6, the photograph and 6A, the associated

7   name plate.

8          MR. DE CASTRO:  No objection.

9          THE COURT:  Received.

10         (Government's Exhibits 6 and 6A received in evidence)

11  BY MR. MUKHI:

12  Q.  Now, Detective Kealy, what happened first that day in the

13  controlled buy operation?

14  A.  We met the source and the informant at a meet location and

15  then we had the informant place a phone call to the target,

16  Michael Gamba, and ask him for heroin.

17  Q.  Now, was that call recorded?

18  A.  No, it was not.

19  Q.  Did you overhear the call?

20  A.  I did.  It was on speakerphone.

21  Q.  Before we get to what happened on the call, do you recall

22  the number that the informant called Michael Gamba on?

23  A.  No, I do not.

24  Q.  Is there something that would refresh your --

25  A.  Yes.  My report would refresh my memory.

1              MR. MUKHI:  Your Honor, may I approach with 3516-A?

2              THE COURT:  You may.

3    Q.  And I am asking for Michael Gamba's number on that day.

4    A.  Yes.  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.

5    Q.  Okay.  So what happened next after the informant dialed

6    that number for Michael Gamba?

7    A.  Michael Gamba answered, they exchanged greetings,

8    pleasantries and the informant asked to purchase 30 wax paper

9    envelopes of heroin.  Gamba replied OK, just give him a few

10   minutes.

11   Q.  Now, why -- I'm sorry.  You said 30 wax paper envelopes of

12   heroin?

13   A.  Yes.

14   Q.  And is that a typical way that heroin is packaged?

15   A.  Yes.  He really asked him for three bundles.

16   Q.  What is a bundle?

17   A.  One bundle is ten wax paper envelopes full of heroin.  So

18   three bundles would be 30.

19   Q.  How much heroin is in a one wax paper envelope?

20             THE WITNESS:  Weight-wise?

21             THE COURT:  Or however you would describe it, weight

22   or size or quantity, is it sort of a one-use package?

23             THE WITNESS:  Depending on the quality of heroin, yes,

24   one, anywhere between one to depending on the user, one to

25   five.

1    Q.  One to five uses?

2    A.  Depending on the quality and the person who's using it.

3    Q.  Now, are heroin packages labeled in any way based on your

4    training and experience.

5    A.  Yes.  It's called a stamp.

6    Q.  What is the purpose of a stamp?

7    A.  A stamp is to identify the dealer.  The dealer can put his

8    name on the stamp and give it out to his customers so you have

9    to identify it through something unique or a stamp.

10   Q.  So, after the informant spoke to Michael Gamba and Gamba

11   said give him a few minutes, what happened next?

12   A.  We waited for a phone call and we got that phone call

13   basically -- oh, excuse me.  I searched the source and the

14   informant and I searched the informant's vehicle.  Then I

15   provided the -- that was negative.  Then I provided the source

16   with $210 for the purchase of heroin.

17   Q.  OK.  Now, were you conducting surveillance that day?

18   A.  Yes, I was.

19   Q.  What was your particular surveillance assignment?

20   A.  My assignment was the informant source.

21   Q.  And were law enforcement officers conducting surveillance

22   of other locations?

23   A.  Yes, they were.

24   Q.  And what locations?

25   A.  372 Seventh Street which was in Jersey City which is Mike

1   Gamba's resident and 348 Eighth Street in Jersey City which is

2   Serrano's residence.

3          MR. MUKHI:  Your Honor, may I approach?

4          THE COURT:  You may.

5          MR. MUKHI:  I am now handing the witness what's been

6   premarked for identification as 608, 609, 611 and 612, all

7   Government Exhibits.

8   Q.  If you could just look through this series of documents and

9   let me know if you recognize them.

10         (Pause)

11  A.  Yes, I do recognize them.

12  Q.  And what are they?

13  A.  It is a map of downtown Jersey City, specifically, it's

14  marked with the addresses of 372 Seventh Street, again, just

15  Gamba's residence; 348 Eighth Street which is Serrano's

16  residence and 410 Monmouth Street which is the Barge Inn.

17  Q.  OK.  Each one of those documents a map of one or more of

18  those locations?

19  A.  Yes, it is.

20  Q.  And are you familiar, generally familiar, with those areas?

21  A.  Yes, I am.

22  Q.  Do they fairly and accurately depict the areas surrounding

23  the locations you described?

24  A.  Yes, they do.

25         MR. MUKHI:  Your Honor, the government offers

1   Government Exhibit 608, 609, 611 and 612.

2            MR. DE CASTRO:  No objection.

3            THE COURT:  Received.

4            (Government's Exhibits 608, 609 611 and 612 received

5   in evidence)

6            MR. MUKHI:  Could we put up 608, please.

7            (Pause)

8   Q.  OK.  Detective Kealy, you mentioned that agents were

9   conducting surveillance of Michael Gamba's house at 372 Seventh

10  Street.  Where is that on this map?

11  A.  It is depicted as "A".

12  Q.  And you mentioned that agents were also conducting

13  surveillance of the defendant's house that day where this is

14  that on the map?

15  A.  It's depicted as "B".

16  Q.  How far apart are those two locations, approximately?

17  A.  Approximately, two blocks.

18  Q.  And if you see on the maps there's arrows pointing from

19  Michael Gamba's house to Anthony Serrano's house, the

20  defendant's house.  Is that a walking route or a driving route?

21  A.  That is a walking route.

22  Q.  Now, were you in communication with other officers

23  conducting surveillance that day?

24  A.  Yes.  We were communicating via radio.

25  Q.  Now, you mentioned that your assignment was to track the

1    informant.  Did you ever lose track of him that day?

2    A.  No, I did not.

3    Q.  Now, did there come a time when Michael Gamba called the

4    informant back after that first phone call?

5    A.  Yes.

6    Q.  And what happened during that phone call?

7    A.  He said -- excuse me -- Gamba said that he is good to meet

8    him at his house.

9    Q.  And, approximately, how long before the -- Sorry.  How long

10   after from when the informant called Gamba requesting heroin

11   did it take for Gamba to call the informant back?

12   A.  I'd say around 10 or 15 minutes.

13   Q.  And were there other law enforcement officers conducting

14   surveillance of where Gamba went in that ten or 15 minutes?

15   A.  Yes, there were.

16   Q.  Now, did you review who else Michael Gamba was in contact

17   with that day by phone?

18   A.  Yes, I did.

19          MR. MUKHI:  Your Honor, may I approach again?

20          THE COURT:  You may.

21          MR. MUKHI:  I am now approaching the witness with

22   what's been marked for identification as Government Exhibit

23   502-A and Government Exhibit 411.

24   Q.  Do you recognize 502-A?

25   A.  Yes, I do.

E6GAASER5                         Kealy - Direct

1   Q.  What is it?

2   A.  It is toll records or phone records between Anthony Serrano

3   and Michael Gamba.

4   Q.  OK.  And did you verify what's on 502-A?

5   A.  Yes, I did.

6   Q.  What did you verify it against?

7   A.  The actual, the disk of the phone records.

8   Q.  OK.  And I am now showing you what's been premarked for

9   identification as Government Exhibit 411.  Do you recognize

10  that?

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  It is a CD of phone records between Serrano and Gamba.

14  Q.  Okay.  And does it include other records as well besides

15  those?

16  A.  Yes, it does.  Cell site records as well as and dates.

17  Q.  How do you recognize that as the same CD that you used to

18  prepare and verify 502-A?

19  A.  That is my initials that you wrote on the disk.

20          MR. MUKHI:  Your Honor, at this time the government

21  offers Government Exhibits 502-A, and 411 subject to

22  connection.

23          MR. DE CASTRO:  No objection.

24          THE COURT:  Received.

25          MR. MUKHI:  Can we put up 502-A, page one.

 1            (Pause)

 2   Q.   What is this page of 502-A show?

 3   A.   This is phone conversations between Anthony Serrano and

 4   Michael Gamba between the dates of September 12, 2012 and

 5   January 2, 2013.

 6   Q.   And how many total communications were there during that

 7   period?

 8   A.   261 communications.

 9            MR. MUKHI:  If we could go to the next page.

10            (Pause)

11   Q.   What does this page show?

12   A.   This is phone conversations between Anthony Serrano and

13   Michael Gamba on December 20, 2012.

14   Q.   Was that the same day of the controlled buy operation?

15   A.   Yes, it was.

16   Q.   And what did that show?  What does this page show?

17   A.   Nine total communications between Serrano and Gamba.

18   Q.   And how many of those are during the afternoon?

19   A.   Five.

20   Q.   Now, what happened next after Gamba called the informant

21   back?

22   A.   I followed the source and the informant to Gamba's house,

23   372 Seventh Street and Gamba already went -- they met outside I

24   believe and they went into the apartment.

25   Q.   And were you following on foot or by car?

E6GAASER5                          Kealy - Direct

1    A.  By car.

2    Q.  And what happened next after the informant and source

3    arrived at Gamba's house?

4    A.  They were inside for a short time and then the source and

5    the informant left Gamba's house, got into the informant's

6    vehicle and they went to the predetermined meet location.

7    Q.  And what happened next?

8    A.  The source handed me 30 wax paper envelopes with the stamp

9    "Fat Lady" of heroin.  I searched the source, the informant and

10   the informant's vehicle with negative results and they gave me

11   a description on what happened.

12              MR. MUKHI:  Your Honor, may I approach again?

13              THE COURT:  You may.  For planning purposes we will be

14   taking our afternoon break in about five to seven minutes in

15   that range.

16   Q.  Now, before I hand you this, Detective Kealy, you said the

17   search of the informants resulted in negative results.  What

18   did you mean by that?

19   A.  That they didn't have any money or drugs on them or weapons

20   for that matter.

21   Q.  OK.  All right.  I've now handed you what's been premarked

22   for identification as Government Exhibit 190.  Do you recognize

23   this?

24   A.  Yes, I do.

25   Q.  And what is it?

E6GAASER5                          Kealy - Direct

1    A.  It is 30 wax paper envelopes containing heroin with the

2    stamp "Fat Lady" on it from the purchase on December 20, 2012.

3    Q.  OK.  And how do you recognize Government Exhibit 190 as the

4    same heroin that was given to you by the informant on

5    December 20, 2012?

6    A.  That is the label I made with my signature on it.

7           MR. MUKHI:  Your Honor, at this time the government

8    offers Government Exhibit 190 into evidence.

9           MR. DE CASTRO:  No objection.

10           THE COURT:  Received.

11           (Government's Exhibit 190 received in evidence)

12    Q.  OK.  And you mentioned that there was a stamp on the

13    heroin, a stamp "Fat Lady".  Do you see the stamp in Government

14    Exhibit 190?

15    A.  Yes, I do.

16    Q.  Where is it?

17    A.  The stamp is right on the envelope.

18    Q.  And there is a one envelope in there that's labeled "test",

19    do you see that?

