E6H7SER1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          13 CR 58 (KBF)

5   ANTHONY SERRANO,

6              Defendant.

7   ------------------------------x

8                                          New York, N.Y.
                                           June 17, 2014
9                                          9:15 a.m.

10

    Before:
11
                    HON. KATHERINE B. FORREST,
12
                                           District Judge
13

14                        APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    RACHEL MAIMIN
17  RAHUL MUKHI
         Assistant United States Attorneys
18
    CESAR DE CASTRO
19       Attorney for Defendant Serrano

20  VALERIE GOTLIB
         Attorney for Defendant Serrano
21
    ALSO PRESENT:  Danielle Craig, Paralegal
22                 Todd Riley, Special Agent, DEA

23

24

25

E6H7SER1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.  Please be seated.

3          (Case called)

4          (In open court)

5          MS. MAIMIN:  Good morning, your Honor.  Rachel Maimin

6    and Rahul Mukhi, Special Agent Todd Riley, paralegal specialist

7    Danielle Craig, and Special Agent Natalie Bara.

8          MR. DE CASTRO:  Good morning for Mr. Serrano, Cesar De

9    Castro and Valerie Gotlib.

10         THE COURT:  Good morning.  We have a couple of matters

11   to deal with this morning that I want to raise too, but let me

12   find out first what our total agenda is.  Are there things

13   which you folks would like to raise?

14         MS. MAIMIN:  Just one brief matter, your Honor.

15   Pursuant to the Certified case, it is our position -- and the

16   defendant doesn't object -- that because Mr. Moral's

17   credibility was clearly put into dispute by the opening

18   statement, we intend to introduce Mr. Moral's cooperation

19   agreement under direct examination today.

20         THE COURT:  Do you dispute that you put Mr. Moral's

21   credibility into issue yesterday, Mr. De Castro?

22         MR. DE CASTRO:  No, your Honor.

23         THE COURT:  Then I do think that under that Second

24   Circuit precedent it's appropriate to proceed, as you have

25   outlined.  Anything else that we need to deal with before I go

E6H7SER1

1    to my matters?

2              MS. MAIMIN:  Not from the government.

3              THE COURT:  Mr. De Castro, anything from your

4    perspective?

5              MR. DE CASTRO:  No, your Honor.

6              THE COURT:  I have two things.

7              One, Juror 1 apparently called my clerk yesterday

8    evening after I had left.  I have not spoken to Juror 1, and

9    let me say right at the outset I propose to hear from Juror 1

10   himself with all of us present what he has to say.

11             Apparently he is concerned that among these speakers

12   who his company finds speaking engagements for is Ray Kelly,

13   and that he did not disclose that to us, and he wasn't sure if

14   he needed to, but he felt like it was weighing on him that he

15   might have needed to and, therefore, he wants to disclose that

16   to us.

17             This obviously raises a couple of questions if he says

18   that.  One is whether or not that fact alone would be something

19   which had the defendants in particular, but really either side,

20   known about it, they would have used a peremptory.  I say that

21   because Juror 1 was not the last juror in the box, and you both

22   waived your last strike.  Therefore, you both preserved the

23   ability essentially to argue that had you known, you would have

24   used that peremptory at that time.

25             Therefore, I will say that if either side raises a

E6H7SER1

1   point about this, I would strike Juror 1, and we would move up

2   Alternate 1.  I proceed with each alternate in order.  This is

3   just so that everybody understands what the proceedings would

4   be before we go further.

5        What I suggest we do is just call Juror 1 out, let me

6   engage in a colloquy with him with you folks here -- as I would

7   had he raised this yesterday -- and then let him go back into

8   the room, and then we will discuss it.  Is that acceptable?

9        MS. MAIMIN:  Yes, your Honor.

10        MR. DE CASTRO:  Yes, Judge.

11        THE COURT:  Can we bring out Juror 1?  Is he here?

12        (Juror present)

13        THE COURT:  Juror 1, you get to sit in your own seat

14   here, and we are just going to ask you a couple questions.

15        I understand, sir, that you had called the clerk last

16   night.  Why don't you just start from the top and tell us what

17   your concern was.  The reason for that is because we want

18   everything with a juror, every communication, to be on the

19   record --

20        JUROR:  Yes.

21        THE COURT:  -- so everybody can hear it.

22        JUROR:  Essentially, when you were asking the

23   questions yesterday you had asked if we had any relatives or

24   friends in the NYPD, which I answered no.  Then kind of as the

25   day went on I was sort of thinking you also asked what I did

E6H7SER1

1    for a living, and I represent various celebrities for speaking

2    engagements, kind of former politicians, athletes, authors,

3    journalists.  Our newest client is Ray Kelly, who is the former

4    Police Commissioner of the NYPD, and I just thought that should

5    be relevant and I should kind of bring it up sooner rather than

6    later, if counsel or anyone else thought that was important to

7    know.

8              THE COURT:  I certainly appreciate you bringing it up.

9    Let me ask you, do you know Mr. Kelly personally?

10             JUROR:  He has come to our office twice for meetings.

11             THE COURT:  Do you deal with him on a regular basis

12   when he does show up?  I mean is he your client effectively?

13             JUROR:  Every agent represents everyone, so he sits

14   around the conference table with myself and nine others in the

15   office.

16             THE COURT:  Does the fact that Mr. Kelly is a client

17   of your firm and that you have interactions with him, does that

18   make you feel in some way that you won't be able to be

19   impartial to this matter?

20             JUROR:  Essentially what I told the clerk last night

21   and what I will tell you now is I do support Ray Kelly, but I

22   don't think it has an effect specifically on this case.

23             THE COURT:  All right.  So do you believe -- let me

24   put it this way:  Do you believe that you can listen to the

25   evidence in this case relating to that gentleman sitting at the

E6H7SER1

 1    table and evaluate it fairly and impartially?

 2              JUROR:  I do.

 3              THE COURT:  Thank you.  Why don't you go ahead and

 4    step back into the jury room, and then we will discuss.

 5              (Juror not present)

 6              THE COURT:  All right.  Counsel, does anyone have any

 7    issue to raise?  From the court's perspective Juror 1, had he

 8    given those same answers yesterday, I certainly would have kept

 9    him and found no reason for any basis for a cause strike.  The

10    question is whether or not one of you would have used a

11    peremptory.

12              MS. MAIMIN:  We would not, your Honor.

13              THE COURT:  Mr. De Castro?

14              MR. DE CASTRO:  No, Judge, we would not.

15              THE COURT:  All right.  So then we will then keep

16    Juror 1 as seated on the jury, and that's the end of that.

17              Do any of you have an objection to me having Joe just

18    inform him thanks for the disclosure; it's business as usual?

19              MS. MAIMIN:  No, your Honor.

20              MR. DE CASTRO:  No.

21              THE COURT:  Thank you.  Mr. Pecorino will go ahead and

22    do that.

23              The second thing I wanted to raise was you've got a

24    copy of the jury instructions, and you've also got it in Word

25    form.  What we will do is tomorrow morning that will be our

E6H7SER1

1    only session to go through them really.  If you want to send to

2    me tonight at any point in time track changes, I will look at

3    those.  I get in early, and so I can certainly look at them

4    before I come out on the bench and then be prepared about which

5    ones I accept or don't accept immediately.

6         If you don't have time for that, I understand, and we

7    will do it tomorrow morning page by page, starting with the

8    first page that there are any changes with respect to.

9         One point on the jury charges:  I don't see a basis,

10   given the government's theory right now, for a conscious

11   avoidance charge.  The government's theory appears to be that

12   Mr. Serrano is in fact a mastermind, and that while he may not

13   have been present during certain events, he knew about them

14   because he planned them.  That in my view is inconsistent with

15   a conscious avoidance theory and, therefore, I would not plan

16   to charge the jury that he could have consciously avoided

17   knowing about that which he had planned.  Does the government

18   disagree?

19        MS. MAIMIN:  Not at all, your Honor.  We drafted that

20   before we had a complete understanding of the defense case, and

21   we don't think there is necessarily a basis for conscious

22   avoidance here either.

23        THE COURT:  Mr. De Castro, do you have any question

24   for the court removing the conscious avoidance charge?

25        MR. DE CASTRO:  No, we did not.

E6H7SER1

1          THE COURT:  Thank you.  There are other issues which I

2  am continuing to look at that are more minor, including the

3  similar acts piece, which we will have to see how the evidence

4  comes in and whether or not we want to just do sort of a

5  cautionary instruction when it comes in, or whether or not we

6  want to do that plus a jury instruction.

7          There may be reasons why, for instance, the defendant

8  would not want a second instruction that might serve to

9  emphasize certain pieces of evidence, or may be indifferent one

10  way or the other.  Let's just let that play out a little bit.

11  All right?  Because the way the similar acts evidence is in the

12  charge right now is there would be a listing or at least a

13  summary of the similar acts, and that could serve to highlight

14  certain things.  So, I am aware of that and just want to point

15  that out.  So, you folks just look at that as we go.  It's a

16  place where there are some blanks to be filled in.

17          Mr. Mukhi?

18          MR. MUKHI:  Just one other minor point.  I believe

19  yesterday some of us noticed that some of the jurors appeared

20  to have -- we didn't look -- but it appeared that they had left

21  their notebooks underneath their chairs instead of taking them

22  back into the jury room, so we just wanted to highlight that in

23  case your Honor prefers for them to take them back.

24          THE COURT:  So long as they don't take them home --

25  and I will remind them of that -- I don't mind if they're under

E6H7SER1

1    the chairs or in the jury room, because the only people in the

2    jury box during the day -- I don't have any classes coming in

3    here at night -- are the jurors themselves, and so those are

4    the only folks who are here.  Which reminds me, I do have a

5    luncheon matter today that will be a criminal matter that will

6    be in this room at one o'clock.

7             All right.  Joe, are we all assembled?

8             DEPUTY COURT CLERK:  Waiting on one.

9             THE COURT:  Which one?

10            DEPUTY COURT CLERK:  12.

11            THE COURT:  Anything else we need to do?

12            MS. MAIMIN:  Just to tell your Honor that the first

13   order of business is to read a stipulation into the record, and

14   then we are going to call Mr. Moral.

15            THE COURT:  All right, fine.  Thank you.  Is there

16   anything further that we need to do on any other witnesses, or

17   have I signed everything I need to sign?

18            MS. MAIMIN:  We don't have anything.

19            THE COURT:  I have another trial starting in a week,

20   so I have various pieces of paper.

21            MR. MUKHI:  One other while we have the time.  After

22   Mr. Moral will be two short witnesses, police officer Briones,

23   and then Frank Piazza, who is the audio technician.  After they

24   testify, Special Agent Riley will be testifying, and so the

25   physical evidence will come into play, and so I think it comes

E6H7SER1

1    in towards the middle end portion of the Q and A, but there may

2    be a point where it makes sense to take a break and bring all

3    the physical evidence up and set it up on the table right

4    before it is introduced, if that pleases the court.

5            THE COURT:  Yes.  Do you have a table, or do we need

6    to give you a table?

7            MR. MUKHI:  I think we were going to borrow the tables

8    in the witness rooms for that purpose.

9            THE COURT:  All right.  Are we all set?

10           DEPUTY COURT CLERK:  Still waiting on number 12.

11           THE COURT:  OK.  That sounds fine.  Anything else?

12           MR. DE CASTRO:  Just since we have the time, I thought

13   we would discuss schedule a little bit.  The government -- we

14   discussed the schedule a little.  We think there is actually a

15   chance that testimony would wrap up maybe Wednesday early

16   afternoonish, maybe later, maybe slightly earlier.  I think the

17   one thing I wanted to flag for the court was if that did

18   happen, I would ask that we sum up on Thursday.

19           THE COURT:  Well, let me ask you folks, is that

20   something which you both would like as a joint application?

21           MS. MAIMIN:  Yes, your Honor.

22           THE COURT:  Let me suggest to you -- and I have only

23   started recently doing it, but there is some advantage to

24   this -- instructing the jury at least in part then before the

25   summations.  It has the advantage of giving us the ability to

E6H7SER1

1    use the time tomorrow afternoon after the close of the

2    evidence, of course, after any motions are brought, and having

3    the jury also sit there with the summations knowing a little

4    bit about the framework.

5           Does anybody object to me using some time that we may

6    have tomorrow to at least commence the jury instructions?  If

7    we had enough time, I would complete them, but at least

8    commence.

9           MS. MAIMIN:  We have no objection.

10          THE COURT:  Mr. De Castro?

11          MR. DE CASTRO:  Judge, I don't think I would, but I

12   would just like to think about it a little bit --

13          THE COURT:  Please do.

14          MR. DE CASTRO:  -- and let you know.

15          THE COURT:  Please do.  And I would also, since I have

16   only been giving the jury instructions in advance with consent

17   of counsel, if you have concerns, I would love to know what

18   they are, because I'm still trying to assess what the

19   draw-backs are.  It strikes me there are many more advantages

20   than draw-backs, because then people then have a framework into

21   which to put what people are saying.  But you folks think about

22   it.

23          MR. DE CASTRO:  I never thought about it that way, and

24   I have obviously never had a trial where that happened, so I

25   would like to think about it.

E6H7SER1

1           THE COURT:  All right, do think about it.

2           also, just so you understand, I do have the jury sit

3    there with the instructions.  They each get their own copy of

4    them.  Sometimes people think it's easier to follow along.

5    They also each have their own copy of the verdict form, and

6    then there is one extra copy of the verdict form in the room

7    waiting for them along with any of the evidence that goes in,

8    so they can do whatever they do, mark up their own form, but

9    have a common form, just so you understand the procedures.

10          All right.  Let's take a brief break while we're

11   waiting for this last juror to come in, and then we will start

12   as soon as he is here.

13          (Recess)

14          THE COURT:  All right, let's bring out the jury.

15          I should also say that I will put the jury

16   instructions on the docket.  Each version will go onto the

17   docket, just so you are aware.

18          (Continued on next page)

19

20

21

22

23

24

25

E6H7SER1

1          (Jury present)

2          THE COURT:  Let's all be seated, ladies and gentlemen.

3          And, Ms. Maimin, would the government like to proceed?

4          MS. MAIMIN:  Yes, your Honor.  At this time we request

5    permission to read a stipulation into the record.

6          THE COURT:  Yes.  And, ladies and gentlemen, from

7    yesterday you recall that a stipulation is an agreement between

8    both sides as to certain facts, and you may take those facts as

9    established.

10          MS. MAIMIN:  This is Government Exhibit 807.  The

11    parties agree that Government Exhibit 410 is a true and correct

12    copy of toll records maintained by Verizon Wireless with the

13    telephone call number 201-687-8583 for the period January 1,

14    2012 to September 3, 2013.

15          Government Exhibit 411 is a true and correct copy of

16    toll records and cell site records maintained by Verizon

17    Wireless for telephone 201-687-8583 for the period September 2,

18    2012 to January 9, 2013.

19          Government Exhibit 412 is a true and correct copy of

20    the subscriber registration information maintained by Verizon

21    Wireless for the telephone call number 201-687-8583.

22          Government's Exhibits 413A through Government's

23    Exhibits 413D are true and correct copies of cell site tower

24    locations maintained by Verizon Wireless.

25          Government Exhibit 415 is a true and correct copy of

E6H7SER1

cell site and toll records maintained by AT&T for the telephone
with call number 201-912-6597, for the period November 1, 2012
to January 9, 2013.

Government Exhibit 416 is a true and correct copy of
cell site and toll records maintained by Sprint for the
telephone with call number 848-250-4950, for the period July
21, 2012 to November 14, 2012.

Government's Exhibits 417 is a true and correct copy
of cell site and toll records maintained by AT&T for the
telephone with call numbers 201-423-4826 and 201-744-1205, for
the period January 1, 2012 to January 9, 2013.

Government Exhibit 418 is a true and correct copy of
the subscriber registration information maintained by AT&T for
the telephone with call number 201-744-1205.

Government Exhibit 419 is a true and correct copy of
toll records maintained by T-Mobile for the telephone call
number 201-993-0268, for the period January 5, 2012 to January
9, 2013.

Government Exhibit 420 is a true and correct copy of
the subscriber registration information maintained by T-Mobile
for the telephone with call number 201-993-0268.

Government Exhibit 422 is a true and correct copy of
cell site and toll records maintained by AT&T for the telephone
with call number 201-668-1973, for the period May 5, 2012 to
January 9, 2013.

E6H7SER1

1          Government Exhibit 423 is a true and correct copy of

2     the subscriber registration information maintained by Sprint

3     with the telephone can call number 848-250-0018.

4          Government Exhibit 424 is a true and correct copy of

5     toll records maintained by Sprint with the telephone call

6     number 848-250-0118 for October 14, 2012.

7          Government Exhibit 425 is a true and correct copy of

8     cell site and toll records maintained by AT&T for the telephone

9     with call number 551-201-8756, for October 14, 2012.

10          Finally, Government Exhibit 426 is a true and correct

11     copy of toll records maintained by AT&T for the telephone with

12     call number 551-208-8756, for October 14, 2012.

13          Your Honor, at this time the government offers

14     Exhibits 410, 411, 412, 413A through 413D, 415, 416, 417, 418,

15     419, 420, 422, 423, 424, 425, 426.  And this stipulation, which

16     is Government Exhibit 807.

17          And I just want to clarify with respect to Exhibit

18     416, that includes sub exhibits 416A through 416G.  And we also

19     offer -- and also 413.  And we offer all those exhibits into

20     evidence at this time.

21          THE COURT:  All right.  Any objection?

22          MR. DE CASTRO:  No objection.

23          THE COURT:  All right.  Those are received.

24          MS. MAIMIN:  Thank you, your Honor.

25          (Government's Exhibits 410, 411, 412 and 413 received

E6H7SER1

 1    in evidence)

 2              (Government's Exhibits 413A through 413D received in

 3    evidence)

 4              (Government's Exhibits 415, 416, 417, 418 and 419

 5    received in evidence)

 6              (Government's Exhibits 420, 422 and 423 received in

 7    evidence)

 8              (Government's Exhibits 424, 425 and 426 received in

 9    evidence)

10              (Government's Exhibit 807 received in evidence)

11              THE COURT:  All right.  You may call your next

12    witness.

13              MS. MAIMIN:  The government calls Victor Moral.

14     VICTOR MORAL,

15         called as a witness by the government,

16         having been duly sworn, testified as follows:

17              DEPUTY COURT CLERK:  Please state your full name for

18    the record.

19              THE WITNESS:  Victor Moral.

20              THE COURT:  All right.  Mr. Moral, it will be

21    important for you to speak clearly into that microphone right

22    there.  You can adjust it however you need to.  And there is

23    water on your left.

24              Ms. Maimin, you may proceed.

25

```
 1   DIRECT EXAMINATION

 2   BY MS. MAIMIN:

 3   Q.  Mr. Moral, where do you live?

 4   A.  I'm in jail.

 5   Q.  How long have you been in jail?

 6   A.  Since January 9th of 2013.

 7   Q.  Were you arrested that day?

 8   A.  Yes.

 9   Q.  And when you were arrested, what were you doing?

10   A.  I was planning in a drug robbery.

11   Q.  What do you mean by a drug robbery?

12   A.  I was with a couple of other people, we were about to rob

13   someone for drugs and money.

14   Q.  We will get back to that in a moment.  By the way, when you

15   say a couple of people, it was more than two people, right?

16   A.  Yes.

17   Q.  Was that the first time you ever tried to rob a drug

18   dealer?

19   A.  No.

20   Q.  You also burglarized drug dealers?

21   A.  Yes.

22   Q.  What's the difference between a robbery and burglary?

23   A.  A burglary we just pretty much break into a house when no

24   one was home, and a robbery we would need weapons to deal with

25   people.
```

E6H7SER1                          Moral - direct

1    Q.  Are there any other words you use for burglaries while you

2    were committing them?

3    A.  B and E.

4    Q.  What does B and E stand for?

5    A.  Breaking and entering.

6    Q.  So approximately how many robberies and burglaries of drug

7    dealers have you committed?

8    A.  Around 15.

9    Q.  During what time period approximately?

10   A.  2012.

11   Q.  And what did you do with the drugs you stole?

12   A.  We'd sell them.

13   Q.  When you robbed and burglarized drug dealers in the past,

14   did you do that alone, or did you do that with other people?

15   A.  With other people.

16   Q.  Mr. Moral, I'd like you to look around the courtroom and

17   let us know if you recognize anybody you have robbed,

18   burglarized drug dealers with.

19   A.  Yes.

20   Q.  Could you please point him or her out by where he or she is

21   sitting and/or what he or she is wearing.

22   A.  The defendant with the blue shirt.

23        MS. MAIMIN:  I request that the court indicate that

24   the defendant has been identified by the witness.

25        THE COURT:  So reflected.

E6H7SER1                          Moral - direct

1   Q.  Do you know the defendant's name?

2   A.  Yes.

3   Q.  What is it?

4   A.  Anthony Serrano.

5   Q.  And did you know it when you were committing burglaries and

6   robberies together?

7   A.  No.

8   Q.  What did you know him as?

9   A.  Chillina.

10  Q.  Is robbing and burglarizing drug dealers the only crime

11  that you have committed?

12  A.  No.

13  Q.  What other crimes have you committed?

14  A.  Murder, theft.

15  Q.  Do you also deal drugs?

16  A.  Yes.

17  Q.  So we will get back to all of that in a moment.  I just

18  want to ask you a little bit more about your background now.

19  Where were you born?

20  A.  Puerto Rico.

21  Q.  U.S. citizen?

22  A.  Yes.

23  Q.  How old are you?

24  A.  36.

25  Q.  How far did you go in school?

E6H7SER1                          Moral - direct

1    A.  I started college.

2    Q.  But you didn't finish?

3    A.  No.

4    Q.  What kind of legitimate jobs did you have before you were

5    in jail?

6    A.  Driving trucks, tow truck, working in a warehouse.

7    Q.  So I want to talk a little bit more about your past crimes

8    now apart from the robberies and burglaries.

9            You just testified that you have committed a murder.

10   A.  Yes.

11   Q.  When did that happen?

12   A.  May 25, 1993.

13   Q.  How old were you?

14   A.  16.

15   Q.  Who did you kill?

16   A.  Someone by the name of David Eldrin.

17   Q.  Why did you kill him?

18   A.  He was from a rival block, we were going back and forth,

19   they beat me up a couple of times, and I got to the point where

20   I felt violence was the only way to deal with it.  I got into a

21   shoot-out and ended up killing him.

22   Q.  Did you have a trial in this case?

23   A.  Yes.

24   Q.  Did you testify on your own behalf?

25   A.  Yes.

E6H7SER1                          Moral - direct

1   Q.  How old were you when you testified?

2   A.  16.

3   Q.  Did you tell the truth?

4   A.  No.

5   Q.  What did you lie about?

6   A.  I said I was innocent.

7   Q.  But you were guilty.

8   A.  Yes.

9   Q.  Were you in fact convicted?

10  A.  Yes.

11  Q.  What was your sentence?

12  A.  20 years.

13  Q.  Did you serve all 20 years?

14  A.  No.

15  Q.  How much did you serve?

16  A.  11.

17  Q.  Now, after the trial did you take any steps to change your

18  identity?

19  A.  Yes.

20  Q.  What steps did you take?

21  A.  I got a court order for a change of name.

22  Q.  From what to what?

23  A.  From Roberto Visante to Victor Moral.

24  Q.  Why did you do that?

25  A.  I was trying to start a new life to avoid problems,

E6H7SER1                         Moral - direct

1    retaliation for the murder.

2    Q.  Now you also testified that you have been involved in

3    dealing drugs.

4    A.  Yes.

5    Q.  When did you first get involved with dealing drugs?

6    A.  About 2011, 2012.

7    Q.  Is it safe to say that you were dealing drugs from about

8    2011 until you were arrested in this case on and off?

9    A.  Yes.

10   Q.  Where did you get the drugs you sold?

11   A.  From robberies, burglaries.

12   Q.  And what kind of drugs were you involved in selling?

13   A.  Cocaine, marijuana and heroin.

14   Q.  And did you sell the drugs yourself, or did you have other

15   people sell them for you?

16   A.  Both.

17   Q.  Did you also broker drug deals between other people?

18   A.  Yes.

19   Q.  How much heroin would you say you were involved in selling

20   over time?

21   A.  About five kilos.

22   Q.  Kilos meaning kilograms?

23   A.  Yes.

24   Q.  And about how much did it go for per kilogram?

25   A.  Street value, about 55,000.

E6H7SER1                        Moral - direct

1    Q.  Now, Mr. Moral, are you familiar with the term manteca?

2    A.  Yes.

3    Q.  What does that mean?

4    A.  Heroin.

5    Q.  Moving on to cocaine, about how much cocaine would you say

6    you were involved in selling over time?

7    A.  About five kilos.

8    Q.  And marijuana, about how much marijuana over time?

9    A.  About 50 pounds.

10   Q.  Have you ever used drugs yourself?

11   A.  Yes.

12   Q.  What kind?

13   A.  Marijuana.

14   Q.  When were you smoking marijuana?

15   A.  Like first tried it 2010.

16   Q.  About how many times did you do it approximately?

17   A.  About ten.

18   Q.  When was the last time you smoked marijuana?

19   A.  2012.

20   Q.  Now, were you interviewed last year by the probation office

21   in New Jersey?

22   A.  Yes.

23   Q.  What kind of case did that relate to?

24   A.  Theft.

25   Q.  Were you asked whether you had a history of drug use?

E6H7SER1                          Moral – direct

1   A.   Yes.

2   Q.   And what did you say?

3   A.   No.

4   Q.   Was that accurate?

5   A.   No.

6   Q.   Why did you say no if it wasn't accurate?

7   A.   I didn't feel that the couple times I smoked marijuana gave

8   me a drug problem, so I just said I didn't have a problem.

9   Q.   So, when they said history of drug use, you interpreted

10  that to mean a drug problem?

11  A.   Yes.

12  Q.   Have you ever stolen motorcycles?

13  A.   Yes.

14  Q.   Did you ever agree with someone else to deposit counterfeit

15  checks?

16  A.   Yes.

17  Q.   Did you ever actually deposit any counterfeit checks?

18  A.   No.

19  Q.   Now, you are cooperating with the government in this case,

20  is that right?

21  A.   Yes.

22  Q.   We will talk about the terms of your cooperation in a bit.

23  But for now I want to ask you have you ever previously tried to

24  cooperate with law enforcement?

25  A.   Yes.

E6H7SER1                         Moral - direct

1    Q.  With about how many agencies?

2    A.  Three.

3    Q.  Which ones?

4    A.  Secret Service, state police and the DEA.

5    Q.  The DEA?

6    A.  Yes.

7    Q.  Why did you try to cooperate?

8    A.  With state police I had got in trouble; I was trying to get

9    out of it.  DEA, to make money.  And the Secret Service, I

10   believed the people I was dealing with were dealing with

11   terrorism.

12   Q.  So you reported them to the Secret Service?

13   A.  Yes.

14   Q.  Were you always truthful with law enforcement?

15   A.  Yes.

16   Q.  Did you tell them about other crimes that you were

17   committing?

18   A.  No.

19   Q.  Why didn't you tell them?

20   A.  I didn't want to get in trouble for it.

21   Q.  Did you ever enter into a written agreement in connection

22   with your prior efforts to cooperate?

23   A.  Yes.

24   Q.  Do you remember with what agency?

25   A.  State police.

E6H7SER1                       Moral - direct

1   Q.  And did you agree in that agreement that you would not

2   commit any other crimes such as crimes of violence and

3   obstruction of justice?

4   A.  Yes.

5   Q.  Did you follow the terms of that agreement?

6   A.  No.

7   Q.  How did you break that agreement?

8   A.  I kept committing crimes.

9   Q.  Now, Mr. Moral, have you ever been on parole or probation?

10  A.  Yes.

11  Q.  Are you supposed to tell the truth to your probation

12  officer?

13  A.  Yes.

14  Q.  And not commit any more crimes?

15  A.  Yes.

16  Q.  Did you follow those rules?

17  A.  No.

18  Q.  How did you break those rules?

19  A.  I was brokering drug deals.

20  Q.  So you were committing crimes.

21  A.  Yes.

22  Q.  Now, you also testified earlier that you were involved in

23  theft.  What kind of theft?

24  A.  Cargo theft.

25  Q.  What is cargo theft?

E6H7SER1                          Moral - direct

1   A.   Like tractor trailers, warehousing, stealing property.

2   Q.   What kind of things were you stealing from tractor trailers

3   and other property?

4   A.   Clothing, sneakers, bikes.  It was different types of

5   stuff.

6   Q.   When did you approximately begin engaging in cargo theft?

7   A.   About 2009, I believe.

8   Q.   Is it fair to say you did that on and off until you were

9   arrested in this case?

10  A.   Yes.

11  Q.   What was the approximate highest value of something you

12  ever stole on one occasion?

13  A.   Under a million dollars.

14  Q.   When you were stealing from those trucks, did you ever

15  steal gasoline?

16  A.   Yes.

17  Q.   Were there people in the trucks when you robbed them, or

18  were they unattended?

19  A.   Both.

20  Q.   Sometimes there were people?

21  A.   Yes.

22  Q.   Did you ever participate in a cargo theft where other

23  people used guns and tied up the victims?

24  A.   Yes.

25  Q.   Now, when you did cargo thefts, did you sell the stolen

E6H7SER1                        Moral – direct

1    goods yourself or did someone else sell them for you?

2              MR. DE CASTRO:  Objection, form.

3              THE COURT:  Rephrase.

4    Q.  How did you sell the stolen goods that you stole?

5    A.  Sometimes I would get someone to sell them for us, and

6    sometimes I would try to sell them myself.

7    Q.  And who were some of the people you got to sell them for

8    you?

9    A.  The defendant, some Cuban guy I knew, a lady from New York,

10   and a couple other guys but I don't know their names, from

11   Jersey City.

12   Q.  Let's focus on the defendant for a moment.  How did the

13   defendant get involved in selling stolen goods for you?

14   A.  I had one of the guys I was running around committing the

15   crimes with, stealing, he knew the defendant.

16   Q.  And he introduced you to the defendant?

17   A.  Yes.

18             MR. DE CASTRO:  Objection.

19             THE COURT:  Overruled.

20   Q.  When approximately?

21   A.  Around probably 2009, 2010.

22   Q.  Now, did the defendant sell all of the cargo you stole or

23   just some of it?

24   A.  Some of it.

25   Q.  What were some of the stolen goods the defendant sold for

E6H7SER1                              Moral - direct

```
 1    you?
 2              THE COURT:  Can we get a timeframe?
 3              MS. MAIMIN:  Yes, your Honor.
 4    Q.   When approximately was this?
 5    A.   Say around 2010.
 6    Q.   And what were some of the stolen goods he sold for you?
 7    A.   Generators, clothing, bed sheets.
 8    Q.   And over what time period was that?
 9    A.   Within -- say within a few months to a year.
10    Q.   Of 2011?
11    A.   Yes.
12    Q.   Now, after the defendant sold those stolen goods for you,
13    was that the last you saw of him, or did you see him again?
14    A.   I seen him again.
15    Q.   Why did you see him again?
16    A.   The other guy that I was working with, my partner, he was
17    friends with him, and every now and then he would show up,
18    they'd meet.
19    Q.   And so you saw him socially.  After you saw him socially,
20    did you see him for any other reason?
21    A.   Yes.
22    Q.   For what reason?
23    A.   I was doing a drug deal.
24    Q.   With the defendant?
25    A.   Yes.
```

E6H7SER1                         Moral - direct

1   Q.  So we will get back to that in a moment.  By the way, what

2   kind of car did the defendant drive?

3   A.  Lexus.

4   Q.  Do you remember the color?

5   A.  I think it was like a greenish blue, something like that.

6   Q.  OK.  So I want to talk a little bit more about the

7   robberies and burglaries now.  I want to talk about some of the

8   people you committed those crimes with other than the

9   defendant.

10          May I approach, your Honor?

11          THE COURT:  You may.

12  Q.  Mr. Moral, I am showing you what has been marked for

13  identification as Government Exhibit 1.  Do you recognize this

14  person?

15  A.  Yes.

16  Q.  Who is that?

17  A.  Kong.

18  Q.  Is Kong a real name or a nickname?

19  A.  Nickname.

20  Q.  And does he go by any other nicknames or just Kong?

21  A.  King Kong.

22  Q.  And do you know this person's real name?

23  A.  Yes.

24  Q.  What is it?

25  A.  Javion Camacho.

E6H7SER1                          Moral - direct

1    Q.  And did you know Mr. Camacho's real name when you were

2    committing crimes with him?

3    A.  No.

4              MS. MAIMIN:  Your Honor, at this time the government

5    offers Government Exhibit 1 into evidence.

6              MR. DE CASTRO:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 1 received in evidence)

9              MS. MAIMIN:  I am also going to put up on the board

10   Government's Exhibits 1A, 1B and 1C, which are the name plates

11   Javion Camacho, Kong and King Kong.

12   Q.  What kind of crimes did you commit with Kong?

13   A.  Robberies and burglaries and sold drugs.

14   Q.  Now, by the way, Mr. Moral, did you share your real name

15   with the people you were committing crimes with?

16   A.  No.

17   Q.  Did you always even know the street names of the people you

18   were committing crimes with?

19   A.  No.

20   Q.  Why not?

21   A.  Sometimes we cross paths and it was a quick thing.  You

22   sometimes don't run into the people again, so you don't bother

23   to remember; you remember their face.

24   Q.  Did Kong ever tell you about robberies he participated in

25   that you did not participate in?

E6H7SER1                         Moral - direct

1    A.  Yes.

2    Q.  And did he tell you who participated in all of them?

3    A.  Yes.

4    Q.  So you know who participated in every single robbery that

5    Kong participated in?

6    A.  No.

7              MS. MAIMIN:  May I approach, your Honor?

8              THE COURT:  You may.

9    Q.  I am showing you what has been marked for identification as

10   Government Exhibit 2.  Do you recognize this person?

11   A.  Yes.

12   Q.  Who is that?

13   A.  Honesty.

14   Q.  And is that his real name or a nickname?

15   A.  Nickname.

16   Q.  Does he go by any other names?

17   A.  King Honesty.

18   Q.  Do you know his real name?

19   A.  Yes.

20   Q.  What is it?

21   A.  Julio Camacho.

22   Q.  Did you know it when you were committing crimes with him?

23   A.  No.

24              MS. MAIMIN:  The government offers Government Exhibit

25   2.

E6H7SER1                          Moral – direct

1              MR. DE CASTRO:  No objection.

2              THE COURT:  Received.

3              (Government's Exhibit 2 received in evidence)

4              MS. MAIMIN:  I am putting Government Exhibit 2 on the

5    board and also the name plates Government Exhibit 2A; 2B, which

6    is King Honesty; and 2C which is Honesty.  And 2A is just the

7    name Julio Camacho.

8    Q.  Now, are King Kong and Honesty related in any way?

9    A.  They are brothers.

10   Q.  How do you know that?

11   A.  They told me.

12   Q.  Do you know any other relatives of King Kong and King

13   Honesty?

14   A.  The defendant.

15   Q.  The defendant is a relative?

16   A.  Yes.

17   Q.  What kind of relative?

18   A.  Cousin.

19   Q.  How do you know that the defendant is the cousin of Kong

20   and Honesty?

21   A.  That's what they told me.

22   Q.  Who told you?

23   A.  The defendant and honesty.

24             MS. MAIMIN:  May I approach, your Honor?

25             THE COURT:  You may.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E6H7SER1                          Moral - direct

1   Q.  I am now showing you what has been marked for

2   identification as Government Exhibit 10.  Do you recognize this

3   person?

4   A.  Yes.

5   Q.  Who is this?

6   A.  Alex.

7   Q.  And do you know his real name?

8   A.  Yes.

9   Q.  What is it?

10  A.  Alex Cespedes.

11  Q.  Did you know it when you were committing crimes with him?

12  A.  No.

13          MS. MAIMIN:  The government offers Exhibit 10.

14          MR. DE CASTRO:  No objection.

15          THE COURT:  Received.

16          (Government's Exhibit 10 received in evidence)

17  Q.  I am putting Government Exhibit 10 on the board and also

18  the name plate 10B, which just says Alex.

19          Now, what kind of crimes did you commit with Alex?

20  A.  Robberies, burglaries, theft and sold drugs.

21          MS. MAIMIN:  May I approach?

22          THE COURT:  You may.

23  Q.  I am showing you now what has been marked for

24  identification as Government Exhibit 5.  Do you recognize this

25  person?

E6H7SER1                          Moral - direct

1    A.   Yes.

2    Q.   Who is this person?

3    A.   Black.

4    Q.   And is that a real name or a nickname?

5    A.   Nickname.

6    Q.   Do you know his real name?

7    A.   No.

8              MS. MAIMIN:   Government offers Exhibit 5.

9              MR. DE CASTRO:   No objection.

10             THE COURT:   Received.

11             (Government's Exhibit 5 received in evidence)

12   Q.   I am placing the face plate on the board and also the name

13   plate 5B, which just says Black.   What kind of crimes did you

14   commit with Black?

15   A.   Thefts, burglaries, robberies and sold drugs.

16             MS. MAIMIN:   Permission to approach, your Honor?

17             THE COURT:   Yes.

18   Q.   I am showing you what has been marked for identification as

19   Government Exhibit 9.   Do you recognize this?

20   A.   Yes.

21   Q.   Who is this?

22   A.   The locksmith.

23   Q.   The locksmith?

24   A.   Yeah.

25   Q.   Do you know this person's real name?

E6H7SER1                          Moral - direct

1    A.  No.

2    Q.  You called him a locksmith?

3    A.  Yeah.

4           MS. MAIMIN:  The government offers Government Exhibit

5    9.

6           MR. DE CASTRO:  No objection.

7           THE COURT:  Received.

8           (Government's Exhibit 9 received in evidence)

9           MS. MAIMIN:  I am putting the locksmith on the board,

10   and Government Exhibit 9B, which is the name plate for the

11   locksmith.

12   Q.  What kind of crimes did you commit with the locksmith?

13   A.  Burglaries.

14   Q.  And finally, Mr. Moral, I am showing you what has been

15   marked for identification as Government Exhibit 3.  Do you

16   recognize this?

17   A.  Yes.

18   Q.  What is this?

19   A.  That's me.

20   Q.  That's you?

21   A.  Yes.

22   Q.  OK.  Government offers Exhibit 3.

23           MR. DE CASTRO:  No objection.

24           THE COURT:  Received.

25           (Government's Exhibit 3 received in evidence)

E6H7SER1                          Moral – direct

1   Q.  I am placing you on the board as well.  Government Exhibit

2   3A is the name plate for Victor Moral, which I have placed on

3   the board.

4           Now, you testified earlier that you committed

5   approximately 15 drug robberies and burglaries.

6   A.  Yes.

7   Q.  Were they always of drug dealers, or did you sometimes also

8   rob innocent people?

9           MR. DE CASTRO:  Objection.

10          MS. MAIMIN:  I'm speaking in the alternative, your

11  Honor.

12          THE COURT:  Well, why don't you ask him who he robbed.

13  Q.  What kinds of people did you rob?

14  A.  Drug dealers, regular people.

15  Q.  What do you mean by regular people?

16  A.  Sometimes we just happened to get information on someone

17  that probably had lots of money.

18  Q.  Now, where did these crimes typically take place?

19  A.  Either in homes or on the street.

20  Q.  Why at homes?

21  A.  Sometimes drugs or the money was kept in a house, and we

22  would know when they were leaving, so that's the only chance we

23  had to get it.

24  Q.  And why on the street?

25  A.  Sometimes you wouldn't know where the person lived, and

E6H7SER1                          Moral - direct

1    they were just transporting the drugs and the money in the car.

2    Q.  Now, focusing on the robberies, were you or the other

3    people you were working with armed during those crimes?

4    A.  Sometimes, yes.

5    Q.  With what?

6    A.  A handgun.

7    Q.  Why did you carry a handgun?

8    A.  So we could intimidate the people we were robbing.

9              (Continued on next page)

E6HAASER2                          Moral - Direct

1    BY MS. MAIMIN:

2    Q.   And by the way, did you carry guns during burglaries?

3    A.   No.

4    Q.   Why not?

5    A.   There was nobody there to scare.

6    Q.   Did you ever shoot anyone during a robbery?

7    A.   No.

8    Q.   So, what were the types of different roles people played in

9    these robberies?

10   A.   We had a lookout, getaway driver, someone that was going to

11   go into the property or like hands-on that was going to deal

12   with the people and someone that ran the scanners.

13   Q.   OK.  So, let's talk about each of those in turn.  Kind of

14   obvious but what's the job of the lookout?

15   A.   To run the scanners and look around, pay attention.

16   Q.   What do you mean by run the scanner?

17   A.   Like, listen to the cop frequencies.

18   Q.   So, you had scanners that were able to listen to cop

19   frequencies?

20   A.   Yes.

21   Q.   Why was it important to do that?

22   A.   Just in case we were in a place and someone called the cops

23   for some reason.

24   Q.   And you said you had drivers?

25   A.   Yes.

E6HAASER2                        Moral - Direct

1   Q.  What was the point of the driver?

2   A.  When someone, if they went into a house, they came out the

3   car would be waiting for them to pick them up, take them where

4   ever we needed to go.

5   Q.  You said there would be people that would be more hands-on?

6   A.  Yes.

7   Q.  What do you mean by that?

8   A.  Some people didn't have a problem with being physical with

9   other people.

10  Q.  What do you mean?

11  A.  Like if they needed to tie someone up.

12  Q.  You tied people up during robberies?

13  A.  Yes.

14  Q.  Why?

15  A.  We would retrain them so they wouldn't get out try to run

16  or cause any problems.

17  Q.  What role did you play in these robberies?

18  A.  Just about every one.

19  Q.  So you were sometimes lookout, sometimes you were more

20  hands-on?

21  A.  Yes.

22  Q.  What role did the defendant typically play?

23  A.  Say he just, a little bit of all.

24  Q.  He played different roles as well?

25  A.  Yes.

E6HAASER2                       Moral - Direct

1   Q.  Now, what did you wear during robberies?

2   A.  Sometimes I would wear dark clothing, mask, gloves.

3   Q.  Why did you wear those things?

4   A.  So no one, they would identify me.

5   Q.  Other than masks and gloves, did you take any other steps

6   to disguise yourself?

7   A.  Yes.

8   Q.  What steps?

9   A.  Wore police uniforms.

10  Q.  Why did you wear police uniforms?

11  A.  Sometimes when we went to pull over drug dealers we wanted

12  them to think we were the police so they wouldn't resist.

13  Q.  You wore police uniforms so people wouldn't resist?

14  A.  Yes.

15  Q.  What type of clothes did people in your robbery group wear

16  during robberies in order to look like the police?

17  A.  Bulletproof vests, handcuffs, guns, badges.

18  Q.  Did you also carry handcuffs or zip ties?

19  A.  Yes.

20  Q.  Other than the items you just mentioned, were any other

21  tools or weapons brought to robberies?

22  A.  Yes.  Crowbars, flashlights, walkie-talkies, zip ties.

23  Q.  And by the way, what are zip ties?

24  A.  Like plastic handcuffs.

25  Q.  Now, focusing on the robberies where you pretended to be

E6HAASER2                          Moral - Direct

1    police officers, did you get to those robberies by car or on

2    foot?

3    A.  By car.

4    Q.  Was there a particular car you used or did you just use any

5    car that was available?

6    A.  We had a old Crown Vic, we called it at cop car.

7    Q.  Why did you call it a cop car?

8    A.  Because it looked like a cop car.

9    Q.  Was it outfitted with anything in particular?

10   A.  Yeah.  It had police sirens and police lights.

11   Q.  Now, could you, please, describe the license plate on the

12   cop car?

13   A.  It had a flip-up plate so it would cover he license plate.

14   Q.  What was the purpose of that?

15   A.  So when we pull somebody over where if we were going to rob

16   somebody we didn't want them to be able to read the plate.

17   Q.  How was that device operated?

18   A.  Remote control.

19   Q.  Did the cop car also have a police intercom system?

20   A.  Yeah.

21   Q.  Showing you just on your screen there what's been marked

22   for identification as Government Exhibits 246 and 247.  Do you

23   see that?

24   A.  Not yet.

25           (Pause)

E6HAASER2                          Moral - Direct

1    A.   Yes.

2    Q.   What is --

3    A.   That is the cop car and intercom.

4    Q.   Does that fairly and accurately depict how the cop car

5    looked when you were using it?

6    A.   Yes.

7              MS. MAIMIN:   Government offers Exhibits 246 and 247.

8              THE COURT:   Received.

9              MR. DE CASTRO:   No objection.

10             (Government's Exhibits 246 and 247 received in

11   evidence)

12             MS. MAIMIN:   Would you, please, put up 246.

13             (Pause)

14   Q.   Could you explain what we're looking at here?

15   A.   The cop car in the back is the plate.

16   Q.   That's the plate device on the back?

17   A.   Yes.

18             MS. MAIMIN:   OK.   And could you please put up 247.

19             (Pause)

20   Q.   What are we looking at here?

21   A.   That is the intercom.

22   Q.   Mr. Moral, there should be a laser pointer there.  Do you

23   see it?

24   A.   Yes.

25   Q.   Could you point to what you are referring to as the

E6HAASER2                     Moral - Direct

1    intercom?

2    A.   Right there.

3            MS. MAIMIN:   OK.   Could you let the record reflect,

4    please, Mr. Moral is pointing to that little device in the

5    center of the screen.

6    Q.   So, Mr. Moral, I'd like to now show you on your screen

7    alone what's been marked for identification as Government

8    Exhibit 234.   Do you recognize this?

9    A.   Yes.

10   Q.   What is this?

11   A.   The flip-up plate.

12           MS. MAIMIN:   The government offers Exhibit 234.

13           MR. DE CASTRO:   No objection.

14           THE COURT:   Received.

15           (Government's Exhibit 234 received in evidence)

16           MS. MAIMIN:   Can could you, please, play 234 for the

17   jury.

18           (Pause)

19   Q.   So, Mr. Moral, how was that operated?   Where was the remote

20   control?

21   A.   It's inside the car on a key chain.

22   Q.   Now, did you ever dressed as cops to commit burglaries or

23   just robberies?

24   A.   Robberies.

25   Q.   Why?

E6HAASER2                      Moral - Direct

1  A.  For a burglary there was no one home.  You didn't have to

2  try to scare anyone.

3          MS. MAIMIN:  OK.  Before we move on I just want to

4  play that video one more time.

5          (Pause)

6          MS. MAIMIN:  OK.  That's good, Ms. Craig.

7  Q.  Now, generally speaking, with respect to robberies and

8  burglaries, did every member of the crew go to every job that

9  you did?

10 A.  No.

11 Q.  How was it decided who was going to participate?

12 A.  Depends on who was available at the time.

13 Q.  And the different robberies jobs require people of

14 different skills?

15 A.  Yes.

16 Q.  Now, you testified earlier that you personally sometimes

17 went into homes during robberies.  You didn't just act as a

18 lookout?

19 A.  Yes.

20 Q.  Did you also tie people up at gunpoint?

21 A.  Yes.

22 Q.  When was that?

23 A.  2012.

24 Q.  Did you ever run from the police after a robbery?

25 A.  Yes.

E6HAASER2                      Moral - Direct

1    Q.  When was that?

2    A.  In 2012.

3    Q.  Why did you do that?

4    A.  I was trying to get away.

5    Q.  And after participating in certain robberies did you ever

6    attempt to steal evidence back that the police had taken?

7    A.  Yes.

8    Q.  When was that?

9    A.  In 2012.

10   Q.  You've done that once or more than once?

11   A.  Twice.

12   Q.  You did it once in 2012 and why did you steal it back?

13   A.  It had -- when I got into the case, the person that bought

14   the stuff, the gloves and masks he left the receipt in the car

15   so we were going to try and steal it back before the cops got

16   it so they wouldn't be able to track us.

17   Q.  Where did you steal it back from?

18   A.  The police department.

19   Q.  You said you've also done that another time?

20   A.  Yes.

21   Q.  When was that?

22   A.  In about 2010.

23   Q.  And was that also from a police impound?

24   A.  Yes.

25   Q.  What did you steal back that time?

1    A.  Drugs.

2    Q.  Why?

3    A.  The person had got into a accident and they didn't know the

4    drugs was still in the car.  So they asked me if I could go

5    into the impound and see and check it.  I checked it and the

6    drugs were still there so I took them back.

7    Q.  OK.  Now I'd like to ask you about one particular robbery

8    that you participated in.  In 20 --

9            MR. DE CASTRO:  I am going to object to the sort of

10   breaking, speaking points where -- just ask the question.

11           THE COURT:  All right.  The transitional phrases.

12   I'll allow it but see if you can just ask a question.

13           MS. MAIMIN:  OK.

14   Q.  I'd like to focus -- I'd like to ask you about -- did you

15   ever participate in a robbery on the New Jersey Turnpike?

16   A.  Yes.

17   Q.  With whom?

18   A.  Black, Alex, Benny Blanco and Habib.

19   Q.  That's the Alex that we already talked about?

20   A.  Yes.

21   Q.  Or the Black we already talked about?

22   A.  Yes.

23   Q.  Who was the victim of that robbery?

24   A.  DJ Pro Styles.

25   Q.  And did you pretend to be police officers during that

E6HAASER2                        Moral - Direct

1   robbery or were you dressed normally?

2   A.   Police officers.

3          MR. DE CASTRO:  Objection to form.

4          MS. MAIMIN:  Asked in the alternative.

5          THE COURT:  Well, I think that Mr. de Castro would

6   like it broken up which is fine.  So you can --

7          MS. MAIMIN:  OK.

8   Q.   How did you dress during that robbery?

9   A.   Like police officers.

10  Q.   What was your job?

11  A.   I was a lookout.

12  Q.   What happened briefly during that robbery?

13  A.   I stood in front of the club.  When I noticed that he was

14  leaving I called Alex, told him he was on his way.  And they

15  followed him on the turnpike where they pulled him over.

16  Q.   What happened after they pulled him over?

17  A.   They handcuffed him and they took the money and the

18  jewelry.

19  Q.   Did you get some of the proceeds of that robbery?

20  A.   Yes.

21  Q.   Now, during your meetings with the government in this case

22  were you shown a lot of pictures of different people?

23  A.   Yes.

24  Q.   What were you asked about each picture?

25  A.   If I knew them, if I committed any crimes.

E6HAASER2                        Moral - Direct

1    Q.   Now at one point did you see a picture that you thought

2    might be the Benny Blanco that you just mentioned?

3    A.   Yes.

4    Q.   Sitting here today do you still believe that person is

5    Benny Blanco?

6    A.   No.

7    Q.   What changed your mind?

8    A.   I seen a different picture.

9    Q.   So you thought that the other person might be Benny Blanco?

10   A.   Yee.

11   Q.   Did you tell the government that you had possibly changed

12   your mind about that original picture?

13   A.   Yes.

14   Q.   You brought that to the government's attention?

15   A.   Yes.

16   Q.   Now, how did you decide who the targets of the robbery

17   would be?

18   A.   We would get tips from someone I called the connect which

19   was a person that would let us know about drug deals or drug

20   money that was being moved around.

21   Q.   So the connect was the person you got the tips from?

22   A.   Yes.

23   Q.   Did you ever use the same connect twice or always a

24   different one?

25   A.   Both.

E6HAASER2                          Moral - Direct

1   Q.  What were some of the connects you used more than once?

2   A.  Nena, Cuban, Habibi.  That's about it.

3   Q.  So I'd like to focus on the person you called Nena now, is

4   that a man or a woman?

5   A.  A woman.

6   Q.  Was Nena her real name or a nickname?

7   A.  Nickname.

8   Q.  When did you meet her?

9   A.  2012.

10  Q.  Where did you meet her?

11  A.  In a lounge in the Bronx.

12  Q.  And what, if anything, did you discuss with her when you

13  first met her?

14  A.  Discuss about doing robberies and burglaries, drug dealers.

15  Q.  Well, that was the first time you met her.  Was it unusual

16  for you to talk about that with someone the first time you

17  meet?

18  A.  I guess some criminals like I guess the kind of things we

19  talk about.

20  Q.  How did it come up that day?

21  A.  Seeing somebody had a new car, it was a nice car and

22  mentioned how nice the car was and she brought up that if she

23  would have met me before she was holding money for her

24  exboyfriend that was a drug dealer that we could have robbed

25  him and we could have both bought a car.

1    Q.  What you did you understand her to mean when she said she

2    was holding money for more her exboyfriend?

3    A.  He sold a lot of drugs and he had a lot of money.  He

4    couldn't a keep it all in his house.

5    Q.  Did you discuss whether or not she still had connections

6    with the drug world?

7    A.  Yes.

8    Q.  What was that discussion?

9    A.  She said she did had people to make, that we could probably

10   rob.

11   Q.  Did you agree to commit robberies together?

12   A.  Yes.

13   Q.  And did you meet her again?

14   A.  Yes.

15   Q.  How long after that first meeting?

16   A.  A few days after.

17   Q.  Where did you meet her?

18   A.  In Manhattan.

19   Q.  Were you outside or in a car?

20   A.  Outside.

21   Q.  Now, when you met her did you discuss any particular

22   robbery or burglary jobs?

23   A.  Yes.

24   Q.  How many?

25   A.  Two.

1   Q.  Let's discuss them one at a time.  What was the first job

2   Nena told you about?

3   A.  Webster Avenue in the Bronx.

4   Q.  What was the job on Webster Avenue in the Bronx?

5   A.  There was a house that they were processing heroin.

6   Q.  So what was the plan?

7   A.  We were going to go check the place out, see if we could

8   rob it.

9   Q.  Was that going to be when the victims were home?

10  A.  When the house as empty.

11  Q.  What was the other job Nena told you about?

12  A.  A money van.

13  Q.  What do you mean by "a money van"?

14  A.  It was a van that was picking up money from different drug

15  dealers.

16  Q.  Where was the money van supposed to be?

17  A.  In the Bronx up off of by Grand Concourse.

18  Q.  Now, were there going to be people in the van when you

19  robbed it?

20  A.  We didn't yet decide how we were going to do it but most

21  likely.

22  Q.  Did you agree to commit both of those crimes?

23  A.  Yes.

24  Q.  So still focusing on that meeting with Nena, where did you

25  go after meeting with her on the street that day?

E6HAASER2                          Moral - Direct

1   A.  Went to a phone store.

2   Q.  Why did you go to a phone store?

3   A.  She wanted to buy a phone so when we spoke we would each

4   have a line just to talk to each other.

5   Q.  So was phones you were only going to use for each other?

6   A.  Yes.

7   Q.  Why would that be a desirable thing to do?

8   A.  Because we were going to be like discussing criminal stuff

9   and she didn't want us to have been using our regular phones

10  worrying about police listening in.

11  Q.  Did you, in fact, buy those phones?

12  A.  Yes.

13  Q.  What kind of phones were they?

14  A.  Throw-away Boost phones.

15  Q.  In addition to that throw-away Boost phone did you have

16  other phones you were using at this time?

17  A.  Yes.

18  Q.  And when you were committing robberies and burglaries, did

19  you have the same phones the whole time or did you change them

20  over time?

21  A.  I changed them.

22  Q.  Why?

23  A.  Certain times you dealt with certain people you don't know

24  what things they were into, so you change your phone to try

25  avoid the police.

E6HAASER2                    Moral - Direct

1   Q.  About how many phones did you have at the time?

2   A.  Four, five.

3   Q.  Why did you have four or five phones at the time?

4   A.  I had like phones for different people I dealt with.  Like

5   there was people I dealt with from thefts, people I dealt with

6   the robberies.  She had a personal phone.  I had the phone I

7   dealt with her.

8   Q.  Now, you just testified about a potential burglary at

9   Webster Avenue.  Did you commit that burglary?

10  A.  Yes.

11  Q.  By the way, when you just said "her" who were you referring

12  to?

13  A.  Nena.

14  Q.  Did you, in fact, commit that burglary on Webster Avenue?

15  A.  Yes.

16  Q.  Did you do that alone or with other people?

17  A.  With other people.

18  Q.  When was that?

19  A.  When?

20  Q.  When was that, approximately, in relation to that meeting

21  with Nena?

22  A.  A few days after.

23  Q.  Showing you what's been marked for identification just on

24  your screen Government Exhibit 603-C; do you recognize that?

25  A.  Yes.

E6HAASER2                     Moral - Direct

1    Q.   What is that?

2    A.   That's the house where I did the burglary.

3    Q.   The heroin burglary?

4    A.   Yes.

5    Q.   Does that fairly and accurately depict the way the house

6    looked when you burglarized it?

7    A.   Yes.

8              MS. MAIMIN:   The government offers 603-C, please.

9              MR. DE CASTRO:   No objection.

10             THE COURT:   Received.

11             (Government's Exhibit 603-C received in evidence)

12             MS. MAIMIN:   Could you, please, publish it to the

13   jury.

14             (Pause)

15   Q.   Where was this house?  In what borough?

16   A.   The Bronx.

17   Q.   Briefly, what happened during this burglary?

18   A.   I met up with Nena.  I was with Alex and Black.  She showed

19   me the house, told me what floor it was on and what side.

20   Afterwards I went and met back up with Alex and black I.  I

21   explained to them what was going on and the people on the

22   right-hand side were having a party.  So, I walked back over

23   like I was looking for someone at the party and I did my

24   homework and checked out the area.  And after that I went back

25   to Alex and Black, I told them we should be able to get into

1   through the side window.

2   Q.  Before we keep going to the side window, you just used the

3   word "homework".  What do you mean by that?

4   A.  Like canvass the place out.

5   Q.  Is that something you typically did before committing a

6   robbery or burglary?

7   A.  Yes, just about always.

8   Q.  Just about always?

9   A.  Yes.

10  Q.  Why?

11  A.  You want to try to figure the safest way out to do things.

12  Q.  The safest way out of house?

13  A.  Yeah.  Like to get in, like you didn't, you want to try to

14  avoid people and problems.

15  Q.  Now, what, in fact, happened during the burglary?  Did you

16  follow that plan?

17  A.  Yes.

18  Q.  So, what happened?

19  A.  I went and checked the place out.  I went back with Alex

20  and Black, me and Alex went in through the side window and

21  Black stood out front looking out.

22  Q.  Were you able to find any heroin?

23  A.  Yes.

24  Q.  How much heroin did you find?

25  A.  Two kilos.

E6HAASER2                           Moral - Direct

1   Q.  How do you know it was two kilos?

2   A.  The bags had a number of grams on them.

3   Q.  It was packaged in bags?

4   A.  Yes.

5   Q.  How many grams, approximately, did the bags add up to?

6   A.  A little over 2000.

7   Q.  Two thousand what?

8   A.  Grams.

9   Q.  How did you know it was heroin?

10  A.  From past experience and the smell of it and the look.

11  Q.  Well, how does heroin smell?

12  A.  Has a weird smell.  It has a drug smell.

13  Q.  Does it smell different from other drugs?

14  A.  From coke it smells different from marijuana.

15  Q.  You said the way it looked.  How does heroin look?

16  A.  It's like a brown color compared to coke that was white.

17  Q.  By the way, in your experience with heroin how is it

18  typically packaged?

19  A.  In like street value they put it in little plastic baggies.

20  Q.  And do they ever have stamps on them or are they blank?

21  A.  Stamps.

22  Q.  Why stamps?

23  A.  I guess each drug dealer --

24          MR. DE CASTRO:  Objection.

25          THE COURT:  Sustained.

E6HAASER2                    Moral - Direct

1    Q.  What's your understanding of why stamps are used on those

2    baggies?

3             MR. DE CASTRO:  Objection.

4             THE COURT:  Sustained.  We'll talk about it at a

5    break.

6    Q.  OK.  After you stole the heroin what did you do with it?

7    A.  We went I met up with Nena, gave it to someone she had.

8    They wanted to see if they could get rid of it.

9    Q.  She was going to give it to someone else?

10   A.  Yes.

11   Q.  Did you, in fact, give it to that other person?

12   A.  Yes.

13   Q.  Was that person able to sell the heroin?

14   A.  No.

15   Q.  How long did he have the heroin?

16   A.  For about a day.

17   Q.  So, after he didn't sell it for a day what did you do with

18   it?

19            MR. DE CASTRO:  Objection; foundation.

20            MS. MAIMIN:  We just established foundation.

21            THE COURT:  Hold on.  I see the objection but I think

22   it's fine.  You can answer the question if you understand it.

23            THE WITNESS:  After a day we went and picked it back

24   up.

25   Q.  From who?

1    A.  From Nena.

2    Q.  What were you going to do with it?

3    A.  We were going to sell it ourself.

4    Q.  How?

5    A.  Black said he knew some people.  He was going to get rid of

6    it.

7    Q.  Did he say who the people were at that time?

8    A.  No.

9    Q.  Did you later find out who it was?

10   A.  Yes.

11   Q.  Who?

12   A.  The defendant.

13   Q.  How did you find out it was the defendant?

14   A.  Black called me and told me he had someone that wanted to

15   pick everything up but that they wanted a better price, that he

16   wanted to meet up so we could discuss it.

17   Q.  Who wanted to meet up?

18   A.  Black.  Alex, me and the defendant.

19   Q.  Did you actually meet?

20   A.  Yes.

21   Q.  How long after the burglary, approximately, did you meet?

22   A.  About two days.

23   Q.  Where did you meet?

24   A.  Webster Avenue in Jersey City.

25   Q.  So this is a different Webster Avenue from the one in the

E6HAASER2                          Moral - Direct

1    Bronx?

2    A.   Yes.

3    Q.   Who participated in that meeting?

4    A.   Me, Alex, Black, the defendant and Kong.

5    Q.   Was that the first time you met Kong?

6    A.   Yes.

7    Q.   Now, were you surprised that it turned out to be the

8    defendant who Black was going to give the heroin to?

9    A.   Yes.

10   Q.   What did you say when you first saw each other?

11   A.   We said "what's up".

12   Q.   This was after you had been working with him in the --

13   thefts?

14   A.   Yes.

15   Q.   Did you discuss the price of heroin that day?

16   A.   Yes.

17   Q.   What was the discussion?

18   A.   We kind of settled on a number of around $17 a gram.

19   Q.   How did you negotiate to that number?

20   A.   We were already at a low number cause we were just trying

21   to get rid of it, so the defendant said that if we gave him a

22   good price around that number that he would just take

23   everything.

24   Q.   And what did you understand them him to mean when he said

25   take everything?

E6HAASER2                          Moral - Direct

1    A.  He'll take the kilo we had.

2    Q.  So, you took -- your share was one kilo --

3    A.  Yes.

4    Q.  -- of the burglary?  Did you defendant ask you anything

5    during that meeting?

6    A.  Yeah.  He asked me how I got it.

7    Q.  Got what?

8    A.  The heroin.

9    Q.  What, if anything, did you tell him?

10   A.  I told him how I stole it.

11   Q.  What exactly did you tell him about how you stole it?

12   A.  I told him I had a lady that was giving me information and

13   that she sent me to a place in New York and I broke into the

14   house and stole it.

15   Q.  When -- and how did the defendant react to that?

16   A.  He said -- he, he asked me what's up that he wanted in.

17   Q.  What did you understand him to mean we he said he wanted

18   in?

19   A.  I was explaining how she was giving me tips on different

20   jobs.

21   Q.  When he said he wanted in what did he mean by that?

22   A.  That he wand in by helping out --

23              MR. DE CASTRO:  Objection.

24              MS. MAIMIN:  He testified --

25              THE COURT:  Hold hon.  The way that the question came

E6HAASER2                          Moral - Direct

1   out why don't you rephrase the question.

2             MS. MAIMIN:  Sure.

3   Q.  When the defendant said let me in, what did you understand

4   him to mean?

5   A.  That he wanted a part of the robberies.

6   Q.  How did you react?

7   A.  I explained to him that we were looking for someone to help

8   us that was more and onto bare-face robberies.

9   Q.  What do you mean by "bare-faced robberies"?

10  A.  Someone that was wasn't scared to show their face.

11  Q.  Why did you need someone who wasn't scared?

12  A.  Because with the other jobs that she was given there was

13  some jobs that we had to deal with people as in putting people

14  over in the street so you couldn't wear a mask in the process

15  of doing that.

16  Q.  When you say "she".

17  A.  Nena.

18  Q.  So, how did the defendant react when you explained those

19  things?

20  A.  He laughed.

21  Q.  He laughed?

22  A.  Yeah.

23  Q.  Did he say anything?

24  A.  Yeah.  He said this is what we do.

25  Q.  Who said that?

E6HAASER2                        Moral - Direct

```
 1   A.  The defendant.

 2   Q.  And what did you understand him to mean when he said "this

 3   is what we do"?

 4   A.  The robberies.

 5   Q.  Was there any further explanation of that?

 6   A.  As we went on talking he was explaining to me that they had

 7   cops, they had a shooter, a locksmith and a team that did

 8   robberies.

 9            THE COURT:  What timeframe are we in at this point?

10            MS. MAIMIN:  I think he testified it was a few days

11   after the burglary.

12            THE COURT:  Right.  What year?

13            THE WITNESS:  2012.

14            THE COURT:  All right.

15   Q.  You mentioned that the defendant said there were cops?

16   A.  Yes.

17   Q.  What did you understand him to mean when he said he had

18   cops?

19   A.  Like dirty cops.

20   Q.  And in what respect?

21   A.  That are willing to do the robberies.

22   Q.  And with respect to the shooter what did you understand the

23   defendant to mean when they said they had a shooter?

24   A.  Someone willing to shoot anyone.

25   Q.  Were there any particular words used to describe the
```

E6HAASER2                          Moral - Direct

1    shooter?

2    A.   A hitman.

3    Q.   And you said a locksmith.

4    A.   Yes.

5    Q.   What did you understand the defendant to mean when he said

6    they had a locksmith?

7    A.   Someone that could break into apartments, open doors.

8    Q.   Now, did you discuss whether or not the defendant's team

9    had guns?

10   A.   Yes.

11   Q.   What was discussed?

12   A.   I asked him if they had guns.

13   Q.   What was the response?

14   A.   He said yes.

15   Q.   Who said yes?

16   A.   The defendant.

17   Q.   Did he say what type of guns they had?

18   A.   No.

19   Q.   Did he say what model?

20   A.   No.

21   Q.   Did he say how many guns they had?

22   A.   No.

23   Q.   How did you react to all of this?

24   A.   I was kind of excited.

25   Q.   Why were you excited?

E6HAASER2                         Moral - Direct

1    A.   Cause I know we'd make more money if we had somebody that

2    was willing to deal with the robbery part that we was trying to

3    get people together for.

4    Q.   What do you mean by the robbery?

5    A.   Because the information Nena was giving me like the

6    burglaries I know I'd be able to do but as in, we didn't have

7    no guns yet, like me, Alex and Black so far we were a team.  We

8    didn't have no guns.  And to do robberies pretty much pulling

9    people over in the street you couldn't be wearing mask if you

10   had to show your face and I was kind of scared to do that.

11   Q.   Why were you scared to do that?

12   A.   I didn't want to risk getting arrested.

13   Q.   You weren't scared of the violence.  You didn't want to get

14   arrested?

15   A.   Yes.

16   Q.   Did they show you anything or were you just talking?

17   A.   They showed me some pictures.

18   Q.   Who?

19   A.   Kong.

20   Q.   Where did he show you pictures?

21   A.   On the phone.

22   Q.   On his phone?

23   A.   Yes.

24   Q.   What did he show you pictures of?

25   A.   Pictures of people dressed in police uniforms.

E6HAASER2                          Moral – Direct

1   Q.  What do you mean by dressed in police uniforms?

2   A.  Like a cop, pretty much bulletproof vest with a gun,

3   handcuffs, a like a police officer.

4   Q.  So you said you were excited.  Did you agree to commit

5   robberies together?

6   A.  Yes.

7   Q.  Now, after that heroin on Webster Avenue were you able to

8   make arrangements for that?

9   A.  Yes.

10  Q.  What were your arrangements?

11  A.  We agreed a $17 a gram.  The defendant said he was going to

12  give us $10,000 upfront.  He was going to leave with Black to

13  pick up the drugs and go to his house to get the money and then

14  he would pay us the rest in a few days after he got rid of it.

15  Q.  What did you understand the defendant to mean when he said

16  $10,000 up front?

17  A.  That he was going to give it to us that day.

18  Q.  When was the rest going to come?

19  A.  Within a few days when he got rid of the heroin.

20  Q.  What do you mean by get rid of the heroin?

21  A.  Sold it.

22  Q.  Did you actually receive $10,000 that day?

23  A.  Yes.

24  Q.  Did you receive the whole thing or just part of it?

25  A.  My part of it.

E6HAASER2                          Moral - Direct

1    Q.  How much was your part of it?

2    A.  About three thousand something dollars.

3    Q.  How soon after that meeting that day did you receive your

4    part of this $10,000?

5    A.  About a hour that night.

6    Q.  Where did you receive it?

7    A.  At Black's house.

8    Q.  Did you Black tell you where had he gotten it from?

9    A.  Yes.

10   Q.  What did he tell you?

11   A.  He said he picked it up from the defendant.

12   Q.  And where was the heroin by the time that you got your part

13   of the $10,000?

14   A.  He gave it to the defendant.

15   Q.  Who?

16   A.  The Black.

17   Q.  How do you know that?

18   A.  That's what they left to go do.  Then when we got back with

19   the money he told us he gave them everything.

20   Q.  Black told you?

21   A.  Yes.

22   Q.  Now, do you know whether the defendant actually sold all of

23   that heroin?

24   A.  Yes.

25   Q.  How do you know?

1    A.   A few days down the road Black didn't call us and tell us

2    he had the money.  So I thought it was funny.  I called the

3    defendant to see if he had paid Black the money already and he

4    said he did that he got rid of everything.  He already paid.

5    Q.   So the defendant was supposed give Black the rest of the

6    money for selling the drugs?

7    A.   Yes.

8    Q.   Did you ever talk to black about why you didn't get your

9    share?

10   A.   Yes.

11   Q.   What did he say?

12   A.   He said he used the money.

13   Q.   Did he say what he used it for?

14   A.   He said cause of Hurricane Sandy that his family got caught

15   in the storm and they was out of their home.  He had to put

16   them up in a hotel.  He needed to use the money.

17   Q.   So, you never got the rest of your share?

18   A.   No.

19   Q.   By the way, still focusing on the same day that you made

20   that agreement about the heroin, did you meet with anyone else

21   that day?

22   A.   Yes.

23   Q.   With who?

24   A.   Juan, Benny Blanco and some other kid and I was with Alex.

25   Q.   Who is Juan?

1   A.   Juan is someone I know from Jersey City.

2   Q.   Why did you meet with him?

3   A.   We was at that time trying to find someone to help us do

4   the robberies.

5   Q.   Did the defendant participate in that meeting?

6   A.   No.

7   Q.   Did you see the defendant again after you met with him

8   about the heroin?

9   A.   Yes.

10  Q.   When, approximately?

11  A.   I believe the next day.

12  Q.   Where?

13  A.   At his home.

14  Q.   Where does he live?

15  A.   In Jersey City on eight street.

16  Q.   OK.  I am showing you just on your screen what's been

17  marked for identification as Government Exhibit 605-C and

18  605-D.  Do you recognize these pictures?

19  A.   Yes.

20  Q.   What are they?

21  A.   A picture of his house and his car.

22  Q.   Who's house?

23  A.   The defendant.

24  Q.   And do those pictures fairly and accurately depict the way

25  the defendant's house and car looked when you went to see him?

E6HAASER2                          Moral - Direct

 1   A.  Yes.

 2              MS. MAIMIN:  Would you, please, put up Government

 3   Exhibit 605-C.

 4              (Pause)

 5   Q.  What are we looking at here?

 6   A.  The front of the defendant's house.

 7              MS. MAIMIN:  I forgot to offer it, your Honor.  The

 8   government offers 605-C and 605-D.

 9              MR. DE CASTRO:  No objection.

10              THE COURT:  Received.

11              (Government's Exhibits 605-C and 605-D received in

12   evidence)

13   Q.  Mr. Moral, you said?

14   A.  Defendant's house.

15   Q.  Do you know which one is the defendant's house?

16   A.  I believe the one in the middle.

17   Q.  Could you just point to it with your laser pointer?

18              (Pause)

19              MS. MAIMIN:  For the record, please, reflect that the

20   defendant is pointing to the second house from the right.

21              Now, could you please put up 605-D.

22              (Pause)

23   Q.  Do you recognize anything in this picture?

24   A.  Yes.

25   Q.  What is that?

E6HAASER2                          Moral - Direct

1    A.   The Lexus.

2    Q.   What Lexus?

3    A.   The defendant's.

4    Q.   Can you point to it with your laser pointer?

5              (Pause)

6              MS. MAIMIN:  May the record, please, reflect that

7    Mr. Moral is pointing to the car towards the bottom of the

8    screen.

9    Q.   Now, why did you go to the defendant's house?

10   A.   I had spoke to Nena and I had these jobs I wanted to talk

11   to him about.

12   Q.   What kind of jobs?

13   A.   Two jobs.

14   Q.   Robbery jobs?

15   A.   Yes.

16   Q.   Did you go alone to his house?

17   A.   No.  I went with Alex.

18   Q.   When you first pulled up to the defendant's house did you

19   see any other cars parked in front or yours?

20   A.   The only one there was a K-9 unit truck parked out front.

21   Q.   What do you mean by a K-9 unit truck?

22   A.   Like a police car truck.

23   Q.   What does it have to do with a K-9 unit?

24   A.   It said K-9 unit on the back.

25   Q.   Now, did you contact the defendant to let him know you had

E6HAASER2                    Moral - Direct

```
1    arrived?

2    A.  Yes.

3    Q.  How did you contact him?

4    A.  I called him.

5    Q.  What happened next?

6    A.  He came downstairs.

7    Q.  Did Alex go inside the house with you or did he stay

8    outside?

9    A.  He stayed outside.

10   Q.  By the way, was that the only time you and Alex went to the

11   defendant's house?

12   A.  No.

13   Q.  Now, back to the visit that day.  Did you go straight to

14   the defendant's apartment?

15   A.  No.

16   Q.  What floor did you go to first?

17   A.  Second floor.

18   Q.  And while you were on your way to the second floor what, if

19   anything, did the defendant say to you?

20   A.  Told me he wanted to introduce me to someone.

21   Q.  Did he say who?

22   A.  The cop.

23   Q.  The cop?

24   A.  Yes.

25   Q.  What did you understand him to mean he said "the cop"?
```

E6HAASER2                        Moral - Direct

1    A.  He said one of the cops he said that worked with him.

2    Q.  So what happened when you got to the second floor?

3    A.  Knocked on the door, cop came the door, dog was jumping

4    around.  He told him this is the guy he got the heroin --

5    Chillini said this is the guy he got the heroin from.  He

6    introduced me to the cop and then he told him how easy -- for

7    me to tell him how easy it was that I got it, that I got the

8    heroin.  I explained it to him and then I asked him if the dog

9    could sniff money and he told me no.

10   Q.  What did the defendant say when he introduced you to the

11   guy you called "the cop"?

12   A.  He told the cop this is the guy I got the heroin from.

13   Q.  And what, if anything, did the cop say?

14   A.  He said hi.

15   Q.  Did he provide any additional details about the heroin?

16   A.  Did the defendant?

17   Q.  Um-hmm.

18   A.  Yeah, he told him that it was such a easy job and I ended

19   up getting, it was worth about $120,000.

20   Q.  And you said you asked the man with the dog something?

21   A.  Yeah.

22   Q.  What did you ask him?

23   A.  If the dog could sniff money.

24   Q.  What did he say?

25   A.  No.

E6HAASER2                        Moral - Direct

1   Q.  So after speaking to the man with the dog where did you go

2   next?

3   A.  We went upstairs to the defendant's apartment.

4   Q.  Was the defendant alone in the apartment with you?

5   A.  No.

6   Q.  Who else was there?

7   A.  His wife.

8           MS. MAIMIN:  Before we go on may I approach, your

9   Honor?

10          THE COURT:  You may.

11  Q.  Now showing you what's been marked for identification as

12  Government Exhibit 11.  Do you recognize that?

13  A.  Yes.

14  Q.  What is that?

15  A.  This is a picture of the cop.

16          MS. MAIMIN:  Government offers Exhibit 11.

17          MR. DE CASTRO:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 11 received in evidence)

20          MS. MAIMIN:  Put Exhibit 11 on the board.

21          THE COURT:  How did you identify that individual as a

22  cop?  Was he wearing a uniform or --

23          THE WITNESS:  The dog.  They told me he is a cop and

24  he had a dog in the back, a German Shepherd.

25          THE COURT:  All right.

1   Q.  There was a K-9 unit truck in front of the apartment?

2   A.  Yes.

3   Q.  Is that how you deduced that he was a cop?

4   A.  Yes.

5   Q.  Did he say by the way, what else the dog could sniff if not

6   money?

7   A.  Drugs.

8   Q.  Now, back to the meeting with the defendant's apartment.

9   You said you were going to be talking about two robbery jobs?

10  A.  Yes.

11  Q.  Did you, in fact, do that?

12  A.  Yes.

13  Q.  Let's discuss them one by one.  What was first job you

14  discussed?

15  A.  The money van.

16  Q.  What do you mean by "money van"?

17  A.  The money van I just described earlier that was picking up

18  money from different drug spots.

19  Q.  What did you say about the money van?

20  A.  It had a stash in it and we knew the location of it

21  already.  And Nena told me it just wasn't certain on the time

22  that they were doing the pick up of the money but we knew where

23  the van was and we had to try to figure out a way that we could

24  get the van.

25  Q.  That is what you discussed with defendant?

1   A.   Yes.

2   Q.   Did the defendant propose any ways you might be able to rob

3   the van?

4              MR. DE CASTRO:   Objection.

5              THE COURT:   Why don't you rephrase.

6   Q.   Did you discuss any ways that you might be able to rob the

7   van?

8   A.   Yes.

9   Q.   Who discussed it?

10  A.   Me and the defendant.

11  Q.   And what did you say?

12  A.   I asked him -- I explained to him what options we had and

13  he said he was going to check to see if he could get a tow

14  truck and just tow it.

15  Q.   Tow the van?

16  A.   Yes.

17  Q.   What was the second job you discussed?

18  A.   A cocaine transport.

19  Q.   What do you mean by a "cocaine transport"?

20  A.   Nena had told me that she knew of a deal that was going to

21  be done and that there was going to be at least over two kilos

22  being transported by someone somewhere in New York.

23  Q.   Two kilos of cocaine?

24  A.   Yes.

25  Q.   Did she say at that point where?

1    A.  Just that it was in Manhattan.

2    Q.  And what did you tell the defendant about the cocaine

3    transport?

4    A.  I told him that the other job was that there was going to

5    be a transportation of at least two keys or more and that we

6    just had to be ready when the call came.

7    Q.  Did you discuss whether it was going to be cocaine or some

8    other drug?

9    A.  Cocaine.

10   Q.  And what, if anything, did the defendant say when you

11   described that job to him?

12   A.  He said just let him know.  He's ready.

13   Q.  Now, did you end up trying to commit those two jobs, the

14   money van and the cocaine shipment?

15   A.  Yes.

16   Q.  So with respect to the money van did you discuss that job

17   again with the defendant?

18   A.  Yes.

19   Q.  How soon after your meeting at his house, approximately?

20   A.  About two days.

21   Q.  And did you call him or did he call you?

22   A.  I called him.

23   Q.  What did you say?

24   A.  I told him if he could meet me in New York I gave him an

25   address to where we were going to go check out the money van,

E6HAASER2                          Moral - Direct

1   figure out what we were going to do.

2   Q.  What, if anything, did he say?

3   A.  He said, all right.

4   Q.  Where in New York were you going to meet him?

5   A.  Bronx.

6   Q.  Did he, in fact, meet you in the Bronx?

7   A.  No.

8   Q.  Did anyone meet you in the Bronx?

9   A.  Yes.

10  Q.  Who?

11  A.  Kong and Honesty.

12  Q.  Was Alex with you that day as well?

13  A.  Yes.

14  Q.  Now, did you discuss with Kong and Honesty why the

15  defendant had come along?

16  A.  Yes.

17  Q.  What, if anything, did they say?

18  A.  They said he was dealing with something else.

19          MR. DE CASTRO:  Objection.

20          THE COURT:  Overruled.

21  Q.  Were you able to find the money van that day?

22  A.  Yes.

23  Q.  What did you do when you found it?

24  A.  I put a tracking device on it.

25  Q.  What's a tracking device?

1   A.   It's a GPS tracker box magnet, stick to the car so you

2   could be able to track its location.

3   Q.   Why did you use that to track the car's location?

4   A.   So the guy that whoever it was that was driving the van

5   would have felt suspicious by us following it, so I was able a

6   track it as he was going around picking up money.

7   Q.   Now, did you also see Nena that day?

8   A.   Yes.

9   Q.   Why?

10   A.   Because she was going to come by to see who else I was

11   working with so she could see them.

12   Q.   Why did she need to come see you when you were working?

13   A.   So she would know who I was dealing with.

14   Q.   Was this a particular person you are hoping for her to see

15   that day?

16   A.   Yes.

17   Q.   Who?

18   A.   The defendant.

19   Q.   Why?

20   A.   Because being that she said these other robberies were

21   going to be done in the daytime I wasn't always available

22   early, so I wanted to see I could have just the left phone with

23   him and she'd be able to call and get things going.

24   Q.   You said you were thinking of leaving the phone with him?

25   A.   Yes.

E6HAASER2                          Moral - Direct

1   Q.  With who?

2   A.  With the defendant.

3   Q.  And what phone are you referring to?

4   A.  The throw away phone that I got from her.

5   Q.  So, you were contemplating leaving the burner phone with

6   the defendant for Nena to contact him directly?

7   A.  Yes.

8   Q.  Did you actually rob that cash van that day?

9   A.  No.

10  Q.  Did you rob it?

11  A.  No.

12  Q.  Showing you just on your screen what's been marked for

13  identification as Government Exhibit 606-B.  Do you recognize

14  that?

15  A.  Yes.

16  Q.  What is that?

17  A.  That's the street where the money van was parked at.

18  Q.  OK.  Does that fairly and accurately depict the way that

19  street looked when you put that GPS on the money van?

20  A.  Yes.

21          MS. MAIMIN:  Government offers 606-B.

22          MR. DE CASTRO:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 606-B received in evidence)

25          MS. MAIMIN:  Could your please publish?

1    Q.  Mr. Moral, could you just indicate with the laser pointer

2    where that car was parked when you put the GPS on it?

3    A.  Right there.

4             MS. MAIMIN:  Could the record reflect Mr. Moral was

5    pointing right to the middle of that photograph.

6    Q.  Now, did you and Kong exchange contact information that

7    day?

8    A.  Yes.

9    Q.  Did you also speak to the defendant that day?

10   A.  Yes.

11   Q.  Did you call him?

12   A.  Yes.

13   Q.  Why?

14   A.  I wanted to see why he didn't show up.

15   Q.  And what did he say?

16   A.  He told me not to worry about it, that they worked for him.

17   They were good people and not to worry about it if something

18   happened he's get his cut from them.

19   Q.  Okay.  Now, when he said they were his people, what did you

20   understand him to be talking about?

21   A.  That they worked for him and with him.

22   Q.  Who?

23   A.  Kong and Honesty.

24   Q.  He said something about his cut?

25   A.  Yes.

E6HAASER2                         Moral - Direct

1    Q.  What did he say about his cut?

2    A.  That he would get his cut from them.

3    Q.  What did you understand him to mean by that?

4    A.  Usually when we did robberies or burglaries everybody that

5    was involved we split each share.

6    Q.  So what was he trying to tell you?

7    A.  So at the end of the we wouldn't have to give him his own

8    share.  He would get his share from them.

9    Q.  Now, I want to talk about the other job, the cocaine

10   transportation job you mentioned.  Did you speak to Nena again

11   about that cocaine job?

12   A.  Yes.

13   Q.  What, if anything, did she tell you?

14   A.  She pretty much told me now it's going to be a couple.

15   They were going to be moving in a van and up in Washington

16   Heights, Manhattan.

17   Q.  "A couple" meaning what?

18   A.  It was a guy and a girl.

19   Q.  You said it was going to be moving in Manhattan.  Where in

20   Manhattan?

21   A.  Washington Heights.

22   Q.  And what did you understand her to mean when she said

23   moving in Manhattan?

24   A.  That they were going to be transporting the drugs, the

25   cocaine.

E6HAASER2                          Moral – Direct

1    Q.   Did she say how much cocaine?

2    A.   Over two kilos.

3    Q.   And this was going to be in a car?

4    A.   Yes.

5    Q.   Did you tell the defendant about this new information?

6    A.   Yes.

7    Q.   How long after that first meeting?

8    A.   I'd say within a week.

9    Q.   Where did you give him that information?

10   A.   I met him by his house at a baseball field.

11   Q.   Why did you meet him at a baseball field?

12   A.   He was coaching Little League.

13   Q.   Who participated in that meeting?

14   A.   Me, Kong and the defendant.

15          THE COURT:  Can I ask you a question?  Did you

16   actually go to the field to meet with the defendant?

17          THE WITNESS:  Yes.

18          THE COURT:  Was there a Little League practice going

19   on at the time?

20          THE WITNESS:  I didn't really pay attention.  We met

21   on the side street.

22          THE COURT:  All right.

23   BY MS. MAIMIN:

24   Q.   What, if anything, did you tell the defendant about the new

25   information you got from phone?

E6HAASER2                          Moral - Direct

1    A.  I told him Nena had told me that it was going to be a

2    couple moving the drugs and that there is going to be over two

3    kilos and it was going to be in Washington Heights.

4    Q.  To two kilos of what?

5    A.  Cocaine.

6    Q.  What, if anything, did the defendant say?

7    A.  He said all right.  He's ready.

8    Q.  Did you discuss what the plan was going to be, the robbery?

9    A.  Yes.

10   Q.  What was discussed?

11   A.  We thinking about it since we had the cop car of pulling

12   the couple over and taking the car.

13   Q.  What do you mean by pulling the couple over with the cop

14   car?

15   A.  We were going to act like we were cops, pull them over and

16   take their car from them.

17   Q.  Did you ask him any questions?

18   A.  Yes.

19   Q.  What questions did you ask the defendant?

20   A.  I asked him if he had guns.

21   Q.  What, if anything, did he say?

22   A.  Yeah.

23   Q.  Did he say what type of gun?

24   A.  No.

25   Q.  Did he say what model gun?

E6HAASER2                         Moral - Direct

1    A.  No.

2    Q.  How many guns?

3    A.  No.

4    Q.  Did he say whether he was going to be bringing loaded guns?

5    A.  No.

6    Q.  Or where he was going to be getting them from?

7    A.  No.

8    Q.  Now, how were you going to communicate with Nena in the

9    future about this robbery?

10   A.  I was leaving the defendant with the phone.

11   Q.  Did you leave the defendant with the phone?

12   A.  Yes.

13   Q.  Which phone are you talking about?

14   A.  The throw-away phone.

15   Q.  Why did you leave the defendant with the throw-away phone?

16   A.  Cause being that the job was going to come up during the

17   daytime I wasn't going to be available so that we could have a

18   fast contact and then I could, once I was notified I could try

19   to catch up with him so he would have a better jump in seeing

20   what was going on before I was able to get there.

21   Q.  Why weren't you going to be available?

22   A.  I had my daughter during the day.

23   Q.  Now, did you, in fact, attempt to commit that robbery of

24   the couple?

25   A.  Yes.

E6HAASER2                          Moral - Direct

1    Q.  When, approximately, in relation to the meeting of the

2    Little League field?

3    A.  The next day, I believe.

4    Q.  And where did that robbery take place, approximately?

5    A.  Around in Washington Heights, Manhattan around 171, 72nd.

6    Q.  Approximately, with time of day was that?

7    A.  Nighttime.

8    Q.  Who participated in that robbery?

9    A.  Me, Alex, Kong, the defendant and some other kid I didn't

10   know.

11   Q.  Did you ever learn the other kid's name?

12   A.  No.

13   Q.  What does he look like?

14   A.  Tall, Spanish.

15   Q.  Was he fat or thin?

16   A.  Skinny.

17   Q.  How did you find out that the robbery was going to take

18   place that day?

19   A.  We were in contact with each other, me, Kong and the

20   defendant.  And we made arrangements that Nena had called and

21   we had to get together to try to meet up.  I went with Alex to

22   try to get the cop car so we could meet them in Manhattan.

23   Q.  All right.  So let's take that piece by piece.  You said

24   Nena had called?

25   A.  Yes.

E6HAASER2                              Moral - Direct

1    Q.   Who did Nena call?

2    A.   The defendant.

3    Q.   How did you find out about that?

4    A.   Me and him ended up speaking.

5    Q.   What, if anything, did he tell you about that call?

6    A.   That everything was a go, that we had to meet up in

7    Manhattan.

8    Q.   That day?

9    A.   Yes.

10   Q.   He tell you where to go in Manhattan?

11   A.   He just said drive towards the bridge.

12   Q.   Did he say what bridge?

13   A.   George Washington.

14   Q.   Did you, in fact, drive towards the George Washington

15   Bridge?

16   A.   Yes.

17   Q.   Were you alone?

18   A.   With Alex.

19   Q.   What kind of car were you driving?

20   A.   The cop car.

21   Q.   Now, when you spoke to the defendant could you tell whether

22   he was alone or with someone else?

23   A.   He was with Kong.

24   Q.   How could you tell he was with Kong?

25   A.   We were switching between phones.  I was talking to him and

E6HAASER2                              Moral - Direct

1   I was talking to Kong so I know they were together.

2   Q.   What do you mean you were switching between phones?

3   A.   He was on the phone with Nena.   I would talk to Kong and

4   then he was referring to Kong where we were going and I would

5   also hear him in the background.

6   Q.   You could hear him in the background when you were talking?

7   A.   Yes.

8   Q.   When you heard the defendant in the background what, if

9   anything, could you hear?

10   A.   Just the directions where to go.

11   Q.   Could you tell what he was doing?

12   A.   Driving.

13   Q.   Now, by the way, do you know when the defendant told you

14   everything he learn from Nena that day?

15   A.   No.

16   Q.   Where did you end up going to find the couple first?

17   A.   About 162nd and Amsterdam.

18   Q.   How did you know what to look for?

19   A.   The defendant was giving me details.

20   Q.   What do you mean he was giving you details?

21   A.   He was telling me where they were parked at, the van, what

22   color it was.

23   Q.   Did you understand how he was getting those details?

24   A.   Yes.

25   Q.   How?

E6HAASER2                          Moral - Direct

1    A.   From Nena.

2    Q.   Why did you think he was getting them from Nena?

3    A.   Cause when I was talking to Kong I was hearing the

4    background.

5    Q.   What did you hear in the back brown?

6    A.   He was then referring to Kong to tell me.

7    Q.   How did you know the information was coming from Nena?

8    A.   I figured that's who he was talking to on the phone was

9    her.

10   Q.   Now, you said that you learned where they were parked.

11   Where did you learn from the defendant where they were parked?

12   A.   They were parked on in front of, it was like a bodega and

13   barbershop.

14   Q.   You said they were in a van?

15   A.   Yes.

16   Q.   Did you learn what kind of van they were in from the

17   defendant?

18   A.   Yes.

19   Q.   What kind of van?

20   A.   It was a minivan.

21   Q.   Now, where did you first see the victim's car?

22   A.   It was double parked by the corner.

23   Q.   Which corner?

24   A.   Of 163, I believe.

25   Q.   I am showing you just on your screen what's been marked for

E6HAASER2                         Moral - Direct

1   identification as Government Exhibit 602-C.  Do you recognize

2   this?

3   A.  Yes.

4   Q.  What is this?

5   A.  That's he corner where they were double parked.

6   Q.  When you first saw the couple?

7   A.  Yes.

8   Q.  Does that fairly and accurately depict the way the block

9   looked that day?

10  A.  Yes.

11           MS. MAIMIN:  The government offers 602-C.

12           MR. DE CASTRO:  No objection.

13           THE COURT:  Received.

14           (Government's Exhibit 602-C received in evidence)

15  Q.  OK.  Could you please point to with the laser pointer where

16  you first saw the couple double parked?

17  A.  Right about there.

18           MS. MAIMIN:  Ms. Craig, if you could just zoom-in on

19  the awning to the left of where it says "physical therapy".

20           (Pause)

21  Q.  Can you read what it says in white there?

22  A.  Beauty salon.

23  Q.  Was that how it looked on the day that you were -- when you

24  first saw the victims?

25  A.  Ys.

E6HAASER2                    Moral - Direct

1   Q.  Now, what did you do when you first saw the couple double
2   parked?
3   A.  We double parked behind him about 40 yards.
4   Q.  Who is "we"?
5   A.  Me and Alex.
6   Q.  How long were you double parked behind them?
7   A.  About a half hour.
8   Q.  What were you doing during that half hour?
9   A.  Just sitting there in the car waiting, talking with the
10  defendant.
11  Q.  What were you waiting for?
12  A.  For the couple to drive off.
13  Q.  And why were you waiting for them to drive off?
14  A.  Cause we were going to follow them to try to see where they
15  were going.
16  Q.  You said you were talking to the defendant?
17  A.  Yes.
18  Q.  How were you talking to the defendant?
19  A.  On the phone.
20  Q.  What were you talking to them about?
21  A.  We were starting to think that they must have got
22  suspicious, that they saw the cop car parked behind them.  They
23  were scared to leave.  So we made a decision that he told us
24  just to leave.
25  Q.  Still focusing on the time when you were double parked

E6HAASER2                         Moral - Direct

1   behind the couple's car, were you able to see any other cars in

2   the neighborhood that you recognized?

3   A.  Yes.

4   Q.  What car?

5   A.  The car the defendant was in.

6   Q.  What kind of car was the defendant in?

7   A.  It was a Toyota, red.

8   Q.  A red Toyota?

9   A.  Yes.

10  Q.  And how did you know the defendant was in that red Toyota?

11  A.  When I asked him where he was, he told me to look.  He

12  flashed lights from the car.

13  Q.  What do you mean by flashed lights?

14  A.  He like flashed the high beams.

15  Q.  Where did he tell you to look?

16  A.  Straight up, a block over.

17            THE COURT:  Ms. Maimin, in a minute or two we're going

18  to take our midmorning break, so I just want you to get to a

19  point that's logical for you.

20            MS. MAIMIN:  I can probably stop in about one or two

21  questions.

22            THE COURT:  Sure.

23  BY MS. MAIMIN:

24  Q.  Now you said that after half an hour you broke away from

25  being double parked.

E6HAASER2                      Moral - Direct

1   A.  Yes.

2   Q.  Why?

3   A.  We were under the impression that the couple noticed that

4   we were parked there and they didn't want to move.  So we ended

5   up leaving to throw them off, make them think we just left.

6   Q.  Who ended up leaving?

7   A.  Me and Alex.

8   Q.  Where did you and Alex go?

9   A.  We made the first left.  Once he made that left I jumped

10  out the car and went into the defendant's car.

11  Q.  You got into the defendant's car?

12  A.  Yes.

13          MS. MAIMIN:  Your Honor, this is a reasonable time to

14  break.

15          THE COURT:  All right.  Ladies and gentlemen, we are

16  going to take a midmorning break about ten or so minutes and I

17  want to remind you not to talk to anybody including each other

18  about anything that you've heard of this case.  Thank you.

19          (Jury not present)

20          THE COURT:  You can step down.

21          (Witness not present)

22          THE COURT:  Let's all be seated just for a minute.  I

23  wanted to make sure that we reviewed a couple of objections and

24  things that were going on earlier.

25          There were two types of form objections as I

E6HAASER2                        Moral - Direct

1     understand it, Mr. de Castro, in terms with what you were

2     objecting to.  One was transitional phrase, which people do

3     sometimes.  I think sometimes it could help the jury just sort

4     of understand where we're going.  But technically it's not part

5     of the objection.  It is an appropriates objection though I

6     understand why you wouldn't want to include it but better to

7     leave it off it you can.

8              MS. MAIMIN:  That's fine your Honor.

9              THE COURT:  All right.  The second is the compound

10    objection which is offering what you are referring to as an

11    alternative but that as I perceived the objection is it's a

12    compound objection where that question were answered yes to it

13    as opposed to which of the two alternatives it could lead to

14    juror confusion, particularly, when one of them is benign and

15    not one of them is not benign.

16             Mr. de Castro, is that one of the objections as well?

17             MR. DE CASTRO:  Yes.  And I think and also an aspect

18    of that is also leading, part of that as well.  And this is not

19    cross-examination.  She can't suggest one way or the other.

20    And on the first point I don't really have a huge issue with

21    transition point, but I think directing your attention to the

22    date and letting the witness speak instead of lawyers would be

23    probably more --

24             THE COURT:  All right.  So, these are rather technical

25    objections but technically true.

E6HAASER2                      Moral - Direct

1          MS. MAIMIN:  Directing a witness to a date is

2     extremely common.

3          THE COURT:  It is.  And I think there's a difference

4     between let's talk about May 12 versus let's talk about the

5     robbery that occurred on May 12.

6          MS. MAIMIN:  That's fine, your Honor.

7          THE COURT:  All right.  So in terms of an additional

8     objection was relating to the stamping.  There were two I think

9     two different objections that were occurring at that moment in

10    time.  That is at least is how I perceived it.  One was, the

11    second one which is why did drug dealers stamp heroin?  That's

12    asking him, unless you establish that he himself has done it,

13    about the state of mind of those who are stamping.  And in

14    terms of why the way it was phrased.

15         Now, the other was why stamped.  And that's a close

16    call because it could be that you are making him into an expert

17    witness on the stamping practices of heroin versus just in his

18    experience.  There's certainly an argument that he, based on

19    his wide experience of seeing heroin stamped, could testify to

20    that.  You'd have to build more of a foundation which is that

21    he regularly saw envelopes, the envelopes were stamped.  So,

22    there wasn't quite the foundation to have got him to the same

23    point I think that you were getting to with the jury which is

24    stamping is stamping is stamping.

25         Mr. de Castro, was there something else?

E6HAASER2                    Moral - Direct

1          MR. DE CASTRO:  No, judge.

2          THE COURT:  All right.  So those are what I had

3    perceived.  I just want to make sure if it was a longer trial

4    it would make more sense in terms of explaining everything but

5    I wanted to make sure you understand where I am coming from in

6    terms of sustaining objections or having to rephrase things so

7    that we get our heads into the same place.

8          MS. MAIMIN:  That's fine, your Honor.  I understand.

9          THE COURT:  Is there anything that you folks would

10   like to raise?

11         MS. MAIMIN:  Not from the government.

12         MR. DE CASTRO:  No, your Honor.

13         THE COURT:  All right.  Let's take a brief break

14   ourselves.  Thank you.

15         (Recess)

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

E6H7SER3                         Moral - direct

1                (Jury present)

2                THE COURT:  Let's all be seated, ladies and gentlemen.

3                Ms. Maimin, you may proceed.

4                MS. MAIMIN:  Thank you, your Honor.

5    VICTOR MORAL, resumed.

6    DIRECT EXAMINATION (Continued)

7    BY MS. MAIMIN:

8    Q.  Just to briefly recap, Mr. Moral, before we broke you said

9    that after 30 minutes of being double parked behind the

10   victims, you drove down the street?

11   A.  Yes.

12   Q.  And you got into the defendant's car.

13   A.  Yes.

14   Q.  So who else was in the defendant's car when you got in?

15   A.  Kong and the Spanish kid, tall skinny kid.

16   Q.  Who was sitting where?

17   A.  The defendant was in the driver's seat, Kong was in the

18   passenger seat, and the skinny kid and me were in the back.

19   Q.  Were you actually introduced to the skinny kid?

20   A.  Yes.

21   Q.  You don't remember his name?

22   A.  No.

23   Q.  Who introduced you?

24   A.  The defendant.

25   Q.  Do you remember what he said when he introduced the skinny

E6H7SER3                    Moral - direct

1    kid?

2    A.  He said what's up, this is whatever his name was.  That was

3    it.

4    Q.  What if anything did you see while you were in the car with

5    the defendant?

6    A.  I seen the defendant hand the skinny kid a bag.

7    Q.  Now, what did the bag look like?

8    A.  Black bag.

9    Q.  Was it plastic?  Was it canvas?

10   A.  Plastic.

11   Q.  Could you see what was inside the bag?

12   A.  No.

13   Q.  When the defendant handed the skinny kid the bag, what if

14   anything did the defendant say?

15   A.  He told the skinny kid to go watch the van.

16   Q.  And when he said to go watch the van, what did you

17   understand him to mean?

18   A.  The van we were just watching, the couple's van.

19   Q.  And did the kid leave to go watch the van?

20   A.  Yes.

21   Q.  Now, focusing on the moment when you saw the defendant hand

22   the skinny kid the black bag, did you know what was in the bag?

23   A.  No.

24   Q.  Did you later find out what was in the bag?

25   A.  Yes.

E6H7SER3                          Moral - direct

1    Q.   What?

2    A.   A gun.

3    Q.   All right.  So we will get back to that in a moment.

4            For now, still focusing on the time when you were in

5    the defendant's car, and that was just you, Kong and the

6    defendant, did you and he further discuss the plan for the

7    robbery?

8    A.   Yes.  I got the phone back, I called Nene, told her I was

9    there.  After I sat in like the center console, I was talking

10   to the defendant and Kong, and we were saying about how we were

11   going to pull them over, and right when we were in the process

12   of that the skinny kid called and said the couple was moving.

13   Q.   Who did the skinny kid call?

14   A.   The defendant.

15   Q.   And how did you know that's what the skinny kid said?

16   A.   The defendant told me that the van is moving, go get back

17   in the cop car.

18   Q.   The defendant directed you to get back in the cop car?

19   A.   Yes.

20   Q.   And did you in fact go back to the cop car?

21   A.   Yes.

22   Q.   Now, how far away was the cop car from where the

23   defendant's car was at that point?

24   A.   A block down and to the right.

25   Q.   And while you were on your way back to the cop car, did you

E6H7SER3                          Moral - direct

1    see anyone you knew?

2    A.   Yes.

3    Q.   Who did you see?

4    A.   The skinny kid.

5    Q.   And what if anything happened when you saw the skinny kid?

6    A.   He handed me the bag.

7    Q.   Was it the same bag that the defendant had given him in the

8    car?

9    A.   Yes.

10   Q.   Now, when the skinny kid handed you the black bag, were you

11   able to see what was inside it?

12   A.   No.

13   Q.   Were you able to feel what was inside of it?

14   A.   Yes.

15   Q.   What?

16   A.   A handgun.

17   Q.   Could you tell what model handgun it was?

18   A.   No.

19   Q.   Could you tell whether it was loaded?

20   A.   No.

21   Q.   Was it one gun?

22   A.   Yes.

23   Q.   Now, after you received the bag with the gun, where did you

24   go next?

25   A.   I went to the cop car where Alex was at.

E6H7SER3                              Moral - direct

1    Q.  And Alex was in the cop car?

2    A.  Yes.

3    Q.  What did you do with the bag?

4    A.  I put it on the floor.

5    Q.  The floor of the car?

6    A.  Yes.

7    Q.  Where on the floor of the car?

8    A.  On my side, the passenger.

9    Q.  Now, focusing on the time when you got back into the car

10   with the gun, did you speak to the defendant again on the

11   phone?

12   A.  Yes.

13   Q.  And what, if anything, was discussed?

14   A.  I called the defendant where he was.

15   Q.  And you asked him where he was?

16   A.  Yes.

17   Q.  And what did he say?

18   A.  He told me what block he was on.

19   Q.  Do you remember what block he said?

20   A.  I believe it was probably St. Nick.

21              MR. DE CASTRO:  Objection.

22              THE COURT:  I think the objection was to the word

23   probably.

24              What's your best recollection?

25              THE WITNESS:  St. Nick.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E6H7SER3                              Moral - direct

1    Q.  St. Nicholas Avenue?

2    A.  Yes.

3    Q.  Did the defendant say what he was doing?

4    A.  He was following the van.

5    Q.  So, what if anything did the defendant direct you to do

6    next?

7    A.  Once he told me where he was, we caught up to him, we told

8    him we were behind him, he then sped away from the van, and we

9    stood following the van, me and Alex.

10   Q.  So first you went behind the defendant's car?

11   A.  Yes.

12   Q.  And what was in front of the defendant's car?

13   A.  The van.

14   Q.  So it went van, defendant, your car?

15   A.  Yes.

16   Q.  And then you said the defendant sped away.

17   A.  Yes.

18   Q.  Did you learn why he sped away?

19   A.  He didn't want the van, for them to think that he was

20   following them.

21   Q.  And how do you know that he didn't want that?

22   A.  He told us -- told me.

23   Q.  Did you see the defendant's car again that night?

24   A.  Yes.

25   Q.  When?

1    A.   A couple times we were keeping track of each other, so he

2    would know where we were, and so he would keep coming back as

3    we kept following the van.

4    Q.   So he would come back to you and the victims' car, then

5    speed way, then come back and speed away?

6    A.   Yeah.

7    Q.   And did he explain why he was doing that?

8    A.   So the van wouldn't notice that he was following them also.

9    Q.   So when he would come back, was he behind the van or in

10   front of the van each time?

11   A.   He would come from behind, he would pass it, he would

12   sometimes be in front of it.

13   Q.   And did you understand why he would sometimes be in front

14   of it?

15   A.   We were still trying to go over the plans on what exactly

16   we were going to do, so he then said he was going to have Kong

17   come get in the car.

18   Q.   But did you have an understanding of why the defendant's

19   car would have been in front of the victims' car?

20   A.   Yes.

21   Q.   Why?

22   A.   Well, we were trying to find a dead block so we could pull

23   them over, and he was going to stay in front so they wouldn't

24   be able to drive off.

25   Q.   So who wouldn't be able to drive off?

1    A.   The victims in the van.

2    Q.   And what do you mean by a dead block?

3    A.   As in trap them off when we pulled them over with the cop

4    lights, they wouldn't be able to drive off.

5    Q.   But what do you mean by a dead block?

6    A.   Like there wasn't many people, no traffic.

7    Q.   How did the defendant know where to drive every time he

8    sped away and came back?

9    A.   I was calling him.

10   Q.   And what were you telling him?

11   A.   I was telling him the block we were on.

12   Q.   Now, during this process, what was the victims' van doing?

13   A.   They were circling the block.

14   Q.   And did you have an understanding about why they were

15   circling?

16   A.   I guess they -- I am assuming they were paranoid, they were

17   scared I was following them.  We were in the cop car, so they

18   assumed --

19             MR. DE CASTRO:  Objection, Judge.

20             THE COURT:  Sustained.

21   Q.   What was your understanding about why -- not guessing -- I

22   am just asking you about your state of mind about why they were

23   circling the block.

24   A.   They knew we were behind them.

25             MR. DE CASTRO:  Objection.

E6H7SER3                        Moral - direct

1           THE COURT:  Sustained.

2           MS. MAIMIN:  I will just move on.

3   Q.  You said that the defendant said he was going to send Kong

4   over to you.

5   A.  Yes.

6   Q.  What did you understand that to mean?

7   A.  It was about to go down, that we were about to pull them

8   over.

9   Q.  But why did Kong need to be in the cop car for that?

10  A.  He was going to deal with the victims.

11  Q.  And what do you mean by deal with the victims?

12  A.  Come out of the car and either whatever was going to be

13  done, tie them up or restrain them.

14  Q.  And how did you know that was going to be Kong's job?

15  A.  When I spoke to the defendant, he said he was dropping Kong

16  off.  I then called him back again, and I asked him where was

17  the skinny kid, and he said that Kong was going to take care of

18  everything, just jump in the van afterwards and follow him.

19  Q.  Why did you ask where the skinny kid was?

20  A.  I wasn't trying to be involved in dealing with the people,

21  so I thought the skinny kid would be one of the people to go

22  deal with.

23  Q.  Why didn't you want to go deal with the people?

24  A.  To me it was more a risk of getting caught.

25  Q.  You said that he said that Kong was going to deal with it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.  Yeah.

2    Q.  What did you understand the defendant to mean by that?

3    A.  Kong was going to deal with the people.

4    Q.  At that point did you have any further discussion about

5    what you were going to get paid for this?

6    A.  Yes.

7    Q.  What was the discussion?

8    A.  I would get an extra thousand dollars for jumping in the

9    van.

10   Q.  An extra thousand dollars from who?

11   A.  From the defendant.

12   Q.  Who said that?

13   A.  He did.

14   Q.  And what do you mean by jumping in the van?

15   A.  I was going to jump in the van and follow him back to

16   Jersey.

17   Q.  Whose van?

18   A.  In the victims' van.

19   Q.  You were going to steal the victims' van and follow who

20   back to New Jersey?

21   A.  Follow the defendant back to New Jersey.

22   Q.  Now, did Kong in fact switch cars, from the defendant's car

23   to your car?

24   A.  Yes.

25   Q.  Do you remember what street that happened on?

E6H7SER3                          Moral - direct

```
 1   A.   Audubon.
 2   Q.   Were there any stores on that street, or was it an empty
 3   street?
 4   A.   There were stores.  I remember a pharmacy on the corner.
 5   Q.   Mr. Moral, I am just showing you on your screen alone what
 6   has been marked for identification as Government Exhibit 602E
 7   and 602F.  Do you recognize these photographs?
 8   A.   Yes.
 9   Q.   What are those photographs are of?
10   A.   That's the pharmacy on the corner.
11   Q.   The pharmacy near where Kong got into your car?
12   A.   Yes.
13   Q.   And do these photographs accurately depict the way that
14   street looked?
15   A.   Yes.
16            MS. MAIMIN:  The government offers 602E and 602F.
17            MR. DE CASTRO:  No objection.
18            THE COURT:  Received.
19            (Government's Exhibits 602E and 602F received in
20   evidence)
21   Q.   Let's look at 602E, please.
22            Or you can leave them both up.  That's fine.
23            Mr. Moral, could you please just point on these
24   pictures approximately where you were when Kong got into your
25   car.
```

E6H7SER3                          Moral - direct

1   A.  We were a little further behind that white car, somewhere

2   behind it.

3            MS. MAIMIN:  So, Mr. Moral is pointing to the white

4   car on the right of the first exhibit.

5   Q.  And do you see the pharmacy in these photographs?

6   A.  Yes.

7   Q.  Where is the pharmacy?

8   A.  It's right there on the corner.

9            MS. MAIMIN:  So, will the record reflect Mr. Moral is

10  pointing to the store with the red awning.

11           May I please read a stipulation into the record?

12           THE COURT:  Yes.

13           MS. MAIMIN:  I am reading stipulation marked for

14  identification as Government Exhibit 804.

15           It's agreed between the parties that Government

16  Exhibits 300A and 300B are true and accurate copies of

17  surveillance video taken at the McDonald's restaurant located

18  at 427 Tenth Avenue, New York, New York, on December 17, 2012

19  between the hours of approximately 9 p.m. and 10:15 p.m.

20           Government Exhibit 300C is a true and accurate copy of

21  surveillance video taken in the vicinity of 128 Audubon Avenue,

22  which is between 171st and 172nd Streets, New York, New York,

23  on or about October 14, 2012, between the hours of

24  approximately 8:50 p.m. and 9 p.m.

25           Government's Exhibits 300A, 300B and 300C, as well as

1    this stipulation, which is Government Exhibit 804, may be

2    received into evidence as Government's Exhibits at trial.

3              Your Honor, at this time the government offers

4    Exhibits 300A, 300B, 300C, and the stipulation Exhibit 804.

5              MR. DE CASTRO:  No objection.

6              THE COURT:  Received.

7              (Government's Exhibits 300A, 300B and 300C received in

8    evidence)

9              (Government's Exhibit 804 received in evidence)

10             MS. MAIMIN:  OK.  Ms. Craig, could you please publish

11   to the jury Government Exhibit 300C, and could you please play

12   it through the first 12 seconds.

13             (Video played)

14   Q.  Mr. Moral, first of all, what are we looking at here?

15   A.  That's the victims' van right there coming up the road.

16   Q.  What road is that?

17   A.  This is Audubon.

18   Q.  OK.  And is this near the pharmacy you talked about?

19   A.  Yes.

20   Q.  Could you point to where you see the victims' car.

21   A.  Right there.

22             MS. MAIMIN:  Let the record please reflect that

23   Mr. Moral is pointing in the upper right hand corner to the car

24   with its lights on.

25             OK.  Now, Ms. Craig, could you please play again until

E6H7SER3                          Moral - direct

1    second 16.

2    Q.   What do you see, if anything, that you recognize here?

3    A.   That's me and Alex in the cop car.

4    Q.   Could you point with the laser pointer.

5            OK.   And could you please let the record reflect that

6    Mr. Moral again pointed to a car in the upper right-hand corner

7    with lights on.   The time is 20:50:17 on the recording.

8            OK.   Now, Ms. Craig, could you please play the

9    recording from 3:59 to 4:02.

10           (Video played)

11           MS. MAIMIN:   You can go a little bit more.   Stop.

12   Q.   Do you recognize anything in this photograph?

13   A.   Yes.

14   Q.   What is this?

15   A.   That's the car that the defendant was in.

16   Q.   What kind of car was it again?

17   A.   Toyota.

18   Q.   And could you please use your laser pointer to point out

19   where you are talking about.   Please.

20           Please let the record reflect Mr. Moral is again

21   pointing to a car in the top right corner with the lights on.

22           THE COURT:   Could you play that segment again, please.

23           MS. MAIMIN:   Certainly, your Honor.

24           THE COURT:   3:59.

25           MS. MAIMIN:   Play 3:59 to 4:02.

1              (Video played)

2              MS. MAIMIN:  May the record please reflect that this

3    time the defendant's car is 20:54:03.

4              Now, Ms. Craig, please keep playing until 4:08.

5              (Video played)

6    Q.  Do you recognize anything here?

7    A.  Yes.

8    Q.  What do you recognize?

9    A.  The victims' van.

10   Q.  Can you point to where you see the victims' van.

11             Again, top right corner, headlights on, time 20:54:08.

12             And, finally, Ms. Craig, please keep playing until 4

13   minutes 17 seconds.

14             (Video played)

15   Q.  Now, what do you recognize, if anything, here?

16   A.  That's the cop car.

17   Q.  And did the cop car stop at this point?

18   A.  Yes.

19   Q.  Why did you stop the car?

20   A.  We were waiting for Kong to get into the car, and also the

21   victims were trying -- they double parked on the side of the

22   road.

23   Q.  So you were following the victims and waiting for Kong?

24   A.  Yes.

25   Q.  And where was Kong at this point?

E6H7SER3                          Moral - direct

1    A.  He was getting dropped off by the defendant.

2    Q.  How was he getting dropped off by the defendant?

3    A.  He was up front, and he was getting dropped from the car to

4    walk toward our car.

5    Q.  Kong was getting dropped off?

6    A.  Yes.

7    Q.  What was the defendant's car doing?

8    A.  It made a U turn.

9          MS. MAIMIN:  Ms. Craig, please keep playing until

10   4:34.

11         (Video played)

12   Q.  Do you recognize anything here?

13   A.  Yes.

14   Q.  What do you recognize?

15   A.  The defendant's car.

16   Q.  Where is the defendant's car?

17   A.  Just right here.

18   Q.  This is after he had made a U turn?

19   A.  Yes.

20         MS. MAIMIN:  And let the record reflect this is

21   20:54:34, and Mr. Moral is pointing to the car now facing the

22   other direction in the top middle of the screen.

23         THE COURT:  Could you play that segment again?

24         MS. MAIMIN:  Certainly, your Honor.

25         (Video played)

1            MS. MAIMIN:  Ms. Craig, could you please now keep

2   playing until 4 minutes 59 seconds.

3            (Video played)

4   Q.  Do you recognize anything in this picture?

5   A.  Yes.

6   Q.  Who?  What do you recognize?

7   A.  Kong getting into the cop car.

8   Q.  Could you please point to Kong getting into the cop car.

9            MS. MAIMIN:  Could the record please reflect that

10  Mr. Moral is pointing to a person right next to a car in the

11  top right.  The time is 20:55:01.

12  Q.  Mr. Moral, we are now going to play the recording back from

13  minute 4:34 until 5:11, and if could you please explain what is

14  happening as the video is rolling using your laser pointer.

15           (Video played)

16  A.  Right there we are parked waiting for Kong to get in the

17  car.  The defendant had spun around already and dropped him

18  off.

19           MS. MAIMIN:  Actually, if you want to start out with

20  3:59 instead.  Just go back a little further.

21  A.  This is the defendant going by.  He was in front of the

22  van.  And then that's the van now coming up, and that's me in

23  the cop car with Alex.  And that's where we stopped.  The van

24  had pulled over to the side.  Defendant made a U turn, and

25  we're waiting for Kong now to get into the car.  The defendant

E6H7SER3                              Moral - direct

1    going back by.

2    Q.  Can you point?

3    A.  That's Kong about to get into the car.  We pulled up and

4    end up going behind the victims' van.

5            MS. MAIMIN:  You can stop now.  It's 20:55:11, for the

6    record.

7    Q.  Now, Mr. Moral, what happened when Kong came into the cop

8    car?

9    A.  He asked me to hand him the bag.

10   Q.  Did you have an understanding of what bag he was talking

11   about?

12   A.  Yes.

13   Q.  What bag?

14   A.  The bag with the gun in it.

15   Q.  Did you give him the bag?

16   A.  Yes.

17   Q.  Now, at that point were you able to feel again that it was

18   a gun?

19   A.  No.

20   Q.  Were you able to feel whether it was the same weight as the

21   bag from before?

22   A.  Yes.

23   Q.  So, at that point who was in the cop car with you?

24   A.  Me, Alex and Kong.

25   Q.  And who was with the defendant?

1    A.   The skinny kid.

2    Q.   Did you speak again with the defendant at this point?

3    A.   Yes.

4    Q.   What was discussed?

5    A.   I asked him why the skinny kid didn't come to the car.

6    Q.   What did he say?

7    A.   He told me Kong was going to take care of everything, and

8    just afterwards just jump in the van and follow him back to

9    Jersey, and that he would give me a thousand dollars.

10   Q.   Now, at some point after Kong entered the car did the

11   couple try to park?

12   A.   Yes.

13   Q.   What happened when the couple tried to park?

14   A.   We whooped them with the police siren.

15   Q.   What do you mean you whooped them?

16   A.   It has like a certain noise, you hit the noise so they

17   would know we were cops, and we told them through the intercom

18   they couldn't park there.

19   Q.   Why didn't you want them to park there?

20   A.   We were trying to get them off the busy street so that we

21   could catch them turning on one of these streets and pull them

22   over.

23   Q.   They were trying to park on a busier street?

24   A.   Yeah.

25   Q.   Did you discuss not letting the couple park there with the

E6H7SER3                          Moral – direct

1    defendant?

2    A.   No.

3    Q.   Who came up with the plan not to let the couple park there?

4    A.   I believe Alex.

5    Q.   Now, did the car actually not park?

6    A.   Yes.

7    Q.   What happened after the car wasn't permitted to park?

8    A.   They put their signal on to make a right, and I ended up

9    calling the defendant, telling him they were making a right.

10   Q.   Why did you need to call the defendant to tell him they

11   were making a right?

12   A.   They were going into now a street that we saw wasn't busy,

13   so we were going to try to pull them over now, so he could be

14   up front to block them so they wouldn't be able to drive off.

15   Q.   When you called the defendant to say the couple was making

16   a right, where was the defendant's car?

17   A.   In front of them.

18   Q.   So he couldn't see where they were turning.

19   A.   No.

20   Q.   So you called him to tell him they were turning right?

21   A.   Yes.

22   Q.   And did the defendant turn right first?

23   A.   Yes.

24   Q.   And then the victims followed?

25   A.   Yes.

E6H7SER3                          Moral - direct

1   Q.  And then you followed.

2   A.  Yes.

3   Q.  After the cars turned on to the street, what if anything

4   did Kong say?

5   A.  After they turned, he said pull them over, let's do it now.

6   Q.  Did you in fact do that?

7   A.  Yes.

8   Q.  By this time had you activated the device that covers your

9   license plate?

10  A.  Yes.

11  Q.  Is it a different button for the front and back?

12  A.  Yes.

13  Q.  So when was the front part activated so the license plate

14  was covered?

15  A.  When we first pulled up behind them on 163rd Street.

16  Q.  The first time you saw the couple?

17  A.  Yes.

18  Q.  And when did you activate the back license plated?

19  A.  When we went to pull them over on that block.

20  Q.  Why did you activate the black license plate at that point?

21  A.  So the people that were outside wouldn't see, or any

22  cameras wouldn't see the plate.

23  Q.  Now, before we get to what happened when you pulled them

24  over, can you just describe what that street looked like?

25  A.  It was a one-way street.  It wasn't really no traffic.  It

E6H7SER3                              Moral - direct

1    was a couple people standing outside.

2    Q.  I am showing you just for you on your screen what has been

3    marked for identification as Government Exhibit 602B.  Do you

4    recognize this?

5    A.  Yes.

6    Q.  What is this?

7    A.  That's the street we pulled them over on.

8    Q.  Does it fairly and accurately depict the way the street

9    looked when you pulled them over?

10   A.  Yes.

11              MS. MAIMIN:  The government offers 602B.

12              MR. DE CASTRO:  No objection.

13              THE COURT:  Received.

14              (Government's Exhibit 602B received in evidence)

15              MS. MAIMIN:  Please publish it, Ms. Craig.

16   Q.  Mr. Moral, using your laser pointer, could you please point

17   to the place on the street where you pulled the couple over.

18   A.  Around here.

19              MS. MAIMIN:  Can the record reflect Mr. Moral is

20   pointing right near the black car towards the middle right of

21   the photograph.

22              You can put that down, Ms. Craig.

23   Q.  How did you pull the couple over, Mr. Moral?

24   A.  We turned on the cop car lights and the siren.

25   Q.  Now, when you pulled them over, where was the defendant's

1   car?

2   A.  In front.

3   Q.  In front of what?

4   A.  The van.

5   Q.  The victims' van?

6   A.  Yes.

7   Q.  Why was the defendant's car in front of the victims' van?

8   A.  That way when we turned on the sirens, us knowing that they

9   had drugs in the car, we didn't want them to drive off, so he

10  blocked them off.

11  Q.  And how do you know that's why he was doing that?

12  A.  We spoke about it.

13  Q.  Did you get out of the car after you stopped the van with

14  the lights and sirens?

15  A.  Yes.

16  Q.  Who got out of the cop car?

17  A.  Me, Alex and Kong.

18  Q.  What was Kong wearing?

19  A.  He had on a police vest, like a tactical vest.

20  Q.  And anything else?

21  A.  And handcuffs, a gun and a badge.

22  Q.  Where was the gun?

23  A.  It was in the vest.

24  Q.  What do you mean by the gun was in the vest?

25  A.  Like he had a strap, I guess, a cop vest, strapped in.

1    Q.  What part of the gun were you able to see?

2    A.  The handle.

3    Q.  What did the handle look like?

4    A.  It was either black or dark gray.

5    Q.  It was a handgun, you said?

6    A.  Yes.

7    Q.  Could you tell whether it was loaded?

8    A.  No.

9    Q.  Could you tell what the model was?

10   A.  No.

11   Q.  What was Alex wearing?

12   A.  He had like police pants and I believe a hoodie.

13   Q.  What do you mean by police pants?

14   A.  More like the pants the cops where with all the pockets on

15   the side, dark blue, black.

16   Q.  What were you wearing?

17   A.  I had a pair of jeans and a sweater.

18   Q.  Why weren't you dressed look a cop?

19   A.  I wasn't planning on assisting in that part of the job.

20   Q.  What changed your mind?

21   A.  When I got offered the extra thousand dollars.

22   Q.  What if anything did you, Alex and Kong say to the couple?

23   A.  Alex asked them for their license and registration, and

24   then we told them to step out the car.

25   Q.  Did you speak to them in English?  Spanish?

E6H7SER3                         Moral - direct

1   A.  First when we asked them for license and registration it
2   was in English.  They said they didn't know Spanish, so we told
3   them in Spanish, and then we told them to get out the car in
4   Spanish.
5   Q.  They said they didn't know English?
6   A.  Yes.
7   Q.  What tone of voice were you using with them?
8   A.  Like authority.
9   Q.  Why?
10  A.  To make them feel we were cops and that we were in control.
11  Q.  Did you see what the man was doing when you pulled him
12  over?
13  A.  Yes.
14  Q.  What was he doing?
15  A.  He was on the phone.
16  Q.  And what if anything did you do when you saw that he was on
17  the phone?
18  A.  I took the phone from him.
19  Q.  Why did you take the phone?
20  A.  Make sure he wasn't calling the cops.
21  Q.  What happened next?
22  A.  Once I took the phone from him, we opened the door,
23  unclicked the seat belt, told them to get out the car.  Kong
24  and Alex walked the lady and the guy back towards the cop car.
25  I went and jumped in the van and drove off.

E6H7SER3                              Moral - direct

1    Q.   Where did you drive off to?

2    A.   I followed defendant going towards the George Washington

3    Bridge.

4    Q.   So you got behind the defendant's car?

5    A.   Yes.

6    Q.   Did you actually take the George Washington Bridge?

7    A.   Yes.

8    Q.   Was the defendant on the George Washington Bridge at the

9    same time as you?

10   A.   Yes.

11   Q.   How do you know?

12   A.   He then got behind me, so just in case the call went in

13   that I stole the van, it gives me enough time to like cover me

14   from the back, and he was behind me, and we were talking on the

15   phone towards where we were going.

16   Q.   Whose idea was it for the defendant's car to get behind you

17   in case someone had seen you?

18   A.   His.   He just ended up coming behind me.

19   Q.   Now, you drove over the George Washington Bridge, but

20   before we get to what happened on the other side I want to just

21   talk a little bit more generally about your route that day.   I

22   am showing you now on your screen what has been marked for

23   identification as Government Exhibit 601B.   Do you recognize

24   this?

25   A.   Yes.

E6H7SER3                         Moral - direct

1   Q.   And what is it?

2   A.   It's a map of Manhattan, Washington Heights.

3   Q.   OK.   And does this map fairly and accurately depict the way

4   Manhattan and Washington Heights looked on the day you

5   committed this robbery?

6   A.   Yes.

7            MS. MAIMIN:   Government offers 601B.

8            MR. DE CASTRO:   No objection.

9            THE COURT:   Received.

10           (Government's Exhibit 601B received in evidence)

11           MS. MAIMIN:   Can you please publish?   And if you can

12  possibly make it a bit bigger, Ms. Craig.

13  Q.   OK.   So, Mr. Moral, you can use the laser pointer.

14  Starting with when you drove over the George Washington Bridge

15  into Manhattan, and take us through your route that day up to

16  when you took the George Washington Bridge back to New Jersey.

17  A.   OK.   From George Washington Bridge, came down to I believe

18  it was St. Nick, took it down to about 161st, and then crossed

19  over to Amsterdam and made a left and came up behind the

20  victims on Amsterdam, like around 163rd.

21  Q.   And keep going, please.

22  A.   And afterwards once we followed them off Amsterdam, we

23  made -- it's not showing how far down it goes here, but I

24  believe around 165th made that first left, that's where I

25  followed them, and then we took St. Nick going back up, and

E6H7SER3                          Moral - direct

1    then we just -- where we were circling around this area, and we

2    ended up pulling them over right around here on this street.

3    Q.  And then what?

4    A.  From there I then jumped in the van, made this right, took

5    it straight up, made the left up here, went back up the bridge.

6            MS. MAIMIN:  You can take that down now.

7    Q.  Did you ever discuss with Kong whether he had to pull out

8    his gun that day?

9    A.  Yes.

10   Q.  When?

11   A.  Afterwards.

12   Q.  What if anything did he say?

13   A.  I asked him what happened.  He said he didn't have to -- he

14   didn't pull out the gun or nothing, they didn't do nothing,

15   that they really thought they got pulled over by cops and that

16   I took the car to the pound.

17   Q.  So, he didn't have to pull out the gun?

18   A.  No.

19   Q.  By the way, how many phones did you have on you that day?

20   A.  Four.

21   Q.  Why so many phones that day?

22   A.  I had been dealing with different people, different like

23   things I had going on with different criminals, and the phone

24   was for each different type of people I dealt with.

25   Q.  And where did you live at that time?

E6H7SER3                        Moral – direct

1   A.  In Belleville.

2   Q.  So back to that day.  Where did you go after you crossed

3   the George Washington Bridge into New Jersey?

4   A.  We went to Kearny, New Jersey.

5   Q.  And where in Kearny?

6   A.  By abandoned warehouses, offer of Belleville Turnpike.

7   Q.  Why did you go to an area with abandoned warehouses?

8   A.  That's where we were going to go to check the van.

9   Q.  What do you mean by check the van?

10  A.  We were going to check the van inside and look for the

11  drugs.

12  Q.  Whose idea was it to go to that area?

13  A.  Defendant.

14  Q.  Did he explain why?

15  A.  No.

16  Q.  What did you first see when you got to that abandoned area?

17  A.  It was a dark road, and I ended up parking besides a

18  warehouse, like a driveway.

19  Q.  And what did you see?  Did you see anybody else you

20  recognized?

21  A.  The defendant.

22  Q.  And what was he doing?

23  A.  He came and walked over to the van.

24  Q.  What was he doing?

25  A.  Started searching the van.

1  Q.  And, by the way, were you following the defendant to

2  Kearny?

3  A.  Yes.

4  Q.  Now, you said the defendant was searching the van.  What

5  specifically was he doing to search the van?

6  A.  He was taking out -- he opened up the glove box, pulling

7  stuff out of the glove box, and then was taking out stuff that

8  was in the van.

9  Q.  What stuff did you see him take out?

10  A.  A baby seat.

11  Q.  What did he do with the baby seat?

12  A.  Threw it on the floor.

13  Q.  Did you see him take out anything else?

14  A.  He kept pulling through everything, but then he had told me

15  to go with the skinny kid back to New York.

16  Q.  Did he say why he told you to go back to New York with the

17  skinny kid?

18  A.  We were going to see if we could try to rob the money van.

19  Q.  Whose idea was it to go look for the money van now?

20  A.  The defendant.

21  Q.  Now, before you left that scene, did you see whether the

22  defendant actually found any drugs that day?

23  A.  No.

24  Q.  And did you actually go back to New York to find the money

25  van?

E6H7SER3                                   Moral - direct

1   A.   No.

2   Q.   Where did you go?

3   A.   As I jumped in the car with the skinny kid, I started

4   driving back on the Bellevue Turnpike to take the turnpike to

5   go to New York.  I ended up calling Kong and Alex, and they

6   said they were already on their way back, so we turned around

7   and went back to the van.

8   Q.   Kong and Alex were already on their way back where?

9   A.   To Kearny.

10  Q.   Did you meet them?

11  A.   Yes.

12  Q.   Where did you meet them?

13  A.   At the van.

14  Q.   Near the abandoned warehouses?

15  A.   Yes.

16  Q.   So who was there at that point then?

17  A.   It was me, Alex, the skinny kid, Kong, the defendant.

18  Q.   OK.  And what happened when you were all there at that

19  time?

20  A.   We -- the defendant already finished going through the van.

21  He ended up jumping in the car with the skinny kid, and so me,

22  Alex and Kong stood behind talking about we then started

23  looking through the van and couldn't find nothing.  And Kong

24  said he knew somebody that knew how to find stashes in the car,

25  so he was going to go get the person.  Me and Alex stood there

E6H7SER3                              Moral - direct

1   waiting.  He went to go pick up the person.

2   Q.  What do you mean by stashes?

3   A.  Since we didn't find nothing, we figured they had to have a

4   secret compartment inside the van where they hid the drugs.

5   Q.  And did Kong come back with someone who knew about stashes?

6   A.  Yes.

7   Q.  And were you able to find any stashes?

8   A.  No.

9   Q.  What if anything did you find in the car?

10  A.  A purse that had like paperwork, birth certificates,

11  license, stuff like that.

12  Q.  Do you remember whose paperwork it was?

13  A.  It was the lady's.

14  Q.  How do you know it was the lady's?

15  A.  It had her ID, license, birth certificate, passport and

16  everything.

17  Q.  Did it say where she was born?

18  A.  Dominican Republic.

19  Q.  What did you do with the purse?

20  A.  Kong took it.

21  Q.  Why?

22  A.  He said he was going to sell it, sell the documents.

23  Q.  Sell the documents for what reason?

24  A.  I don't know.  He just said he was going to sell it.

25  Q.  Do you remember where you went after Kearny that day?

E6H7SER3                          Moral - direct

1   A.  I know I went with Alex to put the cop car away.

2   Q.  Do you remember where you went after that?

3   A.  No.

4   Q.  I am showing you just on your screen what has been marked

5   for identification as Government Exhibit 613.  Do you recognize

6   this?

7   A.  Yes.

8   Q.  What is this?

9   A.  It's the little road I went down to the abandoned

10  warehouse.

11  Q.  Does it fairly and accurately depict the way that abandoned

12  road looked on the day you were there?

13  A.  Yes.

14          MS. MAIMIN:  Government offers 613.

15          MR. DE CASTRO:  No objection.

16          THE COURT:  Received.

17          (Government's Exhibit 613 received in evidence)

18  Q.  Now, Mr. Moral, can you see on this picture where you were

19  actually searching the van?

20  A.  Like back there where that other van is parked, whatever

21  car that is back there.

22          MS. MAIMIN:  Can the record reflect Mr. Moral is

23  basically pointing in between those two electrical poles, to

24  the left, in the middle of the screen.  We are going to move on

25  now.

E6H7SER3                         Moral - direct

1   Q.  I want to focus on the time period between the robbery in

2   Washington Heights and your arrest in this case.

3            MR. DE CASTRO:  Objection.

4            THE COURT:  Overruled.

5   Q.  Did you continue committing burglaries and robberies?

6   A.  Yes.

7   Q.  Did you ever ask the defendant for guns?

8   A.  Yes.

9   Q.  Why?

10  A.  We didn't -- me and Alex, our team didn't have no weapons,

11  so we wanted some so we could try to do robberies on our own.

12  Q.  Well, you had used guns before, right?

13  A.  Yes.

14  Q.  Where did you get the guns from?

15  A.  We borrowed them from other people that were involved, that

16  were helping us.

17  Q.  And why did you want your own guns instead of borrowing

18  them?

19  A.  Because each time we used somebody's gun, we had to pay

20  them for it.

21  Q.  What if anything did the defendant say when you asked him

22  for a gun?

23  A.  He said he could get it.

24  Q.  Did he actually get you a gun?

25  A.  No.

E6H7SER3                        Moral - direct

1   Q.  Did you ever follow up with him about it?

2   A.  Yes.

3   Q.  What did he say?

4   A.  He said he was waiting.

5   Q.  When he said he was waiting, did you understand what he

6   meant by that?

7   A.  As whoever he was asking for the guns.

8   Q.  But he never actually sold you a gun.

9   A.  No.

10  Q.  Now focusing on November 2012, did you participate in a

11  robbery in the Bronx with Honesty, Alex and an individual named

12  Oscar?

13  A.  Yes.

14  Q.  I am showing you what has been marked for identification as

15  Government Exhibit 216.  Who is this photograph?

16  A.  Oscar.

17  Q.  Do you know Oscar's real name?

18  A.  Yes.

19  Q.  What is it?

20  A.  Oscar Noriega.  Noriega.

21  Q.  Does it fairly and accurately depicted how Oscar looked

22  when you committed crimes with him?

23  A.  Yes.

24          MS. MAIMIN:  The government offers 216.

25          MR. DE CASTRO:  No objection.

E6H7SER3                          Moral - direct

1              THE COURT:  Received.

2              (Government's Exhibits 216 received in evidence)

3    Q.  And there is Oscar?

4    A.  Yes.

5              MS. MAIMIN:  You can put that down.

6    Q.  Mr. Moral, who was the target of that robbery on November

7    2012?

8    A.  Drug dealer.

9    Q.  What kind of drugs?

10   A.  Cocaine.

11   Q.  And who is the connect for that robbery?

12   A.  Nene.

13   Q.  And where was the robbery supposed to take place?

14   A.  In Washington Heights.  It was a house, a building.

15   Q.  And who was supposed to be in that house?

16   A.  The old man that had the drugs.

17   Q.  What happened when you first tried to get into the

18   apartment?

19   A.  There was nobody home, and we tried to break the door down;

20   we couldn't get in.  And someone called the cops on us.

21   Q.  Did you try to go back again?

22   A.  Yes.

23   Q.  What happened when you tried to go back?

24   A.  We actually ended up going back without no weapons, since

25   we knew there was nobody there, but we couldn't get in the

1    door, so we ended up leaving, and we were going to go to the

2    guy's house and wait for him to come back.

3    Q.   What happened next?

4    A.   Nene called us and told us somebody robbed him.

5    Q.   Somebody had already robbed him before you got there?

6    A.   I guess when we ended up going to the house, somebody

7    called the cops from we banging on the door to the apartment.

8    The old man became aware of it, he went in the house and took

9    the drugs out.  When he took the drugs out, I guess someone

10   else was watching him; they ended up robbing him for the drugs

11   and the money.

12   Q.   When did you find that out?

13   A.   Afterwards.

14   Q.   After what?

15   A.   After we grabbed him on the street.

16   Q.   So you grabbed the old man on the street when you thought

17   he still had his drugs?

18   A.   Yes.

19   Q.   And then you spoke to Nene?

20   A.   Yes.

21   Q.   Now when you said you grabbed the old man, where did you

22   put him?

23   A.   We put him in the car.

24   Q.   And what happened when you got into the car?

25   A.   We put zip ties on him and we drove off.

E6H7SER3                              Moral - direct

1    Q.  And what if anything did you discuss with him?

2    A.  We were asking him where the drugs were at, where the money

3    was.

4    Q.  And what did he say?

5    A.  He said that they stole it from him already.

6    Q.  And did you discuss how you were going to address that?

7    A.  Yeah, he said he was going to help us set somebody up that

8    he worked with so we could get the money.

9    Q.  So you brought him into your car and then you agreed to

10   work together.

11   A.  Yes.

12   Q.  Do you know one way or the other whether the defendant was

13   involved in planning this robbery?

14   A.  No.

15   Q.  OK.  Now, I am still focusing on that time period after the

16   Washington Heights robbery before you were arrested.  Did you

17   discuss with Kong whether you were going to continue selling

18   heroin through the defendant?

19   A.  Yes.

20   Q.  What was the discussion?

21   A.  I just told him we were coming up on something, we were

22   going to try to sell it to him, and Kong said to let him know

23   first because that defendant who was giving him his prices was

24   too high.

25   Q.  So what did you understand Kong to mean when he said the

E6H7SER3                          Moral - direct

1   defendant's prices were too high?

2   A.   The heroin we had sold him, he was then giving it to Kong

3   for a larger price than what Kong wanted.

4   Q.   So the defendant was supplying Kong.

5   A.   Yes.

6   Q.   How did you react to that?

7   A.   I told him all right, if I came across something I'd let

8   him know.

9   Q.   But did you still keep trying to sell heroin through the

10  defendant?

11  A.   Yes.

12  Q.   And through Kong?

13  A.   Yes.

14  Q.   Now, after the Washington Heights robbery, did you have any

15  further thoughts about the defendant's role in this crew?

16  A.   Yes.

17  Q.   And what were your thoughts?

18          MR. DE CASTRO:  Objection.

19          THE COURT:  Hold on a second.  Overruled.

20          You can answer.

21  A.   That he was trying to be the boss.

22  Q.   And did that bother you?  Make your happy?  What was your

23  reaction?

24  A.   It was kind of bothering me because we were going into this

25  as a partnership, and at the end of the day the couple times I

E6H7SER3                          Moral - direct

1    got involved with him to do jobs, he didn't do nothing; he was

2    pretty much just telling other people what to do.

3    Q.  Why would it bother you if he did nothing?

4    A.  Because at the end of the day I could just find somebody

5    else that could do the job, and I could have told them what to

6    do and made the money.

7    Q.  And were you taking more of a risk?

8    A.  Yes.

9    Q.  And why did that bother you?

10   A.  Because being that I was the tipster getting information

11   from the connect, I felt I didn't have to do too much, so me

12   just giving up the information should have been enough for me

13   to earn my share.

14   Q.  And during the Washington Heights robbery you felt that you

15   did more than you should have done?

16   A.  Yes.

17              MR. DE CASTRO:  Objection.

18              THE COURT:  Sustained.

19   Q.  All right.  Now, before January 9, 2013, the day of your

20   arrest, what was the most recent robbery or burglary you did?

21   A.  In Jamaica -- I mean, yeah, Jamaica, Queens, I ended up

22   stealing two kilos of heroin.

23   Q.  And how soon was that before you were arrested?

24   A.  Two days before.

25   Q.  Was that a robbery or a burglary?

E6H7SER3                          Moral - direct

1    A.   A burglary.

2    Q.   So there was no one home.

3    A.   No.

4    Q.   And who did you commit that burglary with?

5    A.   A crew from New York.

6    Q.   How did you know that crew?

7    A.   We ended up getting together.  They needed somebody that

8    could sneak, that, was trying to sneak into the house, so they

9    got ahold of me, and I went with them to check out the place.

10   Q.   Did the defendant participate in that burglary?

11   A.   No.

12   Q.   Did you then try to sell the two kilos of heroin?

13   A.   Yes.

14   Q.   To whom?

15   A.   The defendant and Kong.

16   Q.   So starting with the defendant, how did you let the

17   defendant know you had more heroin to sell him?

18   A.   I texted him.

19   Q.   Did he respond back?

20   A.   Black actually responded.

21   Q.   Had you previously texted Black about the heroin?

22   A.   No.

23   Q.   I am showing you what has been marked for identification

24   just on your screen Government's Exhibits 404A through 404P.

25        You can just scroll through them, Ms. Craig.

```
 1              Do you recognize these?
 2   A.  Yes.
 3   Q.  And what are these?
 4   A.  Texts from my phone.
 5   Q.  These are photographs of texts from your phone?
 6   A.  Yes.
 7   Q.  What about contacts on your phone?
 8   A.  That's Black's contact.
 9   Q.  But are there also photographs of contacts in this phone?
10   A.  Yes.
11   Q.  And do these pictures fairly and accurately depict what the
12   texts and contacts look like on your actual phone?
13   A.  Yes.
14   Q.  Are these from one phone or two phones?
15   A.  Two phones.
16              MS. MAIMIN:  Government offers 404A through 404P.
17              THE COURT:  Any objection?
18              MR. DE CASTRO:  Just taking a quick look.  No
19   objection.
20              THE COURT:  Received.
21              (Government's Exhibits 404A through 404P received in
22   evidence)
23   Q.  Before we talk about these photographs --
24              You can take it down now, Ms. Craig.
25              I just have a couple of quick questions.  Generally
```

1  speaking, when you were talking to people you were committing

2  crimes with, did you use the real words for things?

3  A.  No.

4  Q.  What did you use?

5  A.  Sometimes you just used street slang.

6  Q.  Why did you use street slang?

7  A.  To avoid, you know, just in case police was listening on

8  the phones.

9  Q.  What kinds of things did you use street slang for?

10  A.  Guns, drugs, robberies.

11  Q.  Are you familiar with the term burner?

12  A.  Yes.

13  Q.  What's a burner?

14  A.  A gun.

15  Q.  And what about with the term paper?

16  A.  Yes.

17  Q.  What is paper?

18  A.  Money.

19  Q.  What about the term stack?

20  A.  Also money.

21  Q.  What about the term bundle?

22  A.  It's drugs.

23  Q.  What about the term eat?

24  A.  That's like if you want to work, you want to eat, make

25  money.

1    Q.  And when you say work, is that a legitimate job?

2    A.  No.

3    Q.  Was that another word for robbery?

4    A.  Yes.

5            MS. MAIMIN:  Could you please put up 404A, and we can

6    just maybe focus on -- OK.

7    Q.  So, there are two texts here.  Are they texts from you or

8    to somebody else -- from you or from somebody else to you?

9    A.  From me.

10   Q.  OK.  And who were you texting?

11   A.  The defendant.

12   Q.  And how do you know it was the defendant?

13   A.  That's his number up top.

14   Q.  The 201 number?

15   A.  Yes.

16   Q.  Could you please read the first text.

17   A.  "Yo, I got it at 55$ same thing you got last but better."

18           MR. DE CASTRO:  I don't think that's the actual.  I

19   think he added a word.

20           THE COURT:  He did add a word.

21   Q.  Why don't you read it again slowly.

22   A.  "Yo, got it at 55$ same thing you got last but better."

23   Q.  And what was the date of this text?

24   A.  January 7.

25   Q.  And was this before or after you robbed that two kilos of

E6H7SER3                          Moral - direct

1    heroin?

2    A.  After.

3    Q.  Is this the text message you were talking about when you

4    told the defendant about the heroin?

5    A.  Yes.

6    Q.  What did you mean by "got it at 55$"?

7    A.  The grams.

8    Q.  Was that a price?

9    A.  Yes.

10   Q.  Price per gram?

11   A.  Yes.

12   Q.  And what did you mean by "same thing you got last but

13   better"?

14   A.  The heroin we had sold him earlier from the Webster Avenue

15   robbery.

16   Q.  What about it?

17   A.  That was in reference to that, it's the same as last, same

18   heroin, just better.

19   Q.  Better in what way?

20   A.  The quality of it.

21   Q.  Now, you said the defendant did not text you back.

22   A.  Yes.

23   Q.  Did you text him again?

24   A.  Yes.

25   Q.  OK.  Could you read the second text there.

E6H7SER3                    Moral - direct

```
 1   A.  "Yo Susea hit me back."

 2   Q.  What did you mean by that?

 3   A.  For him to call me.

 4   Q.  What's Susea?

 5   A.  Just street slang.

 6   Q.  What does it mean?

 7   A.  Like dirty girl.

 8   Q.  OK.  And the date of that second text?

 9   A.  January 8.

10   Q.  OK.  Now you said Black actually responded to your first

11   text.

12   A.  Yes.

13   Q.  Could you please go to 404B.  So, first of all, who is this

14   a text conversation with?

15   A.  Between me and Black.

16   Q.  How do you know it's between you and Black?

17   A.  From the phone.

18   Q.  Does it say Black at the top?

19   A.  Yes.

20   Q.  Now, the first text at the top, is that from you to Black

21   or from Black to you?

22   A.  Black to me.

23   Q.  And could you read it.

24   A.  "What you talkin about, the dog food?"

25   Q.  And what did you understand Black to be saying here?
```

1   A.  The heroin.

2   Q.  Dog food means heroin?

3   A.  Yes.

4   Q.  And what heroin in particular did you think Black was

5   talking about?

6   A.  The one I had texted defendant about.

7   Q.  Did you understand why Black was responding instead of the

8   defendant?

9   A.  They were together.

10  Q.  And why do you believe they were together?

11  A.  Because I already had text him, and then Black responded.

12  Q.  And then how did you respond?

13  A.  I said "Yeah."

14  Q.  And then could you read Black's response, please?

15  A.  "Brah I need 2 punch in whenever there's room 4 me hit me

16  went 2 go see the lawyer last week."

17  Q.  And what did you understand Black to mean when he said

18  "Brah I need 2 punch in whenever there is room 4 me."

19  A.  He wanted to work.

20  Q.  Meaning?

21  A.  To do robberies.

22  Q.  And how did you respond?

23  A.  I told him "K ya just gotta be ready to really work

24  homework all that not get $5 in ya pocket and fall back."

25  Q.  And what did you mean when you said "ya gotta really work

1    homework"?

2    A.   Because at the end of the day when we usually go do certain

3    burglaries and robberies, and we had to do the stake-out, do

4    the homework, and he didn't want to do part of that; he just

5    wanted to be able to just do the robbery so he could get his

6    money.

7    Q.   Could you please go to 404C.  Is this a continuation of the

8    last conversation with Black?

9    A.   Yes.

10   Q.   So how did he respond?

11   A.   "Brah I ain't neva fall back ... Iv been waiting on ur

12   callz you already kno I go hard."

13   Q.   And I guess it keeps going on.  Read the next text.

14   A.   "I got real shit goin on just like you Brah... Tryna beat

15   dis case."

16   Q.   Now, what did you understand Black to mean when he said "u

17   already kno I go hard"?

18   A.   That he does a good job, like he ain't scared, he goes

19   forward with robberies.

20   Q.   OK.  And could you please go to the next page of this.  OK.

21   This is Government Exhibit 404D.  Why don't you read your

22   response.

23   A.   I told him "I hear u but u know you get lazy once u get

24   bread wanna boo love that leaves me to fuck with other niggas

25   to do shit then they stick around I can't just push them off

E6H7SER3                          Moral - direct

1    then u becoming a package deal with bones and u know he hasn't

2    been pull n no weight eat n for free then not step n up turn n

3    out to b a donation not a team."

4    Q.  Who is Bones?

5    A.  He is another kid that went with us to do a robbery and a

6    burglary.

7    Q.  And what were you trying to say here?

8    A.  A couple times we went out and we did stuff, Bones did

9    nothing, he just like sat in the car, and we ended up still

10   giving him his share, and it happens, it happened twice, it

11   happened a couple times, and he pretty much never did anything,

12   and he was getting paid the same amount of money everyone else

13   was who was actually doing work.

14   Q.  What did you mean by eatin for free?

15   A.  He was getting paid for doing nothing.

16   Q.  And did you sometimes call your crew your team?

17   A.  Yes.

18   Q.  All right.  So let's turn to 404E.  This is a continuation

19   of the conversation with Black?

20   A.  Yes.

21   Q.  Who is the top text from?

22   A.  That's from Black.

23   Q.  Could you read the first -- I guess it's the top two texts.

24   A.  "I understand what u sayin but iv always been on call I

25   just been goin thru some shit but there's no excuses n I'm not

1    tryna make 1 up, as far as Bones I hear wat you sayin he could

2    b put 2 work on other shit when u need him because I already

3    kno how u feel... but I need 2 b in the mix like I been I'm

4    part of the team."

5    Q.  And what did you understand Black to be saying?

6    A.  That he wanted to work, he wanted to get back to doing the

7    stuff we were doing.

8    Q.  Finally if you can turn to 404F.  Turning to the last text

9    on this page, what's the date of this text?

10   A.  January 9.

11   Q.  That's the day you were arrested?

12   A.  Yes.

13   Q.  Is that last text from you to Black or from Black to you?

14   A.  From Black to me.

15   Q.  And what -- could you read it, please.

16   A.  "If you still have somebody dat wanna get this food let me

17   kno cause these niggaz talkin bout it ain't dat good."

18   Q.  So what did you understand him to mean when he said if you

19   have somebody that wants to get this food?

20   A.  That if I had somebody else that wanted to buy it, buy the

21   heroin.

22   Q.  Why would you need somebody else to buy it?

23   A.  Because the defendant didn't want it; he was saying it was

24   no good.

25   Q.  And what did you understand him to mean by the defendant

1   didn't want it, it was no good?

2   A.   Like heroin, it has like a quality, sometimes the quality

3   ain't that strong, and if they feel they can't get rid of it,

4   they won't buy it.

5   Q.   And just to be clear, was it these N words that you thought

6   was referring to the defendant?

7   A.   Yes.

8   Q.   Now, there are different qualities of heroin?

9   A.   Yes.

10  Q.   What do you mean by that?

11  A.   Like some are stronger than others, like I guess the purity

12  of it.   Purity of it.

13  Q.   Why did you think that Black was telling you what the

14  defendant thought about the heroin?

15  A.   I had spoke to him.

16  Q.   To who?

17  A.   To Black.

18  Q.   And what did Black say?

19  A.   He said that he said it was no good.

20  Q.   Who said it was no good?

21  A.   The defendant.

22  Q.   So did you end up selling the heroin to the defendant?

23  A.   No.

24  Q.   OK.   Now you said you also tried to sell it through Kong?

25  A.   Yes.

E6H7SER3                          Moral - direct

```
 1    Q.  How did Kong respond?

 2    A.  He told me to bring him a sample.

 3    Q.  What's a sample?

 4    A.  Like a small portion of the drug so he could be able to

 5    give to somebody to test or to show it to them.

 6             MS. MAIMIN:  Ms. Craig, could you please put up 404G.

 7    Q.  Who are you texting with here?

 8    A.  Kong.

 9    Q.  And how do you know it's Kong?

10    A.  His number.

11    Q.  And is the top text from Kong to you or from you to Kong?

12    A.  From Kong to me.

13    Q.  And what date is that?

14    A.  January 8.

15    Q.  Could you please read the text.

16    A.  "When you get a chance grab 20 griz for me so I could see

17    if my man wanna buy the whole thing."

18    Q.  What did you understand Kong to be saying here.

19    A.  To grab 20 grams from him as a sample so he could have

20    someone check it.

21    Q.  Griz is grams?

22    A.  Yes.

23             MS. MAIMIN:  You can take that down, Ms. Craig.

24    Q.  Did you end up selling the heroin through Kong?

25    A.  No.
```

E6H7SER3                         Moral - direct

```
1    Q.  Why not?

2    A.  We ended up being arrested.

3    Q.  Did you bring the heroin sample with you on the night you

4    were arrested?

5    A.  Yes.

6    Q.  Could you please put up 404H.  This is another picture from

7    your phone?

8    A.  Yes.

9    Q.  So if you can just go starting from the top explain what

10   each call is.

11   A.  That was me calling out to the defendant.

12   Q.  Why don't you use your pointer.

13   A.  Right here I was calling the defendant.

14   Q.  Why?

15   A.  To ask him about the heroin.

16   Q.  Which heroin?

17   A.  The one I had text him about.

18   Q.  And then what?

19   A.  And then that's Black, calling Black.

20   Q.  You were calling Black?

21   A.  Yes.

22   Q.  And what's the third text?

23   A.  That's back calling the defendant again.

24   Q.  That's you calling the defendant?

25   A.  Yes.
```

E6H7SER3                        Moral - direct

1   Q.  And then what's the last one?

2   A.  I don't remember whose number that is, but someone calling

3   me.

4   Q.  And if you can also turn to 404I.  These are also calls

5   from January 7?

6   A.  Yes.

7   Q.  If you want to stop at the top and explain what each one

8   is?

9   A.  That's me calling Black, me calling the defendant, I had a

10  call that came in, and that's Kong also calling me.

11  Q.  And what was the purpose of these calls?

12  A.  Doing drug deals.

13  Q.  Which drug deals?

14  A.  For the heroin.

15  Q.  And finally 404P, what are we looking at here, Mr. Moral?

16  A.  That's a picture of the heroin.

17  Q.  Why did you take a picture of the heroin?

18  A.  I first had text him to show it what it looks like.

19  Q.  Who did you text a picture of the heroin to?

20  A.  I believe it was Kong.

21          MS. MAIMIN:  All right, you can take this down.

22  Q.  Now, in the month or so before your arrest, were you also

23  in touch with Kong through phone calls, or just texts?

24  A.  Both.

25  Q.  And what about in-person meetings?

E6H7SER3                    Moral - direct

1    A.  Yes.

2    Q.  What was the main topic of conversation?

3    A.  A robbery he had coming up.

4    Q.  And what did he say about the robbery he had coming up?

5    A.  It was a big robbery, it was going to be for heroin, it was

6    going to be a lot.

7    Q.  Did he say how much?

8    A.  Over ten kilos.

9    Q.  Did he direct you to do anything with respect to this

10   robbery?

11   A.  Yes.

12   Q.  What?

13   A.  He told me to see if I could find some people and to have

14   the equipment, the cop car, ready.

15   Q.  Find some people for what purpose?

16   A.  To help in the robbery.

17   Q.  And did you in fact do that?

18   A.  Yes.

19   Q.  Who did you recruit?

20   A.  Guys from New York, the New York group.

21   Q.  The ones you did the robbery in Jamaica, Queens with?

22   A.  Yes.

23   Q.  Did you discuss with Kong whether he would be bringing

24   anyone else to the robbery?

25   A.  Yes.

1    Q.  What did he say?

2    A.  He said the defendant was going to be coming, and the cop.

3    Q.  And when he said the defendant was going to be coming, what

4    did you understand him to mean?

5    A.  As in he was going to come work.

6    Q.  Work?

7    A.  Yeah, to the job, for the robbery.

8    Q.  And when he said that the cop was going to be coming, what

9    did you understand him to mean?

10   A.  He was explaining to me that the cop had a job in New York,

11   so that it would work good for us; if something went wrong, he

12   would be able to put his neck out there because he had an

13   operation that he was doing in New York so it went good.

14   Q.  So the cop was going to help protect you if something went

15   wrong?

16   A.  Yes.

17   Q.  Did the defendant actually participate in that attempted

18   robbery?

19   A.  No.

20   Q.  I should say, did he actually go to the attempted robbery?

21   A.  No.

22   Q.  Do you know whether or not he played any role behind the

23   scenes?

24   A.  Once Kong told me the cop was going to go, and that

25   defendant was coming with the cop, I spoke to the guys in New

1    York, and once I told them a cop was coming they said they

2    weren't going to do it if he came, do the robbery.

3    Q.   About how many people did participate in that attempted

4    robbery?

5    A.   16.

6    Q.   Was Alex there?

7    A.   Yes.

8    Q.   Kong?

9    A.   Yes.

10   Q.   Honesty?

11   A.   Yes.

12   Q.   What did the crew bring that day?

13   A.   The cop car, police uniforms, police clothes, guns,

14   handcuffs, zip ties, flashlights, police scanner.

15   Q.   And who was transporting most of the guns?

16   A.   I was.

17   Q.   How did the crew get to the attempted robbery location?

18   A.   They went -- everybody went in different cars.

19   Q.   Including the police car?

20   A.   Yes.

21   Q.   Where was the victim supposed to be?

22   A.   In the house.

23   Q.   And what did you understand the plan to be once you reached

24   the victims' house?

25   A.   They were going to go into the house like it was a police

E6H7SER3                         Moral - direct

1    raid.

2    Q.   OK.  Were you going to do your homework first?

3    A.   Yes.

4    Q.   How did you know you were going to do your homework first?

5    A.   Kong told me they were going to go by to check the place

6    out.

7    Q.   Did you make it to your destination that night?

8    A.   Yes.

9    Q.   Were you actually able to do the robbery?

10   A.   No.

11   Q.   What happened?

12   A.   We got arrested.

13   Q.   Did you also have cash with you in addition to heroin when

14   you were arrested?

15   A.   Yes.

16   Q.   How much?

17   A.   About $7,000.

18   Q.   Why did you have $7,000?

19   A.   From the heroin we stole, that I was trying to sell to the

20   defendant earlier, I had sold some of it.

21   Q.   You had already sold some of the heroin from the Queens

22   burglary?

23   A.   Yes.

24   Q.   Now, after you were arrested, where did you go?

25   A.   Went to DEA headquarters.

E6H7SER3                          Moral - direct

1  Q.  Did you make a statement to law enforcement at that time?

2  A.  Yes.

3  Q.  What did you tell them?

4  A.  I told them I didn't know what was going on, that I was

5  just paid to drive the van.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E6HAASER4                          Moral - Direct

1   BY MS. MAIMIN:

2   Q.  Was that true?

3   A.  No.

4   Q.  Why did you lie to them?

5   A.  Trying to get out of trouble.

6   Q.  Now, when you made those statements had you already begun

7   meeting with the prosecutors to become a cooperator?

8   A.  No.

9   Q.  I'd like to draw your attention now to July 4, 2012.  Did

10  you participate in any burglaries on that day?

11  A.  Yes.

12  Q.  Where was that?

13  A.  Communipaw in Jersey City.

14  Q.  Who else participated in this burglary in terms of going to

15  the actual burglary?

16  A.  Me, Alex, the locksmith, some girl and Ali.

17  Q.  Showing you just on your screen what's been marked for

18  identification as Government Exhibit 210.  Do you recognize

19  that picture?

20  A.  Yeah, it's Ali.

21  Q.  Does that fairly and accurately depict the way that Ali

22  looked when you were committing crimes with him?

23  A.  Yes.

24          MS. MAIMIN:  Government offers 210.

25          MR. DE CASTRO:  No objection.

1              THE COURT:  Received.

2              (Government's Exhibit 210 received in evidence)

3    Q.  Who is that?

4    A.  Ali.

5              MS. MAIMIN:  You can put it down now.

6    Q.  Who is the target of this burglary?

7    A.  Drug dealer.

8    Q.  What kind of drug dealer?

9    A.  Cocaine and marijuana.

10   Q.  And how did you learn about the target of this burglary?

11   A.  From the locksmith.

12   Q.  What did the locksmith tell you?

13   A.  He said he had a connect that was giving him information on

14   a drug dealer that was dropping off drugs and picking them up

15   from certain stores and found out what apartment he lived in.

16   Q.  So they were picking it up from different stores and

17   bringing it to the apartment that Communipaw?

18   A.  Yes.

19   Q.  How were you going to get into the building?

20   A.  He said the connect had a relative that lived in the

21   building.  He gave me a key to the downstairs door and we would

22   have to break into the upstairs door.

23   Q.  The locksmith said the connect had a relative in the

24   building?

25   A.  Yes.

1    Q.  Did he say who the relative was?

2    A.  No.

3    Q.  Did he say whether it was a man or a woman?

4    A.  At that time, no.

5    Q.  And did he say what connection the relative had to the

6    building?

7    A.  No, he didn't.

8    Q.  OK.  Now, why did you need a locksmith if you had a key to

9    the front door?

10   A.  Just had a key for the main door downstairs and then the

11   locksmith, it was his job, he would open the door upstairs.

12   Q.  By the way, did you ever meet that relative?

13   A.  No.

14   Q.  Did you actually commit a burglary?

15   A.  Yes.

16   Q.  Were you concerned that somebody might be home?

17   A.  Yes.

18   Q.  What did you do to --

19   A.  The locksmith had a girlfriend.  He was going to send her

20   upstairs to knock on the door and see if anyone was there.

21   Q.  Is that, in fact, what happened?

22   A.  Yes.

23   Q.  What did the woman look like?

24   A.  She had like blue hair like a punk rocker.

25   Q.  Now, after you confirmed there was no one home, what

E6HAASER4                          Moral - Direct

1   happened?

2   A.  She came downstairs, told us no one was home.  Me, Alex and

3   locksmith decided we were going to try to go in.

4   Q.  Did you, in fact, go in?

5   A.  Yes.

6   Q.  And what happened once you went in?

7   A.  We ran through the apartment looking for the drugs and the

8   money.

9   Q.  Showing you what's been marked for identification as 604-H

10  and Q.

11          (Pause)

12          Do you recognize what's in those photographs?

13  A.  Yes.

14  Q.  What' in these photographs?

15  A.  That's the apartment we broke into.

16  Q.  And do these pictures fairly and accurately depict the way

17  the apartment looked after you broke into it?

18  A.  Yes.

19          MS. MAIMIN:  The government offers 604-H and 604-Q.

20          THE COURT:  Any objection?

21          MR. DE CASTRO:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibits 604-H and 604-Q received in

24  evidence)

25          MS. MAIMIN:  OK.  Could you, please, put up 604-H.

```
 1              (Pause)
 2    Q.   What are we looking at here?
 3    A.   That's the door that we went into the apartment that we
 4    broke and fire extinguisher.
 5    Q.   Why is there a fire extinguisher there?
 6    A.   We took the fire extinguisher cause they said the person
 7    had dog.  So just in case the dog ran out we could spray the
 8    fire extinguisher.
 9    Q.   Why were you going to spray the fire extinguisher if there
10    is a dog?
11    A.   I was under the impression that if you spray the fire
12    extinguisher the dog from the smoke he wouldn't want to come
13    near it.  So he would stay away from it.
14    Q.   Was there, in fact, a dog?
15    A.   Yeah.
16    Q.   Where was the dog?
17    A.   He was inside a cage.
18    Q.   So did you have to use a fire extinguisher?
19    A.   No.
20              MS. MAIMIN:  Could you, please, put up 604-Q.
21              (Pause)
22    Q.   What are we looking at here?
23    A.   The apartment after we were running around there everything
24    looking for the drugs and the money.
25    Q.   So did the apartment look this messy before you got there?
```

1    A.  No.

2    Q.  Is that what you guys did to the apartment?

3    A.  Yes.

4    Q.  And which room of the apartment is this?

5    A.  The bedroom.

6    Q.  Did you end up finding any drugs that day?

7    A.  Yes.

8    Q.  Where did you find them?

9    A.  It was about over here somewhere there's some boxes back

10   there.  It was over here.

11           MS. MAIMIN:  Could you, please, let the record reflect

12   that Mr. Moral is pointing underneath that hanger area.

13   Q.  So, what kind of drugs -- what did the drugs look like when

14   you found them?

15   A.  It was a black like a brick.

16   Q.  How was it packaged?

17   A.  In like black shrink wrap.

18   Q.  Were you able to see inside the shrink wrap?

19   A.  No.

20   Q.  And why do you think they were drugs?

21   A.  From past experiences pretty much how cocaine gets wrapped

22   up and I know it wasn't weed because it was too small of a

23   package.

24   Q.  What did you do with the drugs after you stole them?

25   A.  Ended up passing them off to someone.

E6HAASER4                        Moral - Direct

1   Q.  Now, by the way, how did you actually get into this

2   apartment?

3   A.  The locksmith ended up breaking the door.

4   Q.  Do you know who took these photographs?

5   A.  No.

6   Q.  Was anything else taken from the apartment that you saw?

7   A.  Money and TV and a couple other things.

8   Q.  Who took the TV?

9   A.  Locksmith.

10  Q.  Now, when you were leaving the scene of the burglary was

11  your crew alone in the street or was there anybody else there?

12  A.  There was other people outside.

13  Q.  Who did you see?

14  A.  A guy started to approach the locksmith.  I guess he seen

15  him coming out the building with the TV.

16  Q.  What did the guy look like?

17  A.  Spanish with a mustache, black hair.

18  Q.  What did you understand him to be doing?

19  A.  He was trying to figure out what the locksmith was doing.

20  I get guess he caught on that he didn't belong in the building.

21  Q.  Now, after the burglary did you learn who the owner was of

22  the drugs in the apartment?

23  A.  Yes.

24  Q.  Who?

25  A.  Some guy by the name of Will and Whites.

E6HAASER4                          Moral - Direct

1    Q.  Showing you what's been marked for identification as

2    Government Exhibit 8.  Do you recognizes this?

3    A.  Yes.

4    Q.  What is this?

5    A.  Whites.

6    Q.  Does that fairly and accurately depict Whites when you knew

7    him?

8    A.  Yes.

9         MS. MAIMIN:  The government offers Exhibit 8.

10        MR. DE CASTRO:  No objection.

11        THE COURT:  Received.

12        (Government's Exhibit 8 received in evidence)

13        MS. MAIMIN:  I am putting 8 on the board with

14   Government Exhibit 8-B which is just the word "Whites".

15   Q.  Now, who is Whites?

16   A.  Drug dealer that I know from Jersey City.

17   Q.  How did you learn it was Whites' drugs?

18   A.  He called me.

19   Q.  Without going into the substance of your conversation with

20   Whites what, if anything, did you do after you spoke to Whites?

21   A.  I called the defendant.

22   Q.  What did you say?

23   A.  I told him Whites was looking for him.

24   Q.  And what did the defendant say, if anything?

25   A.  He said he don't give a fuck.  He said he didn't have to

E6HAASER4                          Moral - Direct

1    look for him, that he was going to go look for him.

2    Q.  That who did have to look for him?

3    A.  That Whites didn't have to look for him, that the defendant

4    was going to go look for Whites.

5    Q.  Now, Mr. Moral, did you participate in other robberies and

6    burglaries other than the one we discussed today, specifically?

7    A.  Yes.

8    Q.  And you pled guilty to a cargo theft related crimes in New

9    Jersey?

10   A.  Yes.

11   Q.  When was that, approximately?

12   A.  201.

13   Q.  Did you reach an agreement with the prosecutors in New

14   Jersey about what your sentence would be?

15   A.  Yes.

16   Q.  What?

17   A.  Seven years.

18   Q.  And is that going to run at the same time as your sentence

19   in this case or on top of it?

20   A.  At the same time.

21   Q.  Is there parole in New Jersey?

22   A.  Yes.

23   Q.  Do you know whether you are going to be released on parole

24   in connection with your sentence in New Jersey?

25   A.  No.

1   Q.  Have any promises been made to you about your sentence in

2   New Jersey?

3   A.  No.

4   Q.  Are you hoping the government in this case will tell the

5   prosecutors in New Jersey about your cooperation here?

6   A.  Yes.

7   Q.  Well, why are you hoping that?

8   A.  So he could give me less time.

9   Q.  And has the government promised to write you a letter like

10  that or tell the people in New Jersey?

11  A.  No.

12  Q.  Now, you testified you were arrested on January 9?

13  A.  Yes.

14  Q.  What were you charged with?

15  A.  Drugs, weapons and robbery.

16  Q.  Then you decided to cooperate?

17  A.  Yes.

18  Q.  Did you enter into a cooperation agreement with the

19  government?

20  A.  Yes.

21  Q.  What did you have to do in order to get your cooperation

22  agreement?

23  A.  Take responsibility to the crimes I committed, tell the

24  truth and --

25  Q.  Are you also required to meet with the government and tell

1    them about all the crimes you've committed?

2    A.   Yes.

3    Q.   What about crimes you know about that were committed by

4    other people?

5    A.   Yes.

6    Q.   How did you go about giving that information to the

7    government?

8    A.   Going to proffers.

9    Q.   What are proffers?

10   A.   A meeting with the government and you.

11   Q.   As you sit here today have you told the government

12   everything about your criminal past?

13   A.   Yes.

14   Q.   Did you eventually plead guilty to certain crimes?

15   A.   Yes.

16   Q.   Which crimes?

17   A.   Of robbery, possession of guns and drugs.

18   Q.   Did you also agree to forfeit or give back to the

19   government any money you made through your wrongdoings?

20   A.   Yes.

21   Q.   About how many proffers would you say you had with the

22   government?

23   A.   Around 40.

24   Q.   As you sit here today have you been sentenced yet?

25   A.   No.

1   Q.  What's the maximum sentence you face?

2   A.  Life.

3   Q.  What is the mandatory minimum sentence you face?

4   A.  17 years.

5   Q.  Is that a higher or lower mandatory minimum sentence than

6   you faced before you started cooperating?

7   A.  Higher.

8   Q.  Like how much?

9   A.  Two years.

10  Q.  You said you had a cooperation agreement with the

11  government.  Was that oral or written down?

12  A.  Written down.

13  Q.  OK.  I am actually showing you what's been marked for

14  identification as 3502-WW.

15          MS. MAIMIN:  May I approach, your Honor?

16          THE COURT:  You may.

17  Q.  3502-WW.  Do you recognize this?

18  A.  Yes.

19  Q.  What is this?

20  A.  This is a cooperation agreement.

21  Q.  Is this your cooperation agreement?

22  A.  Yes.

23          MS. MAIMIN:  Government offers 3502-WW.

24          MR. DE CASTRO:  No objection.

25          THE COURT:  Received.

```
 1                (Government's Exhibit 3502-WW received in evidence)
 2     Q.  What's your understanding of what you have to do under your
 3     cooperation agreement with the government?
 4     A.  Tell the truth, cooperate with the government and any other
 5     agencies, testify honestly if needed to, commit no more crimes
 6     and take responsibility of what I've done.
 7     Q.  What do you mean by "take responsibility"?
 8     A.  Come forward everything and admit to it.
 9     Q.  Plead guilty?
10     A.  Yes.
11     Q.  Now, before today has the government previously asked you
12     to testify?
13     A.  Yes.
14     Q.  When, approximately?
15     A.  November 2012.
16     Q.  Did you testify?
17     A.  Yes.
18     Q.  What event was that trial primarily about?
19     A.  Robbery.
20                MR. DE CASTRO:  Objection.
21                THE COURT:  Sustained.
22     Q.  By the way, Mr. Moral, what's your understanding of what
23     the government is obligated to do for you if you live you up to
24     the end of your bargain under the cooperation agreement?
25     A.  Give me a 5K1 letter.
```

E6HAASER4                          Moral - Direct

1   Q.  What's a 5K1 letter?

2   A.  It's a letter that allows the judge to sentence me under

3   the minimum guidelines.

4   Q.  Under the mandatory minimum?

5   A.  Yes.

6   Q.  Who writes the 5K letter?

7   A.  The government.

8   Q.  And it goes to the judge?

9   A.  Yes.

10  Q.  What does the 5K letter say?

11  A.  It would state the crimes I've committed, the help I've

12  given to the government.

13  Q.  Now, if you receive a 5K letter what would your maximum

14  sentence still be?

15  A.  Life.

16  Q.  As you sit here today have you been promised a 5K letter?

17  A.  No.

18  Q.  Have you been promised a reduced sentence?

19  A.  No.

20  Q.  Have any promises been made to you at all about the

21  sentence you are going to receive?

22  A.  No.

23  Q.  Does the government recommend a particular sentence to the

24  judge?

25  A.  No.

E6HAASER4                          Moral - Direct

1   Q.  What happens if you don't tell the truth here on the

2   witness stand?

3   A.  My agreement gets torn up.

4   Q.  What do you mean by your agreement gets torn up?

5   A.  I won't be able to get sentenced to under the 17 year

6   minimum.

7   Q.  So, the judge won't be permitted to go under the 17 years?

8   A.  No.

9   Q.  Can you also be prosecuted for obstruction of justice and

10  perjury?

11  A.  Yes.

12  Q.  Does the result of this case here today against the

13  defendant affect whether you get a 5K letter as long as you

14  tell the truth?

15  A.  No.

16  Q.  Why are you testifying?

17  A.  I am upholding my agreement.  I agreed that if I was needed

18  to testify I would come forward.

19  Q.  Are you also hoping for a lower sentence?

20  A.  Yes.

21          MS. MAIMIN:  OK.  My final few questions, your Honor.

22  Q.  I want to turn back now to some pictures from your phones.

23          MS. MAIMIN:  If you could, please, put up 404-J.

24          (Pause)

25  Q.  What are we looking at here?

1   A.  The defendant's number.

2   Q.  How do you know it's the defendant's number?

3   A.  It has his name.

4   Q.  His name being?

5   A.  Chillini.

6   Q.  And what does "JC" mean?

7   A.  From Jersey City.

8   Q.  And if you can put up -- why Jersey City, by the way?

9   A.  That's where he lived.

10          MS. MAIMIN:  Could you please put up 404-K.

11          (Pause)

12  Q.  Whose contact is this?

13  A.  Alex.

14          MS. MAIMIN:  And would you, please, put up 404-L.

15          (Pause)

16  Q.  Whose contact is this?

17  A.  Black.

18          MS. MAIMIN:  Could you please put up 404-M.

19          (Pause)

20  Q.  Whose contact is this?

21  A.  Kong.

22  Q.  Does it say "Kong"?

23  A.  No.

24  Q.  Now, I think you said that -- well, what does it say?

25  A.  Bottom.

E6HAASER4                        Moral - Direct

1    Q.  What does "Bottom" mean?

2    A.  I's just a name I gave him because when I first started

3    dealing with him I ain't really worry about his name, so I just

4    gave him any name.  And as time went on I changed it on another

5    phone.  I gave him a name.

6    Q.  Do you actually recognize that number on the bottom?

7    A.  No.

8    Q.  You said "Bottom".  Is there a "Top"?

9    A.  Yes.

10   Q.  Who is Top?

11   A.  His brother.

12   Q.  Sitting here today do you actually remember which one was

13   Bottom and which one was Top or are you not sure?

14   A.  Top was the tall brother and Bottom was Kong cause he was

15   the little brother.

16           MS. MAIMIN:  Can you please turn to 404-O.

17           (Pause)

18   Q.  What do we have here?

19   A.  Kong's number.

20   Q.  How do you know it's Kong's number?

21   A.  Has his name up top.

22           MS. MAIMIN:  No further questions.

23           THE COURT:  All right.  Thank you.

24           Now, ladies and gentlemen, normally we would break at

25   12:45 for lunch.  Does that work for people or do people need

E6HAASER4                         Moral - Direct

1    or prefer to take a break now?  I'll ask it as yes or no.  Are

2    you OK right now?  All right.  We'll go on until 12:45 and

3    we'll break for lunch at 12:45.

4    CROSS-EXAMINATION

5    BY MR. DE CASTRO:

6    Q.  Good afternoon, Mr. Moral.

7    A.  Good afternoon, Mr. Moral.  My name is Cesar de Castro.  I

8    represent Anthony Serrano.

9            You go by Victor Moral now but that's really not what

10   you normally go by, right?

11   A.  No.

12   Q.  Your original name was Ruperto Vicente say, right?

13   A.  Yes.

14   Q.  But everybody calls you "Ruper", right?

15   A.  Yes.

16   Q.  You changed your name from "Ruperto Vicente" to "Victor

17   Moral" right after you got out of jail, right?

18   A.  Yes.

19   Q.  And you testified that you did that because you wanted a

20   fresh start, right?

21   A.  Yes.

22   Q.  But yet you didn't tell anybody else that you hang out with

23   that you'd rather be called Victor Moral any more, right?

24   A.  No.

25   Q.  You just continued to be called "Ruper", right?

E6HAASER4                        Moral - Cross

1   A.  Yes.

2   Q.  Everybody knows you as "Ruper", right?

3   A.  Yes.

4   Q.  Now, law enforcement actually knew you as Ruperto Vicente,

5   right?

6   A.  Yes.

7   Q.  So to change you are name, now if you get arrested you

8   could be Victor Moral, right?

9   A.  It pops up in the computer the same name.  Now I got the

10  same social.  I never changed my social, so.

11  Q.  Where did you get arrested for the murder?

12  A.  Connecticut.

13  Q.  You did time in Connecticut, right?

14  A.  Yes.

15  Q.  Then where did you move to?

16  A.  New Jersey.

17  Q.  And New Jersey where you are in contact with a lot of New

18  Jersey police in your lifetime, right?

19  A.  Yes.

20  Q.  Not necessarily Connecticut even though you pulled a bunch

21  of jobs in Connecticut as well, right?

22  A.  Yes.

23  Q.  Now, I just want to address a little bit of what, since

24  it's fresh in everybody's mind --

25          MR. DE CASTRO:  Exhibit 404, if I could ask the

E6HAASER4                    Moral - Cross

1   government, would you mind publishing 404-A.

2              (Pause)

3   Q.  Now, just ask you some questions about 404-A, right?  Do

4   you remember those questions that Ms. Maimin asked you about?

5   A.  Yes.

6   Q.  You said that was the defendant's number, right?

7   A.  Yes.

8   Q.  On the top that text you see his number's listed out,

9   right?

10  A.  Yes.

11             MR. DE CASTRO:  Then you go to 404-B if you could,

12  thanks.

13  Q.  Bunch of texts between you and Black, right?

14  A.  Yes.

15  Q.  His name because it's in your address book is listed on

16  top, right?

17  A.  Yes.

18             MR. DE CASTRO:  But then 404-H, please.

19             (Pause)

20  Q.  Can you take a look at 404-H.  That's your sort of received

21  calls, placed calls, right?

22  A.  Yes.

23  Q.  And there you see the, what you said was the defendant's

24  number on the top, right?

25  A.  Yes.

E6HAASER4                        Moral - Cross

1   Q.  But then below that you see Black, right?

2   A.  Yes.

3   Q.  And also includes his number?

4   A.  Yes.

5   Q.  Because that's in your contacts?

6   A.  Yes.

7   Q.  404-J.

8           (Pause)

9   Q.  And that's -- you just saw this, right?

10  A.  Yes.

11  Q.  That's what contact, right?

12  A.  Yes.

13  Q.  And that was apparently in that same phone, right?

14  A.  Different phone.

15  Q.  But you were just testifying about your one phone, right?

16  A.  Yes.

17  Q.  This is some totally different phone?

18  A.  Yeah, it's a different phone, iPhone.

19  Q.  This is an iPhone?

20  A.  Yeah.

21  Q.  Other phones, different phone?

22  A.  Yes.

23  Q.  How many different phones did you have?

24  A.  Four.

25  Q.  But you said you used one phone to call one set of crews,

E6HAASER4                         Moral - Cross

1    right?

2    A.  Yes.

3    Q.  You used another phone to call a different set of crews,

4    right?

5    A.  Yes.

6    Q.  Very regimented?

7    A.  Yes.

8    Q.  Because you operated with some different robbery crews,

9    right?

10   A.  Yes.

11   Q.  Because that's really what you do, you are a broker, right?

12   A.  Yes.

13   Q.  You put everything together and you are a leader of people

14   and organize robberies, right?

15   A.  Yes.

16   Q.  Now, you have pretty much spent your entire adult life

17   dealing with law enforcement, right?

18   A.  Yes.

19   Q.  And you have been evading law enforcement in one way or

20   another probably for your whole adult life, right?

21   A.  Yes.

22   Q.  And you have been pretty good at doing that, haven't you?

23   A.  Yes.

24   Q.  But along the way you have had slip-ups and you've gotten

25   caught a bunch times as well, right?

1    A.  Yes.

2    Q.  And you have a way of dealing with that, right?  You have a

3    sort of plan, right?

4    A.  Yeah.

5    Q.  That plan is to first deny, right?

6    A.  Yes.

7    Q.  Deny you did anything.  Then if you really can't get out of

8    it that way then what you do is you try to say yourself, right?

9    A.  Yes.

10   Q.  And then you tell the government you'll work with them,

11   right?

12   A.  Yes.

13   Q.  You've done that multiple times with multiple different law

14   enforcement agencies, right?

15   A.  Why.

16   Q.  Then you said oh, I'll help you.  I'll help you make cases,

17   right?

18   A.  Yes.

19   Q.  I can help you make cases.  Just tell me what you need me

20   to do, right?

21   A.  Yes.

22   Q.  And that's what you have tried to do here, right?  You've

23   tried to help them make cases, right?

24   A.  No.

25   Q.  Well, you are sitting there trying to help them make a

1    case, aren't you?

2    A.  No.

3    Q.  You are there to save yourself so that you don't have to go

4    to jail for the rest of your life, right?

5    A.  Yes.

6    Q.  You'll say what you need to say in order to spare yourself

7    from a life sentence, right?

8    A.  Not at all.

9    Q.  You need to provide substantial assistance in the

10   prosecution of others, don't you?

11   A.  Yes.

12   Q.  But to get that 5K letter that we just heard about you need

13   to provide substantial assistance, right?

14   A.  Yes.

15   Q.  And that is the magic language that you've learned in being

16   a defendant that you need to provide that type of assistance,

17   right?

18   A.  Yes.

19   Q.  That's just not answering questions and that's the end of

20   it, right?

21   A.  Yes.

22   Q.  It's substantial assistance in the prosecution of it,

23   correct?

24   A.  Substantial assistance.

25   Q.  Right.  With the prosecution of others, right?

E6HAASER4                        Moral - Cross

1    A.  No.

2              MR. DE CASTRO:  Judge, I don't know if you wanted

3    to -- it's 12:45.  I am going to go right to.  I was going to

4    switch to a topic and the come back.

5              THE COURT:  If it's going to mess up your --

6              MR. DE CASTRO:  I was just going to start a new topic.

7              THE COURT:  Why don't you go ahead and start.

8              MR. DE CASTRO:  No problem.

9    BY MR. DE CASTRO:

10   Q.  Now back to you putting crews together.

11   A.  Yes.

12   Q.  You put crews together to commit robberies, right?

13   A.  Yes.

14   Q.  You put crews together to commit robberies in Connecticut,

15   right?

16   A.  Yes.

17   Q.  You put crews together to commit robberies in New York?

18   A.  Yes.

19   Q.  You put crews together to commit robberies in New Jersey,

20   right?

21   A.  Yes.

22   Q.  Any other states?

23   A.  Pennsylvania.

24   Q.  Pennsylvania as well, right.  You have at least two

25   robberies in Pennsylvania, right?

E6HAASER4                        Moral - Cross

1    A.   Yes.

2    Q.   Where you tied people up and broke into locations, right?

3    A.   No, just broke into the location.  I didn't tie no one up.

4    Q.   There wasn't one robbery where someone in your crew that

5    you were with tied some people up?

6    A.   That was in New Jersey.

7    Q.   That was New Jersey?

8    A.   Yes.

9    Q.   And you were arrested on January 9, 2013, and you said you

10   had around seven thousand dollars cash on you, right?

11   A.   Yes.

12   Q.   And -- well, really you had around eight thousand, right,

13   because had about nine hundred dollars in your pocket too?

14   A.   Yes.

15   Q.   That was from what you say was a robbery that you had

16   committed a couple days before?

17   A.   Yes.

18   Q.   Nothing to do with Mr. Serrano, right?

19   A.   No.

20   Q.   And that that was your team that had committed a robbery,

21   right?

22   A.   Me and the guys from New York.

23   Q.   Right, your team, right?

24   A.   Yes.

25   Q.   And that team that you are sort of a leader, right?

E6HAASER4                        Moral - Cross

1    A.  You could say that.

2    Q.  A leader is a person who would have four phones, right?

3    There's a reason for that, right?

4    A.  Yes.

5    Q.  Because you want to say in contact with people but also you

6    want to pass them around to people, right?

7    A.  Yes.

8    Q.  You want people to use your phones and then you could get

9    them back, right?

10   A.  Yes.

11   Q.  You talked a lot about this cop car, right?

12   A.  Yes.

13   Q.  And what you didn't mention was that that was your cop car,

14   right?

15   A.  Yes.

16   Q.  You bought that car?

17   A.  We did, yeah.

18   Q.  You bought that car off of Craig's List, did you not?

19   A.  Yes.

20   Q.  And you arranged for it to have all those wonderful little

21   toys in it, right?

22   A.  Yeah, we did.

23   Q.  And you got all that done and in fact you even parked it in

24   a particular location, right?

25   A.  Yes.

E6HAASER4                          Moral - Cross

1   Q.  It's your parking spot, you get it, right?

2   A.  Right.

3   Q.  You store robbery things within that car as well as, right?

4   A.  Yeah.

5           THE COURT:  Ladies and gentlemen, we'll take our lunch

6   break now and we'll come back and pick up at two o'clock.  So

7   if could you be ready and in place having gotten through all of

8   the security lines downstairs by a few minutes before two, that

9   would be very helpful.  And I want to remind you not to talk to

10  anybody about this case including each other.  Thank you.

11          (Jury not present)

12          THE COURT:  You can step down, sir.

13          (Witness not present)

14          THE COURT:  Ladies and gentlemen, do we have anything

15  we need to go over before we take our lunch break?

16          Let's have everybody back a little before two.

17          (Luncheon Recess)

18          (Continued on next page)

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION
 2                           2:00 p.m.
 3           THE COURT:  All right.  Let's bring out the jury.
 4           (Jury present)
 5   VICTOR MORAL, resumed.
 6   CROSS EXAMINATION (Continued)
 7   BY MR. DE CASTRO:
 8   Q.  Mr. Moral, you testified on your direct examination that
 9   back in the early in the 1990s you committed a murder, right?
10   A.  Yes.
11   Q.  And you shot a person.  You took his life, right?
12   A.  Yes.
13   Q.  And you went to trial in this case.
14   A.  Yes.
15   Q.  And you testified in your own defense, right?
16   A.  Yes.
17   Q.  And you were placed under oath just like you were today,
18   right?
19   A.  Yes.
20   Q.  And you swore to tell the truth.
21   A.  Yes.
22   Q.  The whole truth and nothing but the truth, right?
23   A.  Yes.
24   Q.  Just like they did here today, correct?
25   A.  Yes.
```

E6HAASER4                          Moral - Cross

1    Q.  And there was a judge in that case, right, sitting next to

2    you like the judge here today, right?

3    A.  Yes.

4    Q.  There was a court reporter there, just like today, sitting

5    next to you?

6    A.  Yes.

7    Q.  And there was a jury, just like the jury is here today too,

8    right?

9    A.  Yes.

10   Q.  And you didn't tell the truth then, right?

11   A.  No.

12   Q.  And you looked at that jury in the face and you lied to

13   them, right?

14   A.  Yes.

15   Q.  And you lied to them that you had nothing to do with that

16   crime, right?

17   A.  Yes.

18   Q.  You didn't shoot that person at all, right?

19   A.  Yes.

20   Q.  And in fact you actually did.

21   A.  Yes.

22           THE COURT:  I'm going to ask you both if you can speak

23   up or put yourselves closer to the mics.  Thank you.

24           MR. DE CASTRO:  I'm sorry, Judge.

25           THE COURT:  That's all right.

E6HAASER4                        Moral - Cross

1   Q.   What kind of gun did you use to -- well, withdrawn.  What
2   was the name of your victim?
3   A.   David Elbern.
4   Q.   Alvern?
5   A.   Yes.
6   Q.   And what kind of gun did you use to shoot Mr. Elbern?
7   A.   Nine millimeter.
8   Q.   And how many shots did you fire?
9   A.   I don't remember.
10  Q.   Was it more than one?
11  A.   Yes.
12  Q.   Was it a group of people?
13  A.   Yes.
14  Q.   You were firing at many people?
15  A.   Three.
16  Q.   And you killed one person, right?
17  A.   Yes.
18  Q.   Did you injury anybody else?
19  A.   No.
20  Q.   You could have killed any one of those people, right?
21  A.   Yes.
22  Q.   Do you think you fired more than three shots?
23  A.   Yes.
24  Q.   So you could have killed up to four or five people, isn't
25  that right?

1    A.  At least three.

2    Q.  You testified that you lied in that courtroom because --

3    withdrawn.  You lied in that courtroom because you felt you had

4    to, right?

5    A.  Yes.

6    Q.  It was your only way out of that particular situation that

7    you were stuck in, right?

8    A.  Yes.

9    Q.  So you lied to that jury.

10   A.  Yes.

11   Q.  And the only way for you to get off in that case in your

12   mind at that time was if you lied, right?

13   A.  Yes.

14   Q.  And that didn't work, and you were convicted, right?

15   A.  Yes.

16   Q.  And you spent 11 years in prison.

17   A.  Yes.

18   Q.  And I think as you testified before the break, when you got

19   out of prison -- withdrawn.

20          When you were in prison, prison was tough for you,

21   wasn't it?

22   A.  Yes.

23   Q.  You do not want to go back to prison, correct?

24   A.  No.

25   Q.  You were in fights, and you had a lot of trouble while you

E6HAASER4                         Moral - Cross

1   were in jail, right?

2   A.  Somewhat, yes.

3   Q.  And so when you got out, you testified that you changed

4   your name, right?

5   A.  Yes.

6   Q.  And so you moved to New Jersey and you changed your name.

7   A.  Yes.

8   Q.  Now, the last time you had a legitimate job was many years

9   ago, right?

10  A.  Yes.

11  Q.  Your full-time job was -- what would you say your full-time

12  job was?

13  A.  Truck driver.

14  Q.  Truck driving.  And that was years ago, right?

15  A.  Yes.

16  Q.  And when you stopped doing truck driving, what was your

17  full-time job?

18  A.  Stealing.

19  Q.  Committing robberies, right?

20  A.  Thefts at that time.

21  Q.  Thefts.

22  A.  Yeah.

23  Q.  Burglaries.  You have a distinction between robbing

24  somebody is if you actually steal from them, right, the person,

25  right?

1    A.  Yes.

2    Q.  If you go into a house and there is somebody there, that's

3    a robbery to you, right?

4    A.  Yes.

5    Q.  And a burglary is if you go in and there is nobody there,

6    right?

7    A.  Yes.

8    Q.  But when you -- after you were a truck driver, you pretty

9    much turned full time to crime, right?

10   A.  Yes.

11   Q.  Robberies, burglaries and cargo thefts, correct?

12   A.  Yes.

13   Q.  You also did drug dealing, right?

14   A.  Yes.

15   Q.  You set up deals, and you sold drugs, right?

16   A.  Yes.

17   Q.  Now, when it came to cargo thefts, we are talking about

18   tractor trailers, right?

19   A.  Yes.

20   Q.  Tractor being the truck that drives the trailer, right?

21   A.  Yes.

22   Q.  Like those trucks that we see on the turnpike if we're

23   driving on a highway, right?

24   A.  Yes.

25   Q.  And those trailers can be -- what's inside those trailers

E6HAASER4                        Moral - Cross

1    can be very valuable, right?

2    A.  Yes.

3    Q.  You said I think on direct that your biggest theft was

4    close to a million dollars?

5    A.  Yes.

6    Q.  You stole things like air conditioners, right?

7    A.  Yes.

8    Q.  Coffee?

9    A.  Yes.

10   Q.  Carpets?

11   A.  Yes.

12   Q.  In fact the carpets that you stole were worth about half a

13   million dollars, right?

14   A.  Yes.

15   Q.  In the bags, right?

16   A.  Yes.

17   Q.  Valuable carpets from a truck, right?

18   A.  Yes.

19   Q.  You even stole toothpaste, right?

20   A.  Yes.

21   Q.  And sneakers, like Nike sneakers, right?

22   A.  Yes.

23   Q.  I think you did that around the holidays, right?

24   A.  Yes.

25   Q.  Big demand for Nike sneakers around the holidays, isn't

1   that right?

2   A.   Yes.

3   Q.   And I think you even stole Rocawear, is that right?

4   A.   Yes.

5   Q.   Clothing, right?

6   A.   Yes.

7   Q.   About $250,000 worth of Rocawear clothing, right?

8   A.   Yes.

9   Q.   But your involvement doesn't end there when you steal the

10  items, right?

11  A.   No.

12  Q.   You're able to find buyers, right?

13  A.   Yes.

14  Q.   Because you have a large network of connections, isn't that

15  right?

16  A.   Yes.

17  Q.   So you're able to sell those items to businesses even,

18  right?

19  A.   Yes.

20  Q.   Because I would assume it's very, very hard to get rid of

21  an entire truckload full of Nike sneakers.

22  A.   Yes.

23  Q.   Now, you testified on direct that I think you said you

24  smoked marijuana ten times in your life?

25  A.   About that.

E6HAASER4                          Moral - Cross

1    Q.  Ten total times?

2    A.  Somewhere around there.

3    Q.  Do you remember a biker gang?

4    A.  A lot of them.

5    Q.  You remember more than one biker gang?

6    A.  Yes.

7    Q.  What are some of the gangs you were a member of?

8    A.  Whatever Riders.

9    Q.  What others?

10   A.  That's the only one I was a member.

11   Q.  So when you said a bunch of biker gangs, you meant there

12   was a bunch of people in your gang?

13   A.  I thought when you asked the question you said if I knew of

14   biker gangs.

15   Q.  Understood.  But you actually -- you actually formed

16   Whatever Riders, right?

17   A.  Yes.

18   Q.  You and another person you committed crimes with, right?

19   A.  It was about five of us.  One of the kids had died, so...

20   Q.  But would you say you were one of the founding members?

21   A.  Yes.

22   Q.  How many members do you have?

23   A.  Now I couldn't even tell you.

24   Q.  A lot, right?

25   A.  Probably ten, probably a little more than that.

1    Q.  At times there were probably more, right?

2    A.  Yes.

3    Q.  You had pictures of you and all the Whatever Riders on your

4    phone, right?

5    A.  Yes.

6    Q.  And you guys have jackets, right?

7    A.  Right.

8    Q.  And hang out a lot during the week and on the weekends,

9    right?

10   A.  Yes.

11   Q.  You hang out actually in Jersey City, don't you?

12   A.  Yes.

13   Q.  A lot of different bars and lounges, right?

14   A.  Yes.

15   Q.  In fact some of those bars and lounges are around 8th

16   Street, aren't they?

17   A.  I think there is one somewhere downtown.

18   Q.  Well, you've got like the Indio Lounge, that's on 2nd

19   Street?

20   A.  I don't go to like bars like that.

21   Q.  You don't go to bars like that?

22   A.  No.

23   Q.  What about like Dennis and Maria's?

24   A.  No.

25   Q.  When you say bars like that, what do you mean?

1   A.  Those are like small local bars.  I usually go to like a

2   club or a lounge where there are a lot of people at.

3   Q.  That's because you also have 20 bikers with you probably,

4   right?

5   A.  Yes.

6   Q.  Now, before the break I asked you some questions about you

7   putting robbery crews together.  Do you remember those

8   questions?

9   A.  Yes.

10  Q.  And I just want to follow up on that just for a second.

11  Part of you putting crews together is also helping plan the

12  robberies, right?

13  A.  Sometimes, yes.

14  Q.  And in fact members of the team looked to you as a leader,

15  right?

16  A.  Some.

17  Q.  Some, right?

18  A.  Yes.

19  Q.  People you commit these crimes with, like Alex and Black,

20  they look at you like a leader, right?

21  A.  No.

22  Q.  No?  Well, let's look at what the government.

23          Would you mind putting up Government Exhibit 4 --

24          Well, do you remember the government was showing you

25  in Government Exhibit 404 a group of texts between you and

1   Black?

2   A.  Yes.

3   Q.  And I think at 404C, for example, that was an example of

4   you and Black texting back and forth about his willingness to

5   be involved in these robberies, right?

6   A.  Yes.

7   Q.  And how he sort of his work ethic, right?

8   A.  Yes.

9   Q.  And he is looking to tell you that, no, no, no, I'm willing

10  to put in the work, right?

11  A.  Yes.

12  Q.  Like you're his boss, right?

13  A.  You could say that.

14  Q.  And I think as we said before the break, you were also in

15  charge of that cop car, right?

16  A.  The cop car?  Alex was.

17  Q.  But that was something you got -- you and Alex got that

18  together and got a parking spot for it, right?

19  A.  Yes.

20  Q.  And you maintained it, and you made sure it was available

21  for use, right?

22  A.  Both of us, we both paid for it.

23  Q.  Now, as a result of committing all of these theft crimes,

24  you were making money, right?

25  A.  Yes.

E6HAASER4                         Moral - Cross

1    Q.  You were making pretty good money, right?

2    A.  Yeah.

3    Q.  And especially when you are the organizer, you get to get a

4    larger cut sometimes, right?

5    A.  No.

6    Q.  Well, if you arrange both ends, the sale of the goods as

7    well, right?

8    A.  No, that would be like let's say my job was if I sat in the

9    car, I was the look-out, they actually went and stole the

10   truck, so I get the equal share, and part of my job would still

11   be to find somebody to buy it, so that would balance everything

12   out.

13   Q.  And most of the people that you were doing those cargo

14   thefts with, they didn't have the connections you did to get

15   rid of or to sell the cargo, right?

16   A.  No, not some of them didn't, no.

17   Q.  Like you were the guy that knew who to go to to sell the

18   coffee, for example?

19   A.  Yes.

20   Q.  And so you could negotiate a price with that person, and

21   they would pay you the money for the coffee, right?

22   A.  Yes.

23   Q.  And then you would give your employees, for lack of a

24   better term, the cut.

25   A.  We would agree on what price to set, and then we would

E6HAASER4                        Moral - Cross

1   split whatever came.

2   Q.  But sometimes that person would negotiate with you, right?

3   A.  Yes.

4   Q.  And you could get a higher price sometimes or even a lower

5   price.

6   A.  I would still have to go to the rest of the crew to ask

7   them if the price was acceptable or not.

8   Q.  Right.  But you could also just tell them -- you could make

9   up a price too, right?

10  A.  Well, because somebody is always in the middle picking up

11  the money, so ...

12  Q.  And I think you were testifying that you have an issue with

13  people not doing that much work and getting paid, right?

14  A.  Yes.

15  Q.  And you were doing work for those jobs and setting them all

16  up, so you deserved a bigger cut, right?

17  A.  Not a cut, but there was other people that was part of it

18  also, and they would complain that somebody else was making

19  more money than them, and they actually did the work also, so I

20  understood that.

21  Q.  Now, you said that you made good money doing the robberies,

22  right?

23  A.  Yes.

24  Q.  Better than being a truck driver, right?

25  A.  Not really.

1    Q.  At times?

2    A.  Yeah.

3    Q.  Well, truck driver can be steady employment, right?

4    A.  Yes.

5    Q.  A paycheck every couple weeks or a month, right?

6    A.  Every week.

7    Q.  And then when you are committing these cargo theft

8    robberies it's sort of hit or miss, right?

9    A.  Yes.

10   Q.  You could get a lot of money one month and maybe nothing

11   the next month, right?

12   A.  Yes.

13   Q.  But it still allowed you to buy things, right?

14   A.  Yes.

15   Q.  Support yourself?

16   A.  Yes.

17   Q.  Support your family, right?

18   A.  Yes.

19   Q.  And you're not a flashy guy, right?

20   A.  I can say I am sometimes.

21   Q.  Sometimes you are flashy.  Jewelry is not your thing,

22   right?

23   A.  No.

24   Q.  Cars are your thing, right?

25   A.  Yeah.

1    Q.  Bikes?

2    A.  Yeah.

3    Q.  So you had an Escalade, right?  You had a Cadillac

4    Escalade?

5    A.  Yes.

6    Q.  In fact you had two Cadillac Escalades at one point.

7    A.  No.

8    Q.  Well, you had one, sold it and got another, right?

9    A.  Yes.

10   Q.  So, those are pretty expensive SUVs, right?

11   A.  Yes.

12   Q.  And you would get those vehicles, and you would trick it

13   out, right?

14   A.  Yes.

15   Q.  Add rims to it, right?

16   A.  Yes.

17   Q.  Add a sound system to it, right?

18   A.  Yes.

19   Q.  You would add specialty items like doors, right?

20   A.  Yes.

21   Q.  That would open up like maybe a DeLorean from the '80s in

22   from Back To The Future, right?

23   A.  Yes.

24   Q.  And they would also swivel up too, right?  And you would

25   drive that around, and everybody could see that flash, right?

1    A.  Yes.

2    Q.  And you also had a Maserati before?

3    A.  Yes.

4    Q.  Have you ever had a BMW?

5    A.  Yeah.

6    Q.  Mercedes?

7    A.  Yeah.

8    Q.  Maybe not your style.  Didn't like that one so much?

9    A.  No, I bought it, it lasted like a week because they

10   confiscated it, so ...

11   Q.  Now, you also bought yourself a house as well, right?

12   A.  Yes.

13   Q.  So that's pretty good for you.  The crimes you were

14   committing were good to you in terms of --

15   A.  The house I actually bought when I was working legit.

16   Q.  You bought that when you were working legit?

17   A.  Yes.

18   Q.  And did you buy it all cash?

19   A.  No.

20   Q.  You had to make payments, right?

21   A.  Yes.

22   Q.  Good thing for the robberies, right?

23   A.  No, I lost the house to foreclosure.

24   Q.  Hard to pay the bank with cash, right?

25   A.  No, when you don't got money.  That's kind of what led me

E6HAASER4                        Moral - Cross

1    to stealing.

2    Q.  So, in 2012, is it fair to say that you went on a pretty

3    long and successful crime spree?

4    A.  Yes.

5    Q.  Successful until you are sitting in that chair now, right?

6    A.  Yes.

7    Q.  You committed a lot of crimes, and you made a lot of money

8    in just 2012 alone, right?

9    A.  Yes.

10   Q.  Now, but before 2012 you got arrested for being the leader

11   of a cargo theft crew in New Jersey, right?

12   A.  Yes.

13   Q.  And you were arrested by the New Jersey state police.

14   A.  Yes.

15   Q.  That was in 2011, right?

16   A.  Yes.

17   Q.  They said that you were responsible -- withdrawn.

18          You were charged with being responsible for thefts of

19   those entire tractor trailers, right?

20   A.  Yes.

21   Q.  Some of the things that I was asking you about, right?

22   A.  Yes.

23   Q.  What types of things were you charged with stealing?

24   A.  Coffee, spaghetti sauce, ACs, rugs.

25   Q.  ACs meaning air conditioners?

1    A.   Yes.

2    Q.   Do you remember what brand?

3    A.   No.

4    Q.   Now, do you remember how much they were worth?

5    A.   No.

6    Q.   And when you stole the tractor trailer, you would take the

7    entire trailer, right?

8    A.   Yes.

9    Q.   Because you were a truck driver, you could drive it

10   commercially, right?

11   A.   Yes.  I actually never drove none of the trucks; I just

12   watched and brought them to places where they can steal the

13   stuff from.

14   Q.   You sort of organized it?

15   A.   Yeah.

16   Q.   Oversaw it?

17   A.   Yeah.

18   Q.   And you actually formed your own trucking company, didn't

19   you?

20   A.   Yes.

21   Q.   What was that called?

22   A.   Whatever Trucking.

23   Q.   Whatever Trucking, was Whatever Trucking related to

24   Whatever Riders?

25   A.   Yeah, somewhat.

E6HAASER4                          Moral - Cross

1    Q.  Were some of the same people involved?

2    A.  Yes.

3    Q.  And when you got arrested in New Jersey in 2011, you had

4    three phones on you then, right?

5    A.  Yes.

6    Q.  An iPhone, a Galaxy and a Motorola Boost phone, right?

7    A.  Yes.

8    Q.  And when you got arrested that particular time, your first

9    priority was to stay out of jail.

10   A.  Yes.

11   Q.  And after some time the case was pending, they finally

12   offered you a confidential source agreement, right?

13   A.  Yes.

14           MR. DE CASTRO:  May I approach?

15           THE COURT:  You may.

16   Q.  I am showing you what I have marked as Defendant's Exhibit

17   1 for identification.

18           Would you want me to do that as A?

19           THE COURT:  You know, if you call it Defendant's

20   Exhibit 1, that's fine.

21   Q.  So take a look at Defendant's Exhibit 1 for identification.

22   Do you recognize that document?

23   A.  Yes.

24   Q.  What is it?

25   A.  It's an agreement I signed.

E6HAASER4                     Moral - Cross

1    Q.  It's a confidential source agreement from the New Jersey

2    state police, right?

3    A.  Yes.

4    Q.  It's the one we have been talking about?

5    A.  Yes.

6    Q.  On page 2 of the agreement, is that your signature?

7    A.  Yes.

8            MR. DE CASTRO:  I will offer that into evidence as

9    Defense Exhibit 1.

10           MS. MAIMIN:  No objection.

11           THE COURT:  Received.

12           (Defendant's Exhibit 1 received in evidence)

13   Q.  Now, that agreement is a cooperation agreement, right?

14   A.  Yes.

15   Q.  And you were entering into that agreement so that you could

16   work off your case, right?

17   A.  Yes.

18   Q.  Work off all those robberies, right?

19   A.  Yes.

20   Q.  And did they tell you that if it was successful you may not

21   even have to go to jail for very long?

22   A.  No.

23   Q.  You weren't sure?

24   A.  No,we didn't get into the process.

25   Q.  You just knew you needed to do that in order to give

1    yourself a shot, right?

2    A.  Yes.

3    Q.  Directing your attention to -- have a look at it -- at

4    paragraph -- I'm sorry -- section 2, acknowledgments of

5    paragraph 6.  That section deals with them not authorizing you

6    to commit crimes, right?

7    A.  Yes.

8    Q.  In fact they told you you cannot commit crimes while being

9    a confidential source, right?

10   A.  Yes.

11   Q.  It's a violation of this agreement if you do that, right?

12   A.  Yes.

13   Q.  And it says that you are not authorized to participate in

14   any criminal activity except as specifically authorized by my

15   controlling detectives, right?

16   A.  Yes.

17   Q.  And you were in contact with those controlling detectives,

18   right?

19   A.  Yes.

20   Q.  And section 11 of -- sorry -- section 2, subsection 11 of

21   that agreement also says you can't commit acts of violence,

22   right?

23   A.  Yes.

24   Q.  You can't participate in anything that is designed to

25   obtain information by an unlawful method, breaking and

1   entering, illegal wiretapping, illegal opening of the mail,

2   trespass amounting to illegal search, etc.  Right?

3   A.  Yes.

4   Q.  And then subsection 12 of that same section says that you

5   understand that if you're asked by anybody to participate in

6   any of that prohibited conduct, that you will immediately

7   contact controlling detectives, right?

8   A.  Yes.

9   Q.  And you never did that, right?

10  A.  No.

11  Q.  You never contacted them and said people are asking me to

12  commit crimes, right?

13  A.  For about a couple weeks.

14  Q.  And then you moved on and just started doing your own thing

15  again, right?

16  A.  Yes.

17  Q.  When you signed that agreement, you never intended to abide

18  by the terms, right?

19  A.  I never gave it much thought.

20  Q.  You did it because you were jammed up and you needed to get

21  out of trouble, right?

22  A.  Yes.

23  Q.  So, instead of abiding by that agreement you went on what I

24  term that crime spree, right?

25  A.  Yes.

1    Q.  That was in 2012, correct?

2    A.  Yes.

3    Q.  You said on direct examination that you think you committed

4    something like 15 crimes during that time period, right?

5    A.  Yes.

6    Q.  It's more like more than 20 crimes, right?

7    A.  Crimes in total?

8    Q.  Um-hum.

9    A.  You can probably say that.

10   Q.  It's closer to 30 than it is to 15, right?

11   A.  As in robberies and burglaries, I did about 15.  Like if

12   you're counting cargo theft and everything else, it's somewhere

13   past 20.

14   Q.  Because that agreement covers all those types of crimes,

15   right?

16   A.  Yes.

17   Q.  It's not just cargo thefts, right?

18   A.  Yes.

19   Q.  You got arrested for cargoes thefts, but that agreement

20   prohibited you from committing any other crimes without

21   authorization, right?

22   A.  Yes.

23   Q.  Now, let's talk a little bit about some of the crimes that

24   you committed while you were a state informant, OK?

25   A.  Yes.

1   Q.  I'm not going to go through all of them.  We would be here

2   for a long time.  As you just said, it was more than 20, right?

3   A.  Yes.

4           MS. MAIMIN:  Objection.  Well, try to keep it to the

5   question.

6           MR. DE CASTRO:  I will.

7   Q.  Now, in the spring of 2012 I think you alluded to this

8   before the break, that you were involved in a theft of a barn

9   in New Jersey, right?

10  A.  A barn?

11  Q.  A barn.

12  A.  Yes.

13  Q.  And you stole eight pounds of marijuana from that barn,

14  right?

15  A.  Yes.

16  Q.  You thought there would be over a hundred pounds, but it

17  turned out there were only eight, right?

18  A.  Yes.

19  Q.  You did that with a person you knew as Habibi's cousin, a

20  guy named Mike, and two other guys from Connecticut, right?

21  A.  Yes.

22  Q.  And there might have been another guy in that robbery, in

23  that crime as well, right?

24  A.  Yes.

25  Q.  Now, and that is the one you said you tied two people up to

1    commit the crime, right?

2    A.  No, that one we didn't tie no one up.

3    Q.  OK.  You didn't tie anyone up in the New Jersey robbery.

4    A.  No.

5    Q.  We will get back to that one in a second.  That crime you

6    committed while you were a government informant, right?

7    A.  Yes.

8    Q.  Then in the summer of 2012 you set up a four kilo drug deal

9    with someone called the Arab in Edgewater, New Jersey, right?

10   A.  Yes.

11   Q.  And you set up that deal for Kito and Tone, who were going

12   to buy the drugs, right?

13   A.  Yes.

14   Q.  In fact Kito and Tone robbed the Arab, right?

15   A.  Yes.

16   Q.  And they beat him and they pistol whipped him, right?

17   A.  Yes.

18   Q.  And you arranged that drug deal while you were a government

19   informant, right?

20   A.  Yes.

21   Q.  Then in the summer of 2012 you were involved in a Newark

22   home invasion, right?

23   A.  Yes.

24   Q.  Where you snuck in the back window of a stash house, right?

25   A.  Yes.

E6HAASER4                      Moral - Cross

1    Q.  In fact that was only an attempt because a fight broke out

2    there, right?

3    A.  Yes.

4    Q.  You didn't think someone would be there, and they turned

5    out to be there.

6    A.  Yes.

7    Q.  And you fled and got away, right?

8    A.  Yes.

9    Q.  And you tried to commit that crime -- or committed that

10   crime while you were a government informant, right?

11   A.  Yes.

12   Q.  Then sometime in 2012 you and Shy, Habibi, and maybe the

13   Arab, committed another home invasion, right?

14   A.  Yes.

15   Q.  Pounds and pounds of weed or marijuana, right?

16   A.  Yes.

17   Q.  And your share in that robbery was $6,000, right?

18   A.  Yes.

19   Q.  You committed that crime while you were a government

20   informant.

21   A.  Yes.

22   Q.  In September of 2012 you robbed a drug stash house in

23   Waterbury, Connecticut, right?

24   A.  Yes.

25   Q.  With three other people, right?

1    A.  I think it was four.  Five.

2    Q.  So it's five total?

3    A.  Yes.

4    Q.  You were driving at that time, right?

5    A.  Yes.

6    Q.  And they in fact went into that location and held people up

7    at gunpoint, right?

8    A.  Yes.

9    Q.  And you fled in that particular case, right?

10   A.  Yes.

11   Q.  And that was a crime committed while you were a government

12   informant.

13   A.  Yes.

14   Q.  In the fall of 2012 you also planned to rob a drug dealer

15   with two Hudson County corrections officers, right?

16   A.  Yes.

17   Q.  Your plan was to rob that drug dealer of $60,000 in cash,

18   right?

19   A.  Yes.

20   Q.  Did you end up completing that robbery?

21   A.  No.

22   Q.  And that was still while you were a government informant,

23   right?

24   A.  Yes.

25   Q.  You didn't tell your handlers at the state police, right?

1    A.  No.

2    Q.  In the winter of 2012 you committed a Jersey City apartment

3    burglary, right?

4    A.  Yes.

5    Q.  You stole drugs and -- stole drugs, and you also stole

6    marijuana, right?

7    A.  Yes.

8    Q.  I guess they're both drugs, but different types, right?

9    A.  Yes.

10   Q.  What else did you steal other than marijuana?

11   A.  Money.

12   Q.  How much money?

13   A.  I think about $30,000.

14   Q.  And that was actually an empty apartment, right?

15   A.  Yes.

16   Q.  You did that with Black, Bones and Steven, right?

17   A.  I'm confusing.  I thought you were talking about the July

18   4 -- yeah, that was just marijuana.

19   Q.  It's hard to keep track, right?

20   A.  Sometimes.

21   Q.  Sometimes.  There is a lot of them, right?  You did that

22   crime when you were also a government informant, right?

23   A.  Yes.

24   Q.  Winter of 2012, that was a cocaine robbery, right?

25   A.  Which one?

E6HAASER4                          Moral - Cross

1    Q.  Do you remember that?  Winter of 2012 you robbed a cocaine

2    dealer.

3    A.  Yes.

4    Q.  And you zip tied some people up.

5    A.  Yes.

6    Q.  And that was where some girl gave you a tip on her

7    boyfriend, right?

8    A.  Yes.

9    Q.  And actually so you actually kidnapped the person who was

10   stealing the drugs, right?

11   A.  Yes.

12   Q.  And you committed that crime while you were also a

13   government informant?

14   A.  Yes.

15   Q.  In the fall of 2012 you committed another marijuana

16   burglary, right?

17   A.  Yes.

18   Q.  It was with Arab, Cuban Frank, Arab's cousin and some

19   others, right?

20   A.  Yes.

21   Q.  That was a big haul.  That was 300 pounds of marijuana.

22   A.  Yes.

23   Q.  How much could you sell 300 pounds of marijuana after

24   stealing it?

25   A.  It depends how much you want to get rid of it.

E6HAASER4                         Moral - Cross

1    Q.  Well, give us the range.

2    A.  I sold my pounds for $1,000 each.

3    Q.  Say?

4    A.  I sold my pounds for about $1,000 each.

5    Q.  $1,000 per pound.

6    A.  Yeah.

7    Q.  And that particular robbery you guys had 300 pounds.

8    A.  It was supposed to, but a lot of it wasn't packaged yet so

9    it didn't come out to that.

10   Q.  So more like 200 pounds?

11   A.  Probably a hundred something.

12   Q.  You still had over 50 pounds?

13   A.  Yes.

14   Q.  And you sold it at over $1,000 a pound?

15   A.  Yeah.

16   Q.  In the winter of 2012, that's where -- I think you

17   corrected me this morning -- you also committed crimes in

18   Pennsylvania, right?

19   A.  Yes.

20   Q.  That was a Pennsylvania barn robbery with Cuban Frank,

21   Habibi and Habibi's cousin.

22   A.  Yes.

23   Q.  You broke in the door; it was a growing operation, right?

24   A.  Yes.

25   Q.  And you went to the barn and that's where you stole the

E6HAASER4                        Moral - Cross

1    marijuana.

2    A.   Yes.

3    Q.   How much did you get?

4    A.   I think it was about eight pounds.

5    Q.   What did you think would be there?

6    A.   At least 100.

7    Q.   You committed that crime while you were also a government

8    informant, right?

9    A.   Yes.

10   Q.   December 2012 you bought a gun from Alex and Jo Jo, right?

11   A.   Yes.

12   Q.   You bought a TEC-9.

13   A.   Yes.

14   Q.   $700?

15   A.   Yes.

16   Q.   You were a government informant when you bought that gun,

17   right?

18   A.   Yes.

19   Q.   You also, as I think you testified, you bought the Crown

20   Vic on Craig's List, right?

21   A.   Yes.

22   Q.   When did you buy that?

23   A.   Somewhere in the middle of the year, 2012.

24   Q.   2012, right?

25   A.   Yeah.

E6HAASER4                         Moral - Cross

1   Q.  And you had it outfitted with all those toys, right?

2   A.  Yes.

3   Q.  Now, one of the things -- one of the things you added to it

4   was this intercom, right?

5   A.  Yes.

6   Q.  Not your word, right?  What did you call it?

7   A.  Police siren.

8   Q.  Police siren, right?

9   A.  Yes.

10          MR. DE CASTRO:  Would you mind publishing Government

11   Exhibit 247.

12   Q.  That right there?

13   A.  Yes.

14   Q.  That little hand-held thing?

15   A.  Yes.

16   Q.  That looks like sort of a walkie-talkie?

17   A.  Yes.

18   Q.  What did you call that --

19   A.  That's the --

20   Q.  -- when you were operating it?

21   A.  That's the intercom, part of.

22   Q.  You didn't call it an intercom though when you were a part

23   of this crew, right?

24   A.  Just an intercom.  I don't know what else I could have

25   called it, but that's part of the intercom for the police line.

1    It's just a part of it.

2    Q.  Now, while you were a government informant you also stole a

3    Dodge Nitro truck, right?

4    A.  Yes.

5    Q.  That was to use in robberies, right?

6    A.  Yes.

7    Q.  You used that on January 9, right?

8    A.  Yes.

9    Q.  So you provided at least two of the vehicles on January 9,

10   right?

11   A.  Yeah.

12   Q.  More?

13   A.  There was about -- we took three vehicles that we often

14   used that were there.

15   Q.  There was also a Newark home invasion that you committed

16   while you were a government informant, right?

17   A.  Yes.

18   Q.  That's where there was a gun involved in that case, right?

19   A.  Yes.

20   Q.  Did you hold the gun?

21   A.  No.

22   Q.  Who had the gun?

23   A.  One of the other guys.  They were masked up, so I couldn't

24   tell which one.

25   Q.  You couldn't tell who was pointing the gun, right?

E6HAASER4                    Moral - Cross

1    A.   Yes.

2    Q.   They actually pointed it at people in that home, right?

3    A.   That's where the fight broke out, so when the fight broke

4    out everybody just ran out.

5    Q.   I think you testified on direct examination you even broke

6    into police impound yards, right?

7    A.   Yes.

8    Q.   Not many people can say they've done that, right?

9    A.   Yes.

10   Q.   And that's something you could brag about when you were out

11   on the street, right?

12   A.   I wouldn't brag about it.

13   Q.   But you broke into the police's facilities themselves, and

14   you took evidence out of there, right?

15   A.   Yes.

16   Q.   And didn't one time you go in there and the car needed a

17   battery?

18   A.   Yes.

19   Q.   So, you went out, you got a battery, you came back, right?

20   A.   I actually got a booster box.

21   Q.   A booster box like a portable battery.

22   A.   Yes.

23   Q.   So you were able to give the car power so you could access

24   what you needed to, right?

25   A.   Yes.

1   Q.  And you were successful in that timeframe.

2   A.  Yes.

3           THE COURT:  Is that the pound here in Manhattan or one

4   in New Jersey?

5           THE WITNESS:  No, it was in Connecticut.

6           THE COURT:  Oh, Connecticut.

7           Did you have to climb a fence?

8           THE WITNESS:  A fence and get into a building, inside

9   a building.

10  Q.  So how would you get into the building part to break in?

11  A.  I climbed up the fence, climbed onto like a balcony and

12  went in through a window.

13  Q.  Now, in terms of stealing those tractor trailers, you would

14  have to break into some yards to do it, right?

15  A.  Yes.

16  Q.  They're secured in some way, right?

17  A.  Yes.

18  Q.  They're not just parked out there for anybody to just take,

19  right?

20  A.  Some of them.

21  Q.  Sometimes they are, and that's a good target, right?

22  A.  Yes.

23  Q.  And you routinely did that on your days when you weren't

24  committing robberies, right?

25  A.  Yes.

1    Q.  Like you went out looking for trailers that would be good

2    to rob, right?

3    A.  Yes.

4    Q.  Like didn't you once follow a Model's truck and think about

5    stealing Model's gear inside?

6    A.  Yes.

7    Q.  Would you say that your -- withdrawn.

8            Is it fair to say that your sort of regular crew in

9    New Jersey was with Orlando Pagan?

10   A.  Back in about I'd say 2011, yeah.

11   Q.  And then the people -- like all the people you got arrested

12   with in 2011, right, that guy Nazal, right?

13   A.  Who?

14   Q.  Mohammed Nazal?

15   A.  Yeah, he was one of the fences.

16   Q.  A guy named Baker Baker?

17   A.  Yeah, I actually met them through the defendant.

18   Q.  Mr. Orta?

19   A.  Yes.

20   Q.  Now, when you organized those jobs, those cargo thefts, you

21   were the person who had all the phones, right?

22   A.  Yeah.

23   Q.  Because you are going to have people in different

24   locations, right?

25   A.  Yes.

E6HAASER4                          Moral - Cross

1    Q.   So you passed out those phones, and you collect them

2    afterwards, right?

3    A.   When we went to do the job?

4    Q.   Yes.

5    A.   No, the phones were to try to call people that would buy

6    the freight.

7    Q.   That would buy the --

8    A.   The freight.

9    Q.   People meaning people you are working with.

10   A.   Yes.

11   Q.   Now, you testified on direct examination that -- I'm sorry.

12   Withdrawn.

13            One second, Judge?

14            THE COURT:  Yes.

15   Q.   You testified on direct examination that Mr. Serrano

16   obtained the gun for that robbery, right?

17   A.   Yes.

18   Q.   He gave you a bag that you felt had a gun inside?

19   A.   Well, the skinny kid gave me the bag.

20   Q.   And you were arrested on January 9, right?

21   A.   Yes.

22   Q.   And when did you start proffering with the government?

23   A.   I don't remember exactly.  Somewhere down the road.

24   Q.   Months later?

25   A.   Somewhere around there.

E6HAASER4                              Moral - Cross

1    Q.  Pretty quick right after you got arrested?

2    A.  About a month, I think.

3    Q.  You said you had more than 40 probably proffer meetings,

4    right?

5    A.  Yes.

6    Q.  Isn't it true that you didn't mention anything about Mr.

7    Serrano getting that gun until May of 2014?

8    A.  Yes.

9    Q.  So more than a year after you had been arrested.

10   A.  When I was asked.

11   Q.  After you had met with the government more than 20 times,

12   right?

13   A.  Yes.

14   Q.  And in that robbery on October 14 you didn't get any

15   drugs -- I think you testified on direct that you got no drugs

16   in that robbery, right?

17   A.  Yes.

18   Q.  But once upon a time you did tell law enforcement that

19   there were drugs in a trap in that car, didn't you?

20   A.  That there were drugs in the trap?

21   Q.  Yeah.

22   A.  That's what we thought; that's what I thought.

23   Q.  But didn't you tell law enforcement in April of 2013 that

24   there were drugs in a trap in that car?

25   A.  There was supposed to be.  I didn't say we found no drugs.

E6HAASER4                        Moral - Cross

1    We never found any.

2    Q.  Now, you testified that after the robbery you went to --

3    sorry.  Withdrawn.

4         It's also the first time you mentioned to the

5    government, that is, in May of 2014, that Mr. Serrano said

6    something about a tow truck when you guys met, right?

7    A.  Yes.

8    Q.  You never mentioned that before, right?

9    A.  No.

10   Q.  And this job was set up by you and Nene, right?

11   A.  Yes.

12   Q.  And you were the organizer, right?

13   A.  Yes.

14   Q.  You had the connect, right?

15   A.  Yes.

16   Q.  You were the tipster, right?

17   A.  Well, she was the tipster.  I was the one --

18   Q.  Right.

19   A.  Yeah.

20   Q.  And you had all the tools you needed to do the robbery,

21   right?

22   A.  Except for the guns.

23   Q.  But you bought a gun from Alex and Jo Jo, right?

24   A.  I never seen that gun.

25   Q.  You didn't buy a gun?  You admitted to buying a gun.

E6HAASER4                        Moral - Cross

```
 1    A.  I did buy it.  I never seen it.  I never got it.

 2    Q.  And you have plenty of people you can commit robberies

 3    with, right?

 4    A.  Yes.

 5    Q.  Habibi, right?

 6    A.  Yes.

 7    Q.  Habibi's cousin, right?

 8    A.  Yes.

 9    Q.  Money Mike?

10    A.  Yeah.

11    Q.  You probably have Connecticut connections, right?

12    A.  Yes.

13    Q.  At least two guys in Connecticut, right?

14    A.  Yes.

15    Q.  Kito?

16    A.  Yes.

17    Q.  Tone?

18    A.  Yes.

19    Q.  Arab?

20    A.  Yep.

21    Q.  Shy?

22    A.  Yes.

23    Q.  Bones?

24    A.  Yes.

25    Q.  Steven?
```

E6HAASER4                         Moral - Cross

1    A.  Yes.

2    Q.  Black?

3    A.  Yes.

4    Q.  Alex?

5    A.  Yes.

6    Q.  Jo Jo?

7    A.  Yes.

8    Q.  Orlando Pagan?

9    A.  Yes.

10   Q.  Mohammed Nazal?

11   A.  Yes.

12   Q.  Mr. Kaled?

13   A.  Yes.

14   Q.  And Mr. Baker Baker.

15   A.  Yes.

16   Q.  Now, you also testified on direct examination about the

17   area in Washington Heights, right, where they said you

18   committed a robbery, right?

19   A.  Yes.

20   Q.  And you testified that they originally stopped outside a

21   beauty salon and a bodega, right?

22   A.  Yes.

23            MR. DE CASTRO:  Would you mind publishing 602C.

24   Q.  Can you show me where the bodega is in that?

25   A.  Right there where the gate is down.

1    Q.  Where Boost Mobile is?

2    A.  Yeah, right in front of it.

3           MR. DE CASTRO:  And could you put up G, please, 602G.

4    Q.  Where is the bodega?

5    A.  Right there.

6    Q.  Now, you also testified that after the robbery you went

7    back to Jersey City, right?

8    A.  Yes.

9    Q.  They showed you a picture of the area where you went,

10   right?

11   A.  Yes.

12   Q.  I'm sorry.  In Kearny, New Jersey, right?

13   A.  Yes.

14          MR. DE CASTRO:  Can you publish 613 for me, please.

15   Q.  Does that picture seem strange to you?

16   A.  Strange?

17   Q.  Yeah.

18   A.  No.

19   Q.  Look at the power line.

20   A.  OK.

21          MR. DE CASTRO:  Your Honor, could I use the laser

22   pointer?  May I approach?

23          THE COURT:  Yes.

24   Q.  Do you see this area of the picture, upper left-hand corner

25   where the power lines are, right?

1    A.  Yes.

2    Q.  Those lines don't match up, right?

3    A.  Nope.

4    Q.  Look at the picture right here too.  The lines don't match

5    up on the power lines, right?

6    A.  Yes.

7    Q.  And that's the area you said that you went back to in

8    Kearny, right?

9    A.  Yes.

10            MR. DE CASTRO:  I am just going to put this back,

11   Judge.

12            THE COURT:  All right.

13   Q.  Now, on January 9, 2013 you said you got arrested with 17

14   guys, right?

15   A.  Yes.

16   Q.  And you have been in jail ever since, right?

17   A.  Yes.

18   Q.  Actually before I get to January 9, remember you testified

19   a little bit about being at my client's home, right?

20   A.  Yes.

21   Q.  In Jersey City, right?

22   A.  Yes.

23   Q.  And I think the government showed you 605D.  And do you

24   remember testifying about that photo?  Right?

25   A.  Yes.

E6HAASER4                          Moral - Cross

1   Q.   In fact Ms. Maimin asked you about the white car in front,

2   right?

3   A.   Lexus.

4   Q.   The white Lexus there?

5   A.   No, the one in the back.

6   Q.   Sorry, one in the back.  Do you know what the one in the

7   front is?

8   A.   Is it a Lexus or Infinity truck?

9   Q.   Do you know whose car that is?

10  A.   No.

11  Q.   Do you know Ms. Serrano?

12  A.   No.

13  Q.   Because you never met her, right?

14  A.   No.

15          THE COURT:  You can take that down, please.

16  Q.   Now, back to January 9.  That's when you were arrested with

17  that Javion Camacho crew?

18  A.   Yes.

19  Q.   It's Javion, not Javion?

20  A.   I guess.

21  Q.   If we were speaking Spanish we would say Javion.

22  A.   Yeah.

23  Q.   And Javion Camacho and Julio Camacho organized that

24  robbery, right?

25  A.   From what I know, yes.

E6HAASER4                          Moral - Cross

1    Q.   They're brothers, right?

2    A.   Yeah.

3    Q.   They're family, right?

4    A.   Yes.

5    Q.   And that was supposed to be more than 20 kilos, maybe even

6    more than 30 kilos, right?

7    A.   They said more than ten, about ten.

8    Q.   You need a lot of guys there for that job, right?

9    A.   That's what he wanted, yes.

10   Q.   And you were in charge of recruiting people, right?

11   A.   Yes.

12   Q.   As well as he was as well, right?

13   A.   Yes.

14   Q.   So probably the three of you in charge of putting the team

15   together, right?

16   A.   Yes.

17   Q.   And you needed sort of a lot of fire power to get it done,

18   right?

19   A.   Yes.

20   Q.   Biggest job that you had ever been involved in, right?

21   A.   Yes.

22   Q.   And you robbed more marijuana but never something this big

23   in terms of a controlled substance, right?

24   A.   Yes.

25   Q.   And you dragged all the guys you normally commit robberies

1   with, and then some, right?

2   A.  Yes.

3   Q.  You guys actually had a meeting before you committed the

4   robbery, right?

5   A.  Yes.

6   Q.  Huddled up and had sort of a meeting, right?

7   A.  Yes.

8   Q.  Now, that was sort of a place, it was in a parking lot,

9   right?

10  A.  Yes.

11  Q.  A place where you could quarterback the whole job, right?

12  A.  Yes.

13  Q.  You, Javion and Julio quarterbacked how it was going to go

14  down, right?

15  A.  Well, he pretty much told me what he needed.

16  Q.  That's Javion?

17  A.  Yes.

18  Q.  And so you say he took the lead, right?

19  A.  Yeah.

20  Q.  It's his crew, right?

21  A.  Yeah.

22  Q.  And you had to get all the equipment, right?

23  A.  Yes.

24  Q.  You had to get the car, and you had to get all the

25  equipment, right?

E6HAASER4                    Moral - Cross

1   A.  Yes.

2   Q.  Now, how many times would you say you have met with the

3   government total?

4   A.  Probably 40 times, around.

5   Q.  Would you say you proffered 40 times?

6   A.  I met with them about that much, yes.

7   Q.  And at first you had a first set of proffers, right?

8   A.  Yes.

9   Q.  You didn't get a cooperation agreement right away, right?

10  A.  No.

11  Q.  And you had that first set of proffers.  How many do you

12  think you had then?

13  A.  Probably say 15.

14  Q.  Then at some point you got a cooperation agreement, right?

15  A.  Yes.

16  Q.  And you pled guilty on October 2013, right?

17  A.  Yes.

18  Q.  Ten month after you were arrested, right?

19  A.  Yes.

20  Q.  And all that time you were proffering with the government.

21  A.  Yes.

22  Q.  And that's when you had all those 40 meetings.

23  A.  No, the 40, I had some even after.

24  Q.  OK.  And but you've also met with the government to prepare

25  for testimony, right?

E6HAASER4                      Moral - Cross

1    A.  Yes.

2    Q.  To prepare what's going on in this courtroom today, right?

3    A.  Yes.

4    Q.  For direct examination and for cross-examination, right?

5    A.  Yes.

6    Q.  They showed you documents and photos, right?

7    A.  Yes.

8    Q.  They showed you the exhibits that they used today.

9    A.  Some, yes.

10   Q.  And they role played what's happening here, right?

11   A.  No.

12   Q.  Ms. Maimin asked you the questions she was going to ask you

13   in court, right?

14   A.  Not necessarily.  She just asked me questions, yes.

15   Q.  And someone also role played my role, right?

16   A.  Yes.

17   Q.  And someone practiced cross-examination, right?

18   A.  Yes.

19   Q.  Now, also during the course of your proffers -- actually,

20   withdrawn.

21          In January of 2013, after you got arrested, you

22   immediately lied, right?

23   A.  Yes.

24   Q.  Because as we discussed this morning that's your game plan,

25   right?

1   A.  Yes.

2   Q.  Your MO is to immediately deny, right?

3   A.  Yes.

4   Q.  Then when you can't deny, you then move on to try working

5   with the government, right?

6   A.  Yes.

7   Q.  And you told the agents you were in a different car than

8   the one you were actually in.

9   A.  Yes.

10  Q.  And during your cooperation you identified also a person

11  named Benny Blanco that was involved, right?

12  A.  Yes.

13  Q.  And you did that when agents showed you pictures and asked

14  you if he was involved, right?

15  A.  Yes.

16  Q.  They wanted you to say that he was involved, and you

17  obliged, right?

18  A.  No, they asked me if I knew him, if he is the person I

19  committed crimes with, and I said, yes, he is familiar.

20  Q.  You actually told them he was involved in that one, didn't

21  you?

22  A.  Which one?

23  Q.  In that January 9 crime, right?

24  A.  No.

25  Q.  But you changed your mind about the things what you said

1     after, correct?

2     A.  No.

3              MS. MAIMIN:  Objection.

4              THE COURT:  Sustained.  Why don't you rephrase.  You

5     need to go back I think two questions to do it.

6     Q.  You said that he was involved in the November 22nd robbery,

7     right?

8     A.  Yes.

9     Q.  And then you changed your mind, right?

10    A.  No.

11    Q.  You changed your mind in terms of the person you

12    identified, right?

13    A.  Yes.

14    Q.  And is it fair to say you sort of forgot because of how

15    many different crimes you committed?

16    A.  I didn't forget about the crime.  It's just the picture of

17    the person I seen looked like him, but it wasn't for sure it

18    was him.

19    Q.  And you told them that he wasn't involved.

20    A.  No, he was involved.  It's just the picture, the person I

21    seen wasn't --

22    Q.  Withdrawn.  The person that you had originally identified

23    mistakenly, you told them was not involved.

24    A.  Yes.

25             THE COURT:  Let me just see if I've got that right.

E6HAASER4                        Moral - Cross

1          So there is this fellow Benny Blanco who you committed
2     a crime with in November of 2012?
3               THE WITNESS:  Yes.
4               THE COURT:  And you subsequently when meeting with the
5     prosecutors identified a picture as that person.
6               THE WITNESS:  Yes.
7               THE COURT:  But then later on decided that that wasn't
8     the right picture, that that was somebody else.
9               THE WITNESS:  Yes.
10              THE COURT:  I see.  All right.
11              MR. DE CASTRO:  Sorry.  My fault, Judge, stumbling a
12     little there.
13    Q.  Now, is it fair to say you want to get out of jail
14    desperately?
15    A.  Yes.
16    Q.  You want to get out as soon as you can.
17    A.  Yes.
18    Q.  You want to get out as soon as this trial is over, right?
19    A.  Yes.
20    Q.  This is the only thing standing in your way, right?
21    A.  No.
22    Q.  You've got to get sentenced, right?
23    A.  Yeah.
24    Q.  And once the case is over, you are hoping that you get that
25    5K letter, right?

E6HAASER4                        Moral - Cross

1   A.  Yes.

2   Q.  That was mentioned on direct examination, right?

3   A.  Yes.

4   Q.  And on direct examination you said the government will

5   write that letter, right?

6   A.  Yes.

7   Q.  Well, it's your understanding that the government

8   represented by these prosecutors will write that letter, right?

9   A.  Yes.

10  Q.  Either Ms. Maimin or Mr. Mukhi will write the letter for

11  you.

12  A.  Yes.

13  Q.  And that letter will lay out for the judge who sentences

14  you all the assistance that you have provided to the

15  government, right?

16  A.  Yes.

17  Q.  And hopefully it's going to will say that you provided that

18  substantial assistance, that magic language, right?

19  A.  Yes.

20              (Continued on next page)

21

22

23

24

25

E6HAASER6                           Moral - Cross

1   BY MR. DE CASTRO:

2   Q.  And you are facing a 17 year mandatory minimum, right?

3   A.  Yes.

4   Q.  But there's one that that word mandatory does not apply if

5   you get that 5K letter, right?

6   A.  Yes.

7   Q.  That allows the judge if he or she wants to go below that,

8   right?

9   A.  Yes.

10  Q.  In fact, the judge could go all the way down to time-served

11  right?

12  A.  Yes.

13  Q.  And that's exactly what you wanted, right, time-served?

14  A.  I would like it.

15  Q.  Time-served or at least seven years, right?

16  A.  Or at least seven years.

17  Q.  If you would like to at least get seven years because --

18  A.  I wouldn't like to get none.

19  Q.  Actually in New Jersey your sentence is seven, right?

20  A.  Yes.

21  Q.  And that's sort of, the agreement is that it's covered --

22  I'm sorry -- is timely concurrent, right?

23  A.  Yes.

24  Q.  But you understand that you could get out in less than

25  seven in New Jersey, right?

1    A.  Yes.

2    Q.  What's your understanding of the earliest time you could

3    get out of jail?

4    A.  In New Jersey they have parole so it depends what qualifies

5    me for parole and what time period.

6    Q.  What is your understanding of the earliest time that you

7    can get out in New Jersey on parole?

8    A.  I haven't checked yet the timetables cause I am in New

9    York, so in the law library I can't look up the laws.

10   Q.  But it's substantially less than the seven, right?

11   A.  Yes.

12   Q.  Now, just a couple final questions.  You've used Facebook

13   in the past?

14   A.  If I had Facebook?

15   Q.  You have used Facebook in the past?

16   A.  Yes.

17   Q.  And on Facebook you go by Ruper, right?

18   A.  Yes.

19   Q.  Of the whatever riders?

20   A.  Yes.

21   Q.  And you post pictures and things like that on Facebook,

22   right?

23   A.  Yes.

24   Q.  Your page has obviously probably been inactive since you

25   have been in jail, right?

1    A.  Nope.

2    Q.  Still going on?

3    A.  Yeah, like a friend of mine that stays on it.

4    Q.  And you had a couple sayings posted up there, right?

5    A.  I wouldn't know what's on it.

6    Q.  When you were using Facebook you posted a couple sayings,

7    didn't you?

8    A.  Yes.

9    Q.  Wasn't one of them "actions always prove my words mean

10   nothing"?

11   A.  I don't remember that.

12   Q.  Not familiar with that?

13   A.  No.

14   Q.  What about, "I don't owe anyone any explanations for why I

15   do the shit I do"?

16   A.  Nope.

17   Q.  Doesn't sound familiar to you?

18   A.  No.

19          MR. DE CASTRO:  Nothing further, judge.

20          THE COURT:  All right.  Thank you.  Ms. Maimin,

21   anything further from you?

22          MS. MAIMIN:  Yes, your Honor, briefly.

23          Ms. Craig, could you, please, put up Government

24   Exhibit 425 which is in evidence.  It's phone records from

25   October 12, 2012

E6HAASER6                    Moral - Cross

1   REDIRECT EXAMINATION

2   Q.  Mr. Moral, I am also handing you a copy.  Do you see

3   October 14, 2012?  Sorry.  Do you see your initials at the top

4   of that page?

5   A.  Yes.

6   Q.  Do you recognize this document?

7   A.  Yes.

8          THE COURT:  Hold on one second.  Why don't you just

9   turn the document so we can see it.

10         (Pause)

11  Q.  While we're pulling this up why don't you tell us whether

12  you recognize that document?

13  A.  Yes.

14  Q.  What do you believe that document to be?

15  A.  My phone records.

16  Q.  Phone records from October 14, 2012?

17  A.  Yes.

18  Q.  Why do you believe those are your phone records?

19  A.  My number there.

20  Q.  Which number?

21  A.  The 551 number.

22  Q.  Now, do you actually recognize that number as your own?

23  A.  Yes.

24  Q.  How do you recognize that as your own?

25  A.  I've seen it before I remember.

1              MR. DE CASTRO:  I am going to object on outside the

2    scope.

3              THE COURT:  I'm hoping she's going to connect it up.

4    BY MS. MAIMIN:

5    Q.  Mr. Moral, you were asked whether you knew all the phone

6    numbers that you had all the time?

7    A.  Yes.

8    Q.  Did you, in fact, know all the phone numbers?

9    A.  No.

10   Q.  Was this one of the phone numbers you were aware having at

11   the time?

12   A.  Yes.

13   Q.  You were also asked about calls had you with the defendant?

14   A.  Yes.

15   Q.  And whether you were actually speaking to the defendant?

16   A.  Yes.

17   Q.  And are there calls here with the defendant?

18   A.  Yes.

19             MS. MAIMIN:  Your Honor, we believe we are well within

20   the scope here.

21             THE COURT:  Go ahead.  We'll wait for another

22   objection.

23   Q.  Now, you were asked about your murder trial?

24   A.  Yes.

25   Q.  Now, and the fact that you lied on the stand?

E6HAASER6                         Moral - Redirect

1   A.  Yes.

2   Q.  What's the difference between now and when you lied on the

3   stand in your murder trial?

4   A.  Back then the only thing I could do to help myself was lie.

5   Now I have been given an opportunity to tell the truth to help

6   myself.

7   Q.  You were also asked about the fact that you've committed

8   many crimes while you were cooperating with the New Jersey

9   State Police after you entered into your cooperation agreement

10  with them?

11  A.  Yes.

12  Q.  What's the difference between now and when you were in that

13  agreement with the New Jersey State Police?

14  A.  I never admitted to crimes.  I never went to any proffers.

15  I pretty much, now I've admitted to everything I've done wrong

16  and I've taken the responsibility and I am facing a 17 year

17  minimum.

18  Q.  You weren't facing it then, were you?

19  A.  No.

20  Q.  You were also asked about the timing of when you told the

21  government that the defendant supplied the gun for the

22  October 14 robbery?

23  A.  Yes.

24  Q.  You said you told us when you were asked?

25  A.  Yes.

E6HAASER6                    Moral - Redirect

1   Q.  What did you mean by that?

2   A.  When I was doing the proffers they sometimes ask you

3   questions, you don't get into the details of particular things.

4   They had asked me what I am crimes I committed.  I admitted

5   everything I did and then later on they got specific into what

6   I admit to.

7   Q.  You had not previously been asked?

8   A.  No.

9           MS. MAIMIN:  Could you, please, put up 613.

10          (Pause)

11  Q.  You were asked some questions about this photograph?

12  A.  Yes.

13  Q.  Did you take this photograph?

14  A.  No.

15  Q.  Do you know where this photograph comes from?

16  A.  Google Maps or something.

17  Q.  How do you know it comes from Google Maps?

18  A.  I've seen it.  I was looking for it on the computer.

19  Q.  You were the one who actually found it?

20  A.  Yes.

21  Q.  While you were working with the government?

22  A.  Yes.

23  Q.  OK.  You talked about how Javion Camacho was in charge on

24  the night of January 9 to your understanding?

25  A.  Yes.

E6HAASER6                         Moral - Redirect

1    Q.  Was he always in charge of every single robbery?

2    A.  No.

3    Q.  You were also asked about lies you told after you were

4    arrested in this case when you were arrested?

5    A.  Yes.

6    Q.  Was this before or after you started proffering with the

7    government?

8    A.  Before.

9    Q.  OK.  Who decides your sentence in this case?

10   A.  The judge.

11            MS. MAIMIN:  All right.  Ms. Craig, could you, please,

12   put up 3502-WW.  It's Mr. Moral's cooperation agreement.

13            (Pause)

14   Q.  Before we get to that, by the way, when you went to the

15   defendant's house during the meeting that you testified about

16   earlier today, was there anybody else home?

17   A.  His wife.

18   Q.  Did you have any contact with her?

19   A.  Just said hi.

20   Q.  Did you learn her name?

21   A.  No.

22            THE COURT:  What did she look like?

23            THE WITNESS:  I want to kind of say she is sitting

24   back there but I'm not certain.

25   Q.  What race is she?

1   A.  I think like Italian, Caucasian.

2   Q.  OK.  So now we are going to talk about 3502-WW again.  What

3   is this, Mr. Moral?

4   A.  Agreement.

5   Q.  This is your cooperation agreement?

6   A.  Yes.

7          MS. MAIMIN:  Ms. Craig, can you just scroll through

8   this.  Now I want to focus in on the last paragraph of that

9   page.

10  Q.  Mr. Moral, can you read this?

11  A.  It is understood that Moral, A, should truthfully and

12  completely disclose all information with respect to the

13  activities of himself and others concerning all matters about

14  which this office requires of him, which information can be

15  used for any purpose; B, should shall cooperate fully with this

16  office, Drug Enforcement Administration and any other law

17  enforcement agency designated by this office; c, shall attend

18  all meetings at which this office requests his presence; D,

19  shall provide to this office upon request any document, record

20  or other tangible evidence relating to matters about which this

21  office or any designated law enforcement agency inquires of

22  him; E, shall truthfully testify before the grand jury and at

23  any trial and other court proceedings.

24  Q.  Just read to the end of paragraph, please.

25  A.  With respect to any matters about which this office may

E6HAASER6                          Moral - Redirect

1    request his testimony; F, shall bring to this office's

2    attention all crimes which he has committed and all

3    administrative, civil or criminal proceedings, investigations

4    or prosecutions in which he has been or is a subject, target,

5    party or witness; and G, shall commit no further crimes,

6    whatsoever.

7            Moreover, any assistance Moral pay provide to federal

8    criminal investigator shall be pursuant to the specific

9    instruction and control of this office and designated

10   investigators.

11           MS. MAIMIN:  No further questions.

12           THE COURT:  I thank you.

13           MR. DE CASTRO:  Briefly?

14           THE COURT:  Yes.

15   RECROSS EXAMINATION

16   BY MR. DE CASTRO:

17   Q.  Mr. Moral, that agreement they just put up on the screen is

18   your cooperation agreement, right?

19   A.  Yes.

20   Q.  A piece of paper, right?

21   A.  Yes.

22   Q.  A piece of paper a lot like Defense Exhibit One was, right?

23   That's the agreement with state police, right?

24   A.  Somewhat.

25   Q.  It's an agreement you made with the government, right?

1    A.  Yes.

2    Q.  Just like an agreement you made with the New Jersey State

3    Police, right?

4    A.  Yes.

5    Q.  You make promises to the New Jersey State Police that you

6    would not commit my other crimes, right?

7    A.  Yes.

8    Q.  And you wouldn't lie about them, right?

9    A.  Yes.

10   Q.  Just like the promises you made in the plea agreement in

11   your case right now, right?

12   A.  Yes.

13   Q.  And back then when you made those promises you were facing

14   much less than 17 years, right?

15   A.  Yes.

16   Q.  You were willing to go out in and commit more crimes and

17   lie, right?

18   A.  Yes.

19   Q.  Now, you are facing 17 years in prison, right?

20   A.  Yes.

21   Q.  At least that's just the minimum, right?

22   A.  Yes.

23   Q.  You're facing a maximum of potential life in prison, right?

24   A.  Yes.

25   Q.  You do not want to stay in jail, right?

1   A.  No.

2   Q.  Now, you testified on redirect that they never asked you

3   until May of 2014 where the gun came from?

4   A.  Yes.

5   Q.  One month ago?

6   A.  Yes.

7   Q.  You've been cooperating for more than a year?

8   A.  Yes.

9   Q.  You're telling us that it never came up?

10  A.  No.

11          MR. DE CASTRO:  Nothing further.

12          THE COURT:  All right.  Thank you.

13          MR. DE CASTRO:  Sorry, judge.  I do have a couple more

14  questions.

15          THE COURT:  All right.

16          MR. DE CASTRO:  I am sorry about that.  I walked right

17  past it.

18  Q.  They also showed you Government Exhibit 425 on redirect,

19  right?  That was the --

20  A.  Yes, the phone records.

21  Q.  The phone records, right?

22  A.  Yes.

23  Q.  Is it true that five days ago you told the government you

24  weren't even sure if these were your phone records?

25  A.  I said I wasn't certain.

E6HAASER6                         Moral - Recross

1    Q.  You are not sure because had you so many phones, right?

2    A.  Yes.

3            MR. DE CASTRO:  Nothing further.

4            MS. MAIMIN:  Just one question.

5    REDIRECT EXAMINATION

6    Q.  Mr. Moral, you testified earlier that you testified at a

7    prior proceeding in this case?

8    A.  Yes.

9    Q.  Was that proceeding focused on October 14, 2012?

10   A.  No.

11           MR. DE CASTRO:  Objection; outside the scope.

12           THE COURT:  Well, I think it's relating to this

13   document that you just went over on your extra question.

14           Go ahead.

15           MS. MAIMIN:  One more question.

16   Q.  Have you ever testified at a prior proceeding that was

17   focused on October 14, 2012?

18   A.  No.

19           MS. MAIMIN:  No further questions.

20           THE COURT:  All right.  Thank you.  Mr. Moral, you may

21   step down, sir.

22           Actually, this is a good time to take our afternoon

23   break because it's 3:15.  So we'll take a break and then we'll

24   go on to the next witness after the break.  So, I want to

25   remind you, as you all know, not to talk to anybody about this

1    case including each other.

2              (Jury not present)

3              THE COURT:  In terms of timing, we had talked about

4    taking a break before the physical evidence I think was going

5    to come out.  Can we bring it that out now?  Can we do that

6    next or I'd like not to have to take another break that's all.

7              MR. MUKHI:  We could.  I think it will be close

8    whether we get to the physical evidence today.  If you want to

9    be safe and the defense has no objection we can set it up now.

10   Obviously, it'll be out there for a while before we get to it

11   in the Q and A.

12             THE COURT:  Well, I'll tell you what we'll do, let's

13   just proceed in the order in which you folks want to proceed

14   and if we get to the physical evidence, we'll do what we did

15   last time, just bring it on out.  We won't take another break.

16   We'll just parade it out as you get to it as opposed to a

17   special set-up, all right.  So that way if you get to it, you

18   get to it.  If you don't, you don't.

19             MR. DE CASTRO:  Perhaps it makes sense if they have

20   the table, if they get it to it and table will just be empty.

21             THE COURT:  All of the above is fine with me, either

22   taking them out of order or setting up the table in advance but

23   this will be our afternoon break.

24             (Recess)

25             THE COURT:  Bring the jury back out.

```
 1                    (Jury present)

 2                    THE COURT:  All right.  Ms. Maimin.

 3                    MS. MAIMIN:  The government calls Officer Christina

 4     Briones.

 5      CHRISTINA BRIONES,

 6          called as a witness by the Government,

 7          having been duly sworn, testified as follows:

 8     DIRECT EXAMINATION

 9     BY MS. MAIMIN:

10     Q.  Officer Briones, where do you work?

11     A.  I work in the 33rd Precinct in Washington Heights.

12     Q.  You work with the NYPD?

13     A.  Correct.

14     Q.  What's your job title there?

15     A.  I am currently the domestic violence officer.

16     Q.  Is that the same job you had back in October of 2012?

17     A.  No.

18     Q.  What was your job then?

19     A.  I was assigned to patrol duties at that time.

20     Q.  This is with the NYPD?

21     A.  Correct.

22     Q.  Generally speaking, what were your duties and

23     responsibilities while you were on patrol?

24     A.  My responsibility was to respond to 911 jobs.

25     Q.  When you say "911 jobs" what do you mean?
```

E6HAASER6                         Briones - Direct

1    A.   911 calls.

2    Q.   Are you familiar with the term "radio run"?

3    A.   Yes.

4    Q.   What's a radio run?

5    A.   A radio run is a call that is given to us by the central

6    dispatcher when she receives a 911 job.

7    Q.   Then you found out what the 911 job is?

8    A.   When central gives it out to us, yes.

9    Q.   Now, I want to draw your attention to October 14, 2012.

10   Were you on patrol at that time?

11   A.   Yes, I was.

12   Q.   Were you alone?

13   A.   I was with a partner.

14   Q.   Who is your partner?

15   A.   Officer Brion.

16   Q.   Are where were you patrolling?

17   A.   Washington Heights.

18   Q.   Generally, where?

19   A.   About 171 around St. Nicholas.

20   Q.   And what were your specific duties on that day?

21   A.   To answer any 911 jobs that came over.

22   Q.   Over a radio run?

23   A.   Yes.

24   Q.   So, I'd like to draw your attention to, approximately,

25   8:58 p.m.  What, if anything, happened while you were on duty

E6HAASER6                    Briones - Direct

1   at that time?

2   A.  When we received a 911 job over the air of a 1030.

3   Q.  What's a 1030?

4   A.  It's a robbery in progress.

5   Q.  After hearing the radio run of a robbery in progress what,

6   if anything, did you do?

7   A.  We responded to the scene.  It was between 171 Street

8   between St. Nicholas and Audobon.  We made the right turn onto

9   that street when we saw a crowd in the middle of the street.

10  That's when we got flagged down by a group of people and were

11  approached by a male and female.

12  Q.  Without -- and did you speak that male and female?

13  A.  Yes, I did.

14  Q.  Without going into the substance of what was said, did you

15  learn the male and female's name?

16  A.  Yes.

17  Q.  What was it?

18  A.  Yscarly Infante and -- Pareda.

19  Q.  And, again, without going into the substance of what was

20  said did you interview Ms. Infante and Mr. Pareda?

21  A.  Yes.

22          MS. MAIMIN:  Could you, please, put up Government

23  Exhibit 602-B which is in evidence.

24          (Pause)

25  Q.  Do you recognize this?

E6HAASER6                    Briones - Direct

1    A.  Yes, I do.

2    Q.  What is this?

3    A.  This is 171 Street.

4    Q.  And you responded here at, approximately, 8:58 p.m.?

5    A.  Correct.

6    Q.  And there should be a laser pointer there for you.

7    A.  This?

8    Q.  Yep.

9    A.  OK.

10   Q.  Could you, please, point on this laser pointer to where you

11   first saw that commotion you mentioned?

12   A.  Towards this way.

13   Q.  If you can do it on the big screen?

14   A.  Oh, I am sorry.  Towards where that, where I am pointing

15   at, towards the middle of the block.

16           MS. MAIMIN:  OK.  Could you let the record reflect

17   that Officer Briones is referring sort of near the white car

18   that's all the way to the right of this photograph.

19   Q.  Officer Briones, after you interviewed the male and female,

20   what did you do?

21   A.  We put a description over of the vehicle and canvassed the

22   area for information that was provided to us and we rent to the

23   complainant's old address to make sure that the perpetrators

24   didn't go to that area to commit another crime.

25   Q.  When you say the complainant are you talking about the male

E6HAASER6                    Briones - Direct

1    or female?

2    A.   The female, Ms. Infante.

3    Q.   What did you find when you went there?  Did you find that

4    anyone had been there?

5    A.   No, nobody had been there.  We just warned the current

6    residents who lived what had happened and if they saw any

7    suspicious males to call 911.

8    Q.   What did you do next?

9    A.   After that we went back to the 33rd Precinct and typed up

10   the complaint report.

11            MS. MAIMIN:  No further questions.

12            THE COURT:  All right.  Thank you.

13            Mr. de Castro or Ms. Gotlib?

14            MS. GOTLIB:  Thank you, your Honor.

15   CROSS-EXAMINATION

16   BY MS. GOTLIB:

17   Q.   Good afternoon.  How are you, officer?

18   A.   Good afternoon.

19   Q.   Just a couple quick questions.  So, there was an

20   investigation into the robbery that occurred on October 14,

21   2012; is that correct?

22   A.   Correct.

23   Q.   And the victims identified one of the perpetrators of the

24   crime, correct?

25            MS. MAIMIN:  Objection to the foundation.

1            THE COURT:  Well, why don't you rephrase.

2    Q.  If you know, were the victims shown photographs of

3    potential individuals?

4    A.  That would be done by the investigator who took this case,

5    not by me.

6    Q.  If you know, do you know if that was done in this case?

7    A.  I am not sure.

8    Q.  Now, you went and you spoke with -- you went to court and

9    spoke with an assistant district attorney about this case?

10   A.  Say one more time.

11   Q.  You spoke with Assistant District Attorney LaDonna about

12   this case, correct?

13   A.  I know I spoke to -- you mean in regular state court?

14   Q.  Yes.

15   A.  I don't recall what ADA I got but I know I spoke to an ADA

16   in regards to it.

17   Q.  What case was that?

18   A.  I don't recall.

19   Q.  But it was related to October --

20   A.  It was related to this case.

21   Q.  And somebody was being prosecuted for this robbery?

22   A.  I don't recall at this time.

23   Q.  But it was related to this incident, correct?

24            MS. MAIMIN:  Objection; asked and answered.

25            THE COURT:  I think it's confirming what was said, but

E6HAASER6                          Briones – Cross

1    go ahead.

2    Q.  Is that correct?

3    A.  Yes.

4              MS. GOTLIB:  Thank you.  No further questions.

5              THE COURT:  Thank you.

6              Ms. Maimin, anything further from you?

7              MS. MAIMIN:  No, your Honor.

8              THE COURT:  All right.  You may step down, officer.

9              Would the government like to call its next witness,

10   please.

11             MS. MAIMIN:  Yes, your Honor.  The government calls

12   frank Piazza.

13             THE COURT:  All right.  Mr. Piazza, please.

14   FRANK PIAZZA ,

15        called as a witness by the Government,

16        having been duly sworn, testified as follows:

17   DIRECT EXAMINATION

18   BY MS. MAIMIN:

19   Q.  Mr. Piazza, where do you work?

20   A.  I work at Audio Paint in New York City.

21   Q.  What is Audio Paint?

22   A.  Audio Paint is an audio/video production company.

23   Q.  What is your position there?

24   A.  Owner and president.

25   Q.  What do you mean by "audio production"?

1  A.  Various different forms of audio might include spoken word,

2  might be music, might be sound effects, things of that nature.

3  Q.  And what does it mean to produce audio?

4  A.  It has many different stages.  We could record the audio.

5  We could be handed the audio and work with it a little bit.

6  Q.  Have you become familiar with the term "audio enhancement"?

7  A.  Yes.

8  Q.  And do you do audio enhancement?

9  A.  I do.

10  Q.  What is audio enhancement?

11  A.  Audio enhancement is taking previously recorded audio and

12  trying to bring the best possible clarity to it so you can

13  enjoy the playback.

14  Q.  How long have you been doing audio enhancement?

15  A.  I became an audio enhancement specialist in the year 2000.

16  Q.  What do you mean by audio enhancement specialist?

17  A.  I was, began my work working with forensic materials for

18  court cases.

19  Q.  By "forensic material" what do you mean?

20  A.  Any audio or video evidence that might be used in a legal

21  case.

22  Q.  How did you learn how to do audio enhancement?

23  A.  Most of the learning was hands-on owning the business.

24  Dealing with a lot of the audio I have taken special courses

25  over the years but mostly as a business owner and being part of

1    the industry.

2    Q.  Do you make presentations to other people about audio

3    enhancement?

4    A.  Yes, I do.

5    Q.  To what kinds of people?

6    A.  Mostly the legal community.  They might include government

7    agencies such as FBI or private investigator agencies or Bar

8    Association things of that nature.

9    Q.  Now, is there only one technique used during audio

10   enhancement?

11   A.  You can't really say there's one technique, no.  Every

12   piece of audio is approached differently.  So there are

13   numerous techniques.  Sometimes many at once and sometimes not

14   so many.

15   Q.  OK.  Are you familiar with the term "equalization

16   filtering"?

17   A.  Yes.

18   Q.  What does that mean?

19   A.  Equalization filtering is audio when you look at it and you

20   analyze it it falls into different frequencies, different bands

21   of harmonics and you can filter them, meaning you can adjust

22   the levels of just certain frequencies or equalization of audio

23   to make it sound a certain way.

24   Q.  And what is the purpose of equalization filtering?

25   A.  Well, the purpose might be, for example, an equalization

E6HAASER6                    Piazza - Direct

1    band might include something that might be the sound of an air

2    duct or a low grumble of a truck.  And these can be removed

3    just simply by reducing or filtering those equalization bands.

4    Q.  Are you familiar with the technique of noise reduction?

5    A.  Yes, I am.

6    Q.  What's that technique?

7    A.  Noise reduction is a technique, and many times through

8    software, that identifies certain noise that might be present

9    in recording and we try to reduce those to bring out other

10   parts of the recording we might be more interested in.

11   Q.  What kinds of noises might you try to reduce?

12   A.  Environmental noises.  Again, I mentioned air ducts, air

13   conditioning, the sound of a hiss, low hums, things of that

14   nature.  That's considered noise.

15   Q.  And that's what you try to reduce in the recording?

16   A.  Correct.

17   Q.  Finally, are you familiar with the process of increasing

18   the amplitude of voices?

19   A.  Yes.

20   Q.  What does that mean?

21   A.  Amplitude, will just describe it as volume.  It's very

22   typical that if were speaking closer to this microphone I'd be

23   louder.  If I were further away I would be softer.  So, I would

24   have the opportunity to raise the amplitude or the volume of

25   different voices so we can hear everything that's present in

E6HAASER6                    Piazza - Direct

1    the recording.

2    Q.  So you can just control it for certain voices to make them

3    louder to be heard?

4    A.  That's correct, yeah.

5    Q.  Now, turning from the process of audio enhancement, do you

6    also do subtitling at Audio Paint?

7    A.  Yes, we do.

8    Q.  What is subtitling?

9    A.  Subtitling is creating a visual of a transcript and making

10   a movie so you can sync the actual transcript with the audio

11   playback and you can read what you are hearing.

12   Q.  How do you do that?

13   A.  A transcript will be prepared by my client and I will take

14   that transcript as a digital file and combine it into a

15   software program that marries the two together.

16   Q.  Are you paid for your work?

17   A.  Yes, I am.

18   Q.  And are you also paid for your time to prep for trial and

19   testify at trial?

20   A.  Yes, I am.

21   Q.  Now, in this case were you asked to make enhanced

22   recordings?

23   A.  Yes, I was.

24   Q.  Were you also asked to make subtitled versions of those

25   enhanced recordings?

1    A.  Yes, I was.

2    Q.  I am now going to hand you what's been marked for

3    identification as Government Exhibits 301, 303, 307 and 308.

4    Do you recognize these?

5    A.  Yes, I do.

6    Q.  What are they?

7    A.  These are disks of recordings that were handed to me.

8    Q.  So, these are sort of the base original recordings?

9    A.  Yes, these are the original recordings before enhancement.

10   Q.  And how do you know that that's what they actually are?

11   A.  I've initialed these disks.  I have had an opportunity to

12   see these.

13   Q.  Are those the recordings that were provided to you with

14   respect to this case?

15   A.  Yes.

16        MS. MAIMIN:  The government offers 301, 303, 307 and

17   308 subject to connection.

18        MR. DE CASTRO:  No objection.

19        THE COURT:  Received.

20        (Government's Exhibits 301, 303, 307 and 308 received

21   in evidence)

22   Q.  OK.  I am now going to be showing you what's been marked

23   for identification as 301-E, 308-E, 307-E and 303-E.  Do you

24   recognize these?

25   A.  Yes, I do.

1    Q.  What are these?

2    A.  These are enhanced versions of the disks I just previously

3    spoke about.

4    Q.  Just to clarify, for instance, 301-E the enhanced version

5    of 301 and so on?

6    A.  Yeah.

7    Q.  How do you know those are the enhanced versions?

8    A.  I've initialed these disks and I have had an opportunity to

9    review them.

10           MS. MAIMIN:  The government offers 301-E, 303-E, 307-E

11   and 308-E subject to connection.

12           MR. DE CASTRO:  No objection.

13           THE COURT:  Received.

14           (Government's Exhibits 301-E, 303-E, 307-E and 308-E

15   received in evidence)

16   Q.  When you made these enhanced recordings, did you use the

17   technique of equalization filtering?

18   A.  I did.

19   Q.  What about noise reduction?

20   A.  Yes.  On some of these files I did use noise reduction.

21   Q.  What about increasing amplitude of voices?

22   A.  Yes.

23   Q.  Were you also asked to add subtitles to these recordings?

24   A.  Yes, I was.

25   Q.  I am now handing you what's been marked for identification

1   as 303-E-S, 308-E-S, 301-E-S and 307-E-S.  Do you recognize

2   these?

3   A.  Yes, I do.

4   Q.  What are these?

5   A.  These are disks of the enhanced audio with the subtitle

6   included or the subtitle movie included.

7   Q.  So, how did you know what subtitles to put on those

8   subtitled recordings?

9   A.  You've provided me with the transcripts.

10  Q.  And how do you recognize those CDs as the subtitled

11  recordings?

12  A.  My initials are on these disks and I have had an

13  opportunity to review the materials.

14          MS. MAIMIN:  The government offers 301-E-S, 303-E-S,

15  307-E-S and 308-E-S as an aid to the jury subject to

16  correction?

17          MR. DE CASTRO:  No objection.

18          THE COURT:  Received as stated.

19          (Government's Exhibits 301-E-S, 303-E-S, 307-E-S and

20  308-E-S received in evidence)

21  Q.  Just to clarify, is 301-E-S the subtitled version of the

22  enhanced recording 301-E and so on?

23  A.  That's correct.

24          MS. MAIMIN:  Nothing further.

25          THE COURT:  All right.  Thank you.

E6HAASER6                          Piazza - Direct

1              Mr. de Castro.

2              MR. DE CASTRO:  No questions, judge.

3              THE COURT:  Thank you.  You may step down, Mr. Piazza.

4    You are all set.

5              (Witness excused)

6              THE COURT:  All right.  Would the government call its

7    next witness.

8              MR. MUKHI:  The government calls Special Agent Todd

9    Riley.

10             THE COURT:  All right.

11    TODD RILEY,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. MUKHI:

16    Q.  Good afternoon, Mr. Riley.  Where do you work?

17    A.  For the Drug Enforcement Administration.

18    Q.  Is that called anything for short?

19    A.  DEA.

20    Q.  And what is your title with the DEA?

21    A.  I am a special agent.

22    Q.  How long have you been a special agent with the DEA?

23    A.  September 2008.

24    Q.  What unit are you currently assigned to at the DEA?

25    A.  I am in the Drug Enforcement Administration Task Force.

1    Q.   What is the task force?

2    A.   The task force is comprised of special agents with the Drug

3    Enforcement Administration, NYPD detectives and investigators

4    with the New York State Police.

5    Q.   And are you assigned to a particular task force?

6    A.   I am in the group T-32.

7    Q.   What does group T-32 focus on?

8    A.   We specialize in the violence side of drug trafficking

9    organizations, drug robberies, drug homicides, things of that

10   nature.

11   Q.   What do you do in your day-to-day duties as a special agent

12   in that group?

13   A.   The cases that we work in review witnesses, cooperators,

14   conduct surveillance, recordings, things of that nature.

15   Q.   And, approximately, how many different drug robbery

16   investigations have you worked on?

17   A.   I'd say over 20.

18   Q.   How long have you been with T-32, your group, right now?

19   A.   About a year and a half.

20   Q.   And so directing your attention to December 2012 and

21   January 2013, were you in the same group you are in now or were

22   you in the different group?

23   A.   I was in a task force but I was in a different group.

24   Q.   What was that group?

25   A.   That was primarily a drug enforcement group.

1   Q.  Besides doing drug enforcement did that group do any other

2   types of cases and investigations?

3   A.  Yes.  Also the drug robbery crews and things of that

4   nature.

5   Q.  Now, do you see anyone in the courtroom today who you have

6   arrested during the course of one of your investigations?

7   A.  Yes.

8   Q.  Who do you see?

9   A.  Anthony Serrano sitting at defense table with the blue

10  shirt on.

11          MR. MUKHI:  Your Honor, may the record reflect the

12  witness has identified the defendant?

13          THE COURT:  So reflected.

14  Q.  Now what was your role in the investigation of the

15  defendant?

16  A.  As the case agent.

17  Q.  What is the case agent?

18  A.  The case agent kind of coordinates the case, establishes

19  the surveillance, handles the cooperators and witnesses, kind

20  of directs the investigation.

21  Q.  Were you working with any other agents or agencies during

22  the course of the investigation of the defendant?

23  A.  Yes, I was.

24  Q.  Which agencies are those?

25  A.  The Federal Bureau of Investigation or the FBI and also the

1    Hudson County Prosecutors' Office.

2    Q.  Now, you mentioned you do debriefings of witnesses in your

3    duties.  What type of witnesses?

4    A.  There's confidential sources and cooperating witnesses.

5    Q.  What's the different between a confidential source and a

6    cooperating witness?

7    A.  A confidential source is a person working with the

8    government in exchange for money.  A cooperating witness is a

9    person who faces charges from the government and they're

10   working with us in exchange for hopefully leniency in their

11   sentencing.

12   Q.  Now, when did the investigation of the defendant begin,

13   approximately?

14   A.  November 2012.

15   Q.  And how did that investigation begin?

16   A.  Through debriefing of the cooperating witness.

17   Q.  And who is in charge of this, of supervising this

18   cooperating witness at the DEA?

19   A.  I was.

20   Q.  And by the way, we just heard from Mr. Moral.  Was this

21   Mr. Moral or some other cooperating witness?

22   A.  This is another cooperating witness.

23   Q.  Now without getting into the specifics of what this other

24   witness told you, what was the general nature of the

25   information that started the investigation?

1    A.   That he had information on a drug robbery crew.

2    Q.   Once you learned that information what did you do next?

3    A.   Set-up meetings with members of this organization.

4    Q.   And the meetings between the members of the organization

5    and who?

6    A.   The cooperating witness.

7    Q.   What was your ultimate goal in November/December 2012 for

8    this investigation?

9    A.   To conduct a sting operation on this group.

10   Q.   What is a sting?

11   A.   It's a tool used by law enforcement to conduct a controlled

12   arrest of individuals that you believe are involved in this

13   crime where you can control the environmental factors and try

14   to keep witnesses and victims safe.

15   Q.   And was there a particular type of sting that you decided

16   to use in this investigation?

17   A.   Robbery sting or reverse sting.

18   Q.   And a robbery of what?

19   A.   Drugs.

20   Q.   OK.   Now, you mentioned that you decided to set up meetings

21   between the witness and members of the crew.   Did that occur at

22   some point?

23   A.   Yes, it did.

24   Q.   What happened first?

25   A.   First, I set up a meeting December 14th of 2012 in

1   Paterson, New Jersey with a subject named Jauncey Valle.

2   Q.  Now, what did you instruct the witness to tell Valle about

3   why the CW -- what did you instruct the CW or the witness to

4   tell Valle about why the CW wanted to meet with him that day?

5   A.  I told him to tell Valle that he had potential inside

6   information on a drug crew that was primed to be rocked.

7   Q.  Now, you mentioned the meeting took place on December 14.

8   Did you conduct surveillance of that meeting?

9   A.  Yes, I did.

10  Q.  Who did you see attend the meeting?

11  A.  The cooperating witness and Jauncey Valle.

12          MR. MUKHI:  Now, can you put on the screen or Agent

13  Riley only, Government Exhibit 202.

14          (Pause)

15  Q.  Do you recognize what's on the screen?

16  A.  Yes, I do.

17  Q.  What is it?

18  A.  Jauncey Valle.

19          MR. MUKHI:  Your Honor, the government offers

20  Government Exhibit 202 into evidence.

21          MR. DE CASTRO:  No objection.

22          THE COURT:  Received.

23          (Government's Exhibit 202 received in evidence)

24          MR. MUKHI:  Can we briefly publish.

25          (Pause)

1    Q.  Now, after the initial meeting with Valle did there come a

2    time when you instructed the CW to have an in-person meeting

3    with another member of the robbery crew?

4    A.  Yes.

5    Q.  When did this second meeting take place?

6    A.  December 17, 2012.

7    Q.  Who attended -- well, first of all, did you conduct

8    surveillance of that meeting?

9    A.  Yes, I did.

10   Q.  And who attended that meeting?

11   A.  That meeting was the cooperating witness, a confidential

12   source, Jauncey Valle and Javion Camacho.

13   Q.  Now, did you ultimately arrest Javion Camacho?

14   A.  Yes, I did.

15   Q.  When was that?

16   A.  January 9, 2013.

17   Q.  Where did you arrest him?

18   A.  In the Bronx around 253 Street and Post Road.

19          MR. MUKHI:  And can you put up 203 just for Agent

20   Riley.

21          (Pause)

22   Q.  Do you recognize what's on your screen?

23   A.  I do.

24   Q.  What is it?

25   A.  It's a picture of Javion Camacho.

E6HAASER6                          Riley - Direct

1   Q.  Do you know when it was taken?

2   A.  That night either January 9 or if it bled over into

3   January 10.

4              MR. MUKHI:  The government offers Government Exhibit

5   203 into evidence.

6              MR. DE CASTRO:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 203 received in evidence)

9              MR. MUKHI:  Can we publish?

10              (Pause)

11   Q.  Now, you mentioned that it was both a CI and a

12   confidential, a cooperating witness who attended those

13   meetings?

14   A.  Correct.

15   Q.  Now, who at the DEA was supervising the CI or the

16   confidential informant?

17   A.  I was.

18   Q.  And who decided to also have the CI join this meeting with

19   Javion Camacho?

20   A.  I did.

21   Q.  And why did you decide to send the CI to the meeting along

22   with the CW?

23   A.  The CW's first time working with us.  The CS had worked

24   with us in the past to kind of corroborate the CW's accounts of

25   what happened.

1    Q.  Now, prior to the meeting with Javion Camacho on

2    December 17, did you provide any instructions to the CI and the

3    CW?

4    A.  Yes.

5    Q.  OK.  Did you provide those instructions together or

6    separately?

7    A.  Together.

8    Q.  Now, what instructions did you give him?

9    A.  The CI was to pose as the person with the inside

10   information on the drug trafficking organization and the CW was

11   to facilitate the meet between the CI and Javion Camacho.

12   Q.  And what did you direct them to discuss at the meeting with

13   Javion Camacho?

14   A.  To tell them that they had information on an upcoming

15   shipment of heroin that was coming to the New York City area

16   sometime after the holidays and to see if they would be willing

17   to conduct an armed robbery of it.

18   Q.  What was the size or the amount of heroin that you

19   instructed the CI and the CW to say would be in the shipment?

20   A.  We instructed them to say it was at least ten kilos of

21   heroin, ten kilograms.

22   Q.  Why did you choose that amount?

23   A.  When you are doing, chose that amount, one, it had to be

24   believable that that amount of drugs would be transported by

25   several people and armed.  And also to weed out anyone that's

E6HAASER6                          Riley - Direct

1    on the fence with committing a robbery so that they don't think

2    it's just an easy cash grab that you actually have to be

3    prepared to carry out this robbery and that you also have to

4    have the wherewithal to then sell those drugs to make a profit

5    on the robbery.

6    Q.  All right.  Prior to the CI going in -- well, first of all,

7    where did this meeting take place?

8    A.  At McDonald's at 34th Street and Tenth Avenue, New York,

9    New York.

10   Q.  Now, prior to the meeting taking place, did you give the CI

11   or the CW anything?

12   A.  Yes.

13   Q.  What did you -- who did you give something to and what did

14   you give them?

15   A.  I gave the CI an audio recorder.

16   Q.  And what instructions did you give to the CI, if any, about

17   what to do with the audio recording?

18   A.  To keep it on his person and follow my other instructions

19   to say that he had information on the drug crew or the drug

20   organization.

21       MR. MUKHI:  And if we could just for Agent Riley put

22   206 on the screen.

23   Q.  Do you recognize what's on your screen?

24   A.  I do.

25       MR. MUKHI:  I am sorry; 204.

E6HAASER6                        Riley - Direct

1   Q.  Do you recognize was on your screen now?

2   A.  I also recognize this picture.

3   Q.  What is this?

4   A.  This is a picture of the McDonald's at 34th Street and

5   Tenth Avenue where this meeting occurred.

6   Q.  Does it fairly and accurately represent the McDonald's as

7   you it saw it on December 17, 2012?

8   A.  Yes, it does.

9        MR. MUKHI:  The government offers Government Exhibit

10   204 into evidence.

11        MR. DE CASTRO:  No objection.

12        THE COURT:  Received.

13        (Government's Exhibit 204 received in evidence)

14   Q.  OK.  So what did the CI do after you gave him the recording

15   equipment?

16   A.  The CI then walked into the front entrance of this

17   McDonald's and proceeded to the upstairs level of McDonald's

18   and sat down.

19   Q.  By the way, before he went, did you check to make sure that

20   the recording equipment was working properly?

21   A.  Yes, I believe I turned it on for him.

22   Q.  Now, what did the CI do after the meeting with the

23   recording equipment?

24   A.  He gave it back to us.

25   Q.  And what did you do with the recording after the CI gave it

1    back to you?

2    A.  It was then downloaded to a disk.

3    Q.  Now, during the course of this investigation were there

4    other recordings made by the CI and maintained by you in a

5    similar fashion under similar procedures?

6    A.  Yes.

7    Q.  And, actually, in front of you are piles of disks and I'll

8    direct you to 301, 301-E, 301-E-S, 303, 303-E, 303-E-S, 307,

9    307-E, and 307-E-S.  Do you recognize those particular disks?

10   A.  I do.

11   Q.  And what are they?

12   A.  They're the original recordings from that device.  They --

13   the one 301-E is the enhanced version and the E-S is the

14   enhanced with subtitles.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

E6H7SER7                        Riley - direct

1   BY MR. MUKHI:

2   Q.  And and how do you recognize those as the disks containing

3   the recordings?

4   A.  I reviewed those and also put my initials on each disk.

5   Q.  And were those the recordings you were referring to when

6   you said they were recordings made in this case in the manner

7   that you described?

8   A.  Yes.

9   Q.  Now, were there also audio -- phone call recordings made

10  during the course of this case?

11  A.  Yes.

12  Q.  And were those made at whose direction?

13  A.  Mine.

14  Q.  And who made the recordings?

15  A.  Both the CW and I believe the CI also may have had a phone

16  conversation as well.

17          MR. MUKHI:  I am now going to approach, your Honor,

18  with what has been premarked for identification as 302 and 306,

19  government's exhibits.

20          THE COURT:  All right.

21  Q.  Do you recognize these disks, Agent Riley?

22  A.  I do.

23  Q.  What are they?

24  A.  These are the recordings of the phone calls.

25  Q.  Now, how do you recognize them as recordings of phone calls

```
1    made in this investigation?
2    A.  Again, my initials are at the bottom after reviewing it.
3    Q.  Who provided the CI and the CW with the equipment to record
4    these calls?
5    A.  I did.
6    Q.  And were you present for some of the calls when they took
7    place?
8    A.  Yes.
9    Q.  And for those calls did you -- what did you do after the
10   call?
11   A.  Downloaded them to disks.
12   Q.  And were any of the calls made outside of your presence
13   that you know of?
14   A.  No.
15   Q.  And how did you get a copy of those recordings?
16   A.  I would then meet with the CW or the CS and download it
17   onto a disk.
18   Q.  Now, have you listened -- well, you testified you listened
19   to these recordings.  How many times have you listened to these
20   recordings approximately?
21   A.  I'd say at least 50.
22   Q.  And who is on the recordings?
23   A.  Javion Camacho, the CW, Jauncey Valle.
24   Q.  Anyone else that you can recall?
25   A.  On the phone calls or the meetings?
```

1   Q.  Let's start with the meetings, the in-person meetings.  Who

2   are on those recordings that you recall?

3   A.  The CW, the CS, Jauncey Valle, Javion Camacho and Julio

4   Camacho.

5   Q.  And directing your attention to the January -- well, what

6   were the dates of those recordings?

7   A.  December 17, January 2, January 9.  And on January 9 there

8   was also a Victor Moral, and I believe that's it.

9   Q.  And on the phone calls, who are on those phone calls?

10  A.  The phone calls primarily the CW, Jauncey Valle and Javion

11  Camacho.

12  Q.  Now, by the way, you have been saying CS and CI.  Are those

13  the same or different?

14  A.  I'm sorry, the CS and the CI, we use them interchangeably,

15  confidential informant and confidential source.

16  Q.  Now, did you also prepare or review transcripts for those

17  recordings?

18  A.  Yes.

19          MR. MUKHI:  Your Honor, I am approaching with 301T,

20  302T, 303T, 306T and 307T.

21          THE COURT:  All right.

22  Q.  Do you recognize what I just handed you?

23  A.  I do.

24  Q.  And what are they?

25  A.  These are the transcripts from listening to the audio

E6H7SER7                          Riley - direct

1   recordings.

2   Q.  Now, you mentioned that there were various people on those

3   recordings.  Are you familiar with the voices of all the people

4   in the recordings?

5   A.  Yes.

6   Q.  Starting with the CI and the CW, how are you familiar with

7   their voices?

8   A.  From working with them and talking to them on a nearly

9   daily basis.

10  Q.  OK.  And then you testified that Javion Camacho is also on

11  some of those recordings.  How are you familiar with his voice?

12  A.  I arrested him on January 9 and spoke with him.

13  Q.  And how about Julio Camacho, how are you familiar with his

14  voice?

15  A.  The same.

16  Q.  And how about Jauncey Valle?

17  A.  I arrested him I believe January 11, 2013 and spoke with

18  him as well.

19  Q.  And how about Victor Moral?

20  A.  Victor Moral, also from the arrest on January 9, 2013 and

21  through subsequent proffers with the government.

22  Q.  Now, the transcripts in front of you, did you verify that

23  the corresponding transcript reflected what was taking place on

24  the corresponding recordings?

25  A.  Yes.

E6H7SER7                          Riley - direct

1    Q.  And how did you do that?

2    A.  That's why I listened to them over 50 times, just going

3    back and forth.

4    Q.  And how did you listen to them?

5    A.  With headphones.  Sorry.

6    Q.  And did you verify on the transcripts that the transcripts

7    accurately assigned who is speaking when?

8    A.  Yes.

9            MR. MUKHI:  Your Honor, at this time the government

10   offers 301, 301E, 301ES, 302, 303, 303E, 303ES, 306, 307, 307E,

11   307ES and 301T, 302T, 303T, 306T and 307T.

12           The ES series and the Ts, the transcripts, are offered

13   only as aids; the rest are offered into evidence.

14           THE COURT:  All right.  The others are actually

15   already in evidence.

16           MR. MUKHI:  Subject to connection.

17           THE COURT:  Subject to connection.  So they are

18   received for all purposes.

19           MR. MUKHI:  Thank you, your Honor.

20   Q.  All right.  Now let's go back to the December 17th meeting

21   at the McDonald's.  What time approximately did the meeting

22   take place?

23   A.  That meeting was around 9 o'clock p.m.

24   Q.  And were you conducting surveillance inside or outside of

25   the McDonald's?

1    A.   I was outside.

2    Q.   And were you by yourself or were you with other agents?

3    A.   I was with other agents.

4              MR. MUKHI:   If we could put 204 back up on the screen.

5    Q.   And where in relation to the McDonald's were you set up

6    doing surveillance that day?

7    A.   This same side of the McDonald's, the viewpoint of where

8    the camera is being taken, looking at the upstairs window

9    section of the McDonald's.

10   Q.   And were you in a vehicle, or were you on foot?

11   A.   Vehicle.

12   Q.   Now, who arrived -- well, what did you see first?

13   A.   The CS walking in and going upstairs.

14   Q.   And did the CS arrive with you or separately from you?

15   A.   With me.

16   Q.   And what did you see next?

17   A.   Next I saw a red Toyota Camry enter the parking let.  A

18   short time after that Javion Camacho, the CW, and Jauncey Valle

19   exited that vehicle and entered the McDonald's.

20   Q.   Now, the red Toyota Camry, do you recall whether or not you

21   wrote down the license plate number of the red Toyota Camry?

22   A.   I did.

23   Q.   And sitting here today, do you recall the license plate

24   number?

25   A.   I don't.

E6H7SER7                        Riley - direct

1    Q.  Is there something that would refresh your recollection?

2    A.  My report that I wrote that day.

3              MR. MUKHI:  Your Honor, I am approaching with 3501AA.

4              THE COURT:  All right.

5    Q.  If you could just read that to yourself, put it down and

6    then let us know if that refreshes your recollection as to the

7    license plate number of the red Toyota Camry that you saw that

8    day.

9    A.  Yes, U89CKX, New Jersey.

10             MR. MUKHI:  Now, your Honor, I now have a stipulation

11   to read into evidence.

12             THE COURT:  All right.

13             MR. MUKHI:  It is agreed between the parties that

14   Government Exhibits 607A through 607D are true and correct

15   business records maintained by the New Jersey Motor Vehicle

16   Commission regarding a 2012 red Toyota Camry registered with

17   the MVC to Julio Camacho, 9 Saint Ann's Street, Carteret, New

18   Jersey, 07008, and bearing New Jersey registration number

19   U89CKX, and vehicle identification number 4T1BF1FK9CU604337.

20             The parties also agree that this stipulation and

21   Government's Exhibits 607A through 607D may be received into

22   evidence as government's exhibits at trial.  At this time the

23   government offers Government's Exhibits 607A through 607D, as

24   well as 801, which is a stipulation.

25             THE COURT:  Any objection?

1          MR. DE CASTRO:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibits 607A through 607D received in

4     evidence)

5          (Government's Exhibit 801 received in evidence)

6          MR. MUKHI:  All right.  Can we put up 607A and zoom

7     into the top half.

8     Q.  Now, Agent Riley, do you see that same license plate number

9     anywhere on this screen here?

10    A.  I do.

11    Q.  Where is that?

12    A.  Right there on the plate number.

13    Q.  Can you read that again?

14    A.  U89CKX.

15    Q.  Does it say anywhere here what the make, model, year and

16    color of this car is?

17    A.  Yes.  Make Toyota, the model Camry, the year 2012.  And the

18    color over here red.

19    Q.  And what does it say about the registration information on

20    this page?

21    A.  It it's at the top, and it shows that it's a lease from

22    Toyota.

23    Q.  And if we turn to the next page -- I'm sorry -- 607B.

24          All right.  What does this page show?

25    A.  This is the leasee information, and the name is Julio

1    Camacho.  The street is 9 Saint Ann Street, Carteret, New

2    Jersey.

3    Q.  By the way, was Julio Camacho seen that day on December 17

4    in the red Camry?

5    A.  No, he was not.

6    Q.  By the way, there is a start date there.  Can you read

7    that, or do you see it?

8    A.  Yes, it's August 6, 2012.

9    Q.  Before we get to the recording, was there also video

10   surveillance footage of what was taking place inside of the

11   McDonald's on December 17?

12   A.  Yes.

13   Q.  And whose cameras were capturing what was going on?

14   A.  The McDonald's surveillance video.

15   Q.  Now, did the McDonald's surveillance video capture audio

16   and video or just one of those?

17   A.  Just video.

18   Q.  And have you been inside that McDonald's?

19   A.  Yes.

20   Q.  And who obtained that video?

21   A.  I did.

22           MR. MUKHI:  Now, this is already in evidence.  Can we

23   put up 300A.  If we could just pause for a second.

24   Q.  What are we looking at in this screen?

25   A.  This is the upstairs portion of the McDonald's looking

1    down.  You would go down these stairs, and then right off to

2    the left of the stairs would be the front entrance to this

3    McDonald's.

4    Q.  And where is the street in relation to what we're seeing?

5    A.  If you are looking at the screen, to your right would be

6    Tenth Avenue, and if you were to go down those stairs and walk

7    straight out, you would walk out onto 34th Street.

8              MR. MUKHI:  Ms. Craig, can we fast forward to

9    approximately 1:58 in the video and pause at 2:08.

10             (Video played)

11   Q.  Who was that that just walked up the stairs, if you know?

12   A.  That is the CW.

13   Q.  And now can we fast forward to 2:55.

14             (Video played)

15   Q.  Who is that on the screen, if you know?

16   A.  That is Jauncey Valle.

17   Q.  And that's the same Jauncey Valle that you identified

18   earlier in the photo?

19   A.  Correct.

20             MR. MUKHI:  Now if you could fast forward to three

21   minutes -- just continue playing actually to 3:22.

22             (Video played)

23   Q.  Who is that?

24   A.  That is Javion Camacho.

25             MR. MUKHI:  All right.  Why don't we just continue

 1 │ playing.

 2 │         (Video played)

 3 │ Q.  All right.  So we just saw those three individuals make a

 4 │ left at least from what we are looking at on the screen.  Do

 5 │ you know what is to the left of where they just walked to?

 6 │ A.  The dining area.

 7 │         MR. MUKHI:  Now, can we pull up 303B already in

 8 │ evidence.  And if we could fast forward to approximately --

 9 │ Q.  Well, first of all, if we pause right there, do you

10 │ recognize the person sitting at the table?

11 │ A.  I do.  That is the CS.

12 │         MR. MUKHI:  All right.  And now, Ms. Craig, if you

13 │ could fast forward to approximately two minutes.

14 │         (Video played)

15 │ Q.  Who is that who just sat down with the CS?

16 │ A.  That is the CW.

17 │         MR. MUKHI:  And now we can fast forward to 3:05.

18 │         (Video played)

19 │ Q.  Who is that?

20 │ A.  That is Jauncey Valle.

21 │         MR. MUKHI:  And let's continue to play.

22 │         (Video played)

23 │ Q.  Who is that who just walked onto the screen?

24 │ A.  That's Javion Camacho in the gray sweat suit.

25 │         MR. MUKHI:  Why don't we actually now go to the video

E6H7SER7                          Riley - direct

1  from October 14, 2012, which is introduced into evidence as

2  300C, and fast forward to 20:54 or 8:54:25.

3            (Video played)

4  Q.  All right.  Do you see the individual that we just saw walk

5  onto the screen, Agent Riley?

6  A.  Yes, I do.

7  Q.  How many times have you seen or met Javion -- how many

8  times have you seen Javion Camacho?

9  A.  Three or four times.

10 Q.  And did you ever meet him?

11 A.  Yes.

12 Q.  When was that?

13 A.  January 9, 2013.

14 Q.  OK.  And the times you saw him besides the arrest, what

15 types of situations did you see him?

16 A.  Under surveillance during the meets.

17 Q.  Based on your observations of Javion Camacho, from seeing

18 him and from the arrest, the individual who just walked on the

19 screen, does he have the same physical profiles as Javion

20 Camacho, or a different one?

21 A.  The same.

22 Q.  By the way, have you been to that approximate location?

23 A.  Yes, I have.

24 Q.  OK.  And what is located there?

25 A.  A pharmacy.

E6H7SER7                          Riley - direct

1   Q.   OK.   Now, before we get to the audio recording --

2              You may take that down --

3              What instructions did you give before this meeting --

4   you may have mentioned this -- about the type of drug the CI

5   and CW should tell Camacho that could be robbed by them?

6   A.   Heroin.

7   Q.   And approximately how many heroin cases have you worked on?

8   A.   In my entire career?

9   Q.   Yeah, approximately.

10  A.   I'd say close to 1,000, at least a couple hundred.

11  Q.   And what quantities of heroin are sold at street level?

12  A.   Individual glass -- sorry -- glassine bags, like wax paper.

13  Q.   Are the glassine bags actually glass, or are they something

14  else?  What are they?

15  A.   No, it's a wax paper.  Heroin, the powder is so fine that

16  you have to use a wax paper, or else it will blow all over the

17  place and you will lose the heroin.

18  Q.   Now we are talking about the wholesale level.  What are the

19  quantities of heroin sold at the wholesale level?

20  A.   Kilograms.

21  Q.   And approximately how many pounds in a kilogram?

22  A.   2.2 pounds.

23  Q.   And in the New York City area, approximately how much is a

24  kilogram of heroin?

25  A.   It can go anywhere from about $50,000 to $65,000 a gram.

1    THE COURT:  Let me just ask you, in terms of the

2    kilogram of heroin, how many glassine bags would that be?

3    THE WITNESS:  So typically a glassine bag holds about

4    .03 to .04 grams.

5    Typically heroin dealers when you get that kilogram,

6    they go to a mill and they then cut it with their cutting

7    agent, so they can actually expand that kilogram, which is

8    obviously a thousand grams, and can expand it even more.  They

9    break it down with a cutting agent, and about .03 and .04 grams

10   go into each glassine bag.  I am not good enough at math to

11   figure out how many bags.

12   THE COURT:  I can figure it out.  Thank you.

13   Q.  Speaking of math, I believe you said that heroin costs

14   $55,000 per gram.  Is that what you meant?

15   A.  Yes.

16   Q.  Per gram?

17   A.  They go like $50 to $65 per gram or $50,000 to $65,000 per

18   kilogram.

19   Q.  Now turning to cocaine, how many cocaine investigations

20   approximately have you worked on in your career?

21   A.  The same.

22   Q.  And what are the quantities of cocaine sold at the street

23   level?

24   A.  Again they come in just plastic bags, about .1 gram inside

25   of each gram.

1   Q.   And are those also those wax bags?

2   A.   They're typically in just like small Ziploc or plastic

3   bags.

4   Q.   And does cocaine fall apart in the same way you described

5   the heroin was fragile in that way?

6   A.   No.

7   Q.   Now, again talking about the wholesale level, what are the

8   quantities of cocaine sold at the wholesale level?

9   A.   Also kilograms.

10   Q.   And how much does a kilogram of cocaine cost in the New

11   York City area?

12   A.   In the New York City area it's anywhere from about $30 a

13   gram to I've heard recently it's up to about $45 a gram.

14          THE COURT:  Were those prices materially different

15   back in 2012?

16          THE WITNESS:  2012 the heroin was about the same,

17   about $50,000 to $65,000 per kilogram.  The cocaine was

18   probably less, about 35 to 30.  And recently we have heard of a

19   spike in the price.

20          THE COURT:  All right.

21   Q.   And what's the reason for the spike in the price, if you

22   know?

23   A.   You are always hearing about a drought, a shortage of

24   product, large seizures at the border.  You are getting this

25   information from informants in the street, things like that.

E6H7SER7                        Riley - direct

1   Q.  All right.  Now before we get started with the recordings,

2   two other questions.  Based on your review of the recording,

3   what name did the CI or the CS use with Javion Camacho during

4   that meeting?

5   A.  Papo or Papi.

6   Q.  And what name did the CW use during the meeting?

7   A.  Jos or Jose.

8           MR. MUKHI:  Your Honor, I am now going to ask that the

9   jurors turn to 301T in their binders.

10          THE COURT:  All right.  Ladies and gentlemen, I want

11  to remind you that it's the recording that is actually the

12  evidence.  The transcript that you will be looking at is simply

13  an aid to help you follow along.

14          MR. MUKHI:  Your Honor, we are simultaneously going to

15  put the subtitles on the screen, and so the jurors can either

16  follow along in the transcripts or on the screen.

17          THE COURT:  Or both.

18          MR. MUKHI:  Or both.

19          THE COURT:  Again, the subtitles are treated look a

20  transcript.  The subtitles are simply to assist you.  And if

21  your ears perceive a different word than what you see, it's

22  what you believe you have heard that controls.

23          MR. MUKHI:  OK.  And if we could go ahead and play the

24  54 second mark.

25          (Audio played)

1   Q.  Just one logistical thing.  We saw in a couple of places UI

2   in brackets.  What's the significance of UI?

3   A.  That's short for unintelligible.  We just couldn't make out

4   exactly what someone was saying.

5   Q.  And you may have mentioned this, but what amount of heroin

6   did you instruct the CI or the CS and the CW to say that would

7   be coming in, the heroin shipment?

8   A.  At least ten kilograms.

9   Q.  And what did you say, if anything, to the CI and the CW

10  about what they should say about whether it would be expected

11  that people would be inside the location where the heroin could

12  be robbed?

13  A.  I told them to say that there would be people inside.

14  Q.  And why did you tell the CI and the CW that?

15  A.  Again, you want to weed out anyone who is not serious about

16  this.  You want the crew to know that this is a dangerous job,

17  that there is going to be people, not only is it a drug

18  organization but there are going to be people protecting this

19  drug shipment.

20          MR. MUKHI:  OK.  Let's continue to play to 1:34.

21          (Audio played)

22  Q.  Agent Riley, what if anything did you instruct the CI to

23  say about whether the people inside the robbery location would

24  be holding any weapons?

25  A.  I told him to tell him that they would be armed.

1          MR. MUKHI:  Continue playing to 2:35.

2          (Audio played)

3   Q.  Now, Agent Riley, we just heard Javion Camacho say that

4   there were real cops and ATF agents.  When you arrested Javion

5   Camacho, were other people there?

6   A.  Yes.

7   Q.  OK.  And how many people?

8   A.  15 other people, not including Javion Camacho.

9   Q.  Were any of those people real cops?

10  A.  No.

11  Q.  By the way, what were they doing at the time you arrested

12  them?

13  A.  Getting ready to carry out this robbery.

14  Q.  And were any of the people you arrested federal law

15  enforcement of any kind?

16  A.  No.

17  Q.  Now, what did you instruct the CI about what to say about

18  where this robbery location was going to be located?

19  A.  That it should be in like a quiet neighborhood.

20  Q.  Why did you give that instruction?

21  A.  One, to kind of set the stage for where our arrest would

22  occur.  We want them to feel comfortable when we take them to a

23  quiet place, because we obviously don't want to take down an

24  armed crew in the middle of Time Square with people everywhere.

25  Q.  All right.  Now, what did you say, if anything, to the CI

1    about what he should say to Javion Camacho about when the

2    heroin shipment would be arriving?

3    A.   That it would come after the holidays.

4            MR. MUKHI:  Let's continue to play.

5            (Audio played)

6    Q.   Agent Riley, what did you instruct the CI, if anything,

7    about what he should say about how he found out about this

8    heroin shipment that could be robbed?

9    A.   That he had inside information from I believe a female, I

10   told him to say.

11   Q.   That the female was who in your instruction?

12   A.   She was someone that was working with the drug trafficking

13   organization that would be able to pass on the information to

14   the CI of when the drugs were there, where they were at, how

15   they were accessible.

16           MR. MUKHI:  Let's continue playing to 5:04.

17           (Audio played)

18   Q.   Agent Riley, what instructions, if any, did you give the CI

19   about whether he should ask any questions about prior robbery

20   jobs that the crew had done?

21   A.   I instructed the CI to ask about prior jobs or other crimes

22   that the people have committed.

23   Q.   Why was that?

24   A.   One is we can begin our investigation on the crew, and also

25   once the arrests occur, if anyone wants to cooperate, we kind

1   of have our homework and our information about what to ask them

2   about, what to know what they are telling the truth about or

3   what they are possibly lying about.

4            MR. MUKHI:  All right.  Why don't we continue to play.

5            (Audio played)

6   Q.  All right.  Agent Riley, we saw a moment ago Javion Camacho

7   give a phone number for himself.  Do you recall that?

8   A.  Yes.

9   Q.  Now, have you looked at who Javion Camacho was in contact

10  with?  Or let me put it this way:  Have you looked at which

11  numbers that phone number was in contact with around the time

12  of this meeting?

13  A.  Yes.

14  Q.  And did you seize a phone from Javion Camacho on January 9,

15  2013?

16  A.  Yes.

17  Q.  And did it have the same number or a different number than

18  the one we just saw?

19  A.  Same number.

20           MR. MUKHI:  Your Honor, may I approach?

21           THE COURT:  You may.

22  Q.  Now, I am handing you 502B.  Do you recognize that

23  document?

24  A.  I do.

25  Q.  And what is it?

E6H7SER7                      Riley - direct

1   A.   These are charts of the communications between Anthony

2   Serrano's phone number and Javion Camacho's phone number

3   between November 16, 2012 and January 9, 2013.

4   Q.   And how about the rest of the pages in those documents?

5   A.   This is more charts and data that were collected from

6   Javion Camacho's phone.

7   Q.   OK.   And is there analysis with regards to other people's

8   phones as well in this document you are looking at?

9   A.   Yes.

10  Q.   And did you verify the information that's in those charts?

11  A.   Yes.

12  Q.   And what did you verify them against?

13  A.   The actual records from the phone company.

14  Q.   All right.   I am now handing you what has been already

15  introduced into evidence as 410, 411, 415, 416, 417, 419 and

16  422.   Do you recognize these disks?

17  A.   These are the disks of the information supplied from the

18  phone company about these different phones.

19  Q.   OK.   The same information that you used to verify the

20  charts?

21  A.   Exactly.

22            MR. MUKHI:   Your Honor, at this time the government

23  offers Government Exhibit 502B into evidence.

24            MR. DE CASTRO:   No objection.

25            THE COURT:   Received.

1           (Government's Exhibit 502B received in evidence)

2           MR. MUKHI:  Can we put the first page up?

3    Q.  Now, Agent Riley, what does this page of the analysis show?

4    A.  This shows total communications between Anthony Serrano's

5    cell phone number and Javion Camacho's between November 16 and

6    January 9.

7    Q.  And how many total communications were there?

8    A.  371.

9    Q.  And if we could turn to the next page.  What does this page

10   of your chart show?

11   A.  This is the communications between Anthony Serrano's cell

12   phone number and Javion Camacho's on that December 17th meet

13   date and the amount of communications that they had.

14   Q.  OK.  And what time was the meeting again?

15   A.  This meeting was around 9 o'clock p.m.

16   Q.  And how long did it last approximately?

17   A.  Not very long, maybe half an hour or so.

18   Q.  And were there any communications after 7 p.m. between

19   Anthony Serrano and Javion Camacho on December 17?

20   A.  After 7 p.m. there were three.

21   Q.  And approximately what times or time ranges?

22   A.  It looks like probably 7:30, around 7:50 p.m., and then

23   another right before ten p.m.

24           MR. MUKHI:  All right.  Now, why don't we go back to

25   where we were in the recording.

1          (Audio played)

2    Q.  Agent Riley, we just saw Javion Camacho say that he was

3    from Jersey City.  Did you ever do surveillance of Javion

4    Camacho at what you believed was his home?

5    A.  Yes.

6    Q.  And was that in Jersey City or somewhere else?

7    A.  No, that was in Carteret, New Jersey.

8    Q.  And do you remember the address in Carteret?

9    A.  Nine Saint Ann Street.

10   Q.  Can we go back to 502B, page 3.

11          Now, Agent Riley, what does this show?

12   A.  This is an overview map of New Jersey and New York, and

13   this is the location of Javion Camacho's cell phone on December

14   17, 2012 at approximately 7:53 p.m., when he was having a

15   communications with Anthony Serrano's cell phone.

16   Q.  And where did you get the information to put in this page

17   of your chart?

18   A.  This information comes from the data collected from the

19   phone company.

20          MR. MUKHI:  Now, can we go to 415 and page 126 in

21   particular, and if we could zoom in on the second to last row.

22   I believe it's 2655.  And if we could zoom in further.  We can

23   do it piece by piece.  OK.

24          And could we put that side by side with page 3 of 415.

25   Is that possible, the zoomed in part, or just the portion on

1    the left ending at 8583.  And then can we put page 3 of 502B.

2    And zoom in at the top.

3    Q.  All right.  So, Agent Riley, what's the significance of

4    what we're seeing in 415 versus what we're seeing in the phone

5    chart?

6    A.  So, the top left, the 2655, I believe that's the call

7    number, the actual like amount of calls that there were.  This

8    is number 2655.  The date that the call was made, December 17,

9    2012, which is the same as below obviously.  The time of the

10   call, 7:53 p.m., same as below.  The seven seconds I believe is

11   the lapse time of how long the phone rang before it was picked

12   up.  To the left is the phone number -- or to the right of that

13   seven seconds in the phone number, which is Javion Camacho's

14   cell phone.  That's the number that makes the call.  And then

15   the number to the right is the phone number of Anthony Serrano.

16        MR. MUKHI:  And if we could go to the next section of

17   that row, 265.

18        THE COURT:  Just be aware we are going to be ending in

19   about a minute and a half.

20        MR. MUKHI:  I will wrap up quickly.

21   Q.  So we see the 2:13 on the top half, which is 415.  What's

22   the significance of that?

23   A.  That's the duration of the phone call.

24   Q.  By the way, that 8583 number, whose number is that?

25   A.  That again is Anthony Serrano's.

E6H7SER7                              Riley - direct

1   Q.  OK.  Why don't we go to the very end of the row.  So now

2   what is the significance of that information?

3   A.  The second half of numbers is the latitude and longitude of

4   the placement of that cell phone.  In this case it was Javion

5   Camacho's cell phone.

6   Q.  And how did you find out where that location was?

7   A.  We plugged latitude and longitude numbers into Google Maps

8   and it will pop up.

9   Q.  Just a couple more questions.  That type of information,

10  where does that information come from, the location

11  information?

12  A.  From the cell phone company.

13  Q.  OK.  And how does the DEA get that information from the

14  cell phone company?

15  A.  Through a court order.

16          MR. MUKHI:  If we could just go back to 415 --

17  sorry -- 502B, page 3, bottom full screen and zoom in a little

18  bit.

19  Q.  And so, according to the records, where was Javion

20  Camacho's cell phone located, what town in New Jersey?

21  A.  Down in Carteret, New Jersey.

22  Q.  And we saw that it was 7:53 p.m. in the top half of this

23  slide.  What time was the meeting in New York?

24  A.  Around 9 o'clock p.m.

25  Q.  And if you know, approximately how long of a drive is it

E6H7SER7                          Riley - direct

1    from Carteret to 34th Street and Tenth Avenue in Manhattan

2    approximately?

3    A.   Around that time traffic isn't it bad, so maybe half an

4    hour, 30 minutes, somewhere around there.

5            MR. MUKHI:  Your Honor, this would be a good time to

6    end for the day.

7            THE COURT:  All right, thank you.

8            Ladies and gentlemen, we will pick up tomorrow at

9    9:30.  So, if you could be here and ready to go at around 9:20,

10   that would be terrific.

11           I want to remind you not to talk to anybody about this

12   case, including each other.  Keep an open mind.  Remember, do

13   not Google or do any electronic research relating to anything

14   you have heard in this case, any locations, any venues.  We

15   will see you in the morning.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

E6H7SER7

1          (Jury not present)

2          THE COURT:  Let's all be seated.  I have one matter

3     that I wanted to just make sure we had covered before we break,

4     which has to do with timing -- actually one and a half matters.

5     It's timing.  I want to get a sense of timing, and if we are

6     still thinking that we are going to be at this point ending

7     testimony from the government's case tomorrow and, if so,

8     whether or not Mr. Serrano is likely to testify.

9          MR. MUKHI:  I think it's actually going to end

10    tomorrow mid to late afternoon, depending on crosses.  But

11    Agent Riley probably another hour on direct.  I understand the

12    cross is not going to be very long.  And then after that the

13    witnesses will all be shorter.  Investigator Donaldson will

14    probably be the longest witness after that, and he is probably

15    half an hour to 45 minutes on direct.  Other than that, I don't

16    think anyone is going to exceed very much on direct.  They are

17    going to be short fact witnesses and one expert, Mr. Perry, but

18    he is going to be a short time and limited in scope.

19         THE COURT:  All right.  At this point in time,

20    Mr. De Castro, does Mr. Serrano intend to testify?

21         MR. DE CASTRO:  He does not.

22         THE COURT:  All right.  It is my practice when there

23    is a defendant who has chosen not to testify to have a direct

24    conversation with the defendant to ensure that he understands

25    his right to testify as well as his right not to testify, and

E6H7SER7

1    also to make sure that we have covered it so that later on

2    nobody is surprised, because every once in a while people if

3    they don't testify regret not having testified.  Sometimes I'm

4    sure if they do testify, they may regret having testified too.

5    But this colloquy, this conversation is just to make sure that

6    you understand your rights in this regard, Mr. Serrano.

7              THE DEFENDANT:  Yes.

8              THE COURT:  Do you understand that you have the right

9    to testify?

10             THE DEFENDANT:  Yes.

11             THE COURT:  And do you understand that that's a

12   decision that is your decision.  You can consult with your

13   lawyer, but ultimately it is your decision to make.  Do you

14   understand that?

15             THE DEFENDANT:  Yes.

16             THE COURT:  You also have the right not to testify,

17   and if you choose not to testify, the jury will be given an

18   instruction that they cannot draw any inference or suggestion

19   of guilt from the fact that you don't testify.  But you

20   understand you do have the right to testify.

21             THE DEFENDANT:  Yes.

22             THE COURT:  And have you spoken with your lawyer about

23   your right?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Are you making your decision not to

530

E6H7SER7

1    testify yourself?

2             THE DEFENDANT:  Yes, I am.

3             THE COURT:  All right, thank you.

4             Is there anything further that we should go over this

5    afternoon before we break?  Ms. Maimin?

6             MS. MAIMIN:  Just a brief housekeeping issue.  I

7    understand there is no objection from the defense.  We just

8    want to formally introduce into evidence some of the name

9    plates we put up on the board today.  Those are 1A, 1B, 1C, 2A,

10   2B, 2C, 3A, 5B, 8B, 9B and 10B.

11            THE COURT:  I think these were marked for

12   identification before, so they are going into evidence now.

13            MR. DE CASTRO:  No objection.

14            THE COURT:  Received.  All right.

15            (Government's Exhibits 1A, 1B and 1C received in

16   evidence)

17            (Government's Exhibits 2A, 2B and 2C received in

18   evidence)

19            (Government's Exhibits 3A, 5B, 8B, 9B and 10B received

20   in evidence)

21            MR. MUKHI:  One other issue with regards to timing.

22   We had discussed earlier this morning about the possibility of

23   if we wrap up early afternoon or midafternoon tomorrow starting

24   the charge but not launching into summations, so I just wanted

25   to close the loop on that to see where we stood.  I understand

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E6H7SER7

1    defense counsel had an opportunity to think about the charge

2    issue.

3            MR. DE CASTRO:  Yes, Judge.  Actually if I can have

4    one minute.

5            THE COURT:  Yes.  And let me make sure -- I mean you

6    have all looked at Rule 30, but Rule 30 allows us to do after

7    the close of evidence, obviously before it goes to the jury.

8            MR. DE CASTRO:  Can I have just one second?

9            THE COURT:  Yes.  Should we deal with this tomorrow

10   morning?

11           MR. DE CASTRO:  No.  I think the only issue is

12   whatever time we have left, which part of the charge, but I

13   don't think we have -- we actually don't have any problem.

14           THE COURT:  I propose not to pick and choose.  I

15   propose to start at page 1 and just to go on through.  I think

16   it's easier than having debates about whether or not where I

17   get has some meaning.  And I would instruct the jury -- I mean

18   if we want to, we can stop at a certain point which is after

19   the general instructions, before we get to the substantive

20   charge.

21           MR. DE CASTRO:  So the idea is you would just do the

22   entire charge.

23           THE COURT:  I will do as much as we have time for.

24           MR. DE CASTRO:  I see.

25           THE COURT:  So depending upon when the evidence

E6H7SER7

1    closes, I would start the charge and continue until done.  If

2    we only have an hour, I will only get through a piece of it.  I

3    think the charge is about an hour and a half because it's three

4    counts, and so I think, you know, it's not short but it's not

5    terribly long, but it's not going to be 45 minutes.

6         MR. DE CASTRO:  We have no objection.

7         THE COURT:  All right.

8         MR. MUKHI:  Just for planning purposes, the parties

9    will not be summing up tomorrow.

10        THE COURT:  The parties, right, will not be summing up

11   tomorrow.  You should spend your time tonight giving me any

12   comments you have in terms of track changes on the jury

13   instructions so I can get those whenever you are done with them

14   tonight.

15        What I will do is if they are relatively

16   straightforward, I will include them in a version I will give

17   you tomorrow morning by 9 o'clock.  If they're not, then I will

18   do what I can, and we will talk about whatever is left at nine.

19   But we should make sure to try to all be on time so we can

20   start right at nine and take up that half hour, and that would

21   conclude our charging session on the instructions.

22        So, the discussion will be in writing, so you will

23   have an opportunity to give me whatever comments you have, and

24   then we will address things orally as well.

25        If you want to include any written argument on

E6H7SER7

1      instructions, go ahead and put in a letter if you would like.

2      We may or may not have enough time tomorrow to address it.

3              With that said, I received your draft instructions --

4      go ahead.

5              MR. DE CASTRO:  No.  If we have any legal argument

6      like a case, can we just put that in the comment section.

7              THE COURT:  Yes, absolutely and then we will pull that

8      out.  Absolutely.

9              We have taken out conscious avoidance, as you know.

10     My plan at the moment is to include the Pinkerton charge.

11     There is a case directly on point with both aiding and abetting

12     liability as well as Pinkerton related to a gun charge.  That

13     case distinguishes the -- what is the name of the case?  It's

14     the Masotto case.  Actually it's a different context.  It's

15     organized crime.  M-a-s-o-t-t-o.  And it's at page -- the pin

16     cite is at page 1239 to 1240.  So I think that that does

17     support a Pinkerton charge in the instructions.

18             I looked at it hard because of the aiding and abetting

19     piece, and I wanted to ensure that aiding and abetting did not

20     for some reason preclude the Pinkerton charge, in some way

21     having the two interact.  So I just give you that folks that

22     because I looked at that just today.

23             Anything further we should go over right now?

24             MS. MAIMIN:  Very minor housekeeping.  Defense counsel

25     inadvertently asked Ms. Craig to show an exhibit that was not

E6H7SER7

1    in evidence during Moral's cross-examination.  It's 602G, and

2    we are happy to offer it into evidence now.

3                THE COURT:  I see.  602G looked very much like E or F.

4                MS. MAIMIN:  It does.  It's a very easy mistake to

5    make.

6                THE COURT:  It's just the front.

7                MR. DE CASTRO:  Audubon.

8                THE COURT:  All right.  So 602G is received.

9                (Government's Exhibit 602G received in evidence)

10               MS. MAIMIN:  Thank you.  Nothing further from the

11   government.

12               THE COURT:  Thank you.  Then we are adjourned until

13   tomorrow morning.  Let's all get ready to starting at nine.  I

14   look forward to receiving your track changes on the jury

15   instructions sometimes in the wee hours.

16               (Trial adjourned to June 18, 2014 at 9:00 a.m.)

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3    VICTOR MORAL

 4    Direct By Ms. Maimin . . . . . . . . . . . . 245

 5    Cross By Mr. De Castro . . . . . . . . . . 401 )

 6    Redirect Q. . . . . . . . . . . . . . . . . 468

 7    Recross By Mr. De Castro . . . . . . . . . . 474

 8    Redirect Q. . . . . . . . . . . . . . . . . 477

 9    CHRISTINA BRIONES

10    Direct By Ms. Maimin . . . . . . . . . . . . 479

11    Cross By Ms. Gotlib  . . . . . . . . . . . . 483

12

13    Direct By Ms. Maimin . . . . . . . . . . . . 485

14    TODD RILEY

15    Direct By Mr. Mukhi  . . . . . . . . . . . . 493

16                        GOVERNMENT EXHIBITS

17    Exhibit No.                              Received

18     410, 411, 412 and 413   . . . . . . . . . . 243

19     413A through 413D   . . . . . . . . . . . . 244

20     415, 416, 417, 418 and 419   . . . . . . . 244

21     420, 422 and 423   . . . . . . . . . . . . 244

22     424, 425 and 426   . . . . . . . . . . . . 244

23     807  . . . . . . . . . . . . . . . . . . . 244

24     1  . . . . . . . . . . . . . . . . . . . . 259

25     2  . . . . . . . . . . . . . . . . . . . . 261
```

1    10      . . . . . . . . . . . . . . . . 262

2    5      . . . . . . . . . . . . . . . . . 263

3    9      . . . . . . . . . . . . . . . . . 264

4    3      . . . . . . . . . . . . . . . . . 264

5    246 and 247   . . . . . . . . . . . . . . 271

6    234     . . . . . . . . . . . . . . . . . 272

7    603-C   . . . . . . . . . . . . . . . . . 283

8    605-C and 605-D   . . . . . . . . . . . . 298

9    11      . . . . . . . . . . . . . . . . . 302

10   606-B   . . . . . . . . . . . . . . . . . 308

11   602-C   . . . . . . . . . . . . . . . . . 318

12   602E and 602F   . . . . . . . . . . . . . 335

13   300A, 300B and 300C   . . . . . . . . . . 337

14   804     . . . . . . . . . . . . . . . . . 337

15   602B    . . . . . . . . . . . . . . . . . 346

16   601B    . . . . . . . . . . . . . . . . . 351

17   613     . . . . . . . . . . . . . . . . . 357

18   216     . . . . . . . . . . . . . . . . . 360

19   404A through 404P   . . . . . . . . . . . 366

20   210     . . . . . . . . . . . . . . . . . 385

21   604-H and 604-Q   . . . . . . . . . . . . 387

22   8      . . . . . . . . . . . . . . . . . . 391

23   3502-WW   . . . . . . . . . . . . . . . . 396

24   301, 303, 307 and 308   . . . . . . . . . 490

25   301-E, 303-E, 307-E and 308-E   . . . . . 491

1    301-E-S, 303-E-S, 307-E-S and 308-E-S   . . . 492

2    202   . . . . . . . . . . . . . . . . . . 498

3    203   . . . . . . . . . . . . . . . . . . 500

4    204   . . . . . . . . . . . . . . . . . . 503

5    607A through 607D   . . . . . . . . . . . 512

6    801   . . . . . . . . . . . . . . . . . . 512

7    502B   . . . . . . . . . . . . . . . . . 526

8    1A, 1B and 1C   . . . . . . . . . . . . . 533

9    2A, 2B and 2C   . . . . . . . . . . . . . 533

10   3A, 5B, 8B, 9B and 10B   . . . . . . . . . 533

11   602G   . . . . . . . . . . . . . . . . . 537

12                    DEFENDANT EXHIBITS

13   Exhibit No.                        Received

14   1   . . . . . . . . . . . . . . . . . . . 432

15

16

17

18

19

20

21

22

23

24

25