E6IAASER1                     Trial

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                          13 CR 58 (KBF)

 5  ANTHONY SERRANO,

 6                  Defendant.

 7  ------------------------------x

 8                                          New York, N.Y.
                                            June 18, 2014
 9                                          9:00 a.m.

10

    Before:
11
                    HON. KATHERINE B. FORREST,
12
                                            District Judge
13

14                          APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    RACHEL MAIMIN
17  RAHUL MUKHI
         Assistant United States Attorneys
18
    CESAR DE CASTRO
19       Attorney for Defendant Serrano

20  VALERIE GOTLIB
         Attorney for Defendant Serrano
21
    ALSO PRESENT:  Danielle Craig, Paralegal
22  Todd Riley, Special Agent, DEA

23

24

25

E6IAASER1                    Trial

1              (Trial resumed; jury not present)

2              THE COURT:  Good morning, everyone.  Please, be

3    seated.

4              COURTROOM DEPUTY:  Continuation of the matter now on

5    trial.  U.S. v. Serrano.

6              Counsel, please, state your names for the record.

7              MS. MAIMIN:  Good morning, your Honor.  Rachel Maimin

8    and Rahul Mukhi, Special Agents Todd Riley and Natalie Bara and

9    Paralegal Specialist Danielle Craig.

10             MR. DE CASTRO:  Cesar de Castro and Valerie Gotlib,

11   and Mr. Serrano is standing to my left.

12             THE COURT:  All right.  Good morning everyone.  We are

13   going to start this morning with the jury instructions and

14   verdict form.

15             Let me just insure that there aren't other items on

16   the agenda that you folks would like to raise or if there are

17   at lease let me get the agenda straight.

18             MS. MAIMIN:  We don't have anything.

19             MR. DE CASTRO:  No, your Honor.

20             THE COURT:  So I've handed you folks a copy of the

21   verdict form and we had not gotten drafts from you folks with a

22   separate proposal.  I know you have had very little time to

23   look at this, so we'll talk about this at the midmorning break.

24             Now, I've broken Count One, you'll see, into subparts

25   for type and quantity that relates both to enhanced penalties,

1    if any, that would be imposed for particular types and

2    quantities, as well that's the primary reason for pulling it

3    out in terms of enhanced penalties.  We'll talk about the jury

4    instructions separately whether or not something is reasonably

5    foreseeable versus whether it's direct participation can

6    determine whether or not the quantity and type also need to be

7    considered, they do under the reasonably foreseeable situation

8    but the jury is instructed on that.  And I don't think I have

9    to necessarily pull that out on the verdict form simply for

10   that purpose.

11          One thing I want the government to think about and

12   since you are hearing about this right now for the first time

13   you don't have to, you can deal with this also at the break.

14   But in order to charge on brandishing I need to understand what

15   your evidence of brandishing is in light of how the testimony

16   came in on what I thought it was going to be the moment of

17   brandishing yesterday.  And so it may -- Mr. Mukhi?

18          MR. MUKHI:  Yes.  Was your Honor finished or no?

19          THE COURT:  If you've gotten immediate response, you

20   are standing, go on ahead.

21          MR. MUKHI:  OK.  Thank you, your Honor.  So Mr. Moral

22   testified that he could see the gun that Javion Camacho was

23   carrying when --

24          THE COURT:  In the black plastic bag.

25          MR. MUKHI:  No.  After when they pulled over the

1    couple Mr. Moral testified that he could see the gun on Kong as

2    they were approaching the couple in a bulletproof vest.  We can

3    find those for your Honor when we have a moment.  Now, the

4    victims we also expect are going to testify today that although

5    they don't have 100 percent certainty each of them saw

6    something that they believed was a firearm.

7             THE COURT:  All right.  Well, that would be -- we'll

8    see how the testimony comes in yet today.  I didn't realize

9    there was more testimony to come on that point.  That may

10   answer the question, I don't believe, but there may be case law

11   supportive of the fact that Moral's knowing of the gun being

12   visible would suffice to prove brandish-ment.  It would be

13   inferentially probative of the presence of a firearm but the

14   brandish-ment has to be placing a person in as an intimidated

15   person whether the presence is seen or at least believed.

16            MR. MUKHI:  Well, I am looking at charge and it says

17   to brandish a firearm means that all or part of the weapon was

18   displayed or the presence of the weapon was otherwise made

19   known to another person to intimidate that person.

20            THE COURT:  I don't think you can have a secret weapon

21   though even if it was displayed.  When I say "secret" I don't

22   mean secret in the sense it was concealed.  Let's see how the

23   testimony comes in.  If it comes in that the victims believe

24   that there was a weapon and there's testimony that there was a

25   weapon, it'll be a jury question.  Then we'll weigh the

E6IAASER1                    Trial

1   evidence as they deem appropriate and we won't have to get into

2   the nuances as to whether or not there needs to be some

3   inferential proof as to whether or not the victims knew.  It

4   sounds like you've got testimony you expect today.

5              MR. MUKHI:  Yes.

6              THE COURT:  All right.  Let's leave it for the moment.

7        Mr. de Castro, obviously, we can see how the testimony

8   comes in and if you at that point -- I've raised the point sua

9   sponte based on yesterday but -- I see on page 344 and 345 of

10  the transcript it looks like the gun was strapped in the vest

11  is the way the testimony came in in the transcript and that the

12  butt or handle may have been visible to Moral whether or not it

13  was visible to a third party or needed to be is a question

14  we'll get to if we need to, all right.  But that's where the

15  testimony is.

16             Let's go to the instructions.  I gave you a black line

17  of the jury instructions that contained both your suggested

18  changes which largely I took as you can see as well as a couple

19  of my own which were really language changes.  I do think that

20  the government's change on aiding and abetting to include the

21  advanced knowledge language is necessary under the Supreme

22  Court's very recent case Rosemond v. United States 134 Supreme

23  Court 1240.  So, I believe that that is appropriate.

24             I also believe it's appropriate to change the quantity

25  and type instruction in the manner that the government has

1    suggested based upon a combination of the Endino case which is

2    627 F.3d 341 and at Esclaera case, E-S-C-L-A-E-R-A.  I think

3    those two cases together lead to the proposition that for

4    direct evidence you don't need quantity or type.  If there's

5    going to be direct evidence of participation in a narcotics

6    transaction conspiracy where the narcotics of a particular type

7    and quantity are exchanged, but if it's reasonably foreseeable

8    you do hear there's both.  Here, we have I think evidence or at

9    least the argument that there's evidence of the direct

10   participation as well as more reasonably foreseeable.  So I

11   think the instruction as currently worded does achieve both of

12   those.

13            Let's start off and just see where you folks may have

14   your first suggested change or want to note an exception.

15            MS. MAIMIN:  Actually, your Honor, we concur with the

16   current draft except defense counsel and the government would

17   still propose that the Court give an instruction about expert

18   witnesses since there will be Special Agent Eric Perry

19   testifying today who is an expert witness.

20            THE COURT:  All right.  Let's pull out the standard

21   expert witness charge.

22            Mr. de Castro.

23            MR. DE CASTRO:  We join in the expert request.  I am

24   now just paging through.

25            THE COURT:  All right, page through.

```
1          If you have any exceptions that you want to raise in
2     the first break as well, you can give me your initial response
3     now or if you see something that you want to raise you can
4     raise it then.  This would be the time to raise exceptions.
5          MR. MUKHI:  Your Honor, this is not an exception but
6     just to be efficient with time and we've discussed this with
7     Mr. de Castro and Ms. Gotlib last night, to give your Honor an
8     update on witnesses, we will not be calling Ephraim Ortiz or
9     Margaret Camacho.
10         THE COURT:  All right.
11         MR. MUKHI:  We also understand that the defense will
12    not be calling any witnesses.
13         THE COURT:  All right.
14         MR. MUKHI:  And so I think there's an outside chance
15    we be could be done even before lunch.  If not, certainly, in
16    the afternoon.  Just, and I think at that point as we have
17    discussed your Honor would start the charge and however far we
18    got maybe we'll be able to finish all of it if things went
19    quickly.
20         THE COURT:  Mr. de Castro, is that correct that at
21    this point in time the defendant does not intend to call
22    witnesses?
23         MR. DE CASTRO:  That's correct.
24         THE COURT:  So, when the government rests what we'll
25    do is we'll take a break, obviously.  We'll take any motions.
```

E6IAASER1                    Trial

1   There are none, then what we'll do is come back and commence

2   the charge and I will go through the entirety of the charge if

3   I have time.   Nonetheless, you will not close today.   As I had

4   said yesterday, you'll close tomorrow.   It I haven't finished

5   charge you would still close first prior to my completing the

6   charge.   So, the first order of business tomorrow would be the

7   summations and will be the summations.

8           MR. MUKHI:   OK.   And then just two other --

9           MR. DE CASTRO:   Just on to topic, Judge, I think we

10  discussed this a little bit last night.   I think the government

11  may go -- depending on the timing if they are done by lunch, I

12  assume you would get through the whole charge.

13          THE COURT:   Yes.

14          MR. DE CASTRO:   But if there's a point where you've

15  read three quarters of the charge and it might be going a

16  little extra, we would be more comfortable and I would request

17  that you finish the charge so that we would just sum up in the

18  morning and have the full charge read.

19          I am concerned about if there was just you reading a

20  portion of the charge to the jury, then we give our summations

21  and then read that last part and just that the jury may be

22  confused in not keeping everything together in one spot.   And

23  then I would just be having a premonition of a note if it

24  related to the first part or to the second part, I just think

25  it would cleaner if you did it all

E6IAASER1                    Trial

1          THE COURT:  Certainly would be cleaner.  I agree with

2      you on that.

3          MR. DE CASTRO:  If it would only be an extra ten

4      minutes or something like that and the jury was willing to do

5      it.

6          THE COURT:  If they're willing to do it, I am loathe

7      to make them stay longer.  Some of them have childcare and

8      other issues they have to get back for.  But I agree, if it's

9      ten minutes we'll ask their indulgence.  But let me just

10     request that depending on when we start and if we start the

11     charge at two o'clock we are going to finish, OK.  But if we

12     start it at four we well may not.

13          What I'd like you to do, Mr. de Castro, is if it looks

14     likely that we've got an hour or less to do the charge let me

15     know where you'd like me to break, what your preference would

16     be, your break point.  Because it might be easier if I start

17     and go to a point that you believe is not objectionable and/or

18     doesn't raise any other issues.  So, for instance, it we only

19     had a limited amount of time it seems like we are going to have

20     ample time today to tell you the truth based upon the new

21     information about these two witnesses not being called, that I

22     would propose to give, but if we didn't have enough time I

23     would propose to give the charge up through the summary of the

24     indictment but not to the specific charges on the counts.  That

25     would be, that's my first chunk, if you will, and then to do

1    the specific counts afterwards.  So, I do all the preliminary

2    instructions up to the summary of the indictment but not to the

3    specific charges.  Once I started with the specific charges,

4    the easiest thing to do is one full charge, stop, a second full

5    charge, stop and then all three but not to stop in the middle

6    of the charge.

7              MR. DE CASTRO:  OK.

8              THE COURT:  But let me know if you have a preference

9    as to how that plays out.

10             MR. DE CASTRO:  We'll see.  It my may be mooted.

11             THE COURT:  Do you have any exceptions that you are

12   aware of at this point?

13             MR. DE CASTRO:  None other than the exception we've

14   already noted, the Pinkerton, we've made that clear.  Other

15   than that, none at this point.

16             THE COURT:  All right.  I did take I think most of

17   your suggestions in terms of language, in fact, perhaps all of

18   them.  Let me just see which ones I didn't.  Oh, you know the

19   similar acts, you and the government differed a little bit on

20   the similar acts language and, I the government had more in it.

21   I reconciled the two.  That's the main difference.  Let me tell

22   you about one other change which I am proposing to make on

23   similar acts which is one, two on the similar acts page which

24   is page 22, four lines down after the 2011 I would strike the

25   phrase -- and this is really a language change.  It is a not

E6IAASER1                    Trial

1   intended to be a truly significant substantive change, so let

2   me know if you disagree.

3          I would strike the phrase "let me remind you that".  I

4   would pick up with capital "T" "the defendant is not" here,

5   insert the word "here" on trial for, strike the word

6   "committing any" and insert the word "these", and these acts,

7   period.

8          The reason for that is because we're not reading the

9   entire indictment to the jury and so referencing and defining

10  things in the four corners of the indictment might be to them a

11  little confusing.  I also don't want to have to go into whether

12  overt acts are or not part of certain things.  Of course, they

13  would be.  It gets complicated.  So it would read "the sale of

14  stolen cargo with Victor Moral in about 2010 and 2011" period.

15  "The defendant is not here on trial for these acts" period.

16  "Accordingly, you may not consider it evidence" and then it

17  goes on.  That's how it would read

18          THE COURT:  That makes sense to the government.

19          MR. DE CASTRO:  No objection to that.

20          THE COURT:  All right.  So that change will be made.

21          All right.  Anything further?

22          MS. MAIMIN:  Just the expert --

23          THE COURT:  All right.  What I'll do is hand around a

24  page.  I'll have my clerk hand around that page to you folks

25  during to this morning's session.  You can take a look at it.

1   What I'd ask you to do is to hand back any markings on it with

2   your name on the top and I'll take that as any exceptions that

3   you have to the language but it'll be the standard charge out

4   of Sands, the current charge for experts, all right?

5           MS. MAIMIN:  Sounds good.

6           THE COURT:  Anything else?  Mr. Mukhi.

7           MR. MUKHI:  Just one minor housekeeping procedural

8   matter.  One of the victims will be testifying which we had

9   reviewed will be testifying pursuant to the immunity order that

10  your Honor signed and as we discussed.  And there was no

11  objection.  We won't be clearing the courtroom in order for him

12  to invoke the Fifth.  And so the questions I planned to ask him

13  to make the order go into effect are, are you testifying today

14  pursuant to an immunity order?  Yes.  And is that because your

15  testimony would incriminate yourself?  Yes.  And then assuming

16  there's no foundation that anyone believes is necessary, our

17  view is that the immunity order is in effect and we'll proceed

18  with our questions.

19          THE COURT:  Mr. de Castro.

20          MR. DE CASTRO:  That's fine, judge.

21          THE COURT:  All right.  OK.  And are the two victims,

22  is that Gilbert and Infante?

23          MR. MUKHI:  Yes.

24          MR. DE CASTRO:  One other issue I have is just related

25  to the similar acts.  We would request a limiting instruction

1   and I know it was in your decision that you would give a

2   limiting instruction at the appropriate time and I think that's

3   going to be with Ms. Bara.

4            MS. MAIMIN:  She's the second to last witness.  I

5   think if your Honor is -- and that's fine with the

6   government -- I think it would essentially be repeating that

7   portion of the charge that pertains to the planned burglary,

8   the planned cargo theft.

9            MR. DE CASTRO:  If you could give that instruction, a

10   very shortened version if you like.

11            THE COURT:  All right.  So I'll do that during the

12   Bara testimony when the planned burglary I think is what's

13   going to come in, is that right?

14            MS. MAIMIN:  That's correct, is the recordings.

15            THE COURT:  All right.  Recordings.

16            When is the Serrano recording coming in?

17            MS. MAIMIN:  That's the Serrano recording.

18            THE COURT:  All right.  That's the last one in the

19   book, is that right?

20            MS. MAIMIN:  Correct 308-T.

21            THE COURT:  OK.  Anything further?

22            MS. MAIMIN:  Not from the government.

23            MR. DE CASTRO:  No, your Honor.

24            THE COURT:  All right.  We're waiting on a few more

25   jurors.  Let's take a short break.  We are going to hand around

1   so that you see it, the final to be delivered jury charge.  As

2   I said the jury charges, all three versions, version one,

3   version two and then the final will be on the docket.  If after

4   I have delivered the charge you believe that I have misstated

5   something, left something out, you've noticed something for the

6   very first time and it is just hit you as you've heard me say

7   it, I will before the jury is dismissed turn to you and say, is

8   there anything, counsel?  And if there is that would be your

9   time.  We'll take it over at the sidebar so you are not having

10   to surface it, but that will be the time.  I am just going to

11   say that now so you understand what the queues are.

12          MR. DE CASTRO:  I still have until the morning break?

13          THE COURT:  Yes, for the charges as well as the

14   verdict form.  Now, we're going to if things move quickly I

15   don't know, I don't think we'll move so quickly that that's

16   going to be an issue but if they did we would just go off of a

17   marked version.  Let's take a short break until we get the jury

18   here.

19          (Recess)

20          THE COURT:  All right.  Let's bring in the jury and

21   then we'll be seated.

22          (Jury present)

23          THE COURT:  All right.  Let's all be seated.

24          Ladies and gentlemen, you see some materials that are

25   laid out there that will be used later and I want to assure you

1    that nothing here is, those firearms are not operable.  Those

2    are not firearms which could currently be fired.

3              All right.  Mr. Mukhi, you may proceed, sir.

4              MR. MUKHI:  Yes, your Honor.

5     TODD RILEY,

6          called as a witness by the Government,

7          having PREVIOUSLY been duly sworn, testified as follows:

8    CONTINUED DIRECT EXAMINATION

9    BY MR. MUKHI:

10   Q.  Before we get to anything else do you recognize the

11   evidence that's being displayed for the jury?

12   A.  Yes, I do.

13   Q.  And where did that evidence come from?

14   A.  From the arrest on January 9, 2013, and one firearm is from

15   the arrest on January 11, 2013.

16   Q.  And what did you -- who seized all of that evidence?

17   A.  I did.

18   Q.  OK.  And where did you cease it?

19   A.  An area West 253 Third Street and Post Road, Bronx, New

20   York.

21   Q.  And what -- how did you keep track of what was seized from

22   where?

23   A.  It was assigned an exhibit number and those exhibit numbers

24   went into evidence bags and they were kept in evidence.

25   Q.  And how did you label the evidence to keep track of where

1    it came from?

2    A.   The case number.

3    Q.   And is all of that evidence on the table with the exception

4    of that one firearm evidence seized from January 9, 2013 in the

5    Bronx, is all of that evidence from that date besides that one

6    firearm?

7    A.   Yes.

8    Q.   OK.  And the one firearm exception, where did that come

9    from?

10   A.   That came from Jauncey Valle's residence in New Jersey.

11   Q.   Who is Jauncey Valle?

12   A.   Jauncey Valle is the -- his picture isn't there but Jauncey

13   Valle is the gentleman that the CW met on December 14, 2012 in

14   Patterson, New Jersey and then came to the McDonalds meeting on

15   January 17, 2012.

16         MR. MUKHI:  Your Honor, at this time the government

17   introduces or offers for introduction 103 and all these are

18   Government Exhibits 103, 109, 113 through 122, 124 through 159,

19   161 through 164 inclusive of all subparts, as well as the

20   firearm from Jauncey Valle which is 166 and the bullets --

21   Q.   Let me ask you were there bullets also seized from Jauncey

22   Valle?

23   A.   Yes.  He had a whole box of ammunition which was next to

24   the gun which are also up there.

25         MR. MUKHI:  OK.  And 166-A as well as the bullets, and

1   we offer those into evidence at this time.

2               MR. DE CASTRO:  No objection.

3               THE COURT:  Received.

4               (Government's Exhibits 103, 109, 113, 122, 124-159,

5   161-164, 166 and 166-A received in evidence)

6   Q.  All right.  Before we get back to December 17, I am going

7   to read one stipulation for the jury which is Government

8   Exhibit 803 is what has been marked for identification

9   purposes.

10              So, it's stipulated between the parties that heroin is

11  not grown, produced or manufactured in New York State and has

12  never been grown, produced or manufactured in New York State.

13              It is also agreed that cocaine is not grown, produce

14  or manufactured in New York State and has never been grown,

15  produced or manufactured in New York State.  The parties also

16  agree that this stipulation may be introduced as Government

17  Exhibit at trial.

18              At this time we offer Government Exhibit 803 into

19  evidence.

20              MR. DE CASTRO:  No objection.

21              THE COURT:  Received.

22              (Government's Exhibit 803 received in evidence)

23              MR. MUKHI:  Ms. Craig, can we return to the

24  December 17 recording which is 301-E-S and if we could -- and

25  the jurors can follow along either in their jury binders at

E6IAASER1                    Riley - Direct

1   301-T or the jury can follow along on the screen.

2                One moment, your Honor.  I am just getting the page

3   from the transcript in case the jurors want to follow along.

4                THE COURT:  OK.  I am going to have you even for that

5   keep your voice up just so the court reporter can get a clear

6   record.

7                MR. MUKHI:  Yes.  I am just searching for the page of

8   the transcript in case any jurors want to follow along.

9                (Pause)

10               MR. MUKHI:  Your Honor, if it's OK I'll start the --

11               THE COURT:  Are we picking up where you left off?

12               MR. MUKHI:  Yes.

13               THE COURT:  I think we're on page 23 of the

14   transcript.  Take a look at that and just see --

15               MR. MUKHI:  All right.  Your Honor, if it pleases the

16   Court, I suggest that we start with the subtitled version.

17               THE COURT:  All right.  So, ladies and gentlemen, the

18   subtitles will be shown on the screen.

19               All right.  Go ahead and proceed, Mr. Mukhi.

20               MR. MUKHI:  OK.

21               (Audio Recording Playing)

22               MR. MUKHI:  OK.  We are now actually going to jump

23   ahead in the transcript.  We'll be on page 26 of 301-T and if

24   you could fast forward to 1442 of the subtitled video.

25               (Audio Recording Playing)

E6IAASER1                    Riley - Direct

BY MR. MUKHI:

Q.  Now, Agent Riley, we just saw Jauncey Valle say, "I got
stun guns".  Did you see that?

A.  Yes.

Q.  That firearm that you seized from Jauncey Valle, was that a
stun gun or an actual gun?

A.  No.  It was an actual firearm.

Q.  And on January 9, 2013, you testified yesterday I believe
Javion Camacho had a cellphone on him?

A.  Yes.

         MR. MUKHI:  Your Honor, may I approach?

         THE COURT:  You may.

Q.  Did other people that you arrested on that day also have
cellphones on them?

         MR. MUKHI:  I am handing the witness what's been
premarked for identification as Government Exhibits 169, 170,
171 and 183.

Q.  Agent Riley, if you could just look at each of those
starting with 169 and just tell us which or if you recognize
them and what they are?

A.  I recognize Exhibit 169 as a phone belonging to Victor
Moral.

Q.  And how do you recognize that as the phone you seized from
Victor Moral?

A.  I had labeled it with his name and phone number on it.

E6IAASER1                              Riley - Direct

1    Q.   And 170, do you recognize that?

2    A.   That's an iPhone belonging to Victor Moral.

3    Q.   How do you recognize it as an iPhone belonging to Victor

4    Moral?

5    A.   Again, I labeled it with his name on the back.

6    Q.   And how about 171?

7    A.   171 is the phone belonging to Javion Camacho and, again, I

8    labeled his name on that phone.

9    Q.   And finally 183?

10   A.   183 is the phone that belonged to Alex Cespedes and, again,

11   I wrote his name on the back of that one.

12            MR. MUKHI:  Your Honor, I'm going to read a

13   stipulation at this point and it's premarked for identification

14   as 802.

15            THE COURT:  All right.

16            MR. MUKHI:  It's agreed between the parties that

17   government 169 is a cellphone with call number 201-204-2269

18   that was seized by the DEA on January 9, 2013.

19            Government Exhibit 401 is true and correct report of

20   the contents of Government Exhibit 169.

21            Government Exhibit 170 is cellphone with call number

22   (201)423-4826 that was seized by the DEA on January 9, 2013.

23            Government Exhibit 402 is a true an correct report of

24   contents of Government Exhibit 170.

25            Government Exhibit 171 is a cellphone with call number

1    (201)912-6597 that was seized by the DEA on January 9, 2013.

2            Government Exhibit 403 is a true and correct report of

3    the contents of Government Exhibit 171.

4            Government Exhibit 183 is a cellphone that was seized

5    by the DEA on January 9, 2013.

6            Government Exhibit 421 is a true and correct report of

7    the contacts list contained in Government Exhibit 183.

8            The parties also agree that Government Exhibits 169,

9    170, 171, 183, 401, 402, 403 and 421 is also the stipulation

10   may be introduced in evidence as Government Exhibits.  And at

11   this time the government would offer into evidence Government

12   Exhibits 169, 170, 171, 183, 401, 402, 403, 421 as well as 802

13   which is the stipulation.

14           MR. DE CASTRO:  No objection.

15           THE COURT:  Received.

16           (Government's Exhibits 169, 170, 171, 183, 401, 402,

17   403, 421 and 802 received in evidence)

18           MR. MUKHI:  OK.  Ms. Craig, can we put on the screen

19   403 which is just admitted as a report of Javion Camacho's

20   cellphone.

21           (Pause)

22   BY MR. MUKHI:

23   Q.  And, Agent Riley, are you generally familiar with cellphone

24   report formats?

25   A.  Yes.

1    Q.  And can you just briefly describe what a cellphone report

2    is to the jury?

3    A.  A cellphone report is the basic identifiers of the phone,

4    the phone number, the serial number, the subscriber, things of

5    that nature, the type of software that the phone has.

6    Q.  And how is a report like that generated, generally?

7    A.  Through the phone company.

8    Q.  And is this also something that law enforcement is able to

9    extract from a phone?

10   A.  Yes.  Like the analysts will come and they'll conduct this

11   report.

12   Q.  All right.  So let's just direct your attention to the

13   middle of the page, the number (201)912-6597 and it's under

14   MSISD.  Do you see there is an MSISDN and then as

15   1-201-912-6597?

16   A.  Yes.

17            (Continued on next page)

18

19

20

21

22

23

24

25

E6I7SER2                           Riley - direct

1    Q.  What does that signify?

2    A.  That's the phone number.

3    Q.  And do you recognize that phone number?

4    A.  I do.

5    Q.  Whose phone number is that?

6    A.  Javion Camacho.

7    Q.  Now, why don't we turn to page 2 of the report.  And it

8    says phone contacts.  Do you see that?

9    A.  Yes.

10   Q.  So what is this section of the report?

11   A.  The contacts that were inside of the phone.

12   Q.  And if we actually go to the next page, and if we go to

13   number 12, Jauncey, do you see that number?

14   A.  Yes, I do.

15   Q.  And it's 917-243-2854?

16   A.  Yes.

17   Q.  And if we could go a little further down.

18           I think probably zoom out.  Actually go to number 18,

19   Chill.

20           Do you see that contact in the Javion Camacho's cell

21   phone report?

22   A.  Yes, I do.

23   Q.  And do you recognize the number that's listed under Chill?

24   A.  Yes.

25   Q.  Whose number is that?

1   A.  It's the phone number for Anthony Serrano.

2   Q.  Now, is that the same number we looked at yesterday on your

3   phone charts?

4   A.  Yes, it is.

5   Q.  Now, can we now go to 412, which is already admitted into

6   evidence.  OK.  What is this?

7   A.  This is the subscriber information for the phone number

8   belonging to Anthony Serrano.

9   Q.  And who is it subscribed to, and what address is it

10  subscribed to?

11  A.  It's subscribed to Linda Serrano, and the address is at 348

12  8th Street in Jersey City, New Jersey, and the phone number,

13  you can see for the subscriber is over here all the way to the

14  left, 201-687-8583.

15  Q.  Let's go back to your phone chart.  Go back to page 3 of

16  502B.  Remember yesterday we looked at the location of Javion

17  Camacho's phone at the time that he spoke to the defendant on

18  December 17 at 7:53 p.m.?

19  A.  Yes.

20  Q.  How long was this call, according to your review of the

21  records?

22  A.  About two minutes and 13 seconds.

23  Q.  And can we go to the underlying records, 415, page 126.

24          Actually let's do both those rows, the bottom two rose

25  rows.

1          Now, 2655, do you see that, it's a call between Javion

2     Camacho and the defendant's phone on December 17, 2012, 7:53

3     p.m., two minutes 13 seconds?

4     A.  Yes.

5     Q.  And that's the call you mapped on the slide we just looked

6     at?

