E6J7SER1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                            13 CR 58 (KBF)

5    ANTHONY SERRANO,

6                   Defendant.

7    ------------------------------x

8                                        New York, N.Y.
                                         June 19, 2014
9                                        9:30 a.m.

10

     Before:
11
                    HON. KATHERINE B. FORREST,
12
                                         District Judge
13

14                       APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     RACHEL MAIMIN
17   RAHUL MUKHI
          Assistant United States Attorneys
18
     CESAR DE CASTRO
19        Attorney for Defendant Serrano

20   VALERIE GOTLIB
          Attorney for Defendant Serrano
21
     ALSO PRESENT:  Danielle Craig, Paralegal
22                  Todd Riley, Special Agent, DEA

23

24

25

E6J7SER1

```
1              (Trial resumed; jury not present)
2              THE COURT:  Good morning, everyone.  We are ready to
3    bring out the jury.  Is there anything we should go over before
4    we do that?
5              MR. MUKHI:  No, your Honor.
6              MR. DE CASTRO:  No, your Honor.
7              THE COURT:  Let's bring out the jury.  The plan, I
8    take it, is still as we discussed yesterday, I will say,
9    Mr. Mukhi, or Ms. Maimin -- whoever is sitting in that first
10   chair is usually who I turn to -- would you like to proceed.
11   You will rest.  Mr. De Castro, is it still your intention to
12   rest?
13             MR. DE CASTRO:  Yes.
14             THE COURT:  All right.  Then having dealt with the
15   motions, we will proceed directly to summations.  All right,
16   thank you.
17             (Jury present)
18             THE COURT:  All right.  Mr. Mukhi, would the
19   government like to proceed, sir?
20             MR. MUKHI:  Yes, your Honor.  The government rests.
21             THE COURT:  Thank you, Mr. Mukhi.
22             Mr. De Castro?
23             MR. DE CASTRO:  The defense rests.
24             THE COURT:  Thank you.  The evidentiary record in this
25   matter is now closed.  What we are going to do next is we are
```

E6J7SER1

going to hear the summations from the lawyers.  The summations

are the opportunity for the lawyers to argue to you what

inferences they believe you should draw from the evidence in

this case.  It's their opportunity to summarize and to collect

all of the evidence for you in a manner that they deem useful.

        I want to remind you that nothing that lawyers say is

itself evidence; that the evidence is obviously the testimony

that you heard and the evidence that was otherwise admitted

that you heard me say the word "received" from time to time.

        So, I'm going to have the lawyers proceed in just a

moment.  However, now that the evidentiary record is closed, I

want to reiterate for you one instruction that I gave to you at

the beginning of this trial, which is to remind you that you

should not update your Facebook profiles, engage in any digital

media interactions, communications, Twitter or anything else,

update your profile on LinkedIn, anything at all with respect

to the fact that you are on jury service or anything about the

case.  And I say that not that I think anyone will, but from

time to time there have been instances in the past where people

have, and so it's always prudent for us, until you have

delivered a verdict, to just make sure you are reminded of no

communications.

        All right.  With that said, Mr. Mukhi, sir, would you

like to proceed?

        MR. MUKHI:  Yes, your Honor.  Thank you.

1          (Audio played)

2          MR. MUKHI:  His words, ladies and gentlemen.  This

3   defendant July 28, 2013 was planning a burglary, sending

4   someone else in, won't get his hands dirty.  He'll be the guy

5   around the corner.

6          July 9, 2013, attempted robbery of 20 kilograms of

7   heroin in the Bronx, he doesn't show his face; others are out

8   doing the dirty work.

9          THE COURT:  I think you meant January 9.  I'm sorry.

10         MR. MUKHI:  January 9.

11         Ladies and gentlemen, October 14, 2012, Washington

12  Heights, he tracks down a drug dealer and his girlfriend,

13  stalks them on the streets of this city like they were his

14  prey, and when the time comes, he sends the others to face the

15  victims and rob them with a gun.  He is blocking off the street

16  with his car so they can't escape.  Ladies and gentlemen, he is

17  the guy around the corner.  That's his MO.

18         Ladies and gentlemen, he wouldn't face his victims,

19  but now he must face your judgment.  Even though he said he

20  wouldn't get his hands dirty, those hands are dirty, ladies and

21  gentlemen.  They're dirty because the evidence at this trial

22  showed that he was a drug dealer, he was an armed robber, he

23  was part of that crew, and he is guilty as charged.

24         Now, what you have seen and heard over the last three

25  days is a mountain of evidence showing this defendant is guilty

E6J7SER1                          Summation - Mr. Mukhi

of every crime he has been charged with:  Conspiring to deal
drugs, commit robbery, and possessing, carrying and brandishing
a gun when committing those crimes.

You know he is a drug dealer from many different ways.
The first witnesses you heard from told you about the heroin he
was selling out of his home.  You saw the heroin yourself.  You
learned, ladies and gentlemen, after that that this was just
the tip of the iceberg.  He was a big-time drug robber, part of
a crew that was robbing other drug dealers of kilos of heroin
and cocaine that they would get for free by stealing it and
then sell to their own customers.

You heard about the October 14 robbery of the drug
dealer in Washington Heights, the drug dealer who came into
this courtroom and testified under immunity, that police stop
that was really a hold-up.  Victor Moral and the victims
Erickson Gilbert and Escarly Ynfante gave you the blow-by-blow
of that robbery, and you heard all about the defendant's role
that night, driving in that red Toyota, telling everyone where
to go; and when the robbery went down, he boxed them in, he
boxed the victims in so they couldn't escape.

You saw the cell site data showing the defendant
traveling from his home in New Jersey to Washington Heights on
the night of the robbery, being on the block of the robbery at
the time the robbery is being committed, getting on the GW
Bridge, going to that secluded area in New Jersey where they

E6J7SER1                    Summation - Mr. Mukhi

1   tore up the car to look for drugs, and then he went home for

2   the night, back to that cell tower that's closest to his home.

3        You also saw all of the phone records showing that the

4   defendant was in contact with Moral and Javion Camacho more

5   than 70 times that night, just like Moral told you the

6   defendant was calling everyone to call the plays and audibles

7   leading right up to the robbery of the victims.

8        You also heard about the gun, the gun that the

9   defendant passed off in that bag, that was ultimately given to

10  Javion Camacho, King Kong, who had the gun on him as he was

11  robbing the victims with Moral and Alex Cespedes, while the

12  defendant was a a few feet away making sure everything went

13  according to plan.  And you just heard the defendant's own

14  words.  This is how he operated.  Others did the real dirty

15  work while he was waiting around the corner.

16       You heard even more evidence, ladies and gentlemen,

17  all of it leading to one conclusion:  The defendant is guilty

18  beyond any reasonable doubt.

19       So, let's walk through the evidence you saw and heard

20  right now.  Now, I think there is some basic facts that are not

21  seriously in dispute at this trial.  There was a drug robbery

22  crew.  It existed, and it included people like Victor Moral,

23  Javion Camacho and Alex Cespedes.  They were a crew of armed

24  robbers, and they robbed drug dealers with guns.  Victor Moral

25  admitted that he was part of that crew when he testified.  And

E6J7SER1                    Summation - Mr. Mukhi

1    there is no dispute that the way they did this was to dress up

2    and pretend to be police officers.

3          You saw all of the evidence that the DEA seized on

4    January 9.  It's in that photo.  You saw it on the table

5    yesterday.  There is no dispute that there was this drug

6    robbery crew and they impersonated police to rob drug dealers.

7    You seen saw their cop car, the license plate that they used to

8    cover up their plate during the robberies so the victims

9    couldn't write it down.  You also saw the fact that the car

10   said police on it.  And you saw the picture of the intercom

11   they used to pull over victims during the fake traffic stops.

12         There is even no dispute that the defendant knew some

13   of the crew members.  Javion Camacho and Julio Camacho were his

14   cousins.  Ladies and gentlemen, they were not distant cousins.

15   Javion Camacho was in constant contact with the defendant, over

16   1,000 communications between the defendant and Javion Camacho

17   on this cell phone that Javion Camacho was using until October

18   2012, and then more than 350 contacts with this other phone

19   that Javion Camacho started using in November of 2012 until

20   January 9, 2013 when he was arrested at the robbery sting.

21         You even know that the defendant and Javion Camacho,

22   Kong, spoke to each other on days that the crew was committing

23   robberies.  October 14, 2012, there was a robbery that day.

24   There are 28 communications between the defendant and Kong on

25   the day of that Washington Heights robbery.

1             January 9, 2013, the day of the DEA sting, attempted

2     robbery of 20 kilograms of heroin, the defendant and Javion

3     Camacho are in contact 15 times on that day.  There is no

4     dispute that the defendant knew some of the crew members.

5             There is also no dispute that this crew sold heroin

6     and cocaine.  This is Javion Camacho talking to the DEA

7     informant on December 17, 2012.  He is telling the CI that he

8     is dealing with dope right now, heroin, and it's more than a

9     kilogram, 1100 grams, and it's exclusive, it's fire, it's

10    untouched.  You heard him talk about that.  You also heard him

11    talk about how he used to be, Javion Camacho, a coke boy.

12    That's his field.  You even saw some of the heroin.  Here is

13    the photo of the heroin that Moral stole from a stash house in

14    Queens a few days before the January 9 robbery, a picture on

15    Moral's own cell phone.

16            Now, ladies and gentlemen, there is also no serious

17    dispute that members of the crew agreed to commit a robbery on

18    October 14, 2012, which took place right here, 171st and

19    St. Nick in Washington Heights, Manhattan.  It took place at

20    8:58 p.m.  Officer Briones came in, and she said that's the

21    time the robbery was recorded, 8:58 p.m.

22            You heard from the drug dealer victim, Erickson

23    Gilbert, who told you that he dealt heroin in the past,

24    although he didn't have any drugs on him that night.  And I

25    don't expect there to be any dispute that this was an attempted

1      drug robbery and that the robbers included Victor Moral, Javion
2      Camacho and Alex Cespedes.

3              Also, there is no dispute what these three did that
4      night.  They were in that police car, they pulled over the
5      couple with lights and sirens, they pretended to be the police,
6      and they stole the car so they could search it for drugs.

7              So, what is in dispute?  What is in dispute is:
8      First, did the defendant agree to distribute heroin and/or
9      cocaine with members of the crew?  Second, did the defendant
10     agree to participate in any armed heroin and/or cocaine
11     robberies with members of the crew?

12             The question for you, ladies and gentlemen, is:  On
13     October 14, 2012 was he in Washington Heights with Javion
14     Camacho, Alex Cespedes and Victor Moral, committing that
15     robbery of the couple you saw testify?  Or was he -- as defense
16     counsel has suggested in his opening statement -- at a
17     restaurant or a club in Washington Heights with other people,
18     knowing nothing, doing nothing with respect to that robbery?

19             Ladies and gentlemen, the evidence you heard through
20     the more than ten witnesses who testified over the last three
21     days showed you these are not close questions.

22             Of course he was there committing that robbery.  Of
23     course he was.  He was out there on October 14, 2012 with other
24     members of the crew in that red Camry, blocking off victims
25     while the other crew members held them up for cocaine.  He was

1   there every step of the way.  You know he was not at a

2   Washington Heights bar, or at a restaurant, because he had

3   agreed to commit that drug robbery with Moral, with Javion

4   Camacho and Alex Cespedes.  We know that.

5          So, let's start there, the robbery you heard the most

6   about during this trial.  What happened that night?  The

7   victims arrived here, this barber shop on 164th and Amsterdam.

8   The police car was parked behind their van, and the crew

9   members waited to make their move.  Moral told you that, and

10  the victims told you that.

11         Moral also told you that that night it was the

12  defendant who had contact with the tipster Nene.  And the

13  defendant directed Moral to where the van was.  You see, the

14  defendant got the tip, he had the phone that night.  And when

15  Moral got to this location, the defendant told him he was there

16  by flashing his lights in that red Camry.  Then they waited.

17  They waited until it was the right time to commit this robbery.

18         And, By the way, while we are on this photo, there was

19  some suggestion on the cross-examination of Moral that he was

20  lying or not credible on the fact that there is a bodega on

21  this block.  Ladies and gentlemen, he was not lying about that.

22  Mr. Gilbert also told you that there is a bodega there.  And if

23  you look closely to where both Moral and Gilbert told you there

24  was a bodega, you can even see the Newport sign.

25         Moral wasn't lying about the bodega, he wasn't lying

about the defendant being there in the red Toyota, and he
wasn't lying about anything else that happened that night.

How do you know that?  Here are Moral's two cell
phones hitting off a cell phone tower just a few blocks away
from that barber shop at 8:45 p.m. and 8:47 p.m., before he
starts heading north, the direction of the robbery.  Alex
Cespedes, his phone hitting off the same cell phone tower right
near the barber shop at 8:45 p.m., heading north.

How do you know that the defendant is also there every
step of the way?  The defendant's own cell site information.
There he is hitting off the cell phone tower in the same area
of the barber shop and of the robbery, just like Moral, just
like Cespedes.  First he's hitting south, the direction of the
barber shop, then he is hitting north, the direction of the
robbery.

And, by the way, just like Moral told you, the
defendant who shows up first in Washington Heights that day,
the first hit is 8:17 p.m., all the way to the left of the
screen right above the George Washington Bridge.  Why does that
make sense?  It makes sense because the defendant had the phone
with the tip, he goes over to Manhattan first.  He's got the
information; people follow him.

Now, Moral also told you that the defendant that night
was driving around furiously trying to outmaneuver the victims,
stay ahead of them, circling the block, speeding up to get past

E6J7SER1                      Summation - Mr. Mukhi

 1    them.  If you see, there is one hit, one hit all the way north

 2    at 8:48 p.m., and it's coming from a southern direction where

 3    they were circling the block and where they were committing the

 4    robbery and stalking the victims at the barber shop.  That's

 5    consistent with him driving around.

 6           Now, who did the defendant call during this time

 7    period?  Now, most of these calls, as you can see, are to

 8    Moral.  The first call in Manhattan, 8:17 p.m., call to Victor

 9    Moral -- call from Victor Moral.  Now, you know what that call

10    was about.  The defendant is the one with the tip, he's telling

11    Moral where to go.  Last call in Manhattan, Moral calling the

12    defendant.  You know what that call is about.  The defendant

13    was the one who was leading everyone to that warehouse area so

14    they could search the car; he was taking the lead.  That's what

15    that call is.

16           Now, all those calls in between, between Moral and

17    Serrano, you also know what those are about.  Moral told you

18    the defendant was in front of the victims' car, so he couldn't

19    keep track if they were going to make a turn, if they turned on

20    their blinker.  He needed someone who was behind him to feed

21    him information about what they were going to do next, and

22    that's exactly what happened.  Moral said he was feeding the

23    defendant information about where the victims were going so he

24    could keep in front of them, so he could cut them off when the

25    time was right.

1          And, by the way, we obviously know this is the

2     defendant's phone.  It's registered to his wife at his home.

3     It's in Javion Camacho's phone under Chill.  That's the top.

4     And then the bottom is Victor Moral's phone, Chill JC.  Chill

5     Jersey City.

6          Now, how do you know that it was the defendant using

7     his own phone that night?  How do you know that, besides the

8     fact that he was calling Moral at the times and locations you

9     would expect him to be calling when he is committing a robbery

10    with Moral in that location?  All of those numbers in between,

11    all of those 201 numbers, Agent Riley testified that those

12    numbers are also numbers that the defendant contacts all the

13    time on that phone.  Those are not random numbers to Serrano.

14    Those three 201 numbers Serrano calls not just on that night

15    but all other days he's using the phone.  It fits his call

16    pattern.  It's his phone, and he's using it.  You know the

17    defendant was using that phone that night because those calls

18    are to Moral and to other people he calls all the time.

19          Now let's go to the video.

20          (Video played)

21          There it is.  You just saw it drive up on the street.

22    That's the red Camry.  The defendant is in that car ahead of

23    the victims.  And you know what red car that was.  There is a

24    stipulation, a red Camry, red Toyota Camry registered to Julio

25    Camacho, a member of the crew, the defendant's cousin, the same

1    red Camry that Javion Camacho and Jauncey Valle and the CW were

2    in when they arrived at one of those meetings at the McDonald's

3    to talk about the heroin robbery.  It's the same car, ladies

4    and gentlemen.

5         Moral told you that the defendant was in a red Toyota,

6    and the victims said they saw a red car in front of them on the

7    night of the robbery.  And you just saw it with your own eyes.

8         Let's go back.

9         (Video played)

10        Defendant's red Toyota driving by, the victims' van.

11   And there is the police car stopping right behind the van, and

12   there is Erickson Gilbert -- the same Erickson Gilbert who

13   walked into this courtroom, admitted he was a drug dealer, and

14   told you about the robbery from his perspective that night --

15   he is standing right there as the driver of the police car,

16   Alex Cespedes, told him to move, move because this street was

17   too busy to commit the robbery.

18        What happens next?  Ladies and gentlemen, that car at

19   the top of the screen, that is the defendant's red Camry, and

20   it just looped back around.  He dropped off Javion Camacho a

21   little further up the block, so Javion Camacho could walk down

22   and get into the police car so he could do the defendant's

23   dirty work, hold up the victims with the gun that the defendant

24   supplied that night.

25        How do you know?  Let's keep playing.

E6J7SER1                    Summation - Mr. Mukhi

1          (Video played)

2          The top of the screen the red Camry drives back, and

3    look who follows:  Javion Camacho walking from the north, from

4    the direction from where the red Camry came, to get into that

5    vehicle, that police car.  That's what happened.

6          How else do you know that's what happened?

7    Mr. Gilbert testified that that's what happened.  He told you.

8    He said when asked where did that man come from, the man who

9    gets into the police car, he answered:  "There was a red car in

10   front of us that was blocking our way right halfway around the

11   block.  He" -- the person that went into the police vehicle,

12   who you know is Javion Camacho -- "was coming exactly from the

13   direction from where this car was, from where the car had

14   parked ... "  The red car.

15         Mr. Gilbert saw Javion Camacho walk away from a red

16   car, and you know from all the other evidence in this case that

17   was a red Toyota Camry that the defendant was driving that

18   night.

19         Now, by the way, there was a lot of cross-examination

20   of Mr. Gilbert about the fact that he only remembered the red

21   car yesterday before he testified.  But what was the result of

22   all of that cross-examination?  He just said the same thing

23   over and over again.  No one suggested anything to him about

24   the red car, not Ms. Ynfante, not the government.  He said no

25   one from the government had ever asked him about a red car

E6J7SER1                     Summation – Mr. Mukhi

1    before he testified.  He remembered it on his own.  He

2    remembered it as he was waiting to testify before you.  He

3    remembered it as he was about to relive that night on the

4    witness stand, the night he was pulled over, thrown up against

5    the vehicle and thought about how if that robbery had taken

6    place two minutes later his two kids would have been inside.

7    As he was about to relive that nightmare, he remembered

8    something important, he remembered the red car.

9            And this is what Ms. Ynfante told you, same thing, the

10   red car was blocking their way.  And, by the way, how do you

11   also know that Erickson Gilbert didn't get the red car idea

12   from Ms. Ynfante?  Look at Ms. Ynfante's testimony:

13   "Q.  Did you notice the red car first or Erickson notice the

14   red car first?"

15           Talking about the night of the robbery.

16   "A.  Erickson was the one who saw it first, because I was

17   actually paying more attention to the car that was behind me."

18           Ladies and gentlemen, he was the one who originally

19   noticed the red car; he was the one who remembered it

20   yesterday.

21           Now, ladies and gentlemen, there was also some

22   suggestion that the victims were making up the red car.  Just

23   think about it.  Why would they do that?  What do they have to

24   gain?  Nothing.  Not only do they have nothing to gain; they

25   know nothing about this case other than that they were victims.

They didn't identify the defendant.  They didn't know he was
the one in the red car.  They didn't know for sure that the red
car was part of the robbery.  They didn't, but you do.  You
learned that that red Camry was used by the crew and was
registered to Julio Camacho.  You learned that the defendant
was in the red Toyota that night.  You saw the cell site
putting the defendant in Washington Heights around the corner
while the robbery was taking place.  They didn't know that; you
do.

And, ladies and gentlemen, let's watch a little bit
more of the video, and pay attention to what the red Camry on
the other side of the street does as Javion Camacho approaches.

(Video played)

The car starts to creep away as Javion Camacho is
getting closer and closer, creeps away, creeps away.  Javion
Camacho successfully into the car, and the red car takes off,
job done.

Ladies and gentlemen, you can use your own common
sense and your own observations.  The defendant is making sure
that Kong gets into the police car just like he told him to.
He is checking the side mirror, rearview mirror, whatever,
waiting until Kong gets into the other car.  Then he speeds
off, job done.  That's what he wanted to have happen, Kong to
go into the police car so he could be the one to hold up the
victims with the gun.

