UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

UNITED STATES OF AMERICA            :

                    - v. -            :

ANTHONY SERRANO,                    :

                Defendant.            :

13 Cr. 58 (KBF)

-----------------------------------------------------------------------X


**SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA**



PREET BHARARA
United States Attorney
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007




RACHEL MAIMIN
RAHUL MUKHI
Assistant United States Attorneys
    - Of Counsel -

**Table of Contents**

I.    Preliminary Statement ........................................................................................ 1

II.   Relevant Facts ................................................................................................... 2

   A.   The Trial ...................................................................................................... 2

   B.   Offense Conduct ......................................................................................... 2

      1.   Background and the Webster Avenue Burglary ................................. 3

      2.   The October 14th Robbery .............................................................. 4

      3.   The Money Van Job and the Edgewater Job ................................... 7

      4.   The January 9th Attempted Robbery ............................................... 8

      5.   Drug Dealing Out of the Serrano Home .......................................... 9

      6.   Gun Dealing Out of the Serrano Home ........................................ 10

      7.   Additional Burglaries and Planned Burglaries .............................. 12

III.  Criminal History .............................................................................................. 16

IV.  Guidelines Calculation .................................................................................... 17

   A.   The PSR ................................................................................................... 18

   B.   The Defense ............................................................................................. 18

   C.   The Government ....................................................................................... 19

      1.   Base Offense Level ....................................................................... 19

      2.   Leadership Enhancement .............................................................. 22

V.   Analysis of 3553(a) Factors ........................................................................... 24

VI.  Conclusion ...................................................................................................... 27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

UNITED STATES OF AMERICA                          :

                  - v. -                          :

ANTHONY SERRANO,                                  :

                Defendant.                          :

-----------------------------------------------------------------------X

13 Cr. 58 (KBF)

## I.    Preliminary Statement

The defendant in this case, Anthony Serrano ("Serrano" or the "defendant"), is scheduled to be sentenced on January 9, 2015.  The Government respectfully submits this memorandum in advance of that sentencing and in response to Serrano's sentencing letter, dated December 26, 2014 ("Def. Ltr.").  Serrano asks the Court to impose a sentence of 144 months' imprisonment: less than half of the bottom end of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of calculated by the Probation Office.  (Def. Ltr. 3.)  Serrano arrives at his proposal by calculating his advisory Guidelines range to be 176 to 199 months—a range that absolves him of responsibility for all his conduct except for a single robbery—and then granting himself a downward variance based primarily on certain purported personal factors.  This proposal should be rejected.  It is based upon an inaccurate calculation of the Guidelines range and is insufficient to meet the statutory sentencing goals.  The Court should sentence Serrano to a term of imprisonment within the range of 324 to 405 months' imprisonment, plus the mandatory, consecutive term of 7 years' imprisonment on the gun charge.[1]  The defendant was the leader of a violent armed robbery crew; he sold drugs and guns out of his own home; and he

---

[1]  As detailed below, the Government's calculations match those of the Probation Office, except that it also gives Serrano a 4-point leadership enhancement pursuant to U.S.S.G. § 3B1.1(a).

has a lengthy and serious criminal history.  A sentence within this range would reflect Serrano's life of crime and leadership role in this violent offense, and is necessary to protect the community from Serrano.

## II.    Relevant Facts

### A.    The Trial

On June 20, 2014, following a jury trial, Serrano was convicted of participating in a narcotics trafficking conspiracy, from at least in or about 2012, up to on or about July 31, 2013, in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(B); participating in a robbery conspiracy, from at least in or about 2012, up to on or about July 31, 2013, in violation of Title 18, United States Code, Section 1951, and brandishing a firearm, from at least in or about 2012, up to on or about July 31, 2013, in furtherance of the narcotics and robbery conspiracies, in violation of Title 18, United States Code, Section 924(c)(1)(a)(ii).  (PSR ¶¶ 2-7.)  With respect to the narcotics conspiracy, the jury found by a special verdict that the Government had not proven beyond a reasonable doubt that Serrano had conspired to distribute either one kilogram or more of heroin, or the lesser included amount of 100 grams or more of heroin, but it did find that the Government had proven beyond a reasonable doubt that Serrano had conspired to distribute 500 grams or more of cocaine.

### B.    Offense Conduct

Serrano did not confine himself to one type of crime.  He committed cargo theft; he led an armed robbery and burglary crew; and he sold heroin and firearms out of his own home. Serrano was even planning an additional burglary at the time of his arrest.  If there was an opportunity to make money through crime, Serrano was willing to do it, no matter the danger to others.

### 1.      Background and the Webster Avenue Burglary

Cooperating witness Victor Moral testified at trial that, beginning in or about 2012, he began robbing and burglarizing drug dealers with other people in order to resell the drugs they stole.  (Tr. 243).  Moral identified Serrano as one of the individuals with whom he robbed and burglarized drug dealers.  (Tr. 243.).

Moral testified that he first met the defendant in the context of a cargo theft scheme that took place between in or about 2009/2010 and 2011.  (Tr. 253-54).  In 2012, Moral and the defendant began participating in drug robberies and burglaries together along with other members of their robbery crew (the "Crew").

On or about October 6, 2012, Moral and two other members of the Crew, Alex Cespedes ("Cespedes") and Wilfredo Suarez, a/k/a "Black," ("Suarez"), burglarized a heroin stash house on Webster Avenue in the Bronx, New York (the "Webster Avenue Burglary").  (Tr. 280; PSR ¶ 56).  During the burglary, Moral, Cespedes, and Suarez stole approximately two kilograms of heroin.  (Tr. 281-82; PSR ¶ 56).  Moral, Cespedes, and Suarez then sold one of these kilograms of heroin to Serrano.  (Tr. 284; PSR ¶ 56).

