UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                  :

ANTHONY SERRANO,                   :
                     Petitioner,      :

                                :          17-cv-6444 (KBF)
               -v-                 :          13-cr-0058 (KBF)
                                :

UNITED STATES OF AMERICA,     :      OPINION & ORDER
                                :
                   Respondent.    :
-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 5, 2018

KATHERINE B. FORREST, District Judge:

Anthony Serrano, currently incarcerated at F.C.I. Butner, brings a petition under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. Serrano was sentenced on February 21, 2014 to 150 months of incarceration for narcotics trafficking under 21 U.S.C. § 846; conspiracy to commit Hobbs Act robbery under 18 U.S.C. § 1951; and for use or carry of a firearm under 18 U.S.C. § 924(c)(1)(A)(i). Serrano puts forth four bases for his petition: vagueness under Johnson; improper sentencing based on drug quantity; ineffective assistance of counsel; and jury tampering. For the reasons set forth below, the petition is DENIED.

I. BACKGROUND

    A. The Offense Conduct

On August 1, 2013, Serrano was arrested in connecting with an attempted robbery of narcotics traffickers. At a trial that occurred between June 16-20, 2014, it was determined that Serrano participated in the following robberies and burglaries:

- On July 4, 2012, several of Serrano's co-conspirators burglarized a narcotics stash house in Jersey City, New Jersey, which one particular co-conspirator (CC-l) knew had kilograms of cocaine and cash. During that burglary, approximately $50,000 in cash was stolen, as well as a bag which a co-conspirator believed contained kilograms of cocaine. Serrano organized and directed the burglary, though he was not present for it. (Pre-Sentence Investigation Report ("PSR") ¶ 55.)

- In October 2012, several of Serrano's co-conspirators stole approximately two kilograms of heroin from an apartment in the vicinity of Webster Avenue in the Bronx, New York. Following the burglary, Serrano agreed to resell one kilogram of the heroin that had been stolen. (Id. ¶ 56.)

- On October 14, 2012, in New York, New York, Serrano and several co-conspirators robbed two men in a van, whom they believed possessed approximately two kilograms of cocaine. Cell site location evidence placed Serrano in the vicinity of the robbery when it occurred. However, rather than interacting with the victims, Serrano blocked off the street where the robbery was taking place with his car, preventing the victims from leaving and anyone else from interrupting the robbery. While Serrano waited down the block, his co-conspirators pulled the victims over in a fake police car, brandished a gun, and carjacked the van. After the robbery, the crew reconvened in Keamy, New Jersey, and searched the van for a hidden compartment with the cocaine, which they did not find. (Id. ¶ 57.)

2

- In late 2012, Serrano agreed with a co-conspirator to rob a van known to carry large amounts of drug money. Serrano sent two others to conduct surveillance and ultimately attach a GPS device to the van. The Crew never actually committed this robbery. (<u>Id.</u> ¶ 58.)

- In late 2012, Serrano agreed with a co-conspirator to rob a marijuana dealer in Edgewater, New Jersey, of money and drugs. Again operating through proxies, Serrano sent others to conduct surveillance of the victim and attach a GPS to the victim's car. The Crew never actually committed the robbery. (<u>Id.</u> ¶ 59.)

- In December 2012, informants working at the direction of the DEA proposed a robbery to a co-conspirator, Javion Camacho, of approximately 20 kilograms of heroin. Camacho recruited others, Serrano to participate. Ultimately, Serrano did not participate in the January 2013 Robbery because he was known to bring real police officers to robberies, and other members of the crew did not want real police at this robbery. Phone records showed that Camacho and Serrano were in contact at the same time that Camacho was in contact with the DEA informants about the 20 kilogram-heroin robbery; cell-site data showed that Camacho was in the vicinity of Serrano's house on the day before the proposed robbery. Immediately after Camacho and other members of the crew were arrested at the scene of the January 2013 Robbery, Serrano repeatedly tried to contact Camacho and Camacho's brother, Julio, both of whom attempted to commit the robbery that night. (<u>Id.</u> ¶ 60.)

At sentencing, as described below, the Court found by a preponderance of the evidence that Serrano was responsible for conspiring to distribute and possess with intent to distribute at least twenty-two kilograms of heroin and two kilograms of cocaine. (Id. ¶ 62.)