20    A.  Yes, I do.

21    Q.  And what does that signify?

22    A.  That was my field test for the presumptive identification

23    for heroin which was positive.

24           MR. MUKHI:  Your Honor, I am now going to read a

25    stipulation and then publish 190 to the jury and then I think

E6GAASER5                        Kealy - Direct

1      it would be a good time for a break.

2                  THE COURT:  All right.  Let me just tell the ladies

3      and gentlemen of the jury what a stipulation is.  You may have

4      heard me mention during some of the preliminary instructions

5      that evidence comes in primarily in the form of testimony of

6      witnesses, documentary and other physical evidence but it also

7      comes in by way of what's called a stipulation.

8                  A stipulation is an agreement between the government

9      and the defendant through his counsel as to certain facts and

10     you should take those facts as established.  They are not

11     contested.

12                 You may proceed, Mr. Mukhi.

13                 MR. MUKHI:  Yes, your Honor.

14                 The parties have agreed that Government Exhibit 190

15     consists of 30 envelopes containing a total of, approximately,

16     .45 grams of heroin.

17                 Government Exhibit 191 consists of 30 envelopes

18     containing a total of, approximately, .525 grams of heroin.

19                 Government Exhibit 192 consists of 30 envelopes

20     containing a total of, approximately, .375 gram as heroin.

21                 Government Exhibit 193 consists of 50 envelopes

22     containing, approximately, .5 grams of heroin.

23                 This stipulation and Government Exhibits 190, 191, 192

24     and 193 may be received into evidence as government exhibits at

25     trial.  190 is already in evidence.  And at this time the

1    government offers Government Exhibit 191, 192, 193 and 805

2    which is the stipulation.

3            THE COURT:  All right.  By stipulation those are

4    received.

5            (Government's Exhibits 191, 192, 193 and 805 received

6    in evidence)

7            MR. MUKHI:  Your Honor, may I have permission to

8    public Government Exhibit 190 to the jury by walking it by?

9            THE COURT:  You may.

10           (Pause)

11           MR. MUKHI:  Your Honor, now would be a good time for a

12   break.

13           THE COURT:  All right.  Ladies and gentlemen, we're

14   going to take our midafternoon break.  I think I forgot to tell

15   you that you'll get a break both in the morning and then one in

16   the afternoon, more if we need more breaks.  But those are the

17   regular and I try to do them at about this time in the

18   afternoon, there or thereabouts depends on where we are in

19   testimony, things of that nature.  So, we'll take a short break

20   about ten minutes, time to stretch your legs.  And then we'll

21   come on back and we'll continue.

22           So, Joe will explain to you sort of the procedure

23   which is just all come back to the room.  You all get back in

24   the room and are ready, we'll bring you back out here in about

25   ten minutes, all right.

1    I want to remind you not to talk to each other or

2    anybody else about the case.

3         (Jury not present)

4         THE COURT:  All right.  You can step down, detective,

5    and be back in about ten minutes.

6         Counsel, is there anything that we should go over

7    before we take our own break?

8         All right.  We'll take our break and be back in ten

9    minutes.

10        (Recess)

11        THE COURT:  Let's all be seated and bring out the

12   jury.

13        (Jury present)

14        THE COURT:  All right.  Ladies and gentlemen, let's

15   all be seated.

16        Mr. Mukhi, you may proceed, sir.  Wait.  We're missing

17   Alternate Number One.

18        (Pause)

19        (All jurors present)

20        THE COURT:  All right.  Now, Mr. Mukhi, you may

21   proceed, sir.

22        MR. MUKHI:  Thank you, your Honor.

23   Q.  Detective Kealy, turning your attention now to December 27,

24   2012, seven days later, were you working that day?

25   A.  Yes, I was.

1   Q.  And what was your assignment that day?

2   A.  Narcotics Task Force.

3   Q.  What were you doing in particular?

4   A.  Controlled purchase from Michael Gamba and Anthony Serrano.

5   Q.  And what type of purchase?

6   A.  Heroin.

7   Q.  What happened first on that day in the buy operation?

8   A.  I met the informant at a meeting location in Jersey City.

9   Then we placed a phone call to Michael Gamba.

10  Q.  And what instructions, if any, did you give to the

11  informant about what to say during this phone call?

12  A.  Number one, asked if he purchased heroin and number two,

13  the price, number three, location.

14  Q.  And was this phone call recorded?

15  A.  It was not.

16  Q.  Did you listen to the call?

17  A.  I did.  It was on speakerphone.

18  Q.  By the way, what time of day was this, approximately?

19  A.  Afternoon.

20  Q.  Now, what happened during the phone call?

21  A.  Again, they exchanged greetings and they, Gamba said give

22  him a few minutes.

23  Q.  And what happened next?

24  A.  The informant picked up -- excuse me.  I searched the

25  informant and the vehicle with negative results and I gave the

1   informant $210 for the purchase of heroin.

2   Q.  By the way, how much heroin was being purchased on this

3   occasion?

4   A.  Three bundles, 30 wax paper envelopes.

5   Q.  And what happened next?

6   A.  The informant drove to Gamba's house, 372 Seventh Street

7   and Gamba got out of his house and into the informant's

8   vehicle, then they drove to 248 Eighth Street, Serrano's

9   residence.

10  Q.  Now, were you personally conducting a surveillance of this?

11  A.  Yes, I was conducting surveillance of the informant and at

12  this point the informant and Gamba.

13  Q.  And how were you conducting surveillance?

14  A.  In my vehicle.

15  Q.  Now, what happened next?

16  A.  They arrived at 348 Eighth Street.  They pulled over and

17  parked.  Gamba got out of the vehicle and he was outside

18  Serrano's residence.  A short time later Serrano opened the

19  door for Gamba, let him inside and I'd say just a couple

20  seconds later Gamba exited from Serrano's residence and back

21  into the informant's vehicle.  Then the informant drove Gamba

22  to Gamba's residence, 372 Seventh Street.

23  Q.  Now, was your role, again, to keep track of the informant

24  that day?

25  A.  Yes.

E6GAASER5                          Kealy - Direct

Q.  And did you ever lose track of him?

A.  No, I did not.

        MR. MUKHI:  Now, if we could pull up Government

Exhibit 611 which is already in evidence.

        (Pause)

Q.  Now, Detective Kealy, there's a laser pointer in front of

you now.

A.  OK.

Q.  If you could just show with the laser pointer on the map

611, what you just described, what you observed that day.

A.  The informant picked up Gamba at this location, 372 Seventh

Street.  They went eastbound on Seventh Street.  They went

northbound on Monmouth Street, then they went westbound on

Eighth Street to 348 Eighth Street.

        MR. MUKHI:  If we could pull up 605-A.

        (Pause)

Q.  So, what did you observe once the informant and Gamba

arrived at 348 Eighth Street, the defendant's residence?

A.  Serrano opened the door for Gamba.  He was kind of in the

doorway and a little bit outside and they walked in together

and Gamba reappeared, basically, exited the apartment.

Q.  And where was the informant after the defendant let Gamba

into the house?

A.  The informant was in the vehicle waiting for Gamba.

Q.  What happened next once Gamba exited?

1   A.   Gamba got into the informant's vehicle and they drove back

2   to the Gamba's house, 372 Seventh Street and Gamba got out and

3   went to his apartment and the informant went to the

4   predetermined meet location.

5   Q.   And did you go to the meet location as well?

6   A.   Yes, I did.

7   Q.   And what happened at the meet occasion?

8   A.   The informant handed me 30 wax paper envelopes with the

9   stamp "Fat Lady" on it and I searched the informant's vehicle

10  with negative results and the informant gave me a description

11  on what happened.

12          MR. MUKHI:   Your Honor, I am now going to approach

13  with Government Exhibit 191 --

14          THE COURT:   All right.

15          MR. MUKHI:   -- which is Government Exhibit -- which

16  has already been admitted into evidence.

17  Q.   Now, Detective Kealy, do you recognize Government Exhibit

18  191?

19  A.   Yes, I do.

20  Q.   What is it?

21  A.   It is the heroin purchased on December 27, 2012 from

22  Michael Gamba an Anthony Serrano.

23  Q.   How do you recognize it as that same heroin?

24  A.   That's my label and my initials on the bag and inside.

25  Q.   And you mentioned that there was a stamp.  Where is the

1    stamp?

2    A.   The stamp on the outside of the envelope.

3    Q.   And is that the same stamp or a different stamp that was on

4    the heroin in Government Exhibit 190 from December 20, 2012?

5    A.   The same stamp.

6         MR. MUKHI:   Your Honor, may I briefly publish to the

7    jury by walking it by?

8         THE COURT:   Yes, you may.

9         (Pause)

10   Q.   Now, Agent Kealy, you mentioned that after the informant

11   and Gamba arrived at the defendant's house, the defendant let

12   in Gamba and they were in there very briefly.   Approximately,

13   how long?

14   A.   I'd say seconds, 30 seconds, less than a minute.

15        MR. MUKHI:   All right.   Now, if we could pull up the

16   third page of 502-A.

17        (Pause)

18   Q.   Now, what does this page of 502-A show?

19   A.   This is phone conversations between Anthony Serrano and

20   Michael Gamba on December 27, 2012.

21   Q.   And how many were there?

22   A.   There were two.

23   Q.   And what time, approximately?

24   A.   A little after three p.m. and 3:30, around 3:30.

25   Q.   I now want to turn your attention to January 4, 2013.   Were

1   you working that day?

2   A.  Yes, sir, I was.

3   Q.  And what was your assignment?

4   A.  Narcotics Task Force.

5   Q.  And what were you doing?

6   A.  Controlled purchase from Michael Gamba and Anthony Serrano.

7   Q.  Now, did this buy involve both a source and an informant or

8   just one?

9   A.  Just the source.

10  Q.  And what were you trying to buy that day?

11  A.  Heroin.

12  Q.  What happened first during this buy operation?

13  A.  We placed a phone call to Michael Gamba -- excuse me -- the

14  source placed a phone call to Michael Gamba.

15  Q.  And was that call recorded?

16  A.  Yes, it was.

17          MR. MUKHI:  And I am now going to hand you what's been

18  premarked for identification as Government Exhibit 304 and

19  304-T if I might, your Honor?

20          THE COURT:  Yes.

21  Q.  What are 304 and 304-T?

22  A.  304 is a disk of the consensually recorded phone

23  conversations of between the source and Michael Gamba.  And

24  304-T is the transcript of that proceeding.