7     A.  Yes.

8     Q.  Again, what time was the meeting at the McDonald's between

9     the CI, CW, Jauncey Valle and Javion Camacho?

10    A.  Around 9, 9:15 p.m.

11         MR. MUKHI:  Can we do side by side?  Now we focus on

12    the very next call after the call between the defendant's phone

13    and Javion Camacho's phone.  Can we pull up underneath 403,

14    page 3, and zoom in on the number for Jauncey Valle.

15    Q.  After that call we were just looking at between the

16    defendant's phone and Javion Camacho's phone.  What is the next

17    contact that Javion Camacho's phone has with what number?

18    A.  It's Jauncey Valle's cell phone number.

19    Q.  What time was that?  How long after the call with the

20    defendant's phone?

21    A.  That call is at 7:55 p.m.

22    Q.  And it lasted -- how long did the one between the

23    defendant's phone and Javion Camacho's phone at 7:53, how long

24    did that call last approximately?

25    A.  The 7:53 call lasted two minutes and 13 seconds.

E6I7SER2                         Riley - direct

1    Q.  And what time is the next call between Javion Camacho's

2    phone and Jauncey Valle's phone?

3    A.  About two minutes later, 7:55 p.m.

4    Q.  Let's go back to the recording, 301ES and 301T, and we will

5    just continue where we left off.

6            (Audio played)

7    Q.  Agent Riley, by the way, we saw some pauses and black

8    spaces in the recording.  What was the significance of those?

9    A.  They were redacted as irrelevant or personal information.

10   Q.  All right.  Now, did there come a time on December 17, 2012

11   when you saw Javion Camacho, Jauncey Valle and the CW leave the

12   McDonald's?

13   A.  Yes.

14   Q.  And what did you do next?

15   A.  We conducted mobile surveillance on the Toyota Camry that

16   they entered, and they left the area and headed towards the

17   Lincoln Tunnel.

18   Q.  And was that the same red Toyota Camry you testified about

19   yesterday and we saw the DMV records for?

20   A.  Yes.

21   Q.  Now, what happened next?

22   A.  Next the vehicle went to the area of Union City, New

23   Jersey, where it dropped off Jauncey Valle and the CW.

24   Q.  And, by the way, how were you following what was going on?

25   A.  Mobile surveillance in our car.

E6I7SER2                         Riley - direct

1    Q.  And what happened next?

2    A.  Next we followed Javion Camacho inside of the red Toyota

3    Camry southbound on the New Jersey Turnpike.  We lost sight of

4    him at one time, and I responded to the registered address on

5    the vehicle which is the 9 Saint Ann's Street in Carteret, New

6    Jersey.  And when I arrived there I saw the red Toyota Camry

7    parked outside that residence.

8    Q.  Backing up a minute, what time did you see -- approximately

9    what time did Javion Camacho, Jauncey Valle and the CW get into

10   the red Camry to go back to Jersey?

11   A.  They got to the McDonald's around 9:15 p.m.  The meet was

12   only 20 to 30 minutes, so maybe around 10 o'clock or so.

13   Q.  OK.  So the meeting lasted approximately from 9 o'clock

14   until about 10 o'clock; is that what you testified to?

15   A.  Yes.

16   Q.  Let's go back to the phone charts, 502B at page 4.  What

17   does this page of your chart show?

18   A.  This is again the cell site information, the location of

19   Javion Camacho's cell phone on December 17, 2012 at

20   approximately 9:12 p.m., and it shows him in the area of 34th

21   and Tenth -- 34th Street and Tenth Avenue, New York, New York.

22   Q.  You are pointing to the A that's on the map?

23   A.  Correct.

24   Q.  And again did you prepare this slide in the same way that

25   we saw that the prior location slide for Javion Camacho's

E6I7SER2                        Riley - direct

1    phone?

2    A.  Yes.

3    Q.  And why don't we go to the next slide.  All right.  So,

4    what does this show?

5    A.  This shows the location of Javion Camacho's cell phone on

6    December 17, 2012 at 9:55 p.m., while he is having contact with

7    Anthony Serrano's cell phone.  This is at 9:55 p.m.  The A is

8    the location of Javion Camacho's cell phone, and this is in the

9    Union City, New Jersey area, a couple blocks from where Javion

10   Camacho dropped off Jauncey Valle and the CW.

11   Q.  And how far is that from the Lincoln Tunnel that connects

12   Manhattan to New Jersey?

13   A.  This is the Lincoln Tunnel here.  The McDonald's is over

14   here in this area of 34th and Tenth Avenue.  And then back

15   across the Lincoln Tunnel, this is the Union City, New Jersey

16   area.

17   Q.  All right.  And it's indicated attempted call.  Why is that

18   indicated on this slide?

19   A.  The call didn't connect.

20   Q.  All right.  Why don't we go to this call in 415, and if we

21   go to 2672.  I believe it's 2672.

22              THE COURT:  If you're looking for 2672 --

23              MR. MUKHI:  It's divided into -- yeah.

24              We can come back, or I will ask a couple questions

25   while we are getting to that.

1   Q.  Now, again in Union City were you conducting mobile

2   surveillance?

3   A.  Yes.

4   Q.  And what did you see?

5   A.  At that point the red Toyota Camry parked on Jauncey

6   Valle's block, at which time the CW and Jauncey Valle exited

7   the vehicle.

8           MR. MUKHI:  OK.  We will move on from this, Ms. Craig,

9   and come back to it.  But just to close the loop, if we could

10  put up page 5 of 502B.

11  Q.  Just to close the loop, where did you get this information

12  that you mapped on this slide?

13  A.  From the cell phone company.

14  Q.  And whose -- records of who from the cell phone company?

15  A.  Javion Camacho's.

16  Q.  Is that from one of the CDs you initialed yesterday?

17  A.  Correct.

18  Q.  All right.  Now, after this December 17th meeting with

19  Javion Camacho and Jauncey Valle and the CI and CW, did there

20  come a time when you directed the CW or the CI to contact

21  Javion Camacho?

22  A.  Yes.

23  Q.  And what instructions, if any, did you -- focusing on the

24  CW now, what instructions did you give to the CW before such a

25  call?

1   A.  To set up another meeting with Javion Camacho.

2   Q.  And what did you instruct him with regards to what was

3   happening with the proposed heroin robbery?

4   A.  That it was getting closer.

5           MR. MUKHI:  All right.  So now we will play 302, which

6   has already been admitted into evidence.  And the jurors, there

7   is no subtitles to this particular call, so the jurors can

8   follow along on 302T of their binders.

9           (Audio played)

10  Q.  Agent Riley, if we could put up 302T, the front page.  You

11  see that the date for the call is December 24, 2012 at

12  approximately 4:44 p.m., the call we just heard between the

13  confidential witness and Javion Camacho?

14  A.  Yes.

15  Q.  Now, did you analyze who else Javion Camacho was in

16  communication with around this period?

17  A.  Yes.

18  Q.  Can we turn to page 6 of 502B.  OK.  What does this page of

19  your phone chart show?

20  A.  This shows the total communications between Anthony Serrano

21  and Javion Camacho between December 17, 2012 and January 2,

22  2013, and it shows that there was 29 total communications.

23  Q.  OK.  Just focusing on Sunday, December 23 through Wednesday

24  the 26th, were there communications between Javion Camacho's

25  phone and Anthony Serrano's phone on those days?

1   A.  Yes.

2   Q.  All right.  Now, we just heard the CW have a call with

3   Javion Camacho, and you testified you also gave instructions to

4   the CI to contact Javion Camacho?

5   A.  Yes.

6   Q.  OK.  And what type of communication did you direct the CI

7   to have with Javion Camacho?

8   A.  He texted Javion Camacho.

9   Q.  And did you obtain those text messages?

10  A.  Yes.

11  Q.  How did you obtain them?

12  A.  I believe I just took a picture or had him e-mail me the

13  text message conversation.

14  Q.  All right.

15          MR. MUKHI:  Can we actually just put up for Agent

16  Riley, just scroll through starting with 310.  Maybe it's

17  quicker, I will just hand it up.  I am handing up what has been

18  premarked for identification as Government's Exhibits 310

19  through 322.

20  Q.  And why don't you just flip through them in the page

21  format.  Do you recognize what I just handed you?

22  A.  I do.

23  Q.  What are they?

24  A.  These are the text message conversations that I had the CI

25  make with Javion Camacho.

E6I7SER2                          Riley - direct

1             MR. MUKHI:  Your Honor, at this time the government

2    offers Government's Exhibits 310 through 322 into evidence.

3             MR. DE CASTRO:  No objection.

4             THE COURT:  All right.  Received.

5             (Government's Exhibits 310 through 322 received in

6    evidence)

7             MR. MUKHI:  And why don't we put up 310.

8    Q.  OK.  First directing your attention to the top of the page,

9    the 201-912-6597 number, do you recognize that number?

10   A.  I do.

11   Q.  What number is that?

12   A.  Javion Camacho's phone number.

13   Q.  OK.  So that's the same phone number we have been looking

14   at in the charts that we have been going through?

15   A.  Yes.

16   Q.  Now, what's the date of these text messages, the start of

17   the text messages?

18   A.  At the top it's December 31, 2012.

19   Q.  And there is a blue message first, it says, "Yo what up

20   this is Papo.  I need to holla at you."  Who is Papo?

21   A.  Papo is the CS.

22   Q.  So is this a message from the CS to Javion Camacho, or is

23   this a message to the CS from Javion Camacho?

24   A.  From the CS to Javion Camacho.

25   Q.  And then there is a yellow bubble response, "My cuzzin?"

1   At 4:14 p.m.  Is this a message from or to Javion Camacho?

2   A.   From Javion Camacho to the CS.

3   Q.   And then through the rest of the text messages there are

4   yellow bubbles and blue bubbles.  Who is texting in the blue

5   bubble?

6   A.   The blue is the CS, and the yellow is Javion Camacho.

7   Q.   All right.  So I'm going to read a few of these.  So

8   starting at 4:15 p.m. the CS says, "Nah from NY we spokre thru

9   Jos."

10          Javion Camacho response, "Oh.  What's good, bro?

11          The CS writes, "Nothing much.  I just need to holla at

12   you again good news."

13          Javion Camacho responds, "I love good news...  When do

14   you want to link up?"

15          Going to the next page, it continues.  "Let's link up

16   on Wed night."  This is the CS.  "I'll let you know what time

17   ... I'm flying back in on tomorrow so same spot as the last

18   time."

19          And Javion Camacho responds, "Anytime 2morrow is good

20   4 me.  Aite holla at me."

21          And now if we could jump ahead to 314.  What's the

22   date of these text messages, Agent Riley?

23   A.   At the top again it's January 1, 2013.

24   Q.   And the CS writes at 6:12 p.m., "What up I just got back

25   and want to make sure that we still gonna link up tomorrow at

1   3."

2              Javion Camacho writes back, "Yeah that's a go bro."

3              6:13 p.m. the CS says, "OK I'll holla tomorrow then."

4              Javion Camacho says, "Aite."

5         And then move on to January 2, 2013, 1:44 p.m., Javion

6   Camacho says, "We still on for 3?"

7              At 1:55 p.m. the CS responds:  "Yea."

8              1:56 p.m. the CS says, "I'll see you there."

9         And 1:57 p.m. Javion Camacho responds, "Aite."

10             Now, after these text messages that we just went

11  through, did there come a time when the CI met with Javion

12  Camacho again?

13  A.  Yes.

14  Q.  And what was the date of that meeting?

15  A.  January 2, 2013.

16  Q.  And were you conducting surveillance of the meeting?

17  A.  Yes.

18  Q.  And where was the meeting?

19  A.  The same McDonald's at 34th Street and Tenth Avenue, New

20  York, New York.

21  Q.  And approximately what time, if you recall?

22  A.  Around 3, 3:30 p.m.

23  Q.  And if we could republish 204.  That's the McDonald's you

24  identified yesterday from the December 17 meeting.  Is that the

25  same McDonald's where the January 2nd meeting took place?

1   A.  Yes.

2   Q.  Now, who attended this particular meeting?

3   A.  This meeting it was the CS, the CW, Javion Camacho, Julio

4   Camacho, Jauncey Valle and an unknown female.

5   Q.  And who arrived first at the meeting?

6   A.  The CS.

7   Q.  And did the CS arrive with you or separately?

8   A.  With me.

9   Q.  And who arrived next?

10  A.  Next Jauncey Valle and the unknown female arrived in a 2012

11  black Honda Accord.  And at the same time Javion Camacho, Julio

12  Camacho and the CW arrived in a gold Honda Accord.

13  Q.  OK.  And where did they go once they arrived, the people

14  you saw arrived?

15  A.  Inside the McDonald's and met with the CS.

16  Q.  Now, did you provide the CI with a recording device before

17  this January 2 meeting?

18  A.  Yes.

19  Q.  Now, before this second meeting, did you give any

20  instructions to the CI about what to say about the heroin

21  shipment that could be robbed?

22  A.  Yes.

23  Q.  And what instructions did you give?

24  A.  I told him to tell them that it would be coming soon and to

25  also tell them that it would be a little bit more heroin than

E6I7SER2                          Riley - direct

1   they originally thought.

2   Q.  And how much more heroin approximately?

3   A.  I believe we said at least 20 kilograms of heroin.

4   Q.  And why did you increase the amount of heroin involved in

5   the robbery from the first meeting to the second meeting?

6   A.  Because after listening to the first conversation and

7   debriefing both the CW and the CS about the talk of Javion

8   Camacho discussing being able to bring real cops, however, the

9   real cops demanded a higher fee, 50 percent, so our plan was to

10  up the amount of heroin to try to lure out the real cops.

11          MR. MUKHI:  OK.  Now I would ask the jurors to turn to

12  303T in their binders, and we'll also play the subtitles on the

13  screen.  And this is what was introduced into evidence as the

14  transcript and the subtitles to the January 2, 2013 meeting.

15          (Audio played)

16  Q.  Agent Riley, again we saw some gaps in the recording.  What

17  was the significance of those gaps?

18  A.  That's just redacted conversation that's either personal

19  information or irrelevant.

20  Q.  Now, before we get back to the recording, what if anything

21  did you instruct the CI before this meeting about the timing of

22  the heroin shipment that was going to be robbed?

23  A.  That it should be coming soon, and he would have like a day

24  or two notice beforehand when it was coming.

25  Q.  OK.  By the way, before these meetings on December 17 and

1   January 2, did you give any instructions to the CI and the CW

2   about how they should negotiate the split of proceeds of the

3   robbery?

4   A.   I kind of instruct them to negotiate how they would a

5   normal drug deal, to give them free leverage to go back and

6   forth, not give right in, but use their instincts and their

7   past experience to negotiate a fair deal.

8            (Audio played)

9   Q.   Agent Riley, we just heard Julio Camacho say my name is

10  King Honesty?

11  A.   Yes.

12  Q.   Now, when you arrested Julio Camacho on January 9, did he

13  have anything that identified himself as Honesty?

14  A.   Yes, he had a tattoo of Honesty, I believe, on his forearm.

15           MR. MUKHI:   Could we put up for Agent Riley what has

16  been premarked for identification as Government Exhibit 242.

17  Q.   Do you recognize the photo on your screen?

18  A.   I do.

19  Q.   What is it?

20  A.   That's a picture of Julio Camacho's I believe it's his left

21  arm, and it says Honesty.

22  Q.   When was the photo taken?

23  A.   The night of the arrest January 9, 2013, approximately

24  January 10, 2013.

25           MR. MUKHI:   The government offers 242.

1           MR. DE CASTRO:  No objection.

2           THE COURT:  Received.

3           (Government's Exhibit 242 received in evidence)

4    Q.  Again, where was this tattoo?

5    A.  It was on Julio Camacho's left arm.

6    Q.  All right.  Actually let's go to 403, which is the cell

7    phone report that was admitted into evidence for Javion

8    Camacho's cell phone, page 2.  Do you see the phone number

9    there?

10   A.  Yes.

11   Q.  And can you just read it for the record.

12   A.  Contact number 7 is Honesty, and the phone number is

13   1-201-668-1973.

14   Q.  Now, did you also look at whether the defendant had in the

15   defendant's phone, had any communications with Julio Camacho's

16   phone around the same time period?

17   A.  Yes.

18   Q.  If we could go to page 22 of 502B.  And what does this

19   chart show?

20   A.  This shows the total communications between Anthony Serrano

21   and Julio Camacho's cell phone between November 11, 2012 and

22   January 9, 2013.  There are 19 total communications.

23           MR. MUKHI:  All right.  And if we could go back to

24   303.  And we're at page 9 in the transcript.

25           (Audio played)

1   Q.  Now, Agent Riley, after this January 2 meeting did you

2   direct the CI to have contact with Javion Camacho?

3   A.  Yes.

4   Q.  And if we could put 315 on the screen now, text messages.

5   And I will start reading from January 8, 2013 for the CS.

6          The CS says, "You what up big bro everything is good

7   and we will be going out to the party tomorrow.  I'll give you

8   the details when I get out of work.  It's a for sure thing."

9          And Javion Camacho responds, "Aite.  So 2morrow is the

10  day?"

11         The CS says, "yes, sir."

12         And Javion Camacho says "say nomore."

13         Now, Agent Riley, when you directed the CI to contact

14  Javion Camacho, did you give him instructions on whether he

15  should use any code during those contacts?

16  A.  Yes.

17  Q.  And did you tell him to use code?

18  A.  Yes.

19  Q.  And why did you tell him to use code?

20  A.  Because he has to keep it as normal as possible.  He can't

21  text him the robbery is going to go down tomorrow.

22  Q.  What code words, if any, did you instruct the CI to use?

23  A.  Party.

24  Q.  And what was party a code word for?

25  A.  For the robbery of the drug shipment.

E6I7SER2                         Riley - direct

1   Q.  All right.  And we will continue at the bottom at 6:21

2   p.m., also on January 8, Javion Camacho says, "What time you

3   want to meet up?"

4           Our next exhibit, 316, the CS responds, "Be ready to

5   meet me tomorrow around 6:30-7 when I get off work the party is

6   gonna be in a quiet area in the BX."

7           At 6:30 Javion Camacho responds:  "You dnt know where

8   in the BX?"

9           And the CS responds, "I don't know the exact place but

10  def in the Bronx.  They will let me know where to go tomorrow

11  for sure."

12          Now, by the way, we saw the CI telling Javion Camacho

13  the party was on for the next day.  Was that something that you

14  instructed the CI to tell Javion Camacho?

15  A.  Yes.

16  Q.  Why did you give that instruction?

17  A.  Really for two reasons:  One, to make sure they are still

18  interested in carrying out the robbery, and, two, so that they

19  can prepare and get their equipment ready and their people

20  ready.

21  Q.  Now, did you analyze who else Javion Camacho was in

22  communication with during this time period?

23  A.  Yes.

24  Q.  If we could go to Government Exhibit 502B, page 7.  What

25  does this page of your chart show?

1   A.   This shows the total communications between Anthony Serrano

2   and Javion Camacho between January 7, 2013 and January 9, 2013.

3   And there are 28 total communications.

4   Q.   Now why don't we turn to 317.  And now focusing on the

5   bottom portion beginning on January 9, 2013, Javion Camacho

6   says, "As soon as u get the directions to the bar let me know

7   asap."

8          The CS responds, "Aite."  And then "No problem" at

9   11:48 a.m.

10          At 5:34 p.m. Javion Camacho texts, "Any news yet?"

11          The CS responds, "I just got home from work.  It

12   shouldn't be no more than an hour from now as soon as they hit

13   me up I'm gonna tell you where to meet me."

14          And if go to 318, at 5:59 the CS responds, "You get my

15   last text?"

16          Javion Camacho responds saying, "You just got home?"

17          The CS responds, "Yea."  Then he says, "Just be on

18   point now."

19          And 6:01 p.m., "Yiu ready to party right?"

20          Javion Camacho says at 6:01 p.m., "We about to shoot

21   to the city and be on standby."

22          Then at 6:01 he says, "Yea."

23          And the CS says, "OK no problem."

24          Now, did you direct the CI to have these

25   communications with Javion Camacho on January 9?

E6I7SER2                         Riley - direct

1   A.  Yes.

2   Q.  OK.  And what were your instructions, if any, to the CI

3   when you directed him to make these contacts with Javion

4   Camacho?

5   A.  First we wanted Javion Camacho to reach out to us first,

6   just to show his eagerness on the day of to still want to carry

7   out the robbery.  Once that text message came, I told the CS to

8   tell them that they would be meeting up in the Bronx later that

9   evening and that he would give him the location.

10  Q.  Now, we saw that these communications began on 317 at

11  approximately 11:30 a.m.

12  A.  Yes.

13  Q.  And then we went through around 6:03 p.m. between the CI

14  and Javion Camacho.

15  A.  Yes.

16  Q.  Now, did you look at in particular the communications

17  between Javion Camacho and the defendant on January 9?

18  A.  Yes.

19  Q.  Can we go to page 8 of your phone charts, which is 502B.

20  What does this chart show?

21  A.  This is the total communications between Anthony Serrano

22  and Javion Camacho on January 9, 2015.  There is 15 total

23  communications.

24  Q.  OK.  The period we were looking at in the messages for the

25  CS, 11:30 to approximately 6:03 p.m., are there any

E6I7SER2                     Riley - direct

1  communications between Anthony Serrano and Javion Camacho

2  during that same time period?

3  A.  Yes.

4  Q.  And where is that on your chart?  Can you show us with the

5  laser pointer.

6  A.  11 a.m. is right around here.  And this goes up to about 6

7  p.m., and there is one, two, three, four, five, six, seven,

8  eight, nine communications.

9  Q.  OK.  Let's go back to 319.  So, starting at 6:56 p.m., the

10 CS says, "They should be hitting any min.  You in the city?"

11          Javion Camacho says, "Nah, we headin there."

12          6:59 the CS says, "Aight but I think you should be

13 close.  How far are you cause we need to be quick."

14          6:59 the CS says again, "I'm waiting on the text."

15          Javion Camacho says, "Quick 4 what?"

16          And the CS says,  "I'm saying to be ready that's all.

17          Javion Camacho says, "We good.  Just need the info and

18 I do the rest."

19          CS says, "OK."

20          And then the next page, next exhibit, 320, Javion

21 Camacho says, "U think we should do it after u go in so we know

22 how many N words in there?"

23          And then 7:18 the CS says, "Nah because if they see me

24 it's a wrap on my people down there.  Follow me to the block

25 and I'll point it out.  Then do yo thing."

1          Javion Camacho says, "So u not gonna send me the
2   address?"
3          And the CS says, "I don't have it yet, I'm heading to
4   the Bronx now and sitting tight.  And meet you there."
5          A couple of questions about those text messages.  You
6   saw an exchange where Javion Camacho says, so, you're not going
7   to send me the address, and the CI says I don't have it yet.
8   Did you direct the CI to respond to Javion Camacho that he
9   didn't have the address yet?
10  A.  Yes.
11  Q.  Why did you give him that instruction?
12  A.  Several reasons.  When you're dealing with robbery crews,
13  if they can get the address before meeting up with you, there
14  is no telling if they'll go there and try to carry out the
15  robbery and cut you out.  Also, we wanted to meet up with them,
16  make sure they're ready, so we can tell who is all in the crew,
17  if they're ready, and then take them to the location.
18  Q.  Now we can go back to 320, at 7:21 Javion Camacho says,
19  "Aite."
20         And then 7:28 p.m. the CS says, "Meet me at w251 and b
21  way, a pizza joint there."
22         And Javion Camacho says, "Aite."
23         OK.  So, again what happened on January 9, 2013 during
24  this investigation?
25  A.  During this investigation, around this time I instructed

1    the CS to go inside of a pizza shop at the corner of West 251st

2    Street and Broadway in Bronx, New York, and at that time about

3    an hour later, approximately around 8:30, observed a subject we

4    believed to be Julio Camacho walk up the opposite side of the

5    street across from the pizza shop.  There is a large park

6    there.  Look up, look --

7    Q.  Let me stop you right there for a moment.

8    A.  OK.

9         MR. MUKHI:  Why don't we put up for the witness only

10   206.

11   Q.  Do you recognize that document that's on your page?

12   A.  I do.

13   Q.  And what is it?

14   A.  That's the pizza shot where I instructed the CS to sit.

15        MR. MUKHI:  Your Honor, the government offers

16   Government Exhibit 206.

17        MR. DE CASTRO:  No objection.

18        THE COURT:  Received.

19        (Government's Exhibit 206 received in evidence).

20   Q.  So, now just backing up just for a moment, were you

21   conducting surveillance of the pizza shop that day?

22   A.  Yes.

23   Q.  And where were you located?

24   A.  I was moving around in my vehicle, going north and south on

25   Broadway, and just generally combing the area.

1          THE COURT:  Mr. Mukhi, just so that as we approach 11

2     o'clock, there will be a point where we are going to take a

3     break, and I want to give you a chance to stop at a logical

4     point, not right now necessarily but in a few minutes.  All

5     right?

6          MR. MUKHI:  OK.  Thank you, your Honor.

7     Q.  Now, were there other agents conducting surveillance that

8     day?

9     A.  Yes.

10    Q.  And how many agents approximately?

11    A.  Approximately 20 to 30 agents out with us that night.

12    Q.  And who was in charge of the operation that night?

13    A.  Myself and my sergeant Neil Clancey.

14    Q.  And you testified that the CI went into the pizza shop?

15    A.  Yes.

16    Q.  What instructions did you give him if anything before he

17    went in?

18    A.  I told him to sit in there and to text Javion Camacho the

19    location and tell him to meet him there.

20    Q.  And before he went in, the CI went in, did you give him

21    anything?

22    A.  Yes.

23    Q.  And what did you give him?

24    A.  A recorder.

25    Q.  And what happened next?

E6I7SER2                          Riley - direct

A.   So, around 8:30 we observed a subject we believed to be

Julio Camacho walking up across from the pizza shop, kind of

looking into the pizza shop and using his cell phone.  After a

few second he then walked back southbound on Broadway.  A short

time after that I observed a Ford Crown Victoria, a Honda

Odyssey and a silver Dodge Nitro driving in tandem northbound

on Broadway towards the pizza shop.

        Across from the pizza shop the Dodge Nitro double

parked, the Ford Crown Victoria parked behind it.  The Honda

Odyssey made a U turn and parked almost directly in front of

the pizza shop.

        A short time after that Javion Camacho exited the Ford

Crown Victoria, went into the pizza shop.  Victor Moral exited

the Honda Odyssey and also went into the pizza shop.  They

looked around, then they sat down and began talking with the

CS.

        MR. MUKHI:  Now would be a good time for a break, your

Honor.

        THE COURT:  All right, thank you.

        Ladies and gentlemen, we will take our midmorning

break now and come back in about ten or 12 minutes.  I want to

remind you not to talk to each other or anybody else about this

case.

        (Continued on next page)

1          (Jury not present)

2          THE COURT:  Let's all be seated for a moment.  We had

3     talked about taking any comments that people may know of now on

4     the verdict form or on the jury instructions, if there are any.

5     Any from the government?

6          MS. MAIMIN:  We have no objections to the expert

7     charge or the verdict form.

8          THE COURT:  Nothing further on the jury instructions?

9          MS. MAIMIN:  No.

10          THE COURT:  All right.  Mr. De Castro?

11          MR. DE CASTRO:  No objections on the verdict form, and

12     nothing other than what I have raised already with respect to

13     the jury instructions.

14          THE COURT:  How about on the expert charge?

15          MR. DE CASTRO:  No problem with that.

16          THE COURT:  Thank you.  Then we will print up the

17     copies which will be handed to the jurors at the time of the

18     charge, and we will deliver a copy to you.  It will not be read

19     black lined or red lined for you at this point.  There won't be

20     any additional changes apart from what has already been noted.

21          Is there anything you folks would like to raise now?

22          MS. MAIMIN:  No, your Honor.

23          THE COURT:  Where are we, Mr. Mukhi, in terms of Agent

24     Riley?

25          MR. MUKHI:  I'm going a little longer -- I

1    underestimated where we would be.  I think we're probably about

2    three quarters of the way through direct for today.