1          Where does the red Camry go?  Where does the defendant

2     drive to then?  He drives around the block, so, just as Moral

3     told you, he can block off the victims when the robbery takes

4     place on 171st Street.

5          On this block, ladies and gentlemen, 171st Street,

6     8:58 p.m. the robbery goes down.  Moral told you, and the

7     victim told you -- victims.  Moral, Cespedes and Kong pull over

8     the van with their lights and sirens.  Kong has a gun on his

9     person.  Alex grabs the woman, Escarly; and the two others,

10    Moral and Kong, go to get the man.  They grabbed them, they

11    pushed them up against the car.  Erickson's face is pushed so

12    he can't see.  The whole time the defendant is up there boxing

13    the victims in with the red Toyota.  Ladies and gentlemen,

14    there are no bars or restaurants on that block.  That's a block

15    where a robbery took place.

16         Let's look at the chart of the defendant's phone

17    contacts with Kong that night.  Starting at 8:45, around the

18    same time the defendant is on the phone constantly with Moral,

19    look at what happens approximately 8:44.  There is a call,

20    there is a call, there is a call, there is a call.  The robbery

21    is at 8:58 p.m.  What happens during that time period before

22    it, after it and during it?  What happens to the calls?

23    Silence, silence for 20 minutes.  Why?  Why the sudden silence?

24    You know why:  They're doing the robbery.  Kong is with the

25    victims; the defendant is blocking off the block.

E6J7SER1                    Summation - Mr. Mukhi

1            And what happens after?  It picks up again after the
2       robbery.  You know what's going on then too.  The defendant is
3       the one who has to direct everyone to that warehouse area in
4       Kearny.  He is the one who knew about it.  He is the one who
5       took everyone there.
6            So, before we get to Kearny, let's just talk about the
7       gun.  Where did the crew's gun come from that night?  This is
8       where the gun came from, the black bag that the defendant
9       handed off that night to his partner in the cop car, the bag
10      that Moral felt and felt the gun.
11           And while we're on this, let me just point this out.
12      If Moral were going to come into this courtroom and lie -- like
13      defense counsel said he would in his opening statement --
14      wouldn't he actually just say I looked in the bag and I saw
15      there was a gun?  He said he saw the gun later on Kong, but he
16      said I didn't look in the bag, I just felt the gun.  But if he
17      was going to lie, he could have said I had a moment to myself
18      that night, I looked in the bag when no one was looking and I
19      saw a gun.  That would pretty much be impossible to disprove.
20      Why didn't he say that?  Why didn't he say I looked in the bag
21      and saw it?  Because he wasn't here to lie; he was here to tell
22      the truth.  And the truth was he knew it was a gun because he
23      felt it.  And he knows what a gun feels like because he was a
24      member of that crew with the defendant.
25           Now, what did you find out about what the crew did

E6J7SER1                        Summation - Mr. Mukhi

1   with that gun that the defendant brought that night?  Kong was

2   wearing the gun, and Moral could see the gun that Kong was

3   wearing.  The victims also told you that they saw something

4   that they thought was a gun.  They saw an object where a gun

5   would be and where you know Kong had a gun.  So, there was a

6   gun there.  And, ladies and gentlemen, it's just common sense

7   too, when someone does an armed -- when someone does a

8   robbery -- forget the armed -- if you are going to do a robbery

9   of someone who you think is a big time drug dealer, you are

10  going to bring a gun, this crew is going to bring a gun.  And

11  you saw the arsenal of guns they had.

12          Now, let's talk a minute about the differences between

13  the victims' testimony on this.  Ms. Ynfante remembers that it

14  was Kong who had the gun.  She doesn't know Kong by name of

15  course, but she remembers the gun was on the second person, the

16  person who approached Erickson's side of the car.  Not the

17  first person, Cespedes, who approaches her, and not the third

18  person, the person who took the car, you know that's Moral.

19  That's consistent with what Moral told you.  It's also

20  consistent with the fact that Javion Camacho enters the police

21  car right then right before the robbery.  He's the muscle.

22  That's why he is going to the car minutes before the robbery.

23  He is willing to show his face and threaten other people with a

24  gun.

25          Now, Erickson Gilbert remembered it differently.  He

E6J7SER1                      Summation - Mr. Mukhi

1    said it was the guy who took the car who had the gun.  That guy

2    we know is Moral.  Moral and Ynfante say it was Kong and

3    Gilbert remembers it as Moral.  Gilbert is mistaken on this.

4    Not only did Moral and Ynfante tell you otherwise, but you can

5    just use your common sense.  It would make no sense for Moral

6    in the middle of the robbery to drive off with the crew's gun.

7    He would be leaving Kong and Alex without any guns and with the

8    victims who they were robbing, including someone they thought

9    was a major drug trafficker.  It makes no sense that Moral

10   would drive off with the gun.  He is going to the abandoned

11   warehouse, and Kong and Alex are staying with the victims.

12   Kong needs the gun at the scene.

13           Now, before we get to New Jersey, let's look at one

14   more thing.  Ladies and gentlemen, all four of these men were

15   together at the crime scene while the crime was happening.

16   Investigator Donaldson and Special Agent Perry told you that

17   the Serrano phone, the Moral phones and the Cespedes phone were

18   all near 171st Street, including the minutes before, during and

19   after the robbery took place.  You know Javion Camacho was

20   there because you saw him on the video.  And they were also

21   constantly calling each other moments before the robbery.

22           Now, ladies and gentlemen, the government always

23   welcomes our burden of proof, and the defendant has absolutely

24   no burden.  When the defense chooses to make assertions during

25   opening statements, and arguments during cross-examination,

E6J7SER1                          Summation - Mr. Mukhi

1    it's perfectly appropriate for us to respond.

2              So, what does defense counsel ultimately want you to

3    do?  He wants you to look here, here and here, not here, not

4    there.  And he has to say that.  They were all there.  The

5    evidence is the same.  If you look there, you will find him

6    guilty.

7              Now, what happens next?  They all go to New Jersey

8    over the GW Bridge, Moral, Cespedes, both following Serrano's

9    lead to the abandoned warehouse.  Serrano is in the red Camry,

10   Moral is in the stolen van, and Cespedes is with Kong in the

11   cop car.  Then they arrive one by one in Kearny:  The

12   defendant, 9:32; Moral, Kearny, 9:31 and 9:51; Alex Cespedes,

13   Kearny, 9:31.

14             Now, what was in Kearny?  Moral told you about the

15   abandoned spot where they searched for the cocaine, and that

16   they didn't find it but they sure did look hard.  The defendant

17   tore apart the car including tearing out the baby car seat to

18   look for the cocaine.

19             Now, even though they did not find the two kilos of

20   cocaine for this job, that is irrelevant for the crimes that

21   the defendant has been charged with.  He is charged with

22   conspiring or agreeing to commit this robbery and to get that

23   cocaine to resell.  I suspect the judge will instruct you that

24   for someone to be guilty of conspiracy, the conspiracy does not

25   actually need to succeed in its goal, in its objective.  They

E6J7SER1                    Summation - Mr. Mukhi

don't have to get what they were going after.  The crime is

making the criminal agreement for the objective in the first

place.

          Now, the information that the defendant was getting

from the lady tipster, it was slightly off.  Right?  They

thought Gilbert was a cocaine dealer.  He is a heroin dealer.

They had information that Erickson would have drugs that night.

He didn't have them that night.  But everything else was spot

on.  They were a couple.  They were in a van.  They were in

Washington Heights.  They were double parked outside of that

barber shop.  And this is the information that the defendant

and his partners acted on that night when they agreed to commit

that cocaine robbery, so they could steal and sell the drugs

for themselves.

          Now, by the way, while we are on this photograph, you

may remember Moral was cross examined about the distortion on

the power lines on this photograph and the electrical wires on

this photo don't line up, and I guess the implication was that

Moral or someone else had somehow manipulated this photograph.

Ladies and gentlemen, you heard the explanation for that.

These photos are from Google Maps.  Google is a great company,

but did they put their best resources to take this picture of

the abandoned warehouse in Kearny?  Maybe not.  Does that mean

this place doesn't exist?  No.  Does it mean that the defendant

didn't go there with the rest of his crew like the cell site

1    shows to find cocaine?  Of course not.  It's exactly what they

2    did.

3            What did he do after?  He went home.  The defendant

4    went home to that tower, tower 254, the tower that Investigator

5    Donaldson testified was the closest tower to his house or his

6    cell phone provider.

7            And, ladies and gentlemen, look at the records the

8    next day.  Where does the phone wake up?  October 15 it wakes

9    up same place, 254.  And who does the defendant call?  Who does

10   he have contact with at 9:33 that morning?  Kong.  What were

11   they talking about?  You know what they were talking about;

12   they were talking about what happened last night.  Use your

13   common sense.

14           Now, ladies and gentlemen, let's just go back to New

15   York for a minute before we move on.  Ladies and gentlemen, he

16   is at that tower, that tower 242, around the corner from the

17   robbery, calling from the direction of the robbery.  What time

18   is he doing this, among the times he is doing this?  8:58 p.m.,

19   to the minute.  What was he doing?  He wasn't at the bar.  He

20   wasn't at the club.  He wasn't at the restaurant.  Other than

21   these approximately 45 minutes less, you heard over the three

22   months of cell site there are no hits in Washington Heights for

23   that entire period.  This is the only time, the only time he is

24   in Washington Heights, when the robbery is happening.  It's not

25   a coincidence, ladies and gentlemen.  He was at that robbery,

he was in the red Toyota, he was boxing in the victims while

Kong, Moral and Alex held them up with a gun.  It's the same

people he spoke to more than 70 times that day.  That's what he

was doing.

        And, ladies and gentlemen, if you find, if you believe

he agreed to commit that armed robbery of cocaine on October

14, 2012 so he and his other robbers could resell it, he is

guilty of every count in the indictment.  He is guilty of

conspiring to distribute narcotics, 500 grams or more of

cocaine.  He is guilty of robbery, and he is guilty of carrying

or possessing that firearm that he handed to Kong which was

made known to those victims and was brandished.

        Now, the defendant is also charged with heroin.  This

one didn't involve heroin, but we will get to that next.  But

before we do, if you find that he agreed to commit that

robbery, he is guilty of conspiring to distribute cocaine and

the robbery and the gun count, end of story, that robbery.

        Now, let's talk about heroin and let's talk about

January 9, 2013.  This is the massive heroin job, more than 20

kilos, the robbery you heard about the second most, after

October 14.

        And why did you hear about it?  Well, first of all

that's when a lot of the crew at least was taken down,

including the Camachos, Cespedes and Moral.  But why else did

you hear about it?  The defendant was in on it from the moment

E6J7SER1                    Summation - Mr. Mukhi

it was born until the day it died on January 9, 2013.  The
first day of what would become this robbery the defendant was
in on it.

          Approximately one hour before Javion Camacho goes to
that first meeting with the CI, who does he talk to?  The
defendant, partner in crime.  What are they talking about?
What could they be talking about?  Your common sense tells you
they are talking about the meeting that Kong is about to go to
about the new job with 20 keys of heroin.  This is what they
did.  Remember when Moral had that meeting, that first meeting
when he met Kong, he knew Chillina, and Chillini introduced him
to Kong?  What did they say when Moral said I steal drugs?
They laughed.  They said this is what we do.

          How else do you know?  Who is the next person that
Javion Camacho has contact with after the defendant?  Almost
two minute call at 7:26 between the defendant and Javion
Camacho.  7:53, over two minute call with Javion Camacho and
the defendant.  Next call, Jauncey Valle, the same Jauncey
Valle who then an hour later goes to the meeting with Javion
Camacho to talk about this, and Javion Camacho says, "I want
you to understand something, me and my team, this is what we
do.  We play for keeps.  We don't half-step nothing.  If
anything get ugly, we make it real ugly ..."

          So, what are they talking about during these calls?
They are talking about the robbery.  How do you know that?

1     Because what happens after the meeting about the robbery?

2     Javion Camacho attempts to make a call to the defendant right

3     after he leaves that meeting.  He is right over the Lincoln

4     Tunnel.  He is right around where he drops off Jauncey Valle

5     and the CW, and he tries to call him.  Why?  Tell him what

6     happened the first day.  Now, they don't reach each other on

7     that call.  You see it's an attempted call.  What happens two

8     days later?  Cell site.  Javion Camacho in the vicinity of

9     Anthony Serrano's house, on December 19, 2012, two days later.

10    Call standing over an hour.

11          And you also know Javion Camacho had the defendant on

12    his mind that day at that meeting.  Look at what he talked

13    about.  Ladies and gentlemen, if you look at that, it is almost

14    a play-by-play for the Washington Heights robbery.  Look at

15    what he says last.  He said there is someone who cuts the top

16    of the block off:  Defendant.  And then there is a car that

17    cuts the bottom of the block off:  The police car.

18          They are also in contact with each other throughout

19    this period that Javion Camacho is meeting with the CI.  29

20    communications all going on while the CI is texting, calls with

21    the CI and CW between this period, Javion Camacho, Jauncey

22    Valle, it is all happening, these guys are in touch.  Days

23    leading up to the final attempted robbery, 28 total

24    communications between the defendant and Javion Camacho.

25          (Continued on next page)

E6JAASER2                    Summation – Mukhi

1              MR. MUKHI:  The day before the robbery January 8,

2    2013, again, Javion Camacho he lives in Carteret, he doesn't

3    live in Jersey City, he's in the defendant's neighborhood.

4    Then what happens on the night of the robbery?  10:40 p.m.

5    Javion Camacho has tried to do the robbery.  The DEA has

6    arrested him.  Who tries to call him?  The defendant.  And who

7    else tries to call Javion Camacho, Jauncey Valle, the same

8    Jauncey Valle who is at three meetings with the CI.  No one can

9    dispute he was involved with the planning of the robbery of

10   Kong and he doesn't show up, just like the defendant.  He's the

11   other person frantically trying to call Javion Camacho on the

12   night of January 9, 2013.

13             Why are they calling?  Why is Jauncey Valle calling?

14   Why is Anthony Serrano calling?  They're calling to check-in.

15   They want to know what the take is, how much heroin are they

16   going to get.  That's what Valle's doing.  That's what the

17   defendant is doing.  They both had a stake in this robbery.

18             Obviously, the defendant does not reach Javion Camacho

19   at this point because Javion Camacho is under arrest by the

20   DEA.  So who does the defendant try to call next?  Honesty

21   Julio Camacho.  January 9, there's no answer for Javion

22   Camacho.  Who does the defendant try next?  Julio Camacho

23   another robber who is trying to rob the heroin stash on

24   January 9.  He was in on this robbery, ladies and gentlemen.

25   It's not a coincidence.

E6JAASER2                     Summation - Mukhi

1          Now, before we get to the defense's theme you heard

2     during the cross of Agent Riley that Serrano didn't actually

3     show up in the Bronx that night which we agree he was in New

4     Jersey trying to checkup with Javion Camacho and Julio Camacho

5     starting at 10:41 while they were under arrest.  We did learn

6     that the defendant was originally supposed to come.  Moral was

7     told by Kong that the defendant was going to be coming and he

8     was going to be coming with a cop.  And why didn't he come?

9     You also heard Moral say that some of the other robbers didn't

10    want a real cop there.  And so the defendant was not going to

11    come because the real cop wasn't invited.

12         Now, ladies and gentlemen, it's not surprising that he

13    didn't come.  You heard the MO recording.  That was his way of

14    doing things.  He hung back he was the one around the corner.

15    He was the one that didn't want to be seen in that area.  That

16    is what he said.  I don't want to be seen in that area.

17         Now, let's talk about the paint job analogy that

18    Mr. de Castro made in his opening statement.  Now, the way he

19    presented it was completely backwards.  Yes, 16 guys show up to

20    this robbery.  Think about it.  If you're the boss, if you are

21    the CEO of a contracting company that person doesn't go out and

22    do every paint job.  He sends his team.  He sends his muscle.

23    He sends the 16 guys.  We all know that that's what bosses do.

24    They make other people work for them.

25         Now, what was the difference between October 14, 2012

E6JAASER2                    Summation - Mukhi

and January 9, 2013.  Why did he go to one and why didn't he go

to the other?  Here's the reason.  For October 14, 2012 they

didn't have takes extra muscle.  The robbery came together that

day.  You heard about that.  That day they got the tip and so

they all rushed to the city including the boss to get the job

done, just like you would expect.  If there's an emergency, the

boss comes.  But January 9 had been planned for nearly a month.

They had time to recruit and put together the team.  They got

16 of them.  They didn't need any more hands on deck.  The boss

didn't come.  They had the workers.  The boss stayed home,

didn't take the risk of being in the area but he would get his

cut when the score happened.  How do you know that?  You saw

those calls, ladies and gentlemen.  He called Javion.  He

called Julio right after that robbery is supposed to go down.

That's not a coincidence.

         Now, by the way, although he was a boss, that's not an

element to any of the crimes, OK.  As long as he joined and

participated in those conspiracies whether he was a leader or a

follower he's guilty if he joined those conspiracies.

         Now, defense counsel also referred to the crew as the

Camacho crew.  Ladies and gentlemen, this crew didn't have a

name.  It doesn't matter whether you call it the Camacho crew,

Serrano crew or the Moral crew, they didn't give out T-shirts

identifying themselves as the Camacho crew.  They wore police

shirts.  Whatever you want to call the crew the defendant was

1    in it and that's what's matters.

2            Now, let's talk about some of the other jobs.

3            By the way, Mr. de Castro suggested in his opening

4    statement that these calls on January 9 around this time could

5    have been a holiday.  Ladies and gentlemen, there is no reason

6    that Anthony Serrano and Javion Camacho are wishing each other

7    a very belated Happy New Year and Merry Christmas 15 times on

8    January 9, 2013.  They're talking about the robbery and that

9    it's going down that night.  Let's go to Webster Avenue.  This

10   is the heroin stash house in the Bronx where Moral and Cespedes

11   and Black get two kilos of heroin, one of which goes to the

12   defendant and he resells it.  He pays Black $10,000 upfront.

13   Moral says he got, approximately, three thousand from it.  The

14   rest of the payment, the defendant also gave to Black once he

15   sold the entire kilo.

16           Now here is the hash house.  How do you know this job

17   actually happened?  Well, here is Moral October 6, 2012, near

18   the stash house.  This is about a week before the October 14

19   robbery.  There is Cespedes, also same area near the stash

20   house October 6, 2012, around the same time.  So, now what

21   happened to that kilogram of heroin that Cespedes, Moral and

22   Black got to keep?  They got to keep one.  Well, Moral told you

23   Black arranged for the kilo to be sold for the defendant for a

24   price that the defendant negotiated, his $10,000 upfront.  That

25   was the meeting where the heroin was given to the defendant so

E6JAASER2                    Summation - Mukhi

1    he could resell it and it was a meeting where Moral met Kong

2    for the first time through the defendant.

3            Now, what else happened during this meeting?  Moral

4    tells the defendant how he got the heroin and the defendant

5    says he wants in, OK.  Webster Avenue, October 6, 2012, they

6    have this conversation and eight days later they're in

7    Washington Heights doing a robbery together.  You know that

8    happened because we went through the evidence of Moral and the

9    rest of the independent evidence.

10           Now, let's talk about Moral for a minute and defense

11   counsel attacked his credibility in opening statement and

12   crossed him extensively on his credibility including his past

13   crimes, the murder, violating the source agreement, no doubt he

14   has done bad things.  He has lied in the past.  There's no

15   dispute as to that.  But what is the difference now?  Well,

16   Moral told you, he told you that his incentives have never been

17   to tell the truth.  Obviously, he was running free.  And now

18   he's in jail facing 17 years, mandatory minimum and the only

19   thing that can get him out is if he cooperates truthfully.

20           But you know what?  In this case the cooperator is

21   also completely corroborated on everything.  Staying with the

22   Webster Avenue job, the heroin job, here is the text message

23   that Moral sends to Serrano.  What does Moral say?  We got it

24   at 55.  Yo, got it at 55, same thing you got last but better.

25   Last.  What is the last time?  The last time at Webster Avenue.

1   How do you know this is also about heroin?  You heard, heroin

2   is approximately $55 per gram.  They're talking about this new

3   heroin that Moral got, the same heroin that you saw earlier.

4   Moral stole it from Queens and he spoke to the defendant about

5   it over the phone.

6          Now, the defendant doesn't text back but Black

7   responds even though Moral had not sent Black the text message,

8   he sent the defendant's text message and Black responds.  What

9   are you talking about, dog food?  They are not talking about

10  dog food, ladies and gentlemen.  They're talking about heroin.

11  By the way the exchange here corroborates Moral's testimony

12  about Black acting as a middleman for the defendant.  He's

13  doing it again for this January 7 deal just like he did for

14  Webster Avenue, a kilogram deal.  So he saw Webster Avenue was

15  October 6 and Moral told you that Black was in the middle

16  selling a kilo to Chillini.  What is going on in the phone

17  contacts between Serrano and Suarez during that same time

18  period?  They're in touch.  What are they talking about?  The

19  one kilo that the defendant gave him $10,000 upfront still

20  needed to pay on the back.