Specifically, about two days after the burglary, Moral, Cespedes, and Suarez met up with Javion Camacho and the defendant in Jersey City.  (Tr. 285).  Moral told the defendant about how he, Cespedes, and Suarez, had obtained the kilogram of heroin by stealing it from a stash house.  (Tr. 286).  Moral also told the defendant that Moral had a tipster who had given him the inside information about the Webster Avenue Burglary.  (Tr. 286).  The defendant told Moral that "he wanted in," meaning "he wanted a part of the robberies."  (Tr. 286-87).  Moral told the defendant that Moral, Cespedes, and Suarez were looking for help with "bare-face robberies." (Tr. 287).  In response, the defendant laughed and stated "this is what we do."  (Tr. 287).  The defendant went on to explain to Moral that the defendant and Javion Camacho "had a shooter, a

3

locksmith and a team that did robberies."  (Tr. 288-89).  Moral asked the defendant whether the defendant's robbery team had guns, and the defendant responded yes.  (Tr. 289).  Javion Camacho then pulled out his phone and showed Moral pictures of robbers dressed up in police uniforms—"a bulletproof vest with a gun, handcuffs, like a police officer."  (Tr. 290-91).  Moral, Cespedes, Suarez, Javion Camacho, and the defendant agreed to begin committing robberies together.  The defendant also agreed to buy the kilogram of heroin from the Webster Avenue Burglary.  (Tr. 291).

The next day, Moral and Cespedes went to the defendant's house in Jersey City to discuss upcoming robbery jobs.  Moral and the defendant discussed two robbery jobs about which Moral had recently gotten tips—a "money van" (the "Money Van Job") and what turned out to be a robbery on October 14, 2012 (the "October 14th Robbery").  (Tr. 300-01).  With respect to the October 14th Robbery, Moral initially received a tip "that there was going to be at least over two kilos [of cocaine] being transported by someone somewhere in New York."  (Tr. 301).  The defendant told Moral to "just let him know.  He's ready."  (Tr. 302).

## 2.  The October 14th Robbery

As the October 14th Robbery approached, Moral received additional details from the tipster about the targets of the robbery.  The tipster told Moral that the two kilograms of cocaine were going to be moved in a van being driven by a couple—a man and a woman—in Washington Heights, Manhattan.  (Tr. 308; PSR ¶ 57).  Moral conveyed this new information to the defendant at a meeting with the defendant and Javion Camacho on a Little League field near Serrano's home.  (Tr. 308-09).  Moral, the defendant, and Javion Camacho also discussed specific plans for the robbery, including using a fake police car (the "Police Car") and acting like police officers to pull over and carjack the victims.  (Tr. 309).  The defendant also told Moral he

4

had guns to bring. (Tr. 309). Moral decided to leave one of his cellphones with the defendant—the phone Moral used to communicate with the tipster. (Tr. 310).

On the day of the October 14th Robbery, the tipster called the defendant and told him that the robbery was on for that evening. (Tr. 312). The defendant told Moral, who was with Cespedes in the Police Car, to begin driving to Manhattan. (Tr. 312). The defendant was with Javion Camacho and another unidentified co-conspirator ("CC-1"). (Tr. 312). At the defendant's direction, Moral and Cespedes met up with the defendant at a barbershop around 163rd Street and Amsterdam (the "Barber Shop"), outside of which the victims' van (the "Van") was parked. (Tr. 313-14).

Moral and Cespedes waited for the victims in the Police Car, while the defendant, Javion Camacho, and CC-1 waited across the street in a red Toyota (the "Red Toyota"). (Tr. 317). While they were waiting, Moral and the defendant were in touch by phone. (Tr. 316). After about 30 minutes, Moral left the Police Car and got into the Red Toyota. (Tr. 318). The defendant was in the driver's seat, Javion Camacho was in the front passenger seat, and CC-1 was in the backseat of the Red Toyota. (Tr. 322). While Moral was in the Red Toyota, he saw the defendant hand CC-1 a bag (the "Bag"). (Tr. 323). CC-1 left the Red Toyota to watch the Van, and after a period of time, CC-1 called the defendant to tell him that the Van was moving. (Tr. 324). The defendant directed Moral to get back into the Police Car. (Tr. 324). As Moral was walking back to the Police Car, CC-1 handed him the Bag. (Tr. 325). Moral felt a handgun inside of the Bag—which was the same Bag the defendant had handed to CC-1 earlier. (Tr. 325). Moral took the gun back with him to the Police Car and placed it on the floor near his seat. (Tr. 326).

Once the Van was moving, the defendant began following it in the Red Toyota. (Tr. 327). The defendant told Moral where he and the Van were and Moral and Cespedes caught up in the Police Car. (Tr. 327). The defendant then went in front of the Van while the Police Car followed it. (Tr. 327). The Crew continued to follow the Van, which began circling the block. (Tr. 329). Although Moral initially did not want to interact with the victims during the robbery, the defendant told Moral that he would pay Moral an extra $1,000 for stealing the Van from the victims. (Tr. 331). The defendant's role was to stay in front of the victims in the Red Toyota so that they would not be able to drive off during the robbery. (Tr. 328; PSR ¶ 57).

Right before the Crew was ready to pull over the victims, the defendant sent Javion Camacho from the Red Toyota to the Police Car so that he could be one of the robbers who could "deal with the victims." (Tr. 330). Once Javion Camacho entered the Police Car, he told Moral to hand him the Bag—the same Bag with the gun originally supplied by the defendant. (Tr. 339).

Immediately prior to the robbery, the Van stopped on Audubon Avenue and tried to park. The Crew activated the Police Car's siren and intercom and told the victims that they could not park because the Crew wanted the victims on a more secluded block. (Tr. 340). The victims moved the Van and turned right on the next block, which was 171st Street. Moral told the defendant where the Van was headed so that he could cut off the top of the block to prevent them from escaping. (Tr. 341). Javion Camacho—who was now in the Police Car with Moral and Cespedes—then told the Crew to pull over the victims. (Tr. 342).