B.  Pre-Trial Proceedings

From the date of Anthony Serrano's arrest (August 1, 2013), he was represented by Cesar De Castro, who was appointed pursuant to the Criminal Justice Act. De Castro brought Valerie Gotlib on as an associate on September 13, 2013. (See ECF No. 114.)

On January 6, 2014, Serrano was charged in a Third Superseding Indictment (the "S3 Indictment"), which charged him participating in a conspiracy, from at least in or about 2012, up to and including on or about July 31, 2013, to distribute or possess with the intent to distribute a controlled substance, in violation of 21 U.S.C. § 846 (Count I). Count I alleged that the controlled substances involved in the offense were: (a) one kilogram and more of heroin, in violation of 21 U.S.C. § 841(b)(1)(A); and (b) 500 grams and more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(B). The S3 Indictment also charged Serrano with participating in a conspiracy to commit Hobbs Act robbery during the same timeframe, in violation of 18 U.S.C. § 1951 (Count II) and with carrying, using, or possessing a firearm, which was brandished in the course of, or aided and abetted, the crimes charged in Counts One and Two, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Count III). (ECF 294.)

4

Trial was initially set for February 3, 2014. (See ECF No. 283.) However, in response to a request from defense counsel, the trial was adjourned to June 16, 2018 to accommodate their request for more time to review discovery. (See ECF No. 314.) On May 29, 2014, the Court received an unsigned letter from Serrano in which he expressed "deep concerns" due to De Castro's "lack of confidence in my case." (ECF No. 409.) The Court held a conference to discuss the contents of this letter on June 2, 2014. At that hearing, the Court had the following colloquy with Serrano:

> THE COURT: All right. Let me ask you, have you been meeting with Mr. De Castro and Ms. Gotlib about your case?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And have you been able to talk about your defense and evidence that the government has and evidence that you might be able to present?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And have you been discussing with your counsel the strengths and the weaknesses of your case?
>
> THE DEFENDANT: Yes.
>
> THE COURT: All right. And you understand that there will be a time, which you'll work out with your lawyer, where you'll make a decision— and it's your decision—as to whether or not you want to testify in your own defense at trial. Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And do you understand that it will be ultimately your decision as to whether or not you testify?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And you'll talk with your lawyers about that, and your lawyers will give you their best advice on that topic. But, ultimately, you know, it's your decision. Right?

THE DEFENDANT: Yes.

THE COURT: All right. And let me just ask also, have there been plea offers extended to Mr. Serrano? And I just want to make sure they've also been conveyed, et cetera, et cetera.

THE GOVERNMENT: There was one written plea offer extended to the defendant. I believe it was in the fall of last year, of 2013. That offer, our understanding, was conveyed to Mr. Serrano by his counsel and was rejected, and since that time there have been no other offers.

THE COURT: All right. And, Mr. De Castro, that offer, that written offer, plea offer was extended to—

MR. DE CASTRO: Yes.

THE COURT:—Mr. Serrano?

MR. DE CASTRO: We discussed that.

THE COURT: All right. So, Mr. Serrano, you understand you have been given a plea offer by the government, and it's your choice, of course, whether to accept or reject it?

THE DEFENDANT: Yes.

THE COURT: All right. Now, I think that I just want to be sure, Mr. Serrano, that there is nothing you want to raise with the Court about Mr. De Castro's representation. And, in particular, I don't want to learn later on after the trial that you were secretly harboring concerns right now. If you got any concerns, I want you to raise them.

THE DEFENDANT: No. We shelved it. We moved on. Confidence is there, so I'm ready to proceed.

(June 2, 2014 Hr'g Tr. at 3-5.)

   C. The Trial

On June 16, 2014, Serrano's trial commenced. It concluded on June 20, 2014, when the jury found Serrano guilty on all counts. However, with respect to Count One, the jury found that while the Government had proven beyond a reasonable

6

doubt that Serrano conspired to distribute 500 grams or more of cocaine, the Government had not proven beyond a reasonable doubt that Serrano conspired to distribute either one kilogram or more of heroin, or the lesser included amount of 100 grams or more of heroin.