25  Q.  And is this the same call that took place on January 4?

E6GAASER5                          Kealy - Direct

1    A.  Yes, it is.

2    Q.  And how do you recognize, starting with 304 how do you

3    recognize that as a disk of the call from January 4?

4    A.  Those are my initials and I dated it.

5    Q.  And you mentioned that 304-T is a transcript.  Does the

6    transcript accurately reflect what takes place on the January 4

7    call between the source and Michael Gamba?

8    A.  Yes, it does.

9    Q.  And are you familiar with both of their voices, the source

10   and Michael Gamba?

11   A.  Yes, I was.

12   Q.  And do the voice attributions on the transcript accurately

13   reflect who is speaking when?

14   A.  Yes.

15            MR. MUKHI:  Your Honor, the government offers

16   Government Exhibit 304 into evidence and 304-T as an aid to the

17   jury.

18            THE COURT:  Mr. de Castro.

19            MR. DE CASTRO:  No objection.

20            THE COURT:  All right.  Those are received as stated.

21            (Government's Exhibits 304 and 304-T received in

22   evidence)

23            THE COURT:  And are you going to play that audio now?

24            MR. MUKHI:  Yes, your Honor, and I would ask that the

25   jurors turn to 304-T in their jury binders.

1              THE COURT:  All right.  So, ladies and gentlemen, now

2      you can pull up the jury binders which are under your care and

3      let me give you a couple of instructions.

4              First, just turn to the transcript that we point you

5      to because certain of them haven't been offered yet and so

6      we'll point you and walk you through the binder.  But the one

7      we're going to look at right now is 304-T.  Now, we're also

8      going to hear the recording.  The recording is what is received

9      in evidence.  The recording is the evidence.  If there is a

10     difference between the recording and what you see on the

11     transcript, it's what you hear and what you read on the

12     transcript.  It's what you hear that controls.  So, in other

13     words, if you think that a word is, you hear it as one word and

14     it's written down in the transcript as another, it's what you

15     hear that controls.  The transcript is just an aid to assist

16     you to follow along.

17             All right.  You may proceed, Mr. Mukhi.

18             MR. MUKHI:  Yes, your Honor, before we get to the

19     call.

20     Q.  Do you recall what instructions you gave to the source

21     before he placed the call to Michael Gamba?

22     A.  Yes.  I told the source to ask Gamba, number one, for

23     heroin; number two, to get a price and number three, for a

24     location.

25             MR. MUKHI:  All right.  Can we listen to the call now,

E6GAASER5                    Kealy - Direct

1    Ms. Craig.

2              (Audio Recording Playing)

3    Q.  Now, Detective Kealy, we heard someone identify themselves

4    as "Adam".  Who is Adam?

5    A.  Adam is the source.

6    Q.  Someone responded to the name "Michael".  Who is Michael?

7    A.  Mike is Mike Gamba.

8    Q.  Who is Billy?

9    A.  Billy is the informant.

10   Q.  Now, what, if anything, did you give to the informant and

11   source after that this?

12   A.  Say again.

13   Q.  What, if anything, did you give to the informant or the

14   source after this phone call?

15   A.  I gave the source $210 for the purchase of heroin.

16   Q.  Now, what searches, if any, were done of the source in

17   the --

18   A.  I searched the source, the source's person and the vehicle.

19   Q.  And what were the results?

20   A.  Negative.

21   Q.  Now, were other law enforcement officers including yourself

22   conducting surveillance that day?

23   A.  Yes, they were.

24   Q.  And what locations?

25   A.  372 Seventh Street in Jersey City, Gambas residence; 372

1   Eighth Street Serrano's residence and 410 Monmouth Street, the

2   Barge Inn in Jersey City.

3   Q.   What was your particular surveillance?

4   A.   I was assigned to the source.

5   Q.   And now, what instructions did you give to the source and

6   the informant after you handed over the $210?

7   A.   I instructed the source to just not deviate from the plan

8   and meet me at the meet location when it was over.

9   Q.   OK.  What happened next?

10  A.   The -- after I searched him?

11  Q.   Yes.

12  A.   We waited for a phone call from Gamba to let us know he was

13  good.  Excuse me.  That he was positive for heroin.

14  Q.   And how long did you wait?

15  A.   We waited about 15 minutes.

16  Q.   And what happened after 15 minutes?

17  A.   We -- I followed the source to Gamba's residence at 372

18  Seventh Street.  The source got out of the vehicle and met

19  Gamba outside.  They had a handshake.  They just had smalltalk

20  and Gamba went into his residence and the source met me at the

21  meet location.

22  Q.   OK.  And after -- before you followed the informant and the

23  source to Michael Gamba's house, was there any phone call that

24  took place?

25  A.   Yes, there was.

E6GAASER5                        Kealy - Direct

1    Q.  OK.  What was that phone call?

2    A.  Phone call was just "I am good".

3    Q.  Who said that they were good?

4    A.  Gamba.

5    Q.  OK.  So what happened next after you followed the source

6    and informant to Michael Gamba's house?

7    A.  This is just the source.

8    Q.  I'm sorry.  Just the source?

9    A.  Right.  I followed the source from Gamba's house to the

10   meet location.  The source handed me the 30 wax paper envelopes

11   this time with the stamp "Harlem Nights" and I searched the

12   source's vehicle and person for drugs, contraband, money, found

13   negative results.

14   Q.  And what else happened next?

15   A.  I -- when I went back to my office I field tested the

16   heroin which tested positive for the presumptive identification

17   of heroin and entered into evidence into the laboratory.

18   Q.  And by the way, before we get to that, for Government

19   Exhibit 191 the heroin from December 27, did you also take that

20   back to your office for the field testing?

21   A.  Yes, I did.

22            MR. MUKHI:  Your Honor, may I approach?

23            THE COURT:  You may.

24   Q.  I'm now handing the witness what's been introduced evidence

25   as Government Exhibit 192.  Do you recognize Government Exhibit

1   192?

2   A.  Yes, I do.

3   Q.  And what is it?

4   A.  It's from the controlled purchase from the source to

5   Michael Gamba and Anthony Serrano on January 4, 2013.

6   Q.  OK.  And how do you recognize it as the same heroin?

7   A.  That is the label I put on, with my signature both outside

8   and inside.

9   Q.  OK.  And is there a stamp on this heroin?

10  A.  Yes.

11  Q.  What is the stamp?

12  A.  "Harlem Nights".

13          MR. MUKHI:  Your Honor, may I publish 192 to the jury?

14          THE COURT:  You may.

15          (Pause)

16  Q.  OK.  Finally, turning your attention to January 16, 2013,

17  were you working that day?

18  A.  Yes, I was.

19  Q.  What was your assignment?

20  A.  The Narcotics Task Force.

21  Q.  And what were you doing in particular?

22  A.  Controlled purchase from Michael Gamba and Anthony Serrano.

23  Q.  What was being purchased?

24  A.  Heroin.

25  Q.  What happened first on this day?

1   A.  We placed -- excuse me -- the source placed a phone call to

2   Michael Gamba.

3   Q.  And was this call recorded?

4   A.  Yes, it was.

5            MR. MUKHI:  Your Honor, may I approach?

6            THE COURT:  You may.

7            MR. MUKHI:  I am handing the witness what's been

8   premarked for identification as Government Exhibit 305 and

9   305-T.

10  Q.  Do you recognize Government Exhibit 305?

11  A.  Yes, I do.

12  Q.  What is it?

13  A.  It is a CD of a recorded phone conversation between the

14  source and Michael Gamba on January 16.

15  Q.  How do you recognize it as that same recording?

16  A.  That's my initials and the date I received it.

17  Q.  The transcript, does that accurate reflect what took place

18  on the January 16 call?

19  A.  Yes, it does.

20  Q.  And, again, who are the individuals on that call?

21  A.  It's Michael Gamba and the confidential source.

22  Q.  OK.  And did the voice attributions on the transcript

23  accurately reflect who you are speaking with?

24  A.  Yes.

25            (Continued on next page)

E6gdser6                         Kealy - direct

1              MR. MUKHI:  Your Honor, the government offers

2    Government Exhibit 305 into evidence as well as 305T as an aid

3    to the jury.

4              MR. DE CASTRO:  No objection.

5              THE COURT:  All right.  Received as stated.

6              (Government's Exhibits 305, 305T received in evidence)

7    BY MR. MUKHI:

8    Q.  Now, Detective Kealy, before we get to the call, do you

9    recall what your instructions were to the source on that day

10   before this call to Michael Gamba?

11   A.  Yes.  To ask for heroin, to find out how much, and a

12   location.

13   Q.  How much heroin this time?

14   A.  This time it was a brick.  A brick is a street term for 50

15   wax paper envelopes of heroin.

16   Q.  OK.  And I'd ask the jurors if they could turn to 305T in

17   their binders and to follow along with the audio.

18              (Audio played)

19              MR. MUKHI:  OK.

20   Q.  Detective Kealy, what, if anything, did you give to the

21   source or informant after this phone call?

22   A.  I gave the source $300 for the purchase of heroin.

23   Q.  Why did you give him $300?

24   A.  To purchase the brick of heroin.

25   Q.  And why $300 in particular?

E6gdser6                          Kealy - direct

1    A.  Because that's how much it costs.

2    Q.  And was there something on the phone call that made you

3    think the cost was $300?

4    A.  Yes.

5    Q.  OK.  Now, what did you do next?

6    A.  I searched the informant and the source and the informant's

7    vehicle, with negative results.

8    Q.  And were law enforcement officers conducting surveillance

9    that day?

10   A.  Yes, they were.

11   Q.  And at what locations?

12   A.  372 7th Street, Gamba's residence; 348 8th Street,

13   Serrano's residence; and 410 Monmouth Street, the Barge Inn.

14   Q.  And, now, what was your particular surveillance assignment?

15   A.  The source and the informant.

16   Q.  And, now, what instructions did you give to the source and

17   the informant after you gave the source the $300?

18   A.  This time it was to pick up the target Michael Gamba and

19   hopefully go to pick up the drugs.

20   Q.  What happened next?

21   A.  We got to Gamba's house.  The source and the informant, in

22   the informant's vehicle, picked up Michael Gamba, and then I

23   went to the Barge Inn on 410 Monmouth Street.

24   Q.  What is the Barge Inn?

25   A.  The Barge Inn is a bar/restaurant.

1  Q.  What happened -- by the way, were you following in a car or

2  by foot?

3  A.  Car.

4  Q.  What happened next once they arrived at the Barge Inn?

5  A.  They were there awhile.  They were there approximately an

6  hour.  After about an hour I saw the informant, the source and

7  Gamba exit from the Barge Inn and enter the informant's

8  vehicle, and then I followed them to 8th Street.