3           THE COURT:  For today.  So what do you estimate?  Do

4    you estimate another 45 minute on direct?

5           MR. MUKHI:  Half an hour to 45 minutes, essentially

6    just playing January 9th recording, which is short, going

7    through the physical evidence.  Then we will go to finish up

8    the phone charts, and then the defendant's arresting statement,

9    and then that will be it.

10          THE COURT:  Then we will proceed after that.

11   Mr. De Castro?

12          MR. DE CASTRO:  About maybe, I don't know, maybe five

13   or ten cross, more on the five side.

14          THE COURT:  All right.  So then it will be quick, and

15   then we will go on to the next witnesses after that.

16          MR. MUKHI:  Yes.

17          THE COURT:  So we are still going to get to other

18   witnesses this morning.

19          MR. MUKHI:  Yes.

20          THE COURT:  And potentially still finish before lunch?

21          MR. MUKHI:  I don't think we're going to finish before

22   lunch.  I think we'll finish early afternoon after lunch.

23          THE COURT:  So we will take it as it comes.  Let's

24   take a short break ourselves.

25          (Recess)

E6IAASER3                    Riley - Direct

1              THE COURT:  All right.  Let's bring out the jury.

2              (Jury present)

3              THE COURT:  All right.  Ladies and gentlemen, let's

4    all be seated.

5              Mr. Mukhi, you may proceed, sir.

6              MR. MUKHI:  Your Honor, there were three physical

7    evidence exhibits that I neglected to move into evidence, and

8    I'll do that now.  The government offers Government Exhibits

9    104, which is black gloves seized on January 9, 2013; and then

10   173 and 174 are GPS trackers that were recovered from the Honda

11   Odyssey on January 9, 2013.

12             MR. DE CASTRO:  No objection.

13             THE COURT:  Received.

14             (Government's Exhibits 104, 173 and 174 received in

15   evidence)

16   BY MR. MUKHI:

17   Q.  Agent Riley, before we get to the meeting, back to the

18   meeting inside the pizza shop, before that meeting did you

19   direct the CI to have any phone contacts with Javion Camacho?

20   A.  Yes.

21             MR. MUKHI:  And can we now play -- and I direct the

22   jurors to please turn to -- 306T in the their binders.  And at

23   the same time we'll play 306, which is a January 9, 2013, call

24   that's been admitted into evidence at approximately 7:55 p.m.

25   between the CI and Javion Camacho.

E6IAASER3                          Riley – Direct

1             (Audio Recording Playing)

2   Q.  Agent Riley, you just heard voice at end of report

3   recording.  Whose voice was that?

4   A.  That was mine.

5   Q.  Now, Agent Riley, we also on that call heard about a chick

6   and two dudes.  Who are the chick and the dudes?

7   A.  The chick is the person that told the CS to say that he was

8   getting the information from, and the dudes he's referring to

9   is the people inside of the stash house, the victims.

10  Q.  OK.  And just to be clear, are these real victims or was

11  this part of sting?

12  A.  Part of the sting.

13  Q.  All right.

14            MR. MUKHI:  Now, let's go to the recording, the next

15  recording, 307T, which has been admitted into evidence as the

16  January 9, 2013, in-person recording between the CI, Javion

17  Camacho, and Victor Moral.  And this one does have subtitles

18  and will be up on the screen.

19            (Audio Recording Playing)

20  Q.  OK, Agent Riley, we just saw Victor Moral speaking on the

21  recording.  At the time this recording was made, was Mr. Moral

22  cooperating with the government?

23  A.  No.

24            MR. MUKHI:  All right, Ms. Craig, we can continue to

25  play until the end, please.

1            (Audio Recording Playing)

2   Q.  Agent Riley, did there come a time when Javion Camacho,

3   Victor Moral and Joshua Roman exited the pizza shop where they

4   were meeting with the CI?

5   A.  Yes.

6   Q.  What time was that, approximately?

7   A.  That was little before 9:00 p.m.

8   Q.  OK.  And you testified that you later that night placed the

9   Victor Moral, Javion Camacho, Julio Camacho and others under

10  arrest.  What time were the individuals placed under arrest?

11  A.  Sometime between, I believe, 9:15 and 9:30 p.m.

12  Q.  OK.  How long did it take you to leave the location with

13  everyone you had arrested?

14  A.  I believe we were there for a couple of hours.  You know,

15  being 16 people arrested and five vehicles, so it took us a

16  while.

17  Q.  OK.  Before we get back to what happened at the scene, why

18  don't we go to page eight of the phone chart.  Sorry, page nine

19  of the phone chart, which is 502-B.

20            (Pause)

21  Q.  All right.  Now, what does this slide of the chart show?

22  A.  This shows an attempted call between Anthony Serrano an

23  Javion Camacho on January 9, 2013, at approximately 10:40 p.m.

24  And this is the location of Javion Camacho's cellphone at the

25  time.

E6IAASER3                    Riley - Direct

1   Q.  OK.  And what time is this, the location of Javion

2   Camacho's phone?

3   A.  10:40 p.m.

4   Q.  OK.  And were you and other DEA agents still at the scene

5   of the arrest around that time?

6   A.  I believe we were still at the scene.

7            THE COURT:  Can you tell who is attempting the call?

8            THE WITNESS:  I would have to -- if we could pull up

9   the phone records, I would be able to tell who is making the

10  call.

11           MR. MUKHI:  Let's go to 4:15, page 219.

12  Q.  OK.  Let's go to line 481 -- 4581.

13           (Pause)

14  Q.  Are you able to tell from this line of Javion Camacho's

15  phone charts who attempted to call whom?

16  A.  Yes.  This is the date, the January 9.  This that

17  10:40 p.m. call.  This is the number that attempted to call and

18  this is the Javion Camacho's number.

19  Q.  OK.  And just to be clear, whose number is the one that

20  attempted to call Javion Camacho?

21  A.  That is Anthony Serrano.

22  Q.  Why don't we zoom out and look at the next call, 4582.

23           (Pause)

24           MR. MUKHI:  Actually, why don't we go to the one

25  following that.

E6IAASER3                         Riley - Direct

1          (Pause)

2     Q.   What does this show?

3     A.   This shows at 10:41 p.m. again Anthony Serrano attempting

4     to reach the cellphone of Javion Camacho.

5     Q.   OK.  And what time is that, approximately?

6     A.   10:41 p.m.

7     Q.   OK.  Now, let's go to the very next call, 4584.

8          (Pause)

9     Q.   All right.  And do you see that this is another call that

10    was attempted to Javion Camacho's phone?

11    A.   Yes.

12    Q.   OK.  And what is the date and time of that attempted call?

13    A.   January 9, 2013, approximately 10:56 p.m.

14    Q.   OK.  And can you read the number of what phone tried to

15    reach Javion Camacho after the call that we just saw with the

16    defendant?

17    A.   That is 1(917)243-2854, OK.

18    Q.   And by the way, do you recognize that phone number?

19    A.   I believe that's Jauncey Valle's phone number.

20    Q.   OK.

21          MR. MUKHI:  And let's look at -- let's go back to 403.

22          And just do a split screen if we can.

23          (Pause)

24          MR. MUKHI:  And page three of 403.

25          (Pause)

1          MR. MUKHI:  If we could zoom in on the two, at 4582 --

2    83 and 84.

3          (Pause)

4    Q.  OK.  So, do you see in 403 Jauncey's number is listed as

5    (917)243-2854?

6    A.  Yes.

7    Q.  Is that the same number that tried to reach Javion

8    Camacho's phone after the defendant's phone tried to reach

9    Javion Camacho?

10   A.  Yes.

11   Q.  Now, which meetings were Jauncey Valle at?

12   A.  He was at the original December 14 meeting with just the

13   CW.  He also attended the December 17 meeting and the January

14   2nd meeting.

15   Q.  OK.  And did he come to the January 9--

16   A.  No, he did not.

17   Q.  Let's get back to what was happening.

18         MR. MUKHI:  Actually, let's go back to page 9 of the

19   phone charts.  502-B.

20         (Pause)

21   Q.  OK.  And so this is one of the calls we just looked at.

22   And how did you figure out the location information of Javion

23   Camacho's phone during this attempt to call between Serrano and

24   Javion Camacho?

25   A.  From the cell site information gathered from the phone

 1   records.

 2              MR. MUKHI:  OK.  And if you could zoom in on the map,

 3   just the map.

 4   Q.  You are talking about the meeting in the pizza shop?

 5   A.  Correct.

 6   Q.  Where on this map, if at all, was the pizza shop located?

 7   A.  The pizza shop's right here, at 251st and Broadway.

 8   Q.  And where did you arrest, approximately, Javion Camacho?

 9   A.  Just right at the top of the screen, here, just out of

10   view.

11   Q.  All right.  So now let's go back to what happens after

12   Javion Camacho and others exit the pizza shop on January 9.

13   What did you see next?

14   A.  After they exited the pizza shop, I called the CS and told

15   him to bring them to the target location.  At that time Javion

16   Camacho got back into the Ford Crown Victoria.  The CS got into

17   his vehicle.  The CS pulled up slightly on Broadway, the Ford

18   Crown Victoria with Javion Camacho pulled behind him.  Behind

19   that vehicle, the Honda Odyssey made a U-turn and pulled behind

20   the Crown Victoria, the Dodge Nitro then fell in behind the

21   Honda Odyssey.

22              Those three cars following the caravan, the CS's car,

23   they traveled northbound on Broadway.  Close to the

24   intersection of Lakeview, two other cars sped up and fell in

25   behind.  There was a black Chevy Tahoe and a blue Town &

E6IAASER3                          Riley – Direct

1    Country.  So now these five vehicles were directly behind the

2    CS's vehicle.

3            They were traveling from this pizza shop northbound on

4    Broadway.  Right around here is where the black Chevy Tahoe and

5    blue Town & Country caught up.  They then all five followed by

6    behind the CS, they make a left here on Lakeview Place.  The

7    next road you come to is Post Road.  They just drive down the

8    block from Post Road and they pull over to the side.  The CS

9    pulls over, and all five vehicles pull over to the side.

10   Q.  Had you directed the CS to go to the location?

11   A.  Yes.

12   Q.  And what was that location you had directed him to go to?

13   A.  That was the location of the stash house.

14   Q.  What happened next after the CS and five vehicles pulled up

15   to what was supposed to be the stash house?

16   A.  As they arrived and they pulled over to the side, myself

17   and assisting agents then conducted stops on all the

18   individuals and their vehicles an placed them into custody.

19   Q.  And which car or cars did you personally stop?

20   A.  The black Chevy Tahoe.

21   Q.  And did you come to learn who was in which of the five

22   cars?

23   A.  Yes.

24   Q.  And how did you learn that?

25   A.  By then going through the whole scene and seeing who was

1    where, talking to other agents, and just documenting it.

2    Q.  And you said you went through the scene.  Were the various

3    individuals there lined up in any particular order?

4    A.  They generally keep them wherever they were taken out of

5    vehicle, keep them there until we figure out who was where, who

6    was driving what vehicle.

7    Q.  Now, Javion Camacho, what vehicle was he in?

8    A.  He was the front seat passenger in the Ford Crown Victoria.

9    Q.  And was there anything unique about that car?

10   A.  That vehicle was outfitted with police sirens, the light,

11   that license plate cover that was discussed earlier.

12   Q.  And -- sorry, did you finish?

13   A.  Yes.

14   Q.  Who else was in the vehicle?

15   A.  Alex Cespedes was driving.  Behind Javion Camacho was Oscar

16   Noriega, and behind Alex Cespedes was Ali Hussain.

17   Q.  Now, you identified someone named Alex Cespedes.

18          MR. MUKHI:  Can we put Government Exhibit -- can we

19   publish Government Exhibit 10 on the screen, the picture of the

20   faceplate that was introduced evidence for Alex.

21          (Pause)

22   Q.  Do you recognize this person, Agent Riley?

23   A.  I do.

24   Q.  Who is it?

25   A.  That's Alex Cespedes.

1            MR. MUKHI:  I'm now going to offer 10A into evidence,

2    which is Alex Cespedes, and put it up on the board.

3            MR. DE CASTRO:  No objection.

4            THE COURT:  Received.

5            (Government's Exhibit 10A received in evidence)

6    Q.  All right.  Now, we're just going to put up, just for Agent

7    Riley, Government Exhibits 245 through 251.

8            Agent Riley, do you recognize what's scrolling through

9    on your screen?

10   A.  I do.  These are photos of that Ford Crown Victoria that

11   Javion Camacho was in.

12   Q.  Do they fairly and accurately depict the Crown Victoria

13   from January 9, 2013?

14   A.  Yes.

15           MR. MUKHI:  Your Honor, the government offers

16   Government Exhibit 245 -- 246 and 247 are already in

17   evidence -- and we also offer 248, 249, 250 and 251.

18           MR. DE CASTRO:  No objection.

19           THE COURT:  Received.

20           (Government's Exhibits 245, 248, 249, 250 and 251

21   received in evidence)

22   Q.  So let's start with 245.  What is this a photo of?

23   A.  This is the rear of the Ford Crown Victoria.  To the right

24   would be the license plate, and to the left would be the

25   taillight.  In the middle of screen is a police interceptor.

E6IAASER3                    Riley - Direct

1    Q.  And 246?

2    A.  This is a picture of the rear of the Ford Crown Victoria.

3    Q.  247?

4    A.  This is a picture of the passenger seat and the intercom on

5    the seat.

6    Q.  And 248?

7    A.  That is the transmitter that was hanging down from where

8    the ignition is.

9    Q.  OK.  And you testified earlier that there was a license

10   plate device that could cover up the license plate?

11   A.  Correct.

12   Q.  Were you and other agents able to activate that device on

13   January 9, 2013?

14   A.  Yes.

15   Q.  How was that device activated, if you recall?

16   A.  I believe the key file hit off this transmitter, and the

17   front and the rear license plate could be operated

18   independently of each other.

19   Q.  All right.

20          MR. MUKHI:  249.

21   Q.  What is this?

22   A.  This is the driver's side of the Ford Crown Victoria.

23   Q.  250?

24   A.  This is the front of the Ford Crown Victoria.

25   Q.  251?

1   A.  The interior front interior of Ford Crown Victoria.

2   Q.  All right.

3        MR. MUKHI:  Why don't we replay 234, which is already

4   in evidence.

5        (Audio Recording Playing)

6   Q.  Well, do you recognize that video?

7   A.  I do.

8   Q.  Who made that video?

9   A.  I did.

10  Q.  OK.  And what is it a video--when did you make it?

11  A.  The night of either January 9 or January 10, 2013.

12  Q.  And who is--what did we just see?

13  A.  The rear license plate concealer activating.

14  Q.  Who activated it in that video, if you know?

15  A.  I believe State Police Investigator Angel -- I don't know

16  his last name at this time.

17  Q.  Was it another law enforcement officer?

18  A.  Yes.

19  Q.  All right.

20        MR. MUKHI:  Now, Ms. Craig, could you scroll

21  through --

22  Q.  Just by the way, how many people did you arrest on

23  January 9?

24  A.  16.

25        MR. MUKHI:  Can you scroll through 209 through 220

E6IAASER3                          Riley - Direct

1    just for Agent Riley.

2              (Pause)

3    Q.  All right.  Do you recognize the photos that are scrolling

4    through on your screen?

5    A.  I do.

6    Q.  And what are they?

7    A.  These are the pictures of the individuals that were

8    arrested January 9, 2013.

9    Q.  OK.  And when were the photos taken, approximately?

10   A.  January 9th or possibly January 10.

11   Q.  And do they fairly and accurately depict the individuals as

12   you saw them that night?

13   A.  Yes.

14             MR. MUKHI:  Your Honor, at this time the government

15   offers 201, 205, 207, 209, 211 through 215, 217 through 220.  I

16   believe the rest are all in evidence already.

17             MR. DE CASTRO:  No objection.

18             THE COURT:  Received.

19             (Government's Exhibits 201, 205, 207, 209 received in

20   evidence)

21             (Government's Exhibits 211 through 215, 217 through

22   220 received in evidence)

23   Q.  Let's start with 203.  Who is this again?

24   A.  Javion Camacho.

25   Q.  And let's go to 210.

E6IAASER3                          Riley - Direct

1   A.  That's Ali Hussain.

2   Q.  And which vehicle was he in?

3   A.  He was in the Ford Crown Victoria, behind the driver.

4   Q.  And 216?

5   A.  That's Oscar Noriega, and he was seated behind the

6   passenger.

7   Q.  How many total people were in the Crown Victoria?

8   A.  Four.

9   Q.  All right.  Now, let's go to 205.

10  A.  That is picture of Julio Camacho.

11  Q.  Which vehicle was he in that night?

12  A.  He was a passenger in the Dodge Nitro.

13  Q.  OK.  And who else was in the vehicle with him, that you

14  recall?

15  A.  Luis Borrero was driving and Joshua Roman was in the back

16  seat of the Dodge Nitro.

17  Q.  Let's go to 201.  Who is that?

18  A.  That's Luis Borrero.

19  Q.  And 207?

20  A.  Joshua Roman.

21  Q.  By the way, is that the same Joshua Roman who went into the

22  pizza store on January 9 after the CI went in?

23  A.  Yes.

24  Q.  OK.  Let's go to 211.

25  A.  That is Benjamin Jiminez.

E6IAASER3                      Riley - Direct

1   Q.  And which vehicle was he in?

2   A.  He was in the Town & Country minivan.

3   Q.  OK.  212, who is that?

4   A.  That's Manuel Pimenteo.  He was also in that blue Chrysler

5   Town & Country minivan.

6   Q.  213?

7   A.  That's Gary Sanchez.  He was in the black Chevy Tahoe, I

8   believe the front seat passenger.

9   Q.  And 214?

10  A.  That is Domingo Vasquez, and he was in the blue Chrysler

11  Town & Country.

12  Q.  By the way, are you sure that that's Domingo Vasquez?

13  A.  Yes.

14  Q.  Is it--OK.  All right.  Let's go to 215.

15  A.  Oliver Flores.

16  Q.  And where was Oliver Flores?

17  A.  He was driving the blue Chrysler Town & Country.

18  Q.  And 217, who is that?

19  A.  Raphael Huerta.  He was in the black Chevy Tahoe.

20  Q.  And 218?

21  A.  That's Ramon Jiminez.  He was driving the black Chevy

22  Tahoe.

23  Q.  And 219?

24  A.  That is Victor Gomez.  He was also in the black Chevy

25  Tahoe.

E6IAASER3                          Riley - Direct

1   Q.  And finally 220?

2   A.  Victor Moral.  He was driving the Honda Odyssey.

3   Q.  All right.  Now, I am just going to put on your screen 221.

4   Do you recognize the photo on your screen?

5   A.  I do.

6   Q.  What is it?

7   A.  That's a photo of some of the evidence recovered from the

8   vehicles on January 9, 2013.

9   Q.  OK.  And does the photograph fairly and accurately depict

10  the materials you recovered on that night?

11  A.  Yes.

12          MR. MUKHI:  The government offers 221 into evidence.

13          MR. DE CASTRO:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 221 received in evidence)

16          MR. MUKHI:  All right.  Can we publish 221.

17          (Pause)

18  Q.  Why don't you just walk us through what you see here.  You

19  can use the laser pointer.

20  A.  OK.  The top left here is a utility vest.  To the right of

21  that utility vest is the GPS trackers that you would put onto a

22  vehicle to track its location.  Below that is a police scanner;

23  you set it to the frequency of whatever police department or

24  borough you want to listen to.  Next to that is a ski mask.

25  Next to that another utility vest.  Looks like another ski mask

E6IAASER3                       Riley - Direct

1    next to that.  Two sets of two way radios.

2          The top right is a hydraulic press.  Below that's

3    Halligan bar.  There's black zip ties which could be fastened

4    into handcuffs.  There's one, two, three, four, five, six

5    handguns, ammunition, a police shield or badge.  All the way to

6    the left is orange bolt cutters.  To the right of those bolt

7    cutters is a poster.

8          Down at the bottom of the picture you have four police

9    shirts.  In between those shirts are some black athletic and

10   utility gloves.  The bottom left is a police-style belt with

11   the handcuff holster and handcuffs inside of it.

12   Q.  OK.  And is some of that the same evidence that is in 221

13   also in the courtroom today?

14   A.  Yes.

15         MR. MUKHI:  Your Honor, may Agent Riley step down from

16   the stand so he can display and testify about the physical

17   evidence?

18         THE COURT:  Yes.

19   Q.  So, Agent Riley, why don't you come down and just why don't

20   we start with the firearms.  When you do, if you could just

21   mention the exhibit number that you are referring to, what it

22   is and where it was found on January 9.

23         Before we do that, I just have one question about all

24   of firearms.  There are ties on all of the firearms?

25   A.  Yes.

E6IAASER3                     Riley - Direct

1   Q.  What those?

2   A.  Those are zip ties through the barrel and through the

3   magazine, rendering them inoperable.

4   Q.  Is that how they were when you seized them or was that

5   subsequently done to the firearms to make them inoperable?

6   A.  No, that was to make they will safe for court.

7   Q.  Who made them safe?

8   A.  I did.

9   Q.  All right.  So why don't you just walk through the firearms

10  up here and ammunition.

11  A.  Exhibit 145 is a .9 millimeter handgun, found inside the

12  Honda Odyssey.  145A is the magazine that was found inside the

13  firearm.  Exhibit 145C is the rounds of ammunition that were

14  inside of magazine which was inside of gun.  Exhibit 145B is

15  the bullet and the casing that was test-fired by the NYPD,

16  showing that the gun was operable.

17  Q.  By the way, in the course of your career at the DEA, have

18  you received training on firearms?

19  A.  Yes.

20  Q.  OK.  And are all of these firearms real firearms, stun

21  firearms or some other type of firearm?

22  A.  They're all real.

23  Q.  OK.

24  A.  Exhibit 143 is a Glock with a tactical flashlight attached

25  underneath the barrel.  It's Glock .45.  Exhibit 143.  Also

E6IAASER3                         Riley - Direct

inside the Honda Odyssey.  143A is a magazine that was inside

of that firearm.  143C is the rounds of ammunition that were

inside the magazine.  143B is the test-fired round.

Q.  Let me ask you a question.  You said there was a tactical

light on that firearm?

A.  Yes.  This light underneath the barrel is fastened on there

to illuminate any targets that you would be trying to shoot.

Q.  Did you ever use flashlights on firearms, as a law

enforcement agent?

A.  Yes.

Q.  In what types of situations?

A.  To, again, illuminate any targets that you may be firing at

in the dark.

Q.  All right.

A.  Exhibit 144 is another .45 caliber Hi-Point semiautomatic

handgun with a utility light fastened underneath the chamber.

144A is the magazine that was inside of this .45 caliber

handgun.  144B is the rounds that were inside the magazine.

144C is the test-fired round.

          Exhibit 146 is a .380 semiautomatic handgun.  This was

in the Honda Odyssey.  146A is the magazine that goes inside of

this handgun.  146B is the rounds of ammunition.  146C is the

test-fired round.

          Exhibit 147 is a .32 caliber revolver that was inside

the Honda Odyssey.

1          Exhibit 164 is a semiautomatic handgun.  It was found
2     inside of Chrysler Town & Country.
3          146A is the magazine that was inside of this firearm.
4          164B is the rounds of ammunition that was inside the
5     magazine and also the test-fired round of ammunition.
6          Exhibit 166 is the Smith & Wesson revolver that was
7     recovered from Jauncey Valle residence on January 11, 2013.
8     166A is the rounds of ammunition that was recovered next to
9     Exhibit 166 and also the test-fired round from that gun.
10    Q.  You can start at the end of this row.  If you want to, I
11    guess lift up a portion of the top piece.
12    A.  This is Exhibit 142.  This is the four-ton hydraulic
13    puller.
14    Q.  And do you ever use--well, what is that?
15    A.  This is hydraulic puller.  They were using it to get inside
16    of residences or open doors.
17    Q.  Do you ever use that in any law enforcement, that type of
18    device in law enforcement operation.
19    A.  I don't know if our budget has the hydraulic one.  We have
20    more of manual one, like Exhibit 163, which is a rabbit tool.
21    And this you would place inside of a doorjamb, by the frame in
22    the door, if you pump it up, and it expands that door and makes
23    it easier to then knock off.
24    Q.  In what type of situations do you use a device like that?
25    A.  When you are executing a search warrant on a house and

1    trying to gain entry.

2          THE COURT:  Now, do we have to go through each

3    individual one or can we just sort of group them somehow?

4          MR. MUKHI:  We can group them.  So if you want to hold

5    up a couple, as many as you can hold at time, and display them.

6    A.  Exhibit 174 is GPS tracker.  Exhibit 122 is a police

7    scanner.

8    Q.  Do you ever use GPS trackers and police scanners in law

9    enforcement?

10   A.  Yes.

11   Q.  What do you use GPS trackers for?

12   A.  Well, for GPS tracker, you have obtain a court order.  Then

13   you can place it onto vehicle and track the locations of that

14   vehicle.

15   Q.  And then there's series of walkie-talkies.  You want to

16   hold one of them up?  126?

17   A.  Sure.  Exhibit 126 is two-way portable radio, as is 127,

18   125, 125A.

19   Q.  You ever use those in law enforcement operations?

20   A.  Yes.  This is how we communicate with each other on

21   surveillance.

22   Q.  Go ahead.

23   A.  128 and 129 are the shoulder mics.  They are commonly

24   attached to your radio so you can talk.  130 is the utility

25   belt with the handcuffs attached.

E6IAASER3                         Riley – Direct

1    Q.   132 is a crowbar and a fanny pack with various tools.

2    A.   161 is the bolt cutters.

3    Q.   Do you ever use bolt cutters in law enforcement operations?

4    A.   Yes.  To cut off locks.  156 is the holster.

5    Q.   Where was that holster?

6    A.   Inside the Ford Crown Victoria.  158 are white zip ties.

7    Q.   Do you ever use zip ties in law enforcement operations?

8    A.   Yes.  They fasten together, like this set with the black

9    ones are, to make makeshift handcuffs.  The black zip ties are

10   Exhibit 124.  The bat is exhibit 162, the bat in the back of

11   Town & Country.

12             135 is a ski mask.

13   Q.   Where was the ski mask found?

14   A.   This ski mask was inside of the hidden compartment inside

15   the Honda Odyssey.

16             Exhibit 131 and 140 is a knife and also a police style

17   badge.

18   Q.   By the way, do you ever display badges when you are

19   conducting law enforcement operations?

20   A.   Yes.

21   Q.   What type of situations?

22   A.   Arrest situations.

23   Q.   Why do you display a badge in that situation?

24   A.   To let whoever who was being under arrest that we're the

25   police.

1              Exhibit 114 is police shirts blazoned with "police" on

2      the front and also on the back.

3      Q.  Do you ever in law enforcement wear shirts that identify

4      yourself as police?

5      A.  Yes.

6      Q.  What type of situations?

7      A.  Also arrest situations.

8      Q.  OK.  Why in arrest situations do you want to display that

9      you are police?

10     A.  Again, so that people know that we're the police and

11     they're under arrest.

12             Exhibit 109 and 120E, Exhibit 148 are all those

13     tactical gloves.

14             Exhibit 133 is another ski mask.

15             Exhibit 139 are a fluorescent traffic vests.

16     Q.  You ever use fluorescent vests in law enforcement

17     operations?

18     A.  Yes, to direct any track or close off streets, we put one

19     of these on.

20             Exhibit 153 and 134 are more of the ski masks.

21     Q.  And before we get to 118B, just focusing on 155, 149 and --

22     well, let's just focus on those two.  Where were those ski

23     masks found?

24     A.  Exhibit 155 was found on the driver's seat of Ford Crown

25     Victoria.  Exhibit 149 was found on Alex Cespedes.

E6IAASER3                         Riley - Direct

1    Q.  And the ski masks that are 103 and 109?

2    A.  103 was found on Julio Camacho, and Exhibit 109 was found

3    on Javion Camacho.