21         How else is Moral corroborated?  Well, remember he

22  told you right before the Washington Heights robbery he met

23  with Chillini in Little League field and you know there's a

24  field right down the block from that house.  That's where the

25  discussed tapes that were going in and the defendant said he

1    could take care of the gun.  Here is Moral and Cespedes in the

2    vicinity of the defendant's home two days before October 14,

3    2012 on that robbery.

4         Now, Moral also told you that he went on at least one

5    other occasion with Cespedes to defendant's house and here they

6    are October 18 a few days later.  The phones, Moral, Cespedes,

7    Anthony Serrano all around 348 Eight Street.  Now, Moral also

8    told you about an attempted robbery of a cash van, a van that

9    was carrying drug money.  This is the location Anthony Avenue

10   in the Bronx, OK.  Here it is on November 12, 12:13 a.m. Julio

11   Camacho.  Anthony Avenue is all the way to the right.  Who is

12   in the same location approximately the same time?  Alex

13   Cespedes is calling Victor Moral.  Who is also there Victor

14   Moral.  All thee of them, Jersey guys, in this same location

15   where he strapped the GPS onto the van.  Now, what did Moral

16   tell you about that job?  He said the defendant was supposed to

17   show up but instead Julio and Kong showed up, that the

18   defendant sent them instead of him.

19        So, what do you see the might before?  Actually, the

20   same night cause they're there in the middle of the night.

21   This is approximately eight/nine p.m. on November 11 Serrano's

22   calling Julio Camacho.  Then they're all by the cash van spot a

23   couple hours later.  He is telling him, go, you go.

24        Now, ladies and gentlemen, let's talk about the heroin

25   sales.

1          THE COURT:  Mr. Mukhi, before you starts there, is now

2     a time to take a break or is there a more logical point in a

3     few minutes?

4          MR. MUKHI:  This is fine.  I probably have about 15

5     more minutes left.

6          THE COURT:  All right.  Ladies and gentlemen, we'll

7     take a break and just a few minutes then come back and then

8     hear the remainder from Mr. Mukhi.  Then we're going to go on

9     to Mr. de Castro and then the government has an opportunity for

10    a rebuttal after that just to give you a sense of how it plays

11    out.

12         I want to remind you again not to talk to each other

13    about this case or to talk to anybody else on social network or

14    anything else.

15         (Jury not present)

16         THE COURT:  Is there anything that anybody needs to

17    raise before we take our own brief break?

18         MS. MAIMIN:  No, your Honor.

19         THE COURT:  It won't be long.  And after Mr. Mukhi

20    you've got about 15 minutes left, then we'll go to Mr. de

21    Castro then depending upon how long that goes we'll come back

22    and do the rebuttal immediately or we'll take another break.

23         (Recess)

24         THE COURT:  All right.  Let's bring out the jury.

25         (Jury present)

1          THE COURT:  Mr. Mukhi, you may continue, sir.

2          MR. MUKHI:  Thank you, your Honor.

3          OK.  Just one final point before moving on to the

4     heroin sales on Moral.  One final point on Moral on how it is

5     corroborated by everything you've seen and heard.  What did

6     Moral tell you about one of those meetings we saw at the

7     defendant's house?  The defendant introduced him to who Moral

8     thought was a cop, a cop who had a drug sniffing dog who could

9     help with drug robberies.  He identified Lou Faconne.  He

10    didn't know his name but knew that the defendant had introduced

11    him to Moral as a cop with a drug sniffing dog.  What happens

12    when agents go to arrest the defendant and go inside his

13    building?  Lou Faconne shows up with a dog and a gun and it

14    turns out it's not a cop but he's a bail bondsman.

15         Ladies and gentlemen, you can't make that stuff up.

16    That's because it happened.  Moral went to that meeting at the

17    defendant's house.  He met the guy, the cop who he thought was

18    a cop and the cop was Lou Faconne.  That's how corroboration

19    works.

20         Now, let's go to the heroin sales.

21         Heres what you learned on the first day of this case.

22    Four sales of heroin by the defendant out of his house where

23    house and car and it was Michael Gamba who brought in the

24    customers who were really important.  What did the agents see

25    each time?  They all testified in a row and they saw different

things on different days because that's how the surveillance

works.  Sometimes it's one agent who sees the important

transaction, sometimes it's another agent.  That's a fluid

situation.  But each of them on each of those days saw the

important thing which is that when Michael Gamba wanted to get

heroin at the request of an informant he went to the defendant.

December 20, 2012, 30 envelopes stamped "Fat Lady";

December 27, 2012, 30 envelopes stamped "Fat Lady"; January 4,

30 envelopes stamped "Harlem Nights", January 16, 2013, 50

envelopes "Fat Lady".

          Now, what did those agents see?  They all saw

something very similar.  Now, it was boom, boom with Serrano

and Gamba inside the door to the house, 30 seconds, a minute

inside the car.  What else were they doing there.  They were

exchanging drugs.  They were exchanging heroin.  Now, there was

cross-examination and the point was, basically, agents can't

see through walls and cars, correct?  But, ladies and

gentlemen, you know what happened?  No need to see through

walls.  You don't need to see through cars.  Michael Gamba came

to Chillini each time to get the heroin he needed.  They met

quickly discretely every time Gamba got heroin.

          By the way, it also fits with the Defendant's MO, a

layer, a layer of reduce my risk.  Here, the layer is Michael

Gamba.  Now, how else do you know that Serrano was Gamba's

supplier on those days?  Well, you had the phone calls from

1    those two days around the time that Gamba was getting the

2    heroin from the defendant and then you have the cell site

3    records that on these days that agents observed Michael Gamba

4    and Anthony Serrano meeting during those controlled buy

5    operations in the vicinity of the defendant's house he was

6    home.  He wasn't somewhere else.  He was home.  He was

7    supplying Gamba with heroin.

8           Now, how do you know that this is the same heroin that

9    the defendant was dealing with this crew?  Well, look at that

10   first transaction there December 20, 2012.  Three days earlier

11   December 17, 2012, Javion Camacho in the McDonald's CI, what

12   does he tell the CI?  We're dealing with dope right now.  He's

13   talking about dope.  He's talking about heroin. he's talking

14   about how potent it is.  You know when he says we're dealing

15   with dope right now you know who that is.  You know who's in

16   the "we".  Ladies and gentlemen, the 6597 number, the same

17   number that Javion Camacho is using with the CI to set-up the

18   drug robbery he is talking constantly with the defendant.

19          Now, this phone, the phone that Camacho's using on

20   October 14, that phone, that robbery he cuts it off about a

21   week later but that's the phone he has on the night of the

22   robbery.  Now, the question is if everyone agrees that Javion

23   Camacho is a heroin dealer and an armed robber the question is

24   why is Anthony Serrano talking to him almost every single day?

25   It's not because they're cousins.  It's because they sell drugs

1   and they rob drug dealers together and all of the evidence in

2   this trial has shown that.

3          Now, ladies and gentlemen, I want to briefly go over

4   the charges in this case.  This is the verdict form that we

5   expect you'll get once you begin your deliberations.  Count One

6   is a narcotics count.  Pretty simple, was there an agreement to

7   distribute narcotics in particular heroin and/or cocaine?  Yes.

8   Now, if you find that, then you'll be asked to make a finding

9   about the amount of cocaine, the amount of heroin or both.

10         Let me just address the weight issue right now.  For

11  the heroin you know days greater than one kilogram both from

12  the January 9 attempted robbery which is more than 20 we'll put

13  that aside even but one kilogram, approximately, that the

14  defendant gets from Webster Avenue burglary up in the Bronx

15  right there you're above one kilogram.  We're not even talking

16  about the heroin that came out of the defendant's home in

17  December and January, December of 2012 and January of 2013.

18         Now, for cocaine, the October 14 robbery, was Serrano

19  agreeing to obtain two kilograms of cocaine and to redistribute

20  it, two kilograms is well above 500 grams.  Now the second

21  count is a robbery count.  That's what you'd expect, exactly

22  what happened October 14, 2012, for example.  Now you are going

23  to hear there's a requirement that the robbery affected

24  interstate commerce.  The parties have stipulated in Government

25  Exhibit 805 that heroin and cocaine aren't grown in New York,

1   so by definition a conspiracy to rob those narcotics affects

2   interstate commerce.  October 14 robbery was a cocaine robbery.

3   And the January 9 attempted robbery was a heroin robbery.

4          Finally, the last count is the gun count.  Also

5   straightforward did he carry or possess a firearm in connection

6   with those other two crimes?  And if you find him guilty of

7   that and you'll get the specific instructions from the judge

8   before your deliberations you should follow those.  But if you

9   find him guilty of that count of the possession or the

10  carrying, then you are going to be asked to decide whether the

11  gun was brandished.

12         Now, I expect you'll hear that for this element the

13  gun doesn't have to be directly visible, doesn't have to be

14  pointed in someone's face as long as the gun was made known to

15  the victims and it was done to intimidate the victims.  Here

16  there was a gun and Gilbert and Infante each saw something or a

17  gesture that they thought could be a gun and they told you what

18  they thought about that.  They were scared.  They were

19  intimidated.

20         Now, you are also going to hear that the defendant is

21  charged with aiding and abetting the Count One crime which

22  requires that he had advanced knowledge about the gun.  Here

23  you know he did it because he's the one who brought the gun.

24         All right, ladies and gentlemen, I am going to sit

25  down but I just want to finish on where we started, the MO

recording.  The recording that was introduced solely as it relates to its modus operandi, it's a way of doing and planning things.  What did he say?  He said, I don't get my hands dirty. I am the guy around corner.  I don't want to be seen in that area.  Why?  Why?  He thought because if he never showed his face he would never get caught.  He would tell law enforcement what he told Special Agent Todd Riley, I didn't do robberies. I wasn't at any robberies and you can't prove it.

Now, ladies and gentlemen, there's some things that the defendant did not count on.  He did not count on one of his partners flipping against him.  He didn't count on the fact that that partner, Victor Moral, would be corroborated in every way, the cell site, the phone records, everything that puts the defendant at that robbery with the other robbers on October 14, 2012, and he didn't count on that recording.  He didn't count that there would be a recording where he explains how he operates his MO.

So, ladies and gentlemen, when the defendant told the agents he didn't do robberies, he wasn't at any robberies and they couldn't prove any robberies, he lied and he was wrong. He lied because he did robberies.  He was at robberies and he was wrong.  He was wrong because we proved it.

THE COURT:  All right.  Thank you.

Mr. de Castro.

MR. DE CASTRO:  May it please the Court, government,

ladies and gentlemen of the jury, good morning.

On Monday afternoon I delivered my opening statement and I told you that this case was about one man.  I told you it was about Victor Moral.  And you heard Mr. Mukhi talk about the mountain of evidence, the iceberg and he did that to suggest that Moral was not the most crucial witness in this case.  He is the most crucial witness in this case, if they could just rely on cell site evidence they would, but they can't.  Each count in the indictment turns on the truthfulness of Mr. Moral's testimony.

Count One depends on whether he truthfully testified that he was engaged in narcotics transactions with Mr. Serrano and that some act in those transactions was committed in furtherance or in the Southern District of New York.

Count Two depends on whether Mr. Moral truthfully testified that Mr. Serrano was a member of the Javion Camacho crew.

Count Three depends on whether Mr. Moral truthfully testified about Mr. Serrano's membership in that crew and whether he aided and abetted the use of a gun in furtherance of that conspiracy.

We submit that you should disregard Mr. Moral's testimony as is your right and find Mr. Serrano not guilty of all these charges.  I think it's fair to say that Mr. Moral's testimony was extraordinary.  So extraordinary that you, the

1    jury, could disregard his entire testimony.  He simply is not

2    believable.  Admitted to you that when he gets caught his way

3    of dealing with things is to try to lie to get out of trouble.

4    Well, he got caught and what is he doing?  Trying to lie to get

5    out of trouble.  He's lied to juries before.  He's lied to

6    courts before.  After he gets arrested his MO is very simple,

7    deny, deny, deny.  And when they have enough evidence cooperate

8    against anyone and anybody and try and limit your exposure.

9    He'll say whatever he has to say to get the benefits of his

10   cooperation agreement and he told you that he wants a 5K

11   letter.  He wants the government, this government to conclude

12   that he's provided substantial assistance in the prosecution of

13   others.  If they conclude that, he will get his letter and a

14   judge will be permitted to sentence him below 17 years.

15          He is shooting for the lowest possible sentence

16   because he was already sentenced in New Jersey.  He got seven

17   years and it's already been determined that that will be

18   concurrent to whatever he receives in this courthouse.  That's

19   a pretty good deal and he told you from the stand that he's

20   hoping to get time-served.  He told you he's hoping to get

21   time-served after having a proven track record, a proven MO

22   that is to lie to the law enforcement, lie to courts and lie to

23   people like you jurors.

24          As I said in my opening, don't allow Mr. Victor Moral

25   to manipulate you like he's manipulated countless others.  And

1   if you are asking yourself now when you are sitting there after

2   this hearing is adjourned, after Mr. Muhki's summation, why

3   would he lie?  I think the real question should be asking is

4   why would he tell the truth?  Why would he deviate from his

5   normal practice?  His normal practice is to lie.  It's what he

6   does to every person he comes in contact with.  So what is

7   different that would make him tell the truth?  Because he is a

8   facing time.  He lied to New Jersey State Police.  He's facing

9   time there too.  That's seven years there, right?

10          He told you that he was willing to lie and commit

11   upwards of 30 crimes, 30 crimes.  We're talking about crimes

12   with guns and tying people up.  I went through a list.  I am

13   sorry.  It was very painful, I know but I went through the list

14   of all those crimes.  And he committed all those crimes after

15   signing Defense Exhibit One which is his agreement with the New

16   Jersey State Police.  Look at that when you go back in the jury

17   room.  See what he agreed not to do and you'll see what he did.

18          Now, undoubtedly -- well, actually, the government did

19   argue already that, well, if Mr. Moral was lying when he was in

20   this courtroom he would have done a better job of it.  Oh, well

21   the cooperator's is lying.  He would have said something like

22   the gun is right here in the bag or do you know what?  Do you

23   know who gave us the guns for January 9?  Oh, it was

24   Mr. Serrano.  That's exactly what he did.  That's exactly what

25   he did.  He gets arrested on January 9th of 2013.  He starts

E6JAASER2                        Summation - de Castro

proffering with the government.  He doesn't tell the government

until May of 2014, last month he tells the government oh,

Mr. Serrano gave the guns for that robbery.  Mr. Serrano was

arrested in August of 2013.

        The explanation in the questioning was oh, well, it

was never asked.  Ask yourselves if that makes any sense.  He

proffered with the government, approximately, 40 times

according to his testimony.  Mr. Serrano was arrested in August

of 2013.  It simply defies common sense that he was not asked

about the October 14, 2012 robbery.  He wasn't asked if there

was a gun there?  He wasn't asked who brought the gun?

        The government argues that Mr. Serrano is the

mastermind.  They just argued that he is the mastermind.  He is

the puppet master pulling all the strings.  In fact, Mr. Mukhi

was saying he's like the CEO, equivalent of CEO of a business

that is doing -- why?  Because I made that reference in my

opening statement to the painting job.  I'll tell you why my

painter goes to that job.  Because that's the big job and that

painter wants to talk to that client.  Little clients, they are

not going to talk to as much.  The CEO does not meet with every

client, every business person.  They meet with the bigger

people.

        Let me talk to a little bit about why the government's

argument that he is the mastermind, the boss behind this makes

no sense.  Would a mastermind have one phone registered in his

E6JAASER2                    Summation - de Castro

wife's name?  No.  I submit to you he would have multiple

phones.  He would use different phones for different purposes.

Why do I think that?  Oh, I forgot, because the witness

testified to it.  The lead of a robbery crew testified that you

have multiple phones, he uses them, he passes them out and he

has them regimented for different types of jobs.  That's what

Victor Moral told you.  He got arrested in New Jersey.  How

many phones?  Three.  He got arrest here.  How many phones did

he have?  You saw the charts Victor Moral, Victor Moral, Victor

Moral.

He even testified that at times he had four or five

phones at one time.  Ask yourselves if this makes sense that he

would have one phone, keep the same number the entire time and

when he's the puppet master and involved in all of these

crimes?  Would a mastermind not realize the cellphone cell site

records exist and they could estimate a location?  It's not a

secret.  Would a mastermind openly associated with somebody

like Mike Gamba in broad daylight and deal drugs right there

from his home?  Would the mastermind live in a fourth floor

walk-up?  Would he be driving that older model Lexus instead?

No.  He would be driving what Victor Moral drives Escalade,

BMWs, Mercedes and Maserati.  Would a mastermind openly discuss

what you heard yesterday how he was broke and desperate and was

working with a pizza shop employee to try to steal watches from

the boss?  That's the mastermind.

E6JAASER2                    Summation - de Castro

1          The truth is the facts show that Moral from that stand

2     downplayed his role as one of the real leaders and the real

3     leaders of the crew were Javion, Julio and Mr. Moral.  He tried

4     to make it seem like he was just in charge of picking up

5     equipment and being a lookout.  That's what he did on direct

6     examination.  On cross-examination he's agreeing with me that

7     he is the leader.  We even saw those text messages that

8     Mr. Mukhi was referencing between Black and Wilfredo Suarez and

9     Mr. Moral.  What did he say when I asked him a question?  You

10    are like his boss?  Yeah, you can say that.  That's a leader.

11    The leader gets the car, the cop car.  The leader buys it.  The

12    leader tricks it out.  The leader parks it.  The leader has all

13    the equipment.  The leader gets text messages from people like

14    Suarez practically begging them not to cut them out of future

15    work.

16          On cross-examination what did he admit?  He puts

17    robbery crews together.  He was the organizer.  He put together

18    crews to commit robberies in Connecticut.  He put together

19    crews to commit robberies in New York.  He put together crews

20    to commit robberies in New Jersey.  And he put together crews

21    to commit robberies in Pennsylvania.  After the that theft he

22    would commit he would arrange to sell the car.  He had all the

23    contacts.  He was on both sides of everything.  And he said he

24    was making money, lots of it.  $1000 a pound for marijuana is

25    what he testified to and he was testified to stealing 300

1    pounds of marijuanas.  That's one of the more than 25 crimes he

2    committed in 2012 alone.

3             So, why does this case turn on Victor Moral?  Well,

4    with respect to the narcotics conspiracy part which is Count

5    One of the indictment, the government alleges that Mr. Serrano

6    agreed with at least one other to violate these narcotics laws

7    from 2012 to 2013 that he knowingly participated in that

8    conspiracy and that enactment in furtherance of conspiracy

9    occurred within the Southern District of New York.

10            You heard two categories of evidence.  You heard the

11   Gamba evidence that Mr. Mukhi was just talking about and you

12   heard testimony from Mr. Moral that he, Mr. Serrano and others

13   agreed to possess the cocaine and heroin.

14            Let's talk about the Gamba evidence a little bit.  You

15   heard evidence of those sales, sales between Mike Gamba and

16   government informants.  And the government got a little queue

17   saying oh, I saw the deal between Mr. Serrano and Mr. Gamba but

18   then I on cross-examination, no, they never saw anybody change,

19   anything change hands.  They never saw them even shake hands.

20   Mr. Mukhi says, well, they do things really fast, OK.  Well,

21   they didn't note what the person was wearing.  They have no

22   idea whether Mr. Gamba walked out of his own apartment and had

23   that little bag, these little bags in his pocket, no idea.

24   They want you to assume that.

25            All the sales occurred between government informants

1   and Mr. Gamba.  The government's only evidence of Mr. Serrano's

2   involvement were these few brief in-person meetings with him

3   after which at some point Mr. Gamba delivered heroin to an

4   individual working with the government.  There's absolutely no

5   evidence of Mr. Serrano and Mr. Gamba delivering anything.

6   There is no evidence from Agents -- Kolakowski or Kealy that

7   they ever observed narcotics exchange hands between Mr. Serrano

8   and Mr. Gamba.

9           On direct they made it appear that if Gamba gets an

10  order each time what does he do?  Oh, each time he goes and I

11  think Mr. Mukhi just was talking about that, each time he goes

12  to see Mr. Serrano and then they did that on direct.  But they

13  just left one out, so I did it on cross-examination which was

14  February 14 where they made an order and Mr. Gamba delivered

15  heroin and they watched it and went in the Barge Inn, came out

16  and gave the heroin.  That was it.  No Mr. Serrano.

17          So, Gamba doesn't by himself does not establish the

18  conspiracy charge in the indictment.  For one, even if you

19  credit the government's evidence and made that leap they want

20  you to make the leap that it must be those drugs.  Those deals

21  in and of themselves would be insufficient to establish the

22  conspiracy charge of the indictment.