Once on 171st Street, the Crew in the Police Car activated its lights and siren. (Tr. 343). The defendant was in the Red Toyota in front of the Van. (Tr. 344). After the Van stopped, Javion Camacho, Cespedes, and Moral got out of the Police Car. Javion Camacho was wearing a

police vest, handcuffs, a badge, and a gun.  (Tr. 344).  Moral stated that the gun was strapped to Javion Camacho's vest.  (Tr. 344).  Moral stated that the gun was a handgun and that he could see its handle.  (Tr. 345).  Cespedes was also dressed like a police officer.  (Tr. 345).

Javion Camacho and Cespedes asked the victims for their license and registration and to exit the Van.  (Tr. 346).  After the victims were out of the Van, Moral jumped in the Van and drove it off.  (Tr. 346).  Moral began following the defendant—who had been in front of the Van in the Red Toyota during the robbery—towards the George Washington Bridge.  (Tr. 347). Moral followed the defendant to an abandoned warehouse area in Kearny, New Jersey, a location that the defendant had chosen for the Crew to search the Van for drugs.  (Tr. 350).

After Moral and the defendant arrived in Kearny, Javion Camacho and Cespedes arrived in the Police Car.  The defendant searched the Van—taking various items out of the Van, including a child's car seat, to look for the two kilograms of cocaine that were supposed to be in the vehicle.  (Tr. 351; PSR ¶ 57).  Later, Javion Camacho brought someone who knew how to find hidden compartments in vehicles to search the Van, but the Crew ultimately did not find the cocaine that they had been expecting.  (Tr. 351-53).

### 3.      The Money Van Job and the Edgewater Job

The defendant also attempted to commit the Money Van Job with Moral and other members of the Crew.  Moral's tipster had told Moral about a van that transported large amounts of drug money (the "Money Van").  (Tr. 277; PSR ¶ 58).  According to the tipster, the Money Van usually parked in a location near the Grand Concourse in the Bronx.  (Tr. 277).

Moral told the defendant about the Money Van Job during the first meeting at the defendant's apartment.  (Tr. 300).  The defendant proposed getting a tow truck and towing the Money Van once they found it.  Shortly thereafter, Moral and the defendant planned to meet in the Bronx to scope out the job.  (Tr. 302-03).  However, instead of showing up himself, the

defendant sent Javion Camacho and his brother, Julio Camacho.  (Tr. 303; PSR ¶ 58).  The defendant told Moral that the Camacho brothers "worked for him"—the defendant.  (Tr. 306).  The defendant also told Moral if they were successful in robbing the Money Van, the defendant would get his cut from the Camachos.  (Tr. 306).  The Camacho brothers met Moral and Cespedes in the Bronx and the Crew placed a GPS tracking device on the Money Van, although they were not able to successfully rob the vehicle.  (Tr. 303-04).

Similarly, in late 2012, Serrano agreed to rob a marijuana dealer in Edgewater, New Jersey, of money and drugs.  (PSR ¶ 59).  Serrano again sent Javion Camacho to conduct surveillance of the victim and attach a GPS to the victim's car.  (PSR ¶ 59).  This robbery did not come to pass.  (PSR ¶ 59.)

### 4.    The January 9th Attempted Robbery

In December 2012, Javion Camacho told Moral about a new robbery job that would entail robbing more than 10 kilograms of heroin from a stash house in the Bronx.  (Tr. 376). This job ultimately became the January 9th Attempted Robbery, which turned out to be a DEA sting operation during which 17 robbers—some of whom were in the Police Car—came armed with loaded guns, a baseball bat, handcuffs, and zipties, and believed they were going to be stealing at least 20 grams of heroin. (PSR ¶¶ 33, 40-46).

Javion Camacho initially told Moral that the defendant would be coming to the January 9th Attempted Robbery.  (Tr. 376-77).  The defendant was also supposed to be coming with "the cop"—who would protect the Crew if something went wrong.  (Tr. 377).  However, once Moral informed other co-conspirators that a cop would be coming to robbery they objected to the plan. (Tr. 377-78).  Serrano was therefore not at scene of the January 9th Attempted Robbery.  (*See* Tr. 377-78).  This was not surprising; at trial the Government introduced a recording made of Serrano by an informant on July 28, 2013, during which the defendant explained that his

"m.o."—consistent with his roles during the October 14th Robbery and the January 9th Attempted Robbery—was to not "show [his] face" or get his "hands dirty."

The phone records the Government introduced at trial confirm that the defendant participated in the January 9th Attempted Robbery—albeit from behind the scenes.  For example, on December 17, 2012, approximately less than two hours before Javion Camacho met with the CI "tipster" for the first time, he was in contact with Serrano twice for a total of more than four minutes.  (GX-415).  Immediately following the second call with Serrano, Javion Camacho was in contact with Jauncey Valle, who was the one who had introduced Javion Camacho to the tipster.  Almost immediately following Camacho and Valle's meeting with the tipster about the January 9th Attempted Robbery, Camacho tried to call Serrano.  (GX-415).

Cell site evidence showed that Javion Camacho was in the vicinity of Serrano's house two days after his initial meeting with the CI.  (GX-501).  Between December 17, 2012 and January 2, 2013, the day of Javion Camacho's second meeting with the CI, Serrano and Javion Camacho were in contact on 29 occasions; between January 7, 2013 and January 9, 2013 Javion Camacho were in communication approximately 28 times.  Cell site evidence showed Camacho was in the vicinity of Serrano's residence on January 8, 2013—the day before the robbery.  (GX-501; GX-502B).  And on the night of the robbery itself, shortly after the Crew members had tried to commit the robbery and were still at the crime scene, Serrano repeatedly attempted to call both Javion Camacho and Julio Camacho, who were both—unbeknownst to the defendant—in DEA custody.  (PSR ¶ 60).  In total, Serrano and Javion Camacho were in phone contact 15 times on the day of the January 9th Attempted Robbery.