Serrano's participation in the various robbery and burglary conspiracies is outlined in the previous Section. The Government's proof at trial included: (1) testimony from Victor Moral ("Moral"), a cooperating witness who testified that he participated in the Crew with Serrano; (2) testimony from the two victims of the October 14th Robbery, Erickson Gilbert ("Gilbert") and Escarly Ynfante ("Ynfante"); (3) testimony from DEA Special Agent Todd Riley, who oversaw the investigation of the Crew and arrested several of the Crew members during an attempted robbery on January 9, 2013; (4) testimony from law enforcement officers employed by the Hudson County Prosecutor's Office ("HCPO") and the Jersey City Police Department regarding undercover purchases of heroin from Serrano in December 2012 and January 2013; (5) Serrano's phone records showing his contacts with other members of the Crew during the course of the charged conspiracies; and (6) cell-site location evidence showing that, among other things, Serrano was at the scene of the October 14th Robbery with other members of the Crew.

At trial, three witnesses provided testimony as to the brandishing charge which stemmed from a robbery on October 14, 2012. The first was Victor Moral, a cooperating witness and fellow Crew member who participated in that robbery alongside Serrano and his co-defendants Javion Camacho and Alex Cespedes. The

other two witnesses were the October 14, 2012 robbery's victims, Erickson Gilbert and Escarly Ynfante.

Moral provided testimony both as to the preparations for the robbery and the general sequence of events during the robbery itself. Regarding the preparations, Moral testified that when the Crew was planning the robbery, Serrano told Moral that he had guns he would bring; and that before the robbery began, Serrano handed a bag containing a handgun to a "skinny kid," who then handed it to Moral, who in turn handed it off to Camacho. (Trial Tr. 309, 323-26, 339.)

As to the robbery itself, Moral testified that to perpetrate the robbery Camacho and Cespedes used a fake police car and impersonated police officers. (Id. 309.) They pulled over the victims' vehicle and asked them, in an authoritative tone, for their license and registration. (Id. 346.) Camacho and Cespedes then walked the victims from their vehicle toward the fake police car; as they did so, Moral jumped in the victims' vehicle and drove off. (Id. 346.)

Gilbert similarly testified that during the robbery he was pulled over by the fake police car, which had its lights and sirens on. (Id. 656.) One of the robbers then said to Gilbert, "Get the fuck out of the car. FBI. Police." (Id. 656.) Gilbert was then slammed against the car and searched. (Id. 656-57.) One of the robbers jumped in Gilbert's vehicle and drove away. (Id. 657-58.) After the other robbers took off, Gilbert testified that he said to himself, "This is really strange. The police don't do that." (Id. 657.) A bystander later asked him what happened, and he said

8

"I don't know what happened. I don't think it was the police; I think it was something else." (Id. 657.)

Moral, Gilbert, and Ynfante each provided testimony relevant to whether a firearm was used or carried during the robbery. Moral testified that Camacho was wearing "a police vest . . . handcuffs, a gun and a badge," and that a handgun was strapped into the vest. (Id. 344-45.) According to Moral, the handgun's handle was visible. (Id. 345.)

Gilbert testified that during the robbery one of the robbers was wearing a bullet-proof vest and "was clutching at something under his arm . . . where his vest was," and this gesture made him think the robber had a gun. (Id. 656, 658.) In response to the question "Now, did you notice anything that you thought might be a weapon?" Gilbert stated "I never saw the weapon, but he had this bulge here and he wanted to do this: Police. Police. Get out of the car." (Id. 658.) When speaking to the police after the robbery, Gilbert "told them it was a gun but [he] didn't see it." (Id. 661.)

Ynfante testified that she did not actually see a gun, but she noticed something that she thought might be a weapon, and when asked to elaborate as to what that something was, she specified that it was "a black bulge" in an area where "they usually get their gun." (Id. 676.) She also testified that the thing that she thought might be a gun was located "around the waist . . . on the right side." (Id. 676.)

Moral, Gilbert, and Ynfante also each provided testimony relevant to the question of whether the members of the Crew who participated in the robbery intended to intimidate, or actually did intimidate, the victims. Moral testified that during the Crew's robberies, members of the Crew "sometimes" were "armed" with "[a] handgun." (Id. 263.) He also testified that he or other Crew members had carried a handgun during robberies "[s]o [they] could intimidate the people [they] were robbing." (Id. 263.)