9  Q.  And how were you following them?

10 A.  In my vehicle.

11 Q.  And what happened on 8th Street?

12 A.  I saw Gamba come out of 8th Street and enter the vehicle,

13 and then they went back to Gamba's residence, 372 7th Street.

14 Q.  And when you are referring to 8th Street, are you referring

15 to a particular address on 8th Street?

16 A.  348 8th Street.

17 Q.  Now, what happened next?

18 A.  They dropped off Gamba at his residence.  He went inside.

19 And then we went to the predetermined meet location.

20         MR. MUKHI:  If we could put up 612, which is another

21 map that's already been introduced into evidence.

22 Q.  And Detective Kealy, if you could just use the laser

23 pointer again to show the jurors what you saw that day on this

24 map.

25 A.  Yes.  We picked up Mike Gamba here.  We went eastbound on

E6gdser6                        Kealy - direct

1   7th.  We went southbound on Brunswick to Newark Avenue to 3rd

2   Street, and then we pulled -- they pulled over and parked on

3   410 Monmouth Street.

4          When they were in the bar, I was here somewhere.  And

5   they got back in the vehicle and drove to 348 8th Street, which

6   is right there.

7   Q.  Now, you mentioned your assignment on this day, as well,

8   was to track the informant and the source.  Did you ever lose

9   track of them that day?

10  A.  Yes, I did.

11  Q.  And when was that?

12  A.  When they entered the Barge Inn.

13  Q.  Why didn't you go inside the Barge Inn?

14  A.  I didn't want to expose myself, that this was a controlled

15  purchase under my direction, so I didn't want to blow the

16  operation.

17  Q.  So other than that period that the informant and the source

18  are inside the Barge Inn with Michael Gamba, did you ever lose

19  track of the informant or source that day?

20  A.  No.  Besides them being in the bar, no.

21  Q.  Now, what happened at the meet location?

22  A.  The source handed me 50 wax paper envelopes with the stamp

23  Fat Lady.  I searched both the source, the informant and the

24  informant's vehicle, with negative results, and they gave me a

25  play-by-play of what happened.

E6gdser6                      Kealy - direct

<table>
<tr><td>1</td><td>          MR. MUKHI:  All right.  Your Honor, I am going to</td></tr>
</table>

1                MR. MUKHI:  All right.  Your Honor, I am going to

2     approach with what has been admitted into evidence as

3     Government Exhibit 193.

4                THE COURT:  All right.

5     Q.  Do you recognize Government Exhibit 193?

6     A.  Yes, I do.

7     Q.  And what is it?

8     A.  It is 50 wax paper envelopes, a controlled purchase on

9     January 16th, 2013, from Michael Gamba and Anthony Serrano.  It

10    is stamped Fat Lady.

11    Q.  How do you know that is the same heroin from January 16,

12    2013?

13    A.  It's the same stamp, Fat Lady, on the same -- spelled the

14    same way.

15    Q.  Is there anything else on 193 that indicates it is the one

16    from January 16th in particular?

17    A.  Yes.  It has my label and my signature on both the outside

18    and the inside of the bag.

19    Q.  Now, you mentioned this one has the Fat Lady stamp, and

20    then the last one you saw the stamp Harlem Nights.

21               How many -- of the four controlled buys we have been

22    talking about, how many were Fat Lady and how many were Harlem

23    Nights?

24    A.  Three were Fat Lady.  One was Harlem Nights.

25               MR. MUKHI:  Your Honor, may I publish 193?

E6gdser6                         Kealy - direct

1              THE COURT:  You may.

2              (Publishing to the jury)

3    BY MR. MUKHI:

4    Q.  All right.  Just one more question, Detective Kealy.

5              8th Street, the street that the defendant's house is

6    on --

7    A.  Yes.

8    Q.  -- is it a one-way street or a two-way street?

9    A.  It is a one-way street.

10   Q.  If you see, at the end of the upper left-hand corner of the

11   map we are looking at right now, there is a green area --

12   A.  Yes.

13   Q.  -- down the street from the defendant's house.

14   A.  Yes.

15   Q.  What is that?

16   A.  That is called the Oaks Park.  I don't know the proper name

17   of it.  That's what people from Jersey call it.  It has a

18   little league field, a Babe Ruth field, a basketball court, a

19   hockey rink, playground, I believe, things of that nature.

20             MR. MUKHI:  One moment, your Honor.

21             THE COURT:  All right.

22             (Pause)

23             MR. MUKHI:  No further questions at this time, your

24   Honor.

25             THE COURT:  All right.  Thank you.

E6gdser6                          Kealy - direct

1          Mr. De Castro.

2     CROSS-EXAMINATION

3     BY MR. DE CASTRO:

4     Q.  Good afternoon, Detective.

5     A.  Good afternoon.  How are you?

6     Q.  Good.  My name is Cesar De Castro.  I represent

7     Mr. Serrano.  I have a few brief questions for you.

8          You knew who -- you knew Mike Gamba from the

9     neighborhood, right?

10    A.  Yes.

11    Q.  From growing up you knew who he was, right?

12    A.  Not growing up, no.

13    Q.  When you became more of an adult?

14    A.  No.  I didn't know him at all until we got information from

15    the informant that he was involved in selling narcotics.

16    Q.  You did see him around but didn't know his name?

17    A.  I probably did see him around, yes.

18    Q.  And he is somewhat of a staple on that block, isn't he?

19    A.  How do you mean?

20    Q.  He is sitting out on the stoop a lot and out and about in

21    that neighborhood?

22    A.  Yes.  He is physical, yes.

23    Q.  That neighborhood is a very sort of like close-knit

24    community?

25    A.  Yes.

E6gdser6                        Kealy - cross

1    Q.  Row houses, tree-lined streets?

2    A.  Yes.

3    Q.  Like you said, that park, that is just down the block?

4    A.  Right.  Yes.

5    Q.  Many of the families have been living there for many, many

6    years, right?

7    A.  Yes.

8    Q.  Like Linda Serrano's family, they have been living there

9    for years, right?

10   A.  Yes.

11   Q.  And just directing your attention back to December 20th of

12   2012.

13          That was when your confidential informant called

14   Mr. Gamba, right?

15   A.  Yes.

16   Q.  And -- but he didn't call Mr. Serrano, correct?

17   A.  No, he did not.

18   Q.  In fact, through all of these operations he never called

19   Mr. Serrano, right?

20   A.  No.

21   Q.  And on that particular occasion Mr. Gamba exited his house

22   or apartment, right?

23   A.  Yes.

24   Q.  And Mr. Gamba and the informant spoke, right?

25   A.  Yes.

E6gdser6                              Kealy - cross

1   Q.  What was Mr. Gamba wearing that day?

2   A.  I don't recall what he was wearing.

3   Q.  It was December, right?

4   A.  Correct.

5   Q.  So I assume he had appropriate clothing for the weather?

6   A.  Yes.

7   Q.  He wasn't wearing shorts, for example?

8   A.  No.

9   Q.  He probably had a jacket on as well, right?

10  A.  Probably, yes.

11  Q.  Long pants, perhaps, with pockets?

12  A.  Yes.

13  Q.  And probably his jacket had pockets, too, right?

14  A.  Yes.

15  Q.  You have no idea what was in any of his pockets, right?

16  A.  No, I do not.

17  Q.  You couldn't observe that from where you were, right?

18  A.  No.

19  Q.  How far away were you by -- sorry, how far away were you?

20  A.  In what part?

21  Q.  How about when you first observed Mr. Gamba on

22  December 20th.

23  A.  I was half a block away.

24  Q.  And you have no reason to believe Mr. Gamba knows who you

25  are, right?

E6gdser6                         Kealy - cross

 1   A.  No.

 2   Q.  So you can pretty much -- you can be kind of close, right?

 3   A.  Yes.

 4   Q.  I think -- I'm sorry.  Just one moment, your Honor.

 5          (Pause)

 6          Now, let me just direct your attention to

 7   December 27th, that next week.

 8   A.  Yes.

 9   Q.  That, again, the confidential informant called Mr. Gamba,

10   right?

11   A.  Yes.

12   Q.  And did not call Mr. Serrano, correct?

13   A.  Correct.

14   Q.  And he exited his apartment again and spoke to the

15   informant, right?

16   A.  Yes.

17   Q.  And do you remember what he was wearing on that day?

18   A.  No, I do not.

19   Q.  Again, December 2012, so probably something weather

20   appropriate, right?

21   A.  Yes.

22   Q.  Perhaps layers, correct?

23   A.  Yes.

24   Q.  And this was the particular occasion that you observed

25   Mr. Serrano, correct?

1   A.  Yes.

2   Q.  And you observed him outside of his location at 348, right?

3   A.  Not outside; inside.  He came from the inside to like the

4   vestibule area outside and then back in.

5   Q.  Do you remember what he was wearing?

6   A.  No, I do not.

7   Q.  And you testified that you saw interaction between

8   Mr. Gamba and Mr. Serrano, correct?

9   A.  Yes.

10  Q.  They spoke?

11  A.  I assume so.  I don't know.

12  Q.  You didn't see it?

13  A.  I did not see it.

14  Q.  You couldn't see if they were speaking, right?

15  A.  No.  He just let him into the house and Gamba followed

16  Mr. Serrano.

17  Q.  And did you observe -- you didn't observe Mr. Serrano give

18  anything to Mr. Gamba, right?

19  A.  Say that again.

20  Q.  You didn't observe Mr. Serrano give anything to Mr. Gamba?

21  A.  No, I did not.

22  Q.  You did not, likewise, observe Mr. Gamba give anything to

23  Mr. Serrano, correct?

24  A.  Right.  I did not.

25  Q.  You did not observe Mr. Gamba with a package?

E6gdser6                         Kealy - cross

1    A.  No, I did not.

2    Q.  You did not observe Mr. Serrano with a package?

3    A.  No, I did not.

4    Q.  You couldn't see if they exchanged anything, correct?

5    A.  Correct.  They were inside the house.

6    Q.  Right.  You don't even know if they exchanged a handshake,

7    correct?

8    A.  Not outside, no.

9    Q.  Now, on January 4th of 2014, your confidential source

10   called Gamba, right?

11   A.  Correct.

12   Q.  And again did not call Mr. Serrano?

13   A.  Correct.

14   Q.  And Gamba exited his apartment on that day as well, right?

15   A.  No, sir.

16   Q.  Oh, that was the time where you just trailed the

17   confidential source, correct?