4    Q.  Okay.  And then finally just 118B, what is this?

5    A.  118B is that utility vest.  It's basically used to hold

6    different things.  You have little buckles or straps here that

7    can fit flashlights or shotgun shells and just different

8    pouches and pockets that you would throw over the top of your

9    clothing.

10   Q.  All right.  And where was the majority of the evidence

11   found?

12   A.  In the Honda Odyssey.

13   Q.  Who was driving that?

14   A.  Victor Moral.

15   Q.  All right.

16          MR. MUKHI:  That's it, your Honor.

17          May I have one moment, your Honor?

18          THE COURT:  Yes.

19          (Pause)

20          MR. MUKHI:  Your Honor, I am going to approach with

21   3501WWW and 214 on the screen.

22          (Pause)

23   Q.  Now, Agent Riley, I think you just testified that this was

24   Domingo--I think you testified it was Domingo Vazquez or Manuel

25   Pimenteo?

1    A.  Yes.

2    Q.  And if you could just review this sheet starting at line

3    22.  Does that refresh your recollection about who this person

4    is?

5    A.  Yes.

6    Q.  Who is it?

7    A.  Domingo Vasquez.

8    Q.  OK.  And then 212?

9    A.  It's Manuel Pimenteo.

10   Q.  All right.  So, now, let's turn to Government Exhibit 5.

11   Do you recognize this person?

12   A.  Yes.

13   Q.  Who is it?

14   A.  Wilfredo Suarez, a/k/a Black.

15          MR. MUKHI:  Your Honor, the government offers

16   Government Exhibit 5A, which is the nameplate Wilfredo Suarez.

17          MR. DE CASTRO:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 5A received in evidence)

20          MR. MUKHI:  404O.

21   Q.  And these are contacts from Victor Moral's phone.  Do you

22   see the number listed for Kong there?

23   A.  Yes.

24   Q.  Who is Kong?

25   A.  Javion Camacho.

E6IAASER3                          Riley - Direct

1   Q.  Is that the same number we have been looking at so far for

2   Javion Camacho?

3   A.  Yes.

4   Q.  And if we could go to the next page.

5           (Pause)

6   Q.  OK.  Actually, why don't we go to 421, which has been

7   introduced in evidence as the phone contents for the phone you

8   seized from Alex Cespedes.  And if we could go to, I believe

9   it's the third page.

10          (Pause)

11          MR. MUKHI:  OK.  We can stop there.  And can you zoom,

12  Ms. Craig, to King Kong?

13          (Pause)

14          MR. MUKHI:  It's right next to--

15  Q.  Now, who is King Kong again?

16  A.  Javion Camacho.

17          (Continued on next page)

18

19

20

21

22

23

24

25

E6I7SER4                          Riley - direct

1    Q.  And is this the same number we previously saw for Javion

2    Camacho or a different phone number?

3    A.  This is a different phone number.

4    Q.  Now, did you look at whether there were contacts between

5    this phone number for Javion Camacho and the defendant's cell

6    phone?

7    A.  Yes.

8            MR. MUKHI:  Can we go to page 10 of the phone charts,

9    502B.  Actually the next page.  If you can put it side by side

10   by what we were just looking at, which is 422 -- 421.  Sorry.

11   Q.  And so are those the same numbers in Alex Cespedes' phone

12   for King Kong and the analysis you did of phone calls between

13   the defendant's phone and Javion Camacho's phone number, this

14   particular phone number?

15   A.  Yes.

16   Q.  All right.  So let's just now go to the left side of 502B.

17   So, what did your analysis show?

18   A.  It showed that between January 1, 2012 and October 25, 2012

19   there were a total of 1,083 communications between Anthony

20   Serrano and Javion Camacho's cell phone.

21   Q.  And did you look at in particular contacts between those

22   two phones on October 14, 2012?

23   A.  Yes.

24   Q.  Can we go to the next page.  And what did that show?

25   A.  It showed that on October 14 they had 28 total

E6I7SER4                          Riley - direct

1    communications, Anthony Serrano and Javion Camacho.

2    Q.  And just looking at the time period towards 8:45 through

3    slightly after 9 o'clock on the next slide.  Now do you recall

4    the video we saw in 300C?

5          We can maybe pull it up briefly.  And if you go to

6    20:54 approximately or I think it's 4:54 on the bottom.

7          And you recall yesterday you said that that individual

8    fit the profile of Javion Camacho?

9    A.  Yes.

10   Q.  And do you see the time on the video?  What's the

11   approximate time of what just happened?

12   A.  20:55 hours, which is approximately 8:55 p.m.

13   Q.  OK.  So why don't we go back to the phone chart at page 13.

14   OK.  Just starting with the very first contact, it looks like

15   it's slightly before 8:45.  Can you just describe what happens

16   with the phone contacts between Javion Camacho phone and the

17   Anthony Serrano phone during this time period.

18   A.  So, just before 8:45 p.m. until just after 8:50 p.m. there

19   are four communications.  There are no communications after

20   that until around probably 9:07 p.m., and at that point on

21   there are one, two, three, four, five more.

22   Q.  All right.  Now let's go to 404N.  Now, do you recall

23   yesterday Mr. Moral testified that this was a phone number for

24   Javion Camacho?

25   A.  I believe the top was Julio Camacho.

E6I7SER4                          Riley - direct

1   Q.  All right.  Let's look at the contacts between those two

2   numbers.  If you go to page 12.  And you testified that this

3   was Mr. -- Mr. Moral testified that it was Julio Camacho, I

4   believe.  What was the contacts between those two phones?  I'm

5   sorry.  If we could go to page 10.  I apologize.

6           THE COURT:  502B?

7           MR. MUKHI:  502B.

8   Q.  What happened?  What did you see here?

9   A.  Between Anthony Serrano and Javion Camacho's phone between

10  July 26, 2012 to November 30, 2012 there is 115 total

11  communications.

12  Q.  Now, did you also look at contacts between Serrano and one

13  of the phones that Mr. Moral said he believed was his

14  yesterday?

15  A.  Yes.

16  Q.  And could we go to page 14 of the phone charts.

17          THE COURT:  Just so the record is clear, the phone

18  charts that you are referring to are all contained within 502B.

19          MR. MUKHI:  Yes, your Honor.

20  Q.  Now, what does this show?

21  A.  This shows the communications between Anthony Serrano and

22  Victor Moral's cell phone on October 14, 2012 to November 4,

23  2012, and there are 64.

24  Q.  And just focusing in on October 14 in particular, how did

25  the number of communications between the Serrano phone and the

E6I7SER4                          Riley - direct

1    Moral phone compare to communications on other days?

2    A.  You can see that there is a large spike, it goes somewhere

3    between 20 and 25 communications.

4    Q.  All right.  And if you go to the next page, page 15, what

5    does this show about the communications between Serrano's phone

6    and Moral's, this particular phone with Moral on October 14,

7    2012?

8    A.  This shows that there was 43 total communications on

9    October 14 between Anthony Serrano and Victor Moral.

10   Q.  OK.  And now let's actually go to 404L.  Do you see that

11   this was the number for Black in Victor Moral's cell phone?

12   A.  Yes.

13   Q.  Who is Black?

14   A.  Alfredo Suarez.

15   Q.  Let's go to page 16 of 502B.  What does this show?

16   A.  This shows the communications between Victor Moral and

17   Wilfredo Suarez between October 5, 2012 to October 25, 2012,

18   and there are 174 communications.

19   Q.  And did you also look at the contacts between the Serrano

20   phone and the Suarez phone?

21   A.  Yes.

22   Q.  Can you go to the next page, page 17.

23   A.  This looks at Anthony Serrano and Wilfredo Suarez

24   communications between October 11, 2012 and January 9, 2013,

25   and there are 66.

E6I7SER4                         Riley - direct

1    Q.   Next page.

2    A.   This shows the communications between Anthony Serrano and

3    Wilfredo Suarez on October 11 and 12, 2013, and there are 12

4    communications.

5    Q.   And page 19?

6    A.   This shows the location of Victor Moral's cell phone on

7    October 6, 2012 at approximately 10:16 p.m., and this is when

8    he is making a phone call or having a communication with Alex

9    Cespedes.

10   Q.   OK.  And next page?

11   A.   This shows Alex Cespedes' phone location that same date,

12   October 6, 2012 at 10:39 p.m., when he is having a

13   communication with Victor Moral.

14           MR. MUKHI:  And if we could put side by side this with

15   603C.

16   Q.   Now, do you recall yesterday Mr. Moral testified that he

17   went to this location with Alex Cespedes to steal heroin?

18   A.   Yes.

19   Q.   Where, if at all --

20           If we could zoom in on the map.

21           -- is that location on this map?

22   A.   It's right in this area where their cell phones are

23   located.

24   Q.   How do you know that?

25   A.   That's Webster Avenue, and then I took this photograph.

1   Q.  OK.  And were you with Mr. Moral when you took it?

2   A.  I was with Victor Moral.

3   Q.  All right.  And was that recently in the last few weeks?

4   A.  Yes.

5   Q.  And how did Mr. Moral get with you to take a photograph

6   outside of jail?

7   A.  We received a court order, a take-out order.  Myself and

8   several members from my team then transported Victor Moral to

9   these locations and took the photos.

10  Q.  And where did Mr. Moral go after the photos were taken?

11  A.  I went back to prison after that.

12  Q.  All right.  Now let's go back to 502B, page 21.  What does

13  this show?

14  A.  This shows the total communications between Anthony Serrano

15  and Wilfredo Suarez on January 8 and 9, 2013.

16  Q.  Next slide.

17  A.  This shows the total communications between Anthony Serrano

18  and Julio Camacho between November 11, 2012 and January 9,

19  2013, and there were 19 communications.

20  Q.  And next slide.

21  A.  It shows the communications between Anthony Serrano and

22  Julio Camacho on November 11, 2013, and there were three.

23  Q.  And did you look at where Julio Camacho's cell phone,

24  Cespedes' cell phone and Moral's cell phone went after this

25  communication we are looking at?

E6I7SER4                          Riley – direct

1    A.  Yes.

2    Q.  Next slide, what does this show?

3    A.  This shows the location of Julio Camacho's cell phone on

4    November 12, 2012 at approximately 12:13 a.m.

5    Q.  Next page.

6    A.  This shows the location of Alex Cespedes' phone on November

7    12, 2012 at approximately 1:06 a.m.

8    Q.  OK, next slide.

9    A.  This shows the location of Victor Moral's phone that same

10   date, November 12, 2012, at approximately 1:11 a.m.

11           MR. MUKHI:  If we could put that side by side with

12   606B.

13   Q.  Do you recall that yesterday Mr. Moral testified that he

14   went to this location with other individuals including Julio

15   Camacho to try to rob a cash van?

16   A.  Yes.

17   Q.  And now just zooming in on the map, where, if at all, on

18   the map is the location we just observed in 606B?

19   A.  This was down Anthony Avenue, just a block off Grand

20   Concourse.

21   Q.  And was this another photo that you took?

22   A.  Yes.

23   Q.  And is it the same procedure that you described earlier of

24   taking out Mr. Moral, taking photos, and then bringing him back

25   to prison?

E6I7SER4                        Riley - direct

1    A.  Yes.

2    Q.  Was this the same occasion that the other photograph was

3    taken?

4    A.  Yes.

5    Q.  Now page 27.  What does this show?

6    A.  This shows the communications between Victor Moral and

7    Javion Camacho between November 15 and January 9, and there are

8    47 communications.

9    Q.  Now, if we can just turn to page 1.  Do you see that Javion

10   Camacho phone ending in 6597, and this is with Moral?

11   A.  Yes.

12   Q.  And how many total communications are there?

13   A.  47.

14   Q.  And did you also do this analysis for the defendant's cell

15   phone?

16   A.  Yes.

17   Q.  And if you could turn to page 1.  How did the number of

18   communications compare?

19   A.  Anthony Serrano and Javion Camacho had 371 total

20   communications between November 16 and January 9.

21   Q.  Now just one final thing with the phone records.  Let's go

22   to page 15 of the same exhibit, 503B.

23   A.  This shows the total communications between Anthony Serrano

24   and Victor Moral on October 14, 2012, and there were 43.

25   Q.  And do you see the number from Morales, that 8756 number?

E6I7SER4                         Riley - direct

1    A.  Yes.

2    Q.  Now let's go to Government Exhibit 411 and around the area

3    of row 5723.  This has been admitted into evidence as the cell

4    site records for Anthony Serrano.  OK.  So do you see that same

5    number here in contact with the Serrano phone at approximately

6    October 14, 8:47 p.m.?

7    A.  Yes.

8    Q.  OK.  And now let's just go to -- so the number right above

9    that call, do you see above the 551 number?

10   A.  Yes.

11   Q.  There is another number, 201-838-2372?

12   A.  Yes.

13   Q.  Do you know whose number that is?

14   A.  I believe that's Javion Camacho's.  I'm not sure.

15   Q.  OK.  Now, did you look at -- so you're not sure whose

16   number that is?

17   A.  No.

18   Q.  Did you look at how many other times, besides the one we're

19   looking at, that that number, the number ending in the 2372,

20   was approximately in contact with Serrano's cell phone during

21   the time period you were looking at?

22   A.  Yes.

23   Q.  And was it one occasion or more than one occasion?

24   A.  More than one.

25   Q.  Do you recall exactly how many?

E6I7SER4                         Riley - direct

1    A.  I do not.

2    Q.  Let's just look at a little further down, after the 551

3    number on 57 at 24, do you see that there is a call with

4    another 201 number which is 201-705-9268?

5    A.  Yes.

6    Q.  And did you look at whether there was more than one contact

7    in the Serrano cell site records with that number?

8    A.  Yes.

9    Q.  And was there more than one contact?

10   A.  Yes.

11   Q.  Do you recall exactly how many times?

12   A.  No, I did not.

13   Q.  All right.  And now let's go a little further down to row

14   5731.  Do you see that number?

15   A.  Yes.

16   Q.  And it's 201-978-2904?

17   A.  Yes.

18   Q.  Did you look at the records of Serrano's cell site to see

19   whether that number was in contact with the Serrano phone more

20   than one time?

21   A.  Yes.

22   Q.  And was it?

23   A.  Yes.

24   Q.  And do you recall exactly how many times?

25   A.  No.

E6I7SER4                        Riley - direct

1    Q.  And finally the one right above that, 201-993-0773, did you

2    look at that phone and whether that phone number was in contact

3    with Serrano's phone on more than one occasion in the records

4    that you reviewed?

5    A.  Yes.

6    Q.  And was it more than one?

7    A.  Yes.

8    Q.  Do you recall exactly how many times?

9    A.  No.

10   Q.  You said you didn't recall the exact number of times that

11   these phones numbers were in contact with Mr. Serrano's cell

12   phone.  Is there something that would refresh your recollection

13   as to this?

14   A.  My notes.

15   Q.  And I am now handing the witness 3501-5J.

16             THE COURT:  All right.

17   Q.  By the way, are these your notes or someone else's notes?

18   A.  These are your notes.

19   Q.  Were you present when that information was being -- were

20   you doing the count --

21   A.  Yes, you and I together did the count on those four

22   separate numbers.

23   Q.  And so what did the count show with respect to those four

24   separate numbers?

25   A.  The number ending in 0773 had 49 communications with

1   Anthony Serrano.  The number ending in 2904 had 250

2   communications with Anthony Serrano.  The number ending in 2372

3   had 133 communications.  And the 9268 had 422 communications.

4   Q.  We can take all of that down.  Now, just finally, Agent

5   Riley, I wanted to return to the day of the defendant's arrest.

6              THE COURT:  Can you just remind me who all those cell

7   phone numbers were.

8              MR. MUKHI:  It's not in the record.

9              THE COURT:  You haven't gotten there?

10             MR. MUKHI:  I don't think we're going to get there.

11  Q.  Do you know who those numbers belong to, Agent Riley?

12  A.  I do not.

13             THE COURT:  All right.

14  Q.  OK.  Now, Agent Riley, you testified yesterday that you

15  arrested Mr. Serrano.

16  A.  Yes.

17  Q.  Approximately when was that?

18  A.  August 1, 2013.

19  Q.  Who else from law enforcement was present at the arrest

20  besides yourself?

21  A.  Detective Justin Kealy, Special Agent Natalie Bara, and

22  other members of my field team.

23  Q.  OK.  And was the arrest inside or outside?

24  A.  It was outside.

25  Q.  And where did you and other agents go next?

1    A.  After we arrested Anthony Serrano?

2    Q.  Yeah.

3    A.  We went back to his residence on 8th Street in Jersey City,

4    New Jersey.

5    Q.  And put 605 up.  Do you recognize this?

6    A.  Yes, that is Anthony Serrano's residence.

7    Q.  And is the residence a single family or multi family

8    residence?

9    A.  Multi.

10   Q.  Now, while you were in this building, did anyone else show

11   up while you were there with other agents?

12   A.  Yes.

13   Q.  And who is that?

14   A.  Lieu Faccone.

15   Q.  OK.  And if we could put up Government Exhibit 11.  Who is

16   that?

17   A.  Lou Faccone.

18   Q.  Is that the same person on the board?

19   A.  Yes, it is.

20         MR. MUKHI:  Your Honor, at this point we would offer

21   11A into evidence, which is the name plate for Lou Faccone.

22         MR. DE CASTRO:  No objection.

23         THE COURT:  Received.

24         (Government's Exhibit 11A received in evidence)

25   Q.  So where did Lou Faccone show up?

E6I7SER4                          Riley - direct

1   A.  He showed up at the residence that we just saw.  He showed

2   up.  He had on BDU style pants.  He had a canine with him, I

3   believe it was a German Shepherd or a Malinois.  He also had a

4   firearm attached on a holster on his belt, and he entered the

5   8th Street address.

6   Q.  And you say BDU pants.  What are they?

7   A.  BDU pants are the khaki pants with pockets on the thighs

8   and all over the place.

9   Q.  And what, if anything, did he say when he showed up on

10  August 1, 2013?

11  A.  He said that he was checking on a family member on the

12  first or second floor who was having shortness of breath and to

13  see what was going on.

14  Q.  All right.

15          MR. MUKHI:  Your Honor, I am going to read a

16  stipulation.

17          THE COURT:  All right.

18          MR. MUKHI:  806 is what it is premarked as.

19          The parties agree that Government Exhibit 610 is a

20  true and correct copy of a record maintained in the ordinary

21  course of business by the State of New Jersey Department of

22  Banking and Insurance, Division of Insurance, which is

23  responsible for licensing bail bondsmen in the state of New

24  Jersey.

25          As stated in Government Exhibit 610, an individual

E6I7SER4                    Riley - direct

named Louis Faccone has been licensed as a bail bondsman in the

state of New Jersey since September 1, 2005 and is still an

active bail bondsman.

        And the parties also agree that Government Exhibit 610

and this stipulation may be received into evidence as

Government's Exhibits.  At this time we offer 610 and 806 into

evidence.

            THE COURT:  Any objection?

            MR. DE CASTRO:  No objection.

            THE COURT:  Received.

            (Government's Exhibits 610 and 806 received in

evidence)

            MR. MUKHI:  If we could just briefly put up 610.  If

you could zoom in on the section under certification of

licensure.

            OK.

Q.  Finally, Agent Riley -- by the way, what is a bail

bondsman?

A.  A bail bondsman is a person that secures a bail for someone

that has been arrested.  They will post that bond, and at times

if someone skips the bond, they will go out and track them

down.

Q.  Are they a law enforcement officer of any kind?

A.  No.

Q.  Now, finally, after you arrested the defendant, did you

1    read him his Miranda rights?

2    A.   Myself or Special Agent Bara I believe read him his Miranda

3    rights.

4    Q.   Now, did you tell him what he was being arrested for?

5    A.   Yes.

6    Q.   And what did you tell him he was being arrested for?

7    A.   Hobbs Act robbery.

8    Q.   What is a Hobbs Act robbery?

9    A.   Robbery and gun charges.

10   Q.   Now, after you read him his Miranda rights and told him he

11   was being arrested for robbery and a gun, what, if anything,

12   did he say in response?

13   A.   We asked him if he wanted to cooperate about any other

14   members in the crew, and he just told us that he would do his

15   time with honor.

16   Q.   And what else did he say, if anything?

17   A.   We were going back and forth telling him that we didn't

18   just pick him out of the blue, that we had evidence of --

19            MR. DE CASTRO:  Objection to this colloquy.

20   Q.   Just what did Mr. Serrano say?

21   A.   That he didn't do any robberies, he wasn't there for any

22   robberies, and we wouldn't be able to prove anything.

23            MR. MUKHI:  One moment, your Honor.

24            THE COURT:  All right.

25            MR. MUKHI:  Your Honor, no further questions at this

E6I7SER4                        Riley - direct

 1    time.

 2              THE COURT:  All right.  Thank you.

 3              Mr. De Castro.

 4              And, ladies and gentlemen, as we are switching people

 5    here, I will just give you a sense of where we are going.  At

 6    12:45 we will break for lunch, just for your planning purposes,

 7    about ten minutes from now.

 8    CROSS EXAMINATION

 9    BY MR. DE CASTRO:

10    Q.  Good afternoon, agent.

11    A.  Good afternoon.

12    Q.  You used a confidential informant and a cooperating witness

13    in this case, right?

14    A.  Yes.

15    Q.  Actually before we do that, you just testified a little bit

16    about what we call -- a lot about -- the exhibits in 502 or the

17    slides in 502B.  Do you remember that?

18    A.  Yes.

19    Q.  And that contains a lot of the phone charts with certain

20    dates and times, right?

21    A.  Yes.

22    Q.  And just to be clear, the time across the bottom, sometimes

23    it's a time and sometimes it's a month, right?

24    A.  Yes.

25    Q.  It's not always expanded out, right?

1    A.   Correct.

2    Q.   And the time on the left-hand side is the duration of a

3    call or a communication, right?

4    A.   I'm not sure.  Some is the total communications, not the

5    duration.

6    Q.   Sometimes it's the total.  So, when is it a total and when

7    is it a duration?

8    A.   You have would to show me which chart you want to talk

9    about.

10   Q.   So, would you mind putting up 502B, just the first page.

11   So, looking at 502B, the bottom contains months, right?

12   A.   The bottom is the months.

13   Q.   And what's on the left side?

14   A.   And on the left was the total communications.

15   Q.   And along the bottom is each day of the month.

16   A.   Yes.

17   Q.   Well, is there actually 30 in each, or 31, depending on the

18   month?

19   A.   I don't know if it's broken down by each day in between the

20   dashes.

21   Q.   You said that a confidential informant gets paid to work

22   with the DEA, right?

23   A.   Yes.

24   Q.   And a confidential source is trying to get leniency in some

25   type of open case, right?

1   A.   That's a cooperating witness.

2   Q.   Oh, sorry, right, cooperating witness, right.

3   A.   Correct.

4   Q.   The confidential informant is the person that is getting

5   paid.

6   A.   Yes.

7   Q.   Now, in working with this cooperating witness and this

8   confidential informant, your goal was to set up this robbery

9   sting, right?

10   A.   To investigate this robbery crew.

11   Q.   And identify the members of the crew who would be

12   interested in stealing a large amount of heroin, right?

13   A.   Yes.

14   Q.   And you learned that the confidential informant or the

15   cooperating witness had a connect with Javion Camacho, right?

16   A.   Yes.

17   Q.   And he had a connection to a person that had a team of

18   robbers, right?

19   A.   He had a connection with Jauncey Valle; Jauncey Valle had

20   the connection with Javion Camacho.

21   Q.   Who had this team of guys that would do these jobs, right?

22   A.   Correct.

23   Q.   And we heard it in the recordings, right?

24   A.   Yes.

25   Q.   He said he had a team, right?

E6I7SER4                          Riley - cross

1    A.   Yes.

2    Q.   That Javion Camacho had a team, right?

3    A.   Yes.

4    Q.   Now, on December 14th of 2012, that was the meeting with

5    the cooperating witness and Jauncey Valle, right?

6    A.   Yes.

7    Q.   Mr. Serrano was not present for that, correct?

8    A.   No.

9    Q.   On December 17, 2012 that was the cooperating witness, your

10   confidential informant, Jauncey Valle and Camacho, right?

11   A.   Yes.

12   Q.   That's Javion Camacho, correct?

13   A.   Yes.

14   Q.   That was at the McDonald's on 34th Street, right?

15   A.   Yes.

16   Q.   And we saw that video.

17   A.   Yes.

18   Q.   Mr. Serrano was not present?

19   A.   No.

20   Q.   On December 24, Christmas Eve, there ways phone call

21   between Javion Camacho and a cooperating witness, right?

22   A.   Yes.

23   Q.   Again Mr. Serrano was not on that call, right?

24   A.   Correct.

25   Q.   Then between December 24 there are some texts that you were

E6I7SER4                          Riley – cross

1   shown about December 31 through around January 8 between

2   Jauncey Valle and Javion Camacho, right?

3   A.   Those texts were from the CI and Javion Camacho.

4   Q.   Oh, I'm sorry, the CI and Javion Camacho, right?

5   A.   Yes.

6   Q.   And those were just between those two, correct?

7   A.   Yes.

8   Q.   Mr. Serrano was not a third party to those texts, correct?

9   A.   No.

10  Q.   Now, on January 2, that was the follow-up meeting at

11  McDonald's on 34th Street, right?

12  A.   Yes.

13  Q.   And there was this unknown -- now there was -- now there

14  are more people, right?

15  A.   Yes.

16  Q.   There is this unknown female, Valle, Javion Camacho and

17  Julio Camacho, right?

18  A.   Yes.

19  Q.   And you have learned that Javion Camacho and Julio Camacho

20  are brothers.

21  A.   Yes.

22  Q.   And the confidential informant was there as well, right?

23  A.   Yes.

24  Q.   And Mr. Serrano was not present.

25  A.   No.

1    Q.  On January 6th of 2013 there was another phone call between

2    the cooperating witness and Jauncey Valle, wasn't there?

3    A.  Yes.

4    Q.  And Mr. Serrano wasn't involved in that call at all either,

5    right?

6    A.  No.

7    Q.  And you were shown also those texts on January 8, the day

8    before the sting operation, right?

9    A.  Yes.

10   Q.  And again Mr. Serrano was not a third party on those,

11   right?

12   A.  No.

13   Q.  Now, on January 9th of 2013, the day of that sting

14   operation, Javion Camacho and the confidential informant had a

15   phone call, right?  Or they had more than one phone call,

16   right?

17   A.  Can you repeat that?

18   Q.  On the day of the sting operation, January 9, Javion

19   Camacho and the confidential informant had a telephone call,

20   right?

21   A.  Yes.

22   Q.  And that was -- I think we listened to it, and it was 306T,

23   if I am correct on that.  Does that sound right?

24   A.  It sounds right.

25   Q.  And that was around 7:55 p.m. on January 9, right?

E6I7SER4                           Riley - cross

1    A.  Yes.

2    Q.  Javion Camacho and a confidential informant, right?

3    A.  Yes.

4    Q.  And in that call Javion Camacho says I brought my team,

5    right?

6    A.  Yes.

7    Q.  And Mr. Serrano was not on that call, right?

8    A.  No.

9    Q.  On January 9 there was also a pre-meeting that law

10   enforcement conducted surveillance, right?

11   A.  Yes.

12   Q.  And that was where some of the people you arrested were

13   huddled together, right?

14   A.  Yes.

15   Q.  At a meeting in a parking lot before they went to New York,

16   right?

17   A.  Yes.

18   Q.  And Mr. Serrano wasn't there, right?

19   A.  No.

20   Q.  Javion Camacho was there, right?

21   A.  I believe so.  I wasn't at that surveillance.

22   Q.  You are aware that Javion Camacho was there, correct?

23   A.  Yes.

24   Q.  And you are aware that my client wasn't there, right?

25   A.  Yes.

E6I7SER4                           Riley - cross

1   Q.  Now, on January 9, same day, there was a second meeting

2   which was at the pizza shop, right?