23          But just those deals aren't enough so guess who fixes

24  it?  Victor Moral.  He's got to get on the stand.  He solves

25  their problem by testifying, just like he solved their problem

E6JAASER2                    Summation - de Castro

in May of 2014.  Now, all of sudden Mr. Serrano provided the
gun for that one particular robbery, the gun that none of the
victims saw.  The robbery conspiracy depends on Mr. Moral's
claim that Mr. Serrano was a part of Javion Camacho crew.  All
the cell site evidence in the world will not establish
Mr. Serrano or anybody anyone else's -- victims or
co-conspirator.  That's why they need Mr. Moral.  Can't just
put on the cell site information because if I was in that area
and wasn't committing a robbery.

          The government alleges that Mr. Serrano carried a
firearm during that or aided and abetted during that
October 14, robbery.  Other than Mr. Moral, there is no
evidence that Mr. Serrano carried or aided and abetted the
carrying and use of a firearm in connection with October 24,
2012 robbery.  Therefore, like Counts One, Counts Two and Count
Three, all the counts depended on Mr. Moral.  They depended on
him.  That's why I said this is all about Victor Moral.  You
watched him testify.  You judge his credibility.

          I told you in openings that we do not deny the
existence of the Javion Camacho crew and I keep saying Javion
Camacho crew.  I am not doing that because it's me being
tricky.  It's in the transcripts.  Javion Camacho saying "my
team".  Who else is saying "my team"?  Then if you don't want
to call it the Javion crew, fine.  I'll call it the Victor
Moral crew.  Because he says "my crew" to.

E6JAASER2                    Summation – de Castro

1          I told you in openings that the questions for you

2     would be who is a member of this robbery conspiracy or this

3     crew charged in the indictment?  Where was Anthony Serrano on

4     January 9, 2013?  I told you you have to ask yourselves that

5     and you still have to ask yourselves that.  How do you know if

6     it's the Javion Camacho crew?  One, Javion Camacho told you.

7     Victor Moral told you.  Anthony Serrano told you.  And all the

8     facts of January 9, 2013 told you that.  How did Javion Camacho

9     tell you that it was his crew?  All the calls record texts

10    leading up to January 9, all him.  Mr. Serrano as I did not

11    mention any of those calls by the messages, December 17th of

12    2012, Javion Camacho and the CI that's I think Government

13    Exhibit 301.  Javion says me and my team, this is what we did.

14    His team.  His crew.  January 9, 2013 Javion and the informant.

15    I brought my team.

16         Mr. Serrano tells me himself the government introduced

17    that recording yesterday right at the end of the day.  And that

18    was the recording where Mr. Serrano was talking about watches

19    and the pizza shop owner and the government is saying oh, he's

20    talking about his MO, his crew, I guess, right?  So, it's his

21    crew.  Well, that was in July of 2013.  He's talking about that

22    crew and he does say "our MO" the whole Camacho crew got

23    arrested on January 9.  They're all in jail so I'm not really

24    understanding that.  All January 9, 2013 tells you that this is

25    the Javion Camacho crew not the Serrano crew.

E6JAASER2                    Summation – de Castro

1          December 14th of 2014, meeting with the cooperating

2     witness and Mr. Valle; December 17, 2012 meeting with the

3     cooperating witness, the cooperating source Jauncey Valle and

4     Camacho; 34 Street McDonald's you saw it, you did not see

5     Mr. Serrano; December 24 Christmas Eve there was a call.

6     Mr. Serrano was not on the call; January 2, meeting at

7     McDonald's on 34th Street, some unknown female shows up.

8     Mr. Serrano is not present.  The boss, and we're talking about

9     this huge amount of drugs, bigger than anything they've ever

10     done before, you'd think the boss may show up now to do the

11     real negotiating.  The day of the sting operation Javion and

12     confidential informant, this a telephone call.  Mr. Serrano is

13     not on the call.  January 9, the day of the meeting, they

14     didn't bring that out on direct-examination.  They waited for

15     me to bring it out on cross.  They had their own meeting in a

16     parking lot.  The crew got together to do this meeting in the

17     parking lot and that was surveilled.  And the agent said

18     Serrano was not there.  And then the arrests January 9 who

19     showed up in the cop car and everything else?  Who had all the

20     gear?  Shockingly, Victor Moral.  Anthony Serrano was not

21     present.

22          Now, on Count Three of the indictment pretty much for

23     the reasons I've stated so far, the government really hasn't

24     proven that the narcotics or robbery conspiracy beyond a

25     reasonable doubt.  However, if you were to conclude that

E6JAASER2                    Summation - de Castro

1   Mr. Serrano was guilty of either previous conspiracy you would

2   turn to Count Three if you turned to this firearm issue.  And

3   you heard testimony from Mr. Perez and Infante yesterday and

4   they weren't -- about some things.  But they were consistent

5   about one crucial fact.  Both victims told you they didn't see

6   a gun.  Mr. Perez said he saw one of the robberies put his hand

7   under his arm.  Ms. Infante said she that she a bulge on the

8   hip of one of the robbers.  Neither one of them would commit

9   that they saw a firearm.  They weren't in fear that they saw a

10  gun.  They were in fear because they were having an interaction

11  with what they thought were police and a few seconds later

12  those robbers were gone and so was their car.

13          Now, Mr. Mukhi put up on the slide there was this

14  testimony -- I think it was transcript page 344 of the record.

15  And you know you could have anything read back.  If you want

16  the testimony of any of the people we could read it back.  An

17  just send a note back and the judge will ask the parties to get

18  it together.  And that testimony was from Mr. Moral and it says

19  that the part that they cut out of the clip was that he said

20  the person had a gun in his vest.  So the person was wearing, a

21  bullet proof vest, had a gun in the vest.  And on cross at page

22  661 Mr. Perez says, I didn't see a gun.  Ms. Infante says, I

23  never saw a gun, on page 677.

24          But like the previous counts, Victor Moral's testimony

25  is the only link.  Again, he's here to fix it.  He didn't tell

E6JAASER2                        Summation – de Castro

1    prosecutors until a month ago that Mr. Serrano allegedly

2    provided the gun for that and he proffered more than around 40

3    times, he said.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Now, that tape, I want to address that tape that was

2     yesterday for a second.  How does that tape figure into this

3     case?  Well, you heard from the judge yesterday about it.  You

4     will hear about it in the judge's instructions as well.  That

5     evidence was admitted by the government, but it really can't be

6     used to conclude that Mr. Serrano has committed the crimes

7     charged in the indictment.  It was admitted for a very limited

8     purpose, and you should pay close attention to the charge on

9     the subject.

10          But that evidence in and of itself, that evidence

11    doesn't prove that Mr. Serrano was involved in selling

12    narcotics that were stolen in robberies in New York, drug

13    dealers in New York.  It doesn't do that at all.  It doesn't

14    prove for sure that Mr. Serrano was a member of the Javion

15    Camacho crew that robbed drug dealers or that they used guns to

16    rob drug dealers.  It has nothing to do with those allegations

17    at all.  Sure, it sounds really bad, but it's really irrelevant

18    to the charge of conspiracy.  They are using it to say it's his

19    MO, it's his MO, it's his MO.

20          The government introduced all of this cell site

21    evidence of Mr. Serrano's estimated possible locations on

22    October 14, 2012 as well as those of alleged coconspirators

23    around the robbery of Ms. Ynfante and Mr. Perez.  And I know

24    those records, they seem very damaging, but keep in mind that

25    alone they don't prove anything; they're not everything that

E6J7SER3                    Summation - Mr. De Castro

1    the government wants them to be.  They want them to be

2    everything because they want to shy away from Victor Moral.

3    That's why that entire summation was, oh, he's corroborated,

4    corroborated, corroborated.  Because what does he do?  He is a

5    liar; that's just what he does.  That's what he told you.  I'm

6    not characterizing it.  He actually told you.

7         Those charts are created by putting data from phone

8    bills to make an estimate of a location of a cell phone at a

9    particular date and time.  The technology is great, but it's

10   not advanced enough yet to say where people are, what they're

11   doing.

12        And I want to remind you that we don't have to prove

13   where we were.  The government has the burden here to prove

14   this case beyond a reasonable doubt.  So, any suggestion in the

15   summation that, oh, well, there is no explanation for where he

16   is, like we have to explain it, we don't have to do that.

17   Listen to the charge; it's very important on that subject.

18        Any and all of those maps, they could be off by miles.

19   There is a radius for everything.

20        Couple that with the testimony of Victor Moral that

21   cannot be relied upon, and that is going to lead to a

22   reasonable doubt for you just as it relates to October 14.

23        The government has introduced charts.  You have heard

24   testimony regarding toll records and calls between Mr. Serrano

25   and who they allege to be all the other coconspirators.

Mr. Mukhi was just talking about calls between Mr. Serrano and

Javion Camacho.  Most instances they are Mr. Serrano and Javion

Camacho or Julio Camacho.  They are his cousins.  The fact that

they're making calls or sending texts to family members is in

and of itself evidence of nothing.

Mr. Mukhi made a lot of assumptions when he was

summing up here to you about conversations they were having.

You didn't hear any of those conversations.  You can't just

conclude they talked about this.  He gave you the impression he

knew what they were talking about simply based on the timing.

He may be close to his cousins, and it's not in shock that they

would be in contact a lot.

Now, this has been a very short trial; it's not been

very long.  And I want to thank you for your time.  It's been

this week.  I want to thank you on behalf of Ms. Serrano, Ms.

Gotlib and I.  We appreciate you putting your life aside to

serve.  You have been attentive and focused, and we thank you

for that.

It's clear that you are taking your responsibility

very seriously, and as it was when this trial started, Mr.

Serrano is cloaked with the presumption of innocence.  He still

has that.  They still have to prove their case beyond a

reasonable doubt.

They have a high burden.  And because of the extremely

high consequences and dire consequences that flow from a

1    criminal conviction, the high burden of proof also protects you

2    so you don't wrongfully convict an innocent man for a crime he

3    did not commit.  We submit to you the prosecution failed to

4    meet its burden; they have not proved this case beyond a

5    reasonable doubt.

6            Now, I don't get to get back up.  The government gets

7    to have what they call a rebuttal summation.  So, I am going to

8    want to stand up.  After all, I am a lawyer, and I do want to

9    speak a lot, but I can't.  So, I'm going to ask you to think

10   about what I would say in response to the arguments that are

11   going to be made in a minute here.  Think about how I would

12   respond.  And I think if you do that, when you deliberate, that

13   you are going to return the only verdict that's consistent with

14   the evidence here, that there is reasonable doubt and that Mr.

15   Serrano is not guilty of these charges.

16           THE COURT:  Thank you, Mr. De Castro.  Ms. Maimin.

17           MS. MAIMIN:  Thank you, your Honor.

18           Ladies and gentlemen, what you just heard from Mr. De

19   Castro was an attempt to take your eyes off the ball, to

20   distract you from the overwhelming evidence of the defendant's

21   guilt in this case.  Now, that's not blaming Mr. De Castro.  He

22   is a great attorney, and he is working hard for his client, but

23   those are the only kinds of arguments he can make in a case

24   like this where the defendant's guilt is so clear.

25           Now, as Judge Forrest told you at the beginning of the

E6J7SER3                    Rebuttal - Ms. Maimin

1    trial, and Mr. Mukhi said it again just now, the government has

2    the burden of proof in this case.  We welcome that burden, but

3    if the defense just make arguments like he just did now, and

4    like they did during this trail, it's perfectly appropriate for

5    us to address them, and that's what I'm going to do today.

6            Ladies and gentlemen, let's get right down to it.

7    It's very obvious what Mr. De Castro just tried to do.  He

8    spent the majority of his time arguing that you should find the

9    defendant not guilty because Victor Moral is a bad person,

10   because he played an important role in the crew too, like the

11   defendant.  Why is he doing that?  Because if you believe

12   Victor Moral, the defendant is guilty, case closed, plain and

13   simple.

14           Now, before I get to that argument, I just want to

15   remind you that Mr. Mukhi just described in detail all of the

16   evidence in the defendant's guilt that has nothing to did with

17   Victor Moral.  This cell site data placing him at the scene of

18   the crime in Washington Heights at the time the crime was being

19   committed, and at no other time in Washington Heights during a

20   three month period:  The phone records linking him to his

21   fellow robbers at every critical point during this conspiracy.

22   The testimony of the defendant's victims, Mr. Gilbert and

23   Ms. Ynfante, about how the defendant's red car blocked their

24   escape.  The heroin that the defendant sold out of his home.

25   The recording where the defendant outlined his means and

E6J7SER3                         Rebuttal - Ms. Maimin

1    methods for committing robberies.  There is plenty of

2    independent evidence of the defendant's guilt, and it doesn't

3    rely on Mr. Moral at all.

4         But let's talk now about how you know that Mr. Moral

5    is telling the truth.  First of all, you look at his demeanor

6    on the stand.  Look at how open he was when he was testifying

7    all about those crimes he has committed in the past:  Murder,

8    violent armed robberies.  Mr. Moral was just as open with Mr.

9    De Castro on cross-examination as he was when I was talking to

10   him.  He didn't try to hide anything about his past crimes.

11        Now, your life experiences and your common sense tells

12   you that when someone is willing to point the finger at someone

13   else but they don't want to talk about themselves, that's very

14   hard to swallow.  They're not credible if they do that.  But

15   when someone is on the witness stand in federal court, in front

16   of a federal judge and federal prosecutors and a federal

17   criminal jury, openly confessing to murder, violent robberies,

18   nearly a million dollars in cargo theft, and dealing kilos of

19   heroin and cocaine, you need to take that into consideration

20   when assessing his credibility.

21        And, by the way, how did you learn about all those

22   crimes?  He told you about them; Mr. Moral told but them.  He

23   wasn't caught on cross-examination hiding anything.  You

24   learned about his crimes from him.

25        Now, look at Mr. Moral's incentives here.  What are

E6J7SER3                        Rebuttal - Ms. Maimin

1    his incentives to tell the truth?  Is it better for him to tell

2    the truth, or is it better for him to lie?  You heard him tell

3    you himself this is the first time in his entire life that it

4    actually benefits him to tell the truth.  It is night and day

5    from his own murder trail, and it is night and day when he was

6    a confidential source in New Jersey, when he had nothing

7    hanging over his head like a 17 year mandatory minimum sentence

8    and the possibility of life in prison.  And he will get that

9    penalty.  He will spend at least 17 years in prison unless he

10   gets that 5K letter he testified about.  The judge will not

11   have any choice but to sentence him to at least 17 years in

12   prison unless he gets the letter.  And how does he get the

13   letter?  He testifies truthfully.  He meets with the government

14   and tells the truth and then he gets on the witness stand and

15   tells the truth again.

16           Now, on the other hand, if he lies, if he lies during

17   a proffer session with the government, if he lies on the

18   witness stand, the cooperation agreement gets ripped up, it's

19   over.  But what's the important part?  The guilty plea remains;

20   he is stuck with it.  He remains convicted of those serious

21   crimes, he does not get the 5K letter, and he spend at least 17

22   years in jail and as much as the rest of his life.  It is very

23   difficult to imagine a greater incentive to tell the truth than

24   that.

25           Now, Mr. De Castro argued to you that even despite his

cooperation agreement Mr. Moral somehow had to lie to save

himself, he has to pin it on the defendant to frame him.  But

Mr. Moral told you he committed crimes with a lot of people.

On cross-examination Mr. De Castro started listing them, name

after name, after name, people Mr. Moral committed crimes with

in multiple states.  Mr. Moral had plenty of people to

cooperate against; he doesn't need to frame Anthony Serrano.

That's ridiculous.  Not only does he not need to do that, but

just consider for a moment the risk he takes by doing that.

For the same reason he doesn't need to frame anybody, he would

be taking an enormous risk if he tried, because, as

Mr. De Castro pointed out on cross-examination, Mr. Moral has

committed dozens of crimes with dozens of people.  If he lies

about a particular incident, if he lies about anything, he runs

an enormous risk of one of his coconspirators walking through

the door of this courtroom, taking the witness stand and

blowing him out of the water into a 17 year sentence.  It's a

huge risk, and he is not going to take it.

          Now, what's the other major way you know that

Mr. Moral is telling the truth?  Well, what he told you is

backed up by all the other evidence in the case.

          For example, October 14, 2012, the surveillance video

matches to a tee what Mr. Moral told you happened:  The

defendant's red car -- which you know is registered to Julio

Camacho, the defendant's cousin -- was driving right in front

E6J7SER3                              Rebuttal - Ms. Maimin

of the victims, and then dropped off Kong who switched cars.

And the victims' account also matches what Mr. Moral told you

happened.  They were parked in front of that bodega and barber

shop, they were followed by a police car and blocked off in

front by the red car which dropped off one of the robbers.

          And again the cell site data backs up Moral.  He told

you that the defendant went from New Jersey to Washington

Heights to the scene of the robbery and back over the George

Washington Bridge to Kearny to ransack that car.  And that's

what the cell site shows you.  The defendant went from his home

to Washington Heights, to the scene of the robbery, at the time

of the robbery, which was the only time he went to Washington

Heights in three months, back over the GW Bridge to Kearny and

back home at the end of the night.  Now, this is proof that

Moral is telling the truth.  It's also damning evidence of the

defendant's guilt.

          By the way, what did Mr. Moral tell you about the way

the defendant operated that night?  Mr. Moral was actually

annoyed at the defendant because he was trying to call the

shots behind the scenes without taking any of the risk of

getting caught.  And you heard the defendant say in his own

words on that recording that's his MO, that's the way he

operates.

          And, by the way, if you're wondering why the

government would put someone like Victor Moral on the stand,

E6J7SER3                    Rebuttal - Ms. Maimin

1   it's because it is Victor Moral who is going to commit crimes

2   with the defendant.  We called him as our witness but it was

3   the defendant who chose to commit crimes with him.  Would the

4   government prefer to put 100 nuns and priests on the stand to

5   testify in this case?  Yes.  But nuns and priests don't tend to

6   join armed robbery crews and deal drugs.  The defendant chose

7   to be in a conspiracy with Mr. Moral; the government did not

8   choose that.

9           By the way, you will note that the defendant does not

10  want you to believe that Mr. Moral is lying about everything

11  here.  When Mr. Moral tells you about robbery after robbery

12  after robbery he committed, and about his murder, about his

13  drug dealing, Mr. De Castro wants you to believe all of that

14  testimony.  Now that Mr. Moral is telling the truth.  But when

15  Mr. Moral talks about the defendant and tells you the defendant

16  is guilty, oh, no, he's a liar, don't listen to him.  Well, you

17  can't have it both ways, ladies and gentlemen.  Mr. Moral is

18  either telling the truth or he is lying.  And you know from the

19  evidence in this case, and your common sense, that he is

20  telling the truth.

21          Now, what's another distraction that just came up?

22  Whether the defendant is a criminal mastermind.  He only had

23  one phone, he was broke, he did drug deals in broad daylight.

24  Ladies and gentlemen, no one is saying that the defendant is a

25  criminal genius.  We don't have to prove that he is a criminal

E6J7SER3                          Rebuttal - Ms. Maimin

1    genius mastermind for him to be guilty of this crime, just that

2    he is guilty of the crimes he is charged with.  And we did do

3    that.

4         Another distraction:  Mr. De Castro mentioned that

5    there was another heroin sale, February 14 sale, that the

6    defendant was not involved with.  Well, it was a different

7    stamp, right?  Fat Lady.  Different stamp.  Just because he

8    wasn't involved in one single sale does not mean he didn't sell

9    it the other times.  Distraction.

10        Now, Mr. De Castro also spent a bunch of time talking

11   about, well, this is the Javion Camacho crew, this is the

12   Victor Moral crew, Camacho is the leader, Mr. Moral is the

13   leader.  Let's just be clear, Mr. Mukhi said it, nothing to do

14   with the defendant's guilt in this case.  The government does

15   not have to prove that the defendant is a leader, is a

16   mastermind, that he called the shots.  It's irrelevant.  If he

17   agreed to commit armed robbery and deal drugs with other

18   people, he's guilty.

19        Now, we did prove that the defendant was one of the

20   leaders of the crew with his cousin Javion Camacho.  You heard

21   it from Moral.  You saw evidence of it in the phone records,

22   his constant contact with Javion Camacho -- who no one is

23   disputing is one of the leaders -- and that recording which

24   shows the defendant's method of hanging back while other people

25   do his dirty work.  That's something the boss does, not an

E6J7SER3                    Rebuttal - Ms. Maimin

underling.  But it doesn't matter either way.  The defendant

could have been at the bottom of the totem pole, he could have

been at the top of the totem pole; he's still guilty.

        By the way, there is a lot of talk about how Javion

Camacho called this his team.  Well, everyone called it their

team.  You saw that.  That's just how the members of this crew

referred to the crew, my team.  They were all members.

        Now, a related point.  Mr. De Castro was saying that

the defendant didn't go to that DEA sting on January 9.  That

was a big theme for the defendant during this trial.

Therefore, the argument is he wasn't involved in this crew at

all.