### 5.    Drug Dealing Out of the Serrano Home

At trial, the Government also called HCPO Detective Kealy, HCPO Detective Sergeant John Kolakowski, and Sergeant Anthony Musante of the Jersey City Police Department.  The

officers testified about four controlled purchases of street-level quantities of heroin from the defendant between December 20, 2012 and January 16, 2013.  (Tr. 166, 205, 209).  Specifically, the three officers described undercover operations during which an informant contacted an individual named Michael Gamba ("Gamba") to purchase between 30 to 50 envelopes of heroin. On each of the four occasions, after being contacted by the informant, Gamba was observed meeting with the defendant prior to providing the heroin to the informant.  In total, the informant purchased approximately 1.85 grams of heroin from Gamba and Serrano.  The defendant's heroin sales were around the same time period when Javion Camacho had told CW-1 and CI-1 that the Crew had recently obtained a new large supply of heroin that it was selling.

**6.     Gun Dealing Out of the Serrano Home**

On July 25, 2013, shortly before his arrest, Serrano sold a gun out of his own home to a confidential informant working with law enforcement ("CI-1").  In particular, at the direction of the Federal Bureau of Investigation (the "FBI"), CI-1—a former member of the Jersey City Police Department who pleaded guilty to transportation of stolen goods and conspiracy to commit Hobbs Act extortion in the District of New Jersey, and who was friends with the defendant—contacted the defendant about purchasing a gun.  On July 25, 2013, at the direction of the FBI, CI-1 recorded a meeting with the defendant, which took place in front of the defendant's home.  As the recording shows, during the meeting, the defendant sold CI-1 a .22 caliber firearm and five bullets for $300:

> CI-1: What you got?
>
> SERRANO: .22. [UI].  In my pocket.
>
> CI-1: What's that?
>
> SERRANO: .22!  You know what it is.
>
> CI-1: You got bullets in it?

SERRANO: Yeah!  [UI]

* * *

CI-1: Six, seven…seven hundred dollars for that shit?

SERRANO: No, no.  No, no.  Give me three.  Don't give me seven for that.

The defendant also offered to sell CI-1 another firearm in the near future: "SERRANO:  I'm going to get you the other thing, in a minute.  I'm waiting on a phone call, nigga, he's going to call me and then I'm going to pick it up … He's going to give me a .380 I think, brand new in the box. Then I'll call you."  Following the transaction, agents took possession of the .22 caliber handgun and bullets from CI-1.

During another recorded meeting on July 28, 2013, which also took place in front of the defendant's home, the defendant offered to sell CI-1 additional "burners," which is a common street term for guns.  In particular, CI-1 and the defendant had the following discussion:

SERRANO: When is he going to get that? You don't know? [UI]

CI-1: He's trying to get some burners.  But I could get them.  I could rob it, I could burn it.

SERRANO: [UI]

CI-1: He wanted to buy some burners.

SERRANO: Nah, I don't got burners, I only got that on scratch.

SERRANO: Wait! What up?  The kid text me, he got three of them.  I'm just waiting now, he just text me right now!  Before you came. The kid that works for me.  Read the [UI] text, look.  "I'm going to see my homeboy on Friday.  I got three of them. Three brand new ones in the box, he's been busy 'cause he sells weed."

CI-1: How much does he want for them?

SERRANO: I'll get 'em cheap, he said …

CI-1: I want to make some money off that my nigga

11

> SERRANO: "He's sells weed and his crib's been under surveillance so he had to move he said I had to move, my crib was hot! Indian kid sells mad weed and he got a dude that brings him mad burners so he said he got three of them available just got to meet him, they don't talk on the phone." But my thing is to try, try to get him …
>
> CI-1: Ya, I got to get a good price.
>
> SERRANO: Yeah we'll get a good price, I'm not worried about that. I'm just saying what is his next move, you don't know?

This is not the only evidence that the defendant trafficked in firearms during the course of his criminal conduct. After Serrano supplied the gun for the October 14th Robbery, Moral asked the defendant if he could sell CW-1 a gun for use in future robberies. (Prior to that time, Moral had been borrowing guns at a steep price from an unindicted co-conspirator.) The defendant agreed to ask his gun connection whether any guns were available. The transaction was never consummated.

### 7.    Additional Burglaries and Planned Burglaries

As stated above, on July 28, 2013, at the direction of law enforcement, CI-1 recorded a meeting with the defendant in front of the defendant's home. In addition to the conversation above regarding a potential gun sale, the defendant told CI-1 that he was planning another burglary. As the defendant outlined his plans, he explicitly stated his intent to use the same *modus operandi* used in prior robberies and burglaries, *i.e.,* letting others "dirty [their] hands" while he waited "around the corner" and reaped the proceeds. Specifically, the defendant told CI-1 he intended to direct an unindicted co-conspirator—known as "Fat Cat"—to burglarize a victim of Pakistani descent, who owned a pizza restaurant in Jersey City, and who kept approximately $500,000 and $1 million in watches at his home (the "Planned Watch Burglary"). For instance, CI-1 and the defendant had the following discussions about the Planned Watch Burglary (emphases added):

CI-1: Who is that nigga?  The pizza [UI]

SERRANO: It's the owner of the pizzerias. [UI]

CI-1: Mmm.

CI-1: Arab nigga, right?

SERRANO: Pakistan.

CI-1: He's Arab?

SERRANO: [UI].

CI-1: Pakistani?

SERRANO: Yeah. [UI].

CI-1: I'm waiting, I'm waiting for the opportunity like I told you to get this motherfucker.

SERRANO: This Friday, I got niggas going in the house. Supposedly nigga, he's got like half a million cash in the, in the closet.  He's got a watch collection like a million dollars and then …

[Interrupts]

CI-1:   Why you got niggas going in the house, I thought …

[Interrupts]

SERRANO: I got Fat Cat going in.  Nigga, we don't have to dirty our hands.  They gonna do it. I'm gonna be right around the corner on [UI] —

[Interrupts]

CI-1: Who the fuck is Fat Cat?