Gilbert testified that he was scared during the robbery "because anything could have happened. Anything." (Id. 659.) When asked how he felt when he saw the man wearing the police vest reach to his side, he testified: "I couldn't speak. I had never been involved in an event like that. And I felt even worse knowing that my two little girls had been in the van minutes—like a little over an hour before." (Id. 659.) Ynfante testified that throughout the entire robbery she was "very nervous." (Id. 679.)

With respect to Count One, the jury found that the Government had proven beyond a reasonable doubt that Serrano had conspired to distribute 500 grams or more of cocaine, but that it had not proven beyond a reasonable doubt that Serrano had conspired to distribute either one kilogram or more of heroin, or the lesser included amount of 100 grams or more of heroin. With respect to Count Three (the firearms charge), the jury was instructed that: (1) the Government was required to prove beyond a reasonable doubt that Serrano carried a firearm "during and in relation to a crime of violence or drug trafficking crime" (id. 857); (2) as a matter of

10

law, Count One (narcotics conspiracy) qualified as a drug trafficking crime and Count Two (robbery conspiracy) qualified as a crime of violence (id. 857); and (3) in order to convict Serrano of Count Three, the jury had to be "unanimous as to whether it was the drug trafficking crime charged in Count One or the crime of violence charged in Count Two or both that the defendant used or carried a firearm during or and in relation to or possessed a firearm in furtherance of or aided and abetted the same" (id. 857). The verdict form (ECF No. 440) did not ask the jury to specify whether it was unanimous as to the drug trafficking crime, the crime of violence, or both.

### D. Post-Trial Proceedings

After trial, De Castro sent a letter on August 4, 2014 to the Court requesting that new CJA counsel be appointed to represent Serrano, due to a "fundamental disagreement with respect to how to proceed with his post-trial litigation."[1] (ECF No. 457.) On September 3, 2014, the Court held a conference to discuss this letter, at which another CJA attorney, Natali Todd, was present. The following colloquy took place:

> THE COURT: What I'd like to do is figure out what the issues are and what the report is. Who is best to start here?
>
> MS. TODD: I will, your Honor, and I'll try not to get into too much detail, unless the Court requires it, because I think the issue is really moot at this point, having spoken with Mr. Serrano.

---

[1] As explained below, it is now clear—and highly relevant to the instant petition—that at least one disagreement between Serrano and De Castro centered around De Castro's refusal to bring a jury tampering claim during post-trial motions or sentencing.

THE COURT: All right.

MS. TODD: I met with Mr. Serrano. There was an issue that he thought was important for his post-trial motions. I spoke with Mr. De Castro on Friday briefly to get a sense of what was happening, and then I spoke with two attorneys whose clients might have some information, and based on the information that the attorneys provided to me, I then met with Mr. Serrano at length yesterday morning. It is my understanding that he fully understands what the issue is, and I don't believe it's a problem going forward. And he is satisfied with Mr. De Castro on all other fronts.

THE COURT: All right. Mr. De Castro, do you believe that there is a current communication issue between you and Mr. Serrano? And Mr. Serrano, I'm going to turn to you and ask you for your views, sir.

MR. DE CASTRO: Well, Judge, again, not to get into too much detail about the issue, but a particular issue came up where Mr. Serrano and I were having a sort of fundamental disagreement, which is why I wrote the letter that I did, and that was after multiple meetings and discussions regarding a potential post-trial issue, and at that point, I think we both agreed that we just weren't working on this issue together; I did not want to do one thing, he wanted me to do it. So I wrote the letter and I didn't interfere with this process, so I haven't even spoken to Mr. Serrano since. I mean, I saw him at the MCC briefly, but I haven't spoken to him about the issues since I wrote the letter, because I didn't want to interfere with his and Ms. Todd's conversation on what he wanted to do going forward. My concern, as I said to him before I wrote the letter, is that it was a particular issue that I don't want him, after I do not raise the particular issue, to regret it and to be living with this and constantly be thinking "I should have done this, I should have done this, I tried," and it's going to be wasted additional litigation later on, maybe in the Court of Appeals if he wants me off the case, those kinds of things. I just saw it coming down the road. I didn't want him to be OK with what I said now and then later on regretting it and wanting to go forward. And he understood that, and that's when we both agreed that we would make the application. As to what his feelings are today, I think you have to ask him. Other than that, that's where I stand.