18   A.  Correct.  Gamba.  Gamba came out of the Barge Inn that day.

19   Q.  The Barge Inn?

20   A.  Yes.

21   Q.  Do you remember what Mr. Gamba was wearing on that day?

22   A.  I do not.

23   Q.  Do you remember the weather that day?

24   A.  I do not remember.

25   Q.  And the Barge Inn is just down the block from Mr. Gamba's

E6gdser6                         Kealy - cross

1   residence, right?

2   A.  Yes.

3   Q.  He's known to frequent that location, correct?

4   A.  Yes.

5   Q.  And you observed Mr. Gamba exit.  Did you see if he had any

6   packages with him?

7   A.  No, I did not.

8   Q.  Did you see if he had -- sorry.  Could you see if he had

9   any bulges in his pocket?

10  A.  I'm sorry, sir.  I didn't see him exit from the Barge Inn

11  that day.  I was watching the informant.  Another law

12  enforcement officer saw Mr. Gamba.

13  Q.  OK.  Now, on January 16th, that was another day where your

14  confidential source called -- or it was the confidential

15  informant that called Mr. Gamba?

16  A.  It was the source who called.

17  Q.  The source called Mr. Gamba.

18          And they, again, did not call Mr. Serrano, correct?

19  A.  No, they did not.

20  Q.  And you saw Mr. Gamba exit his apartment again at that

21  time?

22  A.  Yes.

23  Q.  And, again, do you have any recollection as to what he was

24  wearing?

25  A.  No, I do not.

E6gdser6                          Kealy - cross

1    Q.  Would you have any recollection as to whether he was

2    carrying a package with him?

3    A.  No, I do not.

4    Q.  Any idea if he had a bag with him?

5    A.  No, I do not.

6    Q.  How many drug cases have you done in your career?

7    A.  Cases?

8    Q.  Yes.

9    A.  Personally where I was the lead investigator?

10   Q.  How many have you been involved in?

11   A.  Involved in?

12   Q.  Roughly.  I won't hold you to it.

13   A.  250, somewhere around there.

14   Q.  Would you say it is pretty important to observe the

15   clothing that individuals are wearing during those

16   observations, during those -- withdrawn.

17           Would you say it is important to observe the types of

18   clothing that people that you suspect are involved in narcotics

19   trafficking are wearing?

20   A.  In some cases.

21   Q.  Some cases because you are not sure if people are carrying

22   the drugs or secreting them in some way, right?

23   A.  Correct.

24   Q.  But you didn't note that on this particular occasion?

25   A.  No.

E6gdser6                              Kealy - cross

1   Q.  Now, on February 14th there was also a purchase from

2   Mr. Gamba, isn't that right?

3   A.  Yes.

4   Q.  Of 2013, correct?

5   A.  Yes.

6   Q.  And that was where your confidential informant purchased

7   heroin from Mr. Gamba, correct?

8   A.  Yes.

9   Q.  That was similar to the other operations, where the

10  confidential informant called Mr. Gamba and set up a meeting,

11  right?

12  A.  Correct.

13  Q.  And that meeting was at the Barge Inn down the block?

14  A.  Correct.

15  Q.  And the confidential informant entered and purchased heroin

16  from Mr. Gamba, correct?

17  A.  Correct.

18  Q.  And Mr. Serrano was not there, right?

19  A.  Correct.

20  Q.  You didn't observe Mr. Gamba travel to Mr. Serrano's home

21  at all at that time, right?

22  A.  Correct.

23  Q.  Now, as part of your work on this case -- I'm sorry.

24          MR. DE CASTRO:  Judge, can I have one second?

25          THE COURT:  Yes.

E6gdser6                         Kealy - cross

1            (Pause)

2            MR. DE CASTRO:  Thank you, Judge.

3   BY MR. DE CASTRO:

4   Q.  This case is somewhat personal for you, isn't it?

5   A.  No, sir.

6   Q.  This prosecution has no personal ties to you at all; did

7   you say that?

8   A.  Say that again.

9   Q.  Do you remember saying this isn't personal at all to you?

10  A.  No, this is not personal.

11  Q.  Do you have any connection to -- any personal connection to

12  Mr. Serrano?

13  A.  Personal?  No.

14  Q.  Didn't you know my client before you were even involved in

15  this investigation?

16  A.  Yes.  We had a mutual friend.

17  Q.  In fact, you knew him as Chillini, right?

18  A.  Yes.

19  Q.  Prior to this investigation?

20  A.  Yes.

21  Q.  Years before this investigation?

22  A.  Yes.

23  Q.  And the mutual friend you are talking about is one of the

24  Cardinellis, right?

25  A.  Correct.

E6gdser6                         Kealy - cross

1    Q.  And there is a Big Jimmy and Little Jimmy Cardinelli,

2    right?

3    A.  Correct.

4    Q.  Little Jimmy is a Jersey City cop?

5    A.  Yes, he is.

6    Q.  And isn't Mike Gamba -- wasn't Mike Gamba friends with the

7    Cardinellis?

8    A.  I don't know.

9    Q.  You never saw Mike Gamba over at the Cardinellis' house?

10   A.  No.

11   Q.  You had been to the Cardinellis' house, right?

12   A.  Yes.

13   Q.  In fact, you had been to the Cardinellis' house when

14   Mrs. Serrano was there, right?

15   A.  Correct.

16   Q.  In fact, that is really how you first met her, right?

17   A.  Correct.

18   Q.  You first met her before she even knew the defendant,

19   right?

20   A.  I don't know.

21   Q.  She wasn't married when you met her, right?

22   A.  No, she wasn't.

23   Q.  She wasn't Linda Serrano at that time?

24   A.  Right.

25   Q.  I mean, now she is married to the defendant, right?

1    A.  Correct.

2    Q.  And you know they have a young son named Jagger, right?

3    A.  Correct.

4    Q.  And would you say that you met her around 2003?

5    A.  No.  I'd say it's around 2006, 2007.

6    Q.  OK.  Seven/eight years ago?

7    A.  Yes.

8    Q.  Far before you started this investigation, right?

9    A.  Correct.

10   Q.  And was that even before you were working in the Hudson

11   County Prosecutor's Office?

12   A.  No.  I was working there.

13   Q.  You and Mrs. Serrano used to hang out at the Cardinellis',

14   right?

15   A.  Yes.

16   Q.  The Cardinellis' invite a lot of people over, right?

17   A.  Yes.

18   Q.  They are very -- they are part of this close-knit

19   community, right?

20   A.  Correct.

21   Q.  There are barbecues and parties and pool parties, right?

22   A.  Right.

23   Q.  And I think you testified that you are very close to little

24   Jimmy, right?

25   A.  Yes.

E6gdser6                          Kealy - cross

1   Q.  Are you also close to Big Jimmy, too?

2   A.  Yes, I'm close to them.

3   Q.  Now, you would see Mrs. Serrano at Cardinellis' functions,

4   right?  Parties, pool parties, things like that?

5   A.  There was only, I'd say, about less than ten times that

6   I've seen her there.

7   Q.  So nine times?  Five times?  Closer to ten or closer to

8   one?

9   A.  I think I'd give it a little more than a little less.

10  Q.  So around five -- maybe five/six times --

11  A.  Around there.

12  Q.  -- you have been at a party where Linda Serrano --

13  A.  Yes.

14  Q.  -- was at the Cardinellis'?

15  A.  Yes.

16  Q.  Let me finish the question so the reporter can get both our

17  words down.

18        So there was some point that Linda Serrano started

19  dating Mr. Serrano, correct?

20  A.  Yes.

21  Q.  You became aware of that, right?

22  A.  Yes.

23  Q.  You became aware of that because, in fact, Linda Serrano

24  started bringing Mr. Serrano to the Cardinellis', right?

25  A.  Correct.

E6gdser6                          Kealy - cross

1   Q.  And fair to say you weren't a fan of Mr. Serrano at that

2   time, were you?

3   A.  I had no opinion of him.

4   Q.  You didn't tell Linda anything about him?

5   A.  Never.

6   Q.  Never thought she was too good for him?

7   A.  Never.

8   Q.  Never said that to her?

9   A.  Never.

10  Q.  So she started bringing Mr. Serrano to the Cardinelli

11  functions at times as well, right?

12  A.  I think there was only three times that I was there that

13  Mr. Serrano was there.

14  Q.  And you met him and spoke to him, correct?

15  A.  Yes.

16  Q.  Friendly, right?

17  A.  Yes.

18  Q.  And there came a point in time when the Cardinellis' home

19  was burglarized, right?

20  A.  Burglarized?

21  Q.  In fact, there was a guy named Sammy that was robbed inside

22  that home, was there not?

23  A.  Yes.  Sammy was robbed.

24  Q.  Sammy, whose father owns a construction company, right?

25  A.  Correct.

E6gdser6                          Kealy - cross

```
 1    Q.  And Sammy was at the Cardinellis' allegedly doing payroll,

 2    right?

 3    A.  I don't know the details of it.  I just -- I heard that,

 4    you know, he was robbed.

 5              MR. MUKHI:  Judge, objection as to relevance as to

 6    this.

 7              THE COURT:  All right.  I'm assuming Mr. De Castro is

 8    going to -- I will give him little more leeway.

 9              Tie it in.

10    BY MR. DE CASTRO:

11    Q.  Wasn't -- a few questions, it will be clear, Judge.

12              Isn't it true that Sammy was doing the cash payroll at

13    the Cardinellis' for the construction site?

14    A.  I don't know that.

15    Q.  That he was robbed, or claimed that he was robbed and made

16    a report to law enforcement?

17    A.  I don't know that.

18    Q.  Did you hear about this particular incident?

19    A.  I heard that Sammy was robbed near the Cardinellis'.  I

20    didn't know the details of it.

21    Q.  And isn't it true that you thought at that time that

22    Mr. Serrano was responsible for that?

23    A.  No, I didn't think that he was -- I didn't know what

24    Mr. Serrano was involved in.  I didn't know either way.

25    Q.  You knew he was involved with Linda Serrano, right?
```

E6gdser6                         Kealy - cross

1    A.  Yes, I knew he was involved with Linda Serrano.

2    Q.  Who you had known and were friends with, correct?

3    A.  Friends?  We weren't friends.  We were acquaintances.  We

4    saw each other at the Cardinellis' house.  But to say friends,

5    no.  I never called her on the phone or things like that.

6    Q.  Back in those years, 2006/2007, if you were driving by 348

7    8th Street, did you know that's where Linda Serrano lived?

8    A.  No, I did not.

9    Q.  You never stopped by and chat with her on the street?

10   A.  No, I did not.

11            MR. DE CASTRO:  Nothing further, Judge.

12            THE COURT:  Thank you.

13            Mr. Mukhi, any redirect?

14            MR. MUKHI:  Your Honor, just very briefly.

15   REDIRECT EXAMINATION

16   BY MR. MUKHI:

17   Q.  Detective Kealy, on cross-examination Mr. De Castro asked

18   you about a sale of heroin from Michael Gamba on February 14,

19   2013.  Do you recall that?