3   A.  Yes.

4   Q.  And that's a meeting that you set up basically, right?

5   A.  Yes.

6   Q.  Now, who was at that meeting at that pizza shop?

7   A.  Javion Camacho, Victor Moral and Joshua Roman.

8   Q.  And that was also recorded, right?

9   A.  Yes.

10  Q.  You had a confidential informant and a body wire, right?

11  A.  Yes.

12  Q.  We listened to that.  That was 307T, correct?

13  A.  Yes.

14  Q.  And in that meeting Javion Camacho says that he brought his

15  team, right?

16  A.  Yes.

17  Q.  Actually his words are I got my team.  Right?

18  A.  Yes.

19  Q.  Now, then after that meeting at some point you made that

20  arrest, right?

21  A.  Yes.

22  Q.  You recovered all of these items, right?

23  A.  Yes.

24  Q.  16 men showed up to do that robbery, right?

25  A.  Yes.

1    Q.  And 16 men showed up after there had been an increase in

2    the original amount of heroin that the sources had proposed,

3    right?

4    A.  Yes.

5    Q.  So now it was up to as much as maybe 40 kilos, right?

6    A.  Yes.

7    Q.  They showed up obviously with obviously all of this gear

8    spread out amongst some of the cars, right?

9    A.  Yes.

10   Q.  But the majority of it was in the Honda Odyssey, right?

11   A.  Yes.

12   Q.  The majority of it was in the car that was driven by

13   Mr. Moral.

14   A.  Yes.

15   Q.  On that day when all those 16 men showed up, my client

16   wasn't present, right?

17   A.  No.

18   Q.  He wasn't there, right?

19   A.  No.

20           MR. DE CASTRO:  I have nothing further.

21           THE COURT:  All right.  We are going to break for

22   lunch.

23           Do you have anything else, Mr. Mukhi, or can this

24   witness be excused?

25           MR. MUKHI:  This witness can be excused.

E6I7SER4                         Riley - cross

1              THE COURT:  All right, Agent Riley, you may step down,

2     sir.  Thank you.

3              (Witness excused)

4              THE COURT:  Ladies and gentlemen, we are going to

5     break for lunch.  We are going to come back at 2 o'clock, so

6     the usual routine of getting back a few minute before 2 to able

7     to come right out at 2.  I want to remind you not to talk to

8     anybody, including each other, about the case.  Thanks.

9              (Jury not present)

10             THE COURT:  Let's all be seated for just a moment.

11             Who is first after lunch?

12             MR. MUKHI:  Erickson Gilbert.

13             THE COURT:  Gilbert and then Infante?

14             MR. MUKHI:  And then Infante.

15             THE COURT:  All right.  And then Bara?

16             MR. MUKHI:  And then Donaldson.

17             THE COURT:  Then Donaldson.

18             MR. MUKHI:  Then Bara.

19             THE COURT:  Then Bara.

20             MR. MUKHI:  And then Perry.

21             THE COURT:  And then Perry.  All right.

22             MR. MUKHI:  I think we will still get there.

23             THE COURT:  All right.  OK.  Now, what was that

24    routine about for all of the phone numbers that didn't like

25    lead anywhere?  What was the purpose of that?

E6I7SER4

1          MR. MUKHI:  I guess I will give a preview to my

2     closing, which is that those numbers -- if you turn to what we

3     expect will be introduced as 501, which is the Donaldson --

4          THE COURT:  Well, if it's going to connect up, then I

5     don't need to have a preview, but it just seemed like it was a

6     road to nowhere.

7          MR. MUKHI:  No, I am happy to share, which is

8     Mr. De Castro made a suggestion yesterday that members of the

9     crew passed their phones around, and so I believe the

10    suggestion from there could be taken in argument that Mr.

11    Serrano gave his cell phone to someone else that night.

12         So, the purpose of that was to show these numbers --

13    that as far as we know have nothing to do with other crew

14    members -- were being called on October 14 during the robbery,

15    and then were also being called numerous other times on other

16    days, same pattern of phone usage.  And so the argument that

17    Mr. Serrano gave his phone to some stranger, say, who would

18    then be calling the same numbers that Mr. Serrano was calling

19    on virtually every other day, you know, obviously I think the

20    government would argue that that would respond to any

21    suggestion the phone was passed around.  It's a phone pattern.

22         THE COURT:  So it's to tie the phone to Mr. Serrano.

23         MR. MUKHI:  Including on the night of the robbery.

24         THE COURT:  All right.  OK, I understand it in terms

25    of where you are going with that now.

E6I7SER4

1          All right.  Now, can you folks make sure that you have

2     all of the exhibits agreed to and ready to go into the back

3     room when I charge the jury?  Although now I think it's unclear

4     how much we are going to get to, I will start if we end before

5     the end of the day, unless we end at 4:30 in which I won't, and

6     I will do it in the more traditional fashion and pick up

7     tomorrow after the closings.  But I do want to make sure that

8     we are ready to role the cart with an agreed-to list of

9     admitted exhibits into the back room, minus the firearms and

10    ammunition.

11          MR. MUKHI:  Yes.

12          THE COURT:  All right?

13          MR. MUKHI:  And there is going to be one change to

14    502B.  I believe one of the numbers is labeled on the chart as

15    belonging to Javion Camacho.  I believe the way the evidence

16    came in is that it was Julio Camacho's phone.  It's one

17    particular number.  So we will discuss with defense counsel.  I

18    think a change has to be made to that exhibit, and we will work

19    it out.

20          THE COURT:  All right.

21          But you folks should work out, get yourselves in order

22    so that you have worked out all the exhibits so that there

23    isn't a delay.  In a trial I recently had it took about I would

24    say almost an hour to an hour and a half for people to get the

25    exhibits into the back room, so I want to make sure that

E6I7SER4

1    doesn't happen again.

2              I do want to see counsel up here just for one moment.

3              (At the side bar)

4         THE COURT:  I just wanted to do it at side bar because

5    I didn't want to embarrass you, but things were sort of all

6    over the place a little bit today, sort of scrambling, trying

7    to find things, lots of pauses.  I think it took twice longs as

8    it probably needed to take because of this.

9              I don't know if maybe you are exhausted or coming up

10   with some of the cross last night or whatever the issue, but I

11   am wondering if you folks can go over the next witnesses and

12   try to pull it together.  It's not about speed; it's also just

13   about, you know, it creates unnecessary delay.  It's not about

14   causing you to cut out anything or anything of that nature.

15   Not the cross.  I mean the direct.

16        MR. MUKHI:  Thank you.

17        THE COURT:  I didn't want to say it in open court

18   because I don't know what the background is, but if you can

19   grab the tail --

20        MR. MUKHI:  Have a cup of coffee.

21        THE COURT:  Have a cup of coffee.

22        MR. MUKHI:  Thank you.

23        (In open court)

24        THE COURT:  Let's take our lunch break.  We will come

25   back a few minutes before two.

E6idser5

**A F T E R N O O N   S E S S I O N**

2:06 p.m.

(Jury not present)

THE COURT:  Let's bring out the jury.

THE CLERK:  All rise.  The jury entering.

(Jury present)

THE COURT:  All right, ladies and gentlemen.  Let's all be seated.

Mr. Mukhi, would the government like to call its next witness, please.

MR. MUKHI:  Yes, your Honor.

The government calls Erickson Gilbert.

THE COURT:  All right.  Mr. Gilbert.

ERICKSON GILBERT PAREDES,

    called as a witness by the government,

    having been duly sworn (through the Interpreter),

    testified as follows:

THE CLERK:  Please state your full name for the record.

THE WITNESS:  Erickson Gilbert Paredes.

THE CLERK:  Thank you.

THE COURT:  Be seated, sir.

It will be important for you to pull your chair up and speak clearly so that the translator can hear all of the words and then she'll make the translation for the record.

E6idser5

1              All right.  Mr. Mukhi, you may proceed, sir.

2              MR. MUKHI:  Thank you, your Honor.

3    DIRECT EXAMINATION

4    BY MR. MUKHI:

5    Q.  Mr. Gilbert, are you fluent in English?

6    A.  No.

7    Q.  Are you more comfortable testifying today with a Spanish

8    interpreter?

9    A.  Yes.

10   Q.  Mr. Gilbert, have you ever been the victim of a robbery?

11   A.  Yes.

12   Q.  And where were you at the time that you were a victim of a

13   robbery?

14   A.  On 171st between Audubon and St. Nicholas in Washington

15   Heights.

16   Q.  Now, before we get back to that, Mr. Gilbert, are you

17   testifying today pursuant to an immunity order?

18   A.  Yes.

19   Q.  And is that because your testimony would incriminate

20   yourself?

21   A.  Yes.

22   Q.  And what is your understanding of what your immunity order

23   provides?

24   A.  That I won't be prosecuted for the mistakes that I

25   committed previously and for what I'm going to testify.

E6idser5                         Gilbert - direct

1   Q.  And have any promises been made to you that you'll not be

2   prosecuted in the future based on something aside from your

3   testimony?

4   A.  Could you repeat the question?

5   Q.  OK.  Have any promises been made to you that you will not

6   be prosecuted in the future?

7   A.  No.

8   Q.  And what is your immigration status?

9   A.  Undocumented.

10  Q.  Have any promises been made to you regarding your

11  immigration status?

12  A.  No.

13  Q.  OK.  Mr. Gilbert, how old are you?

14  A.  36.

15  Q.  Where were you born?

16  A.  In Santo Domingo.

17  Q.  What country is that in?

18  A.  Dominican Republic.

19  Q.  When did you come to the United States?

20  A.  In 2002.

21  Q.  And how did you get into the United States?

22  A.  Through the border.

23  Q.  Which border is that?

24  A.  Mexico/Arizona.

25  Q.  And where did you go after you crossed the Mexico/Arizona

1   border?

2   A.   Washington -- Manhattan and Washington Heights.

3   Q.   Have you been in New York since that time?

4   A.   Yes.

5   Q.   And what have you done for work since you arrived in New

6   York?

7   A.   Working -- well, I have worked and what I'm doing today, I

8   deliver furniture.

9   Q.   And have you ever made money from any illegal activities?

10  A.   Yes.

11  Q.   What activities?

12  A.   I have tried to sell.

13  Q.   Sell what?

14  A.   Heroin.

15  Q.   When was the -- and you said you tried to sell heroin.

16  Were you ever successful in selling heroin?

17  A.   Yes.

18  Q.   When was the first time you tried or succeeded in doing a

19  heroin transaction?

20  A.   2008.

21  Q.   And who did you get the heroin from, if anyone?

22  A.   At that time his name was El Don; that's how people knew

23  him on the street.

24  Q.   What did you do with the heroin you got from El Don?

25  A.   I would bring a sample, and if the work was fine then they

E6idser5                         Gilbert - direct

1   would call me back.

2   Q.   Now, have you done additional heroin deals since the deal

3   with El Don in 2009, approximately?

4   A.   Yes.

5   Q.   And approximately how many heroin deals have you done

6   successfully?

7   A.   From four to six.

8   Q.   And how much heroin was involved during those four to six

9   occasions?

10  A.   200/250 grams.

11  Q.   And when was the last time you did a heroin transaction?

12  A.   Last summer.

13  Q.   Summer of 2013?

14  A.   Yes.

15  Q.   Now, I want to turn back to the time you were robbed.

16          Was the robbery during the day or at night?

17  A.   At night.

18  Q.   And where did you start out that night?

19  A.   I started out on 163rd and Amsterdam.

20  Q.   And what were you doing before you were at 163rd and

21  Amsterdam?

22  A.   I was dropping off my family, my mom and my two girls, at

23  172nd and St. Nicholas.

24  Q.   And what was at 172nd and St. Nicholas?

25  A.   My female cousin lives there and my mom was on vacation so

E6idser5                        Gilbert - direct

1   I brought her over there.

2   Q.  Now, who were you with that night, if anyone?

3   A.  With Escarly.

4   Q.  Who is Escarly?

5   A.  My girlfriend, the mother of my children.

6   Q.  Was she with you when you dropped off your mother and your

7   children at your cousin's house?

8   A.  Yes.

9   Q.  And where did you go next?

10  A.  To the barbershop on 163rd and Amsterdam.

11          MR. MUKHI:  Can we put up 602E, which is in evidence.

12  Q.  Do you recognize what's in this photograph?

13  A.  Yes.

14  Q.  And what's in the photograph?

15  A.  That's the salon where I go and get my haircut on 163rd and

16  Amsterdam.

17  Q.  Which store is that?  Does it have a label on it?

18  A.  Yes.  It says "Beauty Salon."

19  Q.  And if you know, do you recognize any other stores in that

20  photograph?

21  A.  Yes.  Well, over there in the corner there is the cellphone

22  store, and then after the cellphone store in the corner is the

23  bodega.

24  Q.  So the bodega, is that to the left or the right of the

25  cellphone store?

E6idser5                        Gilbert - direct

1    A.   If I'm going up, then it would be right after the cellphone

2    store.

3    Q.   All right.  Now, what type of car --

4    A.   Could I say something?

5    Q.   Yes.

6    A.   I was saying it was 163rd but it's actually 164th.

7    Q.   OK.  Thank you.

8              And is it between -- what cross-section is it at, if

9    you know?

10   A.   Amsterdam.  This one is Amsterdam.

11   Q.   Now, what type of car, if any, were you in that night?

12   A.   A Grand Caravan.

13   Q.   And what type of car is that?

14   A.   A van, 2008.  No.  Sorry.  It's a '98.

15   Q.   1998 Caravan?

16   A.   Yes.

17   Q.   Now, who was driving that night?

18   A.   Escarly.

19   Q.   And where were you seated in the car?

20   A.   On the front side to the right.

21   Q.   And whose van was that?

22   A.   Ours.

23   Q.   And who did you get it from, if anyone?

24   A.   My uncle gave it to me as a gift.

25   Q.   And how long before the night of the robbery had your uncle

E6idser5                          Gilbert - direct

1    given it to you as a gift?

2    A.  I don't have the exact date, but it was about six or seven

3    months before it.

4    Q.  And you said the van was ours.  Was that -- did you mean

5    you and Escarly's?

6    A.  Yes.

7    Q.  Was there anything valuable inside the van that night?

8    A.  No.

9    Q.  What was inside?

10   A.  The cellphone, a car seat, the weekly payment that my wife

11   had just gotten, Escarly, and her documents.

12   Q.  And where does your wife work?

13   A.  At the furniture store, where I also work.

14   Q.  Did you have any drugs on you that night?

15   A.  No.

16   Q.  Now, why did you go to the barbershop that night?

17   A.  To get my hair cut.

18   Q.  All right.  So what happened first when you arrived at this

19   location?

20   A.  Well, when we got there I got out and -- well, where that

21   red van is, there was a car parked there.  We were waiting for

22   the person to get out of the parking spot so that Escarly could

23   park there.  And since that was our first car, Escarly didn't

24   have a lot of experience parking and she told me you park it,

25   the van.  And I told her no, because the police is right behind

E6idser5                         Gilbert - direct

1    us.  And since I don't have a driver's license, I didn't do it.

2    Q.  OK.

3    A.  Should I continue?

4    Q.  Yes.

5    A.  I went into the barbershop and I asked my barber how many

6    people he had, and he said one.  OK.  So then I got out and I

7    went into the bodega to drink something.  And we were at the

8    bodega for about 45 minutes and then I went back to get my cut.

9            The police car was still outside.  I finished getting

10   my haircut.  And then we went back to the house where we had

11   dropped off my mom and my daughters.

12   Q.  Let me stop you right there with a few follow-up questions.

13           You mentioned a police car.  Where did you --

14   A.  Yes.

15   Q.  Where did you first notice the police car?

16   A.  In front of the barbershop.

17   Q.  And where was the police car in relation to your van?

18   A.  Behind us.

19   Q.  And was it a marked or an unmarked police car?

20   A.  One of those undercover police cars.

21   Q.  And why did you think it was an undercover police car?

22   A.  Well, the windows, the lights, the little antenna, the

23   tinted windows.

24   Q.  What type of lights did you notice?

25   A.  The ones the police cars have on top of the window but

E6idser5                          Gilbert - direct

1  inside the car.

2  Q.  OK.  So what happened next after you got your haircut at

3  the barbershop?

4  A.  We went out.  We went to the house where we had dropped off

5  my mom and the girls.  We went up on Amsterdam.  We turned left

6  on 165th.  And on 165th and St. Nicholas, I turned right.

7  Right in front of the hospital, Escarly told me, Erickson, the

8  police continues to be right behind us.

9       I turned back and I said, well, there's no problem

10  because they are here to protect us.  You haven't done any

11  traffic infraction or anything.

12       We got to 172nd.  We turned right.  And they continued

13  to be behind us.  We turned around the block for about two

14  times.  And after the second turn I stopped on -- between 171st

15  and 172nd and Audubon in front of the Villa Lounge.

16       Since Escarly doesn't really know how to park well, I

17  got out of the car so that I could signal to her so that she

18  could park.  The car was still behind us.  When I got out of

19  the car so that I could signal to her so that I could help her

20  park, he signals at me and he says, no, just go on.  So I was

21  wondering what's going on.  I mean, this is a parking spot.

22  How come I can't park here?

23  Q.  Let me stop you right there.

24       You said he signaled me to move on.  Who signaled you

25  to move on?

E6idser5                        Gilbert - direct

1  A.  The person who was driving the car from inside the car.

2  Q.  Which car?

3  A.  The car that I said was supposedly the police car.

4  Q.  And was that the same police car you had seen at 164th and

5  Amsterdam?

6  A.  Yes, sir.

7         MR. MUKHI:  Now, can we pull up 300C, the video, and

8  fast-forward to 3:59.

9         (Video played)

10        MR. MUKHI:  Can we pause right there.

11 Q.  Mr. Gilbert, do you recognize the vehicle on the screen?

12 It is 20:54:09.

13 A.  Yes.  That's the van.  That's my van.

14 Q.  And let's continue.

15        (Video played)

16        And pause right there.

17        At 20:54:14, do you recognize the vehicle that just

18 entered the scene?

19 A.  That's the car that I was saying was the police car that

20 was behind me.

21 Q.  OK.  Let's continue to play.

22        (Video played)

23        All right.  Let's pause right there.

24        Do you recognize the person who just entered the scene

25 and is paused at 20:54:27?

E6idser5                          Gilbert - direct

1    A.  Yes.  That's me.

2    Q.  And what are you doing, if you recall, in this section of

3    the video?

4    A.  I was helping Escarly park.

5    Q.  And where were you?

6    A.  I was inside the van, and I got out so that I could help

7    her park so that I could signal to her to park back.

8    Q.  And what happened next?

9    A.  He did like this:  No.  Leave.

10   Q.  And who was that?

11   A.  The one who was inside the car.

12          MR. MUKHI:  All right.  Let's continue to play.

13          (Video played)

14          Let's stop right there.  We are at 20:55:00.

15   Q.  Do you recognize the person who just entered the scene on

16   the video?

17   A.  Yes.

18   Q.  Who is it?

19   A.  That was the person who took me out of the car.together

20   with another person.

21   Q.  And when was that?

22   A.  After that we turned right on 171st, and it was half along

23   the block.

24   Q.  Before we get to that, did you notice -- at the time, did

25   you notice where that man came from?

E6idser5                          Gilbert - direct

1   A.  There was a red car in front of us that was blocking our

2   way right halfway around the block.  He was coming exactly from

3   the direction from where this car was, from where the car had

4   parked, because they didn't know which way I was going.

5   Q.  And you mentioned the red car had been in front of you; is

6   that what you said?

7   A.  Yes.

8   Q.  When was the red car in front of you?

9   A.  When we crossed along 172nd, all along the way.

10  Q.  Why did you notice the red car?

11  A.  Because they didn't let us go through even though there was

12  space.

13  Q.  Now, we met before today, is that right?

14  A.  Yes, sir.

15  Q.  We met on two occasions and spoke about the events of this

16  night?

17  A.  Yes.

18  Q.  Before today did you remember what you just told us about

19  the red car?

20  A.  No.

21  Q.  OK.  And how were you able to remember that today?

22  A.  I was thinking when you had asked me if I remembered

23  anything differently to what I had already told you.

24  Q.  And did you talk to anyone else that made you remember what

25  you just told us about the red car?

E6idser5                           Gilbert - direct

```
 1    A.  Yes.
 2    Q.  Who did you talk to?
 3    A.  With Escarly.
 4    Q.  Did you talk to anyone besides Escarly about what you
 5    remembered today?
 6    A.  No.
 7    Q.  Now, by the way --
 8    A.  Sorry.  Well, that's besides the detective, whom I told him
 9    that I had remembered something else.
10    Q.  OK.  And when did you tell him that?
11    A.  Today.
12    Q.  OK.  And did he ask you anything about the red car before
13    you told him what you remembered?
14    A.  No.
15    Q.  Now, did you see the person driving the red car that night?
16    A.  No.
17    Q.  And do you recognize anyone in the courtroom who robbed you
18    the night you were robbed?
19    A.  I'm not sure.  No.
20            MR. MUKHI:  Now we can put the video down, and if we
21    could, just for Mr. Erickson -- Mr. Gilbert, put up 601A.
22            And, Mr. Gilbert, this will be on your screen.
23    Q.  What do you see on your screen?
24    A.  The map of Washington Heights up there.
25    Q.  OK.  And does that map fairly and accurately depict
```

1   Washington Heights?

2   A.  Yes, sir.

3          MR. MUKHI:  Your Honor, the government offers 601A

4   into evidence.

5          THE COURT:  Any objection?

6          MS. GOTLIB:  No, your Honor.

7          THE COURT:  Received.

8          (Government's Exhibit 601A received in evidence)

9          MR. MUKHI:  OK.  Can we put it up on the screen?

10  Q.  Mr. Gilbert, can you tell us what happened next after what

11  we just saw on the video on Audubon?

12  A.  When I got to 171st, I turned right.  Halfway along the

13  block there was a red light.  The car that I was saying was the

14  police car threw itself at us like trying to stop us.  They

15  turned the lights, the siren.  There were two people that came

16  on my side.

17         The window in my van wasn't working.  I opened my

18  door.  They took me out of the vehicle.  It was somebody with a

19  sweater.  There was another thinner guy with a bullet-proof

20  vest.  He said to me, Get the fuck out of the car.  FBI.

21  Police.  I don't remember what words he said to me.  And he was

22  clutching at something under his arm over here, where his vest

23  was.

24         They slammed me against the car.  They searched me.

25  So the other person who went over to the other side made my

1   girlfriend get out.  He checked her and then he took off in the

2   van.

3            So the person who stayed with me asked me for an ID.

4   I turned around like this.  He turned my face back around.  I

5   took out my ID and I gave it to him.

6            He went over to the car.  So I looked.  He opened up

7   the car and he just threw my ID in it.  He said, This guy's a

8   fucking Dominican.  And they just took off and left me there on

9   the street.

10           I said, This is really strange --

11           MS. GOTLIB:  Objection.

12           MR. MUKHI:  I don't think this is being offered for

13   the truth, your Honor.

14           THE COURT:  All right.  Overruled.

15   A.  This is really strange.  The police don't do that.

16   Q.  OK.  You can continue.

17   A.  Should I continue?

18           So there were some people around.  They said, what

19   happened?  I said, I don't know what happened.  I don't think

20   it was the police; I think it was something else.

21           So I called 911 right away so the real police would

22   come and figure out what had happened.

23   Q.  OK.  Let me stop you right there.

24           You mentioned that your car was -- your van was taken.

25   Who took the van?

1   A.  Yes.  The two people who made me -- out of the two people

2   who made me get out of the car, it was the thinner one.

3   Q.  And what were the men wearing, if you recall?

4   A.  The guy who asked me for my ID was wearing a black sweater,

5   and like these gray gym pants.  The other guy was wearing a

6   bullet-proof vest and I don't remember what else.  I didn't get

7   to really have a good look at him.

8   Q.  How quickly did this happen?

9   A.  Less than a minute, 45 seconds.

10  Q.  Now, did you notice anything that you thought might be a

11  weapon?

12  A.  I never saw the weapon, but he had this bulge here and he

13  wanted to do this:  Police.  Police.  Get out of the car.

14  Q.  And who of the three people did that?

15  A.  The skinny guy, kind of dark-skinned.  The guy who took off

16  in the van.

17  Q.  Now, your Honor -- if you could do the gesture that you saw

18  that made you think someone had a gun.

19  A.  (Indicating) Yes.  Take it out.  Take it out.

20          MR. MUKHI:  And, your Honor, if the record could

21  reflect the witness has taken his right arm and put it

22  underneath his left arm?

23          THE COURT:  All right.

24  BY MR. MUKHI:

25  Q.  OK.  Now, did you talk to the police that night?

E6idser5                          Gilbert - direct

1    A.  Yes.

2    Q.  And did you give them -- well, what name do you go by?

3    A.  My name is Erickson Gilbert Paredes.

4    Q.  What name did you give the police that night?

5    A.  Erickson Paredes.

6    Q.  And why didn't you give your full name?

7    A.  Maybe because I was nervous maybe because of my illegal

8    situation in this country.

9    Q.  Now, just two final questions.

10        How did you feel when you saw someone reach to their

11   side?  When you saw that, how did you feel?

12   A.  I couldn't speak.  I had never been involved in an event

13   like that.  And I felt even worse knowing that my two little

14   girls had been in the van minutes -- like a little over an hour

15   before.  They didn't even notice anything.  They just got into

16   the van and took off.  That was the most -- the thing that

17   caused most of an impact for me, because if this had happened

18   minutes later they would have driven away with my daughters.

19   Q.  And were you scared during the robbery?

20   A.  Yes, because anything could have happened.  Anything.

21        MR. MUKHI:  One moment, your Honor.

22        THE COURT:  All right.

23   A.  Can I add to that?

24   Q.  Yes.

25   A.  And then I got even more scared when I found out they

E6idser5                        Gilbert - direct

1    weren't real police officers.

2    Q.  When did you first realize they were not real police

3    officers?

4    A.  When they took off in both cars and left me standing there

5    on the street.

6            MR. MUKHI:  No further questions at this time, your

7    Honor.

8            THE COURT:  All right.  Thank you.

9            Ms. Gotlib.

10           MS. GOTLIB:  Yes.  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MS. GOTLIB:

13   Q.  Hello, Mr. Erickson.

14   A.  Hello.

15   Q.  This incident happened on October 14, 2012, is that

16   correct?

17   A.  Yes.

18   Q.  Almost two years ago?

19   A.  Yes.

20   Q.  Immediately after the incident you talked to police,

21   correct?

22   A.  Yes.

23   Q.  And you told them everything that you remembered, correct?

24   A.  Yes.

25   Q.  And you told them the truth?

1    A.  Yes.

2    Q.  But you didn't tell them about the arm and somebody

3    clutching a gun, correct?

4    A.  Yes.  The only thing was at that time I told them it was a

5    gun but I didn't see it.

6    Q.  You didn't see a gun, correct?

7    A.  No.

8    Q.  Did you -- and you didn't tell them that you saw somebody

9    clutch something, correct?

10   A.  Yes.

11   Q.  You testified that you are here illegally, is that correct?

12   A.  Yes.

13   Q.  You are familiar with something called the U Visa, is that

14   correct?

15   A.  Yes.

16   Q.  And that is something that individuals who help victims of

17   crime that help the government, if the government believes that

18   they gave enough help, will certify in their petition for them

19   to become a citizen, correct?

20          MR. MUKHI:  Objection as to form.

21          MS. GOTLIB:  Withdrawn.

22          THE COURT:  Rephrase it.

23   BY MS. GOTLIB:

24   Q.  A U Visa -- if you know, a U Visa is something for victims

25   of crime who provide assistance to the government, correct?

E6idser5                          Gilbert - cross

1   A.  Yes.

2   Q.  And you want the government to sponsor your application for

3   a U Visa, correct?

4   A.  If that's possible, yes.

5   Q.  In fact, you told the government that you were hoping that

6   they would do that, correct?

7   A.  I did ask them.  I said if they could do that, if that was

8   something they could do, I would like them to do that.

9           MS. GOTLIB:  Just a couple of more questions.

10  Q.  When you met with the government, they told -- did they

11  tell you not to speak about your testimony with your

12  girlfriend?