        Well, Mr. Mukhi went into detail with the phone

records and the cell site data that shows the defendant was

closely involved in planning that robbery.  He was planning it

with his cousin Javion Camacho.  He was being kept in the loop

every step of the way.  But of course he didn't go to that

robbery.  Why would he take that risk?  He wasn't willing to

show his face on a deserted street to two people during the

Washington Heights robbery.  Why is he going to go in a five

car caravan with 16 other robbers to do a massive heroin

robbery?  That is a much riskier operation, much more likely

for him to get identified and caught.

        No, it was better, it was safer for the defendant to

hang back in New Jersey, just like his normal method of doing

1    things, no need to get his hands dirty.  It was his plan never

2    to get caught, never to be in this courtroom; and going on

3    January 9 would have put that plan in jeopardy, so of course he

4    didn't go.  He didn't need to.  His team was carrying the

5    robbery out while he was behind the scenes.

6           And, by the way, you will note that nobody is

7    disputing that Jauncey Valle was involved in that robbery.  You

8    saw him on the video, and Mr. De Castro just talked about it

9    just now.  He didn't show up.  He wasn't there on January 9.

10   You don't hear Mr. De Castro saying Jauncey Valle wasn't

11   involved.  Just quite the opposite.  Again, he wants to have it

12   both ways, but he can't, because the evidence is overwhelming

13   that the defendant was involved.

14          Another distraction:  You heard Mr. De Castro talking

15   about the fact that the two victims didn't testify that they

16   actually saw a gun.  Let's just be clear about this.  I expect

17   that Judge Forrest is going to instruct you that the defendant

18   is guilty if the presence of the weapon was made known to

19   another person to intimidate that person regardless of whether

20   the weapon was directly visible to that person.  And you know

21   that weapon was made extremely clear to those two victims.

22   They both saw Javion Camacho reach for that gun, and they were

23   terrified.  Terrified.  They told you in their own words.  The

24   defendant is guilty of the gun charge.

25          Now, Mr. De Castro also spent some time talking about

1  the cell site evidence, attacking the cell site evidence.  Of

2  course, that's not surprising because the cell site evidence

3  destroys him, it's extremely damning.

4          So, what did he say?  Well, cell site evidence isn't

5  precise, it doesn't tell you exactly where a person is in a

6  particular time.  Well, that's true, it tells you where the

7  closest cell tower is when they are communicating on their

8  phone.  You also learned that in a busy city like New York

9  there can be cell site tours every two blocks.

10          But you don't need to know the exact location of the

11 defendant's phone to put two and two together about what

12 happened during this conspiracy and in particular on October

13 14, because you saw his phone traveling with his coconspirators

14 from New Jersey to Manhattan to Kearny and back.  It doesn't

15 have to be the exact pinpointed location.  The cell site

16 evidence tells you where he was.  And, by the way, Agent Perry

17 also gave you his conclusion that the defendant's phone was in

18 Washington Heights at the time of the robbery.

19          Now, let me address the issue of reasonable doubt.

20 You heard from Mr. De Castro about the government's burden to

21 prove these charges beyond a reasonable doubt and what a high

22 standard it is.  He is right, it is a high standard, and it

23 should be.  But it's not a standard the government shies away

24 from.  It's the same standard used in courthouses all across

25 this country every day.

E6J7SER3                    Rebuttal - Ms. Maimin

1          Now, to hear Mr. De Castro describe it, you might

2     think it's an impossible standard to meet, but it's not.  It's

3     not some magical standard.  It's not beyond any doubt; it's

4     beyond a reasonable doubt.  And the judge will explain to you

5     more precisely what that means.  However, I am confident you

6     can apply it as well as any jury.  There is nothing mysterious

7     about it.  It's the same reason you use in your everyday lives.

8     So, just follow the judge's instructions, using your reason and

9     common sense, and you will conclude that the defendant is

10    guilty.

11         Now I want you to just pause and think for a moment

12    about what Mr. De Castro is asking you to believe here.  He's

13    asking you to believe that the defendant is not part of this

14    robbery crew, he's completely innocent, he just has the

15    misfortune of being related to two of its most violent leaders

16    and active members.  And they're not just his cousins, they're

17    his very close cousins who he speaks to over 1,000 times in

18    less than a year, often most frequently on the days that the

19    cousins are involved in planning violent armed robberies.

20         Mr. De Castro is asking you to believe that the

21    defendant had nothing whatsoever to do with that attempted

22    robbery on January 9, he just happened to be speaking a lot

23    with his cousins on those days leading up to it and on the day.

24    The defendant had nothing to do with the Washington Heights

25    robbery.  You are asked to believe he was just coincidentally

1   at a bar in the Washington Heights area at the same exact time

2   a robbery was happening, as the same exact place the robbery

3   was happening, which just so happens -- based on the cell site

4   data -- to be the only time he is in that area in three months.

5   And he never sold heroin out of his house, he just happened to

6   be home and answer the door when somebody wanted to buy heroin,

7   and then that person left with heroin less than a minute later

8   and gave it to the F.B.I., but it wasn't the defendant who did

9   it.

10          And he is asking you to believe he is not a robber,

11   it's not his practice to let other people do his dirty work

12   while he waits around the corner.  He happened to be caught on

13   a tape saying that, but it has nothing whatsoever to do with

14   the way he operates in a robbery crew.

15          Ladies and gentlemen, this is quite a list of

16   unfortunate coincidences for the defendant.  Either he is

17   literally the unluckiest person in the world or he is guilty.

18   All of the evidence in this case and your common sense tells

19   you that he is not just a victim of many of unfortunate

20   coincidences.  He is guilty.

21          Now, Mr. De Castro also suggested to you that the

22   consequences of the defendant's crimes are somehow your

23   responsibility now, you're deciding his fate because of your

24   jury service.  That's not the case.  The defendant is

25   responsible for what he did, not you.

1          Ladies and gentlemen, some cases may be close.  This

2     is not one of them.  The evidence all points in the one

3     direction and one direction alone:  The defendant is an armed

4     robber; he is a drug dealer; he uses guns to commit these

5     crimes; and he is guilty.

6          THE COURT:  All right, thank you, Ms. Maimin.

7          Ladies and gentlemen, we are now going to have the

8     instructions on the law.  You have been sitting for about 45

9     minutes, and the instruction is going to take about an hour and

10    15.  So, the question is whether I do half, take a quick break,

11    come back and do the other half and then you have lunch

12    together -- we are bringing it into the room -- and then you

13    can deliberate over lunch, or whether or not I just go to

14    12:45, between now and 12:45, break, you have lunch, you don't

15    deliberate, we come back and finish the charge after that.

16          I am voting for option number one, but I want to check

17    with you folks, because if you folks want option number two,

18    then I will do option number two.  What do you folks things?

19    One or two?  I've got a lot of ones.  All right, I am going to

20    charge you on the instructions, give you the charge.

21          Let me start by telling you what you are going to have

22    with you in the jury room.  In the jury room you are going to

23    have with you, you can keep with you a copy of these

24    instructions.  You are welcome to mark on them if you've got a

25    pen, or not.  They will be thrown out at the end of your

1    deliberations.  They are really just here for you to follow

2    along and to refer to if you want to refer back.

3          Now, the written instructions are not what really

4    controls.  It's my voice and what you hear me say that

5    controls.  Every once in a while there will be something a

6    little bit different than what is written down, and that's

7    because of a couple of things.  One, I ad-lib a little bit,

8    having done this before but, two, sometimes I notice a mistake,

9    and I change something that's substantive.

10         So, I want you even though you are following along, I

11   want you to listen to what I'm saying and not just sort of flip

12   ahead 20 pages and just not hear me.  I want you to hear me

13   because it's what I say that controls.

14         You are also going to have all of the exhibits in the

15   jury room except for the weapons.  All right?  And also the

16   audiotapes you won't have in the jury room.  We can play the

17   audiotapes back for you, but we will do that out here.  The

18   technology for that is out here.  But you will have all of the

19   e-mails or the text messages and things of that nature with

20   you.

21         You are also going to have a copy of the verdict form.

22   Each of you will have one copy of the verdict form, and there

23   will also be an extra.  The extra is after you folks are ready

24   to render your verdict on each count, it's a clean one.  I have

25   just learned that people sometimes mark theirs up, and they

1    always ask for a clean one at the very end.

2              And you will have lunch.  That's the other thing you

3    are going to have in the jury room.

4              All right.  Now, let's go ahead and just flip to the

5    various charges.  While this is a thick document, each page has

6    its own charge or a couple of pages, and so there is a lot of

7    blank space in here, and that's why it's so thick.

8              There is a table of contents.  Just make sure you're

9    aware of that, because later on if you want to remind

10   yourselves about the elements, for instance, of Count One it

11   will give you a handy way to turn to that page.

12             Let's go to page 1, number page 1, which is

13   introductory instructions.

14             You have now heard all of the evidence in this case as

15   well as the final arguments of the lawyers for the parties.  My

16   duty now is to instruct you as to the law.  And it is your duty

17   to accept these instructions of law and apply them to the facts

18   as you determine them.

19             On these legal matters, you must take the law as I

20   give it to you.  Regardless of any opinion that you may have as

21   to what the law may be -- or ought to be -- it would violate

22   your sworn duty to base a verdict upon any other view of the

23   law than that which I give you.  If an attorney has stated a

24   legal principle different from any that I state to you now in

25   my instructions, it is my instructions that you must follow.

1   You should not single out any instruction alone stating the

2   law, but you should consider my instructions as a whole when

3   you retire to deliberate in the jury room.  And, as I said, you

4   can take a copy of these instructions with you into the jury

5   room.

6           The role for the jury is to pass upon and decide the

7   fact issues in this case.  You, ladies and gentlemen of the

8   jury, are the sole and exclusive judges of the facts.  You pass

9   upon the weight of the evidence; you determine the credibility

10  of the witnesses; you resolve such conflicts as there may be in

11  any testimony, and you draw whatever reasonable inferences you

12  decide to draw from the facts as you have determined them.

13          The evidence before you consists of the answers given

14  by witnesses and the exhibits and the stipulations that were

15  received into evidence.  In determining the facts, you must

16  rely upon your own recollection of the evidence.  I will

17  instruct you at the end of these charges about your ability to

18  request to have testimony read back and to access other

19  evidence that has been received.

20          Now, what the lawyers have said in their opening

21  statements, in any objections and in their questions, and what

22  they may say and what they have said now in their closing

23  arguments, is not evidence.  You should bear in mind

24  particularly that a question posed to a witness is never

25  evidence.  Only the answer is evidence.  If a witness affirms a

 1    particular fact in a question by answering "yes," you may

 2    consider that fact as agreed on by the witness; the weight you

 3    give to that fact is up to you.

 4              Nor are you to substitute anything that I may have

 5    said during the trial or during these instructions with respect

 6    to facts for your own independent recollection.  What I say, in

 7    other words, is not evidence.  If I have sustained an objection

 8    to a question -- and I haven't stricken any testimony -- but if

 9    I sustained an objection, then if it was after an answer, then

10    that answer is no longer part of the record.  That happened

11    very infrequently in this trial, as you folks know.

12              You should draw no inference or conclusion for or

13    against any party because of the lawyers' objections.  Counsel

14    have not only the right but the duty to make legal objections

15    when they think that such objections are appropriate.

16              Also, do not draw any inferences from any of my

17    rulings.  The rulings I have made during the trial are not any

18    indication of my views of what your decision should be as to

19    whether or not the government has proven the defendant guilty

20    of any of the crimes charged beyond a reasonable doubt.  You

21    should draw no inference or conclusion of any kind, favorable

22    or unfavorable, with respect to any witness or any party in the

23    case, because of any comment, question, or instruction of mine.

24              Now, your verdict must be based solely upon the

25    evidence, or the lack of evidence.  It would be improper for

you to consider any personal feelings you may have about the

defendant's race, ethnicity, or national origin.  It would be

equally improper for you to allow any feelings you might have

about the nature of the crimes charged to interfere with your

decision-making process.

I also want to remind you that before each of you was

accepted and sworn to act as a juror, you were asked questions

concerning competency, qualifications, fairness, and freedom

from prejudice or bias.  On the faith of those answers, you

were accepted as jurors by the parties.  Therefore, those

answers are as binding on each of you now as they were then,

and should remain so, until the jury is discharged from

consideration of this case.

Now, the fact that the prosecution is brought in the

name of the United States of America entitles the government to

no greater consideration than that given to any other party to

a litigation.  By the same token, the government is entitled to

no less consideration.

The defendant has pleaded not guilty to the charges in

the indictment.  As a result, the burden is on the government

to prove the defendant's guilt beyond a reasonable doubt.  This

burden never shifts to the defendant for the simple reason that

the law never imposes upon a defendant in a criminal case the

burden or duty of testifying, or calling any witness, or

locating or producing any evidence.

1          The law presumes a defendant to be innocent of the

2     charges.  This presumption was with the defendant when the

3     trial began and remains with the defendant unless and until you

4     are convinced that the government has proven the defendant's

5     guilt beyond a reasonable doubt.

6          So, the question naturally arises:  "What is

7     reasonable doubt?"  What does that phrase mean?  Well, the

8     words almost define themselves.  A reasonable doubt is a doubt

9     based in reason and arising out of the evidence in the case, or

10    the lack of evidence.  It is a doubt that a reasonable person

11    has after carefully weighing all of the evidence in this case.

12         Reasonable doubt is a doubt that appeals to your

13    reason, your judgment, your experience, and your common sense.

14    If, after a fair and impartial consideration of all the

15    evidence, you can candidly and honestly say that you are not

16    satisfied with the guilt of the defendant, that you do not have

17    an abiding and firm belief in the defendant's guilt; in other

18    words, if you have such a doubt as would reasonably cause a

19    prudent person to hesitate in acting in matters of importance

20    in his or her own affairs, then you have a reasonable doubt,

21    and in that circumstance, it is your duty to find the defendant

22    not guilty.

23         On the other hand, if after a fair and impartial

24    consideration of all the evidence you can candidly and honestly

25    say that you do have an abiding belief of the defendant's

guilt, such a belief as a prudent person would not hesitate to

rely upon in important matters in the permanent affairs of his

or her own life, then you have no reasonable doubt, and under

the circumstances it is your duty to find the defendant guilty.

One final word on this subject:  Reasonable doubt is

not whim or speculation.  It is not an excuse to avoid the

performance of an unpleasant duty.  Nor is it sympathy for the

defendant.  Beyond reasonable doubt does not mean a positive

certainty, or beyond all possible doubt.  After all, it is

virtually impossible for a person to be absolutely and

completely convinced of any contested fact that by its nature

is not subject to mathematical proof or certainty.  As a

result, the law in a criminal case is that it is sufficient if

the guilt of the defendant is established beyond a reasonable

doubt, not beyond all possible doubt.

Now, the defendant, Mr. Anthony Serrano, has been

formally charged in what we have all been referring to, and we

explained to you at the beginning is called an indictment.

As I instructed you at the outset of this trial, the

indictment is simply an accusation.  It is no more than the

means by which a criminal case is started.  It is not evidence.

It is not proof of the defendant's guilt.  It creates no

presumption, and it permits no inference that the defendant is

guilty of the crimes charged.

You are to give no weight to the fact that an

indictment has been returned against the defendant.

I am not going to read the entire indictment to you at this time.  In a moment, I'm going to summarize for you the charges in the indictment and then explain to you in detail the each of the crimes charged.

Now, you must consider each count in the indictment separately, and you will determine with respect to each whether the government has met its burden of proof.

Now, there are two types of evidence, direct and circumstantial evidence, and you can use both of them in reaching your verdict.  One type, direct evidence, is a witness's testimony about something that he or she knows by virtue of his or her own senses, something that the witness has smelled, touched, heard.  Direct evidence may also be in the form of an exhibit.

There are other types of evidence, and the second one is called circumstantial evidence.  Circumstantial evidence is evidence that tends to prove one fact by proof of other facts.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may explain the water on the sidewalk. Therefore, before you decide that a fact has been proven by circumstantial evidence, you must consider all the evidence in light of reason, experience, and common sense.

E6J7SER3                        Charge

1              That is all there is to circumstantial evidence.  You

2     infer based on reason, experience, and common sense from an

3     established fact the existence or the nonexistence of some

4     other fact.

5              I will give you another example, and this is the

6     deserted island example that I gave you at the beginning of the

7     case.  Let's assume that you've been alone for five very long

8     years.  One day, you see footprints in the sand, human

9     footprints, of a size several sizes larger than your own.  You

10    haven't seen a person, but based on the footprint, you are able

11    to put two and two together and determine that you are no

12    longer alone.  Someone is now on the island with you.  That

13    deduction or inference on your part is based on circumstantial

14    evidence and it constitutes your determination of a fact.

15             Many facts, such as a person's state of mind, can only

16    rarely be proven by direct evidence.  Circumstantial evidence

17    is of no less value than direct evidence.  It is a general rule

18    that the law makes no distinction between direct and

19    circumstantial evidence, but simply requires that, before

20    convicting the defendant, you, ladies and gentlemen of the

21    jury, must be satisfied of the defendant's guilt beyond a

22    reasonable doubt from all of the evidence.

23             Now, during the trial, and as I give you these

24    instructions, you have heard and will hear the term

25    "inference."  For instance, in the closing arguments, the

E6J7SER3                        Charge

1    attorneys have asked you to infer, based upon your reason,

2    experience, and common sense, from one or more established

3    facts, the existence of some other fact.  And I have instructed

4    you on circumstantial evidence and that it involves inferring a

5    fact based on other facts, your reason, and common sense.

6          What is an "inference"?  What does it mean to "infer"

7    something?  An inference is not a suspicion or a guess.  It's a

8    reasoned, logical decision to conclude that a disputed fact

9    exists based on another fact that you know exists.

10          There are times when different inferences may be drawn

11    from facts, whether proven by direct or circumstantial

12    evidence.  The government asks you to draw one set of

13    inferences, while the defense asks you to draw another.  It is

14    for you, and you alone, to determine what inference you will

15    draw.

16          The process of drawing inferences from facts in

17    evidence is not a matter of guesswork or speculation.  An

18    inference is a deduction or conclusion that you, the jury, are

19    permitted but not required to draw from the facts that have

20    been established by either direct or circumstantial evidence.

21    In drawing inferences, you should exercise your common sense.

22          Therefore, while you are considering the evidence

23    presented to you, you may draw, from the facts that you find to

24    be proven, such reasonable inferences as would be justified in

25    light of your experiences.

1          However, some inferences are not permissible.  You may

2     not infer that the defendant is guilty of participating in

3     criminal conduct merely from the fact that he was present at

4     the time the crime was being committed and had knowledge that

5     it was being committed.  Nor may you use evidence that I have

6     instructed you was admitted for a limited purpose for any

7     inference beyond that limited purpose.

8          In addition, you may not infer that the defendant is

9     guilty of participating in criminal conduct merely from the

10    fact that he associated with other people who were guilty of

11    wrongdoing or merely because he has or had knowledge of the

12    wrongdoing of others.

13         Here again, let me remind you that, whether based on

14    direct or circumstantial evidence, or upon the logical,

15    reasonable inferences drawn from such evidence, you must be

16    satisfied of the guilt of the defendant beyond a reasonable

17    doubt before you may convict the defendant of any of the crimes

18    charged.

19         Now for the important topic of evaluating testimony.

20    How do you evaluate the credibility or the believability of a

21    witness?  The answer is that you use your plain common sense.

22    Common sense is your greatest asset as a juror.  You should ask

23    yourselves, did the witness impress you as open, honest,

24    candid?  Or did the witness appear evasive or as though the

25    witness were trying to hide something?  How responsive was the

witness to the questions asked on direct examination and on

cross-examination?

If you find that a witness is intentionally telling a

falsehood, that is always a matter of importance that you

should weigh carefully.  If you find that any witness has lied

under oath at this trial, you should view the testimony of such

a witness cautiously and weigh it with great care.  It is,

however, for you to decide how much of the witness's testimony,

if any, you wish to believe.  Few people recall every detail of

every event precisely the same way.  A witness may be

inaccurate, contradictory, or even untruthful in some respects

and yet entirely believable and truthful in other respects.  It

is for you to determine whether such inconsistencies are

significant or inconsequential, and whether to accept or reject

all or to accept some and reject the balance of the testimony

of any witness.

On some occasions during this trial, witnesses were

asked to explain an apparent inconsistency between testimony

offered at this trial and previous statements.  It is for you

to determine whether a prior statement was inconsistent, and

how much weight to give that.

In evaluating credibility of the witnesses, you should

take into account any evidence that the witness who testified

may benefit in some way from the outcome of this case.  Such an

interest in the outcome creates a motive to testify falsely and

may sway the witness to testify in a way that advances his own

interests.  Therefore, if you find that any witness whose

testimony you are considering may have an interest in the

outcome of this trial, then you should bear that factor in mind

when evaluating the credibility of his or her own testimony and

accept it with great care.  This is not to suggest that any

witness who has an interest in the outcome of the case would

testify falsely.  It is for you to decide to what extent, if at

all, the witness's interest has affected or colored his or her

testimony.