SERRANO: Daryl [PH], this kid.  [UI]  He's a good dude.  I took him up there last Friday.  He didn't have no tools.  He looked at the door.  They were at Mosque, they pray on Fridays.  I was up there yesterday, this Friday, and I dropped him off he looked at the lock and everything say he need to [UI] flat bar.  [UI] He's going to buy that.  He's going to get everything.  He's going to go in Friday.  He wants to go early because they pray all day Fridays, they pray.  So he got time to fuck with the house.  Tell him, "When you go in I'll wait at the corner on Kennedy Boulevard."   And

jump in the car. [UI] Take the watches, I tell him "Yo you got to give me the watches.  Pay him thirty grand with the money I get." The watch is Patek Philippe.  It's two hundred and twenty thousand dollar stainless steel Patek Philippe.  He's got a, uh, uh, seventy thousand dollar uh, Hublot, he just bought.

* * *

CI-1: Yeah but nigga, you, you putting, you putting other niggas down instead of …

[Interrupts]

SERRANO: No just him.  Nigga I got to have a nigga that's a b & e artist.  I can't, we can't go in -- the lock, plus that's not our M.O., I don't want to be seen in that area with, on a fucking -- let him go and do the dirty work.  [UI]  I'm gonna be there!  I'm gonna be around the corner cause I'm his ride there and his ride back. That's what my whole thing is banking on right now if we get that, bro, it's fucking lights out, nigga.  Light's out. We was at the other day in the pizzeria looking to buy uh, gram of weed, hundred and eighty dollars cash. [UI]  He was negotiating.

At the direction of the FBI, CI-1 also proposed another burglary to the defendant: a cargo theft (the "Planned Cargo Theft").  The defendant responded enthusiastically.  For instance, CI-1 and the defendant had the following discussions about the Planned Cargo Theft, which entailed stealing cargo from trailers near the New Jersey port:

CI-1: Nigga let me tell you right now. I'm telling you this white nigga right here Telling … [UI] set that nigga up.

SERRANO: Nigga I'm waiting on you to just take me to the place [UI] so I can go early in the morning and we can get it.  I'll get the truck.  It's all on you I don't want [UI]

CI-1: I gotta wait on that motherfucker, yea.

SERRANO: … That's like, that's like taking candy from a baby.

CI-1: I gotta to wait, I got to wait for the opportunity you know what I mean?

SERRANO: I go in there.   Especially if it's Macbooks and electronics thing I could sell that shit ASAP.  You never told me

14

nothing else, you just.   But Chet told me you were leaving with him for a few days with that guy.

*** 

SERRANO: … [UI] what does he do? [UI]

CI-1:  [UI] He works for the Port!

SERRANO: Right.  And then what does he do?

CI-1: He works for the Port and he gets shit, and he delivers stuff for them.  You know what I mean?

SERRANO:   Oh he delivers for the Port?

* * *

SERRANO: You don't know nothing?

CI-1: Yeah but I don't want to go over there like that, you know what I mean?

SERRANO: That's what I'm saying.

CI-1: I got to wait for his call, nigga.

SERRANO: Yeah, but even when he's called you don't want to go over like that neither [UI] calls and tell you something.

CI-1: Yeah.

SERRANO: You gotta fucking know.

CI-1: Yeah.

SERRANO: You got to do your homework.

Serrano's role in these burglaries was the same as it always was; he planned and directed the burglaries but generally did not go to the scene of the crime—the one notable exception being October 14, 2012. [2]

---

[2]     In addition to the Webster Avenue Burglary, the January 9th Attempted Robbery, and other incidents described above, on July 4, 2012, Moral and other co-conspirators burglarized a narcotics stash house in Jersey City, New Jersey.  (PSR ¶ 55). They stole approximately $50,000

### III.    Criminal History

Serrano has been continuously committing crimes since the age of 19, including prior gun offenses and violent crimes.  He even sustained a prior federal gun conviction in the District of New Jersey before proceeding, undeterred, to commit the crimes in this case.  Serrano also has a history of repeated violations of court supervision.

In 1993, at the age of 19, Serrano was convicted of criminal mischief after threatening his victim and breaking several windows of the victim's car, resulting in one day's imprisonment and a year of probation.  (PSR ¶ 79.)

In 1996, at the age of 21, Serrano was convicted of committing terroristic threats, resulting in 3 years' probation.  (PSR ¶ 82).  During this offense, Serrano threatened his victim with a handgun.  (PSR ¶ 82).  The victim was treated at a hospital for cuts to his face.  (PSR ¶ 82).  During this period of probation, Serrano was arrested 7 times for noise complaints, (PSR ¶¶ 83, 84, 85, 86, 87, 88), and, in 1998, for burglary and conspiracy to commit burglary after he and others stole a tractor trailer containing $440,000 worth of merchandise.  (PSR ¶ 89).  This resulted in a sentence of 364 days' custody and 3 years' probation.  (PSR ¶ 89).

During this additional period of probation, Serrano was again arrested 4 times for noise complaints.  (PSR ¶¶ 90, 91, 92, 93).  More significantly, during this period of probation, on April 8, 2002, he was also arrested federally for possessing a firearm after being convicted of a felony, resulting in a sentence of 40 months' imprisonment.  (PSR ¶ 94).  During this offense, Serrano was found in possession of a Smith & Wesson .44 caliber revolver and a Cobray 9mm pistol with a defaced serial number.  (PSR ¶ 94).

---

in cash and a bag, which Moral believed contained kilograms of cocaine.  (PSR ¶ 55).  Serrano directed and organized the burglary but was not himself present.  (PSR ¶ 55).

It was not too long after this arrest that Serrano was again arrested, on November 2, 2002, for possession of a weapon, resulting in 3 years' probation.  (PSR ¶ 96).