THE COURT: All right. And I will ask Mr. Serrano, but it sounds like, and I don't want to know the details, some form of strategic issue, which does happen between counsel and the client, and essentially two lawyers have now spoken with Mr. Serrano and given Mr. Serrano

their views.  What is your view, Mr. Serrano?  Do you believe that at this point in time you do not have effective communication with Mr. De Castro, and are you seeking today to change counsel?

THE DEFENDANT: Yes. I'm happy with Mr. De Castro.  I just wanted a second opinion, because he didn't want to do what I wanted to do, and I found out it was probably wrong, so I have no problem with Mr. De Castro.

THE COURT: All right. I think Mr. De Castro made a good point, you understand that once you make this decision—I don't know what the issue is, I don't want to know what the issue is—once you make this decision, you'll be proceeding with Mr. De Castro for the post-trial motions and down the road you won't be able to say that you had ineffective assistance from Mr. De Castro because he didn't raise an issue that is on the table right now.  Do you understand?

THE DEFENDANT: Yes, that issue, I understand: Can it be brought up down the line? If he don't file now, you can't file later, I was told.

THE COURT: So you know it's out the window and you know it can't be brought up later, is that right?

THE DEFENDANT: Yes.

THE COURT: And understanding that, it's your view that you would willingly like to proceed with Mr. De Castro.

THE DEFENDANT: Yes.

THE COURT: All right. That sounds consistent with what Ms. Todd had stated, which is that the issue may now be moot that had been raised.

(Sept. 2014 Tr. at 2-5.)

On October 24, 2014, Serrano filed post-trial motions, which were denied on January 6, 2015.  (ECF No. 506.)  On January 9, 2015, Serrano was sentenced to 264 months' imprisonment.  Serrano's appeal, which did not raise the issue of jury tampering, was denied by the Second Circuit on March 28, 2016.  (ECF No. 568.)

On August 23, 2017, Serrano filed the instant motion to vacate his sentence. The next day, the Court ordered the Government to respond, (ECF No. 631), and, because he alleges jury tampering, ordered Serrano to (1) provide the Government and the Court with any purported evidence and (2) refrain from contacting any jurors until further order of the Court. (ECF No. 632.) The Court also ordered Serrano to execute and return an Attorney-Client Privilege Waiver, (ECF No. 631), which he did on October 6, 2017, (ECF No. 633). On March 8, 2018, the Government submitted its opposition to this motion, (ECF No. 650), and Serrano's counsel submitted an affidavit on May 22, 2018, (ECF No. 652). Because the Court never received a reply memorandum from Serrano, the Court issued an Order notifying the parties that it considered the matter fully briefed as of April 19, 2018. (ECF No. 651.)

## II.  GENERAL LEGAL PRINCIPLES

### A.  <u>Pro Se Habeas Petitions</u>

A petition to vacate, set aside or correct a sentence requires Serrano to show "that the sentence was imposed in violation of the Constitution or laws of the United States, . . . or is otherwise subject to collateral attack." 28 U.S.C. § 2255. <u>Pro se</u> litigants are "entitled to a liberal construction of their pleadings, which should be read 'to raise the strongest arguments that they suggest.'" <u>Green v. United States</u>, 260 F.3d 78, 83 (2d Cir. 2001) (quoting <u>Graham v. Henderson</u>, 89 F.3d 75, 79 (2d Cir. 1996)). Nevertheless, a Court may dismiss a petition under § 2255 without requiring a government response if "it plainly appears from the

motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief." Fed. R. Governing Sec. 2255 Proceedings for the U.S.D.C. 4(b); see also id. 5(a) ("The respondent is not required to answer the motion unless a judge so orders.").

III. JOHNSON CLAIM

A. Legal Principles

In 2015, the Supreme Court held that the residual clause of the Armed Career Criminal Act ("ACCA") violates the Constitution's guarantee of due process because it is unconstitutionally vague. Johnson v. United States, 135 S. Ct. 2551 (2015). The clause at issue defined "violent felony" to include any felony that "otherwise involves conduct that presents a serious potential risk of physical injury to another." Id. at 2555 (quoting 18 U.S.C. § 924(e)(2)(B)). The Court determined that the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." Id. at 2557. If a statute is held to be void for vagueness, then a criminal defendant may have his or her conviction overturned. See, e.g., id.