20   A.  Yes, I do.

21   Q.  And do you recall he asked you questions about not

22   observing Mr. Serrano during the surveillance on that day, the

23   February 14th date?

24   A.  Correct.

25   Q.  And do you recall whether or not heroin was successfully

E6gdser6                           Kealy - redirect

1   obtained from Mr. Gamba on February 14th?

2   A.  From Mr. Serrano?

3   Q.  From Mr. Gamba.

4   A.  Yes, it was.

5   Q.  And do you recall what the stamp was on the heroin from

6   February 14, 2013?

7   A.  I believe there -- you know what.  May I see my report?

8           MR. MUKHI:  Your Honor, may I refresh him?

9           THE COURT:  Yes.

10          MR. MUKHI:  3524-A.

11  Q.  And if you could review the report, put it down, and then I

12  will ask my question again.

13          (Pause)

14  A.  OK.

15  Q.  Having reviewed your report, do you now recall what the

16  stamp on the heroin was that was purchased from Michael Gamba

17  on February 14, 2013?

18  A.  Yes.  It was Street Nights.

19  Q.  And is that similar to any of the stamps we saw in

20  Government Exhibits 190 through 193?

21  A.  No, it was not.

22  Q.  And I am going to hand you Government Exhibit 192.

23          Do you recognize that?

24  A.  Yes.

25  Q.  And what was the stamp -- and what is it?

E6gdser6                          Kealy - redirect

1    A.   Harlem -- it's -- it is the heroin purchased on January 4,

2    2013.

3    Q.   And what was the -- and was that during the buy operation

4    with the targets of Gamba and Anthony Serrano --

5    A.   Yes.

6    Q.   -- that we talked about earlier?

7    A.   Yes.

8    Q.   What was the stamp from that particular day?

9    A.   Harlem Nights.

10   Q.   All right.

11           MR. MUKHI:  One moment, your Honor.

12           THE COURT:  All right.

13           (Pause)

14           MR. MUKHI:  Nothing further, your Honor.

15           THE COURT:  All right.  Thank you.

16           Oh, wait.  Mr. De Castro has got --

17           MR. DE CASTRO:  A couple of questions.

18           THE COURT:  This is the way it goes.

19           MR. DE CASTRO:  May I borrow 192?

20           May I approach, Judge?

21           THE COURT:  Yes, you may.

22   RECROSS-EXAMINATION

23   BY MR. DE CASTRO:

24   Q.   Detective, you just testified about the stamp Harlem

25   Nights, right --

E6gdser6                          Kealy - recross

1    A.  Correct.

2    Q.  -- that is contained within Government Exhibit 192, right?

3    A.  Correct.

4    Q.  And you said the stamp on that date on February,

5    February 14th, was not similar, right?

6    A.  Correct.

7    Q.  The name was different, right?

8    A.  The name was different.

9    Q.  What was different about the stamp?

10   A.  It was a different identifier.

11   Q.  Different name?

12   A.  Correct.

13   Q.  Was it the same type of stamp?  Did it look the same?

14   A.  No.

15   Q.  Do you remember, what did it look like?

16   A.  No, I don't.

17            MR. DE CASTRO:  Nothing further.

18            THE COURT:  All right.  Thank you.

19            You may step down, sir.

20            (Witness excused)

21            THE COURT:  All right.  Would the government like to

22   call its next witness, please.

23            MR. MUKHI:  Yes, your Honor.

24            The government calls Sergeant John Kolakowski.

25            THE COURT:  All right.  Sergeant Kolakowski, please.

E6gdser6

| | |
|---|---|
| 1 | Ladies and gentlemen of the jury, while we are waiting |
| 2 | for the next witness, I just want to remind you that we will |
| 3 | end promptly at 5.  So you can think about that as the |
| 4 | timeframe.  We will go for about another half an hour, 32 |
| 5 | minutes, something like that. |
| 6 | JOHN KOLAKOWSKI, |
| 7 | called as a witness by the government, |
| 8 | having been duly sworn, testified as follows: |
| 9 | THE CLERK:  Please state your full name for the record |
| 10 | and spell your last name for the record. |
| 11 | THE WITNESS:  My name is John Kolakowski, last name |
| 12 | spelled K-o-l-a-k-o-w-s-k-i. |
| 13 | THE CLERK:  Thank you. |
| 14 | THE COURT:  All right.  Sergeant, please be seated, |
| 15 | sir.  And it will be important for you to speak clearly and |
| 16 | with a strong voice into the mic.  I'm sure you won't have any |
| 17 | problem with that.  Then there is water there on the your left, |
| 18 | if you would like it. |
| 19 | THE WITNESS:  Thank you. |
| 20 | THE COURT:  Mr. Mukhi, you may proceed, sir. |
| 21 | MR. MUKHI:  Thank you, your Honor. |
| 22 | DIRECT EXAMINATION |
| 23 | BY MR. MUKHI: |
| 24 | Q.  Mr. Kolakowski, where do you work? |
| 25 | A.  I am a detective sergeant with the Hudson County |

E6gdser6                        Kolakowski – direct

1   Prosecutor's Office in Hudson County, New Jersey.

2   Q.   And how long have you been a detective sergeant?

3   A.   I have been employed as a detective since February of 2003.

4   Q.   And what did you do before then?

5   A.   Before then I worked in a variety of positions over there,

6   mostly clerical type work as a dispatcher.  Also as a

7   prosecutor's agent, and an intern for several months when I

8   first started there.

9   Q.   OK.  Have you had any other jobs in law enforcement besides

10  the one at the Hudson County Prosecutor's Office?

11  A.   No.  But I was assigned out to the Drug Enforcement

12  Administration, Newark, New Jersey for approximately three

13  years.

14  Q.   What are your duties and responsibilities as a detective

15  sergeant at the Hudson County Prosecutor's Office?

16  A.   I'm currently assigned to the Narcotics Task Force.  I

17  supervise four detectives, and we investigate narcotics

18  offenses in New Jersey.

19  Q.   Turning your attention to December 20, 2012.  Were you

20  working that day?

21  A.   Yes, I was.

22  Q.   And what was your assignment?

23  A.   I was going to be assisting with a narcotics investigation,

24  specifically a controlled purchase of heroin in downtown Jersey

25  City.  And I was assigned as a surveillance unit for that

E6gdser6                        Kolakowski – direct

1    specific occasion.

2    Q.  And who is the case agent for that controlled buy

3    operation?

4    A.  Detective Justin Kealy, from the Hudson County Prosecutor's

5    Office.

6    Q.  And what time of day were you doing surveillance?

7    A.  Mid-afternoon, probably in the range of 3 to 4 o'clock.

8    Q.  And were you -- where were you doing surveillance?

9    A.  On that day I was set up on 7th Street in Jersey City, near

10   the intersection of 7th and Division.

11   Q.  And what were you set up to look at?

12   A.  Michael Gamba's residence, which is located at I believe

13   it's 372 7th Street in Jersey City.

14        MR. MUKHI:  And if we could briefly publish Government

15   Exhibit 6.

16   Q.  Do you recognize this person?

17   A.  Yes, I do.

18   Q.  Who is it?

19   A.  That is Michael Gamba.

20   Q.  Now, were you on foot or in a car that day doing

21   surveillance?

22   A.  Initially I was in a car, and then once I observed

23   Mr. Gamba leave his residence I jumped out on foot and followed

24   him.

25   Q.  Now, you mentioned Mr. Gamba you observed leave his house.

E6gdser6                           Kolakowski – direct

1    What did you see next?

2    A.  He walked east to the intersection of Brunswick and turned

3    northbound, crossed over to the east side of the street

4    mid-block, and then turned the corner and walked eastbound on

5    8th Street.  And then walked over to 348 8th, 8th Street in

6    Jersey City, which is approximately about two-block walk or so.

7    Q.  And, by the way, were you following by foot at this point

8    or did you go back into a vehicle?

9    A.  On foot.

10   Q.  And where were you in relation to Mr. Gamba when Mr. Gamba

11   arrived at 348 8th Street?

12   A.  I was a little bit west of him, a few houses down on the

13   south side of the street.  And I saw him approach the location,

14   ring the doorbell, and then the door opened subsequently.  And

15   I observed Anthony Serrano in the doorway allowing him to enter

16   into the location.

17   Q.  Do you see Anthony Serrano in the courtroom today?

18   A.  Yes, I do.

19   Q.  And can you point to him and identify a piece of clothing

20   he's wearing?

21   A.  All right.  He is sitting right over there, with the orange

22   shirt with the collared shirt.

23        MR. MUKHI:  Your Honor, the government asks that the

24   record reflect the witness has identified the defendant.

25        THE COURT:  So reflected.

E6gdser6                          Kolakowski - direct

1    BY MR. MUKHI:

2    Q.  What did you see next after the defendant let in Michael

3    Gamba into 348 8th Street?

4    A.  All right.  The door closed and I just milled around on the

5    block for not too long, several minutes at the most.  And then

6    I saw Mr. Gamba leave the residence and then walk back to his

7    residence in the same -- pretty much the same route, west, just

8    in reverse.

9    Q.  And did you conduct -- continue to conduct surveillance

10   after Gamba returned to his residence?

11   A.  Yes, on foot.

12   Q.  OK.  And what did you see next?

13   A.  He then went back to his residence at 372 7th Street, and

14   he went into his residence.  And at that time I broke off from

15   that area and I let another surveillance unit take over the

16   surveillance at his house.

17            MR. MUKHI:  OK.  Can we put up Government Exhibit 608,

18   which is already in evidence.

19   Q.  And there is a -- there should be a laser pointer in front

20   of you, Detective Sergeant Kolakowski.  If you could just use

21   that to point up on the projection screen what you observed

22   that day.

23   A.  All right.  Mr. Gamba left the house from 372 7th Street,

24   which is marked off by "A" over there.  He walked eastbound on

25   7th.  Then turned northbound on Brunswick, crossing about

E6gdser6                         Kolakowski - direct

1    mid-block.  Went up Brunswick, and then turned the corner.

2    Came up, crossed over again to the north side of the street,

3    and then approached Mr. Serrano's location, which is marked off

4    by "B," which would be 348 8th Street.

5    Q.  And where were you, approximately, when you observed

6    Mr. Serrano let Mr. Gamba into the home?

7    A.  In this area over here.

8    Q.  You are pointing a little bit to the left?

9    A.  A little bit to the west and on the south side of the

10   street.