13  A.  Yes.

14  Q.  But you did anyway?

15  A.  Today I asked her something -- well, I told her what I had

16  just remembered right then.

17  Q.  You told her what you had just remembered, is that correct?

18  A.  Yes.

19  Q.  And what did you just remember?

20  A.  That that red car that was up ahead, the person who had

21  asked me for my ID had walked away from that car -- was walking

22  from that car.

23  Q.  And you're testifying that you remembered about the red

24  car, correct?

25  A.  Yes.

E6idser5                          Gilbert - cross

1              MS. GOTLIB:  One second, your Honor.

2              (Pause)

3    Q.  Sir, you never told anyone about the red car prior to this,

4    your testimony here, correct?

5    A.  That is correct.  I had not talked about it, no.

6    Q.  In fact, you didn't remember about the red car until

7    Escarly told you about the red car?

8    A.  No.  I talked to Escarly.  She confirmed that for me.

9    Q.  Sir, didn't you tell these prosecutors today that you

10   remembered the red car after talking to Escarly?

11   A.  This is what I explained to them, that I asked Escarly --

12   well, when I watched the video that was shown here, I

13   remembered that the person who walked over had walked over from

14   that red car that was ahead of us.  But I hadn't testified

15   about the red car.  I hadn't talked about the red car.  I

16   didn't remember it.  I couldn't remember everything.

17   Q.  That's correct.  You didn't remember it until Escarly told

18   you about it, correct?

19   A.  No.  I asked Escarly about it.  Escarly confirmed it for

20   me.

21   Q.  And where was the red car, sir?

22   A.  Ahead of me.

23   Q.  It was ahead of you?

24   A.  When I was in the van, it was ahead of the van.

25   Q.  How far ahead?

E6idser5                        Gilbert - cross

1   A.   Two cars, one car.  There was one point when it was just in

2   front of it.

3   Q.   The red car was just in front of your car?

4   A.   Yes.  It wouldn't let me pass.

5   Q.   And you remembered all of this this morning?

6   A.   I remembered that the person walked --

7   Q.   Sir, if you could answer "yes" or "no," please.

8            MR. MUKHI:  Your Honor, he was answering the question.

9            THE COURT:  He was in the middle of an answer.

10           MS. GOTLIB:  Withdrawn.

11           THE COURT:  You can go ahead and complete.

12   A.   I remembered that the person walked over and then he walked

13   over from the red car.  Escarly refreshed my memory and said,

14   Right, it wouldn't let us pass.

15   Q.   Yes or no, sir, you only remembered about the red car this

16   morning before your testimony today, is that correct?  Yes or

17   no, please.

18   A.   Yes.

19           MS. GOTLIB:  No further questions.

20           THE COURT:  All right.  Thank you.

21           Mr. Mukhi, anything further from you?

22           MR. MUKHI:  Just very briefly, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. MUKHI:

25   Q.   Mr. Gilbert, Ms. Gotlib asked you about a U Visa

E6idser5                        Gilbert - redirect

1    application.

2    A.  Yes.

3    Q.  Now, have any promises been made to you by the government

4    that you will receive a U Visa?

5    A.  No.

6    Q.  Now, Ms. Gotlib asked you a number of questions about the

7    red car.  Do you recall that?

8    A.  Yes.

9    Q.  OK.  Prior to today had anyone from the government or the

10   police asked you about a red car?

11   A.  No.

12          MR. MUKHI:  Nothing further, your Honor.

13          THE COURT:  All right.  Thank you.  You may step down,

14   sir.

15          Oh, hold on.

16          MS. GOTLIB:  Redirect, your Honor.

17          THE COURT:  Recross.

18          (Pause)

19   RECROSS-EXAMINATION

20   BY MS. GOTLIB:

21   Q.  Sir, one question and please answer yes or no.

22          Back in 2012, the night of the incident, right after

23   it occurred, you were speaking to the police.  They asked that

24   you tell them everything that happened, and you did not tell

25   them about the red car, correct?

E6idser5                        Gilbert - recross

```
 1   A.  Yes.
 2              MS. GOTLIB:  Thank you.
 3              No further questions.
 4              THE COURT:  All right.  Now you may step down.  Thank
 5   you, sir.
 6              THE WITNESS:  Thank you.
 7              (Witness excused)
 8              THE COURT:  All right.  Mr. Mukhi, why doesn't the
 9   government call its next witness.
10              MR. MUKHI:  Yes, your Honor.
11              The government calls Escarly Ynfante.
12              THE COURT:  All right.  Ms. Ynfante.
13    ESCARLY YNFANTE,
14         called as a witness by the government,
15         having been duly sworn (through the Interpreter),
16         testified as follows:
17              THE CLERK:  Please state your name for the record.
18              THE WITNESS:  Escarly Ynfante.
19              THE COURT:  All right.  Ms. Ynfante, please be seated.
20   You will want to pull your chair up and speak clearly so that
21   the translator can hear each word and then she will translate
22   for the record.
23              Could you please spell your last name?
24              THE WITNESS:  Y-n-f-a-n-t-e.
25   DIRECT EXAMINATION
```

E6idser5                         Ynfante - direct

1   BY MR. MUKHI:

2   Q.   OK.   Ms. Ynfante, how old are you?

3   A.   33.

4   Q.   And where were you born?

5   A.   The Dominican Republic.

6   Q.   When did you come to the United States?

7   A.   In 2005.

8   Q.   Are you more comfortable testifying in Spanish today?

9   A.   Yes.

10  Q.   Did you enter the country legally or illegally?

11  A.   Legally.

12  Q.   What is your current immigration status?

13  A.   Permanent resident.

14  Q.   And what have you done for -- well, where have you lived

15  since you came to the United States?

16  A.   Well, I've lived on 163rd in Manhattan, on Thayer in

17  Manhattan, on Anderson in the Bronx, and right now on Sedgwick

18  in the Bronx.

19  Q.   OK.   Now, what have you done for work since you came to New

20  York?

21  A.   Well, my first job was as a cashier at a supermarket, and

22  then I started working at a furniture store, where I am still

23  working today, and I have been there for about seven years.

24              (Continued on next page)

25

E6I7SER6                         Yfante - direct

1    Q.  What do you do at the furniture store?

2    A.  I'm a saleswoman.

3    Q.  Do you have any kids?

4    A.  Yes.

5    Q.  And how many?

6    A.  Two.

7    Q.  And are you with the father of your children?

8    A.  Yes.

9    Q.  And what is his name?

10   A.  Erickson.

11   Q.  What's his last name?

12   A.  Gilbert.

13   Q.  And what does Mr. Gilbert do for a living?

14   A.  He works at the furniture store too.  He is a delivery man.

15   Q.  And how long has he done that?

16   A.  About ten or 11 years.

17   Q.  As far as you know, has Mr. Gilbert ever done anything

18   illegal to make money?

19   A.  No.

20   Q.  Have you ever been the victim of a robbery?

21   A.  Yes.

22   Q.  And who were you with when you were robbed?

23   A.  I was with Erickson.

24   Q.  And was the robbery during the day or at night?

25   A.  At night.

E6I7SER6                         Yfante - direct

1   Q.  OK.  Why don't you just tell the jury how that evening

2   began.

3   A.  Well, that night, it was a Sunday, so I left work. I went

4   home to pick up my girls and Erickson to take them to the home

5   of a female relative in Manhattan.

6           So, when we got to Manhattan, I dropped off the girls.

7   Erickson's mother was also with us.  So, we couldn't find a

8   parking spot right away, so we just decided to drop them all

9   off at my relative's house, and then Erickson and I would go to

10  the barber shop so he could have his haircut.

11  Q.  And where was the cousin's house that you referred to?

12  A.  On 172nd Street between St. Nicholas and Audubon.

13  Q.  And where did you go after you left that location?

14  A.  We went to 162nd, 163rd, where the barber shop was.  I

15  stayed outside; I was double parked.  Then Erickson came out of

16  the barber shop.  He said somebody is about to pull out, try to

17  park, because there is a police car right behind you.  So I

18  parked.  We stayed in the barber shop for about 40 minutes.  We

19  left; we headed back up to our cousin's where I had dropped off

20  the girls.

21  Q.  Let me stop you right there.  You said that Erickson

22  noticed someone behind you at the barber shop?

23  A.  Yes.

24  Q.  When he said that, did you look to see what he was

25  referring to?

E6I7SER6                          Yfante – direct

1   A.  I didn't pay too much attention to that.  I just parked and

2   went into the barber shop.

3   Q.  OK.  So, did you see anything at that point that you

4   noticed outside of the barber shop?

5   A.  No.

6   Q.  All right.  What happened next after you left the barber

7   shop with Erickson?

8   A.  So, as we were driving up St. Nicholas at around 170th, I

9   saw the car that was behind us.

10  Q.  What type of car was it?

11  A.  It was a Ford.

12  Q.  And was there anything unique about the Ford?

13  A.  No, it was black, that's all.

14  Q.  And when you noticed the car, did you see the license

15  plate?

16  A.  When I looked through my rearview mirror, it didn't have a

17  license plate.

18  Q.  And what type of car were you in that night, and Erickson?

19  A.  In a Dodge Caravan van.

20  Q.  And who was driving?

21  A.  I was.

22  Q.  Was it a new van or an old van?

23  A.  No, old, 2008.

24  Q.  Was there anything valuable inside the van that night?

25  A.  Not really, a GPS.  No, nothing.

1   Q.   Did you have any of your personal effects in the van that

2   night?

3   A.   My handbag.

4   Q.   And what was in your handbag?

5   A.   My driver's license, my green card, my older daughter's

6   green card, Social Security cards, my credit cards.

7   Q.   Now, what happened next after you noticed the Ford?

8   A.   So, after I had got on to 172nd I saw that the car

9   continued to be behind me, so I turned around the block one

10  time, and they continued to be behind me all throughout that

11  time.  So, after I did another turn around the block, I saw

12  that they continued to be behind me, and so when I got to

13  Audubon, between 171st and 172nd, I found a parking spot and I

14  tried to park.

15  Q.   How did you try to park?

16  A.   I first stopped, and then Erickson got out of the car so

17  that he could signal to me so that I could park.

18  Q.   What happened next?

19  A.   So, at that time when he was going to signal at me so that

20  I could park, one of the men from the other car got out and

21  told Erickson that we couldn't park there.

22  Q.   What other car?

23  A.   The one that was behind me, the police car.

24  Q.   Why do you say it was a police car?

25  A.   Well, because it looked like one of the cars that police

1   usually use, you know, like incognito.

2   Q.  By the way, when you noticed the police car for the first

3   time, did you say anything?

4   A.  That I didn't understand why -- I told Erickson that I

5   didn't understand why they were behind me, because I had my

6   seat belt on and everything was fine.

7   Q.  And what happened --

8           Actually, let's put up 300C, and if you could go to

9   3:59.  All right, 20:54:09.

10          (Video played)

11  Q.  Ms. Ynfante, do you recognize the vehicle that just came on

12  the screen?

13  A.  Yes.

14  Q.  Whose is it?

15  A.  That was my van.

16          (Video played)

17  Q.  Stop right there.  Do you recognize the car that just

18  entered the scene at 20:54:15?

19  A.  Yes.

20  Q.  What vehicle is that?

21  A.  The one that was behind us.

22  Q.  The police car?

23  A.  Yes.

24          MR. MUKHI:  And if you could continue to play.

25          (Video played)

E6I7SER6                              Yfante - direct

1    Q.  Who is on the screen, if anyone you recognize, now,

2    20:54:26?

3    A.  That's Erickson.

4    Q.  And where is Erickson?

5    A.  The one with the white sweater.

6    Q.  Towards the center right of the screen?

7    A.  Yes.

8            MR. MUKHI:  We can put the video down.

9    Q.  So, what happened after you tried to park?

10   A.  They told us that -- well, the guy said that we couldn't

11   park there.  Erickson asked him why, and the only thing he said

12   was move.

13   Q.  What happened next?

14   A.  So, I continued to drive towards 171st, meaning right

15   straight on Audubon towards 171st.  And when I got to the

16   corner I also noticed that there was a red car that was right

17   there, that was sort of blocking my way.

18   Q.  Let me ask you a couple of questions about the red car.

19   Did you notice the red car first or Erickson notice the red car

20   first?

21   A.  Erickson was the one who saw it first, because I was

22   actually paying more attention to the car that was behind me.

23   Q.  And what happened -- by the way, did you see the driver of

24   the red car that night?

25   A.  No.

E6I7SER6                          Yfante - direct

1   Q.  And do you see anyone in the courtroom that you recognize

2   as one of the robbers from that night?

3   A.  No.

4   Q.  Now, what happens next?  What happens next?

5   A.  So, when Erickson made that comment that, you know, what's

6   going on with that guy who is not letting us pass.  Then I

7   turned on 171st, and so right around, halfway along the block,

8   that's when they turned the lights on, they turned the siren

9   on, and they had me stop.

10  Q.  And who turned on the lights and sirens?

11  A.  The car that was behind us.

12  Q.  And what sound did the siren make?

13  A.  Like the ones that the police cars do like this.

14  Q.  Now, what happened next after you were stopped with the

15  lights and siren?

16  A.  So, a guy came right on my side, and another guy came to

17  Erickson's side.  So, he told me to put the car in park.

18  Q.  Do you remember the exact words that that person said to

19  you?

20  A.  First he said like this, put your car in park, and then I

21  asked him if something was happening, and I asked why he was

22  stopping me.  At that time he said put your car in park, and

23  then get out of the fucking car, and he pulled the door.

24  Q.  What happened next?

25  A.  So, when I was getting out, he grabbed me, and he slammed

E6I7SER6                        Yfante - direct

1   me against the van.  So then he brought me behind the van, and

2   he searched me, they searched me, he touched me.

3   Q.  And what happened after that?

4   A.  So, after that one of the two guys -- well, the one who got

5   me out of the car, he asked Erickson to give him the ID.  At

6   that time Erickson didn't understand, so I told him that he was

7   asking for his ID.

8   Q.  And what happened next?

9   A.  So, Erickson gave him the ID he had, and that was the ID

10  from the Dominican consulate.  And so he gave it to the other

11  guy who was there who had been the guy who had gotten Erickson

12  out, and so the guy went back to the car, saw the ID, and he

13  said, well, this guy is a fucking Dominican, and he threw it

14  away.

15  Q.  What happened next?

16  A.  While they were asking about the ID and everything, there

17  was a third person who got in my van and took off in my van.

18  So, when this guy had said what he said about Erickson's ID,

19  the other guy got in the car, and they all got in the car, they

20  took off.

21  Q.  Let's pause right there for a minute.  So, you described

22  three people:  The first person who went to your side of the

23  vehicle, a second person who went to Erickson's side of the

24  vehicle, and a third person who took your car.  Is that right?

25  A.  Yes.

E6I7SER6                         Yfante - direct

1   Q.   Did you notice anything that night that you thought might

2   be a weapon?

3   A.   Yes.

4   Q.   What did you see that you thought might be a weapon?

5   A.   Well, at that time when the guy who had asked for the ID,

6   who was the guy who had gotten Erickson out of the car, when he

7   was going towards the car that's when I saw that there was like

8   a black bulge like around where they usually get their gun, but

9   I never saw a gun.

10  Q.   So this was the second person who had approached Erickson's

11  side of the car?

12  A.   Yes.

13  Q.   What were the men wearing?

14  A.   Well, I don't remember exactly right now, but that guy, the

15  one that I was telling you that I saw with that thing, I saw

16  him that he was wearing like a vest, like one of those

17  bulletproof vests.

18  Q.   And where was the thing that you thought might be a gun

19  located on that second person's body?

20  A.   Like around the waist.

21  Q.   And where was it in relation to the vest that you saw?

22  A.   Like around here on the right side.

23  Q.   The right hip?

24  A.   Yeah.

25  Q.   Now, what happened next?

1    A.  At that time when they left us there on the street, well,

2    there were some other guys playing around on the street, and

3    they said, well, they just robbed you.  Erickson called 911,

4    and the police came right away to pick us up.

5    Q.  By the way, before Erickson called 911, did he try to call

6    anyone else?

7    A.  Yes.

8    Q.  When did he try to call someone, and who was he trying to

9    call?

10   A.  So, at the time when we were stopped by the alleged police,

11   he tried to call his mom to tell her not to worry, that we were

12   going to get there a little late.  And the guy who got him out

13   of the car on his side, he took the phone away, and that was my

14   phone.

15            THE COURT:  Mr. Mukhi, we are going to stop in just a

16   minute for our break.

17            MR. MUKHI:  I have about two more minutes.

18            THE COURT:  All right.

19   Q.  All right.  Now, you testified that you had looked for a

20   license plate on the front of the car, and you didn't see one.

21   Did there come a time when you looked for a license plate on

22   the back of the car?

23   A.  Yes.

24   Q.  And when was that?

25   A.  When the car left, when they left us on the street, the car

E6I7SER6                          Yfante - direct

1    left, I looked because they had taken our van, but it didn't

2    have a plate either.

3    Q.  Now, did you later talk to the police, the NYPD, about the

4    robbery that night?

5    A.  Yes.

6    Q.  And at some point later did the police ask you to look at

7    pictures of suspects?

8    A.  Yes.

9    Q.  And did you recognize anyone on those photographs?

10   A.  Well, I saw someone who looked a little similar, because

11   they was chubby and bad, but I wasn't sure, I wasn't 100

12   percent sure.

13   Q.  Sitting here today are you 100 percent sure whether the

14   person you identified for the police was one of the robbers?

15   A.  No, I don't know.  I don't remember.

16          MR. MUKHI:  May I approach with 3509D?

17          THE COURT:  Yes.

18   Q.  Ms. Ynfante, do you recognize that document?

19   A.  Yes.

20   Q.  And what is it?

21   A.  That's the document that the detectives gave me, and they

22   asked me if I recognized anyone from there.

23   Q.  OK.  And is your signature anywhere on this document?

24   A.  Yes.

25          MR. MUKHI:  Your Honor, the government offers 3509D

1    into evidence.

2                MR. DE CASTRO:  No objection.

3                THE COURT:  Received.

4                (Government's Exhibit 3509D received in evidence)

5    Q.  And, Ms. Ynfante, there is a circle around the box of the

6    person in the lower right-hand side.  Is that the person you

7    circled?

8    A.  Yes.

9    Q.  And are you positive that that person was one of the

10   robbers that night?

11   A.  No, I've always said that I wasn't 100 percent sure.

12   Q.  Now, finally, how long did this robbery last?

13   A.  Everything happened very quickly.  I imagine it was about

14   ten minutes, something lake that.

15   Q.  And how about the time just when you were interacting with

16   the people you thought were the police, how long did that last?

17   A.  Minutes.

18   Q.  And how did you feel when the robbery was taking place?

19   A.  Very nervous.

20   Q.  And how did you feel when you saw what you thought might be

21   a gun on that second person?

22   A.  I was very nervous throughout the entire time.

23                MR. MUKHI:  One moment, your Honor?

24                THE COURT:  All right.

25                MR. MUKHI:  Nothing further, your Honor.

1          THE COURT:  All right.  Thank you.

2          Before we go on to cross-examination, why don't we

3     take our afternoon break, because we have had people sitting

4     here about 15 minutes longer than we have been in the

5     afternoon.  So let's take our break.  We will come back in

6     about ten minutes and continue.  I want to remind you as usual

7     not to talk about the case.  Thanks.

8          (Jury not present)Let's all be seated just for a

9     moment.  One very minor evidentiary point, which was there was

10    an objection, Ms. Gotlib, that you had at a point when there

11    was a statement "This is really strange; the police don't do

12    that."  Mr. Mukhi offered that that was not being offered for

13    the truth.  In any event, it would have fit under 803(1) or

14    (2), as either a present sense impression or an excited

15    utterance.  But I can't imagine why that particular statement

16    would be offered for the truth, although it could be that this

17    was strange.  In any event, I just sort of say that just for

18    the record.

19          All right.  Where are we?

20          MR. MUKHI:  I think it's going to be close whether

21    we're going to be done at five.

22          THE COURT:  That's a very big difference between this

23    morning being done before lunch and not getting done at all.

24          MR. MUKHI:  Concededly.

25          THE COURT:  So, what can we do to get ourselves done?

E6I7SER6                          Yfante - direct

 1    I have my heart set on it now.

 2              MR. MUKHI:  Well, I don't want to break your heart.

 3              THE COURT:  It would break my heart.  I was all ready

 4    to charge, but now I'm ready not to charge, but I don't want to

 5    come back tomorrow and have a long languorous, you know --

 6              MR. MUKHI:  I think the charge is going to be

 7    tomorrow.

 8              THE COURT:  Well, no, I think the charge will be

 9    tomorrow.  I mean a long languorous additional witnesses

10    tomorrow.

11              MR. MUKHI:  No.  We have three witnesses.

12              THE COURT:  Any of them like sort of, you know, if we

13    can --

14              MR. MUKHI:  Yes, Eric Perry, is going to be very

15    short.

16              THE COURT:  All right.

17              MR. MUKHI:  What we will do, I think what makes the

18    most sense to do is we will switch it now, we will do Donaldson

19    and Perry, who I think we're safe to get both of them done

20    today, and then Ms. Bara who has to be here anyway.

21              THE COURT:  All right.  So how much are we going to

22    have to do on Perry?  I mean what is really necessary with

23    Perry?  Are we going to do this whole cell site thing?  Is it a

24    PowerPoint on cell site stuff?

25              MR. MUKHI:  I think it's three slides.  I think we are

1    basically going to explain what cell site is, establish his

2    credentials as an expert, offer him as an expert.

3           THE COURT:  How long is that going to take?  Can we

4    get a stip that he is an expert, or is there no stip on the

5    fact that he's an expert in cell site stuff?

6           MR. DE CASTRO:  Give me one moment.

7           THE COURT:  Yes.

8           MR. MUKHI:  After that foundation is laid with regards

9    to cell site and possibly the offer of him being an expert, he

10   is going to look at two of the slides that Donaldson had done,

11   say I looked at these, I did my own verification and this is

12   what I found.

13          THE COURT:  That sounds like we could hopefully we can

14   get a stip and this can be done in like ten minutes.

15          MR. MUKHI:  Yeah.

16          THE COURT:  All right.  That's Perry.  What does

17   Donaldson do?

18          MR. MUKHI:  Donaldson puts in the longer cell site

19   analysis that's in 501.

20          THE COURT:  Do we have this well choreographed?

21          MR. MUKHI:  We are just going to be going through the

22   slides, so I will just be walking through each slide and

23   explaining them.

24          THE COURT:  OK.  All right.

25          MR. DE CASTRO:  I think we're fine with the expert,

E6I7SER6                          Yfante - direct

1    Judge.

2              THE COURT:  All right.  So, why don't you folks work

3    out a sentence that would be the magic sentence, you know, that

4    we can just have it agreed, so I don't say something that's

5    beyond what you folks are agreeing to.  Normally a sentence

6    would be that the parties have agreed that so and so has

7    qualifications in the following area and he is accepted as an

8    expert in that area, move on.

9              MR. DE CASTRO:  We will draft that quick.

10             THE COURT:  All right.  Let's take a short break and

11   come on back and get as much done as we can get done.

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

E6I7SER6                          Yfante - direct

 1              (Jury present)

 2              THE COURT:  Let's all be seated.

 3              Mr. De Castro, you may proceed, sir.

 4    CROSS EXAMINATION

 5    BY MR. DE CASTRO:

 6    Q.  Good afternoon, Ms. Ynfante.  My name is Cesar De Castro,

 7    and I represent Anthony Serrano.  I am just going to ask you a

 8    few questions about that night in October, OK?

 9    A.  OK.

10    Q.  And that happened in October of 2012, correct?

11    A.  Correct.

12    Q.  And that was two years ago?

13    A.  Correct.

14    Q.  Now, the people who pulled you over you originally thought

15    were police, correct?

16    A.  Yes.

17    Q.  And they approached your car like a police stop, right?

18    A.  Yes.

19    Q.  And they weren't wearing any masks, right?

20    A.  No.

21    Q.  You could see their face, right?

22    A.  Yes.

23    Q.  And one of those particular people asked you and took you

24    out of the car, right?

25    A.  Yes.

1  Q.  And I think you said they took you to the back of the car,

2  right?

3  A.  Yes.

4  Q.  And so you were able to see what that person was wearing,

5  right?

6  A.  Not really.  I really don't remember much.

7  Q.  But roughly you remember, right?

8  A.  Yes.

9  Q.  And you could see their face as they took you to the back

10  of the car, right?

11  A.  Yes.

12  Q.  And after the incident you testified that you went back to

13  the police precinct, right?

14  A.  Yes.

15  Q.  It was the 33rd Precinct, correct?

16  A.  Yes.

17  Q.  And that's where they had you look at a bunch of pictures,

18  right?

19  A.  Yes.

20  Q.  And that was that exact same night, right?

21  A.  Yes.

22  Q.  How long after the robbery?

23  A.  About four or five hours.

24  Q.  Now, you also testified that they showed you a group of

25  pictures, right?

1    A.  Yes.

2    Q.  But that happened a little later, right?

3    A.  Yes.

4    Q.  It was on a different day, right?

5    A.  The photograph where I signed was a different day.

6    Q.  First they had you looking through pictures on a computer,

7    right?

8    A.  Yes.

9    Q.  And then later on they had you come back and look at a

10   group of six pictures, right?

11   A.  Yes.

12   Q.  And you recognize -- that evening you recognized somebody

13   from the computer pictures, right?

14   A.  I said it looked like the person who had robbed me.

15   Q.  And then when you came back later they showed you what the

16   government introduced as 3509D, right?

17   A.  Yes.

18   Q.  And that was -- you thought that person looked like the

19   person who had taken you out of the car, right?

20   A.  Yes.

21   Q.  Now, you went back to the precinct at a later time too,

22   right?

23   A.  Do you mean the same day?

24   Q.  No, not the same day.  A later date.

25   A.  Yes.

E6I7SER6                          Yfante - cross

1   Q.  And they had you look at a live line-up, right?

2   A.  Yes.

3   Q.  That was a group of individuals, and you were behind some

4   glass, correct?

5   A.  Yes.

6   Q.  And they all had numbers, right?

7   A.  Yes.

8   Q.  And do you remember when that was?

9   A.  No.

10  Q.  Let me show you what is marked Defense Exhibit 3 for

11  identification.

12  A.  You can't really see it too well.

13  Q.  It's not a great copy, right?

14  A.  No.

15  Q.  Let me ask you just to take a look at it and page through

16  it, if you would.

17  A.  OK.

18  Q.  Now, is Defense Exhibit 3 photographs relating to that

19  line-up procedure?

20  A.  Yes.

21  Q.  Other than the bad copy, does it fairly and accurately

22  reflect the way the line-up appeared that day?

23  A.  Yes.

24          MR. DE CASTRO:  We offer Defense Exhibit 3 into

25  evidence.

E6I7SER6                          Yfante - cross

1          MR. MUKHI:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 3 received in evidence)

4          THE COURT:  Did you have a 2?

5          MR. DE CASTRO:  We don't have a 2 in evidence.

6          THE COURT:  All right, thank you.

7          MR. DE CASTRO:  Judge, can I use the Elmo, if you

8   don't mind?

9          THE COURT:  Of course.

10          MR. DE CASTRO:  If I could publish it in that way.

11          THE COURT:  Yes.  You can also pass it around.

12          MR. DE CASTRO:  That might be easier.

13          THE COURT:  Whichever you like.  So that's DX3 being

14   passed to the jury, Defense Exhibit 3.

15          MR. DE CASTRO:  Judge, I have no more questions, if

16   you want to excuse the witness.

17          THE COURT:  All right, thank you.

18          Anything further, Mr. Mukhi, from you?

19          MR. MUKHI:  No.

20          THE COURT:  You may step down, ma'am.

21          (Witness excused)

22          THE COURT:  Would the government like to call its next

23   witness.

24          MR. MUKHI:  Yes, your Honor, the government calls

25   Reginald Donaldson.

E6I7SER6                          Yfante - cross

1          While we are waiting, I am going to put government's

2     501 on the stand.