        You are not required to accept testimony even though

the testimony is uncontradicted and the witness's testimony is

not challenged.  You may decide because of the witness's

bearing or demeanor, or because of the inherent improbability

of the testimony, or for other reasons sufficient to yourselves

that the testimony is not worthy of belief.  On the other hand,

you may find, because of a witness's bearing and demeanor and

based upon your consideration of all of the other evidence in

the case, that the witness is truthful.

        Thus, there is no magic formula by which you can

evaluate testimony.  You bring to this courtroom all of your

experience.  You determine for yourselves in many circumstances

the reliability of statements that are made by others to you

and upon which you are asked to rely and act in your everyday

life.  You may use the same tests here that you use in your

1    everyday lives.  You may consider the interest of any witness

2    in the outcome of this case and any bias or prejudice of any

3    such witness, and this is true regardless of who called or

4    questioned the witness.

5            A defendant in a criminal case does not have a duty to

6    testify or come forward with any evidence.  Under our

7    Constitution, a defendant has no obligation to testify or to

8    present any evidence, because it is the government's burden to

9    prove a defendant guilty beyond a reasonable doubt.  The burden

10   remains with the government throughout the entire trial and

11   never shifts to the defendant.  The defendant is never required

12   to prove that he is innocent.

13           In this case, the defendant, Anthony Serrano, chose

14   not to testify.  You must not attach any significance to the

15   fact that the defendant did not testify.  I instruct you that

16   no adverse inference against the defendant may be drawn by you

17   because he did not take the witness stand, and you may not

18   consider it in any way in your deliberations in the jury room.

19           Now, you have heard testimony from law enforcement

20   officials.  The fact that a witness may be employed as a law

21   enforcement official does not mean that his or her testimony is

22   necessarily deserving of more or less consideration, or greater

23   or lesser weight, than that of an ordinary witness.

24           At the same time, it is legitimate for defense counsel

25   to try to attack the credibility of a law enforcement witness.

E6J7SER3                        Charge

1   As I have said, it is for you -- the fact finders in this

2   case -- to determine the issues of credibility.

3           It is your decision, after reviewing all of the

4   evidence, whether to accept the testimony of the law

5   enforcement witness and to give that testimony whatever weight,

6   if any, that you find it deserves.

7           Now, you heard from a witness who testified that he

8   has committed crimes.  Let me say a few things that you want to

9   consider during your deliberations on the subject of what we

10  call cooperating witnesses.

11          Cooperating witness testimony should be given such

12  weight as it deserves in light of the facts and circumstances

13  before you, taking into account the witness's demeanor, candor,

14  the strength and accuracy of the witness's recollection, the

15  witness's background, and the extent to which the witness is or

16  is not corroborated by other evidence in the case.

17          You may consider whether the cooperating witness, like

18  any other witness called in a case, has an interest in the

19  outcome of the case and, if so, whether it has affected his or

20  her testimony.

21          You also heard testimony about an agreement between

22  the government and the cooperating witness.  I must caution you

23  that it is no concern of yours why the government made an

24  agreement with a witness.  However, the existence of the

25  agreement itself and its effect on the witness may be

E6J7SER3                    Charge

1   considered by you in determining credibility.  Your sole

2   concern is whether a witness has given truthful testimony here

3   in this courtroom.

4            In evaluating the testimony of cooperating witnesses,

5   you should ask yourselves whether the cooperating witness would

6   benefit more by lying, or by telling the truth.  Was his

7   testimony made up in any way because he believed or hoped that

8   he would somehow receive favorable treatment by testifying

9   falsely?  Or did he believe that his interests would be best

10  served by testifying truthfully?  If you believe that the

11  witness was motivated by hopes of personal gain, was the

12  motivation one which would cause him to lie, or was it one

13  which would cause him to tell the truth?  Did this motivation

14  color his testimony?

15           If you find that the testimony was false, you should

16  reject it.  However, if, after a cautious and careful

17  examination of the cooperating witness's testimony and demeanor

18  upon the witness stand, you are satisfied that the witness told

19  the truth, you should accept it as credible and act upon it

20  accordingly.

21           As with any witness, let me emphasize that the issue

22  of credibility need not be decided in an all-or-nothing

23  fashion.  Even if you find that a witness testified falsely in

24  one part, you may still accept his or her testimony in other

25  parts, or may disregard all of it.  That is a determination

1    entirely for you, the jury.

2              You have also heard testimony that the cooperating

3    witness pled guilty to charges arising out of the same facts

4    that are at issue here in this case.  You are instructed that

5    you are to draw no conclusions or inferences of any kind about

6    the guilt of the defendant on trial from the fact that a

7    government witness pled guilty to similar charges.  The

8    decision of that witness to plead guilty was a personal

9    decision that witness made about his own guilt.  It may not be

10   used by you in any way as evidence against or unfavorable to

11   the defendant here.

12             There has also been testimony before you about the use

13   of informants.  Informants are frequently used by the

14   government to obtain leads and to gain introduction to people

15   suspected of violating the law.  There are certain types of

16   crimes where, without the use of informants, detection would be

17   extremely difficult.  Because this law enforcement technique is

18   lawful, your personal views on its use -- whether you approve

19   or disapprove -- is beside the point and must not affect the

20   evaluation of the evidence in this case.

21             Now, yesterday I gave you a special instruction

22   relating to that last audio recording that you heard, and I am

23   going to give you now another special instruction on that same

24   audio recording and also on some additional earlier evidence

25   that you heard in the case regarding the earlier cargo theft,

1   the one where Mr. Moral mentioned an earlier cargo theft before

2   2012 relating to the defendant.

3          The government has offered evidence regarding the

4   defendant's participation, on July 28, 2013 in the planning of

5   a burglary and a cargo theft, and his participation in the sale

6   of stolen cargo with Victor Moral in or about 2010 and 2011.

7   As I said yesterday, the defendant is not here on trial for

8   these acts.  Accordingly, you may not consider this evidence as

9   a substitute for proof that the defendant committed any of the

10  crimes with which he is charged in the indictment, nor may you

11  consider this evidence as proof that he has a criminal

12  personality or bad character.

13         The evidence was admitted for a much more limited

14  purpose, and you may consider it for that limited purpose only.

15  You may but are not required to draw an inference from the

16  evidence regarding the defendant's alleged participation on

17  July 28, 2013 in the planning of a burglary and a cargo theft

18  that the defendant had a particular way of doing things, or

19  "modus operendi," MO, with respect to the crimes charged in the

20  indictment.  In addition, you may but are not required to

21  consider the evidence that the defendant participated in the

22  sale of stolen cargo in or about 2010 or 2011 with Victor Moral

23  as background evidence to the development of the relationship

24  between the defendant and Victor Moral.  It's actually 2010 and

25  2011.  I put an "or" there, and it should be an "and".  This

1   evidence may not be considered by you for any other purpose.

2   Specifically, you may not use this evidence to conclude that

3   the defendants must have committed the crimes charged in the

4   indictment.

5           Now, you may not draw any inference, favorable or

6   unfavorable, towards the government or the defendant on trial,

7   from the fact that certain persons were not named as a

8   defendant in the indictment.  The fact that these persons are

9   not here on trial now must play no part in your deliberations.

10          Whether a person should be named as a coconspirator or

11  indicted as a defendant in this matter is within the sole

12  discretion of the United States Attorney and the grand jury.

13  Therefore, you may not consider it in any way in reaching your

14  verdict as to the defendant here on trial now.

15          Now, you heard evidence during the trial that

16  witnesses have discussed the facts of the case and their

17  testimony with the government lawyers or his or her own lawyer

18  before the witness appeared in court.

19          Although you may consider that fact when you are

20  evaluating a witness' credibility, I instruct you that there is

21  nothing either unusual or inherently improper about a witness

22  meeting with government lawyers or his own lawyers before

23  testifying so that the witness can be aware of the subjects he

24  or she will be questioned about, to focus on those subjects,

25  and have the opportunity to review relevant exhibits before

E6J7SER3                        Charge

1    being questioned about them.  Such consultation helps conserve

2    time, your time and the court's time.  In fact, it would be

3    unusual for a lawyer to call a witness without such

4    consultations.

5            The weight you give to the fact or the nature of the

6    witness's preparation for his or her testimony and what

7    inferences you draw from such preparations are completely

8    matters within your discretion.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Now, you've heard reference throughout

2     questioning to the fact that certain investigative techniques

3     were used by the government.  There is no legal requirement

4     however that the government prove its case through any

5     particular means.  While you are to carefully consider the

6     evidence adduced by the government you are not to speculate as

7     to why law enforcement authorities used the techniques they

8     did.  Your concern is whether or not on the evidence or lack of

9     evidence the defendant's guilt has been proven beyond a

10    reasonable doubt.

11         You have heard tape recordings of telephone

12    conversations.  There is nothing illegal about the government's

13    us of recordings and the tapes and you may consider the

14    conversations contained on the tape recordings along with all

15    of the other evidence in this case.  Whether you approve or

16    disapprove of the interception of recordings of these

17    conversations may not ent into your deliberations.

18         You must therefore, regardless of any personal opinion

19    give this evidence full consideration along with all the other

20    evidence in the case in determining whether the government has

21    proven beyond a reasonable doubt the guilt of the defendant.

22         The parties have shown you typed transcripts and

23    subtitles of certain audio recordings.  The recordings

24    themselves as I have told you, those are what have been

25    received into evidence.  The transcripts and the subtitles are

1    not evidence.  They were provided to you as an aid or guide to

2    assist you in listening to the recordings.  As you may recall,

3    when the recordings were played I advised you to listen very

4    carefully to the record themselves.  You alone should make your

5    own interpretation of what you heard on recordings.  If you

6    think you heard something different from what was typed on the

7    transcript or in the subtitle, then what you heard is

8    controlling.

9           You also heard testimony from one expert witness.

10   Such a witness is permitted to express his opinion on matters

11   about which he has specialized knowledge and training.  The

12   parties present expert testimony to you on the theory that

13   someone who is experienced in the field can assist you in

14   understanding the evidence or in reaching an independent

15   decision on the facts.  In weighing an expert's testimony you

16   may consider the expert's qualifications his opinions and his

17   reasons for testifying as well as all the other considerations

18   that ordinarily apply including all the other evidence in the

19   case.  You may give expert testimony whatever weight, if any,

20   that you find it deserves in light of all of the other evidence

21   in the case.  However, you should not accept witness testimony

22   simply because the witness happens to be an expert.  Nor should

23   you substitute such testimony for your own reasons, judgment

24   and common sense.  The determination of the facts in this case

25   rests solely with you.

1           Now, you did hear read certain stipulations of fact.

2      A stipulation of fact is an agreement among the parties that a

3      certain fact is true and you should regard such agreed fact as

4      true.

5           You also heard the name of several people during the

6      course of the trial who did not appear here to testify and one

7      or more of the attorneys may have referred to their absence.  I

8      instruct you that each party had an equal opportunity or lack

9      of opportunity to call any of these witness.  However, the

10     government bears the burden of proof in this trial.  The

11     defendant does not bear the burden of proof.  Therefore, you

12     should not draw any inference or reach any conclusion as to

13     what these persons would have testified had they been called.

14     Their absence should not affect your judgment in any way.  You

15     should however remember my instruction that the law does not

16     impose on a defendant in a criminal case the burden or duty of

17     calling any witnesses or producing any evidence.

18          Now, let's take just a short five-minute break, just a

19     very quick break just to sort of stretch your legs, use the

20     facility if you need to and then get right back to the doors so

21     Joe can come and get you.  We'll finish the instructions and

22     then you'll be sent into the room to deliberate.  Now you are

23     not yet at the point when you can discuss the case.  So, in

24     these quick few minutes don't discuss the case with each other.

25     Thank you.

1          (Jury not present)

2          THE COURT:  Ladies and gentlemen, I have just two

3    quick matters.

4          One is that I have changed the verdict form slightly.

5    I realized when it was being reviewed during Mr. Mukhi's

6    summation that Question 1B should be modified slightly.  It

7    stated before if you checked "yes" in response to the prior

8    question you may move on to the next count.  I have struck the

9    word "count" and inserted the following:

10         Question (1C) regarding cocaine, and then it

11   continues.  Because even if they answer the heroin question

12   however they answer it, they still need to go on to the cocaine

13   question, all right.

14         Also, similarly in Count Three I changed the comma, I

15   inserted the word "or".  Only consider Count Three if you have

16   fund the defendant guilty on Count One or Count Two or both.

17   All right.  Those are the two changes I've made.  Are they

18   acceptable?

19         MR. DE CASTRO:  Yes.

20         MR. MUKHI:  Yes, your Honor.

21         THE COURT:  All right.  Now, I also modified a little

22   by bit of language as I was going along to conform to how

23   things, in fact, came in and what, in fact, seemed to be

24   relevant.  They were some minor changes but you probably heard

25   them if you were following along.  Does anyone have any

1    exceptions as to what I have said so far or anything else?

2              MS. MAIMIN:  No, your Honor.

3              MR. DE CASTRO:  No, your Honor.

4              THE COURT:  All right.  Let's take a very short break

5    and we'll come on back.  Thank you.

6              (Recess)

7              THE COURT:  Why don't you find out from them if it's

8    OK if we run till 1:15.  If not then we'll run to one o'clock

9    and then stop.

10             (Pause)

11             COURTROOM DEPUTY:  They would like to go straight

12   through.

13             THE COURT:  All right.  Go ahead and bring the jury

14   out.

15             (Jury present)

16             THE COURT:  All right.  Ladies and gentlemen, let's

17   all be seated again and we're picking up on page 30 if you are

18   following along in the written instructions.  And we're at the

19   summary of the indictment.

20             The defendant Anthony Serrano as you know has been

21   formal charged in the document as we called an indictment.  And

22   as I instructed you at the outset of this case the indictment

23   is not proof of anything.  It's just a charge or accusation.

24   Here the indictment contains three counts, two of the counts

25   charge conspiracies and one count relates to a firearm.  Each

E6JAASER4                    Jury Charge

of those counts constitutes a separate crime and you have to

consider each separately.  So you'll consider them Count One,

Count Two, Counsel Three that's what the verdict form will lead

you through.

Now, Count One charges Anthony Serrano with

participating in a conspiracy to distribute or possess with

intent to distribute a controlled substance.  Here, heroin

and/or cocaine.  That conspiracy is alleged to have existed

from at least in or about 2012 up through an including July 31,

2013.

Count Two charges Serrano with participating in a

conspiracy to commit a robbery, the object of which was to rob

individuals believed to be engaged in narcotics trafficking.

That conspiracy is also alleged to have existed during the same

time period.

Count Three charges Serrano with carrying a firearm

during and in relation to or possessing a firearm in

furtherance of the narcotics conspiracy charged in Count One

and the robbery conspiracy charged in Count Two or aiding and

abetting another doing the same.

Now it can be either Count One or Count Two.  So for

Count Three, the firearms count, we'll go through it but it can

relate to either Count One or Count Two and I'll discuss the

elements for each of these in a moment.

As I said, Count One charges the defendant with

1    participating in a conspiracy to violate the narcotics laws of

2    the United States.  In order to find the defendant guilty of

3    this count you have to find that the government has proven

4    beyond a reasonable doubt the following two elements:

5           First, that the conspiracy charged in the indictment

6    existed, that is, an agreement or understanding between two or

7    more persons existed from in or about 2012 through on or about

8    July 31, 2013 to achieve some unlawful end, that is, to do

9    something.  The unlawful end is what we call the object of the

10   conspiracy.  Every conspiracy has to have one or more objects

11   or goals.  In Count One the object charged is that the

12   defendant and others intentionally and knowingly agreed to

13   distribute or to possess with intent to distribute a controlled

14   substance here, heroin and or cocaine.  Therefore, the first

15   question for you is did the conspiracy alleged in the

16   indictment exist?  Was there such a conspiracy?

17          Second, the government must prove beyond a reasonable

18   doubt that the defendant intentionally and knowingly became a

19   member of the conspiracy charged, that is, that he knowingly

20   participated in the conspiracy to distribute or possess with

21   the intent to distribute narcotics with knowledge of its object

22   and with an intent to further the aims of the conspiracy.

23          Before I explain the elements of the conspiracy in

24   greater detail, let me make one point.  In considering a

25   conspiracy charge you do not have to find that the actual

crime, the substantive crime, that is the object of the

conspiracy has been committed, here, an actual distribution or

possession with intent to distribute narcotics or an actual

robbery, that would be the substantive crime.  In a conspiracy

case it's the agreement itself, the agreement or the

understanding itself with others to commit the crime that is

the crime, along the other elements of the conspiracy.  And

that's what the law for bids.  So it's not whether or not it

was completed or achieved or successful.  It's whether there

was an agreement or understanding to achieve that unlawful end,

whether the unlawful end was in fact achieved or not.

         Now, how do you determine whether or not a conspiracy

existed?  Simply defined a conspiracy is an agreement between

two or more people to violate the law.  A conspiracy has

sometimes been called a partnership for criminal purposes in

which each partner becomes the agent of every other partner.

To establish the existence of a conspiracy, however, the

government is not required to show that two or more people sat

around a table and entered into a formal contract.  Indeed, it

would be extraordinary if there was such a formal document or

specific agreement.  From its very nature a conspiracy is

almost always characterized by secrecy and concealment.  It is

sufficient if two more persons in any manner whether they say

so directly or not come to a common understanding to violate

the law.  Expressed language or specific words are not required

1    to indicate agreement to or membership in a conspiracy.

2            It is not necessary that a conspiracy actually succeed

3    in its purpose for you to conclude that it existed.  If a

4    conspiracy exists, even if it should fail in its purpose it is

5    still a crime.  In determining whether there has been an

6    unlawful agreement you may judge the acts and conduct of the

7    alleged members of the conspiracy that are done to carry out an

8    apparent criminal purpose.  The adage "actions speak louder

9    than words" is applicable here.

10           If upon consideration of all the evidence, direct and

11   circumstantial and you find beyond a reasonable doubt that the

12   minds of two or more conspirators met, we sometimes call this a

13   meeting of the minds, that is that they agreed as I have

14   explained a conspiratorial agreement to you to work together in

15   furtherance of the unlawful scheme alleged in the indictment,

16   then proof of the existence of that conspiracy is established.

17           So, for Count One let's talk about the object of the

18   conspiracy.  As said in order to find the defendant guilty of

19   the conspiracy charged in the indictment, and, again, you've

20   got one type of conspiracy in Count One and another conspiracy

21   in Count Two, you must find that the government has also met

22   its burden of proof with respect to what it has charged or

23   asserted was the object or the goal of the conspiracy.

24           Put another way, what did the conspirators want to

25   achieve?  What was their unlawful end?  In Count One the

1    government charges that the object or goal of the conspiracy

2    was either to distribute or to possess with intent to

3    distribute a controlled substance here, heroin and/or cocaine

4    and they are controlled substances.

5           Thus, to find that the government has met its burden

6    of proof with respect to Count One the government must prove

7    that a goal or object of the conspiracy, again, whether it

8    succeeded or not was the goal of distributing or possessing

9    with intent to distribute heroin and/or cocaine.  To distribute

10   means just that, to distribute.  When one has the object or

11   goal to distribute something to someone else, one has the

12   object or goal of transferring it.  Possession also means just

13   that, to have possession or to possess something.  Now to have

14   the object to possess or to have custody or control something

15   such as a controlled substance, does not mean that it has to

16   physically be on someone's person.  And more than one person

17   can possess the same thing.  The key is that to have the object

18   to possess something means a person must have the object of

19   exercising some control over it.

20          If you have determined that the object of the

21   conspiracy was to possess a controlled substance you must then

22   make a determination as to the drug types and quantities.  I'll

23   talk about that more in a moment.  In making your determination

24   about the type and quantity of any controlled substance

25   involved in the conspiracy charged in Count One you should

1    include whatever type and quantity of controlled substance were

2    involved in any act or acts in which the defendant personally

3    and directly participated.  That is, if you find that the

4    defendant directly and personally participated in a jointly up

5    undertaken drug transaction, he is personally responsible for

6    the full quantity of drugs involved in that transaction,

7    whether or not he knew the specific type or quantity involved

8    in the transaction and whether or not the type and quantity

9    were reasonably foreseeable to him.

10           In making your determination about type and quantity

11   however, you should also include any other controlled

12   substances, the conspiracy involved so long as the type and

13   quantity were either known to the defendant or reasonably

14   foreseeable to him and within the scope of the criminal

15   activity that he jointly undertook.  Reasonably foreseeable

16   means that the defendant could have reasonably anticipated the

17   type and quantity of drugs involved in the conspiracy.  I am

18   going to come back to quantity in a moment.