Serrano also has several prior arrests for violent offenses that did not result in convictions:

- On August 2, 1994, he was arrested for simple assault and resisting arrest after attempting to punch a uniformed police officer in the face.  (PSR ¶ 102).

- On January 19, 1996 he was arrested for aggravated assault and unlawful possession of a weapon.  (PSR ¶ 104).

- On February 9, 1996, he was arrested for aggravated assault and unlawful possession of a weapon after threatening his victim with a knife during a physical altercation.  (PSR ¶ 104).

- On November 23, 1998, Serrano was arrested for making terroristic threats after attempting to kick in the door to a residence of a witness to a double homicide by members of the Latin Kings.  (PSR ¶ 105).  As the Court will recall, Serrano's relatives and fellow Crew members, Javion Camacho and Julio Camacho, were members of the Latin Kings (along with Louis Borrero and other Crew members).

- On October 9, 2000, Serrano was arrested for simple assault and harassment after beating his girlfriend by slapping and dragging her.  (PSR ¶ 106).  Serrano fathered a child with the victim but lost contact with the victim and his child after his arrest.  (PSR ¶ 115).

- On May 4, 2001, Serrano was arrested on weapons charges and, on September 12, 2011, was arrested for simple assault.  (PSR ¶¶ 107-108).

## IV.   Guidelines Calculation

The Government, defense, and Probation Office all agree that Serrano is in Criminal History Category of IV.  The parties differ on his offense level.  As detailed below, the Probation Office calculates Serrano's total offense level to be 36 and Serrano calculates it to be 26.  The proper offense level, however—taking into account all of Serrano's offense conduct, including his leadership role in the offense—is 38.  Accordingly, his Guidelines range is 324 to 405

months' imprisonment, plus the mandatory seven years' (84 months') consecutive imprisonment on the gun charge.

### A.    The PSR's Calculation

Using the pre-November 1, 2014 version of the Guidelines, the Probation Office calculated a total offense level of 36 and a Criminal History Category of IV, resulting in a Guidelines range of 262-327 months' imprisonment followed by the mandatory, consecutive term of imprisonment on the gun charge, *i.e.,* a range of 346 to 411 months' imprisonment. (PSR at 29.)

The Probation Office calculated Serrano's base offense level on the conspiracy charges, which are grouped together pursuant to U.S.S.G. § 3D1.2(b), to be 36. (PSR ¶ 69.) This represents the sum of the marijuana equivalencies of: (1) 2 kilograms of cocaine (from the October 14th Robbery); (2) 2 kilograms of heroin (from the Webster Avenue Robbery); and (3) 20 kilograms of heroin (from the January 9th Attempted Robbery). (PSR ¶ 69.) The Probation Office did not give Serrano any additional role adjustments and, accordingly, calculated his total offense level to be 36. (PSR ¶ 77.) Following the November 1, 2014 amendments to the Guidelines, which reduced the offense levels for narcotics offenses by two levels, the Probation Office's calculation results in an offense level of 34. U.S.S.G. § 2D1.1(c)(3).

With a Criminal History Category of IV and offense level of 34, Serrano's Guidelines range would be 210 to 262 months' imprisonment followed by the mandatory seven years. (PSR at 29).

### B.    The Defense's Calculation

Serrano disputes the Probation Office's base offense level on the conspiracy charges. Specifically, Serrano argues that calculation of the base offense level should exclude all narcotics evidence at trial—*i.e.,* evidence of Serrano's involvement in the Webster Avenue Burglary and

the January 9th Attempted Robbery—apart from the 2 kilograms of cocaine related to the October 14th Robbery.  (Def. Ltr. 3).  Accordingly, Serrano calculates his base offense level to be 26, leading to a Guidelines range of 96 to 115 months' imprisonment followed by the mandatory 7 years.  (Def. Ltr. 3).  Serrano claims that this lower base offense level is appropriate because the jury did not find him responsible for selling heroin beyond a reasonable doubt at trial.  (Def. Ltr. 2).

### C.   The Government's Calculation

The Court should adopt the Government's calculation of Serrano's Guidelines range as 324-405 months' imprisonment, plus an additional mandatory seven years' (84 months') consecutive imprisonment on the gun charge.  Again, this differs from the calculation by the Probation Office only insofar as the Government's calculation includes a leadership enhancement, which is amply supported by the evidence introduced at trial, and accounts for the November 1, 2014 amendments to U.S.S.G. § 2D1.1(c).

### 1.   Base Offense Level

The Government agrees with the Probation Office that Serrano's base offense level is 36. Although the jury did not find that the defendant's involvement in heroin distribution was proven beyond a reasonable doubt, the standard is different at sentencing.  "[D]istrict courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct."  *United States* v. *Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005); *see United States* v. *Watts*, 519 U.S. 148, 156-57 (1997) ("[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.").  The jury's verdict should of course not be disregarded.  Rather, "district courts should consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and

19

determining a reasonable sentence." *United States* v. *Vaughn*, 430 F.3d at 527. Here, the Government proved Serrano's involvement in a conspiracy to distribute at least 22 kilograms of heroin at trial by—at the very least—a preponderance of the evidence. Accordingly, that heroin should factor into Serrano's sentencing Guidelines calculation. *See United States* v. *Aller*, 384 F. App'x 34, 35 (2d. Cir. 2010) (noting that it "is well settled that in the post-*Booker* world, a sentencing judge retains the authority to find facts relevant to sentencing by a preponderance of the evidence, even those of acquitted conduct").