B. Discussion

Serrano argues that the Court should vacate his sentence on the firearms offense (Count III) because robbery conspiracy is not a crime of violence under Johnson. However, Serrano's convictions "are clearly supported by a narcotics predicate." United States v. Vasquez, 672 F. App'x 56, 61 (2d Cir. 2016). The jury found Serrano guilty of the narcotics conspiracy beyond a reasonable doubt.

15

Accordingly, the Court need not reach the <u>Johnson</u> question, and may dismiss Serrano's challenge to the firearms offense.

IV.   INEFFECTIVE ASSISTANCE OF COUNSEL

A. <u>Legal Principles</u>

To prevail on a claim of ineffective assistance of counsel, Serrano "must [first] show that counsel's representation fell below an objective standard of reasonableness," as measured against "prevailing professional norms." <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984).  In addition, petitioner must demonstrate that counsel's "deficient performance prejudiced the defense," <u>id.</u> at 687, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," <u>id.</u> at 694.

As to the first prong of <u>Strickland</u>, attorney conduct is subject to an objective standard of reasonableness, and is accorded deference in light of the "range of legitimate decisions" that accompanies the various circumstances encountered by counsel.  <u>Id.</u> at 688-89.  As a result, reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that there are countless ways to provide effective assistance in any given case and that even the best criminal defense attorneys would not defend a particular client in the same way." <u>United States v. Aguirre</u>, 912 F.2d 555, 560 (2d Cir. 1990) (alterations and internal quotation marks omitted) (quoting <u>Strickland</u>, 466 U.S. at 689).

As to the second prong of <u>Strickland</u>, a petitioner must show that, but for his or her attorney's deficient performance, there is a reasonable probability that the result would have been different. <u>Strickland</u>, 466 U.S. at 694. More is required than a mere showing "that the errors had some conceivable effect on the outcome of the proceeding," as "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." <u>Id.</u> at 693.

Under <u>Strickland</u>, "strategic choices made [by counsel] after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." <u>Id.</u> 466 U.S. at 690–91. "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." <u>Henry v. Poole</u>, 409 F.3d 48, 63 (2d Cir. 2005) (quoting <u>Strickland</u>, 466 U.S. at 689). A "lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision." <u>Greiner v. Wells</u>, 417 F.3d 305, 319 (2d Cir. 2005) (quoting <u>DeLuca v. Lord</u>, 77 F.3d 578, 588 n.3 (2d Cir. 1996)). "The likelihood that an affirmative defense will be successful at trial and an assessment of the probable increase or reduction in sentence relative to the plea if the defendant proceeds to trial are clearly relevant to the determination of whether an attorney acted competently in recommending a plea." <u>Panuccio v. Kelly</u>, 927 F.2d 106, 109 (2d Cir. 1991).

B. Discussion

Serrano's ineffective assistance of counsel claim alleges that De Castro did not properly discuss the plea offer with him. Specifically, he claims that De Castro would not discuss his case or the evidence against Serrano until Serrano made a decision about the plea offer, and that De Castro called him "stupid" and said he "better take the plea." However, Serrano's allegations, which are not supported with evidence, are belied by the record and by De Castro's sworn affidavit. (ECF No. 653.)

As described earlier, Serrano was asked by the Court whether plea offers had been made; he agreed that there had been one, which he rejected. The Court specifically asked whether Serrano wanted to raise any issues with his counsel, warning him that he should not "secretly harbor[] concerns." (June 2, 2014 Hr'g Tr. at 5.) Serrano answered: "No. We shelved it. We moved on. Confidence is there, so I'm ready to proceed." (Id.) The Court does not now credit Serrano's self-serving assertions in his petition over his in-Court statements just before trial.