11          And then afterward he exited from that location and

12   then returned the same basic route to his residence at 372 7th

13   Street.

14          MR. MUKHI:  OK.  If we could briefly publish 605A?

15          THE COURT:  Sir, were you on foot?

16          THE WITNESS:  Yes.

17          THE COURT:  How long did it take you to get from "A"

18   to "B"?

19          THE WITNESS:  A few minutes.

20          THE COURT:  All right.

21   BY MR. MUKHI:

22   Q.  How far apart are they, approximately?

23   A.  Again, it looks -- it's about two total blocks; two,

24   two-and-a-half the most.

25          MR. MUKHI:  If you could put up 605A.

E6gdser6                         Kolakowski - direct

1    Q.  Do you recognize what is in this photo?

2    A.  Yes.  That is Mr. Serrano's residence.  That is 348 8th

3    Street.

4    Q.  The same residence you have been describing?

5    A.  Yes.

6    Q.  All right.  Turning your attention to January 16, 2013.

7            Were you working on that day?

8    A.  Yes, I was.

9    Q.  What was your assignment?

10   A.  Again, I was assigned to the surveillance unit for a

11   narcotics investigation, specifically a controlled purchase of

12   heroin on that day.

13   Q.  And what was your surveillance assignment that day?

14   A.  I had an eyeball or a surveillance location marked on 8th

15   Street of that day.

16   Q.  And what were you looking at?

17   A.  Specifically, the front of Mr. Serrano's residence.

18           MR. MUKHI:  If you could put up 605B.

19   Q.  Do you recognize this photo?

20   A.  Yes.  That's the front of -- the front door of

21   Mr. Serrano's residence.

22   Q.  By the way, were you using any aids to assist your

23   surveillance on that day?

24   A.  On that day, yes, binoculars.  I wasn't specifically set up

25   in front of the location; I was off about a half block east

E6gdser6                          Kolakowski - direct

1     from the residence.

2     Q.  OK.  Why don't we pull up 608.

3            So if you could use a laser pointer, approximately

4     where were you set up with the binoculars?

5     A.  I was parked right in that area right there, very close to

6     the southeast corner of Monmouth and 8th Street.

7     Q.  So what did you see first?

8     A.  I set up surveillance at that location.  And at a certain

9     period in time I saw the -- a green Lexus.  I don't recall what

10    model exactly the vehicle was, but it was -- I recognized it as

11    being Mr. Serrano's because it was registered to him.  He

12    passed me and then parked on the north side of the street,

13    approximately this area, a little bit east of the house.

14           He then exited the vehicle and then subsequently

15    walked over to the front of the location.  From what I could

16    tell, he entered the residence.

17    Q.  And what did you see next?

18    A.  Several minutes later I observed a vehicle, which was being

19    utilized by our confidential informant, our cooperating

20    witness, and it arrived on 8th Street, double-parked in the

21    approximate area of where 348 8th Street is.  And then I

22    observed Michael Gamba get out of the vehicle, walk over to the

23    front of the location, and then enter it.

24           He was in there for maybe about a minute, at most, and

25    then he exited from there, got back into the vehicle, and the

E6gdser6                         Kolakowski - direct

1    vehicle departed from there.

2    Q.  And what happened next?

3    A.  The vehicle departed from that location, and then

4    surveillance -- other surveillance units took over the

5    surveillance of that vehicle.

6            MR. MUKHI:  One moment, your Honor.

7            THE COURT:  All right.

8            (Pause)

9            MR. MUKHI:  Nothing further.

10           THE COURT:  Thank you.

11           Mr. De Castro, cross-examination.

12           Ms. Gotlib.

13           MS. GOTLIB:  Thank you, your Honor.

14           One minute, your Honor.

15           THE COURT:  All right.

16           (Pause)

17           MS. GOTLIB:  Thank you.

18   CROSS-EXAMINATION

19   BY MS. GOTLIB:

20   Q.  Good afternoon.

21   A.  How are you?

22   Q.  So you testified that you observed Mr. Gamba go to

23   Mr. Serrano's residence, correct, on -- sorry, December 20,

24   2012, correct?

25   A.  Yes.

E6gdser6                        Kolakowski - cross

1   Q.  And you observed Mr. Serrano open the door, correct?

2   A.  Yes.

3   Q.  And Mr. Gamba went inside, correct?

4   A.  Yes.

5   Q.  And then they shut the door, correct?

6   A.  Yes.

7   Q.  Did you see Mr. Serrano at any point hand anything to

8   Mr. Gamba or vice versa?

9   A.  No, I didn't.

10  Q.  Did you see them shake hands?

11  A.  No, I didn't.

12  Q.  On January 16th you observed Mr. Gamba go to Mr. Serrano's

13  residence, is that correct?

14  A.  Yes, it is.

15  Q.  You observed Mr. Serrano open the door, correct?

16  A.  No.  I didn't observe him open the door.  I saw Mr. Gamba

17  approach the door, and then the door opened and he went in, but

18  I couldn't see who opened the door from where I was at.

19  Q.  So you don't know if Mr. Serrano opened the door or not?

20  A.  I don't know.

21          MS. GOTLIB:  No further questions.

22          THE COURT:  All right.  Thank you.

23          Mr. Mukhi, anything further?

24          MR. MUKHI:  No, your Honor.

25          THE COURT:  All right.  Thank you.  You may step down.

1            THE WITNESS:  Thank you.

2            (Witness excused)

3            THE COURT:  Would the government like to call its next

4    witness, please?

5            MR. MUKHI:  Yes, your Honor.

6            The government calls Sergeant Musante.

7            THE COURT:  All right.  Mr. Musante.

8     ANTHONY MUSANTE,

9        called as a witness by the government,

10       having been duly sworn, testified as follows:

11           THE CLERK:  Please state your full name for the record

12    and spell your last name for the record.

13           THE WITNESS:  First name is Anthony.  Last name is

14    Musante, M-u-s-a-n-t-e.

15           THE CLERK:  Thank you.

16           THE COURT:  All right, sir.  Please be seated.

17           And it will be important for you to turn the mic so

18    you could speak into it clearly and directly.

19           THE WITNESS:  Yes, ma'am.

20           THE COURT:  Thank you.

21           Mr. Mukhi, you may proceed, sir.

22    DIRECT EXAMINATION

23    BY MR. MUKHI:

24    Q.  Mr. Musante, where do you work?

25    A.  The Jersey City Police Department.

1   Q.  And what is your title?

2   A.  I'm a sergeant.

3   Q.  And how long have you been a sergeant with the Jersey City

4   Police Department?

5   A.  I have been a sergeant since 2005, and I have been a police

6   officer approximately 20 years.

7   Q.  And what types of jobs have you had as a police officer?

8   A.  I was a -- I became a police officer in 1995.  My first

9   four years was in the Patrol Division in the West District of

10   Jersey Police Department as an officer.  In 1999, I was

11   assigned to the Hudson County Prosecutor's Office Narcotics

12   Task Force as an investigator until --

13          THE COURT:  I will ask you to slow down.  You speak

14   almost as quickly as I do.  Slow down so the court reporter can

15   get a good sound.

16          THE WITNESS:  In Jersey City we speak a little quick.

17   Sorry.

18   A.  In 1999 I was assigned to the Hudson County Prosecutor's

19   Office Narcotics Task Force, where I worked as an investigator

20   until 2005.  I was promoted to sergeant in 2005.  I spent a

21   little over a year as an Internal Affairs sergeant for the

22   Jerry City Police Department.  From 2006 until 2013, I was a

23   sergeant in the Special Investigations Unit of the Jersey City

24   Police Department, and for the past year I went back into the

25   Patrol Division as a supervisor on -- in uniform.

E6gdser6                          Musante – direct

 1  BY MR. MUKHI:

 2  Q.  Now, what are your current duties and responsibilities as a

 3  sergeant at the Jersey City Police Department?

 4  A.  Currently I'm in the Patrol Division.  So I supervise

 5  uniformed officers in regular patrol, uniformed patrol

 6  functions.

 7  Q.  What were you doing prior to that?

 8  A.  Prior to that I was in the Special Investigations Unit,

 9  supervising a squad of investigators, conducting operations in

10  the Special Investigations Unit.

11  Q.  What is the Special Investigations Unit?

12  A.  We investigate longterm operations.  We conduct longterm

13  operations involving counterterrorism, organized crime, and

14  corruption activities.

15  Q.  Turning your attention to January 4, 2013.

16          Were you working that day?

17  A.  Yes, sir.

18  Q.  And what was your assignment?

19  A.  That day we were working with the Hudson County

20  Prosecutor's Office, assisting them with a controlled buy

21  operation of narcotics.

22  Q.  What sort of assistance were you providing to the Hudson

23  County Prosecutor's Office?

24  A.  Surveillance.

25  Q.  And were you personally conducting surveillance that day?

E6gdser6                          Musante – direct

1   A.   Yes, sir.

2   Q.   And where did you start out conducting surveillance that

3   day?

4   A.   On the fourth -- I started out actually at the Barge Inn,

5   which is at 2nd and Monmouth in downtown Jersey City.  I set up

6   my initial surveillance there.

7   Q.   OK.  What did you see first?

8   A.   We initially observed a male by the name of Michael Gamba.

9   We had established surveillance on him at the bar.

10        MR. MUKHI:  Can we put up Government Exhibit 6,

11   briefly.

12   Q.   Do you recognize this person?

13   A.   Yes.  That's Mr. Gamba.

14   Q.   So what happened next after you saw Mr. Gamba that day at

15   the Barge Inn?

16   A.   He exited the bar.  We followed him down Monmouth Street,

17   which would be northbound.  He made a left onto 8th Street.

18   And we reestablished surveillance on him in front of Anthony

19   Serrano's residence on 8th Street.

20        MR. MUKHI:  And if we could put up Government Exhibit

21   605A.

22   Q.   Do you recognize what's in this photograph?

23   A.   Yes.

24   Q.   What is it?

25   A.   That is the building where Anthony Serrano resides, at I

E6gdser6                          Musante - direct

1    believe 348 8th Street.

2    Q.  OK.  And what did you see once Mr. Gamba arrived at Anthony

3    Serrano's residence on January 4, 2013?

4    A.  Once he arrived he stood by outside by the curb area.

5            Anthony Serrano's green Lexus passed us from our

6    surveillance location on 8th Street and double-parked

7    immediately in front of the location.  A female and two

8    children exited the vehicle and entered the residence.  And

9    Mr. Gamba entered the passenger side of the vehicle, which was

10   being driven by Mr. Serrano.

11           After about a minute or two, Mr. Gamba exited the

12   green Lexus, and then the green Lexus left the area and

13   Mr. Gamba walked back to his residence, which was around the

14   block or around the corner on 7th Street.