3          THE COURT:  All right.  And do you folks have

4     something that you agreed you were going to give to me?  Just

5     hand it up.  I know it's not for this witness.  Right?

6          MR. MUKHI:  Correct.

7      REGINALD DONALDSON,

8          called as a witness by the government,

9          having been duly sworn, testified as follows:

10         DEPUTY COURT CLERK:  Please state your full name for

11     the record.

12         THE WITNESS:  Reginald Van Donaldson, Sr.

13         THE COURT:  Please be seated.  You will need to pull

14     up the chair and adjust the mic to whatever will give a nice

15     clear sound.

16         You may proceed.

17     DIRECT EXAMINATION

18     BY MR. MUKHI:

19     Q.  Where do you work, Mr. Donaldson?

20     A.  I work for the U.S. Attorney's office here in the Southern

21     District.

22     Q.  What is your title?

23     A.  I'm an investigative analyst.

24     Q.  And how long have you done that?

25     A.  A little over four years.

E6I7SER6                        Donaldson - direct

1   Q.  What did you do before that?

2   A.  Retired police officer, 20 years with NYPD.

3   Q.  What did you do at the NYPD?

4   A.  I was an investigator; I was a detective there.

5   Q.  And did you do any computer work at NYPD?

6   A.  Yes, I did.

7   Q.  And what are your duties and responsibilities now as an

8   investigator at the U.S. attorney's office?

9   A.  I assist the prosecutors and investigators with their

10  investigations.  I keep track of cooperators and information

11  they have.  I run criminal histories and law enforcement

12  databases to find out information about defendants and

13  subjects, and I also perform data analysis and extraction of

14  cell phones, analysis of cell sites and subscriber information.

15  Q.  What are cell sites?

16  A.  Cell sites are the sites that the cell phones connect to

17  when you are making calls or receiving calls.

18  Q.  Does cell site information provide an exact location for a

19  phone?

20  A.  No, it doesn't.

21  Q.  What information does it provide?

22  A.  It gives you a general area of where the phone is.

23  Q.  Now, does a cell phone always connect to a cell site when

24  it makes a communication over the cellular network?

25  A.  Yes.

1   Q.  And which cell site does the phone usually connect to?

2   A.  Either the nearest or one with the strongest signal.

3   Q.  What happens if someone is traveling and making phone calls

4   at the same time?

5   A.  Each cell site has an area of coverage, and as it leaves

6   one area it connects to the next cell site in the next area as

7   it moves on.

8   Q.  And have you received any training in analyzing cell site

9   records?

10  A.  Yes, I have.

11  Q.  And what training briefly?

12  A.  I had extensive training with the National White Collar

13  Crimes Center.  I have been trained by a company called Sumuri,

14  S-u-m-u-r-i; also a company called Geocell and also by the

15  F.B.I. Cellular Analysis Survey Team.

16  Q.  Have you analyzed cell site records in the course of your

17  duties as an investigator?

18  A.  Yes.

19  Q.  And approximately how many criminal investigations total?

20  A.  I couldn't give you an exact number.  I would say 15 or

21  more.

22  Q.  All right.  And did you analyze cell site records when you

23  were preparing to testify in this case today?

24  A.  Yes, I did.

25  Q.  In front of you is what is premarked for identification as

E6I7SER6                        Donaldson - direct

1    Government Exhibit 501.  Do you see that?

2    A.  On the screen, yes.

3    Q.  And do you recognize it?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  It's a PowerPoint presentation I prepared for this trial.

7    Q.  Does it contain your analysis?

8    A.  Yes, it does.

9    Q.  What did you use to prepare your analysis?

10   A.  PowerPoint, you mean?

11   Q.  What underlying records.

12   A.  The information?  Call detail records and cell site

13   information from AT&T and Verizon.

14   Q.  And prior to today, did you initial CDs and one document

15   that you had used to prepare your analysis?

16   A.  Yes, I did.

17   Q.  And with the initials RD?

18   A.  Yes.

19          MR. MUKHI:  Your Honor, at this time the government

20   offers Government Exhibit 501.

21          THE COURT:  Any objection?

22          MS. GOTLIB:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 501 received in evidence)

25   Q.  Investigator Donaldson, do you recognize that number?

1    A.  Yes, I do.

2    Q.  What is it?

3    A.  It's the phone number for Anthony Serrano which belongs to

4    Verizon, 201-687-8583.

5    Q.  Is that one of the phone numbers you analyzed?

6    A.  Yes.

7    Q.  And how about the three additional numbers that just came

8    on the screen?

9    A.  Yes, I analyzed all of those numbers.

10   Q.  OK.  Now, briefly, what are call detail records?  You

11   referred to them earlier.

12   A.  Call detail records are sort of like a phone bill except it

13   has more information.  It's the same information that you would

14   have on a phone bill if you are making calls, but in this case

15   we have cell site information also.

16   Q.  And who are these call records for?  Whose phone?

17   A.  This is for the Serrano phone, 201-687-8583.

18   Q.  And we are just going to zoom in on one of those rows.  Can

19   you just walk us through those various columns and what they

20   signify.

21   A.  The network element is the general area of where the switch

22   is for this particular cell site.

23        A switch controls numerous cell sites; it could be 100

24   or more.

25        The mobile directory number is the number of this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    record, which is the Serrano number.

2              The dial digit number would be the number that was

3    dialed.

4              And the call direction is indicating which way it

5    goes.  For Verizon 3 is outgoing, 6 is incoming.

6              The seizure date and time is the date and time the

7    call is made.

8              The seizure duration is the duration of the call in

9    seconds.

10             The first serving cell site is the position of the

11   cell site that the phone connected to when it either made or

12   received the call.

13             The cell face is a direction of the call.  And most of

14   the cell sites on here are what you call three sectors, so

15   they're labeled alpha, beta and omega.

16             The last serving site is 254, which is where the phone

17   call ended, on which cell tower.  And it also gives the face.

18             And the calling party number is the number that's

19   making the call.

20             (Continued on next page)

21

22

23

24

25

1    Q.  Now, just a couple of follow-ups.

2            Which company are these call detail records from?

3    A.  Verizon.

4    Q.  And do cellphone providers all use the same cell sites?

5    A.  No.

6    Q.  So do they each have their own set of cell sites --

7    A.  The major ones have their own.  The smaller ones will piggy

8    back off the major ones.

9    Q.  Are cell sites a set distance apart?

10   A.  No, they are not.

11   Q.  And why not?

12   A.  It's according to the capacity where they are needed.  If

13   you are out in the country somewhere where there is not much

14   population, they are further apart.  They could be up to 10

15   miles apart.  In the city they are almost like every couple of

16   blocks, so.  And there is no set distance between them.  It is

17   according to how much capacity they need, you know, in certain

18   areas.

19   Q.  And just one follow-up.

20           What is the difference between a cell site and what

21   people commonly know as -- see as cellphone towers?

22   A.  It is the same thing.  The official name is cell site.

23   Q.  All right.  Now, how -- are you able to get location

24   information from the cell site information on a call detail

25   record?

1   A.  No.

2   Q.  Let's go to the next slide.  Do you recognize this?

3   A.  Yes.

4   Q.  And what is this?

5   A.  This is a cell site list for Verizon.

6   Q.  And we'll zoom in.

7           Now, what do you do with this list?

8   A.  I actually look at the previous -- the CDRs.  I'll get the

9   connecting site, and I'll look it up on this list to find where

10  it is.  And then it has GPS locations, latitude and longitude,

11  and I plot those on a map.

12  Q.  So on the last slide we saw, 254 is a cell site.  Would you

13  check it on this list here?

14  A.  Yes.  It would be the cell number on this list.

15  Q.  And there would a longitude and latitude associated with

16  that cell site?

17  A.  Yes.

18  Q.  And what is latitude and longitude?

19  A.  It's imaginary lines around the earth.  Some are north and

20  south; some are east and west.  From any -- you can plot any

21  point on earth by using one of these numbers with fractions,

22  and it can give you any location on earth.

23  Q.  So what did you do in your analysis with the longitude and

24  latitude coordinates that you looked up?

25  A.  I plugged them into a mapping program, and it gave me the

E6idser7                          Donaldson - direct

1   location of the cell site.

2   Q.  What are we looking at here?

3   A.  This is an AT&T call detail record.

4   Q.  OK.  And how does this differ from the Verizon call records

5   we were looking at?

6   A.  One of the good things about AT&T is that they include

7   their cell site locations on their CDRs -- it is in the last

8   column -- so I don't have to look it up on a separate list.

9   Q.  And is that under the column called "Cell Location"?

10  A.  Yes.

11  Q.  Where is the latitude and longitude in the cell location?

12  Do you see it there?

13  A.  Yes.  It's the last -- it's the numbers that start with 74

14  and 40 at the end.

15  Q.  And, again, what do you do with that information?

16  A.  I plot it on a map and show the location.

17  Q.  All right.  How about these documents?  Do you recognize

18  them?

19  A.  Yes.

20  Q.  What are they?

21  A.  Those are the call detail records for Victor Moral, who had

22  two phones he was using, and Alex Cespedes.

23  Q.  What company are these --

24  A.  They are all AT&T.

25  Q.  Do these records work the same way you just described for

1    the Javion Camacho AT&T --

2    A.  Yes.

3    Q.  All right.  I'm now going to direct your attention to

4    October 14, 2012.

5           Now, on this slide, which is page 6, we see a whole

6    bunch of small Verizon icons.  What are the whole bunch of

7    Verizon icons?

8    A.  It is to show all of the cell sites that are in that area.

9    Q.  Now, you have -- by the way, whose number did this analysis

10   relate to?

11   A.  Anthony Serrano.

12   Q.  Now, towards the bottom there is an arrow to a particular

13   cell site, and it says JCY254.  It has GPS coordinates and

14   latitude and longitude, and it says 6:36 p.m. to 6:40 p.m.

15   What does that indicate?

16   A.  That indicates that the phone was used using that cell site

17   at that time.

18   Q.  And by the way, is there -- what is the relationship

19   between cell site 254 for Verizon and 348 8th Street in Jersey

20   City, if there is one?

21   A.  That it was given to me as Serrano's address, and this cell

22   site is the closest cell site to that address.

23   Q.  OK.  So that on your analysis indicates that between 6:36

24   and 6:40 on October 14, 2012, that cell phone was hitting off

25   of that tower that is closest to the address that was given to

E6idser7                        Donaldson - direct

1    you as Serrano's address?

2    A.  Yes.

3            THE COURT:  Mr. Mukhi, can I ask a clarifying

4    question?

5            When a cellphone hits off of a cell tower, does that

6    only occur when the cellphone is communicating or attempting to

7    communicate with another cell phone, or is there sometimes just

8    a ping?

9            THE WITNESS:  No, it's only when the phone is either

10   making or receiving a phone call.  That's when it is

11   communicating that we can see with the tower.  It is always

12   connected to that tower when it is on, but we can only see the

13   communication when they are actually communicating.

14           THE COURT:  So when you have got the time up here,

15   that corresponds with a call or attempted call?

16           THE WITNESS:  Right.  Actually, between 6:36 and 6:40,

17   there were numerous calls.  That's why I have it spread out

18   like that.

19           THE COURT:  All right.

20   BY MR. MUKHI:

21   Q.  What did you see next?  What happens at 6:47 p.m.,

22   6:54 p.m. and then 7:36 to --

23   A.  As it progresses in time, it shows that the phone is

24   traveling north in New Jersey.

25   Q.  All right.  Now, what is this page?

E6idser7                          Donaldson – direct

1   A.  This is the Serrano phone between the hours of 8:17 p.m.

2   and 8:59 p.m. on October 14, 2012.

3   Q.  OK.  Starting with 8:17 p.m., where did this Serrano cell

4   phone access a cell site?

5   A.  Right near the George Washington Bridge, in the upper

6   left -- the left-most cell tower, number 261.

7   Q.  OK.  And there is a cone in the -- or an arc in the

8   southwest direction emanating from that cell site.  What is the

9   significance of that?

10  A.  As I said, these are what's called three-sector towers,

11  there is three faces to the cell site.  And the phone calls

12  that were made from -- on those two times were on the face that

13  that yellow pie represents, that slice of pie.

14  Q.  What direction?

15  A.  Southwest.

16  Q.  Southwest of the tower?

17  A.  Yes.

18  Q.  All right.  Now, let's go to 8:45 and 8:46.  Where is the

19  phone connecting at that point?

20  A.  It's in the lowest one that I have indicated, the tower

21  242.

22  Q.  And do you see the approximate cross street of cell site

23  242?

24  A.  It looks like it is 170th Street and it is near Audubon.

25  Q.  Now, what happens at 8:48?

1   A.  8:48?  At 8:48, there is a connection to the tower up in

2   the north.

3   Q.  All right.  And what are some of the reasons that a phone

4   would use a different tower between phone calls?

5   A.  The tower that is closest to it could be congested.  One of

6   the reasons he could have hit that tower is that tower looked

7   and is a little elevated, you know, high elevation, and there

8   is a clear line of sight from where 242 is located up to that

9   one at 63.  So he could have connected to it briefly.  In my

10  analysis it looked like it switched back down to 242.  That's

11  usually unusual to be that far away, because that tower, 63, is

12  a mile away from 242.

13  Q.  Are there reasons why a cell phone would not connect to the

14  closest cell site other than congestion?

15  A.  Yeah, there could be other reasons.  It could be down, you

16  know.  There could be a number of reasons.

17  Q.  What are some examples of the reasons why a phone would

18  connect to a cell phone tower that is not the closest tower?

19  A.  That is not the closest?  Like I said, the terrain,

20  buildings, you know.  Besides it being congested, there could

21  be -- buildings could be in the way of where he is standing,

22  you know, wherever the phone is, or they could be inside of

23  something or up on a roof or something or whatever and it just

24  has a clear line of sight.

25  Q.  With that one with 8:48 up at the top tower, there is also

1  a cone emanating.  What does that signify?

2  A.  The phone was located south of that tower.

3  Q.  All right.  Now, let's go to 8:53, 8:54 and 8:58.  Where is

4  the cell phone hitting then?

5  A.  It is hitting the tower number 242 at the bottom.

6  Q.  OK.  That is the same tower as 8:45 and 8:46 p.m.?

7  A.  Yes.

8  Q.  There are also cones emanating from that tower.

9  A.  Yes.

10  Q.  What do those signify?

11  A.  During the various calls, that's where the phone was

12  located, either on the south side or on the north side there.

13  Q.  And did you look to see which calls are coming from the

14  north side and which calls are coming from the south side?

15  A.  Yes, I did.

16  Q.  OK.  And sitting there right now, do you recall for 8:45

17  and 8:46 and 8:53 which side of the tower the calls are coming

18  from?

19  A.  I do believe, but I'd rather refer to a document that we

20  prepared to make sure.

21  Q.  OK.

22          MR. MUKHI:  Your Honor, I am approaching with 3503-PP.

23          THE COURT:  All right.

24  Q.  If you could just review this document and see if it

25  refreshes your recollection.

E6idser7                        Donaldson - direct

1    A.  OK.

2    Q.  So for 8:45, 8:46 and 8:53, what direction are the calls

3    coming from with respect to the Serrano phone and tower 242?

4    A.  The bottom cone or the bottom slice, that's where he is,

5    the phone is.

6    Q.  You are referring to the southern slice?

7    A.  Yes.

8    Q.  OK.  And how about for 8:54?

9    A.  It's on the top slice we have there.

10   Q.  OK.  And 8:58?

11   A.  It's -- it is not shown here but it's -- the slice is not

12   drawn in.  It is on that part.  That area.

13   Q.  OK.  And you are referring to the area in between the two

14   yellow cones?

15   A.  Oh, wait a minute.

16            (Pause)

17            I'm sorry.

18            (Pause)

19            Actually, I believe it's --

20   Q.  Do you want to refer to your notes and I will ask you one

21   more time?

22   A.  Sure.

23   Q.  At 8:54 -- just look at your notes, and if it refreshes

24   you, let us know.  At 8, 54 which direction were -- was a call

25   coming from --

1    A.  Oh, I'm sorry.

2    Q.  -- with respect to the Serrano phone and tower 242?

3    A.  8:54, it should have been the north -- the north slice.

4    Q.  And 8:58?

5    A.  Would be the bottom slice.

6    Q.  All right.  Now, did you also look at what calls were being

7    made for these calls that you mapped?

8    A.  Yes.

9    Q.  OK.  And can you just walk through who is calling who and

10   who they are, starting at 8:17?

11   A.  8:17, one of the Moral phones called Serrano.  At 8:45, the

12   Serrano phone calls Moral.  At 8:46, the Serrano phone calls a

13   201.838.2372, which hasn't been identified.  At 8:48 the Moral

14   phone calls Serrano.  At 8:53 an unidentified 201 number called

15   Serrano.  At 8:54 an unidentified number called Serrano.  8:58

16   Serrano calls Moral, and at 8:59 Moral calls Serrano.

17   Q.  OK.  Finally, at 8:59 where is the phone?

18   A.  It's near the GW bridge.

19   Q.  And also coming from the southern direction?

20   A.  Yes.

21   Q.  OK.  What does this slide show?

22   A.  It shows the phone being used in New York at 9:01, and then

23   at 9:02 the phone is in New Jersey.

24   Q.  What direction is it heading?

25   A.  West.

E6idser7                         Donaldson - direct

1    Q.  And this slide?

2    A.  This shows the Serrano phone at 9:10 in Jersey, and then at

3    9:11/9:14 further south in Jersey.

4    Q.  And this slide?

5    A.  OK.  At 9:15 the phone is somewhere in Kearny -- it looks

6    like it is approaching Kearny, and then at 9:32 it is in Kearny

7    itself, Kearny, New Jersey.

8    Q.  And which tower is that that you are referring to?

9    A.  Number 77.  It is heading -- it seems to be heading from

10   east to west.

11   Q.  OK.  And how about this slide?

12   A.  At 11:44 the phone is used in Kearny, and then it heads

13   east.  At 11:52 it is in Jersey City.  At 11:53 and then 11:55

14   it is in Jersey City, and then 254 is the home cell site for

15   Serrano.

16   Q.  OK.  What did you see here?

17   A.  This is Alex Cespedes' phone.  This is between 8:45 and

18   8:58 on October 14, 2012.

19           8:45 it's at -- it's somewhere near 160th Street and

20   Amsterdam Avenue.  8:46 it is around -- I guess that is

21   169th Street and St. Nicholas Avenue.  At 8:57 it's somewhere

22   near 174th Street and Broadway.  And then back at 8:58 it's

23   back at 169th and Broadway.

24   Q.  By the way, on these slides we have been seeing some

25   additional AT&T symbols that don't have boxes to them.

E6idser7                          Donaldson - direct

1    A.   Yes.

2    Q.   What is the significance of those?

3    A.   Those are all available cell sites for AT&T in that area.

4    Q.   What about this slide?

5    A.   This shows Alex Cespedes' phone at 9:31 p.m. in Jersey, and

6    I believe that's Kearny, New Jersey also.  Yes.

7    Q.   How about this slide?

8    A.   All right.  This is the Victor Moral phones.  He was

9    actually using two phones at one times, switching back and

10   forth to each one.

11        At 8:45, he received a call on one and made a call on

12   another, I believe, or he received a call on both; I forgot.

13   Down in the southern part there, at 8:45, he received a call or

14   made a call on each phone at the same time.  8:46, around

15   169th Street and Broadway, he received a -- he had a call,

16   either made an incoming or outgoing on the 201 number.  And at

17   8:47 he either made or received a call on the 551 number.

18   Q.   Where is the approximate location of those two second

19   calls?

20   A.   They were at 169th -- around 169th and Broadway.

21   Q.   OK.  And how about this slide?

22   A.   All right.  This is Victor Moral's phone, both phones,

23   between 8:46 and 8:59 p.m. on October 14th.  At 8:46 it is in

24   the southern part, like 169th and Broadway.  8:47 -- this is a

25   continuation from the last slide.  8:47 he is using the other

1   phone at the last -- at the same location.  8:48 he is around

2   174th and St. Nicholas.  And then 8:57 he using the other phone

3   at that same location.  And then 8:58 I believe he is using

4   both phones at 179th Street and, I guess, Cabrini Boulevard,

5   around that area.

6   Q.  Is that near the 95 Highway?

7   A.  Yes.  That is near the George Washington Bridge.  Then 8:59

8   he is at the same location.

9   Q.  OK.  So we just saw the Victor -- what you described as the

10  Victor Moral phone hitting off of some of the same towers at

11  around the same time?

12  A.  Yes.

13  Q.  Did you look at other periods during October 14th to see if

14  those two phones --

15  A.  Yes.

16  Q.  -- were hitting off the same or close to the same towers at

17  the same time?

18  A.  Yes.

19  Q.  Before we get to that, what does this show with respect to

20  Victor Moral's phones?

21  A.  This is the Victor -- well, he is using both phones.  He is

22  in Jersey -- the phone is in Jersey.  At 9:01 he is using the

23  201 phone, and then at 9:03 he's further west using the other

24  phone.

25  Q.  How about this slide?

E6idser7                          Donaldson - direct

1    A.  OK.  This is the Victor Moral phone, just the 201 number.

2    And at 9:31 he's in I guess that's Kearny also, New Jersey.

3    And he heads north at 9:51.  I believe that is also Kearny, I'm

4    not sure.  Yes, it's Kearny.

5    Q.  How about this slide?

6    A.  This is between 12:12 a.m. and 1:26 a.m. on October 14,

7    2012.  Victor Moral has both his phones, and let me see what

8    time.

9    Q.  Without asking you the details of this one, are they

10   generally the two phones making phone calls --

11   A.  Yes.

12   Q.  -- in the same area?

13   A.  Yes.

14   Q.  At the same time?

15   A.  Yes.

16   Q.  And how about this slide?

17   A.  Yeah, between the hours of 5:10 and 6:13 p.m. on

18   October 14, 2012, he's using bone phones from the same cell

19   site.

20   Q.  Around the same time?

21   A.  Yes.

22   Q.  All right.  Now, you saw the Serrano phone, the Cespedes

23   phone and the Moral phone.  Did you put all that analysis

24   together?

25   A.  Yes.

E6idser7                          Donaldson - direct

1    Q.  So what does this slide show?

2    A.  This shows all three phones between the hours of 8 p.m. and

3    9 p.m. on October 14, 2012.  They were all in the same

4    vicinity.

5    Q.  What vicinity was that?

6    A.  Washington Heights, New York.

7    Q.  And how about this slide?

8    A.  This shows the three phones leaving New York around the

9    same time, using the phone in New York, and then on the Jersey

10   side like a few minutes later, all three phones.

11   Q.  All right.  Now, what is this slide?

12   A.  This just represents Anthony Serrano's home at 348 8th

13   Street in Jersey City, New Jersey.  The green dot is his home.

14   The red Verizon with the arrow is the closest Verizon cell site

15   to his home, and the blue AT&T cell site is indicated as the

16   closest AT&T site to his home.

17   Q.  What does this show with respect to this -- or this page of

18   your slide, page 24, show with respect to October 12, 2012?

19   A.  It shows that when -- between 8 and 9 p.m. on that date,

20   Cespedes and Moral were in the vicinity of Serrano's home, and

21   Serrano was home or was in the area of his home.

22   Q.  Based on the cell phone hitting 254, is that right?

23   A.  Yes.

24   Q.  All right.  And how about this slide?

25   A.  This is October 18, 2012, between 3 and 5 p.m.  Once again,

E6idser7                              Donaldson – direct

the green dot indicates Serrano's home.  Serrano is hitting off

his cell site between the hours of 4:26 p.m. and 10:30 p.m.,

and Moral and Cespedes are in the vicinity of his home between

3:58 and 4:42 p.m.

Q.  Next slide.

A.  This is December 19, 2012, between the hours of 1:24 p.m.

and 4:30 p.m.  This shows the Serrano and the Camacho phones.

Camacho at 1:24 p.m. and again at 1:53 p.m. and 3:08 p.m. he is

using the phone in the vicinity of Serrano's house.  And

Serrano is using his phone in the vicinity of his house between

2:32 p.m. and 4:30 p.m.

Q.  You say it is in front of -- it is in the vicinity of his

house because of the 254?

A.  Yes, which is the cell site closest to his house.

Q.  And how about this slide?

A.  This is on January 8, 2013, between the hours of 2 p.m. and

4 p.m. and again shows the Serrano and the Camacho phones and

where they were during that time period.

Q.  And where is the Camacho phone hitting at 1:58 p.m.?

A.  It is hitting on the cell site that's closest to Serrano's

home.

Q.  For AT&T?

A.  For AT&T, yes.

Q.  How about this slide?

A.  This is the afternoon of December 20, 2012.  The green dot

1    indicates Serrano's home.  And Serrano is using the cell tower

2    closest to his home between 3:02 p.m. and 4:37 p.m.

3    Q.  Next slide.

4    A.  Again, this Anthony Serrano on December 27, 2012 in the

5    afternoon.  And he -- between the hours of 1:21 p.m. and

6    11:45 p.m., he's hitting the cell tower closest to his home.

7    Q.  Next slide.

8    A.  This is January 4, 2013, in the afternoon.  And between the

9    hours of 3:25 p.m. and 4:11 p.m., the Serrano phone is hitting

10   the cell site closest to his home.

11   Q.  OK.  Now, Investigator Riley, I just want to pass -- go

12   back a couple of slides and ask you a couple of last questions.

13        Now, besides the days we have been looking at for

14   Anthony Serrano's phone, did you review the rest of the cell

15   site that was available to you?

16   A.  Yes.

17   Q.  OK.  And during the period you looked at, was there any

18   other time in that period -- other than October 14, 2012

19   between approximately 8:17 p.m. and 8:59 p.m., was there any

20   other period when Serrano's cell phone was hitting off of those

21   towers in Washington Heights?

22   A.  No.

23        MR. MUKHI:  No further questions, your Honor.

24        THE COURT:  All right.  Thank you.

25        Mr. De Castro.

E6idser7                        Donaldson - direct

1           Ms. Gotlib.  Sorry.

2    CROSS-EXAMINATION

3    BY MS. GOTLIB:

4    Q.  Good afternoon, sir.

5    A.  Good afternoon.

6    Q.  Sir, you testified cell site evidence only shows the

7    general location, correct?

8    A.  Correct.

9    Q.  Within a few blocks but not an exact location?

10   A.  Correct.

11   Q.  As part of your responsibilities at the United States

12   Attorney's office, do they include locating and tracking

13   individuals?

14   A.  Yes.

15   Q.  And how do you track those individuals?

16   A.  I'm sorry.  What do you mean by "tracking"?

17   Q.  Sure.  When you're trying to find, say, a target or a

18   cooperator that you're trying to locate in realtime --

19   A.  OK.

20   Q.  -- what would you use to find them?

21   A.  Various databases, law enforcement databases.

22   Q.  Would you use GPS data?

23   A.  Yes.

24   Q.  Would you use cell phone data --

25   A.  Yes.

E6idser7                          Donaldson- cross

1    Q.  -- to find an individual in realtime?

2    A.  Oh, no.  I don't track individuals in realtime.  I don't

3    have that capability.  No, I don't do that.

4    Q.  I understand.

5    A.  I only view historical.

6    Q.  I see.  Thank you.

7         If you know, how many phones were seized in connection

8    with this investigation, including the January 9 --

9    A.  I don't know how many phones.

10   Q.  How many phones have you analyzed in connection with this

11   investigation?

12   A.  With this investigation?

13   Q.  Mm-hmm.

14   A.  I don't -- I don't think -- I don't know if I've analyzed

15   any phones.  You mean, the cell site data?

16   Q.  Yes.  How many cell site data.

17   A.  Well, for this trial it was four phones for this one.  I

18   think there was another phone in a previous trial but I don't

19   remember.

20   Q.  And did you obtain cell site data for Mr. Serrano for

21   January 9, 2013?

22   A.  I don't recall.  I don't know.  It was a whole list of

23   dates.  I don't know if that date was in there.