19           If you find that the object of the conspiracy charged

20   in this count was to possess a controlled substance, then you

21   must decide whether the object of the conspiracy included an

22   intent to distribute it.  In order to establish this element

23   the government must prove beyond a reasonable doubt that an

24   object of the conspiracy was to control the controlled

25   substance with the purpose of or intention of transferring it

1    to another person.  Here again, you must determine that the

2    government has demonstrated the defendant intended to

3    distribute a quantity of heroin and/or cocaine.

4            Now, let me be clear, the government need only prove

5    that the object of the conspiracy was to distribute the

6    controlled substance or to possess the controlled substance

7    with the intent to distribute it.  The government can but need

8    not prove both.  You must however be unanimous as to which

9    object was proven beyond a reasonable doubt.  If you find

10   beyond a reasonable doubt that the conspiracy charged in Count

11   One of the indictment existed then you must determine whether

12   the defendant intentionally and knowingly became a member of

13   that conspiracy.

14           You must determine not only whether the defendant

15   participated in the conspiracy but also whether he did so

16   intentionally and knowingly.  That is, did he participate in

17   the conspiracy with knowledge of its unlawful purpose and with

18   the specific intention of furthering the objective of the that

19   conspiracy?

20           Knowledge is a matter inference from facts proved.  A

21   person acts intentionally and knowingly if he acts purposefully

22   and deliberately and not because of mistake or accident, mere

23   negligence or other innocent reason.  That is, the acts must be

24   the product of the defendant's conscious objective.

25           If you find that the conspiracy existed, that is the

1    element that we discussed a few moments ago and that the

2    defendant participated intentionally and knowingly in it, the

3    extent of the defendant's participation has no bearing on

4    whether or not he is guilty.  The fact that a defendant's

5    participation in a conspiracy was more limited than that of a

6    co-conspirator should not affect your verdict.

7               Ultimately, the question is this.  Has the government

8    proven beyond a reasonable doubt that the defendant joined the

9    conspiracy charged in the count you are considering, that he

10   intentionally and knowingly participated in it with the

11   awareness of its basic purpose and as something he wished to

12   bring about?

13              So let's talk more about extent of participation.

14              As I just said, the extent of the defendant's

15   participation in the conspiracy charged in the indictment has

16   no bearing on the issue of the defendant's guilt.  He need not

17   have joined the conspiracy at the outset.  But he must at some

18   point during its progress have joined the conspiracy with

19   knowledge as to its general scope and purpose.

20              If he did join with such knowledge at any time while

21   it was in progress he may still be held responsible for all

22   that was done before he joined and all that was done during the

23   conspiracy's existence while he was a member.  Indeed, each

24   member of the conspiracy may perform separate and distinct acts

25   and may perform them at different times.  Some conspirators

1  play major roles while others play minor parts in the scheme.

2  An equal role is not what the law requires.  In fact, even a

3  single act may be sufficient to draw the defendant within the

4  ambit of the conspiracy.

5       I want to caution you however, that the defendant's

6  mere presence at the scene of an alleged crime does not by

7  itself make him a member of the conspiracy.  Similarly, mere

8  association with one or more members of the conspiracy even

9  coupled with knowledge that such other person is acting

10  unlawfully does not automatically make the defendant a member.

11  A person may know, be related to or be friendly with a

12  conspirator without being a conspirator himself.  Mere

13  similarity of conduct or the fact that the defendant may have

14  assembled together with others and discussed common aims and

15  interests does not necessarily establish proof of the existence

16  of a conspiracy.  I also want to caution you that mere

17  knowledge or acquiescence without participation in the unlawful

18  plan is not sufficient.

19       Moreover, the fact that the acts of the defendant

20  without knowledge merely happen to further the purposes or

21  objectives of the conspiracy does not make the defendant a

22  member.  More is required under the law.  What is necessary is

23  that the defendant must have participated with knowledge of at

24  least some of the purposes or objectives of the conspiracy and

25  with the intention of aiding in the accomplishment of those

1    unlawful ends.

2           In sum, you must decide that with an understanding of

3    the unlawful character of the conspiracy the defendant

4    intentionally engaged, advised or assisted in the conspiracy

5    for the purpose of furthering the illegal undertaking.  If you

6    make this determination, the defendant thereby became a knowing

7    and willing participant in the unlawful agreement, that is to

8    say a conspirator.

9           Now, in the event you find that the government's

10   proven beyond a reasonable doubt that the defendant is guilty

11   of the crime charged in Count One, that's the narcotics

12   conspiracy, then there are three more questions you have to

13   answer concerning the quantity of the controlled substance that

14   the defendant agreed to distribute with the other members of

15   the conspiracy charged in Count One.

16          Number one, did the government prove beyond a

17   reasonable doubt that the defendant conspired to distribute or

18   possess with intent to distribute one kilogram or more of

19   heroin?

20          So that has both the quantity and a type.

21          Two, did the government prove beyond a reasonable

22   doubt that the defendant conspired to distribute or possess

23   with intent to distribute 100 grams or more of heroin?

24          Three, did the government prove beyond a reasonable

25   doubt that the defendant conspired to distribute or possess

1    with intent to distribute 500 grams or more of cocaine?

2              So, the first two relate to heroin.  The last one

3    relates to cocaine.

4              The verdict form has boxes on it that will lead you

5    through each of those questions and we'll have a box to check.

6    So it will specify the questions for you, all right.

7              Now, as I stated, Count Two charges the defendant with

8    participating in a different conspiracy, a conspiracy or I

9    should say a separate conspiracy.  So there's three different

10   counts.  Count One is a narcotics conspiracy.  Count Two is the

11   robbery conspiracy and Count Three is the firearms charge.

12             So Count Two is a conspiracy to commit armed robbery

13   of individuals believed to be engaged in narcotics tracking.

14   That is, who had a quantity of heroin and/or cocaine.  To find

15   the defendant guilty of this count you must find that the

16   government has proven beyond a reasonable doubt the following

17   two elements:

18             First, that this conspiracy as charged in the

19   indictment existed, that is an agreement or understanding

20   between two or more persons existed from in or about 2012

21   through on or about July 31, 2013, to intentionally and

22   knowingly commit a robbery.

23             Second, that the defendant intentionally and knowingly

24   became a member of that conspiracy.

25             Again, the first element that the government must

prove beyond a reasonable doubt to establish this conspiracy is

that two or more people entered the unlawful agreement charged

in the indictment.  In other words, with respect to Count Two

the government must prove that there was, in fact, an agreement

or understanding to violate those provisions of law which make

it illegal to rob individuals believed to be engaged in

narcotics tracking.

          I've already instructed you with respect to Count One

on how you should consider whether a particular conspiracy

existed and you should apply those instructions to Count Two as

well in terms of finding whether the conspiracy existed.

          I've also instructed you that an object of conspiracy

is an illegal goal or object that the co-conspirators agree to

achieve.  In Count Two the government has alleged that the

defendant joined a conspiracy, the goal of which was to commit

one or more robberies.  Robbery is defined as the unlawful

taking personal property from another against his or her will.

This is done by threatening or actually using force, violence

or fear of injury immediately or in the future as to person or

property.  In order to find that the defendant has conspired to

commit robbery you must find that the government has proven

beyond a reasonable doubt that the defendant participated in a

conspiracy to one, obtain or take personal property from

another or are the presence of another; two, against the

intended victim's will by actual or threatened force, violence

1    or fear of injury, whether immediate or in the future; and

2    three, these actions would have been in any way or degree

3    obstructed delayed or affected interstate commerce.  And I will

4    now explain these three elements to you in greater detail.

5        The first element of the crime of robbery is the

6    obtaining or taking of personal property of another or from the

7    presence of another.  The term "property" includes tangible and

8    intangible things of value.  In this case the government

9    alleges that the property involved in the conspiracy charged in

10   count Two Was narcotics, specifically, heroin and/or cocaine.

11       The second element of the crime of robbery is the

12   unlawful taking of the property involved against the victim's

13   will by actual or threatened force, violence or fear of injury

14   whether immediate or in the future.  There must be some nexus

15   or connection between the threat or use of force and the taking

16   of property.

17       In considering whether there was a conspiracy to use

18   or threaten to use force, violence or fear you should give

19   those words their common and ordinary meaning and understand

20   them as you normally would.  The violence would not have to be

21   directed at the person whose property was taken.  The use of a

22   threat of force or violence might be aimed a third person or at

23   causing economic rather than physical injury.  Fear is if at

24   least one victim would experience anxiety, concern or worry

25   over expected personal harm or business loss.  The potential

existence of fear must be determined by the facts existing at

the time of the conspiracy.

Your decision whether there was a conspiracy to use

force or threatened fear of injury involves a decision about

what the victim as state of mind would have been at the time of

the agreed upon actions.  It is obviously impossible to

ascertain or prove directly what a person's subjective feeling

would be.  You cannot look into a person's mind to see what his

or her state of mind would be.  But a careful consideration of

the circumstances and evidence should enable you to decide

whether fear would reasonably have been the victim's stated of

mind.

It is not necessary that the fear would be a

consequence of a direct threat.  It's sufficient that the

surrounding circumstances would have rendered the victims' fear

reasonable.  You must find that a person would have been

fearful in the circumstance.

If you decide that the defendant conspired with one or

more people to obtain another's properly against his will by

the use or threat of force, violence or fear of injury, you

must then decide for this count whether this agreed upon action

that is, the robbery of heroin and or cocaine, would have been

affected interstate or foreign commerce in any way or degree.

That is, you must determine whether had the robbery occurred

there would have been be an actual or potential effect on

1   commercial between any two are more states or on commerce

2   within one state that goes through any place outside the state

3   including another state or a foreign country.

4        The requirement of showing an effect on commerce

5   involves only a minimal burden of proving a connection to

6   interstate or foreign commerce and is satisfied by conduct that

7   affects commerce in any way or degree.  For example, if the

8   object of a robbery was items which traveled or went through

9   interstate commerce that would be sufficient effect on

10  interstate commercial.  Even a potential or subtle effect on

11  interstate commerce will suffice.

12       Let me give you some real world examples of affecting

13  interstate commerce.  By ordering a book from Amazon.com and

14  that book is made in California and shipped to Amazon's

15  warehouse in Minnesota and then shipped to New York, that's

16  effecting interstate commerce.  The book has traveled through

17  various states in commerce.

18       If two people conspire to steal bananas shipped into

19  New York from the Caribbean they are conspiring to effect

20  interstate commerce because the bananas traveled in interstate

21  commerce.

22       If decide that interstate or foreign commerce would

23  potentially or probably be effected if the charged conspiracy

24  had successfully completed its object then the elements of

25  effecting interstate commerce is satisfied.  Because this is a

conspiracy case it is unnecessary that you find that interstate

or foreign commerce was actually effected, only that it would

have been if the conspiracy had succeeded.  Moreover, the

defendant need not have intended or anticipated an effect on

interstate or foreign commerce.  You may find that this element

is satisfied if the effect on interstate commerce would have

been a natural consequence of actions he agreed with others to

undertake.

If you find beyond a reasonable doubt that the target

of the robbery related to something that moved in interstate or

foreign commerce, then this element will have been met.

When considering this element it is important for you

to know that commerce effected or potentially effected need not

be lawful.  Activities effecting or potentially effecting

unlawful interstate activity such as drug dealing and

trafficking may fall within the purview of the statute if the

other elements which I have explained to you are established.

Therefore, if you find that the conspiracy involved

robbing controlled substances and you find that the controlled

substances traveled or would have had to have been traveled to

get to New York in interstate or foreign commerce, then you may

find that element is satisfied.

In addition, this element may be met when the object

of a planned robbery did not actually exist.  For example,

drugs in a sting operation as long as you find that the

government has proven beyond a reasonable doubt that the

defendant joined a conspiracy that would have affected

interstate commerce if the conspiracy had been successful as

planned.

Now if you conclude that the government has proven

beyond a reasonable doubt that the robbery conspiracy in Count

Two existed you must determine whether or not the defendant

joined that conspiracy knowing its unlawful purpose and to

further its unlawful objective.  Here, the alleged purpose of

the conspiracy was to rob individuals believed to be engaged in

narcotics trafficking.  I have already instructed you about how

one joins or participate in a conspiracy and you have those

same instructions here as well.

Now when people enter into a conspiracy to accomplish

an unlawful end each and every member of the conspiracy becomes

an agent for the other conspirators in carrying out the

conspiracy.  Accordingly, the reasonably foreseeable acts,

declarations, statements and omissions of any member of the

conspiracy and in furtherance of the common purpose of the

conspiracy are deemed under the law to be the acts of all the

members and all the members are responsible for such acts,

declarations, statements and omissions.

If you find beyond a reasonable doubt that the

defendant was himself a member of the conspiracy charged in the

indictment then any acts done or statements made in furtherance

1    of the conspiracy by persons also found by you to have been

2    members of that conspiracy may be considered against the

3    defendant.  This is so even if such acts were done and

4    statements were made in the defendant's absence and without his

5    knowledge.

6             However, before you may consider the statements or

7    acts of a co-conspirator in deciding the issues of the

8    defendant's guilt you must first determine that the acts and

9    statements were made during the existence and in furtherance of

10   the unlawful scheme.  If the acts are done or the statement

11   made by someone whom you do not find to have been a member of

12   the conspiracy or if they were not done or said in furtherance

13   of the conspiracy they may be considered by you as evidence

14   only against the member who did or said them.

15            Finally, I will talk to you about Count Three, the

16   firearms offense.  Count Three charges a firearms offense

17   connected to either the narcotics conspiracy charged in Count

18   One and/or the robbery conspiracy charged in Count Two.  This

19   means that you cannot consider Count Three unless you first

20   determine that the defendant, Anthony Serrano, is guilty either

21   of the narcotics conspiracy charged in Count One or the robbery

22   conspiracy charged in Count Two or both.

23            Count Three also charges the defendant with aiding and

24   abetting the carried or possession of a firearm as well as the

25   brandishing a firearm in connection with Counts One and/or Two.

1        I will explain these concepts right now.

2        To meet its burden of proof with respect to Count

3   Three beyond a reasonable doubt the government has to prove the

4   following three elements:

5        First, that on or about the dates alleged in the

6   indictment the defendant either used, carried, or possessed a

7   firearm or aided and abetted the use, carrying or possession of

8   a firearm by someone else.

9        Second, that the defendant used or carried the firearm

10   or aided and abetted another's use or carrying of the firearm,

11   during and in relation to the specified crimes charged in

12   either Counts One or Two or that the defendant possessed a

13   firearm or aided and abetted another in the possession of the

14   firearm in furtherance of those same crimes, the conspiracies

15   of Counts One or Two.

16        Third, that the defendant acted knowingly.

17        And I am now going to review these elements for you.

18        As I mentioned, the first element the government has

19   to prove beyond a reasonable doubt in Count Three is that on or

20   about the dates set forth in the indictment the defendant used,

21   carried or possessed a firearm or aided and abetted the same.

22        I am now going to describe these terms for you.

23        A firearm is commonly known as a gun.  It is defined

24   as any weapon which will or is designed or may readily be

25   converted to expel a projectile i.e. a bullet by the action of

an explosive.  In considering the specific elements of whether

the defendant used or carried or possessed a firearm, it does

not matter whether the firearm was loaded or operable at the

time of the crime.  Operability is not relevant to your

determination of whether a weapon qualifies as a firearm.

        To show the defendant carried a firearm the government

must prove beyond a reasonable doubt that the defendant had the

weapon within his controls so that it was available in such a

way that it furthered the commission of the crime.  The

defendant need not have held the firearm physically that is,

have had actual possession of it on his person.  If you find

the defendant had dominion and control over the place where the

firearm was located and had the power and intention to exercise

control over the firearm and that the firearm was immediately

available to him in such a way that it furthered the commission

of the crime of violence or drug trafficking, you may find the

government has proven that the defendant carried the weapon.

        I have a pen in my hand.  There should be no doubt

that I physically possess this pen.

        Let's say I brought it in my book bag with my personal

items in it and I left it on my clerk's desk.  I don't

physically possess the bag in my hand but I have control over

it.  So I can be said to possess it jointly with my clerk.

        One more example.  Say my grandmother had left me some

jewelry when she died and it is now sitting in a safety deposit

1    box at the bank.  My siblings and I are the only people who can

2    get into that box.  Do we have possession of the jewelry?

3    Absolutely, we have possession of it even though it is in a

4    safety deposit box inside a bank and not in our hands or even

5    in our homes.

6            Possession of a firearm in furtherance of a crime of

7    violence or of a drug tracking crime requires the defendant

8    possessed a firearm and that the possession advanced or moved

9    forward the crime.  The mere presence of a firearm is not

10   enough.  Possession in furtherance requires that possession be

11   incident to an essential part of the crime.  The firearm must

12   have played some part in furthering the crime in order for the

13   elements to be satisfied.

14           Let's talk about aiding and abetting.

15           As I mentioned the defendant is also charged with

16   aiding and abetting in the firearms count which is Count Three

17   with which he's been charged.  Accordingly, it would be

18   sufficient for this element and for this charge if the

19   defendant aided and abetted another person in the carrying and

20   possession of a firearm.  Under this law it is not necessary

21   for the government to show that a defendant himself physically

22   committed the crime with which he is charged in order for you

23   to find him guilty.  Thus, if you do not find beyond a

24   reasonable doubt that the defendant himself committed the crime

25   charged you may under certain circumstances still find the

1    defendant guilty of that crime as an aider or abettor.  A

2    person who aids or abets another to commit an offense is just

3    as guilty of that offense as if he committed it himself.  As

4    you could see the first requirement is that another person has

5    committed the crime charged, that is another person committed

6    every element of Count Three as I just described them.

7         Obviously, no one can be convicted of aiding and

8    abetting the criminal acts of another if no crime was committed

9    by the other person in the first place but if you do find that

10   a crime was committed, then you must consider whether the

11   defendant has aided and abetted the commission of that crime.

12   In order to aid or abet another to commit a crime it is

13   necessary that a defendant willfully and knowingly associate

14   himself in some way with the crime and that he willfully and

15   knowingly seeked by some act to help make the crime succeed.

16        Participation in a crime is willful if the action is

17   taken voluntarily and intentionally.  That is to say with a bad

18   purpose either to disobey or to disregard the law.  I have

19   already defined the term "knowingly" and you should apply that

20   term here and that definition here.  The mere presence of a

21   defendant where a crime is being committed, even coupled with

22   knowledge by a defendant that a crime is being committed or the

23   mere acquiescence by a defendant in the criminal conduct of

24   others even with guilty knowledge is not sufficient to

25   establish aiding and betting.

1          An aider and bettor must have some interest in the

2     criminal venture.  In order to convict the defendant of aiding

3     and abetting the another's use, carrying and possession of a

4     firearm you must find that the defendant actively

5     participated -- strike that word first.  Let me do that again.

6          in order to convict the defendant of aiding and

7     abetting another's use, carrying or possession a firearm you

8     must find that the defendant activity participated in the

9     underlying drug trafficking or violent crime with advanced

10    knowledge that a co-conspirator would use or carry a gun during

11    a crime's commission.  When I am talking about violent crime

12    here, I am referring to the robbery in Count Two, the

13    conspiracy robbery.

14          It is not enough to find that the deaf performed an

15    act to facilitate or encourage the commission of the underlying

16    crime of violence or a drug trafficking crime with only the

17    knowledge that a firearm would be used or carried in the

18    commission of that crime.  Instead, you must find that the

19    defendant performed some act that facilitated or encouraged

20    actual carrying, use or possession of a firearm in relation to

21    the underlying crime and that he had advanced knowledge that a

22    firearm would be present during the crime.  For example, if you

23    find that the defendant directed another person to use, carry

24    or possess a gun in the commission of the underlying crime or

25    made such a gun available to the other person, then the

1    defendant aided and abetted other person's use of a firearm.

2    This example is offered only by you as a way of illustration

3    and is not meant to be exhaustive.

4           The second element that government must prove beyond a

5    reasonable doubt is that the defendant carried a firearm during

6    and in relation to a crime of violence or drug trafficking

7    crime or possessed a firearm in furtherance of such a crime or

8    aided and abetted the same.  Possession and furtherance as

9    indicated requires a possession to be incident to and an

10   essential element of the crime.  The firearm must have played

11   some are part in furthering the crime in order for this element

12   to be satisfied.

13          I instruct you that the narcotics conspiracy alleged

14   in Count One qualifies under the law as a drug trafficking

15   crime and I instruct you that the robbery conspiracy alleged in

16   Count Two qualifies as a crime of violence under the law.  I

17   also instruct that in order to find the defendant guilty of

18   Count Three the jury must be unanimous as to whether it was the

19   drug trafficking crime charged in Count One or the crime of

20   violence charged in Count Two or both that the defendant used

21   or carried a firearm during or and in relation to or possessed

22   a firearm in furtherance of or aided and abetted the same.