First, the Government proved Serrano's involvement in the Webster Avenue Burglary well beyond a preponderance of the evidence. Cell site evidence proved that Moral and Cespedes were on the scene of the burglary. (GX 502 at 9). As detailed above, Moral testified at length about the fact that he sold one of the two stolen kilograms of heroin to Serrano. (Tr. 284). Among other things, Moral told the defendant about how he, Cespedes, and Suarez a/k/a "Black," had obtained the kilogram of heroin by stealing it from a stash house. (Tr. 286). Moral also told the defendant that Moral had a tipster who had given him the inside information about the Webster Avenue Burglary. (Tr. 286). The defendant told Moral that "he wanted in," meaning "he wanted a part of the robberies." (Tr. 286-87). They went on to discuss working together, and the defendant ultimately agreed to buy the kilogram of heroin from the Webster Avenue Burglary. (Tr. 291). In particular, Serrano agreed to purchase the heroin for $17 per gram, and give the burglary team $10,000 up front. (Tr. 291). Later that night, at Black's house, Moral received his share of the $10,000. (Tr. 292). Suarez told Moral that Suarez had received the cash from Serrano and had given the heroin to Serrano. (Tr. 292). After time passed, Moral realized that he had not gotten his share of the proceeds and confronted Suarez. (Tr. 293). Suarez said that the defendant had sold the heroin and paid Suarez, but Suarez had spent all the

20

money to help his family with Hurricane Sandy relief. (Tr. 293).   Phone records confirmed that Serrano and Suarez were in contact with each other, (GX-502B), and Moral's testimony was further corroborated by a text message Moral sent to Serrano when he obtained more heroin on January 7, 2013, telling Serrano "Yo got it at 55$ same thing u go last but better."   As Moral testified in the text message Moral was telling Serrano that he got more heroin that was better than the heroin from the Webster Avenue Burglary.   While the evidence is primarily based on Moral's testimony, his testimony was corroborated and it is well-established that a single cooperator's testimony alone is sufficient evidence to convict a defendant at trial beyond a reasonable doubt.   *See United States* v. *Parker*, 903 F.2d 91, 96-97 (2d Cir. 1990) ("[A] conviction may be supported only by the uncorroborated testimony of a single accomplice … if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.  Any lack of corroboration goes merely to the weight of the evidence, not to its sufficiency").  Here, Moral's detailed testimony is surely enough to find Serrano responsible for the Webster Avenue Burglary heroin by a preponderance of the evidence—especially in light of the fact that Serrano was caught on multiple occasions selling heroin out of his own home and participated in other drug burglaries and robberies.

Second, the Government also proved Serrano's involvement in the January 9th Attempted Robbery by—at the very least—a preponderance of the evidence.   As stated above, Moral testified that he spoke to Javion Camacho about Serrano's potential participation in the robbery. (Tr. 376-77; PSR ¶ 60).  Specifically, the defendant was supposed to be coming with "the cop," who would protect the Crew if something went wrong.  (Tr. 377).[3]  Once Moral informed other co-conspirators that a cop would be coming to robbery, they objected to the plan.  (Tr. 377-78).

---

[3] Serrano lived in the same building as a bail bondsman, who was another member of the Crew and whom Serrano represented to Moral was a police officer.  (*See* Tr. 297-99; 626-27).

Serrano was therefore not at scene of the January 9th Attempted Robbery. (*See* Tr. 377-78). However, phone records show that Javion Camacho and the defendant were in contact at the same time that Javion Camacho was in contact with the DEA informants, and cell site data shows that Javion Camacho was in the vicinity of the defendant's house on January 8, 2013, the day before the proposed robbery. (PSR ¶ 60). In particular, phone records showed that Javion Camacho spoke to the defendant immediately before and after a recorded planning meeting Camacho had on December 17, 2012. (GX 502B at 2). Javion Camacho and Serrano spoke 29 more times between the December 17 meeting and Javion Camacho's next recorded planning meeting on January 2, 2013. (GX 502B at 6). Between January 7, 2013 and January 9, 2013, the days and hours leading up to the January 9th Attempted Robbery, Javion Camacho and the defendant communicated an additional 28 times. (GX 502B at 7). Serrano also repeatedly tried to contact the Camacho brothers immediately after they were arrested that night by the DEA. (PSR ¶ 60).

Accordingly, the Government agrees with the Probation Office that Serrano should be held responsible for the heroin stolen during the Webster Avenue Burglary and the 20 kilograms of heroin the Crew attempted to steal during the January 9th Attempted Robbery. Based on the foregoing, his base offense level is 34 under the November 1, 2014 Guidelines because he is responsible for the equivalent of 10,000 to 30,000 kilograms of marijuana. (PSR ¶ 69).[4]

## 2.    Leadership Enhancement

Serrano should also receive an enhancement for his aggravating role in the offense. Pursuant to U.S.S.G. § 3B1.1(a), Serrano's base offense level should be increased by 4 levels

---

[4]    The offense level is the same whether the Court holds Serrano responsible for either the entire two kilograms stolen during the Webster Avenue Burglary or just the one kilogram Serrano received from the burglary.

because he was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. *See* U.S.S.G. § 3B1.1(a).

First, there is no question that Serrano was an organizer and leader of the Crew. He is, in fact, the highest-ranking member of the Crew that was arrested in this case. Serrano assigned work to Javion and Julio Camacho—two other high-ranking members—among other things, dispatching them to conduct surveillance on victims. (Tr. 303). Serrano provided guns to the Crew. (Tr. 309). Serrano planned the Crew's crimes and assigned its members their respective roles in particular offenses, such as during the October 14th Robbery. (Tr. 327-331). Serrano organized burglaries, such as the Planned Watch Burglary and the July 4th burglary detailed above. Serrano also portrayed himself as a leader, explaining to Moral that Serrano and Javion Camacho "had a shooter, a locksmith, and a team that did robberies." (Tr. 288-89). Indeed, Serrano told Moral that the Camacho brothers "worked for him." (Tr. 306). Serrano called the shots in this Crew and was undoubtedly one of its leaders. *See* U.S.S.G. § 3B1.1, Application Note 4 ("Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.").[5]

---

[5] The defendant draws the Court's attention to the sentence in the PSR stating that Javion Camacho was the "most culpable member of the conspiracy." (Def. Ltr. 6). However, the Sentencing Commission has made clear, "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *See* U.S.S.G. § 3B1.1, Application Note 4. Moreover, the Government gave its then-view of Javion Camacho to the Probation Office in connection with the Court's August 6, 2013 Order that the Government describe the relative culpabilities of all of the defendants charged in the Indictment at that time, in order to aid the Court with sentencing. (*See* Docket Entry #93). Serrano was arrested on