Additionally, De Castro's affidavit explains that the Government sent a proposed plea agreement on November 26, 2013, which he discussed with Serrano; at seven meetings between November 26, 2013 and May 19, 2014, De Castro and Gotlin discussed "the pros and cons of accepting a plea offer versus . . . proceeding to trial." (ECF No. 653 ¶ 12.) In either December 2013 or January 2014, Serrano directed De Castro to reject the plea offer, which he did. After this and after the Government filed the S3 Indictment, De Castro again discussed a plea with Serrano

18

and with the Government, but the Government was only willing to make an offer with a stipulated advisory Guidelines range of about 15 years. (Id. ¶ 15.) De Castro and Gotlib also visited Serrano after one of his co-defendants was sentenced to 60 months to explain why proceeding to trial would likely result in a significantly longer sentence. (Id. ¶ 17.) They also explained what they saw as the advantages of a plea. (Id. ¶ 18.) Serrano, however, did not want to take a fifteen-year sentence and was "adamant that he would not take a plea deal." (Id. ¶¶ 20-21.)

Based on this evidence, the Court is persuaded that De Castro and Gotlib provided "objectively reasonable advice about the decision to plead guilty." United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998). Accordingly, he cannot survive the first prong of Strickland, but even if he could, Serrano has not demonstrated prejudice. Serrano provides no evidence or allegations that he would have accepted plea offer but for De Castro's alleged errors.

## V. DRUG QUANTITY

### A. Legal Principles

A district court is required to "instruct the jury that drug quantity is an element of the offense that must be proved beyond a reasonable doubt." United States v. Delarosa, 314 Fed. App'x 331, 332 (2d Cir. 2008); see also United States v. McKenzie, 686 Fed. App'x 77, 80 (2d Cir. 2017). "If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as . . . reliev[ing] the [government] of its burden of persuasion on an element of an offense,

the potentially offending words must be considered in the context of the charge as a whole." Id. (quoting Francis v. Franklin, 471 U.S. 307, 315 (1985)).

B. Discussion

Serrano also argues that (1) the Court improperly failed to instruct the jury to make a finding as to drug quantity, and/or (2) his counsel was ineffective for failing to challenge the Court's instruction and for failing to raise it on appeal.[2]

The Court instructed the jury as follows:

> if you find that the defendant directly and personally participated in a jointly up undertaken drug transaction, he is personally responsible for the full quantity of drugs involved in that transaction, whether or not he knew the specific type or quantity involved in the transaction and whether or not the type and quantity were reasonably foreseeable to him. . . .
>
> In making your determination about type and quantity however, you should also include any other controlled substances, the conspiracy involved so long as the type and quantity were either known to the defendant or reasonably foreseeable to him and within the scope of the criminal activity that he jointly undertook. Reasonably foreseeable means that the defendant could have reasonably anticipated the type and quantity of drugs involved in the conspiracy. . . .
>
> Now, in the event you find that the government's proven beyond a reasonable doubt that the defendant is guilty of the crime charged in Count One, that's the narcotics conspiracy, then there are three more questions you have to answer concerning the quantity of the controlled substance that the defendant agreed to distribute with the other members of the conspiracy charged in Count One.
>
> Number one, did the government prove beyond a reasonable doubt that the defendant conspired to distribute or possess with intent to distribute one kilogram or more of heroin? So that has both the quantity and a type.
>
> Two, did the government prove beyond a reasonable doubt that the defendant conspired to distribute or possess with intent to distribute 100 grams or more of heroin?

---

[2] Serrano also claims, without providing evidence, that the actual innocence exception cures any procedural default.

Three, did the government prove beyond a reasonable doubt that the defendant conspired to distribute or possess with intent to distribute 500 grams or more of cocaine?

So, the first two relate to heroin. The last one relates to cocaine.

(Trial Tr. at 839:3-844:3.) In addition, the verdict form filled out by the jury specifically asked if they "unanimously find beyond a reasonable doubt that the defendant conspired to distribute or possess with intent to distribute" 1 kilogram or more of heroin, 100 grams or more of heroin, and 500 grams or more of cocaine. (EFC No. 440.) The jury only answered "yes" to the third option—500 grams or more of cocaine.

At sentencing, the Court found by a preponderance of the evidence that Serrano was in fact responsible for twenty-two kilograms of heroin and two kilograms of cocaine, and it applied a mandatory minimum sentence based on the cocaine. Serrano now argues that the application of the five-year mandatory minimum was improper because he and his co-conspirators could not have reasonably foreseen that they would possess two kilograms of cocaine, since no drugs were recovered in fact and his team only expected to obtain a share of the proceeds, rather than the full two kilograms.