15           MR. MUKHI:  And if we could put up 608.

16   Q.  Now, if you could just -- there should be a laser pointer

17   in front of you.  If you could use the laser pointer just to

18   tell the jury what you saw once Mr. Gamba was in this vicinity.

19   A.  Where the letter "B" is would be the residence of

20   Mr. Serrano.  Once Mr. Gamba and Mr. Serrano interacted with

21   each other, Mr. Gamba walked to Brunswick Street.  He made a

22   left, and then made a right onto 7th Street to his residence,

23   located where the letter "A" is.

24   Q.  And you mentioned that Mr. Gamba and Mr. Serrano had an

25   interaction in the green Lexus.  How long did that interaction

E6gdser6                              Musante - direct

1    last, approximately?

2    A.   One to two minutes.

3    Q.   All right.  Now, do you see Mr. Serrano in the courtroom

4    today?

5    A.   Yes, sir.

6    Q.   OK.  Can you point to him and describe a piece of clothing

7    he is wearing?

8    A.   Mr. Serrano is sitting third in from the left, wearing like

9    an open-collared, orangy kind of shirt.

10            MR. MUKHI:  Your Honor, may the record reflect that

11   the witness has identified the defendant?

12            THE COURT:  So reflected.

13   BY MR. MUKHI:

14   Q.   Now, by the way, were you following Mr. Gamba on foot or

15   were you in a vehicle?

16   A.   I was in a vehicle.

17   Q.   And when you saw Mr. Gamba get into the green Lexus with

18   Mr. Serrano, where, approximately, were you in the vehicle?  If

19   you could indicate on the map?

20   A.   Where is my vehicle?

21   Q.   Yes.  Where was your vehicle?

22   A.   My vehicle would be off the map slightly.  My vehicle would

23   have been on 8th Street, halfway between Monmouth and Coal

24   Street.  Right around over here.

25   Q.   Were you using any visual aids that day in particular?

E6gdser6                    Musante - direct

1   A.  I was using binoculars on and off as needed.

2   Q.  And were you using binoculars at the time that you saw

3   Mr. Gamba enter the car with Mr. Serrano?

4   A.  Yes, sir.

5   Q.  Now, turning your attention to January 16, 2013.

6        Were you working that day?

7   A.  Yes, sir.

8   Q.  And what was your assignment?

9   A.  I was again working with the Hudson County Prosecutor's

10  Office.  We were again conducting a controlled buy operation of

11  narcotics, and we were assisting them with surveillance.

12  Q.  Were you personally conducting surveillance?

13  A.  I was.

14  Q.  And initially where were you set up to do surveillance?

15  A.  Initially we set up -- my vehicle set up on the Barge Inn

16  Bar, which is on 2nd and Monmouth Street, again.

17  Q.  And what did you see first?

18  A.  Well, we had a -- two of our cooperators, driving one of

19  the cooperator's vehicles, arrived at the bar with Mr. Gamba.

20  Once they entered the bar on foot -- they parked and entered

21  the bar on foot, another unit containing Detective Kealy, they

22  established the primary surveillance on the bar and we

23  relinquished that to them.  We established our surveillance on

24  8th Street where Detective -- then Detective Kolakowski was,

25  had already initiated surveillance on Anthony Serrano's

E6gdser6                        Musante – direct

1    residence.

2    Q.   Then where did you go?

3    A.   I was actually back about a block behind this intersection

4    on 8th Street.  It would have been here, which would be one

5    block behind -- one block east of Monmouth Street, and

6    Detective Kolakowski would have been a block ahead of me.

7    Q.   And were you using binoculars that day, if you recall?

8    A.   Yes.

9    Q.   And so what did you see that day when you were backing up

10   Kolakowski?

11   A.   We -- at that point we were stationary for a period of

12   time.  The vehicle containing the two cooperators and Mr. Gamba

13   turned the corner on Monmouth Street, doubled-parked directly

14   in front of Anthony Serrano's residence.  Mr. Gamba exited the

15   rear of the vehicle and approached the residence.

16           After a few minutes he returned and the vehicle exited

17   the area.  We followed the vehicle out of the area, and

18   Detective Kealy reestablished surveillance once they were out

19   of the area.

20   Q.   OK.  Do you recall whether or not you saw the defendant's

21   car that day?

22   A.   Actually, on that date the defendant's car did pass us.  We

23   were parked further back.  The defendant's car passed us on 8th

24   Street.  When it passed us, it then parked on 8th on the

25   right-hand side right a little past the residence.

E6gdser6                         Musante - direct

1   Q.  Was that before or after, if you recall, Mr. Gamba arrived

2   with the cooperating witness?

3   A.   It actually was before.  We had been established on the

4   residence for between a half hour and an hour before

5   Mr. Serrano arrived.  Once he entered the location, shortly

6   thereafter the cooperator's vehicle with Mr. Gamba arrived, and

7   Mr. Gamba exited the cooperator's vehicle and the cooperators

8   remained inside the vehicle.

9   Q.  And when you observed the defendant's vehicle that day, did

10  you observe him in it?

11  A.  Yes.  He was operating the vehicle.  He drove right past us

12  on 8th Street.

13          MR. MUKHI:  One moment, your Honor.

14          THE COURT:  All right.

15          (Pause)

16          MR. MUKHI:  No further questions.

17          THE COURT:  All right.  Thank you.

18          Ms. Gotlib.

19          MS. GOTLIB:  Yes.  Thank you.

20  CROSS-EXAMINATION

21  BY MS. GOTLIB:

22  Q.  Good afternoon, Sergeant.

23  A.  Good afternoon.

24  Q.  You observed the defendant in a vehicle, correct?

25  A.  Yes.

E6gdser6                          Musante - cross

1    Q.  A green Lexus, correct?

2    A.  Correct.

3    Q.  And you saw the vehicle on at least two occasions, correct?

4    A.  Correct.

5    Q.  And this was an older model, correct?

6    A.  Yes, it was.

7    Q.  At any point did you see Mr. Gamba and Mr. Serrano exchange

8    anything between each other?

9    A.  No.

10   Q.  And you never saw a handshake or anything like that, is

11   that correct?

12   A.  Correct.

13           MS. GOTLIB:  No further questions.  Thank you.

14           THE COURT:  All right.  Thank you.

15           Sir, you may step down.

16           THE WITNESS:  Thank you, ma'am.

17           THE COURT:  Did you have anything else, Mr. Mukhi?

18           MR. MUKHI:  No, your Honor.

19           THE COURT:  All right.  Thank you.

20           (Witness excused)

21           THE COURT:  All right.  It being seven minutes to 5, I

22   think we will stop there for the day.  It will take a few

23   minutes to get our next witness in the courtroom.  So what

24   we'll do is we'll pick up tomorrow morning.

25           I think Joe has arranged to have some breakfast

E6gdser6

1    brought in for you folks.  He'll tell you what it is.  It is

2    not -- I wouldn't call it elaborate, but it is sort of

3    doughnuts and pastries and coffee.  And he can maybe even get

4    fruit if you are looking for something other than doughnuts.

5    That is to motivate you to try to think ahead about your

6    commute, and I appreciate your doing that.  Because we can't

7    start until you are all here -- every single one of you.  And

8    so we'll wait until you are all here.

9            Hopefully, you will all be here and be ready to walk

10   in at 9:30.  So if you can be in place by about 9:20/9:25, that

11   would be terrific so that we can get organized.

12           All right.  I want to remind you not to talk to

13   anybody about this case, including each other.  Not to do any

14   independent research on any people, places or things that you

15   have heard about.  Keep an open mind.  Remember that evidence,

16   as we said, comes in in pieces.

17           And I think that's it for moment.

18           I'll see you tomorrow morning.  Thank you.

19           THE CLERK:  All rise until the jury leaves.

20           (Continued on next page)

21

22

23

24

25

E6gdser6

1              (Jury not present)

2              THE COURT:  All right.  Ladies and gentlemen, let's

3    all be seated just for a moment.

4              As I said, I am likely to get you a set of the jury

5    instructions and so you will have those in the morning.

6              Based upon the pace that we are going, I don't know

7    how long Mr. Moral will take, and I think that he is the

8    longest one in terms of the government's case to come.  So that

9    could be whatever time it takes.  But it may be that we'll

10   judge tomorrow whether or not you will need to give me some

11   comments in track changes, or whether or not we will have time

12   to go through them all in terms of the jury instructions.  But

13   if we finish the testimony on Wednesday, we'll see where we

14   are.  It depends on Mr. Moral.  I see that there is

15   two-and-a-half hours down for him.  He may take substantially

16   longer or he may run at about that time, but the other folks

17   have been moving fairly quickly.

18             Is there anything else that you folks would like to

19   raise with me this afternoon before we break?

20             MS. MAIMIN:  No, your Honor.

21             MR. DE CASTRO:  No, your Honor.

22             (Continued on next page)

23

24

25

E6gdser6

1              THE COURT:  All right.  Then I will see you folks

2     tomorrow morning.  We will start with each other at 9, just to

3     see if there is anything that we should go over.  Then we will

4     start with testimony at 9:30.  Thank you.

5              THE CLERK:  All rise.

6              (Trial adjourned to 9 a.m., Tuesday, June 17, 2014)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION
2    Examination of:                          Page
3    JUSTIN KEALY
4    Direct By Mr. Mukhi  . . . . . . . . . . . . 138
5    Cross By Mr. De Castro . . . . . . . . . . . 183
6    Redirect By Mr. Mukhi  . . . . . . . . . . . 198
7    Recross By Mr. De Castro . . . . . . . . . . 200
8    JOHN KOLAKOWSKI
9    Direct By Mr. Mukhi  . . . . . . . . . . . . 202
10   Cross By Ms. Gotlib  . . . . . . . . . . . . 210
11   ANTHONY MUSANTE
12   Direct By Mr. Mukhi  . . . . . . . . . . . . 212
13   Cross By Ms. Gotlib  . . . . . . . . . . . . 220
14                  GOVERNMENT EXHIBITS
15   Exhibit No.                            Received
16    4, 4A and 4B   . . . . . . . . . . . . . . 140
17    605-A and 605-B  . . . . . . . . . . . . . 142
18    6 and 6A   . . . . . . . . . . . . . . . . 151
19    608, 609 611 and 612   . . . . . . . . . . 155
20    190   . . . . . . . . . . . . . . . . . . 160
21    191, 192, 193 and 805  . . . . . . . . . . 162
22    304 and 304-T  . . . . . . . . . . . . . . 170
23    305, 305T  . . . . . . . . . . . . . . . . 177
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300