24        January 9th, you said?

25   Q.  January 9, 2013.

E6idser7                      Donaldson- cross

1    A.  It might have been in there.  I just don't remember.

2    Q.  Is there anything that would refresh your recollection?

3    A.  If I saw the call detail records, yes.

4         MS. GOTLIB:  One second.

5         (Pause)

6         MS. GOTLIB:  Thank you.

7         For the record, we have on the screen Exhibit 411,

8    which is already in evidence.

9         Drawing your attention, if you don't mind, Ms. Craig,

10   I believe it is a line around the six-hundreds, the mid-600s.

11        (Pause)

12        Thank you very much.

13   Q.  If you know, can you -- this is the records that we

14   received, the cell site information that you received for

15   Mr. Serrano's phone, correct?

16   A.  Yes.

17   Q.  Could you just explain to me what those lines show right

18   there, generally, as to his location?

19   A.  OK.  That's just a switch name that they give a general

20   area.  I did see that but I didn't analyze this one.  I did see

21   this.  I didn't look to see where it was.

22   Q.  Based on the names, would that show that he was in Jersey

23   in and around Jersey City?

24   A.  Oh, I wouldn't -- you mean, with the Jersey City 2.

25   Q.  Yes.

E6idser7                        Donaldson- cross

A.   Jersey City 2, yes, that's his home area.  Well, let me

rephrase that.  No, it wouldn't show that.

You see the zeros at the end and the 5, it means it is

a forwarded call.  So when a call is forwarded or a voicemail

is sent to your home, your home base so to speak, and which is

Jersey City 2.  So according to this, he was wherever this

Monmouth meeting 2 is and these calls are forwarded to Jersey

City.

Q.   But you weren't asked to analyze these records for --

Mr. Serrano's records for January 9, 2013, correct?

A.   No.

MS. GOTLIB:  No further questions.

THE COURT:  All right.  Thank you.

Mr. Mukhi, anything further from you?

MR. MUKHI:  No, your Honor.

THE COURT:  Thank you, sir.  You may step down.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  All right.  Let's have the government call

their next witness, please.

MR. MUKHI:  Yes, your Honor.

We call Special Agent Eric Perry.

THE COURT:  All right.  Agent Perry, please.

And I won't interrupt you, Mr. Mukhi, as you are

proceeding but we will end at 5.

E6idser7

1   ERIC PERRY,

2        called as a witness by the government,

3        having been duly sworn, testified as follows:

4             THE CLERK:  Please state your name for the record.

5             THE WITNESS:  My full name is Eric Perry.  My last

6   name is spelled P-e-r-r-y.

7             THE CLERK:  Thank you.

8             THE COURT:  All right.  And, ladies and gentlemen, I'm

9   going to give you a special instruction on Agent Perry.

10            The parties have agreed that Special Agent Eric Perry,

11  of the Federal Bureau of Investigation, known as the "FBI," has

12  over 400 hours of training  in historical cell site analysis,

13  gives training in historical cell site analysis, and has been a

14  special agent for five years.  He's currently a full-time

15  member of the FBI Cellular Analysis Survey Team and is an

16  expert in the area of historical cell site analysis.

17            Now, expert witnesses, ladies and gentlemen, are

18  slightly different from the other witnesses that you've been

19  hearing from.  The other witness are what we call percipient

20  witnesses.  They are witnesses who have seen, felt, heard

21  something from their own senses.  An expert is testifying based

22  upon expertise in a particular area.  And you can accept

23  Mr. Perry as an expert.  However, as with all witnesses, it is

24  for you to determine how probative you find his testimony and

25  how you weigh his testimony.  Those are determinations for you

E6idser7

1    to make.

2              All right.  Mr. Mukhi, you may proceed, sir.

3              MR. MUKHI:  Yes.

4    DIRECT EXAMINATION

5    BY MR. MUKHI:

6    Q.  Special Agent Perry, we just heard you work for the FBI

7    Cellular Analysis Survey Team.  Is there an acronym or

8    something short that the Cellular Analysis Survey Team is

9    called?

10   A.  Yes.  We're referred to as CAST.

11   Q.  What do you do on a day-to-day basis in your capacity as a

12   special agent with CAST?

13   A.  We utilize historical call detail records and historical

14   cell phone analysis in support of a variety of investigations

15   on a daily basis.  Such to include local and state agencies as

16   well as local and state prosecutors as well as the federal law

17   enforcement agencies and prosecutive agencies.

18   Q.  What types of cases do you work on?

19   A.  Most of the work is generated around fugitive apprehension

20   and location as well as homicides, kidnappings, bank robberies,

21   general robberies of businesses.  We also utilize this

22   technique to locate missing individuals, threats, terrorism.

23   Any particular incident in which a cell phone is used.

24   Q.  Now, I'm now going to direct your attention to page 8 of

25   Government Exhibit 501.

1          Do you recognize what's up on the screen?

2   A.  Yes, I do.

3   Q.  And how do you recognize it?

4   A.  I recognize this as the results, an exhibit that was

5   created by Investigator Reggie Donaldson from the prosecutive

6   offices of the Southern District of New York.

7   Q.  What, if anything, did you do once you received this slide?

8   A.  I was asked to review it for its accuracy.

9   Q.  And what did you review it against?

10  A.  The phone records that were provided to me, the underlying

11  information.

12  Q.  OK.  And what did you conclude upon verifying what's on

13  this slide?

14  A.  I concluded that this is an accurate depiction of the

15  general location of a Verizon cell phone on the evening of

16  October 14, 2012.

17  Q.  And what is your opinion as to where this cell phone was

18  located on October 14, 2012 between the hours of 8:17 p.m. and

19  8:59 p.m.?

20  A.  It would have to be located in the northern part of

21  Manhattan, along the vicinity of the Cross-Bronx Expressway,

22  south of there.

23  Q.  Do you recognize this slide?

24  A.  Yes, I do.

25  Q.  And what -- how do you recognize it?

E6idser7                         Perry - direct

1   A.   This is actually another exhibit that Investigator

2   Donaldson created to depict the general locations of several

3   phones, cell phones, on the evening of October 14, 2012.

4   Q.   And what did you do when you received this slide?

5   A.   Again, utilizing the underlying call detail records and the

6   cell tower list, I was able to verify its accuracy.

7          MR. MUKHI:   Just for the record, this is page 21 of

8   Government Exhibit 501.

9   Q.   Now, what were the results of your verification analysis?

10  A.   Investigator Donaldson was able to identify the general

11  location for several events for these particular phones in

12  which they are utilizing cell towers within the vicinity of

13  170th Street and Broadway in New York, New York.

14  Q.   And what did you verify the analysis against?

15  A.   I verified one of the events that were depicted here

16  actually occurred based on the call detail records as well as

17  the locations.   This particular exhibit provides the latitude

18  and longitude or a GPS coordinate of the cell towers being used

19  by these phones.   So I verified that they do in fact -- that is

20  the correct information provided by the cell phone providers.

21  Q.   OK.   It looks like the earliest time is 8:46 p.m. and the

22  latest time is 8:58 p.m.   What is your opinion about the

23  locations of these phones during that time period?

24  A.   Based on this -- the activity on these call detail records

25  for these phones, the phone would have had to have been in the

1  vicinity of 171st Street -- actually, 170th Street and Broadway

2  in New York, New York.

3  Q.  And finally, Agent Perry, other than the verification of

4  the cell site analysis you just testified about, did you have

5  any involvement in the investigation of this case?

6  A.  No, I did not.

7           MR. MUKHI:  No further questions, your Honor.

8           THE COURT:  All right.  Thank you.

9           MR. DE CASTRO:  We have no questions.

10           THE COURT:  All right.  Thank you.

11           You may step down, sir.

12           THE WITNESS:  Thank you, your Honor.

13           (Witness excused)

14           THE COURT:  All right.  Now, I know that -- I think

15  our next witness is going to probably go longer than 15

16  minutes, but does it make sense to go ahead and get started?  I

17  would like to if we could.

18           MS. MAIMIN:  We can get started, your Honor.

19           THE COURT:  Terrific.  We are only going to go until

20  5 o'clock, ladies and gentlemen, and then we will break.

21           MS. MAIMIN:  The government calls Special Agent

22  Natalie Bara.

23           THE COURT:  All right.  Ms. Bara.

24   NATALIE BARA,

25      called as a witness by the government,

E6idser7

　　　　having been duly sworn, testified as follows:

　　　　　　THE CLERK:  Please state your full name for the

record.

　　　　　　THE WITNESS:  Natalie Bara.  Last name is spelled

B-a-r-a.

　　　　　　THE CLERK:  Thank you.

　　　　　　THE COURT:  All right.  Agent Bara, you have heard me

give the instructions to speak clearly into the mic.  I think

you will have to adjust it just a little bit.  Thank you.

　　　　　　Ms. Maimin, you may proceed.

DIRECT EXAMINATION

BY MS. MAIMIN:

Q.  Agent Bara, where do you work?

A.  I'm a special agent with the FBI in the Newark Division in

Newark, New Jersey.

Q.  How long have you been with the FBI?

A.  A little under seven years.

Q.  What did you do before?

A.  I was the controller of a hedge fund here in Manhattan.

Q.  What types of cases have you worked on with the FBI?

A.  Drugs, guns, organized crime cases, embezzlement cases, and

police corruption cases.

Q.  What are your general duties and responsibilities as an FBI

agent?

A.  To investigate subjects that were committing crimes, arrest

E6idser7                         Bara - direct

1   people, conduct search warrants, analysis, bank analysis.

2   Q.  Do you recognize anyone in this courtroom that you have

3   been involved in arresting?

4   A.  Yes.

5   Q.  Would you please point to him or her by where he or she is

6   sitting and what they are wearing?

7   A.  The defendant, in a lavender shirt.

8           MS. MAIMIN:  Your Honor, may the record please reflect

9   that Agent Bara has identified the defendant, Anthony Serrano?

10          THE COURT:  So reflected.

11  BY MS. MAIMIN:

12  Q.  When did you participate in the defendant's arrest?

13  A.  August 1, 2013.

14  Q.  We'll get back to that in a moment.

15          During your duties at the FBI, have you become

16  familiar with an individual named Mario Rodriguez?

17  A.  I did.

18  Q.  Who is Mario Rodriguez?

19  A.  Mr. Rodriguez was an individual that I was investigating

20  during 2013.  He subsequently -- we subsequently arrested him

21  and then he became a cooperator.

22  Q.  Was his cooperation going to be limited to providing

23  information about other people, or was he also going to be

24  cooperating pro-actively?

25  A.  He was going to be cooperating pro-actively, meaning he

E6idser7                          Bara - direct

1   would wear a recording device to capture conversations, to

2   collect evidence.

3   Q.  Now, are you also familiar with an individual who goes by

4   the name of White Boy?

5   A.  Yes.

6   Q.  Who is White Boy?

7   A.  White Boy was another cooperator in the investigation with

8   Mr. Rodriguez.

9   Q.  OK.  I'd like to draw your attention now to July 28, 2013.

10  What were your particular duties and responsibilities on that

11  day?

12  A.  On July 28, 2013, Mr. Rodriguez was one of my cooperators,

13  and we had set up a meeting between Mr. Rodriguez and

14  Mr. Serrano.

15  Q.  Was that meeting going to be recorded?

16  A.  Yes, it was.

17  Q.  Have you received training in making recordings involving

18  cooperators?

19  A.  Yes, I have.

20  Q.  About how many times have you been involved in recordings

21  between cooperators and targets of your investigations?

22  A.  Probably close to a thousand.

23  Q.  And how does it typically work?

24  A.  Normally you meet with the cooperator prior to the meeting

25  with the subject.  You brief them on what they should say in

E6idser7                           Bara - direct

1   the dialogue with the cooperator and ensure that it's

2   comfortable for them to say it, it wouldn't be out of character

3   for them to say something.

4          You give them the recording device.  Normally I would

5   turn on the recording device and then send them to the meet.

6   And then after the meeting you meet back at a predetermined

7   location in which you would debrief the source, turn off the

8   recording device.

9   Q.  OK.  Back to the events of July 28th.

10          Did that meeting actually happen between the defendant

11   and Mario Rodriguez?

12   A.  Yes, it did.

13   Q.  Was that in Jersey City?

14   A.  Yes, it was in Jersey City.

15   Q.  Where were you during the meeting?

16   A.  I was around the corner from the meet location.

17   Q.  Were you able to see the meeting as it happened?

18   A.  No.

19   Q.  Why didn't you get close enough to see the meeting?

20   A.  We didn't surveil that particular meeting because I was

21   very concerned about getting burnt on surveillance.

22   Q.  What does it mean to get burnt on surveillance?

23   A.  Getting burnt on surveillance means that somebody notices

24   you sitting in a car and alerts the person that you're

25   surveilling, or somebody notices you and you are not -- you are

1    out of place for that area.

2    Q.  And were you nearby, though?

3    A.  Yes.

4    Q.  Did you equip Mario Rodriguez with a recording device

5    before the meeting?

6    A.  Yes, I did.

7    Q.  What directions did you give Mario Rodriguez before the

8    meeting?

9    A.  Mr. Rodriguez was tasked to talk to Mr. Serrano about

10   setting up a score with the White Boy.  He was waiting for the

11   White Boy to come through with an opportunity to make money,

12   whether it be through a cargo theft or a robbery.  We hadn't

13   established the actual operation just yet.  But it was just to

14   float the idea.

15   Q.  OK.  So Mr. Rodriguez was going to float the idea of a

16   possible cargo theft or robbery to the defendant?

17   A.  Correct.

18   Q.  OK.  Now, have you spoken with Mario Rodriguez on a number

19   of occasions?

20   A.  I'm sorry?

21   Q.  Have you spoken with Mr. Rodriguez on a number of

22   occasions?

23   A.  Yes, I have.

24   Q.  Are you familiar with his voice?

25   A.  Yes, I am.

E6idser7                           Bara - direct

1   Q.  Have you also spoken to the defendant on several occasions?

2   A.  Yes, I have.

3   Q.  Or at least heard his voice?

4   A.  Yes.

5   Q.  And that you are familiar with his voice?

6   A.  Yes, I am.

7   Q.  I'm showing you now Government Exhibits -- what have been

8   marked for identification as Government Exhibits 308, 308E,

9   308ES and 308T.  Do you recognize these?

10  A.  Yes, I do.

11  Q.  What are they?

12  A.  308E is the original recording of the meeting between

13  Mr. Rodriguez and Mr. Serrano.  308 -- no, I'm sorry.  308 is

14  the original recording.  308E is the recording that was

15  enhanced.  And 308ES is the recording that was enhanced with

16  subtitles.

17  Q.  And how do you know those are the recordings?

18  A.  Because I reviewed them and then I initialed them.

19  Q.  Whose voices are on those recordings?

20  A.  Mr. Rodriguez and Mr. Serrano.

21       MS. MAIMIN:  The government offers Government Exhibits

22  308 and 308E, which were previously offered subject to

23  connection, and also 308ES, which was previously offered

24  subject to connection but as an aid to the jury only.

25       THE COURT:  All right.  Any objection?

E6idser7                        Bara - direct

1           MR. DE CASTRO:  No objection.

2           THE COURT:  They are received for all purposes as

3    stated.

4           (Government's Exhibits 308, 308E, 308ES received in

5    evidence)

6           THE COURT:  Now, Ms. Maimin, how long is the recording

7    itself if you are going to play it?  Because we could do that

8    the first thing in the morning if it is going to run over, or

9    we can do it now, as you see fit.

10          MS. MAIMIN:  I think we can do it now.

11          THE COURT:  All right.  Ladies and gentlemen, I just

12   want to say to you that there is going to be some events here

13   for which the defendant is not on trial.  The events here in

14   this recording are offered for another purpose, a different

15   purpose.  They are offered to show planning and modus operandi,

16   and it will be up to you to determine how probative you believe

17   this is of modus operandi, MO, or planning.

18          You cannot use the information that you are going to

19   be hearing to show the character of Mr. Serrano, whether he is

20   a good guy or a bad guy.  That would be an improper purpose.

21   You can use it for purposes of MO and planning.

22          All right.  You may proceed, Ms. Maimin.

23          MS. MAIMIN:  Thank you, your Honor.

24   BY MS. MAIMIN:

25   Q.  This recording also has a transcript that is before you

1  marked for identification as 308T.  Do you recognize that?

2  A.  Yes, I do.

3  Q.  What is that?

4  A.  This is the transcript of the meeting between Mr. Rodriguez

5  and Mr. Serrano.

6  Q.  And did you help prepare that transcript?

7  A.  Yes, I did.

8          MS. MAIMIN:  The government offers 308T as an aid to

9  the jury.

10          MR. DE CASTRO:  No objection.

11          THE COURT:  Accepted as stated.

12          (Government's Exhibit 308T received in evidence)

13          THE COURT:  And you can turn to that.  That is the

14  last tab in your binders, ladies and gentlemen.

15          If we run a minute or two over, I hope you will be

16  able to give us indulgence.  We expect to end right about 5, or

17  maybe a minute or two after.  Will that be all right?

18          (The jury indicated)

19          THE COURT:  All right.  Thank you.

20  BY MS. MAIMIN:

21  Q.  How did you indicate who was speaking in this transcript?

22  A.  On the transcript you will see to the left are the last

23  names of both individuals, and then to the right is what they

24  actually say.

25  Q.  And if you couldn't understand something it said U/I,

E6idser7                          Bara – direct

1   unintelligible?

2   A.   Yes.

3   Q.   What about if you aren't sure how to spell it?

4   A.   Then you put "PH" in brackets.

5              MS. MAIMIN:  Ms. Craig, could you please play 308ES.

6              (Audio played with subtitles projected)

7              MS. MAIMIN:  No further questions.

8              THE COURT:  All right.  Thank you.

9              Ladies and gentlemen, we'll break for this evening,

10  and we'll pick up with Agent Bara tomorrow morning.

11             I want to remind you not to talk to anybody about this

12  case, including each other.  And we'll pick up at 9:30 again.

13  So if you can be here at about 9:20 and we'll start right at

14  9:30, I would appreciate it.  Thank you.

15             Good night.

16             THE CLERK:  All rise until the jury leaves.

17             (Continued on next page)

18

19

20

21

22

23

24

25

e6idser7

```
 1                 (Jury not present)

 2                 THE COURT:  Agent Bara, you may step down.

 3                 (Witness not present)

 4                 THE COURT:  All right.  Ladies and gentlemen, let's

 5      all be seated.  Let's quickly get our plan in order for

 6      tomorrow.

 7                 Let's figure out how long we think we're going to be

 8      with Ms. Bara and then -- how long you folks are going to be

 9      with Ms. Bara and then the duration of the closings.

10                 Ms. Maimin, did you say you didn't have any further

11      questions for Agent Bara?

12                 MS. MAIMIN:  Yes.  We are finished on direct.

13                 THE COURT:  All right.  So how long do you expect the

14      cross-examination to be, Ms. Gotlib or Mr. De Castro?

15                 MR. DE CASTRO:  May I have one second?

16                 THE COURT:  All right.

17                 (Pause)

18                 MR. DE CASTRO:  Judge, I don't have any questions for

19      Ms. Bara, or Agent Bara.

20                 THE COURT:  All right.  Then is the government

21      intending to rest at that point?

22                 MS. MAIMIN:  We are.

23                 THE COURT:  So the first order of business tomorrow

24      morning will be to have the government state that it is resting

25      to the jury.
```

e6idser7

```
 1                Will there be a defense case?

 2                MR. DE CASTRO:  No, your Honor.

 3                THE COURT:  All right.  In light of that, what I would

 4   like to do, on consent of the parties, if there are going to be

 5   any motions, I would take them up right now.  If there are not

 6   going to be, then that's fine.  But rather than breaking

 7   tomorrow after the simple announcement of the government rests,

 8   we can do that now.  And then tomorrow morning we'll just close

 9   as our first order of business.  We'll have the summations as

10   the first order of business.

11                MR. DE CASTRO:  That's fine, Judge.  You know, I would

12   make a Rule 29 motion.  If you want, I can give you a -- I can

13   talk about it in the morning and do that right before we start,

14   if you want to do that, and then --

15                THE COURT:  Do you want to do it right now?

16                MR. DE CASTRO:  I mean, I can.  It is a standard Rule

17   29 motion, that the evidence is insufficient to support the

18   charges in this case as to all three counts, and that the

19   government hasn't proven its case.

20                THE COURT:  All right.  Thank you.

21                A Rule 29 motion, I think we're all familiar with the

22   standard.  It is whether or not there is sufficient evidence

23   pursuant to which a jury could return a verdict.  If under any

24   view of the evidence the jury could return a verdict, then the

25   Court must allow the case to go to the jury.
```

e6idser7

1          As is my practice with all criminal trials, which is

2     the context in which a Rule 29 motion arises, I evaluate the

3     elements of each of the charges as the case is proceeding and I

4     make sort of a checklist.  The checklist is the same as that

5     which is contained in the jury instructions that goes through

6     the same elements.

7          My checklist demonstrates that there is sufficient

8     evidence on each of the elements of each of the three counts

9     here to go to the jury.  The case will go to the jury.

10         The jury will decide, then, how they weigh the

11    evidence and will assess weighing the evidence, including

12    credibility of the witnesses and including all of the

13    documentary and other physical evidence that's been presented.

14    So that motion is denied.

15         All right.  Tomorrow morning, then, how long do we

16    expect the government's summation to go?  The order -- I'm sure

17    you discussed it with your client, but the order will, of

18    course, be the order pursuant to the rules.  It will be the

19    government.  Then it will be Mr. Serrano.  Then the government

20    will have an opportunity for a brief rebuttal.

21         How long is the government's closing going to be, the

22    first portion of it?

23         MR. MUKHI:  Well, your Honor, my prediction skills

24    have proven to be --

25         THE COURT:  How long does Ms. Maimin think it is going

e6idser7

1      to last?  Her prediction skills are pretty good.

2                  MR. MUKHI:  I will say if we rewind the clock, I

3      believe at the least pretrial conference I thought there was a

4      shot we would close on Thursday.  I got it wrong the last

5      day --

6                  THE COURT:  I know you get my hopes up and then you

7      dash them.

8                  MR. MUKHI:  I did.

9                  MS. MAIMIN:  It is almost worse.

10                 MR. MUKHI:  It is worse.

11                 THE COURT:  It is?

12                 MR. MUKHI:  We are told to manage expectations --

13                 THE COURT:  You are supposed to manage them in the

14     other direction.

15                 MR. MUKHI:  Yes.  Exactly.

16                 So I think conservatively an hour and a half.

17                 THE COURT:  All right.  So I'm going to peg you at 2

18     hours.  We'll take a break after Mr. Mukhi.

19                 Now, let me just tell you that you need to do the

20     following, or I'll do it for you but I'll give you the

21     opportunity since you are going to go over an hour, to do the

22     following, which is when you reach the point where you've been

23     going for an hour and if you know you've got more than half an

24     hour left, you need to tell me.  I will then break so I'm not

25     breaking right in the middle of your crescendo, whatever that

e6idser7

1    may be.  All right?  But you've got to say:  Now, Judge, is a

2    good time for a break.

3          What I would suggest is that Ms. Maimin, if she knows

4    where you are going to be, let me know or somehow give an

5    indication as to where you are somehow.  Or give it to --

6    somehow we need to sort of time that.

7          The same thing for you, Mr. De Castro.  How long do

8    you think -- or, Ms. Gotlib, is your closing going to be?

9          MR. DE CASTRO:  I'm thinking about how to manage the

10   expectations here.  So my gut tells me 45 minutes.

11         THE COURT:  All right.  I'm not going to cut either

12   one of you off.  My intention for asking the time is simply to

13   get a sense as to where we're likely to be.

14         It may be the case that you are hung over a little bit

15   over lunch, or not.  We'll see how it goes.  And whether or not

16   we -- what I'll probably do is warn the jury that we may sit

17   until 1 o'clock tomorrow to try to give us the extra 15 minutes

18   'til 1.  It is likely then that the case will go to the jury

19   tomorrow.

20         The jury will, therefore, sit on Friday.  I had said

21   that to the jury when they were selected, that if they were in

22   the process of deliberating and if the evidence was closed

23   prior to Friday, they would sit on Friday.  So we'll see where

24   we are at the close of the day tomorrow, but I think it is

25   almost certain that they will be sitting on Friday unless they

e6idser7

1      came back with a verdict tomorrow.

2              All right.  So we will pick up -- the first order of

3      business, I will then say would the government like to proceed.

4      And then you folks will do what you are going to do.  And then

5      Mr. De Castro will do his piece; he'll rest.  And then we'll go

6      directly right then into the summations.  All right?  So you

7      will all be set up for that.

8              MR. MUKHI:  Should we be here at 9 o'clock again or --

9              THE COURT:  There is no need to be here at 9 unless

10     you need me.  Does anybody perceive there being a need right

11     now for that?

12             MR. MUKHI:  Not from the government.

13             MR. DE CASTRO:  No, your Honor.

14             THE COURT:  If anybody changes their mind, they can

15     call chambers.  Let Joe know.  You know, he is always here

16     early.  And we can gather ourselves together.  All right?

17     Otherwise, we will be here, be in place and ready to go at

18     9:20, so that we are here before the jury is, at least.  One

19     hopes.

20             All right.  Good night.  We are adjourned.

21             THE CLERK:  All rise.

22             (Trial adjourned to 9:20 a.m., Thursday, June 19,

23     2014)

24

25

```
 1                        INDEX OF EXAMINATION
 2    Examination of:                              Page
 3    TODD RILEY
 4    Direct By Mr. Mukhi  . . . . . . . . . . . . 552
 5    Cross By Mr. De Castro . . . . . . . . . . . 629
 6    ERICKSON GILBERT PAREDES
 7    Direct By Mr. Mukhi  . . . . . . . . . . . . 643
 8    Cross By Ms. Gotlib  . . . . . . . . . . . . 660
 9    Redirect By Mr. Mukhi  . . . . . . . . . . . 664
10    Recross By Ms. Gotlib  . . . . . . . . . . . 665
11    ESCARLY YNFANTE
12    Direct By Mr. Mukhi  . . . . . . . . . . . . 667
13    Cross By Mr. De Castro . . . . . . . . . . . 684
14    REGINALD DONALDSON
15    Direct By Mr. Mukhi  . . . . . . . . . . . . 689
16    Cross By Ms. Gotlib  . . . . . . . . . . . . 712
17    ERIC PERRY
18    Direct By Mr. Mukhi  . . . . . . . . . . . . 717
19    NATALIE BARA
20    Direct By Ms. Maimin . . . . . . . . . . . . 721
21                        GOVERNMENT EXHIBITS
22    Exhibit No.                              Received
23     103, 109, 113, 122, 124-159, 161-164, 166 and 556-A
24     803  . . . . . . . . . . . . . . . . . . . 554
25     169, 170, 171, 183, 401, 402, 403, 421 and 802558
```

```
 1    310 through 322   . . . . . . . . . . . . . 569

 2    242   . . . . . . . . . . . . . . . . . . . 575

 3    206   . . . . . . . . . . . . . . . . . . . 582

 4    104, 173 and 174   . . . . . . . . . . . 587

 5    10A   . . . . . . . . . . . . . . . . . . . 596

 6    245, 248, 249, 250 and 251   . . . . . . . 596

 7    201, 205, 207, 209   . . . . . . . . . . . 599

 8    211 through 215, 217 through 220   . . . . . 599

 9    221   . . . . . . . . . . . . . . . . . . . 602

10    5A    . . . . . . . . . . . . . . . . . . . 611

11    11A   . . . . . . . . . . . . . . . . . . . 625

12    610 and 806   . . . . . . . . . . . . . . 627

13    601A   . . . . . . . . . . . . . . . . . . 656

14    3509D   . . . . . . . . . . . . . . . . . . 679

15    501   . . . . . . . . . . . . . . . . . . . 692

16    308, 308E, 308ES   . . . . . . . . . . . . 727

17    308T   . . . . . . . . . . . . . . . . . . 728
```

18                        DEFENDANT EXHIBITS

```
19    Exhibit No.                              Received

20    3   . . . . . . . . . . . . . . . . . . . 688
```

21

22

23

24

25