23          The final elements the government has to prove beyond

24   a reasonable doubt for Count Three is that the defendant used,

25   carried or possessed a firearm or knew that he was aiding and

abetting another's use, carrying and possession of a firearm.
To satisfy this element you must find that the defendant had
knowledge that what he or another whom he was aiding and
abetting was carrying or using or possessing was a firearm or
advanced knowledge that another whom he was aiding and abetting
would be carrying or using or possessing a firearm.  I have
previously defined "knowingly" for you and you should apply
that definition here.

In order for the government to satisfy that element it
must be proven beyond a reasonable doubt that the defendant
knew what he was doing that is, that he knew that he was
carrying, using or aiding and abetting another's use, carrying
or possession of a firearm in the commission of a drug
trafficking crime or crime of violence.

Let's talk about brandishing.

If and only if you find the defendant guilty of Count
Three, then you must make a special finding on that count and
that's on the verdict form.  Specifically, you must determine
whether or not during the defendant's use, carrying or
possession of a firearm, he brandished the firearm or aided and
abetted another to brandish the firearm.  Now, to brandish a
firearm means that all or part of the weapon was displayed or
the presence of the weapon was otherwise made known to another
person to intimidate that person regardless of whether the
weapon was directly visible to that person.  The weapon does

1    not have to be directly visible but it must be present.  Your

2    finding as a brandishing must be beyond a reasonable doubt.  In

3    addition, it must be unanimous and that all of you must agree

4    that the firearm was brandished before you can check that box

5    on the form.  You will be provided a verdict form and it will

6    indicate to you where to fill in your determination on that

7    issue.

8            We're almost there.  You OK?

9            There's another method by which you may evaluate the

10   possible guilt of the defendant with respect to the Count

11   Three, the firearms charge.  Even if you do not find that the

12   government has satisfied its burden of proof with respect to

13   each element of that crime.  If in light of my instructions you

14   find beyond a reasonable doubt that the defendant was a member

15   of the conspiracy connected with a substantive crime charged,

16   the narcotics conspiracy in Count One or the robbery conspiracy

17   charged in Count Two, then you may also but are not required to

18   find the defendant guilty of the firearms charge in Count Three

19   provided that you find each of the following elements had been

20   established beyond a reasonable doubt.

21           First, that the crime charged in Count Three was

22   committed.

23           Second, that the defendant was a member of the

24   conspiracies in Count One or Two that you found existed.

25           Third, that the firearms offense was committed

E6JAASER4                    Jury Charge

pursuant to the common plan and understanding you found to
exist among the conspirators involved in that conspiracy.

          Fourth, that the defendant was a member of the
conspiracy at the time the firearms offense was committed.

          Fifth, that the defendant could reasonably have
foreseen that the firearms offense might, reasonably have
foreseen that the firearms offense might be committed by his
co-conspirator.

          If you find that all five of these elements exist
beyond a reasonable doubt then you may find the defendant
guilty of Count Three even if he did not personally participate
in the acts constituting the crime or did not have actual
knowledge of it.

          The reason for this rule is that a co-conspirator who
commits a substantive crime as part of a conspiracy is deemed
to have been the agent of the other conspirators.  Therefore,
all of the co-conspirators bear criminal responsibility for the
commission of the substantive crimes.  If however, you are not
satisfied as to the existence of any of these five elements,
then you may not find the defendant guilty of Count Three
unless the government proves beyond a reasonable doubt that the
defendant personally committed or aided and abetted the
commission of the crime charged in Count Three.

          Final instructions.

          The indictment alleges that certain events or

1    transactions occurred on or about various dates.  You've heard

2    sort of 2012 up through and including July 31, 2013.  It is not

3    necessary, however, for the government to prove that these

4    events or transactions occurred on exactly those dates.  When

5    the crime charged was the crime of conspiracy it is sufficient

6    if you find that the defendant was a member of the conspiracy

7    charged in the indictment for sometime within that period.

8            In addition to all of the elements that I have

9    described for you with respect to Counts One, Two and Three of

10   the indictment, you must also decide whether any act in

11   furtherance of the charged offense occurred within the Southern

12   District of New York.  Now, this applies to each of the three

13   counts, OK.  The Southern District of New York includes the

14   following counties:  Manhattan, the Bronx, Westchester,

15   Duchess, Putnam, Rockland, Orange and Sullivan Counties.  So

16   this element is called venue.  Venue simply means place or

17   location.

18           In regard to venue the government does not have prove

19   that any crime was committed in this district or that the

20   defendant was present here.  It is sufficient to satisfy this

21   element if any act in furtherance of the crime you are

22   considering occurred within this district.  I further instruct

23   that you any action in the Southern District of New York or any

24   communication into or out of the Southern District of New York

25   can establish venue as long as the action furthers the

1    conspiracy charged.  On this issue of venue and this issue

2    alone, the government need not prove venue beyond a reasonable

3    doubt but only by a mere preponderance of the evidence.

4            A preponderance of the evidence means more likely than

5    not.  Thus, the government has satisfied its burden of venue if

6    you conclude that it's more likely than not that some act in

7    furtherance of each charged defense was committed in this

8    district.  If you find that the government has failed to prove

9    the venue requirement, even if all the other elements of the

10   offense are proven, then you must acquit the defendant.

11           Now, under your oath as jurors you are not to be

12   swayed by sympathy.  You are to be guided solely by the

13   evidence in the case.  And the crucial question that you must

14   ask yourselves as you sift through the evidence is, has the

15   government proven the guilt of the defendant beyond a

16   reasonable doubt?  It is for you alone to decide whether the

17   government has proven that the defendant is guilty for the

18   crime for which he's been charged solely on the basis of

19   evidence or the lack of evidence and subject to the law as I

20   charge you.  It must be clear to you that once you let fear,

21   prejudice, bias or sympathy interfere with your thinking there

22   is a risk that you will not arrive at a true and just verdict.

23           If you have a reasonable doubt as to the defendant's

24   guilt you should not hesitate for any reason to find a verdict

25   of acquittal.  But on the other hand, if you should find that

1  the government's met its burden of proving the defendant's

2  guilt beyond a reasonable doubt you must not hesitate because

3  of sympathy or any other reason to render a verdict of guilty.

4          The question of possible punishment of defendant is of

5  no concern to you, ladies and gentlemen of the jury, and should

6  not in any sense enter into or influence your deliberations.

7  The duty of imposing a sentence rests exclusively upon the

8  Court.  Your function is to weigh the evidence in the case and

9  to determine whether or not the defendant is guilty beyond a

10 reasonable doubt solely on the basis of the evidence.

11         Now note-taking.

12         Some of you took notes during the trial.  Don't show

13 your notes to anybody else or discuss your notes with any other

14 juror during deliberation.  Those notes are to help you and to

15 assist you alone.  The fact that any particular juror has taken

16 notes does not entitle that juror to have his or her vies

17 assume greater weight than those of any other juror.  And

18 finally, your notes are not to substitute for your recollection

19 of the evidence.  If you have any doubt as to testimony you

20 have the official transcripts read back and we are going to

21 talk about that.

22         Your function is now to weigh the evidence in the case

23 and determine the guilt or innocence of the defendant, Anthony

24 Serrano, with respect to each one of the counts in the

25 indictment with which he's been charged.  And, again, you have

1  to consider his guilt or non guilt as to each count separately.

2  You are about to begin your deliberations.  Many, but not all

3  of exhibits will be sent with you as I said to the jury room.

4  We are not going to send the firearms or ammunition with you

5  into the jury room.  If you want to see any physical evidence

6  that's not sent into the jury room we'll have you out here

7  again and we'll show it to you.

8          Now, you're entitled and certainly if you have any

9  questions you should write them down and talk to each other.

10 You'll write any questions down on a piece of paper.  Joe will

11 give you guys a particular form with envelopes.  The jury

12 foreperson will then with that question sign and put the time

13 down on that question, stick it in the envelope and that

14 envelope may say, the question may say, I'd like to hear the

15 testimony of Victor Moral read back on the following point.

16 Try to be as specific as you can possibly be about what you

17 want to have read back, OK, like that direct of so and so on a

18 particular topic or something else because otherwise it's like

19 a hunt peck.

20         Now, we can hunt peck and we know the record pretty

21 well but.  By be as specific as you can because it'll help us

22 get the answer to you very quickly to isolate that piece of

23 testimony.  Then what we'll do is either send that copy of that

24 portion of the transcript into the jury room or we'll call you

25 out hear and we'll read it to you.

1              Now, let me describe how this process works in a

2     little more detail.  This is not to in any way deter you from

3     asking questions but to make sure that you understand that your

4     questions cannot be answered with the snap of a finger

5     immediately.  You come up with a question.  You write it down.

6     Everybody knows about the question.  All of you should know

7     about the question.  No rogue jurors.  Somebody signs.  The

8     foreperson signs the question form.  It goes into the envelope.

9     The envelope will go to the marshal because you are going to be

10    turned over to the care of the U.S. marshal who will be outside

11    your door.  The marshal will come find Joe.  Joe will be

12    sitting somewhere around here.  Joe will come find me.  I'll be

13    sitting here or there or a couple floors down.  I will then

14    open the envelope.  I will read the envelope.  I will come out.

15    We'll will gather everybody up.  We'll get the court reporter

16    up and we'll then decide what to do with your question.  We'll

17    talk about it.  Then we'll call you out.  I'll read you the

18    question and make sure there's no rogue juror.  We'll tell you

19    how we're going to answer the question.  I just tell you that

20    not to deter you but so you don't think it's a two minute, 37

21    second process.  It's going to take us a little time.  Be very

22    specific so we can get you what you need.  Any communication

23    with the Court has to occur in writing.  And it will be given

24    to the foreperson which will be given to the marshal.  So even

25    if you need more coffee, that is the kind of thing that will go

1    in writing in an envelope, even if it's not just a question and

2    I'll respond as quickly as I can.

3              Now, in any notes do not tell us ever how your vote

4    stands.  Do not say, by the way, we're at five to seven on the

5    following question.  We are at 11 to one and we really need the

6    following answer.  Don't do that.  The split of the vote is for

7    you and you alone to know.  Don't share it with me.  Don't

8    share it with anybody, OK, until you return the verdict.  That

9    is for you and you alone.  And the verdict must be unanimous.

10             Your first task is going to be -- I am on page 72 --

11   is to choose a foreperson.  The foreperson does not have any

12   greater voice or authority than any other juror but will be the

13   person who communicates with the Court when questions arise.

14             Now, how do you choose a foreperson there.  Are as

15   many ways as people's creative minds can think of.  Sometimes

16   jurors throw their juror numbers into a hat and pull one out.

17   Sometimes somebody volunteers.  Sometimes Juror No. 1 gets

18   picked because that's what they see on TV.  There's no right or

19   wrong way to do it.  It's for you to decide.

20             (Continued on next page)

21

22

23

24

25

1          THE COURT:  The most important part of the case,

2     ladies and gentlemen of the jury, is the part that you are

3     about to play in your deliberations on the issues of fact.  It

4     is for you and you alone to decide whether the government has

5     proven beyond a reasonable doubt the essential elements of the

6     crime with which the defendant here has been charged.  If the

7     government has succeeded, your verdict should be guilty; if it

8     has failed, it should be not guilty.  Again, you must consider

9     each count individually.

10          I know that you will try the issues that have been

11     presented to you according to the oath that you have taken as

12     jurors.  In that oath you promised that you would well and

13     truly try the issues joined in this case and a true verdict

14     render.  Your funciton is to weigh the evidence in the case and

15     to determine whether or not the defendant is guilty solely

16     based upon the evidence.

17          As you deliberate, please listen to the opinions of

18     your fellow jurors and ask for an opportunity to express your

19     own views.  Every juror should be heard.  No one juror should

20     hold center stage in the jury room, and no one juror should

21     control and monopolize the deliberations.

22          If, after listening to your fellow jurors, and if

23     after stating your on view, you become convinced that your view

24     is wrong, do not hesitate because of stubbornness or pride to

25     change your view.  On the other hand, do not surrender your

1    honest convictions and beliefs because of the opinions of your

2    fellow jurors or because you are outnumbered.  Your final vote

3    must reflect your conscientious belief as to how the issues

4    should be decided.  Your verdict must be unanimous.  If at any

5    time you are not in agreement you are instructed that you are

6    not to reveal the position of the jurors, that is, the split of

7    the vote.

8            Finally, I say this not because I think it's necessary

9    but because it's the custom of the courthouse to say this:  You

10   should treat each other with courtesy and respect for your

11   deliberations.

12           All litigants stand equal in this courtroom.  All

13   litigants stand equal before the bar of justice.  All litigants

14   stand equal before you.  Your duty is to decide the issues

15   before you fairly and impartially, and to see that justice is

16   done.

17           Under your oath as jurors are you not to be swayed by

18   sympathy; you are to be guided solely by the evidence presented

19   at the trial and the law as I've given it to you, without

20   regard to the consequences of your decision.  You have been

21   chosen to try the issues of fact and to reach a verdict on the

22   basis of the evidence or lack of evidence.  And, again, if you

23   let sympathy interfere with your clear thinking, there is a

24   risk you will not arrive at a just verdict.

25           All parties are entitled it a fair trial.  You must

1   make a fair and impartial decision so that we will arrive at a

2   just verdict.

3          Counsel, is there anything that we should raise before

4   I let the jury go into the jury room?

5          MS. MAIMIN:  Not from the government.

6          MR. DE CASTRO:  No, your Honor.

7          THE COURT:  All right.  Then, ladies and gentlemen, I

8   am about to send you into the jury room.  Let me just quickly

9   review with you the verdict form.

10          Do they have the verdict form?

11          The verdict form is self explanatory.  You will check

12   a box as indicated and as necessary.  So, there will be one

13   blank one in the jury room.

14          One more thing.  I don't know if there are any folks

15   who are smokers on the panel.  The reason I ask is because

16   sometimes during trial, members of the jury want to go and take

17   a smoke break, and so this instruction applies whether it's a

18   smoke break or you want to go have a diet coke.  It's

19   irrelevant to me.

20          If someone is out of the room for a period of time,

21   you have to wait until they come back.  You can't have somebody

22   like having a smoke break in front of the building and then

23   everybody else delivers a verdict.  Right?  And we will talk

24   about what happens tomorrow morning if you are still

25   deliberating, because you have to wait until everybody gets

1    here before you can start again.

2           Now Alternates 1 and 2, you will not go into the jury

3    room.  You will go in an get your stuff, but you will then

4    leave.  Make sure Joe has your phone number.  It does happen --

5    and we have had it happen before -- that people get called upon

6    to come serve and to deliberate.  So, you are relieved for the

7    day but not dismissed from your participation on the panel.

8    Joe will call you as soon as there is a verdict, so you will

9    know you're done.  At that time you too will be released from

10   your oath of silence.  Until then, I instruct you to continue

11   not to talk about this case to anyone because it may well be

12   the case that we have to call upon you.  So, I ask you to

13   maintain that silence.  And we will call you and let you know

14   as soon as it's over so that you can be relieved from that oath

15   and you will know it's now done.

16          All right?  I want to thank you.  I know that probably

17   it is most difficult to be an alternate in some ways, because

18   you sit there through all of the evidence, you are as attentive

19   as everyone, and then just by luck of where you got sat you

20   don't get to deliberate.  I understand that, and I appreciate

21   that, and I want to thank you for your service.  So, Joe will

22   know where to find you.

23          Everybody else, I now instruct you that you are to go

24   into the jury room and talk to each other.  I will have my

25   deputy now swear in the marshal.  You will be turned over to

E6J7SER5

1      the care of the marshal.

2                   (Marshal sworn)

3                   THE COURT:  Ladies and gentlemen, please proceed.

4                   (Jury commences deliberations at 1:40 p.m.)

5                   THE COURT:  All right.  Ladies and gentlemen, just be

6      seated for one moment and talk about procedure.  And I do have

7      another matter in this room that needs to start immediately.  I

8      have a criminal matter, but let's talk about how we will

9      proceed.

10                  So, you need to be available, anybody who wants to be

11     here at the time of making a decision about questions and/or

12     the verdict.  We won't wait for people to come from an office

13     across town.  That's sort of like done on television and not

14     done in real life.

15                  So, what we will do is there are often questions in

16     the first hour, as you folks know, where people get settled and

17     the jurors say what does it mean X, Y or Z again.  So I stay

18     very close.  I stay in my robing room which is right next to my

19     room.  I don't go to my chambers which is on a different floor,

20     so I stay right there for the first hour or two, and I am

21     available for questions.  So, hopefully you folks can be in the

22     vicinity.  Just make sure Joe knows where to find you.

23                  But anybody who wants to be present if there is a

24     question read, or if a note comes out and it's a verdict,

25     should make sure that Joe knows where to find you and he can

E6J7SER5

1    get ahold of you immediately, so you can come upstairs.

2    Usually the biggest delay is simply getting the court reporter,

3    if it's been a little while, to have to come upstairs.  We

4    shouldn't be much of a delay.

5          Hopefully then the U.S. Attorney's office also will

6    have their electronic version of the transcript available in

7    case we have any questions, so that we can isolate the

8    transcript pages and do any redactions necessary as quickly as

9    possible, but typically you folks do, and so I am counting on

10   you.

11         MR. DE CASTRO:  We have ours as well.

12         THE COURT:  You have one as well, terrific.  Perfect.

13   So then both sides will be able to get that done.

14         Joe will be here until there is a verdict, so for the

15   rest of today.  And if we are still going tomorrow, he will be

16   here until there is a verdict.

17         Tomorrow I will tell you I have matters all day long

18   in this room, but I have done that before.  When juries are

19   out, the jury takes precedence.  Whenever they have a question,

20   I interrupt whatever I am doing, and we go immediately to the

21   jury.  So I push everybody back and take you guys forward, but

22   that allows me, because it can take hours, days, who knows how

23   long for a jury to come back.

24         MR. DE CASTRO:  I want to signal an issue.  It's not a

25   big issue, but I planned this to be a two week trial, into the

E6J7SER5

1    second week, and I have a sentencing before Judge Marrero at 2

2    p.m. tomorrow.

3            THE COURT:  All right.  So, if there is an issue we

4    will deal with that as it comes in terms of timing, and we will

5    see where the jury is at that point.

6            All right.  So, just stay close.  Stay in touch with

7    Joe.  And I am going to ask you now -- you can stay in the

8    room.  It's perfectly fine for you to stay in the room, but I

9    just need people to give me some space at the first two tables

10   so we can let our other --

11           Oh, you know, I think that Mr. Serrano may need to go

12   downstairs while this occurs, because the other individual is

13   also in custody, so I think we have to do a swap.  All right.

14           (Recess)

15           (Time noted 5:00 p.m.)

16           THE COURT:  All right.  Let's bring out the jury.

17           (Jury present)

18           THE COURT:  We will talk a little bit about the

19   procedures for tomorrow morning.  We are going to let you folks

20   go now.  It's 5 o'clock, a couple minutes after five.  You will

21   pick up tomorrow at 9:30, your regular time.  You have to wait

22   until everybody is here, all 12 of you are here, before you can

23   begin to deliberate.  So, if people are here a little early but

24   not everybody is here, you should just talk about the weather

25   or something else until you have the whole complement of

E6J7SER5

people.  Now, I won't be calling you out here to have you

begin.  You are going to be taking your own attendance in

there.  The marshals will let us know if you folks haven't all

arrived.  But if for some reason somebody is not here by 10

o'clock, my goodness, let us know.  Let the marshal know so

that we can follow up.  We don't want you sitting around and

hanging out in that room unable to deliberate.  We will figure

something out.

          So, we will also have lunch for you tomorrow.  Tell

the marshal if you want anything different than what was

arranged for you today, but otherwise it will essentially be

the same thing.

          If there are notes tomorrow, then you will just write

me a note, sending it through the marshal, but otherwise you

start at 9:30, you start on your own, and we will see you with

an envelope for us, with either a note or something else.

          I want to remind you not to talk to anybody else or

only with each other about there case when you are

deliberating, and not to do any of that social media stuff we

talked about like Facebooking.

          (Jury not present)

          THE COURT:  All right, ladies and gentlemen, let's be

all seated and talk about our procedures for tomorrow morning.

I do have a series of matters in here, including one very large

I don't want to call it circus, because it's not really a

E6J7SER5

1    circus, it's a large matter.  But this matter here, this

2    Serrano trial, takes absolute precedence.  You are in the midst

3    of jury deliberations so, we will take jury notes when ever

4    they come in and proceed a pays.

5            But in the meantime we start at 9 on the MDL?  So I

6    start at 9 o'clock on the MDL.  The jury will be doing its

7    thing.  So long as you folks are in the vicinity, just let Joe

8    know thousand are here and around and where to find you, and I

9    will let you know when we have a note of some sort, either a

10   question or otherwise.  Anything else?

11           MS. MAIMIN:  Not from the government.

12           MR. DE CASTRO:  No, Judge.

13           THE COURT:  So we are adjourned for the evening.  Good

14   night.

15           (Trial adjourned to June 20, 2014 at 9:00 a.m.)

16

17

18

19

20

21

22

23

24

25