Second, there is no question that the offense involved five or more participants *and* was otherwise extensive (though only one of these facts is required for the enhancement to apply). These participants included, at a minimum: (1) the 5 men who participated in the October 14th Robbery; (2) the 13 additional robbers who participated in the January 9th Attempted Robbery; (3) Wilfredo Suarez, a/k/a "Black"; and (4) Michael Gamba. The scheme was also extensive. Over years, the Crew committed robberies in New York and New Jersey using such sophisticated means as the Police Car and affixing GPS devices to their victims' vehicles. The Crew stole and sold a panoply of drugs: marijuana, cocaine, and heroin. This was an extensive scheme by any measure.

Accordingly, Serrano's base offense level should be increased from 34 to 38, which, after factoring in the defendant's Criminal History Category of IV, results in a Guidelines range of 324-405, to be followed by the mandatory and consecutive term of imprisonment of seven years' imprisonment on the gun count—for a total range of 408 to 489 months' imprisonment.

## V.     Analysis of 3553(a) Factors

A sentence within the Guidelines range of 408 to 489 months is necessary to reflect Serrano's history and characteristics and the seriousness of the offense and to provide just punishment. Serrano must be incapacitated for a lengthy period of time if there is to be any hope of protecting the community.

Serrano has been on a crime spree since he was a teenager, committing gun offenses, theft offenses, and violent crimes (including, among other things, domestic violence against the mother of one of his children). This is not even his first federal firearms conviction. Yet he went on undeterred to commit the instant serious offenses. He led a massive violent armed

---

August 1, 2013 and indicted on September 3, 2013. Accordingly, he was not even included in the Government's response to the Court's Order.

robbery and burglary crew operating in multiple states.   He supplied the Crew's guns.   He organized and managed each person's role in the Crew.   And he used the specter of law enforcement to frighten victims into submission.   This was graphically displayed by the trial testimony of the victims of the October 14th Robbery who testified about the terror they felt during and after the robbery.   The defendant's impersonation of law enforcement adds another layer of risk to public safety and threatens to erode public trust in the police.   At the same time, the narcotics trafficking business itself inherently creates a danger to the community and degrades the quality of life for those who are affected by it.   Heroin, cocaine, and marijuana can and do destroy the lives of those who become addicts.   And, as amply demonstrated by the facts of this case, the drug trade stokes violence and other crimes.

In support of his request for a 12-year sentence—a downward variance even from the drastically low Guidelines range he proposes—Serrano suggests that he is a community leader and a family man.   But the record in this case shows the opposite.   The Government does not dispute that he loves his son and wife,[6] but by his actions Serrano has shown that he is willing to put his criminal interests above even his own family.   Serrano sold drugs and guns out of the home that he shared with his family, putting them at great risk.   Serrano had a robbery planning meeting with Moral at the little league field where he coaches his son's team.   One of Serrano's meetings with CI-1—on July 28, 2013 where they discussed burglarizing an individual of cash and watches, among other things—was also in the vicinity of his son and wife.   Serrano was going to commit this particular burglary while the victim was praying at mosque.   Contrary to

---

[6] In addition to the son he lives with, Serrano has two children with which he has no contact.   He has not even met one of these children, but expresses that he is "not really concerned about it" because the child was borne out of a casual sexual relationship.   (PSR ¶ 116).

Serrano's representations, the evidence shows that Serrano treats others callously, putting his own interests and the interests of his Crew before his community and his family.

Serrano also argues that unwarranted sentencing disparities would result if he were sentenced to more than 12 years' imprisonment.   Again, the opposite is true—unwarranted disparities would result if Serrano was *not* given the highest sentence in this case.   It goes without saying that Serrano should not be unduly penalized for exercising his constitutional right to a trial.   At the same time, however, he is not similarly situated to those defendants who pled guilty and accepted responsibility for their crimes.   To this day Serrano claims his innocence in even after the overwhelming evidence of his guilt introduced at trial.   His continued lack of remorse demonstrates that he is someone who must be deterred and incapacitated from committing future crimes.

It is useful to compare Serrano to Javion Camacho—who could be considered Serrano's second-in-command—and to Louis Borrero, a lower-level member of the Crew who also failed to accept responsibility for his actions.   Camacho received a sentence of 21 years—which included a 4-point leadership enhancement—after pleading guilty.   Borrero received a sentence of 27 years after going to trial.   A Guidelines sentence of 408 to 489 months, which is 34 years to 40 ¾ years, for Serrano would appropriately reflect his role in the Crew—similar to Javion Camacho but greater than Borrero—and his failure to accept responsibility—unlike Javion Camacho but similar to Borrero.

Serrano was a menace to his community.   Over the years, he has received countless chances to change his ways—even during a previous stint in federal prison.   But his life history presents a picture of someone whose criminal activity is escalating—from noise complaints to gun possession to armed robberies—despite the evident support of his family.   Serrano has done

nothing to warrant another break.  To the contrary, if there is to be any hope of protecting the community and preventing future crimes, Serrano must be incapacitated.  A sentence within the Guidelines range would be sufficient but not greater than necessary to accomplish this goal and the statutory goals of sentencing.

## VI.    Conclusion

For the foregoing reasons, the Government respectfully submits that the Court impose a sentence within the Guidelines range calculated by the Government.

Dated: New York, New York
        January 2, 2015

                                        Respectfully submitted,

                                        PREET BHARARA,
                                        United States Attorney for the
                                        Southern District of New York,
                                        *Attorney for the United States of America*


                            By:    ___/s/_____
                                        Rachel Maimin/Rahul Mukhi
                                        Assistant United States Attorneys
                                        (212) 637-2460/1581