As an initial matter, the jury instructions and the verdict form were both proper—the jury was required to find specific drug quantities beyond a reasonable doubt. Additionally, therefore, Serrano's counsel was not ineffective for failing to challenge the instruction or to raise it on appeal. Because the instruction was

entirely proper, it was certainly reasonable that De Castro did not challenge it. Thus, Serrano's challenges based on the jury instructions fail.

## VI.  JURY TAMPERING

### A.  Legal Principles

"In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal."  United States v. Thorn, 659 F.3d 227, 231 (2d Cir. 2011); see also Bousley v. United States, 523 U.S. 614, 621 (1998) ("Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." (internal quotations omitted)).  "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent.  Bousley, 523 U.S. at 622; see also Murray v. Carrier, 477 U.S. 478, 485-496 (1986); Wainwright v. Sykes, 433 U.S. 72, 87 (1977).

### B.  Discussion

Serrano argues that a juror was contacted during deliberations by the Government and that the communication influenced that juror and potentially others.  He claims that he hired a private investigator to speak with the juror and that he was in the process of securing other affidavits from non-juror witnesses.[3]

---

[3] As noted earlier, this Court prohibited Serrano from contacting any jurors and instructed him to provide any evidence of jury tampering to the Court and Government.  (ECF Nos. 632, 636.)  To date, Serrano has not provided such evidence.  The Second Circuit is "reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences. . . . [P]ost-verdict inquiries may lead to evil consequences: subjecting juries to

As an initial matter, the Court notes that this issue was not raised on appeal and is thus waived, as Serrano has demonstrated neither actual innocence nor cause and actual prejudice. Additionally, when Serrano raised jury tampering post-trial and claimed that two others had evidence, the Court appointed an additional CJA attorney, Ms. Todd, to investigate. She reported that neither Serrano's lawyers nor the lawyers for the others were aware of any evidence of jury tampering. Serrano then, as detailed above, explained to the Court that he was satisfied with De Castro, who had refused to raise jury tampering in the post-trial motions. The Court specifically asked Serrano whether he understood that he "down the road you won't be able to say that you had ineffective assistance from Mr. De Castro because he didn't raise an issue that is on the table right now," and that he knew "it's out the window and . . . it can't be brought up later." (Sept. 3, 2014 Hr'g Tr. at 5:7-15.) Serrano responded that he understood and wanted to proceed with De Castro. (Id. at 5:11-19.) Additionally, De Castro's affidavit states that Serrano did not object to the omission of juror misconduct allegations through post-trial motions, sentencing, and on appeal. (De Castro Aff. ¶ 35.) Accordingly, Serrano has waived his right to raise this issue now.

But in any case, Serrano has not come forward with "clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative

---

harassment, inhibiting jury room deliberation, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts. This court has consistently refused to allow a defendant to investigate jurors merely to conduct a fishing expedition." United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989) (internal quotations omitted).

impropriety has occurred," including after the Court ordered him to do so.

Ianniello, 866 F.2d at 543. Three court-appointed lawyers investigated this claim

thoroughly and found no evidence, (see De Castro Aff. ¶¶ 29-31); Serrano has not

brought any new facts to the table. The Court will not allow Serrano to engage in a

fishing expedition by contacting jurors or other witnesses when an investigation has

already occurred, which brought no evidence to light, and when Serrano failed to

produce any evidence, even after being ordered to do so by the Court.

As such, the Court cannot grant Serrano's petition on the basis of his jury

tampering claim.

VII. CONCLUSION

For the reasons set forth above, petitioner's § 2255 motion to vacate, set aside

or correct his sentence is DENIED. The Court declines to issue a certificate of

appealability, as Serrano has not made a substantial showing of a denial of a

federal right. See Matthews v. United States, 682 F.3d 180, 185 (2d Cir. 2012). The

Clerk of Court is directed to terminate Serrano's petition at 17-cv-6444ECF No. 1

and 13-cr-58 ECF No. 625 and to terminate 17-cv-6444.

SO ORDERED.

Dated:     New York, New York
           July 5, 2018

                                    _K___B.__Forrest_____
                                    KATHERINE B. FORREST
                                    United States District Judge

24

Copy to:
Anthony Serrano
No. 24637-050
F.C.I. Butner Low
Federal Correctional Institution
P.O. Box 999
Butner, NC 27509